Volume 1

Pages 1 - 164

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, JUDGE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )   No. 22-cr-276-JSC
                                )
ALLEN GESSEN,                   )
                                )
            Defendant.          )   San Francisco, California
_____)   Monday, May 1, 2023

**<u>TRANSCRIPT OF TRIAL PROCEEDINGS</u>**

<u>**APPEARANCES:**</u>

For Plaintiff:          ISMAIL J. RAMSEY
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                BY:  **ILHAM A. HOSSEINI**
                     **ALEXIS JAMES**
                     **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:          JODIE LINKER
                        Federal Public Defender
                        450 Golden Gate Avenue
                        Room 19-6884, Box 36106
                        San Francisco, California  94102
                BY:  **CANDIS MITCHELL**
                     **KARTHIK RAJU**
                     **DEPUTY FEDERAL PUBLIC DEFENDERS**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

PROCEEDINGS

1  **<u>Monday - May 1, 2023</u>**                                      **<u>8:17 a.m.</u>**

2                      **P R O C E E D I N G S**

3                              **-oOo-**

4      (The following proceedings were held outside of the

5  presence of the Jury)

6          **THE COURTROOM DEPUTY:**  Calling Criminal Action

7  CR-220276, USA versus Allen Gessen.  Counsel, please come to

8  the podium and state your appearances.

9          **MS. HOSSEINI:**  Good morning, Your Honor.  Ilham

10  Hosseini and Alexis James appearing on behalf of the United

11  States.

12          **THE COURT:**  Good morning.

13          **MS. MITCHELL:**  Good morning, Your Honor.  Candis

14  Mitchell and Karthik Raju on behalf of Mr. Gessen who is here

15  before the Court in custody.

16          **THE COURT:**  Good morning.  Good morning, Mr. Gessen.

17          **THE DEFENDANT:**  Good morning.

18          **THE COURT:**  And thank you to the marshals for bringing

19  Mr. Gessen this morning.

20      Okay, so while we are waiting for the jury -- and we don't

21  -- you should, soon, get an updated list on who showed up and

22  who didn't and also some -- those who didn't -- show up but

23  didn't complete the questionnaire will get paper copies brought

24  down.  But in the meantime, we should go over some things.

25      First, I want to -- the list of witnesses, potential

**PROCEEDINGS**

1    witnesses that I'm going to read to the jury and also show them

2    in a PowerPoint, I want to go over them with you and make sure

3    I have them correctly.

4         So it is FBI Agent Christopher Bognanno, FBI Agent

5    Benjamin -- is it Fierberg?  Fierberg?  Fierberg.  FBI Agent

6    David Peacock, FBI Agent David Rizzo -- and that is what I was

7    going call them, "FBI Agent" -- FBI Agent Ravi Shah; Concord,

8    Massachusetts Detective Sergeant Jeffrey Young; Michael

9    Portman; and Priscilla Chigariro?

10        **MS. HOSSEINI:**  Yes, Your Honor.

11        **THE COURT:**  Okay, and there is no problem with my

12   using her name at this point.

13        **MS. HOSSEINI:**  At this point, no, Your Honor.

14        **THE COURT:**  Okay.  Did I get everybody?

15        **MS. MITCHELL:**  Yes, Your Honor.

16        **THE COURT:**  Okay.

17        So the other thing I had is the case statement that the

18   parties stipulated that I read doesn't say that the murder

19   didn't happen.  And so our venire is going to be sitting here

20   thinking there was actually a murder, which I think could

21   actually change a lot.

22        So what I was going to propose is after I read that line,

23   "The government also alleges the defendant provided a gold coin

24   and sent the two wire transfers totaling approximately 23,000

25   as payment for the murder, the murder did not happen.  The

**PROCEEDINGS**

1  defendant has pled not guilty."

2      Do the parties agree to that?

3          **MS. MITCHELL:**  Yes, Your Honor.

4          **MS. HOSSEINI:**  Yes, Your Honor.

5          **THE COURT:**  All right.  Now, in terms of how we

6  actually do hardships and for-cause, what do you usually do?

7  Do you usually just come to sidebar?  We put the white noise

8  on?  Do I send the jury out to the hallway?

9          **MS. MITCHELL:**  I've done it both ways.  It depends on

10  where we are in the selection process.  If it's the natural

11  time for the break I've had the jurors go on break and then us

12  do the discussion during the break but if it's not an actual

13  time for a break I've just approached during sidebar.

14          **MS. HOSSEINI:**  Yeah, same, Your Honor.

15          **THE COURT:**  Okay.  All right.

16          **MS. HOSSEINI:**  I would just mention if Your Honor is

17  inclined to make an announcement, that during jury selection if

18  some of the jurors don't feel comfortable speaking about

19  something publicly, perhaps they can come and speak about it

20  privately.

21          **THE COURT:**  Yes.  No, yeah.  We always do that.

22  That's a good -- good point.  All right.  I will let Ms. Means

23  then and then Ms. Belle, we will just stay here, stay put, and

24  we'll come over here to sidebar so you -- I don't know if you

25  will need to move, at least you don't have to move to another

1    room.  We do have Judge Chesney's courtroom available but I

2    think that will take a lot of time for us to all go over there.

3    And we have a white noise that we can put on for that.

4        And then we'll see where we are, maybe with, when we get

5    to for-cause or peremptories, even, it will be a good break

6    time and I'll just send them out to the hallway.  Okay.

7            **MS. MITCHELL:**  Uh-huh.

8            **THE COURT:**  Ah.  One other thing.  I issued my written

9    order on the in limines.  I want to clarify, with respect to

10   the IRS incident, as I said, I think it's relevant or comes in,

11   in the event there is an entrapment defense.  But I won't know

12   if I'm going to -- if, A, if they're asserting it, B, if I

13   allow them to assert it, right, because they have to make a

14   prima facie showing.  So it doesn't come in, okay, you

15   understood that.

16           **MS. HOSSEINI:**  Yes, Your Honor.

17           **THE COURT:**  Just wanted to make that clear, it doesn't

18   come in unless and until I say it comes in.

19           **MS. HOSSEINI:**  Yes, Your Honor.

20           **THE COURT:**  Okay.

21           **MS. HOSSEINI:**  We have instructed the first witness

22   who's going to testify that the background is very limited.

23   He's essentially going to say: I had another investigation, I

24   was investigating other people for money laundering, one of

25   those people introduced Mr. Gessen to me.  And he is not going

**PROCEEDINGS**

1    to get into anything else.

2             **THE COURT:**  Perfect.

3             **MS. HOSSEINI:**  On direct.

4             **THE COURT:**  Okay, great.  So then what I'm going to do

5    is when they get in here, I have a little PowerPoint,

6    hopefully, go to the witnesses, talk about a criminal case,

7    identify the staff, see if anybody knows anyone, talk about the

8    schedule, see if that's impossible for everyone.  Let them know

9    we'll always be done in time for them to watch the Warriors,

10   Lakers, whatever it may be, since it's all West Coast, even a

11   5:00 p.m. game they will make.  And then we will put the 32.

12       Ada has it, so we will have there and back there, all,

13   I'll ask them just a few questions, I have about three, and

14   then we'll start, is it going to be you or Ms. James,

15   Ms. Hosseini?

16            **MS. HOSSEINI:**  I would do the voir dire, Your Honor.

17            **THE COURT:**  And then Ms. Mitchell.

18            **MS. MITCHELL:**  Uh-huh.

19            **THE COURT:**  About 20 minutes each.  And then

20   Ms. Means?

21            **THE COURTROOM DEPUTY:**  Yes.

22            **THE COURT:**  For the challenges we are just going to

23   come over here to sidebar.

24            **THE COURTROOM DEPUTY:**  Okay.

25            **THE COURT:**  And turn the white noise on.

**PROCEEDINGS**

 1          **THE COURTROOM DEPUTY:**  Okay.

 2          **THE COURT:**  Okay.  All right.  And in terms of, if we

 3   get to openings today -- hopefully we will -- have you -- do

 4   you exchange -- have you identified any demonstratives that you

 5   have?

 6          **MS. HOSSEINI:**  We are not going to use any,

 7   Your Honor.

 8          **MS. MITCHELL:**  I don't think we have any for ours

 9   either.

10          **THE COURT:**  Criminal case.  Great.  Okay.  All right.

11   So is there anything else we should discuss before we get to

12   the offer of proof as to Exhibit 14?

13          **MS. MITCHELL:**  As to Mr. Rizzo's testimony, I believe

14   that the Court had initially said that you were going to have

15   transcripts ordered but I think there's been clarification on

16   that.

17          **THE COURT:**  Yes.  Oh, thank you.  I forgot about that.

18   Right.

19       So when we came back and upon reflection we thought the

20   answer to that was we're going to stream Agent Rizzo's

21   testimony live next door.  So it's live, it's a partial closing

22   in the sense but we will have the people that we said could be

23   in this courtroom here but it will be streamed live so anyone

24   who is here, if there is anyone, can watch it from there but

25   from the neck down so the face will be obscured.

1      Apparently we don't have -- you can do it on Instagram; we

2   don't have the technological availability to blur the face.

3   Anyway.

4      So, so then we don't need the transcript because the

5   public has live access to the testimony as if they were in the

6   courtroom, they are hearing exactly the same thing.

7           **MS. MITCHELL:**  That will be fine by us.

8           **MS. HOSSEINI:**  Just regarding exhibits, Your Honor, we

9   did receive some redaction requests over the weekend from the

10   defense.  We are having our people work on them now.  And so at

11   the end of today or early tomorrow morning we'll do a quick

12   swap.

13      It only affects I think two exhibits.  We won't be needing

14   them today for selection or for the order, the foundational

15   hearing but I just wanted to explain that we'll do that

16   tomorrow morning if that's okay.

17           **THE COURT:**  Great.  And then, by 5:00 p.m., like

18   today, can you let Ms. Mitchell know -- I mean she knows now,

19   but confirm who the witness is that is testifying or witnesses

20   tomorrow.

21           **MS. HOSSEINI:**  Sure.

22           **THE COURT:**  And the exhibits you intend to use.

23           **MS. HOSSEINI:**  Yes, absolutely.  I think it is kind of

24   self evident but we'll do that.

25           **THE COURT:**  Great.  So then shall we, since we are

1  waiting for the jury, go with the offer of proof as to Exhibit

2  14?

3       MS. HOSSEINI:  Yes, Your Honor.  The United States

4  calls Special Agent Christopher Bognanno.

5       THE COURT:  Good morning, Agent.

6       THE WITNESS:  Good morning, Your Honor.

7       THE COURT:  Ms. Means, can you swear the agent.

8       **CHRISTOPHER BOGNANNO, GOVERNMENT'S WITNESS, SWORN**

9       THE COURTROOM DEPUTY:  Please state your name for the

10 record.

11      THE WITNESS:  Christopher Bognanno.

12      THE COURT:  Thank you.  Agent, you may be seated.

13 You may proceed.

14      MS. HOSSEINI:  Thank Your Honor.

15                  **DIRECT EXAMINATION**

16 BY MS. HOSSEINI

17 Q   Good morning, Agent Bognanno.

18 A   Good morning, ma'am.

19 Q   Can you please tell us where you work?

20 A   The FBI.

21 Q   How long have you been at the FBI?

22 A   Approximately seven years and nine months.

23 Q   Can you tell us a little bit about your current position,

24 just in general, your responsibilities, your job?  What do you

25 do?

BOGNANNO OFFER OF PROOF - DIRECT / HOSSEINI

1    **A**    Sure, I'm a Special Agent with the FBI.  I work violations

2    of trans-national organized crime, focused primarily on Eastern

3    European, Asian and Russian organized crime.  So for example I

4    work violations of money laundering, human trafficking, drug

5    trafficking, arms trafficking.  Extortion.  Bribery.  These

6    kinds of things.

7    **Q**    All right.  Now, directing your attention to June, 2022,

8    did you participate in an investigation involving Allen Gessen?

9    **A**    Yes, I did.

10    **Q**    How did that come about?

11    **A**    That came about primarily through a different

12    investigation happening at the exact same time.

13    **Q**    Tell us a little bit about that.

14    **A**    The main target of that investigation, one of the main

15    targets Aleksei Kiselev, introduced the undercover agent, one

16    of the undercover agents in the investigation to Mr. Gessen.

17    **Q**    And what was the purpose of that introduction?

18    **A**    The purpose was to assist Mr. Gessen in at first a bribery

19    and extortion scheme and then later on in 2022, the purpose was

20    with a different undercover agent to assist Mr. Gessen with an

21    issue involving his ex, his ex-wife.

22    **Q**    What kind of help was Mr. Kiselev seeking for Mr. Gessen?

23    **A**    Initially Mr. Kiselev was asking the undercover agent to

24    assist, so the undercover agent's role, his legend, was such

25    that he purported to have contacts in the U.S. government who

BOGNANNO OFFER OF PROOF - DIRECT / HOSSEINI

1    were open to being bribed.

2        And Mr. Kiselev asked if the undercover agent could assist

3    Mr. Gessen in bribing a U.S. government official in order at

4    the time to have his wife deported from the United States.

5    **Q**    Some kind of immigration official?

6    **A**    Correct, USCIS.

7    **Q**    And tell me a little bit about what your role in that

8    investigation is.

9    **A**    So I was one of the case agents in the investigation,

10   which means that I was in charge of managing the entire

11   investigation, of preserving and reviewing evidence, of setting

12   strategic aims and objectives, managing the undercover agents,

13   pursuing the investigation to the point that we would

14   eventually, if appropriate, have a law enforcement action, as

15   an arrest or indictment, something like that.

16   **Q**    You said you were one of the case agents.  Was there

17   another one?

18   **A**    Yes, there was.

19   **Q**    Who was that?

20   **A**    Special Agent David Peacock.

21   **Q**    Okay.  And so you are both co-case agents on this

22   investigation?

23   **A**    Yes, ma'am.

24   **Q**    Tell us a little bit about some of the investigative steps

25   you guys took.

1    **A**    Okay.  So the investigative steps began with looking at

2    the potential for a crime, investigating the targets.

3    Collecting evidence through undercover agents or through search

4    warrants or any other type of a -- of our investigative methods

5    in order to assess if there was criminal activity or if there

6    is criminal activity ongoing, and take steps to attempt to

7    collect evidence against the targets and eventually make the

8    arrest.

9    **Q**    Did there come a time when Mr. Gessen met with the

10   undercover agents?

11   **A**    Yes.

12   **Q**    Were you involved or were you present during any of those

13   meetings?

14   **A**    Yes.

15   **Q**    How were you present?  Where were you?  Were you on the

16   scene?

17   **A**    Yes.  So myself and other FBI agents who are not

18   undercover agents would be on the scene for any major

19   investigative step such as an undercover operation so the

20   undercover operation would take place in whatever area.

21        The undercover agent would meet with Mr. Gessen and the

22   FBI agents, my co-case and I and others would be in the area to

23   ensure safety of the undercover agent to manage the entire

24   operation, to hear what was happening, and obviously collect

25   the evidence, whether that be a recording or photographs or

1  anything of that nature.

2  **Q**   And so let's talk about the June 2022 meetings and we will

3  not get into the May, 2021 undercover meetings for now, so

4  let's just stick to the June, 2022 meetings.

5      How many meetings were there with an undercover agent, an

6  undercover and Mr. Gessen in June of 2022?

7  **A**   Two.

8  **Q**   Were you present or on the scene for those two meetings?

9  **A**   Yes.

10  **Q**   Where was the first meeting?

11  **A**   The first meeting was in Boca Raton, Florida.

12  **Q**   The second meeting?

13  **A**   New York City, New York.

14  **Q**   Okay.  And so earlier you told us that part of your job is

15  to take photos during these undercover meetings and also to

16  document the evidence.  Did you do that during these two

17  meetings?

18  **A**   Yes, ma'am.

19  **Q**   Okay.  And how is it that you document evidence?

20  **A**   So for example, if I take a photo, surveillance photo of

21  the operation, I would preserve that photo and collect it,

22  remove it from my FBI-issued phone or the camera we would use,

23  put it onto an FBI database system, an evidence preservation

24  system and officially record it with a 302.  If it is a body

25  recording worn by an undercover agent, we issue those at the

BOGNANNO OFFER OF PROOF - DIRECT / HOSSEINI

1  beginning of the operation to the undercover, and then collect

2  them afterwards when the operation's over and everyone is

3  cleared and safe.

4      Take that evidence back to our office, the FBI

5  headquarters, and do the same thing.  Preserve it in our

6  system, and either the FBI undercover agent or one of us would

7  write a 302 documenting the entire operation and what this body

8  recording is and what it said.

9  **Q**   So you said 302.  What is a 302?

10 **A**   That's just -- sorry.  That's just an official FBI

11 investigative report.

12 **Q**   You said "body recording."  Is that a recording device?

13 **A**   Yes.

14 **Q**   Okay.  During this investigation, in June of 2022 did you

15 receive any such types of evidence from the undercover agent

16 and did you document that into the FBI case file?

17 **A**   Yes, I did.

18 **Q**   Can you tell us what some of those items of evidence were?

19 **A**   Primarily it was the recording of both undercover

20 operations or the meetings with Mr. Gessen, recorded by the

21 undercover agent with a recording device.  We also took photos,

22 surveillance photos of the operation throughout the operation

23 and preserved those photos.

24 **Q**   And did you receive any kind of documents from the

25 undercover agent as it related to this investigation?

1    **A**    Yes, we did.  For example, in the Boca Raton meeting on

2    June 2, 2022, Mr. Gessen gave the undercover agent a report of

3    some of his business dealings in general.  And I took that from

4    the undercover agent afterwards.

5         And there's also a Signal conversation that occurred after

6    the meetings where evidence was documented as well, and we

7    would take that evidence from the undercover agent.

8    **Q**    What is Signal?

9    **A**    Signal is a smartphone application, it's an end-to-end

10   encrypted text application.  It can also make calls, video

11   calls as well.

12   **Q**    Did you receive any evidence from the undercover as it

13   related to the Signal application conversations with

14   Mr. Gessen?

15   **A**    Yes, I did.

16   **Q**    What did you receive?

17   **A**    Primarily we received screenshots of the communications

18   throughout the operation.  At one point we received what we

19   refer to as a "hit package."  And that is a targeting package,

20   a document with -- which lists very personal information about

21   Priscilla Chigariro.  And we received that from the undercover

22   agent on July 8, 2022.

23   **Q**    And how did you receive that?

24   **A**    The undercover agent sent me a Signal message and he sent

25   it to my non-attributable FBI-issued phone, which we call in

1   the vernacular a "burner phone."  The undercover agent sent

2   that information to me, electronically, via Signal.

3   **Q**    Why is he emailing it -- or why is he sending it to your

4   burner phone and not to your FBI-issued phone?

5   **A**    So as he is an undercover agent, his protection is

6   dependent entirely on the fact that he is never to be

7   determined to be an undercover agent, so he's to have no FBI

8   affiliation whatsoever on his undercover devices.  So I'm not

9   an undercover agent, but I'm allowed to have a non-attributable

10  FBI-issued phone to communicate with that undercover agent.

11      And for reasons related to operational integrity and his

12  safety, that phone needs to be also non-attributable, my burner

13  phone.  So that when I call or text him and the target sees

14  that, it won't obviously be an FBI agent talking to an FBI

15  agent.  Or if that phone is ever discovered talking or

16  communicating with an undercover's device no one would be able

17  to tell that this is an FBI-affiliated phone.

18  **Q**    I see.  So you said you got this hit package to your

19  non-attributable or burner phone.  What did you do once you

20  received it on your burner phone?

21  **A**    At that point on July 8, 2022 I took four screenshots.

22  The document itself is a lengthy text message, a very long text

23  message, so in order to capture that on the phone I had no way

24  of doing that because I didn't have the undercover's phone, I

25  had no way to image that phone at the time.

BOGNANNO OFFER OF PROOF - DIRECT / HOSSEINI

1     So to preserve evidence, which is the primary objective I

2   have throughout this entire investigation, I took four

3   screenshots of that phone and then emailed them to a

4   non-attributable email address that I created, that I managed.

5   And that allowed me to take -- to go to a non-attributable FBI

6   computer in my office, an FBI space, and download those

7   screenshots on to an FBI-issued thumb drive in order to put

8   them into the FBI evidence database to preserve the actual

9   evidence.

10  **Q**   Okay.  So let me make sure I get this straight.  So, you

11  received the hit package from the undercover agent.

12  **A**   Correct.

13  **Q**   And he told you he received that from Mr. Gessen?

14  **A**   Yes.

15  **Q**   Okay.  And then you, you received that on your burner

16  phone?

17  **A**   Correct.

18  **Q**   And then you took the steps necessary to put it in the FBI

19  case file?

20  **A**   That's right.

21  **Q**   To preserve it as evidence?

22  **A**   Yes, ma'am.

23  **Q**   Okay.  Let's look at some exhibits just to be clear.

24       **MS. HOSSEINI:**  Can we, Mr. Machado, can we please look

25  at Government's Exhibit 3.

 1   **BY MS. HOSSEINI**

 2   **Q**   I can ask you a few questions while we wait for the

 3   exhibits to come up.

 4       So, you told us there were Signal screenshots.  Did you

 5   see --

 6       (Off-the-Record discussion between counsel)

 7           **THE COURT:**  Is it supposed to be on the screen?

 8           **MS. HOSSEINI:**  Can we pull up Government Exhibit 3?

 9           **THE COURTROOM DEPUTY:**  It should be, they're coming

10   up.

11   **BY MS. HOSSEINI**

12   **Q**   So I'm sure the technical difficulties will resolve

13   momentarily --

14       (Document displayed)

15           **THE WITNESS:**  There you go.

16   **BY MS. HOSSEINI**

17   **Q**   Oh, there it is.  What are these, Agent Bognanno?

18   **A**   This is a Celebrite production of Mr. Gessen's text or

19   Signal exchange with the undercover agent from the undercover

20   agent's undercover phone.

21   **Q**   What is Celebrite?

22   **A**   Celebrite, it's software that we use to image cellphones.

23   The user can image the entire cellphone, any cellphone, in

24   order to have a complete image, complete package of what that

25   phone had on it at the time that you imaged it.

1              **MS. HOSSEINI:**  Okay.  Let's look at Government

2    Exhibit 4.

3         (Document displayed)

4    **BY MS. HOSSEINI**

5    **Q**    What is this?

6    **A**    These are photos taken with the undercover agent's

7    FBI-issued phone, official work phone, of his undercover phone

8    at certain times.

9    **Q**    Why do we have photos of a phone?

10   **A**    Because if you look at the middle of the image there

11   you'll see -- I'm just going to read it, if that's okay.  It

12   says:

13              "AG set disappearing message timer to one

14              week.  AG set disappearing message timer to

15              one day."

16        "AG" is a reference to Mr. Gessen.  It's, again, from

17   Signal.  And the disappearing message function in Signal allows

18   one of the users to send a message -- set a timer so that that

19   message is deleted after that timer is up.

20   **Q**    So did the undercover enable that disappearing feature?

21   Or Mr. Gessen?

22   **A**    Mr. Gessen did.

23   **Q**    Okay.  So --

24   **A**    And if I can say one more thing on that.  The undercover

25   agent saw that, realized what was happening and that's why he

1    took photos with his FBI phone to preserve the evidence.

2    **Q**    I see.  So Government's Exhibit 4 are notes of deleted

3    messages that are depicted on Government Exhibit 3?

4    **A**    That's correct.

5              **MS. HOSSEINI:**  If we can look at Government Exhibit

6    29.

7         (Document displayed)

8    **BY MS. HOSSEINI**

9    **Q**    What is this, Agent Bognanno?

10   **A**    So this is, again, this is a Signal message from the

11   undercover agent's undercover phone.  And this came from

12   Celebrite, from our Celebrite image of the undercover agent's

13   phone.

14        And this is part of the hit package that the undercover

15   agent received from Mr. Gessen, and then sent to me on my

16   burner phone.

17   **Q**    Okay.  So at the top it says "Note to Self."  What is

18   that?

19   **A**    So again, the undercover agent, realizing that Mr. Gessen

20   had set these messages to disappear, and actually for this hit

21   package, there was a log-in link that Mr. Gessen provided the

22   undercover agent with a password which you would use to open

23   that, that link.  And that's where the hit package was sourced

24   or was kept for a period of time.

25        So again, the undercover agent realizing, that this was

BOGNANNO OFFER OF PROOF - DIRECT / HOSSEINI

1    going to disappear eventually, copied the image from that link

2    and pasted it into his own phone under a note to self, which

3    obviously would not disappear, because he controlled that

4    message.  So he was preserving the evidence.

5    Q    So is that just like the note feature on someone's phone?

6    A    In Signal, yeah.  It's like sending a message to yourself.

7    Q    I see.  Okay.  And so the undercover puts the information

8    he receives from Mr. Gessen into a note, note to self on his

9    undercover phone?

10   A    That's correct.

11   Q    Because otherwise it would disappear?

12   A    Right.

13   Q    Okay.  And then what happens to that note to self, from

14   the undercover's phone?

15   A    It's currently on his phone right now.  And he took that,

16   he used that -- he used that message to send me the information

17   that I referenced earlier with the hit package information I

18   talked about.

19   Q    Can you look at Exhibit 28.

20        (Document displayed)

21   Q    What is this?

22   A    So again, this is Signal, this is Signal on the undercover

23   agent's phone.  This is messages to Christopher Belefiore which

24   was my alias for this investigation.  And again this was the

25   way that I spoke to the undercover agent, covertly, in order to

1    ensure his safety and to ensure operational integrity.  But we

2    would use -- he would not use this messaging text thread to

3    communicate with me.

4    **Q**    So then that note to self from the undercover's phone is

5    sent to you?

6    **A**    Correct.

7    **Q**    And this Christopher Belefiore that we are looking at the

8    screen is your alias?

9    **A**    Correct.

10   **Q**    And again, you are not using your real name because it

11   would out -- it could potentially out the undercover that he's

12   talkings to an FBI Agent.

13   **A**    That's correct.

14   **Q**    Okay.  And these messages, whose phone are they on?  Looks

15   like a text thread.  Is that right?

16   **A**    Right.  It's a Signal message thread from the undercover

17   agent's undercover phone.

18   **Q**    All right.  And let's go now to Exhibit 14.

19        (Document displayed)

20   **Q**    So tell us how we went from Exhibit 28 that we just saw

21   where it said Christopher Belefiore to Exhibit 14 here on the

22   screen?

23   **A**    So, this is Signal, this is my burner phone, this is a

24   screenshot that I took from my burner phone.  At the top you

25   can see the undercover agent's name.  And you can see what he

1   sent me that day on July 8, 2022, and this is part of the hit

2   package that the undercover agent received from Mr. Gessen on

3   that same day.

4   **Q**    And just for completeness sake, can we please pull up

5   Exhibit 27.

6        (Document displayed)

7   **Q**    How is Exhibit 27 different from Exhibit 14, Agent

8   Bognanno?

9   **A**    So this is the exact same image, same screenshot that I

10  took on my burner phone and that I sent to my email and then

11  pulled off and put on to our FBI evidence database, except for

12  on my FBI computer, I slightly edited, I cropped this

13  screenshot, the same screenshot, this is a copy, I cropped it

14  at the top to eliminate the undercover agent's name in case we

15  needed to use this information operationally at the time.

16        **MS. HOSSEINI:**  And if we can go to Exhibit 31.

17       (Document displayed)

18  **BY MS. HOSSEINI**

19  **Q**    What is this?

20  **A**    So this is an exhibit I created to demonstrate what the

21  hit package looked like when I received it.

22        Again, we can't necessarily show the entire length or the

23  entire message thread, itself, because it's so lengthy.  So I

24  made four pages here, four snips or screenshots of the hit

25  package.  And it shows what it looked like on the undercover

1   agent's phone.  And this was just for this trial.

2       The evidence that I first created was my -- and I entered

3   into trial here -- was that black background, that was my

4   burner phone.  That was the original way that I preserved this

5   evidence.  But it's the exact same thing.

6   **Q**   Okay.  So when did you create Exhibit 14 with the black

7   background?

8   **A**   July 8, 2022.

9   **Q**   Okay.  And this Exhibit 31, approximately when did you

10  create it?  Before or after July 8?

11  **A**   After.

12  **Q**   Okay.  You said it was recently in preparation for the

13  trial?

14  **A**   Yes, ma'am.

15  **Q**   Okay.  And you said it is four pages.

16      **MS. HOSSEINI:**  If we can quickly go down the four

17  pages, Mr. Machado.

18      (Documents displayed)

19  **BY MS. HOSSEINI**

20  **Q**   So what we are seeing on the screen here, Government's

21  Exhibit 31, you said you created this?

22  **A**   That's right.

23  **Q**   From the note to self that the undercover agent sent to

24  you.

25  **A**   That's correct.  This is how it looked like -- not exactly

BOGNANNO OFFER OF PROOF - DIRECT / HOSSEINI

1   like this but this is the message on the undercover agent's

2   phone that was contained in that note to self, he created.

3   **Q**    So it's different in the respect that it's not one really

4   long piece of paper but it's split over four pages?

5   **A**    That is the only difference.

6   **Q**    Okay.  Did you take any steps to confirm whether the

7   content of Exhibit 31 is the same as that note to self that was

8   on the undercover phone?

9   **A**    Yes, I did.  I reviewed the entire message for accuracy.

10  **Q**    Okay.  And how did you do that?

11  **A**    By comparing the exhibit I created to the actual

12  undercover phone's message, or this -- where this message is

13  contained to this day.

14  **Q**    Where is that undercover phone now?

15  **A**    It's in the courtroom.

16  **Q**    Is it this black phone that I'm holding up, this evidence

17  bag (Indicating)?

18  **A**    Yes, ma'am.

19  **Q**    So you compared Exhibit 31 to actually what is on this

20  undercover phone?

21  **A**    Yes, ma'am.

22  **Q**    Was it the same thing?

23  **A**    Yes, ma'am.

24  **Q**    The exact same content?

25  **A**    Yes, ma'am.

1  **Q**    Okay.  So why didn't you just create this Exhibit 31 on

2  July 8th?  Why did it have that black background?

3  **A**    I only had my burner phone on July 8, 2022.  The

4  undercover agent had his undercover phone and we're not

5  together.  So I had no way of preserving his actual undercover

6  phone image.

7  **Q**    At that point, was the operation still ongoing?

8  **A**    Yes, it was.

9  **Q**    Once the operation concluded, did the undercover -- then

10  at that point did you have access to the undercover phone?

11  **A**    Yes, I did.

12  **Q**    Okay.

13  **A**    After the investigation concluded, Mr. Peacock and I took

14  the undercover phone as evidence.

15  **Q**    Okay.

16  **A**    And preserved it.

17       **MS. HOSSEINI:**  Thank you.  Nothing further,

18  Your Honor.

19       **THE COURT:**  Any questions, Ms. Mitchell?

20       **MS. MITCHELL:**  Yes, Your Honor.

21       If I could have the...

22                          **CROSS-EXAMINATION**

23  BY MS. MITCHELL

24  **Q**    So, Agent.  Looking at Exhibit 4, the undercover is

25  trained to preserve all of the messages that he would receive

1  in Signal from whomever is sending it to him, correct?

2  **A**    That's correct.

3  **Q**    And sometimes the way he does that is to take screenshots

4  or videos of those images that are coming in.  Correct?

5  **A**    Or photographs, yes.

6  **Q**    Or photographs.  And he does this because, as you

7  mentioned, sometimes the messages on Signal disappear?

8  **A**    Right.

9  **Q**    And so even if the undercover wasn't able to send the

10  message to you, he would have been trained to take photographs

11  of screenshots, photographs, videos of those messages so there

12  would have been a record of those messages in his actual phone

13  at the time it was sent.  Correct?

14  **A**    In his FBI-issued phone?

15  **Q**    In the phone that he was using in his undercover persona,

16  yes.

17  **A**    To his best ability, ma'am.  I think, you know, there --

18  he was concerned about, if you take a screenshot of Signal it

19  may alert the other user that you are taking a screenshot which

20  can jeopardize his safety and the operation.  So he -- he used

21  what he could to his best ability to preserve the messages,

22  once he began to realize they were being deleted.

23  **Q**    Uh-huh.  And so that would consist of sometimes him video,

24  videoing the text stream with another phone while he's going

25  through all this text.  Correct?

1   A    I don't know that he ever videoed a phone.  I know that he

2   took photographs of the undercover phone.

3   Q    Okay.  And so, what I would like you to do is look through

4   here on Exhibit 4, and let us know where you happen to see a

5   screenshot or an image of this message coming in.

6   A    So right here, this, this Page 2 (Indicating).

7   Q    Uh-huh.

8   A    At the very top there, that link, HTTPS, safesecret.info,

9   that link from my understanding from the undercover agent was

10  the method by which Mr. Gessen sent the hit package we have

11  been discussing.

12  Q    Okay.  Can you scroll through the remaining of these

13  images and let me know if you see another similar link?

14  A    Similar link?  No.

15  Q    Yes.

16  A    Not yet.

17  Q    So there is not another link that indicates that there was

18  a similar text message from Mr. Gessen coming through.

19  A    No, ma'am, not a link.

20  Q    Okay.  All right.  And now if I could have you look at --

21  Exhibit 28, Page 11.

22       (Document displayed)

23  Q    There appears to be two other messages here.

24  A    Correct.

25  Q    And these are messages that were sent to your phone, your

 1  non-attributable phone?

 2  **A**    Yes, ma'am.

 3  **Q**    And these two messages were messages that the undercover

 4  informed you came from Mr. Gessen?

 5  **A**    Yes, ma'am.

 6  **Q**    And you have no independent confirmation that any of these

 7  messages actually originated from Mr. Gessen?

 8  **A**    I had not seen his phone, no.  Not at the time.

 9  **Q**    And you did not actually see any of these messages on the

10  undercover's phone.

11  **A**    These messages?

12  **Q**    Yes.

13  **A**    No.

14  **Q**    The only confirmation that you have in fact that these

15  originated from Mr. Gessen were from what the undercover told

16  you.

17  **A**    Yes, ma'am.

18  **Q**    And we can see here that there are two additional

19  messages.  One sent on -- and it is a little difficult to

20  see -- July 16, and July 18.

21  **A**    Yes, ma'am.

22  **Q**    All right.  Going back again to Exhibit 4.

23       (Document displayed)

24  **Q**    On Page 2 of Exhibit 4 you indicated that these messages

25  had come through --

 1        (Document displayed)

 2            **MS. MITCHELL:**  Wait until it comes up.

 3        (Document displayed)

 4    **BY MS. MITCHELL**

 5    **Q**    -- using this link.  Correct?

 6    **A**    The hit package message, not those two --

 7    **Q**    No, the hit package, as you refer to it the hit package

 8    message came through using this link.  Correct?

 9    **A**    Yes, ma'am.

10    **Q**    And you just told us this link appears nowhere else in any

11    of the messages preserved on Signal, correct?

12    **A**    That's correct.

13    **Q**    Now, looking through Exhibit 4, do you happen to see those

14    other two messages we just looked at on Exhibit 11?

15    **A**    No.

16    **Q**    And so these messages are nowhere to be found in the text

17    messages on Signal, conceivably from Mr. Gessen.  Correct?

18    **A**    Not the record I have.  I understood from the undercover

19    agent they were sent and disappeared due to that disappearing

20    message feature that Mr. Gessen selected.

21    **Q**    But the undercover agent had enough time to send the

22    message to you, correct?

23    **A**    He did.

24    **Q**    And the undercover knew that these messages were set to

25    disappear, correct?

1  **A**    Yes, ma'am.

2  **Q**    And the undercover did not take any opportunity to

3  preserve them on the actual Signal application, did he?

4  **A**    He preserved them in his note to self.  Similar to how he

5  preserved the hit package.

6  **Q**    And so, going back to -- so the only means that you have

7  of it being preserved is it's in the note to self, but the

8  undercover did not actually take any record of it being sent in

9  the stream of messages with other messages from Mr. Gessen,

10  correct?

11  **A**    He did not take a photograph, if that's what you are

12  saying.

13  **Q**    I'm just asking, is there any proof that these messages

14  were in the stream of messages from Mr. Gessen?

15  **A**    There's no proof, in the sense that they have disappeared.

16  So he preserved them by putting those two messages in the note

17  to self.  That was the way that he was able to use Signal on

18  his undercover phone to preserve the message.

19       Otherwise he risked -- a screenshot would maybe send a

20  message to Mr. Gessen so he was trying to be very operationally

21  pure and safe.

22  **Q**    Another way to be operationally pure would be to take

23  another phone and take a screenshot of what's on the image --

24  on the page.  Take a photograph of what's on the page.

25  Correct?

1  **A**    That is one way, yes.

2  **Q**    And the agent did not do that here, correct?

3  **A**    Apparently not, no.

4  **Q**    All right.  And so the only confirmation you have that

5  these messages originated from Mr. Gessen come from your

6  undercover agent.  Correct?

7  **A**    Yes, ma'am.

8  **Q**    There is no forensic evidence that these messages actually

9  came from Mr. Gessen?

10  **A**    No, ma'am, not that I have.

11  **Q**    All right.  And let me ask you about 302s.  You are --

12  302s are reports that agents write.

13  **A**    Correct.

14  **Q**    And generally they are written near or at the same time

15  information is generated.

16  **A**    Typically, yes.

17  **Q**    Sometimes they are written much later, depending on

18  circumstances ands facts.

19  **A**    Yes, ma'am.

20  **Q**    In this case, neither of -- the undercover never wrote a

21  302 specifically about these messages, correct?

22  **A**    Not that I know of.

23  **Q**    And in fact, the only 302 that was generated about these

24  messages came much later, came almost a year later, in fact,

25  correct?

1   **A**   About these messages?

2   **Q**   Yes.

3   **A**   Uh --

4   **Q**   I guess what you're referring to as the hit package?

5   **A**   The hit package, yes, ma'am.

6   **Q**   Okay.  And that was after we had begun litigation in this

7   case?

8   **A**   That was once we were -- yes, once we were going to trial,

9   right.

10  **Q**   And in fact, it actually wasn't generated until a month --

11  about three weeks ago, correct?

12  **A**   Correct.  I was asked to document how I received the

13  messages, and to put that into a report for the benefit of the

14  Court, but in my -- in my records I had my phone preserved the

15  entire time as evidence so that was the way that I was able to

16  use that or to have control over the information and preserve

17  it.

18  **Q**   And so you've documented what you did after you received

19  the information from the undercover.  But there's no

20  documentation from the undercover at the time these messages

21  were allegedly sent to them, that these messages were actually

22  sent to them.  Correct?

23  **A**   There's no 302.  But the undercover phone is

24  documentation, in itself, as evidence.  And that's why we

25  collect it, collect it at the end of the investigation and

1    image it with Celebrite.

2    **Q**    But the undercover phone, itself, does not have any record

3    of these messages being sent, correct?

4    **A**    Other than the note to self which he made on the day that

5    he received the message, and there is the date that you can

6    tell when he sent it to himself.

7    **Q**    And so for the origination of the note to self, you would

8    have no basis for knowing if the undercover agent typed up all

9    that information themselves, correct?

10    **A**    I suppose not.

11    **Q**    And your only basis for understanding that is from

12    Mr. Gessen is based off what the undercover has told you.

13    **A**    That's correct.

14    **Q**    And so if the undercover was not being truthful with you,

15    and actually prepared the note to self and then sent that to

16    you, you would have no confirmation that, in fact, the note

17    originated from Mr. Gessen.  Correct?

18    **A**    I'd have no direct way of confirming the undercover's

19    phone -- or the message on the undercover's phone came from

20    Mr. Gessen, because I didn't have the phone.  But I was present

21    at both undercover operations in June, and heard the

22    conversation live, and reviewed the transcripts afterwards,

23    obviously made the transcripts, helped make the transcripts.

24        And I did hear the undercover agent and Mr. Gessen

25    discussing the need for such a package.  And then I remember

**PROCEEDINGS**

1  Mr. Gessen saying something to the effect of:  I will do the

2  full recon for you.  So there was a lot of other indication at

3  the time that this package was coming.  And so it made sense to

4  me.  And obviously I believe my undercover agent.

5  **Q**    You trusted your undercover agent.

6  **A**    Right.

7  **Q**    So you just believed what they told you.

8  **A**    Yes.  He's a sworn agent.

9          **MS. MITCHELL:**  No further questions, Your Honor.

10         **THE COURT:**  Okay.  All right.  I don't think we need

11  any further questions.

12     Ms. Mitchell, I think they've made their -- I mean, you

13  have fodder for cross-examination, but I think they've made

14  their burden under Rule of Evidence 901.  So I'll go ahead and

15  allow the government to lay its foundation at trial with

16  respect to Exhibit 14.

17         **MS. MITCHELL:**  Thank you.

18         **THE COURT:**  Thank you, Agent.  You may stepdown.

19         **THE WITNESS:**  Thank you, Your Honor.

20     (Witness excused)

21         **MS. HOSSEINI:**  Just to be clear, we realize that

22  Exhibit 14 was redacted, so Exhibit 31 is the unredacted

23  version.  So we'll just be using Exhibit 31.

24         **THE COURT:**  I was wondering why there was 31 and 14.

25  Okay.  All right.

**PROCEEDINGS**

1          **MS. MITCHELL:**  And Your Honor, just for purposes --

2          **THE COURT:**  Can you talk into the microphone?

3          **MS. MITCHELL:**  Yes.  Your Honor, for purposes of 403,

4    now that the Court has ruled Exhibit 14 admissible, we would

5    request that the government -- no agent refer to it as a "hit

6    package," as it's highly prejudicial.

7          **THE COURT:**  I think that's fair.

8          **MS. HOSSEINI:**  That's at a term of art --

9          **THE COURT:**  Can you call it "target package"?  I

10   understand it is a's term of art that agents use, but we are in

11   a trial now.  And "hit package" is rather inflammatory.  Can't

12   they just call it "target package" or something else?

13         **MS. HOSSEINI:**  Yes, we can do that, Your Honor.

14         **THE COURT:**  All right.  Good.  All right.

15         **THE COURTROOM DEPUTY:**  All right.  Are you guys ready?

16         **THE COURT:**  All right.  Is our jury ready?

17         **THE COURTROOM DEPUTY:**  I just want to let you guys

18   know that we have, like, 20 percent missing.  Are you guys

19   ready for the numbers?

20         **THE COURT:**  Yes.

21         **THE COURTROOM DEPUTY:**  Okay.

22         **MS. HOSSEINI:**  Sorry, just one second.

23         **THE COURTROOM DEPUTY:**  No worries.

24      The ones that are missing are 7, 16, 17 --

25         **THE COURT:**  Wait, can you slow down?

```
 1              THE COURTROOM DEPUTY:  Yes.

 2              THE COURT:  Okay, 16, 17.

 3              THE COURTROOM DEPUTY:  24, 30, 34, 37, 45, 46, 60, and

 4    66.

 5              THE COURT:  Does anyone need that repeated?  No?

 6    Okay.  All right.

 7         Are they ready, then, Ms. Means?

 8              THE COURTROOM DEPUTY:  They are, but can I have a few

 9    minutes?

10              THE COURT:  You may.

11              THE COURTROOM DEPUTY:  Okay.  I just need to adjust

12    this, cross them out.

13              THE COURT:  Okay.

14              THE COURTROOM DEPUTY:  Two minutes.

15         (A pause in the proceedings)

16         (A pause in the proceedings)

17              THE COURT:  All right, the jury's here.

18         (The following proceedings were held in the presence of

19    the Jury Venire)
```

**<u>JURY VOIR DIRE</u>**

```
21              THE COURT:  You may be seated.

22         Good morning, members of our -- potential jurors.  We are

23    here this morning to pick the jury for a federal criminal

24    trial.

25         First I want to thank all of you for demonstrating your
```

1   sense of civic duty, for being here on this May 1st, Monday

2   morning.  I know you did not volunteer to be here, that you

3   were summoned.  But still, you are fulfilling your obligations

4   and your responsibility as citizens to be here this morning,

5   and help with the administration of the criminal justice

6   system.

7           Now, as I said, we are here to pick a jury for a criminal

8   trial.  And I'm going to tell you a little bit more about the

9   trial in a few moments.

10          The first step today is we're going to select among you 14

11  jurors.  There will be 12, and then two alternates.  The 12 --

12  everyone will sit through the whole trial.  The 12 will

13  deliberate on the verdict.  And the two alternates will then

14  come in to deliberate if we need replace one of the 12 jurors.

15          The process of selecting a jury is called *voir dire*

16  examination.  And its purpose is to find out if any of you have

17  any bias or prejudice toward this case.  That does not mean

18  that you are a biased or prejudiced person.  Just that because

19  of your background and experience, you are probably not the

20  right person to serve on this jury.  So as a result of this

21  process, some of you will be excused.

22          For your planning purposes, we do intend to pick our jury

23  today.  Some of you may have served in -- state court, been

24  called to state court.  Sometimes it takes several days.  We're

25  going to get -- we plan at least to get our jury selected today

1    and, time permitting, maybe even begin with the opening

2    statements of the trial.  Anyway that is our goal.

3        So to begin with we are now going to place all of you

4    under oath because it is important today when you are asked

5    questions that you answer truthfully.

6        So Ms. Means, would you please swear in the jury pool?

7            **THE COURTROOM DEPUTY:**  Okay.  Will the jurors please

8    stand and raise your right hand.

9        (Jury Venire placed under oath)

10           **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

11           **THE COURT:**  So please listen to all of my questions

12   carefully and tell me anything that any of my questions bring

13   to mind.

14       It is your duty to answer truthfully and completely.  None

15   of our questions today are intended to embarrass you or invade

16   your privacy.

17       If you feel like an answer might embarrass you, and you

18   want to answer privately just let us know and we can arrange

19   for you to do that.  So now we are going to begin with some

20   very hard questions.

21       My name is Jacqueline Scott Corley, I'm a District Court

22   Judge here in the Federal Court in San Francisco.  Do any of

23   you know me, or are any of you friends with me?

24       (No response)

25           **THE COURT:**  No.  Okay.  One time I did have someone

1  raise their hand and stated that they had gone to high school

2  with me, and I said "Stop right there, you're excused, get out

3  before you say anything more."

4      Now, let me introduce my staff.  My courtroom deputy is

5  Ada Means.  I have three law clerks.  Caroline Jacobs, Miranda

6  Mammen and George Mills.  Our court reporter, Belle Ball.  And

7  I have two law student externs, Miranda Piaz and Devin Goodman.

8      Do any of you know any of these people?

9      (No response)

10      **THE COURT:**  Great.  Okay.  Now, this case is called:

11  The United States versus Allen Gessen.  It is a criminal case.

12      Now I'm going to have the attorneys introduce themselves

13  and all of the people at counsel table.  And pay attention,

14  because I'll ask you if you know any of them.

15      **MS. HOSSEINI:**  Good morning, ladies and gentlemen.

16  I'm Ilham Hosseini.  And with me -- and I'll ask her to stand

17  up -- is Alexis James.

18      **MS. JAMES:**  Good morning.

19      **MS. HOSSEINI:**  We are Assistant United States

20  Attorneys.  We work for the United States Department of

21  Justice.

22      With us also at counsel table are FBI Special Agent David

23  Peacock.

24      **SPECIAL AGENT PEACOCK:**  Good morning.

25      **MS. HOSSEINI:**  And FBI Special Agent Christopher

 1   Bognanno.

 2          **SPECIAL AGENT BOGNANNO:**  Good morning.

 3          **MS. HOSSEINI:**  Good morning.

 4          **THE COURT:**  And Ms. Mitchell.

 5          **MS. MITCHELL:**  Good morning, everyone.  My name is

 6   Candis Mitchell.  I work for the Federal Public Defender's

 7   Office.  And I'm here with co-counsel Karthik Raju.

 8          **MR. RAJU:**  Good morning.

 9          **MS. MITCHELL:**  And we are representing Mr. Allen

10   Gessen.

11          **THE DEFENDANT:**  Good morning.

12          **MS. MITCHELL:**  Along with Lisa Tarasyuk, who is our

13   paralegal, and Michael Portman, who is our investigator.

14          **MR. PORTMAN:**  Good morning.

15          **THE COURT:**  Thank you.  Do any of you know any of the

16   persons who have just been introduced to you?

17       (No response)

18          **THE COURT:**  No.  Okay.

19       Now, before I go any further, I bet some of you, upon

20   hearing the name of the case and hearing all these names, were

21   tempted to take out your phone and Google or Bing or whatever

22   it is that we do these days.

23       It's very important that you not do any -- any independent

24   research about this case, either this morning while we are

25   selecting a jury, and, if you're fortunate enough to be

1  selected to be on the jury, while you serve on the jury.

2      It is critical that until you are excused from service,

3  you do not discuss the case with anyone.  And this applies to

4  everyone.  It includes your family members, your work

5  colleagues, your children.  Even each other.  Even each other.

6      Do not search the internet about this case or anyone

7  involved in the case, or try in any way to learn about the

8  case.

9      Do not read any press reports in the event there are any.

10     And, why not?  Why am I giving you this rule?  And that is

11  because it could jeopardize the whole case and require us to

12  start over.  It is critical to the administration of justice

13  that this case is decided solely on the evidence that is

14  presented to the jury here in this courtroom, and not based on

15  stuff that's on the internet.  We all know that's not always

16  true.  But more importantly, there are rules of evidence.

17     I and the parties have worked and will continue to work

18  very hard to ensure a fair trial.  And a fair trial means that

19  the jury only hears the evidence we have decided it should

20  hear, as a matter of fairness.

21     And that is why it's so important that you not -- not do

22  any independent research.  No googling, nothing like that,

23  about anyone involved in this case, or any thing.

24     And this happens, that jurors do do this.

25      (Document displayed)

1    **THE COURT:**  Just last year -- this is a headline from

2    last year -- there was a trial down in Los Angeles, a patent

3    trial.  They went through the whole week of trial, and a juror

4    did some internet research.  Just asking:  What is a patent?

5    You would have hoped, after a week of a patent trial, they

6    would have known.  But they went on Google and did it.

7        It was disclosed to the judge, and they had to throw the

8    whole case out and start over.

9        So please, I know it's -- we are used to doing that.  But

10   please, we're going to be Luddites for today, and during this

11   jury, and not do any internet research.

12       Okay, let's go back to this case now.

13       (Document displayed)

14       **THE COURT:**  There are a number of people who may

15   testify at trial.  And to determine if any of you know these

16   witnesses, I'm going to read off their names:  FBI Agent

17   Christopher Bognanno, FBI Agent Benjamin Fierberg, FBI Agent

18   David Peacock, FBI Agent David Rizzo, FBI Agent Ravi Shah,

19   Concord Massachusetts Detective Sergeant Jeffrey Young, Michael

20   Portman, and Priscilla Chigariro.

21       Do any of you -- are you familiar with any of these

22   people?

23       (No response)

24       **THE COURT:**  No.  No one has raised their hands.

25   Great.

1    All right, let me tell you what our proposed and planned

2  schedule is for the trial.  Today, May 1st, we are going to

3  pick the jury and maybe do opening statements.

4    We will have trial tomorrow from 8:30 to 3:00 p.m.  We

5  take a 45-minute break for lunch.

6    Wednesday, the same schedule.  Thursday, the same

7  schedule.

8    Friday, we may actually get the case to you for closing

9  arguments and deliberations.  But, regardless, we plan on going

10  to 1:30 with no lunch.  That way, everyone can get home before

11  the Friday afternoon rush hour.

12    And then, if needed, the case would resume again on

13  Monday, May 8th.  Again, 8:30 to 3:00.  If the jury is

14  deliberating, the jury -- jurors, themselves, decide how long

15  to stay.  And the parties and the Court will stay as long as

16  the jury wants.

17    Sometimes cases take longer than we anticipate.  And so,

18  is there anyone here who would find it impossible to serve as a

19  juror if the case were to proceed through Wednesday, May 10th?

20  Not inconvenient; it's inconvenient for everyone, we

21  understand.  But, impossible to serve?

22    (Hands raised)

23    **THE COURT:**  Okay, so we have a microphone.  I'm going

24  to ask, when you speak, to please state and spell your name

25  first.

```
 1        (Reporter clarification)

 2        THE COURT:  Oh, and your juror number, if you have

 3   that, as well.

 4        Oh, I'm sorry, and this reminds me about masks.  So, mask

 5   policy, we follow San Francisco guidelines.  Which are:  Not

 6   required, but welcome and encouraged.

 7        So if you want to wear it, you are more than welcome to

 8   wear them, or even encouraged to do so.  But you are not

 9   required to do so at all, even if you're sitting.  And if

10   you're speaking, and are comfortable with it, we would prefer

11   you take it off while speaking, but again only if you are

12   comfortable.

13        PROSPECTIVE JUROR JAIN:  My Juror number is 48.  I

14   have to state my name for the record also?

15        THE COURT:  Please.

16        PROSPECTIVE JUROR JAIN:  Cipi, C-I-P-I, first name.

17   Last name Jain, J-A-I-N.

18        My mother, she is partially blind and she's diabetic.  She

19   lives with me.  And I would have to take her to some doctors'

20   appointments next week, so that could potentially --

21        THE COURT:  Oh, next week.  What days are the

22   appointments?

23        PROSPECTIVE JUROR JAIN:  I'm not 100 percent sure.

24   But I do have to take her to doctor appointments.  And then I

25   do have to help her around the house, because she lives with
```

1  me, actually.

2         **THE COURT:**  Okay.  All right.  So you don't know when

3  the --

4         **PROSPECTIVE JUROR JAIN:**  I'm not 100 percent sure

5  which day it is, yes.

6         **THE COURT:**  All right.  Thank you.

7      And then there was two people over here.

8      (Hands raised)

9         **PROSPECTIVE JUROR RAMOS:**  Good morning.  I'm Juror 18.

10  My name is Martin Ramos, M-A-R-T-I-N, R-A-M-O-S.  I planned a

11  vacation, and I leave on Sunday.  And I planned this, like, way

12  before this came to my doorstep.  So, I brought the itinerary

13  with me if that can help anybody out.

14      I leave on Sunday at 7:00 a.m.

15         **THE COURT:**  Where are you going?

16         **PROSPECTIVE JUROR RAMOS:**  To Maui.

17         **THE COURT:**  Maui, oh, nice.  You're making everyone

18  jealous.

19      Okay.

20         **PROSPECTIVE JUROR MARTINEZ:**  Richard Martinez, Juror

21  31.  And I'm in the process of moving out of state.  And I've

22  already shipped my stuff to Utah.

23      And also, I'm being treated for AFIB.  So I have to keep

24  monitoring on my phone how often I have symptoms.

25         **THE COURT:**  All right.  And what is your moving date.

1    **PROSPECTIVE JUROR MARTINEZ:**  Well, my house is up for

2    sale, and I've already moved all my belonging to Utah.

3    **THE COURT:**  Okay.  But you're not moving until you

4    sell your house?  Or --

5    **PROSPECTIVE JUROR MARTINEZ:**  Well, yeah, you have to

6    sell it first.  That's why we're remodeling it now.  And I'm

7    the only one who lives there to let the people in.

8    **THE COURT:**  Okay.  All right.  And are you comfortable

9    talking about your health issue?

10   **PROSPECTIVE JUROR MARTINEZ:**  It's fine.  I'm suffering

11   from AFIB, so I have to wear this monitor 24-7.  And when I

12   feel symptoms, I'm supposed to mark it on my phone.  And I

13   don't know if that would lend to me being able to concentrate

14   on the case.

15   **THE COURT:**  All right.  Thank you.

16   (A hand is raised)

17   **THE COURT:**  Okay, there was one woman down there.

18   **PROSPECTIVE JUROR OKANO:**  Juror No. 29, Tetsu Okano.

19   I have a business trip scheduled on May 12th.

20   **THE COURT:**  May 12th?

21   **PROSPECTIVE JUROR OKANO:**  Yeah, so...

22   **THE COURT:**  Okay.  Won't be a problem.  All right.

23   Thank you.

24   (Hands raised)

25   **PROSPECTIVE JUROR BALENBIN:**  I'm Juror No. 27.  I'm

**JURY VOIR DIRE**

1  currently unemployed, and do not have a driver's license.  And

2  for these reasons, it would make it difficult for me to commute

3  and to be present for a juror -- jury service.

4          **THE COURT:**  You live in Daly City?

5          **PROSPECTIVE JUROR BALENBIN:**  Yes, I do.

6          **THE COURT:**  How did you get here today?

7          **PROSPECTIVE JUROR BALENBIN:**  My dad called in sick to

8  drop me off.

9          **THE COURT:**  Are you not able to take BART?

10          **PROSPECTIVE JUROR BALENBIN:**  No, I -- my dad would

11 pick me up and drop me off.

12          **THE COURT:**  Or -- but, is there a reason you cannot

13 take BART?

14          **PROSPECTIVE JUROR BALENBIN:**  I just wouldn't be

15 comfortable.  Um, I would just have to find my way around the

16 city.

17          **THE COURT:**  Okay.  The courthouse is actually quite

18 close to BART.  There is a Civic Center BART.

19     Okay.  All right.  Thank you.

20          **PROSPECTIVE JUROR GAO:**  Hi.  My name is Dong Hua Gao.

21 No. 19 --

22          **THE COURT:**  What juror number?

23          **PROSPECTIVE JUROR GAO:**  No. 19.  I've been suffering

24 some dental pain.  I have scheduled appointment this Thursday

25 at the end of my two-week call period.  I'm on ibuprofen.

1           **THE COURT:**  What time is your appointment on Thursday?

2           **PROSPECTIVE JUROR GAO:**  9:00 on Thursday.

3           **THE COURT:**  9:00 a.m.  Okay.  Thank you.

4      (A hand is raised)

5           **THE COURT:**  Okay, pass it over to the other side.

6           **PROSPECTIVE JUROR GENTRY:**  I'm Juror No. 70.

7           **THE COURT:**  Can you stand, please?

8           **PROSPECTIVE JUROR GENTRY:**  Yes, sorry.  I have a

9   business trip this coming Thursday.  I work at a startup, and

10  we are presenting to potential investors.

11          **THE COURT:**  What was your -- the period to be

12  available for jury service?

13          **PROSPECTIVE JUROR GENTRY:**  I don't remember; I'm not

14  sure.

15          **THE COURT:**  Through Thursday.

16          **PROSPECTIVE JUROR GENTRY:**  It was through -- yeah.  I

17  may not have deferred it in time.

18          **THE COURT:**  Okay.  Thank you.

19          **PROSPECTIVE JUROR GENTRY:**  Thank you.

20          **PROSPECTIVE JUROR SANCHEZ:**  My Juror number is 56.  My

21  name is John Sanchez.  I'm the sole foreworker for the

22  structures department with BART.  And if I were to be absent

23  for an extended period of time, it would severely impact the

24  services the department and I provide to the public.

25          **THE COURT:**  Okay.  But, BART does cover your jury

1   service.  Correct?

2           **PROSPECTIVE JUROR SANCHEZ:**  Yes.

3           **THE COURT:**  All right, thank you.

4       All right.  Anyone else that it would be impossible?

5       (No response)

6           **THE COURT:**  Okay.  All right.  I am now going to read

7   you a brief summary.

8           **UNIDENTIFIED WOMAN:**  Your Honor?

9           **THE COURT:**  Oh, there was one more?

10          **PROSPECTIVE JUROR PAMA:**  Hi, yeah.  My number is 23,

11  and my name is Jessica Pama.

12      Actually I can't be here this week because I'm a full-time

13  college student, and for next week we're planning on --

14  studying for finals which is next week.

15          **THE COURT:**  Where are you in school?

16          **PROSPECTIVE JUROR PAMA:**  Cal State East Bay.

17          **THE COURT:**  Okay.  Did you try to defer your service?

18          **PROSPECTIVE JUROR PAMA:**  Uh, no.

19          **THE COURT:**  Is there a reason that you didn't?

20  Because you knew that you were in school now.

21          **PROSPECTIVE JUROR PAMA:**  No, I just -- no, no, I just

22  didn't do it.

23          **THE COURT:**  All right.  Thank you.

24      Okay.  So I'm going to speak with the parties briefly here

25  at sidebar.  So what you can do is if -- it will probably be

 1  about five minutes, if someone wants to -- probably best to

 2  stay here right now.

 3       What I would do, talk about, if you like it, that 50

 4  points that Curry scored yesterday.  First time in history in a

 5  Game 7.  And the Lakers-Warriors series coming up, who could

 6  ask for a better series than that?

 7       If basketball's not your thing, you can talk about

 8  basketball, or it's May and we're going to get rain this week

 9  and how you unusual that is.  So you talk among yourselves, and

10  I'm going to talk to the parties here at sidebar.

11       Thank you.

12       (The following proceedings were heard at sidebar)

13            THE COURT:  Okay, I'm just going to go in order of

14  number.

15            MS. MITCHELL:  Okay.

16            THE COURT:  So I would excuse No. 18 because he has

17  that trip to Maui.

18            MR. RAJU:  I would agree.

19            MS. MITCHELL:  I would agree with that.

20            MS. HOSSEINI:  Yes, Your Honor.

21            THE COURT:  Okay.  No. 7 is excused.

22       Mr. Gao I would not excuse, I'm sorry, Ms. Gao was the

23  one --

24            MS. MITCHELL:  The dental appointment on Thursday.

25            THE COURT:  No. 9 is excused.

1          MS. MITCHELL:  Yes, Your Honor.  I think it's 19.

2          THE COURT:  Sorry.  No. 19 is excused.  I think we

3    have to excuse Ms. Pama, No. 23; she's the full-time student.

4    Any objection?

5          MS. HOSSEINI:  No, Your Honor.

6          MS. MITCHELL:  No objection.

7          THE COURT:  What would you like to do about No. 27?  I

8    don't think she has an excuse, but I don't know if she's afraid

9    to walk or take BART.

10         MS. MITCHELL:  I am concerned that if she already had

11   her father take the day off, and he's a BART train operator,

12   and she's afraid to take BART, that she is probably not going

13   to be in a good head space for coming here and being a juror.

14         THE COURT:  Any --

15         MS. HOSSEINI:  We agree with Ms. Mitchell.

16         THE COURT:  So No. 27 is excused.  Mr. Martinez, I

17   mean, his house is up for sale.  I don't see any reason to

18   excuse him.

19         MS. HOSSEINI:  Your Honor, did you want to inquire

20   whether he's a resident of this district?  And --

21         THE COURT:  He has a house.

22         MS. HOSSEINI:  Still has a house here, all right.

23         MS. MITCHELL:  The only thing I'm concerned about --

24   and maybe we can inquire more of him -- is if he has to

25   constantly be taking out his phone, if that would be a

1   distraction, for reporting his AFIB symptoms.

2       If it's just a check to see if he have symptoms, or if he

3   has to write out an entire thing about what he's doing, he may

4   miss parts of --

5           **THE COURT:**  Okay.  I mean, if you want to excuse him,

6   we can do so.  Or, probably be better just to inquire, you guys

7   can inquire of him further.

8           **MS. HOSSEINI:**  Okay.

9           **MS. MITCHELL:**  Uh-huh.

10          **THE COURT:**  So we will not excuse No. 31.

11      No. 48, Mr. Jain, I don't -- he didn't give me any reason

12  to excuse him.

13          **MS. HOSSEINI:**  Agreed, Your Honor.

14          **THE COURT:**  No. 56, Mr. Sanchez, we don't excuse,

15  because BART.  So, not excused.

16      And we definitely do not excuse Mr. Gentry, who has his

17  investment meeting.

18          **MS. MITCHELL:**  The only thing is, Your Honor, if his

19  trip is this Thursday --

20          **THE COURT:**  He's not going.

21          **MS. MITCHELL:**  All right.

22          **THE COURT:**  He's not going.  No way.  He's not going.

23  He could have deferred.

24          **MS. MITCHELL:**  Okay.

25          **THE COURT:**  Okay.  So we are excusing, just to go

1   through, No. 18, No. 19, No. 23, No. 27, and that's it.

2           MS. HOSSEINI:  Your Honor, I just would like to take

3   this opportunity to say I noticed that Juror No. 53, the one

4   that came in late this morning, mentioned that he had a DUI.

5   He said "I have a DUI; I don't know if this counts."

6       So if it were a felony, I don't know if Your Honor wants

7   to inquire, because that may affect his ability to serve as a

8   juror.

9           THE COURT:  Okay.  So if he --

10          MS. HOSSEINI:  If he was convicted --

11          THE COURT:  He is going to be in our first 32.  He

12   will be.  So, yeah, he will be now, when we excuse people.

13          MS. HOSSEINI:  Okay.

14          THE COURT:  So you can ask him directly.  And if he's

15   not comfortable, then we can bring him over here (Indicating)

16   and speak to him.

17          MS. HOSSEINI:  Okay.

18          THE COURT:  But he's probably -- probably a

19   misdemeanor, if it's the first one.

20          MS. HOSSEINI:  Yeah.  I don't really see it as an

21   issue, but I've had a situation where that person were actually

22   convicted as a felon, then we had to try the whole case,

23   because he was not fit as a juror.

24          THE COURT:  Well, definitely ask him.  You will

25   definitely ask him.

1          MS. HOSSEINI:  I was hoping Your Honor would inquire,

2     so it doesn't look like I'm calling him out.

3          THE COURT:  Oh, 53.  Okay.

4          MS. HOSSEINI:  Yeah.

5          THE COURT:  Fair.

6          MS. HOSSEINI:  Thank you, Your Honor.

7          THE COURT:  That's Mr. Soto.

8          MS. MITCHELL:  Uh-huh.  S-O-T-O.

9          THE COURT:  We just got his questionnaire this

10    morning.

11         MS. HOSSEINI:  Yeah, 53.

12         THE COURT:  Okay.  I will do that.

13         MS. HOSSEINI:  Thank Your Honor.

14         THE COURT:  I will do that.  If I forget, wave your

15    hand.  Great.  Okay.  Thank you.

16         MS. HOSSEINI:  Thank you.

17         MS. MITCHELL:  Thank you, Your Honor.

18         MR. RAJU:  Thank you.

19      (Conclusion of sidebar discussion. The following

20       proceedings were held before the Jury Venire)

21         THE COURT:  Okay, thank you for your patience, members

22    of our jury pool.

23      We are going excuse the following jurors.  No. 1,

24    Mr. Ramos, aloha.  No. 19, Dong Gao.  No. 23, Ms. Pama.  Good

25    luck on your exams.

1          No. 27, Ms. Balenbin.  All right.

2              **THE COURTROOM DEPUTY:**  Can you read those back one

3    more time?

4              **THE COURT:**  Do you just need just the numbers?

5              **THE COURTROOM DEPUTY:**  Yes, Your Honor.

6              **THE COURT:**  All right.  No. 18, No. 19, No. 23,

7    No. 27.

8          So now we will call you to sit in this row.  You jurors in

9    the second and third row, you can move, stand up.  We're going

10   to do a little dance here.

11         And then I and the lawyers are going to ask the 32 of you

12   questions.  The rest of you pay careful attention to those

13   questions, because at some point some of those will likely be

14   excused, and then we will replace them with you.  And then we

15   will ask you, shorthand:  Do you have anything to say to any of

16   those questions?

17         So Ms. Means, would you please read the first 32.

18             **THE COURTROOM DEPUTY:**  Yes, Your Honor.

19         Jessica Pama, please come and sit right here (Indicating).

20         Like a wedding planner.

21         Susan Liu.  You sit next to her.  Perfect.

22         Susan Paskowski.  Two Susans in a row.

23         Maila Estacio.  Calvin Azevedo.  Charlene Perez.

24         Jaromir Krap.  Close.

25         Juan Cardenas.  And Mr. Cardenas, you are going to sit

 1   right in front of Ms. To, here.

 2        Chengguo Dong.  Alana Simmons.

 3        Alondra Garcia Romero.

 4        Tetsu Okano.  Richard Martinez.  Ms. Kimberly Brown.

 5        And Ms. Brown, come on down, you are going to sit on that

 6   first seat right there marked "No. 15."

 7        Susan Mosk.  Another Susan.

 8        Ronald Abantao.

 9        Mello, Vincent.

10        Gail Torres.  Adriana Ocampobotello.

11             THE COURT:  Ada, what about No. 39?

12             THE COURTROOM DEPUTY:  Oh, you're right.

13        Okay.  One, two, three, four, five six.  Okay.

14        Ms. Torres?  Can you -- wait.  Where's Mr. Mello?  Okay.

15   Can you raise your hand?

16        And then Gail Torres, and Ms. Ocampobotello I'm missing,

17   so I need Oscar Gonzalez Gomes after Mr. Vincent.

18        I apologize for the mix-up.

19             THE COURT:  Mr. Mello.

20             THE COURTROOM DEPUTY:  And then you two lovely ladies,

21   can you stand up?  Because I need -- I'm moving you guys.  One,

22   two, three, four, five -- okay.

23        Ms. Torres can stay, and Ms. Ocampobotello, the row behind

24   the first row here, can I have you get up and move?

25        (Request complied with)

1    **THE COURTROOM DEPUTY:**  And then Ms. Adriana, go ahead

2    and go to the second row behind you.  You are going to be

3    No. 21 over there.

4         And then it's going to be Janie Nakamoto, John Hamilton

5    and Marlon Smith.  And Cipi Jain.

6         And then the row behind them, please rise and move down.

7    Gerald Austin.  Yes.  Going together in that same row that I

8    kicked you out of.

9         And then Bridget Ivins-Young.  Thomas Feledy.

10        And two more right there.

11        Oliver Lopez.  And Joseph Soto.  Okay.  Is that -- two

12   more?

13        Eric Ravaglia.  And the last one is Natdanai Thongurai.

14   You are going to take the seat next to Mr. Eric.  There you go.

15   Thank you.

16        **THE COURT:**  Okay.  And as I said, for all the other

17   jurors whose names were not read, if you could please also pay

18   attention.

19        So now I'm going to read you all a brief summary of what

20   this case is about.

21        The United States government alleges that beginning on or

22   about June 2nd, 2022, through July 26, 2022, the defendant,

23   Allen Gessen, committed murder for hire.  According to the

24   government, the defendant hired an individual to arrange the

25   murder of his former partner, the mother of his two children.

1    The government also alleges the defendant provided a gold

2    coin and sent two wire transfers totaling approximately $23,000

3    as payment for the murder.  The murder did not happen.

4    Defendant has pled not guilty, and disputes the

5    government's allegations.  The defendant is presumed innocent

6    unless and until the government proves the defendant guilty

7    beyond a reasonable doubt.

8    Have any of you heard of or read anything about this case?

9    (No response)

10   **THE COURT:**  No one is raising their hand.

11   So before -- so listen carefully to each question I -- and

12   the attorneys now are each going to have about a few minutes to

13   ask individually or all of you some questions.

14   When deciding what your answer is, work very hard to be

15   fully honest with yourself.  Do not answer simply because you

16   think it is what I or the lawyers or the parties want to hear,

17   and do not try to guess what the right answer is.  There is no

18   right answer.  The only right answers are those that are

19   thoughtful and truthful.

20   Again, if there's an answer you do not want to give in

21   front of your fellow jurors, please let me know, and we will

22   talk with you in a more private setting.

23   Now, before I have the attorneys get up and ask some

24   questions, there are some important comments that I must make.

25   First, as you know, this is a criminal case.  As such, the

1  United States Constitution requires -- that is, demands -- that

2  the jury presume the defendant is innocent.  And that the

3  government must prove the defendant is guilty beyond a

4  reasonable doubt.

5      If you are selected to serve on the jury, I am going to

6  instruct you that you must presume the defendant is innocent.

7  And that before a verdict can be rendered in the government's

8  favor, the government must prove the defendant's guilt beyond a

9  reasonable doubt.  I'm going to instruct you that.

10     Is there anyone here who will not follow my instruction

11 that you presume the defendant is innocent, and find the

12 defendant is guilty only if the government proves the

13 defendant's guilt beyond a reasonable doubt?

14          **UNIDENTIFIED MAN:**  Yeah.

15     (A hand is raised)

16          **THE COURTROOM DEPUTY:**  Who has the mic?

17          **THE COURT:**  Where is the mic?  And again, when

18 speaking, if you could please state your jury number.

19          **THE COURTROOM DEPUTY:**  Thank you.

20          **THE COURT:**  And your name.

21          **PROSPECTIVE JUROR MELLO:**  Yeah, Juror 38, Vincent

22 Mello.  So, I think my response might corrupt the jury's

23 thinking.

24          **THE COURT:**  All right, I appreciate you --

25          **PROSPECTIVE JUROR MELLO:**  This is something -- yeah.

1        **THE COURT:**  We will speak to you separately, then,

2   briefly.  Thank you.

3        Oh, there's one other.  I think it was Ms. Brown?

4        **PROSPECTIVE JUROR BROWN:**  My Juror number is 32.  I

5   think I kind of agree too because your question was more so

6   like if we feel like they're guilty, even if the government --

7   I mean if we feel like they're guilty and the government

8   decides that they're innocent, you are saying that -- we stand

9   by that opinion, right?

10       **THE COURT:**  No.  What I'm saying is the government has

11  the burden of proving guilt.  So as we sit here today, you've

12  heard no evidence.  That means the defendant is innocent.

13       **PROSPECTIVE JUROR BROWN:**  Uh-huh.

14       **THE COURT:**  And you can only render -- vote to convict

15  if the government -- the government proves beyond a reasonable

16  doubt that the defendant is guilty.

17       Can you follow -- that's what I'm going to instruct you.

18  Can you follow that instruction?

19       **PROSPECTIVE JUROR BROWN:**  Yes.

20       **THE COURT:**  Yes.  Okay.  Thank you, Ms. Brown.

21       A second important Constitutional principle is that the

22  defendant has the right to remain silent.  That is, to not

23  testify in the trial.  Not to put on any evidence at all.  And

24  that is an important Constitutional right that is critical to

25  the Constitution placing the burden on the government to prove

1  guilt beyond a reasonable doubt.

2      If you are selected to serve on the jury, I am going to

3  instruct you that if the defendant does not testify, you cannot

4  draw any negative inference about the decision not to testify.

5  Instead, without considering that fact, you must analyze solely

6  whether the government has met its burden of proving the

7  defendant's guilt, beyond a reasonable doubt.

8      Is there anyone here who will not follow my instruction

9  that if the defendant does not testify, you cannot consider his

10  decision not to testify in your analysis of whether the

11  government has met its burden of proving guilt beyond a

12  reasonable doubt?

13      (No response)

14      **THE COURT:**  Okay.  All right.  Finally, if you are

15  selected to sit as a juror, you must be able and willing to

16  render a verdict solely on the evidence presented at the trial,

17  and the law as I instruct you, and not be based upon your

18  emotions or any preconceived notions about the facts or the law

19  in this case.

20      Is there anyone who thinks he or she cannot do that?

21      (A hand is raised)

22      **THE COURT:**  Okay.  Mr. Mello, we are going to talk to

23  you separately.

24      And then, here in the first row, who has the microphone?

25  If you could pass that up to the -- here to Mister -- all

1  right.  There we go, thank you.

2      **PROSPECTIVE JUROR GARCIA ROMERO:**  I just feel like I

3  won't be able to do like a -- I have my own opinions against

4  violence against women, so...

5      **THE COURT:**  You have your own --

6      **PROSPECTIVE JUROR GARCIA ROMERO:**  Yeah.

7      **THE COURT:**  Everybody does, right?  We are all people,

8  we are all human and we all have opinions.  Ands that's what a

9  jury of your peers means.

10     But in a criminal trial, we expect -- we demand -- that

11 our jury follow the law, follow the law.  Just like you follow

12 the law, right, we have opinions about the law; there are some

13 laws we don't like, but we follow them.

14     And I'm going to instruct you that you -- whatever your

15 opinions may be, that you follow whatever the facts are as you

16 and your fellow jurors find them, and you follow my

17 instructions.  Can you do that?

18     **PROSPECTIVE JUROR GARCIA ROMERO:**  Yes, I can do.

19     **THE COURT:**  All right.  Thank you.  Okay.

20     And Mr. Mello, we'll speak to you separately in a bit.

21     **PROSPECTIVE JUROR MELLO:**  (Nods head)

22     **THE COURT:**  So I am now going to -- the government

23 lawyer will be able to ask some of you some questions

24 individually.  Each lawyer may not ask all of you -- because

25 there's a lot of you and we don't want to be here all

 1   morning -- questions.

 2        If you don't get asked a question specifically, don't be

 3   offended by that, okay?  It's just some people they need to

 4   follow up with and others they do not.

 5        Please go ahead.

 6        **MS. HOSSEINI:**  Thank you, Your Honor.

 7        So maybe I'll ask some raise-your-hand questions first to

 8   the entire jury pool, and then I'll follow up with a few of

 9   you.

10        As you've seen in the jury questionnaires, there's a

11   question about undercover investigations.  Law enforcement

12   officers are permitted to conduct undercover investigations,

13   sometimes referred to as "sting operations."  And some of you

14   have answered those questions in some ways.

15        Is there anyone here who thinks that undercover

16   investigations should not be lawful?  They should never, ever

17   happen?

18        (No response)

19        **MS. HOSSEINI:**  I see no hands.

20        May I call on Ms. Mosk, Juror No. 33.

21        Can you tell us what your views are on undercover

22   investigations?

23        **PROSPECTIVE JUROR MOSK:**  Hi.  I'm all for them.  Um,

24   to elaborate, um, I just think if it, um, makes the case,

25   proves it, if you don't do bad there is no need for a sting

1   operation.  If you abide by the law, there shouldn't be a sting

2   operation.

3        But if there is a sting operation, and the person is

4   guilty or innocent, it will show by what's taped, and evidence.

5   So, fair chance for the defendant.

6        **MS. HOSSEINI:**  Thank you, Ms. Mosk.

7        Juror No. 35, Mr. Abantao?  May I ask you the same

8   question?

9        **PROSPECTIVE JUROR ABANTAO:**  I believe in them.

10  They're a tool to be used to gather evidence, and see if

11  there's a crime committed.

12       **MS. HOSSEINI:**  Thank you.

13       Juror No. 9, Ms. Perez?

14       **PROSPECTIVE JUROR PEREZ:**  Hello.  Um, yeah, I agree

15  with sting operations as long as there is grounds to -- you

16  know, that there's -- there's something suspicious about a

17  person that needs to be looked into, it makes sense.

18       **MS. HOSSEINI:**  Okay.  Does anyone here think that the

19  fact that a law enforcement officer is taking the role of a

20  criminal in an undercover investigation is something that they

21  cannot agree with,  and listen to the testimony of such an

22  undercover officer with objectivity?

23       Anyone here have any views about that and would like to

24  share?

25       (No response)

 1              MS. HOSSEINI:  I see no hands.  So I'll move on to

 2      another topic.

 3          Law enforcement officers are permitted to record

 4      conversations of people during their investigation.  So if they

 5      are working an undercover investigation, and they suspect that

 6      someone might be committing a crime, they are permitted by law

 7      to record those types of conversations.

 8          Does anyone here believe that that should not be allowed

 9      in that context, in an undercover investigation, such

10      conversations should not be recorded?

11          (No response)

12              MS. HOSSEINI:  I see no hands.  So maybe I'll just

13      call on Juror No. 54.  Yes.

14              PROSPECTIVE JUROR RAVAGLIA:  Hello (Inaudible).

15          (Reporter clarification)

16              PROSPECTIVE JUROR RAVAGLIA:  Sorry about that.  Eric

17      Ravaglia.  It's a silent G.

18          With regards to your question, yeah, absolutely, I think

19      recordings are preferred as long as they're lawfully executed,

20      just because then you have a -- a given record of what may or

21      may not have been said in the course of the investigation.

22              MS. HOSSEINI:  Thank you, Mr. Ravaglia.

23          Going to call on Juror No. 13, Ms. Cardenas.  I'm sorry,

24      Mr. Cardenas.

25              PROSPECTIVE JUROR CARDENAS:  Yeah.  Oh.  Just throw

```
 1   it --
 2            THE COURTROOM DEPUTY:  Please don't.  It will make my
 3   life harder.
 4            PROSPECTIVE JUROR CARDENAS:  Thank you.  Hello.
 5            MS. HOSSEINI:  Yes.  May I ask you the same question?
 6            PROSPECTIVE JUROR CARDENAS:  Hello.  Um, yeah.  I -- I
 7   completely agree with him.  As long as it's, um, executed
 8   lawfully then I think I prefer a recorded thing versus
 9   testimony, because it's, you know, direct, clear evidence.  So
10   -- yeah.
11            MS. HOSSEINI:  Thank you, Mr. Cardenas.
12            PROSPECTIVE JUROR CARDENAS:  No problem.
13            MS. HOSSEINI:  Anyone disagree with that?
14            PROSPECTIVE JUROR MELLO:  I have a question.
15            MS. HOSSEINI:  Yes, sir.
16            THE COURT:  Pass the microphone to Mr. Mello.
17            PROSPECTIVE JUROR MELLO:  How can you trust that it's
18   accurate or real or genuine?
19            MS. HOSSEINI:  Okay.
20            PROSPECTIVE JUROR MELLO:  So that would be my only
21   thing is, like, how do you know it's not been edited, right?
22   So is there something in place that -- that does that, that
23   checks for that it's genuine?
24            MS. HOSSEINI:  That is a factor that would make a
25   difference in your opinion.  Thank you.
```

1       (A hand is raised)

2            MS. HOSSEINI:  Yes, is it Mr. Jain?

3            PROSPECTIVE JUROR JAIN:  Yes.

4            MS. HOSSEINI:  And you are Juror number?

5            PROSPECTIVE JUROR JAIN:  My Juror number, sorry about

6       that.  There you go.  Hello.  My Juror number is 48.

7            And if the recorded conversation only gives a partial

8       view, and that could lead to bias, then I would be compelled

9       not to pay too much attention to it.

10           If the recorded conversation gives a complete perspective,

11      then I would be more compelled to, you know, take -- take

12      evidence and listen to it.

13           MS. HOSSEINI:  So that's what makes a difference, if

14      it's an entirely complete recording or a partial recording.

15           PROSPECTIVE JUROR JAIN:  Absolutely.  That would -- it

16      could alter my point of view.

17           MS. HOSSEINI:  Okay.  Anyone agree with Mr. Jain?

18       (Hands raised)

19           PROSPECTIVE JUROR MELLO:  Yeah, context matters.

20           MS. HOSSEINI:  Context matters, Mr. Mello.

21           UNIDENTIFIED MAN:  Agree.

22           MS. HOSSEINI:  To ask a general question, is there

23      anything about your experiences, your opinions, your beliefs,

24      whether they be religious, moral, ethical, philosophical,

25      personal that would affect your ability to be a fair and

1   impartial juror in this case, now that you know a little bit
2   about this case?
3       (No response)
4       **MS. HOSSEINI:**  Nobody?  I see no hands.
5       Let me ask you if any of you have any views about the
6   Department of Justice or the FBI.  Any kind of views or
7   experiences with them, whether they are positive or negative.
8       (No response)
9       (A hand is raised)
10      **MS. HOSSEINI:**  Yes.  Yes, sir.  If you can give us
11  your name and your juror number, please.
12      **PROSPECTIVE JUROR FELEDY:**  Yeah, No. 41 (sic), Tom
13  Feledy.
14      I have positive views about the Department of Justice.  I
15  worked for them for a while when I was working as a police
16  officer in San Francisco, which I'm retired from, now.
17      So, I tend to look upon the FBI and DOJ favorably.
18      **MS. HOSSEINI:**  Thank you, Mr. Feledy.  Let me ask you,
19  the fact --
20      **THE COURT:**  Tell us again, what was your Juror number
21      **PROSPECTIVE JUROR FELEDY:**  51.
22      **THE COURT:**  Oh, 51.  Thank you.
23      **MS. HOSSEINI:**  Mr. Feledy, even though you tend to
24  look upon the Department of Justice and the FBI favorably,
25  given your prior employment, can you still be a fair and

1    impartial juror, if you were to be selected as a juror in this

2    case?

3                PROSPECTIVE JUROR FELEDY:   I think so.

4            MS. HOSSEINI:   Okay, thank you.

5        Anyone else?   Positive or negative views about the FBI or

6    Department of Justice?

7        (A hand is raised)

8            MS. HOSSEINI:   Yes, sir.   We'll wait until we get the

9    microphone to you.   And once we do, if you can please remind us

10   of your name and your juror number.

11               PROSPECTIVE JUROR DONG:   Okay.

12       (Reporter clarification)

13               PROSPECTIVE JUROR DONG:   Sure.   My Juror number is 15.

14   I have one case actually right now, it's under investigation by

15   the FBI.   So I don't have the (inaudible) on that too, but I

16   just want to say out of the case right now, it's in the FIP --

17   FBI case.

18           MS. HOSSEINI:   Okay.   Thank you for letting us know.

19       Is there anything about that case that would affect your

20   ability to be a fair and impartial juror in this case if you

21   were to be selected a juror?

22               PROSPECTIVE JUROR DONG:   I don't think so.

23               THE COURT:   Okay.

24           MS. HOSSEINI:   Okay.

25               PROSPECTIVE JUROR DONG:   Yeah.

1          **MS. HOSSEINI:**  Anybody else?  And we'll leave the mic

2    on, thank you.  Anybody else, positive or negative views about

3    the FBI or the Department of Justice?

4       (No response)

5          **MS. HOSSEINI:**  I see no hands.

6       If I may call on Juror No. 5, Ms. Estacio, I think in your

7    questionnaire you said that you had ten jury trials you have

8    served on before?  Is that right?

9              **PROSPECTIVE JUROR ESTACIO:**  Not ten, just one.

10         **MS. HOSSEINI:**  Just one, perhaps the zero got in

11   there.

12             **PROSPECTIVE JUROR ESTACIO:**  Just one.

13         **MS. HOSSEINI:**  I was like:  Wow, that's quite a lot of

14   jury service.

15             **THE COURT:**  You would have had the record.

16         **MS. HOSSEINI:**  Thank you.  I just wanted that

17   clarification.

18             **PROSPECTIVE JUROR ESTACIO:**  Okay.

19         **MS. HOSSEINI:**  Everybody has their own experiences,

20   their own views.  Is there anything in your personal life or in

21   your employment that you think would not make you be a good fit

22   for this case?

23       Now that you know a little bit about this case, any

24   reservations you might have about your ability to be fair and

25   impartial?

```
 1        (A hand is raised)
 2            MS. HOSSEINI:  Mr. Mello, we will talk to you.
 3            PROSPECTIVE JUROR MELLO:  Yeah.
 4            MS. HOSSEINI:  I see no hands.
 5        If I may just have a moment, Your Honor?
 6            THE COURT:  You may.
 7        (Off-the-Record discussion between counsel)
 8            MS. HOSSEINI:  Thank you, Your Honor.
 9            THE COURT:  All right.  Thank you.
10        Ms. Mitchell?
11            MS. MITCHELL:  Good morning, everyone.  I'm going to
12    turn and tilt so I can see all of you at the same time.  Thank
13    you for being here this morning.
14        So we are asking you questions to try and figure out if
15    you are a good fit for this trial.  Because while jury service
16    may be something that might work for you for another case a
17    little bit better, or for a different case a little bit better,
18    what we are trying to figure out when we are asking you these
19    questions is:  For this case and for this trial, are you going
20    to be a really good fit?
21        And so I want to ask you a couple of questions about who
22    you are as a person, and some of the experiences that you have
23    had, to find out if that would actually work for you.
24        And I want to talk to a few of you who have had previous
25    experience working in law enforcement.
```

```
 1        And I know, Mr. Martinez, you're a retired police
 2   sergeant.
 3            PROSPECTIVE JUROR MARTINEZ:  (Nods head)
 4        MS. MITCHELL:  Is there anyone else like Mr. Martinez,
 5   who has had prior experience working in law enforcement?
 6        (A hand is raised)
 7            MS. MITCHELL:  Yes.  Anyone else?
 8        (No response)
 9            MS. MITCHELL:  Okay.  So Mr. Martinez and Mr. Feledy.
10            PROSPECTIVE JUROR FELEDY:  (Nods head)
11        MS. MITCHELL:  Okay.  For the two of you, you have,
12   I'm sure, lots of friends who are still, retired and former law
13   enforcement officers.  And you might talk to them about the
14   case later on.
15        Could you go back to them and say "I sat on a criminal
16   trial, and I found someone not guilty"?  Could you feel
17   comfortable doing that?
18            PROSPECTIVE JUROR FELEDY:  (Nods head)
19        MS. MITCHELL:  Or would you feel compelled to go along
20   and find someone guilty, based off of your previous experience
21   working in law enforcement?
22        Mr. Martinez, we'll start with you.
23            THE COURT:  Use the microphone.
24            PROSPECTIVE JUROR MARTINEZ:  Yeah, that wouldn't
25   affect how, you know, guilty or not guilty is, no problem.
```

1              **MS. MITCHELL:**  And, wh would you find no problem in

2      making that kind of decision?

3              **PROSPECTIVE JUROR MARTINEZ:**  I don't know; because

4      it's just true.  You know, that's what I would have -- that's

5      what I would have decided.  Or, you know, that -- each case is

6      separate.

7              **MS. MITCHELL:**  Okay.  Thank you.  I appreciate that.

8      And if we could pass the microphone back.

9              **PROSPECTIVE JUROR FELEDY:**  It's the same thing here.

10     No. 41, Tom Feledy.

11          It wouldn't make any difference to me.  If the evidence

12     isn't there beyond a reasonable doubt, then that's got to be

13     the verdict.  And I would have no problem explaining it.

14             **MS. MITCHELL:**  Uh-huh.

15             **PROSPECTIVE JUROR FELEDY:**  So, sometimes people are

16     actually innocent, you know.

17          **MS. MITCHELL:**  Sometimes they are.  Thank you for

18     that.

19          I'm going to take what you just gave us as an answer, and

20     ask a few more questions about that.  Beyond a reasonable doubt

21     is the burden that the judge has told you about, and the

22     government's going to explain to you that they have to meet in

23     this case.

24          But sometimes people have a really hard time really

25     conceptualizing that, and they feel that if someone is in a

1  courtroom, and a criminal case is going on, that they must have

2  done something.  And then it feels a little bit more like:

3  Well, if they're here I think they did something; I kind of

4  want someone to prove to me that they didn't do it.

5      Does anyone else feel that way?  It's a really common

6  feeling.  Does anyone feel, just by show of hands, that just

7  because someone is here, you kind of want to hear a little bit

8  more about why they didn't do it, and you'd expect it to come

9  from them?

10      I see a couple of hands.

11      (Hands raised)

12      MS. MITCHELL:  Oh, I've got a couple of hands.  This

13  is great.  I really want to hear your thoughts.

14      Let's start with Mr. Jain.  We will start with you first.

15      PROSPECTIVE JUROR JAIN:  Hello.  Number 48.

16      So, if someone is here in my -- that is my opinion and

17  it's my true opinion, if someone is here, there is no smoke

18  without fire.  So it has to be some compelling reasons they are

19  in this situation.

20      MS. MITCHELL:  Uh-huh.

21      PROSPECTIVE JUROR JAIN:  And if they're not going to

22  stand up for themselves and speak for themselves, it will

23  affect my opinion of them, that they can't represent

24  themselves, they can't come out and talk freely in front of me

25  and look at me in the eye.

1    So it could potentially affect my opinion if someone is

2    here already or not testifying for themselves.

3         **MS. MITCHELL:**  I see a lot of heads nodding.

4         **THE COURT:**  I'm going to follow up.

5    Mr. Jain, you did hear my question just a few minutes ago

6    where I explained that there's a Fifth Amendment constitutional

7    right not to testify.  And that I will instruct that you cannot

8    consider that.

9         **PROSPECTIVE JUROR JAIN:**  Yes, Your Honor, I did hear.

10        **THE COURT:**  So are you saying that you can or cannot

11   follow my instruction?

12        **PROSPECTIVE JUROR JAIN:**  Your Honor, this is my first

13   trial.  I've never been in this situation.  And my views are

14   evolving as I'm in different situations.

15   When you made that question, I was thinking of raising my

16   hand.  I wasn't sure.  But as this conversation is going

17   forward, I feel it's important that I express my views as

18   confidently and as honestly as possible.

19        **THE COURT:**  Absolutely.  Thank you for doing so.

20        **MS. MITCHELL:**  And I want to encourage everyone, like,

21   we want to hear what your views are because, of course, this is

22   the determination.  Are you the right juror for this case?  And

23   hearing your views helps us make up our minds about that.

24   So as Mr. Jain said; even though the judge is going to

25   give him instructions, these are things that he personally

 1    holds dear.  Does anyone else have these same feelings?

 2        We saw a lot of hand come up, so I would really like to

 3    hear from you.

 4        (A hand is raised)

 5            **MS. MITCHELL:**  If we could pass the microphone along.

 6    Uh-huh.

 7            **PROSPECTIVE JUROR PEREZ:**  Hi.  I'm Juror 9.  It kind

 8    of goes back to what I said about sting operations.  There must

 9    have been grounds for it.

10        So, kind of the same reasoning, like, somebody's in court

11    because there were grounds to question that something bad

12    happened.  They were behind -- potentially, allegedly, behind

13    something bad.  So...

14            **MS. MITCHELL:**  Thank you, Ms. Perez.

15        Does anyone else feel similar to Ms. Perez?  I thought I

16    saw a few more hands.

17        Mr. Okano, I thought I saw you raise your hand.

18            **PROSPECTIVE JUROR OKANO:**  (Shakes head)

19            **MS. MITCHELL:**  No.  Okay.

20        And Mr. Dong?

21            **PROSPECTIVE JUROR DONG:**  Yes.

22            **MS. MITCHELL:**  Yes.

23            **PROSPECTIVE JUROR DONG:**  Yeah.  Thank you.  My Juror

24    number, 15.

25            **MS. MITCHELL:**  Uh-huh.

1    **PROSPECTIVE JUROR DONG:**  I have the exact same feeling

2    as that gentleman (Indicating).  So this is my also first time

3    showing the court -- courtroom.  And I understand how it works,

4    but really I have the kind of a preconceptional just kind of

5    opinion, I feel.

6        I don't know whether -- I'd try my best if I really

7    selected.  Yeah.

8        **MS. MITCHELL:**  Does anyone else feel the same way as

9    Mr. Dong?  That they would follow the Court's rule, but they

10   have a very strong preconception that they would be fighting

11   while they're trying to follow the Court's order?

12       (A hand is raised)

13       **MS. MITCHELL:**  Yes, Ms. Hoang.

14       **PROSPECTIVE JUROR HOANG:**  I'm Juror No. 14, I think.

15       **MS. MITCHELL:**  Uh-huh.

16       **PROSPECTIVE JUROR HOANG:**  Before coming here, if

17   somebody is innocent, then why don't you come up and try to

18   defend yourself.  So if you don't, then I'm -- you know, that's

19   my preconceived idea, like:  Is there something you want to

20   hide?

21       But I do hear what the judge say, that, you know, you have

22   to, you know, listen to all the evidence.  And I'm willing to

23   follow that.

24       **MS. MITCHELL:**  Thank you very much, Ms. Hoang.  I

25   appreciate that.

1        Does anyone else have any comments along the same line?

2        (No response)

3        (A hand is raised)

4            MS. MITCHELL:  Oh, yes.  Okay, Ms. Brown.

5            PROSPECTIVE JUROR BROWN:  I'm Juror No. 32.  Kimberly

6    Brown.

7        Um, I think I kind of agree with what everybody's saying.

8    Like, at the same time, it's kind of like if you know that

9    you're not wrong, why not defend yourself or why not speak up

10   or give your opinion?  At the same time, you do have to go by

11   the evidence and what's in front of you.

12       So I do agree, but at the same time I can understand

13   following the rules of the courtroom and the jury and stuff

14   like that.

15           MS. MITCHELL:  Thank you, Ms. Brown.  I you really

16   appreciate that.

17       Does anyone else have a similar thought to Ms. Brown or

18   any of the other jurors that you've heard expressed?

19       (No response)

20           MS. MITCHELL:  Okay.  I want to switch topics a little

21   bit and move on to a different one.

22       In this case, as you have heard, there's going to be an

23   allegation that my client, Mr. Gessen, is accused of committing

24   a murder for hire.  And the person that's involved in that is a

25   person who was his former partner.

1          So, questions about that.  Have any of you ever been in an

2    experience where you have been in a relationship with a partner

3    where it has -- there has been allegations of violence against

4    each other, or there's been a situation where you or someone

5    close to you has felt threatened or concerned about their

6    safety in a romantic relationship?

7          (A hand is raised)

8          **MS. MITCHELL:**  I'm seeing a lot of head nods "No" but

9    I see -- Ms. Garcia?

10         **PROSPECTIVE JUROR GARCIA ROMERO:**  Uh-huh.

11         **MS. MITCHELL:**  Is this something you feel comfortable

12   talking about in open court?  Or would you like to talk about

13   it on sidebar?

14         **PROSPECTIVE JUROR GARCIA ROMERO:**  Privately.

15         **MS. MITCHELL:**  Okay.  We'll come back to you later on.

16         Does anyone else have -- has a topic like that, that they

17   would like to discuss?  We can even take it to the side and

18   discuss it in private if someone has a topic like that.

19         (No response)

20         **MS. MITCHELL:**  All right, I'm not seeing anyone else's

21   hands.

22         All right.  In a similar vein, a number of you have gone

23   through divorce proceedings or have close relationships with

24   individuals who have gone through divorce proceedings.

25         Could everyone here who's gone through a divorce just

1    raise their hand?

2         (Hands raised)

3         **MS. MITCHELL:**  Okay.  So I am seeing -- and keep your

4    hands up until I acknowledge you -- Mr. Cardenas, Juror No. 13.

5         **PROSPECTIVE JUROR CARDENAS:**  Uh-huh.

6         **MS. MITCHELL:**  And Mr. Martinez, Juror No. 31.

7    Ms. Mosk, Juror No. 33.  Mr. Smith or Hamilton?

8         **PROSPECTIVE JUROR HAMILTON:**  Hamilton.

9         **MS. MITCHELL:**  Mr. Hamilton, Juror No. 44.

10        And then you would be Mr. Austin, Juror No. 49.  Correct?

11   All right.

12        I want to ask a few of you about your experiences going

13   through these proceedings.

14        If I could start first with Mr. Cardenas, Juror No. 13.

15   And I will wait for the microphone to work its way down.

16        **PROSPECTIVE JUROR CARDENAS:**  Hello.

17        **MS. MITCHELL:**  Can you tell us about the divorce

18   proceedings, the affect on you, how it -- how you view things

19   afterwards, especially with contentious, non-contentious

20   divorce proceedings.

21        **PROSPECTIVE JUROR CARDENAS:**  Yeah.  We did it

22   ourselves, without attorneys.  We just had a mediator.  So it's

23   taken a long time; we're actually just at the final stage now.

24        So, yeah, I mean, it sucks, but -- the first thing we

25   agreed was to not talk badly about each other to the kids, so

1  that makes things a lot easier.  So the kids still think we're

2  buddies, but yeah.

3          **MS. MITCHELL:**  Thank you.

4          **PROSPECTIVE JUROR CARDENAS:**  It's hard, but it's

5  nothing unmanageable.

6          **MS. MITCHELL:**  And you mentioned that you had

7  children.  How is working through the custody issues with the

8  children?

9          **PROSPECTIVE JUROR CARDENAS:**  We actually had no -- we

10  -- that was one of the things that we decided on easily, that

11  we -- you know, with custody.  So we had no issues with that,

12  about money.

13          **MS. MITCHELL:**  Okay.  All right.  Thank you.

14      Turning to Mr. Martinez.  How were your proceedings,

15  Mr. Martinez?  How were your feelings afterwards?

16          **PROSPECTIVE JUROR MARTINEZ:**  Kind of shocking.  Kind

17  of the last to know.

18          **PROSPECTIVE JUROR CARDENAS:**  Hm.

19          **PROSPECTIVE JUROR MARTINEZ:**  I mean, it -- I don't

20  know; it was kind of a painful thing for me.

21          **MS. MITCHELL:**  Do you have any lingering feelings of

22  frustration, confusion, anything like that resulting from the

23  proceedings?

24          **PROSPECTIVE JUROR MARTINEZ:**  No, no.

25          **MS. MITCHELL:**  And as to the legal proceedings

1  surrounding it, did you have any feelings of contention, or

2  were you upset about what happened?

3         **PROSPECTIVE JUROR MARTINEZ:**  Oh, I was crushed.  Yeah.

4         **MS. MITCHELL:**  Because the relationship ending had to

5  be particularly hard.

6         **PROSPECTIVE JUROR MARTINEZ:**  I'm sorry?

7         **MS. MITCHELL:**  The relationship ending had to be

8  particularly hard?

9         **PROSPECTIVE JUROR MARTINEZ:**  Yes.

10        **MS. MITCHELL:**  Do you feel that you're in a good place

11  if you're hearing about another relationship ending?  Do you

12  think that that would affect your ability to judge the case

13  without bias?

14        **PROSPECTIVE JUROR MARTINEZ:**  Yeah, I don't think that

15  would affect it.

16        **MS. MITCHELL:**  Thank you, Mr. Martinez.

17     What about Juror No. 33, Ms. Mosk.

18        **PROSPECTIVE JUROR MOSK:**  Oh.  Um, yes, a divorce,

19  worst time of my life.

20     Um, full circle now, it's great.  I have eight

21  grandchildren, three wonderful kids.  But going through it was

22  horrible.  Absolutely horrible.

23     The court was fine.  My attorney was wonderful.  But, I

24  married an asshole.  So -- and that's what my attorney said.

25  "You married him."

1          So I don't know what you want me to tell you.

2          MS. MITCHELL:  No -- so, this is great.  Thank you for

3    being so candid.  We want to know.  All right --

4          PROSPECTIVE JUROR MOSK:  Divorce is not fun.

5          MS. MITCHELL:  No.  Divorce is not fun.  If you're in

6    a situation where you were going to hear about someone going

7    through a process that involves custody issues, and things

8    might have gotten a little contentious, having been in a

9    similar kind of situation, would you hold it against anyone

10   because of the experiences that you had before?

11         PROSPECTIVE JUROR MOSK:  I'm so open.  I mean,

12   honestly, it's not funny; this is tragic.  My heart goes out to

13   whoever's involved in this.  Because, trust me.  My mom told

14   the whole world she wanted my ex-husband dead.  You know.  And

15   we would tell her:  "It's not funny, it's not funny, stop," you

16   know.  Of course.  Because in my case, my daughter ended up

17   with me, and he took my two sons.  He got awarded my two sons,

18   who were only, like, 10 and 12.  And my daughter was, like,

19   eight.  And my boys got a choice in the case.  It was kind of

20   unheard of.

21         So my kids who -- you know, my youngest two were almost

22   like twins.  They got separated.  So my boys ended up in

23   Arizona, my daughter ended up with me.

24         Again, in the big picture he did me a blessing.  I mean,

25   because I couldn't have raised my two boys, on my, own with the

1    asshole that he was.

2         MS. MITCHELL:  Uh-huh.

3         PROSPECTIVE JUROR MOSK:  So I'm open to hearing the

4    whole thing.  No judgment, quite honestly.  Not whether I want

5    to be on this case so bad or not, but I've lived it.  And, you

6    know, I'm open.  I mean...

7         MS. MITCHELL:  I'm going to add an additional wrinkle

8    to it, because you have lived this, and so you've been in that

9    situation.

10        And one of the concerns we might have, thus being the

11   defense counsel, might be that you identify more with

12   Mr. Gessen's romantic partner because you have been in the same

13   position that she is in.  You're going to hear that there are

14   going to be children that are involved, and there are custody

15   issues about those children.

16        Do you still feel that you can listen to all of that

17   information from an unbiased perspective, understanding it's

18   going to be children separated by distance and things like

19   that?

20        PROSPECTIVE JUROR MOSK:  That's because I have a lot

21   of remorse, too, for what I caused my kids.  Conversations that

22   we have, now that they've given me grandchildren, and, you

23   know, I thought I was doing it all right then.  And now we have

24   conversations, and I screwed up too, you know.  I did not say

25   nice things about their dad.

1     And I'm still not, you know, fond of this person but I can

2     eat with him, I can be next to him, I can be at birthday

3     parties and holidays with him, and I feel nothing.  And I never

4     thought that day would come.

5          And -- really.  I mean, he would get me -- give me major

6     anxiety and the sweats and nervous.  And now, I don't give two

7     shits about him.  Excuse my language, but it's true.  It's

8     like, oh, I can just brush him off.  And it's so nice.  So

9     nice.

10         If I could tell anyone going through, you know, a horrible

11    situation, you know, this too shall pass.

12         **MS. MITCHELL:**  Uh-huh.  Yes.

13         **PROSPECTIVE JUROR MOSK:**  And so, yeah.  For -- you

14    know, my heart goes out for both sides, because it's -- the

15    kids, the ex, the wife, the husband, it's -- just sucks, all

16    around.

17         **MS. MITCHELL:**  Uh-huh.  And I want to touch on one

18    thing that you were talking about there.  That emotionally, at

19    the time, it was particularly troublesome.  But now that you've

20    gotten some distance, you're able to take -- take a minute, and

21    you realize that the emotions you were experiencing then are

22    not the same emotions that you have now.

23         Do you feel as if you might be in any way -- like, it

24    might put you back in that same place?

25         **PROSPECTIVE JUROR MOSK:**  Um, I can departmentalize.  I

1   mean my situation was -- some day my book's coming out, just

2   because there's more to this.   The after-the-fact.   The woman

3   he left me for, and finding her with another woman.   And he's

4   so homophobic.   And it's just an awesome story.

5        But, you know, to get back to your question, I can

6   departmentalize.   And my situation is my situation.   Everyone

7   has a story.   And I'm going to hone in on this story, focus,

8   take my Adderall, and be on point.

9           **MS. MITCHELL:**   Thank you so much, Ms. Mosk.   I'm going

10  to let you get off the hot seat.

11          **PROSPECTIVE JUROR MOSK:**   That's my story, and I'm

12  sticking to it.

13          **MS. MITCHELL:**   I'm going to turn to Mr. Hamilton.

14  Mr. Hamilton, can you tell us a little bit about your

15  experience, and where you are now, and where you were then?

16          **PROSPECTIVE JUROR HAMILTON:**   I can tell you about two

17  experiences.

18          **MS. MITCHELL:**   Uh-huh.

19          **PROSPECTIVE JUROR HAMILTON:**   The first, was married,

20  happily so.   Had a two-year-old son.   And my wife became

21  acutely bipolar.   Was hospitalized for seven years.

22  I became a single dad in the divorce.   I was competing

23  against the State of California, so half of my retirement and

24  half of my home and all my assets -- not home, excuse me --

25  what was legitimately hers went to the State of California to

 1   pay for her care.

 2       I had asked the Court to put it in trust for her benefit,

 3   in the case that she was ever released.  But I didn't know how

 4   the system worked, I think, 27 years ago.

 5       I remain her best friend.  She has been out, working.  She

 6   is a member of our family.  She thanks me for saving her life.

 7   She comes to every event.  We speak weekly.

 8           **MS. MITCHELL:**  Uh-huh.

 9           **PROSPECTIVE JUROR HAMILTON:**  And I'm stoked that she's

10   a grandmother to our grandchildren.

11       That's a happy ending.

12           **MS. MITCHELL:**  Uh-huh.

13           **PROSPECTIVE JUROR HAMILTON:**  Currently, my -- one of

14   my sons is going through a divorce proceeding.  And it is

15   highly, highly contentious.

16           **MS. MITCHELL:**  Uh-huh.

17           **PROSPECTIVE JUROR HAMILTON:**  Tomorrow is the, I

18   believe, the fifth or sixth hearing, going over child care and

19   visitation.  I've been the -- it's highly contentious, really,

20   to say the least.

21           **MS. MITCHELL:**  Uh-huh.

22           **PROSPECTIVE JUROR HAMILTON:**  There was accusations

23   made by his wife of domestic violence, although she never

24   claimed that he ever touched her or the kids.

25           **MS. MITCHELL:**  Uh-huh.

1          **PROSPECTIVE JUROR HAMILTON:**  He voluntarily moved out

2     of the home.  He is a paramedic, firefighter that was suffering

3     from PTSD.

4          **MS. MITCHELL:**  Uh-huh.

5          **PROSPECTIVE JUROR HAMILTON:**  And, was mistreated.  He

6     was seeking treatment, and was mistreated.  This is -- we're on

7     month 11.

8        I have been carrying the expense of his care, his

9     attorney.  I have paid for his supervised visits.  I have been

10    the visit supervisor.  So it is very emotional.

11         **MS. MITCHELL:**  Uh-huh.

12         **PROSPECTIVE JUROR HAMILTON:**  And I still love his

13    wife.

14         **MS. MITCHELL:**  Uh-huh.

15         **PROSPECTIVE JUROR HAMILTON:**  And I love those kids.

16    I'm confident I can remain objective.

17         **MS. MITCHELL:**  Uh-huh.

18         **PROSPECTIVE JUROR HAMILTON:**  Each case is different.

19    Separate.

20         **MS. MITCHELL:**  When thinking about this case, and

21    hearing -- with the fact that you're going to hear about the

22    effect on these kids, you're going to hear about the fact that

23    it got contentious, and it's -- it's probably going to make you

24    think about what's going on with your son and his case, do you

25    think that you might struggle or that you might overly identify

 1   with one side or the other because of the way that you hope

 2   your son's case resolves?

 3          **PROSPECTIVE JUROR HAMILTON:**  I think the best answer

 4   to your question is I might identify, but that doesn't change

 5   the burden of proof on behalf of the government.

 6          So even though I may feel similar emotions or pain, that

 7   that is irrespective of any acts that were occurred, and

 8   documentation to prove that.  I can remain confident that

 9   someone's innocent until and unless proven guilty.

10          **MS. MITCHELL:**  Okay.  Thank you.  I really appreciate

11   that.

12          The last person I believe who raised their hand was Juror

13   No. 49, and that's Mr. Austin.  We haven't heard much from you,

14   Mr. Austin, so we would really like to hear what you have to

15   say.

16          **PROSPECTIVE JUROR AUSTIN:**  Gerald Austin, No. 49.  My

17   divorce was in England; it was very easy.  The only piece of

18   court action was the piece of paper from the Court to say it

19   was granted.  I guess somebody's solicitor somewhere did

20   something.

21          It's interesting when you ask this question because what

22   did occur to me and has occurred to me several times when I

23   hear about some of these cases where somebody goes off and, you

24   know, where my divorce was so simple, I guess my question is

25   how people can get themselves to such a stage they can't just

 1   walk away.  Or they can't -- they can't -- it's like, get a
 2   divorce, you know.  Walk away.
 3            **MS. MITCHELL:**  Uh-huh.
 4            **PROSPECTIVE JUROR AUSTIN:**  Listening to the questions,
 5   it has raised that particular issue with me, which I hadn't
 6   really thought about before when you were asking questions.
 7   And it's distressing, I think.
 8            **MS. MITCHELL:**  In your divorce, did you have children
 9   and custodial issues?
10            **PROSPECTIVE JUROR AUSTIN:**  No children.  No, no.
11            **MS. MITCHELL:**  All right.
12            **THE COURT:**  That's over 20 minutes.
13            **MS. MITCHELL:**  All right.
14      Just having heard anything, did anyone else have any other
15   issues that were brought up by this conversation that they
16   think it's now important for the Court or the rest of us to
17   hear?
18      (A hand is raised)
19            **MS. MITCHELL:**  Ms. Brown?
20            **PROSPECTIVE JUROR BROWN:**  Kimberly Brown, Juror 32.
21      In the regards of the whole divorce proceedings, I don't
22   really know how that would necessarily affect me but, um, my
23   parents literally just got divorced, like, their divorce just
24   got finalized maybe a couple of months ago.  And it was going
25   on, like, for like, three years.

1      So I do kind of feel like it is a touchy subject.

2  Especially with me being one of the kids going through it, and

3  kind of having to do like the back-and-forth, I do kind of feel

4  like it is somewhat of a sensitive subject.  And it kind of is

5  like you never really know, especially from a child's

6  perspective, on the outside looking in, and them being told

7  different things from different parents.  It is kind of like a

8  torn situation.

9      I do feel like that is kind of a soft spot.

10      **MS. MITCHELL:**  Do you feel as though if you were

11  hearing two different stories from one parent and another

12  parent, it would be something that would be very hard for you

13  to evaluate the evidence without bias?

14      **PROSPECTIVE JUROR BROWN:**  I'm a little torn.  Maybe,

15  yeah, maybe a little.

16      **MS. MITCHELL:**  Could you explain a little bit more

17  about that?

18      **PROSPECTIVE JUROR BROWN:**  Um, I don't know; I think I

19  just know, like, how I felt as a child and just dealing with

20  certain stuff, in regards to like, like a mother's perspective

21  or a father's perspective.  I do kind of feel like me

22  personally, my situation may be different from somebody else's

23  situation, but I do feel like it is kind of like a thin line

24  from where I am.  Me, personally.  I can't speak for anybody

25  else.  But I do feel like for me it is kind of --

1              **MS. MITCHELL:**  It would be a little difficult for you

2    to be unbiased.

3              **PROSPECTIVE JUROR BROWN:**  In this situation, just

4    because of what I have been through, but...

5              **MS. MITCHELL:**  Thank you.  I appreciate that.

6              **THE COURT:**  I just want to follow up a little bit.

7         Mr. Martinez, earlier you said you have to check something

8    on your cellphone.  You have to record.  Do you think that's

9    going to interfere with your ability -- or is that something we

10   could accommodate, number one, I guess, or number two?  If not,

11   is that going to interfere with your ability to pay attention

12   to all the evidence as it is being presented in the case?

13             **PROSPECTIVE JUROR MARTINEZ:**  That was my concern.

14             **THE COURT:**  And you still have that concern.

15             **PROSPECTIVE JUROR MARTINEZ:**  Yes.

16             **THE COURT:**  Okay, all right.

17        And then, Mr. Soto? Mr. Soto.  You, on your questionnaire,

18   mentioned a lawsuit.  Is that something you feel okay talking

19   about in public?  Or would you rather talk about it privately

20   at sidebar?

21             **PROSPECTIVE JUROR SOTO:**  Um, no that's fine.  It was a

22   DUI.

23             **THE COURT:**  DUI.  Do you know if it was a misdemeanor?

24             **PROSPECTIVE JUROR SOTO:**  Yes.

25             **THE COURT:**  Okay, that's all.  Great.  Thank you.

1          Okay.  All right.  So members of the jury, we are now --
2     I'm going to go to sidebar, again with the parties.
3          I would like Ms. Garcia, if you come forward, we will talk
4     to you.
5          And then Mr. Mello, if you would just hang out right here,
6     and then we will talk to you separately.
7          So jurors, we probably will be at least ten minutes or so,
8     if you need to use the restroom.  Or, here, you're in this
9     really unique place with all these strangers.  If you ever went
10    to church, they used to say:  Now turn to the person next to
11    you and introduce yourself.
12         I would say:  Turn to the person next to you and introduce
13    yourself.  What a great opportunity to meet someone new from
14    the Bay area community.  All right?
15         Thank you.
16         (The following proceedings were heard at sidebar)
17         **THE COURT:**  Okay.  Ms. Garcia.  You had some
18    comparisons from your own personal experience.
19         **PROSPECTIVE JUROR GARCIA ROMERO:**  Yes, a couple of
20    years back I was actually arrested for a domestic violence case
21    among my partner and I.  And, I just feel like it was really
22    unfair and it's triggering, like, hearing other violence
23    against other, like, women.  So, that's just it.
24         I mean, everybody has their own side of the story.  In
25    that case I felt like I wasn't really, like, heard, even

1    though, like, I had physical -- like, like, how do you say it?

2           THE COURT:  You, yourself, were physically injured?

3           PROSPECTIVE JUROR GARCIA ROMERO:  Injured, yes.

4           THE COURT:  And so, okay, that is a pretty -- do you

5    feel then that that experience, having had that just two years

6    ago, will affect your ability to be fair and impartial in this

7    case?

8           PROSPECTIVE JUROR GARCIA ROMERO:  Yes.  Honestly,

9    yeah.  I'm like emotional, and stress that I had going on back

10   then.

11          THE COURT:  Okay.

12          PROSPECTIVE JUROR GARCIA ROMERO:  Yeah.

13          THE COURT:  Do you have any questions?

14          MS. HOSSEINI:  No.

15          THE COURT:  Okay.  Thank you so much, Ms. Garcia.

16          MS. MITCHELL:  Thank you.

17          PROSPECTIVE JUROR GARCIA ROMERO:  Uh-huh.

18       (Prospective Juror Garcia leaves the sidebar discussion

19        and Prospective Juror Mello joins the sidebar discussion)

20          THE COURT:  Okay.  Mr. Mello, No. 38.

21          PROSPECTIVE JUROR MELLO:  Hey.

22          THE COURT:  What did you want to speak to us privately

23   about?

24          PROSPECTIVE JUROR MELLO:  What was the original

25   question?

```
 1          MS. MITCHELL:  It was about burden of proof and
 2   whether or not the government could meet it, and your thoughts
 3   on that.
 4          PROSPECTIVE JUROR MELLO:  Let's start there, right.
 5       So I think law enforcement already needs all the help they
 6   can get, and if there is enough evidence to actually land you
 7   in the court (shrugs shoulders), right, it's like it's kind of
 8   a done deal.  That's the way I look at it.
 9          THE COURT:  Okay.
10          PROSPECTIVE JUROR MELLO:  They let people get away
11   with so much nowadays.  And the burden of proof thing I think
12   is a gamble.  I think both parties lie, and I think like these
13   specific things where it looks like, oh, particularly this is a
14   technicality where it's the law -- bullshit.  If someone did
15   it, they did it.
16       I think if there is enough there that you can see that
17   they did that without that burden of proof, to me it's common
18   sense, and I don't think people should get off for
19   technicalities.  I think that is complete bullshit.
20          THE COURT:  So, okay.
21          PROSPECTIVE JUROR MELLO:  I think the whole court
22   thing looks like a dance, right, like both parties are going to
23   lie, and then there is this whole proof thing, it's like:  No,
24   absolutely not.
25          THE COURT:  Okay.
```

1          Did you have any questions for Mr. Mello?

2          **MS. HOSSEINI:**  No.

3          **THE COURT:**  Okay.

4          **PROSPECTIVE JUROR MELLO:**  That was the first question.

5   There was two more, right?  So how many things do you want to

6   touch on here?

7          **THE COURT:**  I don't think we need any more, Mr. Mello.

8          **PROSPECTIVE JUROR MELLO:**  Yeah.

9          **THE COURT:**  But I appreciate you being candid with us.

10         **PROSPECTIVE JUROR MELLO:**  I'm trying to be candid.

11   And also one of the things I want to point out, too, this is

12   not a smoke-friendly thing, as well.  Like, I have been

13   chain-smoking cigarettes for 26 years.  Do you see how fidgety

14   and irritated I get here?  They took my lighters when I got

15   here.  They need to do something about that.  Because at a time

16   like that it's going to make people more irritable.  There's no

17   way I can pay attention; I'm hijacked right now.

18         **THE COURT:**  I'm glad you told us.  And that is reason

19   enough for you not to sit on this jury.

20         **PROSPECTIVE JUROR MELLO:**  That's another reason, but

21   there's a few reasons there.

22         **THE COURT:**  Okay, great.  Thank you, Mr. Mello.

23         **PROSPECTIVE JUROR MELLO:**  Also, I have one more thing.

24         **THE COURT:**  Okay.

25         **MS. MITCHELL:**  You're being excused --

1          THE COURT:  Don't talk.

2          PROSPECTIVE JUROR MELLO:  He's being accused of

3    something right now?

4          THE COURT:  He is the defendant, but I'm not sure I

5    need to hear anything more.

6          PROSPECTIVE JUROR MELLO:  Fair enough.

7          THE COURT:  Okay, all right.  Just go have a seat.

8    All right.

9          (Prospective Juror Mello leaves the sidebar discussion)

10          MS. MITCHELL:  So Your Honor, at this time we would

11    like to strike both of those jurors, for cause.

12          MS. HOSSEINI:  We have no objection.

13          THE COURT:  Okay.

14          MS. MITCHELL:  Okay.

15          THE COURT:  So No. 38, Mr. Mello, and --

16          MS. MITCHELL:  Yes.

17          THE COURT:  -- No. 22.

18          MS. MITCHELL:  Ms. Garcia.

19          THE COURT:  Ms. Garcia will be stricken for cause.  I

20    would also -- Mr. Martinez, No. 53 (sic), given his -- I mean,

21    his concern about being able to pay attention, given his health

22    issue.  I would propose we strike him for cause.

23          MS. MITCHELL:  Yes, Your Honor.

24          MS. HOSSEINI:  No objection.

25          THE COURT:  No objections, so No. 53, Mr. Martinez --

1    he was 31.

2              MS. MITCHELL:  Uh-huh.

3              THE COURT:  31.  So, we have 22, 31, and 38.

4         And Ms. Hosseini, does the government have any for-cause

5    challenges?

6              MS. HOSSEINI:  Sorry, if I --

7         (Off-the-Record discussion between counsel)

8              MS. HOSSEINI:  No, Your Honor.

9              THE COURT:  Okay.  And Ms. Mitchell.

10             MS. MITCHELL:  Your Honor, I think I did have concerns

11   about Juror No. 15, Mr. Dong.  And Juror No. 98 -- or sorry,

12   48, Mr. Jain.

13        Both of those individuals seemed to express that despite

14   the fact the Court would give them instructions, they have some

15   firmly-held beliefs it would be difficult for them to overcome,

16   regarding proof, and how the Court and the government would

17   have to establish the case.

18             THE COURT:  Okay.  No. 48, Mr. Jain.

19             MS. HOSSEINI:  I wrote down, Your Honor, he said that

20   he could follow the law, but that it could potentially affect

21   -- "could potentially affect my opinion of them."

22        And so with the understanding that he can follow the law

23   but it could potentially affect his opinion, I did not think

24   that rose to cause.

25             THE COURT:  All right, I'm going to grant the motion

 1   to strike Mr. Jain for cause.  I was actually a little hard on

 2   him.  And he did not back down.

 3         **MS. MITCHELL:**  Uh-huh.

 4         **THE COURT:**  And said that -- and I think he was being

 5   honest.

 6         **MS. MITCHELL:**  Uh-huh.

 7         **THE COURT:**  That notwithstanding my instruction, that

 8   he could not be fair.  And then Mr. Dong said he was just like

 9   Mr. Jain.

10         **MS. MITCHELL:**  Jain.  I have a little bit of concern

11   about language.

12         **THE COURT:**  I have a little bit concerns about

13   language with Mr. Dong as well, but I would hear the government

14   if you want to object to excusing him.

15         **MS. HOSSEINI:**  We also have the same difficulty with

16   the language.  So, no objection.

17         **THE COURT:**  Okay, so I'll excuse him.  So, that means

18   we are excusing five jurors.  No. 15, Mr. Dong.  No. 31,

19   Mr. Martinez.  No. 38, Mr. Mello; No 48, Mr. Jain; and No. 22,

20   Ms. Garcia.

21         **MS. MITCHELL:**  That is what we have as well,

22   Your Honor.

23         **THE COURT:**  Okay.  And then Ms. Means, we will call

24   the next five to sit in their seats.

25       And I will give you each five minutes, total, with them.

1          **MS. MITCHELL:**  Thank Your Honor.

2          **THE COURT:**  Okay?

3          **MS. HOSSEINI:**  Thank you, Your Honor.

4     (Conclusion of sidebar discussion.  The following

5      proceedings were held in the presence and hearing of the

6      Jury:)

7          **THE COURT:**  All right.  So we are going to thank and

8     excuse the following jurors, and then we will replace them with

9     five more.

10         So first No. 15, Mr. Dong; No. 22, Ms. Garcia.  No. 31,

11    Mr. Martinez.  No. 38, Mr. Mello; and Mr. 48, Mr. Jain.  Thank

12    you so much for being here this morning.  Go back to the jury

13    office and let them know you have been excused.

14         And Ms. Means is going to call five more jurors and

15    replace where they were sitting.  Everyone else can stay where

16    you are seated.

17         **THE COURT:**  Okay.

18         **THE COURTROOM DEPUTY:**  And then we're going to have

19    Ligia Arellano, she is going to come and sit at No. 12, and

20    that's on the other side of Ms. Simmons.

21         And then David Campos, take that last seat in the corner,

22    thank you.

23         Next up we have Cherise McBride, and you are going to sit

24    between -- where was Mr. Mello sitting?  Right there.  Sit

25    there.

1        And the last juror will be Chuong Do, and you will sit

2   where Mr. Jain was sitting.

3        Can someone show him where it was?  Right there.  Last

4   one.

5            MS. MITCHELL:  Maybe now would be a good time to take

6   a quick 15-minute break?  Or -- okay.

7            THE COURT:  Okay, great, we will take -- now, remember

8   where you are seated.  And we're going to take a 15-minute

9   break.  If any of you see Ms. To, Jessie To, tell her to get

10  here by 11:00 a.m.

11       We will resume at 11:00 a.m.  Thank you.

12       (Recess taken from 10:47 a.m. to 11:04 a.m.)

13       (The following proceedings were held in the presence of

14  the Jury Venire)

15           THE COURTROOM DEPUTY:  Remain seated and come to

16  order.

17           THE COURT:  Okay, members of the jury, the attorneys

18  will now question our five new guests that have joined us in

19  our box of 32, briefly.  Ms. Hosseini?

20           MS. HOSSEINI:  Yes, Your Honor.  So it's the five new

21  jurors, Mr. Sanchez, Ms. Arellano, Mr. Campos, and Ms. McBride

22  and Dr. Do.

23       Since we haven't heard from you, just wanted to open the

24  floor and see if you would like to share your views on any of

25  the topics that we've already discussed, whether it be about

1  the undercover investigations, law enforcement officers being

2  permitted to record conversations in an undercover

3  investigation, or also some of the other issues that

4  Ms. Mitchell brought up with divorce and custody.

5      Anything you would like to share with us, we would like to

6  hear from you.

7      PROSPECTIVE JUROR SANCHEZ:  Yeah.  John Sanchez,

8  No. 56.  I'm a father, myself.  And in all honesty, just the

9  feeling that I'm getting from this case in general is just a

10  feeling of anger.  And I think that's coming from I know how

11  important it is to -- for children to have both parents in

12  their lives, and how crucial it is to their childhood

13  development and their upbringing.

14      And just the concept of removing a parent and potentially

15  jeopardizing, you know, a child's development, it does elicit a

16  feeling of anger.

17      And I do feel that, you know, I would strive to remain

18  impartial and listen to the evidence, and the facts presented,

19  but like I said previously, I just wanted to be honest that it

20  does make me feel a little bit angry.

21      MS. HOSSEINI:  Thank you for sharing that.  We

22  appreciate it.  If the Court instructs you that you must put

23  aside any of your personal feelings and follow the law and look

24  at the evidence that's in this case, can you do that?

25      PROSPECTIVE JUROR SANCHEZ:  I guess, like I said, I

1   would do my best.

2          **MS. HOSSEINI:**  Thank you.

3      Any of the other four jurors who we haven't spoken to

4   previously, if you would like to share anything?

5      (A hand is raised)

6          **MS. HOSSEINI:**  Yes.

7          **PROSPECTIVE JUROR OKANO:**  I think it might be part of

8   the discovery, but my number is 29, Tetsu Okano.

9      How was the sting operation conducted?  Was it easily

10  discoverable?  Did it almost -- if he wasn't -- option

11  abatable, how was it presented?  And did the way it was

12  presented change the course of the decision?  Was it enticing?

13  Or -- that's one question that I was thinking about, part of

14  the sting operation.

15         **MS. HOSSEINI:**  Thank you.  Thank you very much.

16  Anybody else?

17     (No response)

18         **PROSPECTIVE JUROR ARELLANO:**  When I fill out the

19  questionnaire -- I might -- I -- I speak English but some

20  technical question about court, I don't understand 100 percent.

21  So that's why the reason why, you know, I said I don't want to

22  make mistakes, you know, thinks this is very important and the

23  results and, you know, to do, just what, like I said, I

24  understand but sometimes, no, 100 percent, some questions.

25         **THE COURT:**  Do you think you would have to ask people,

1    like your fellow jurors, oh, you know, to clarify things

2    because you might not fully understand them, yourself?

3           **PROSPECTIVE JUROR ARELLANO:**  If somebody's available,

4    I would appreciate.  If I don't understand the complete

5    question or some part, I would like somebody who help me about

6    that.

7           And another thing, this is just a comment, it is not an

8    excuse or something, I -- never being in a place, kind of

9    cases, I never did in my life, I never did nothing, even for

10   work or nothing about criminal cases at all.  My job is totally

11   different.  But this, I know they come from different -- we

12   came from different backgrounds, different professions and

13   something.

14          It's just, you know, like he said, I would -- the most

15   here, try to do our best.  Just I would like to let you know.

16          **MS. HOSSEINI:**  That is all we can ask is that you do

17   your best.  Thank you, Ms. Arellano.

18          Anybody else?

19          (No response)

20          **MS. HOSSEINI:**  Dr. Do, you have been promoted to one

21   of the five new jurors.  So is there anything would you like to

22   share with us?

23          **PROSPECTIVE JUROR DO:**  (Inaudible)

24          **MS. HOSSEINI:**  Thank you.  We will wait to give the

25   mic.  And I believe, Dr. Do, your Juror number is 61?

1        **PROSPECTIVE JUROR DO:**  Uh, correct.  Just want to

2    address a couple of questions you posed earlier.  As far as

3    some of the undercover work and the sting operation, I think

4    they're fine investigative tools.  For me it's just more about

5    the content and how it was done, if it was done properly I

6    think it's certainly valid.

7        And speaking about divorce, I think it's very common now.

8    I have certainly been divorced, myself.  It's been so long ago

9    I don't remember much about it.  Sort of put it behind me.  But

10   at the time, I think I was toward the end of my second year of

11   residency, and my ex-wife at the time was a corporate lawyer.

12   And we were young strong-willed people, too busy with our work

13   at the time.  And the little time we had together, it was

14   either a happy time or disagreement time.  And, you know, we

15   tried therapy; it didn't work.

16       And the divorce was a bit of a shock.  I took a trip --

17   well, I planned a trip to Paris hopefully to try to mend

18   things.  She didn't want to go.  She said:  Last minute, plan

19   change.  I took my brother, and I came back, and the home was

20   empty.  And so that's how I found out I was divorced.

21       But, you know, it was amicable.  We didn't have any kids.

22   We had two dogs; we split them up.  And that's about it.

23       **MS. HOSSEINI:**  Thank you for sharing that with us,

24   Dr. Do.

25       And I know you said it was a long time ago.  But, is there

1  anything from that experience that would affect your ability to

2  be fair and objective in this case?

3          **PROSPECTIVE JUROR DO:**  No.  Not at all.

4          **MS. HOSSEINI:**  Thank you.

5      Anybody else?

6      (A hand is raised)

7          **MS. HOSSEINI:**  Yes, Ms. McBride?  And I believe your

8  Juror number is 59?

9          **PROSPECTIVE JUROR MCBRIDE:**  Yes.  I'm Juror No. 59,

10  Dr. Cherise McBride.  I'm just standing up to disclose that I'm

11  in the middle of a divorce.  I'm nearing the final stages.

12      It's been very friendly.  We tell our kids that we are a

13  family forever.  And we are working, I think, considerably well

14  together.

15          **MS. HOSSEINI:**  Thank you, Dr. McBride.  We appreciate

16  that.

17      Anybody else?

18      (No response)

19          **MS. HOSSEINI:**  I see no hands.  Thank you very much.

20          **THE COURT:**  Ms. Mitchell, any questions?

21          **MS. MITCHELL:**  Thank you.

22      Ms. Arellano, you brought up an issue about English being

23  your second language and so sometimes you have difficulty

24  understanding when people are using complex terms.  How about

25  if people are not using complex terms but they are speaking

 1 | English very quickly?  Do you have difficulty understanding
 2 | then?
 3 |       **PROSPECTIVE JUROR ARELLANO:**  No.  I -- I understand --
 4 | if in case I won't, I'll ask, uh-huh.
 5 |       **MS. MITCHELL:**  And so you were saying if you were
 6 | confused you would ask someone.  What happens if in the moment,
 7 | you cannot ask someone because trial is going on and evidence
 8 | is being presented?
 9 |     How do you think you would deal with the situation if in
10 | the moment, a confusing term came up and you didn't have the
11 | ability to ask someone?
12 |       **PROSPECTIVE JUROR ARELLANO:**  I don't know, I try to do
13 | my best like I said, you know, if I don't understand
14 | 100 percent I don't want to miss, you know, understanding,
15 | influencing the -- you know, of the (Inaudible).  So, the
16 | conversation or something, the case, or something.
17 |       **MS. MITCHELL:**  Okay.  Is there anyone else who is,
18 | like Ms. --
19 |     (A hand is raised)
20 |       **MS. MITCHELL:**  Yes.  Mister --
21 |       **PROSPECTIVE JUROR GONZALEZ GOMEZ:**  Oscar.
22 |       **MS. MITCHELL:**  Mr. Oscar Gonzalez, Juror No. 38 (sic)?
23 |       **PROSPECTIVE JUROR GONZALEZ GOMEZ:**  Yes.  I have the
24 | same problem, my English.
25 |       **MS. MITCHELL:**  Okay.  And is it that it's difficult to

1   understand technical terms?  Or it's difficult to understand

2   when people speak English very quickly?

3            PROSPECTIVE JUROR GONZALEZ GOMEZ:  Technical terms.

4        MS. MITCHELL:  And so based off of the use of English

5   that we have had in court today, do you understand everything

6   that we have been saying?

7            PROSPECTIVE JUROR GONZALEZ GOMEZ:  Yeah.  Because I --

8   yeah, my first time and --

9        MS. MITCHELL:  So you said some, first, and then you

10  said yes.  So I want to get clarification.  How are you feeling

11  about it?

12           PROSPECTIVE JUROR GONZALEZ GOMEZ:  Uh, some, I don't

13  understand.  Yes.

14       MS. MITCHELL:  Okay.  Thank you very much.  I

15  appreciate that, Mr. Gonzalez.

16     Is there anyone else who's feeling in that same boat?

17     (A hand is raised)

18       MS. MITCHELL:  Yes.  Mr. Krap?  Juror No. 10?

19       PROSPECTIVE JUROR KRAP:  Hello, my name is Jaromir

20  Krap.  And I may be difficult when I listen to some recording.

21  But otherwise, everything here, I understood.

22       MS. MITCHELL:  Great.  Yes.

23     And, Mr. Okano?

24       PROSPECTIVE JUROR OKANO:  I grew up in Japan.  English

25  is my second language.  I understand most of it, but some

 1    technical term I have difficulty with.

 2          MS. MITCHELL:  Have you understood all the English

 3    that we have been using in court today?

 4          PROSPECTIVE JUROR OKANO:  I believe so.

 5          MS. MITCHELL:  And if you were having a problem with

 6    understanding it, what would be your method of trying to solve

 7    it?

 8          PROSPECTIVE JUROR OKANO:  I'm not sure what option

 9    will be available during the session, but I may ask other

10    juror.

11          MS. MITCHELL:  You would ask other jurors for their

12    assistance?

13          PROSPECTIVE JUROR OKANO:  Just the technical term

14    questions.

15          MS. MITCHELL:  Thank you.

16          THE COURT:  When you say "technical term," what do you

17    mean?

18          PROSPECTIVE JUROR OKANO:  That, I don't know.

19          THE COURT:  You mean -- right?  Because sometimes

20    there may be -- but actually, court-specific terms that you may

21    not be familiar with because they're not words we use every day

22    unless we're in court.

23          PROSPECTIVE JUROR OKANO:  Right.

24          THE COURT:  I would say if anything comes up, whether

25    you are an English native speaker or not, you get to raise your

1   hand and say that you don't understand.  Sometimes we forget,

2   and we don't define things clearly.

3       Thank you.

4           MS. MITCHELL:  And then, Ms. Perez, it seems like you

5   also raised your hand for that?  Or no?

6           PROSPECTIVE JUROR PEREZ:  (Shakes head)

7           MS. MITCHELL:  Okay.  So everyone else here is feeling

8   comfortable with the speed at which people are speaking, and

9   are comprehending everything.

10      (A hand is raised)

11          MS. MITCHELL:  Yes, Ms. To?

12          PROSPECTIVE JUROR TO:  Yes.

13          MS. MITCHELL:  Juror No. 1?

14          PROSPECTIVE JUROR TO:  Yes.  Testing.

15      Okay.  English also is my second language.  So you asked

16  me today if I understand everything.  I would be honest:  Not

17  really.  Yeah.

18      So if the person's speaking fast, I would be lost.  If

19  someone's speaking the word, I never heard it, I'll be -- I

20  don't know what this is.  I just guess, or I wait until you

21  start, ask next-door, what they're talking about.  Yeah.

22          MS. MITCHELL:  Thank you.  I appreciate that.

23      And then Mr. Campos, we haven't really heard that much

24  from you.  Is there anything about the conversations that have

25  occurred today or the topics that have come up that make you

 1  think, as you're sitting here: I may not be the right juror for
 2  this case?
 3          **PROSPECTIVE JUROR CAMPOS:**  Hi.  I'm Juror No. 58,
 4  David Campos.  No, I don't believe I have any overwhelming
 5  biases in these matters.  At least, any that I'm conscious of.
 6      I've had a fair number of family members who have gone
 7  through hardships, whether they be through some criminal act or
 8  maybe, you know, something minor like being pulled over too
 9  much, like my mother.  She's -- she emigrated from El Salvador.
10  That kind of thing.  But I believe, no, pretty unbiased in
11  these matters, so...
12          **MS. MITCHELL:**  Thank you, sir.  All right.
13      No further questions.
14          **THE COURT:**  All right, thank you.
15      All right, members, you know the drill.  Talk among
16  yourselves.  We will just be a few moments.  If you could stay
17  in the courtroom.  Thank you.
18      (The following proceedings were heard at sidebar)
19          **THE COURT:**  All right, we are on the record.
20      Thank you, Ms. Mitchell, for bringing out the language
21  issue.
22          **MS. MITCHELL:**  (Nods head)
23          **THE COURT:**  It's -- yeah.  Anyway, thank you for that.
24          **MS. MITCHELL:**  Not a problem.
25          **THE COURT:**  So I would propose that we excuse 39,

 1   Mr. Gonzalez Gomez;  No. 1, Ms. To; and No. 57, Ms. Arellano

 2   for language difficulties.

 3          **MS. MITCHELL:**  (Nods head)

 4          **MS. HOSSEINI:**  No objection, Your Honor.

 5          **MS. MITCHELL:**  No objection from us, Your Honor.

 6          **THE COURT:**  Okay.  Any -- any other of the new jurors?

 7          **MS. MITCHELL:**  I -- I don't have an issue with any of

 8   the other new jurors.

 9       I know that Juror No. 56 in some ways expressed that he

10   may have some bias.  I am uncertain, though, to the extent of

11   the bias that he's expressing, that about parents being

12   involved in a divorce, and being angry, and he's feeling anger

13   issues, and he talked about how that might affect the way that

14   he might view the facts of the case.

15          **THE COURT:**  I think he said he would try to be

16   impartial.  I think he was just being honest.

17          **MS. MITCHELL:**  Uh-huh.

18          **THE COURT:**  That it would make him angry.

19          **MS. MITCHELL:**  Uh-huh.

20          **THE COURT:**  So I don't think I would excuse

21   Mr. Sanchez for cause.

22          **MS. MITCHELL:**  Uh-huh.

23          **THE COURT:**  Okay, so we're going to put three more

24   people.

25          **MS. MITCHELL:**  Uh-huh.

1            THE COURT:  In the box.

2        MS. MITCHELL:  Uh-huh.

3            THE COURT:  So, just question those three.

4        MS. MITCHELL:  Uh-huh, uh-huh.

5            THE COURT:  Hopefully we won't have any excused.

6        MS. MITCHELL:  Uh-huh.

7            THE COURT:  And then, you should be ready to do your

8    peremptories.  Right?  Once we have that break.

9        MS. MITCHELL:  Yes, Your Honor.

10           THE COURT:  Okay.  And we'll do those over here.

11       MS. MITCHELL:  Okay.

12           THE COURT:  As well.

13       MS. MITCHELL:  All right.  Thank you, Your Honor.

14           THE COURT:  Great, thank you.

15       MS. HOSSEINI:  Thank you.

16    (Conclusion of sidebar discussion; the following

17      proceedings were held in the presence and hearing of the

18      Jury:)

19           THE COURT:  Okay, members of the jury, just an update.

20   We are on schedule, and we will have our jury this morning

21   before lunch.  So it's a process of attrition, as you are

22   seeing, but we are getting close.

23       But we are now going to excuse Juror No. 1, Ms. To; juror

24   No. 39, Mr. Gonzalez Gomez; and Juror No. 57, Ms. Arellano.

25   And so you can go up to the jury room, tell them you have been

1    excused.  Thank you so much for your service this morning.  You

2    may go.

3        And we are going to call three more jurors to take their

4    places.

5            THE COURTROOM DEPUTY:  Okay.  The next person I'm

6    calling is Julia Prinzi.  And Ms. Prinzi, you will sit right

7    there at No. 1.

8        (Off-the-Record discussion between the Court and the

9    Courtroom Deputy)

10           THE COURTROOM DEPUTY:  I'm sorry, Chantelle Maloney.

11   No she is not here.  FTA.

12       I'm sorry.  Come on back up; my apologies.

13           THE COURT:  I was wrong.

14           THE COURTROOM DEPUTY:  Oh wait, she is here.  She

15   wasn't here but then now she is here.  Ms. Maloney, I'm sorry,

16   I had crossed you off but then (Inaudible) told me later you

17   are here, I'm sorry.

18       And Ms. Prinzi, you will now sit over there (Indicating).

19   And then we have got Rima Hakim.  Ms. Hakim, go ahead and sit

20   in the front row right here (Indicating).  Thank you.

21       Before you start, who has the mic?  Okay.  Good ahead,

22   Your Honor.

23           THE COURT:  All right.  Please go ahead.

24           MS. HOSSEINI:  Welcome to our three new jurors.

25   Ms. Maloney, Mrs. Prinzi and Ms. Hakim.  I will just call on

1  Ms. Maloney first.  Do we have a mic?  Yes, we do.  All right.

2      I think in your questionnaire you said your brother was

3  going through a custody proceeding.

4          PROSPECTIVE JUROR MALONEY:  (Nods head)

5          MS. HOSSEINI:  Is there anything about your brother's

6  custody proceeding that may affect your ability to be a fair

7  and impartial juror in this case?

8          PROSPECTIVE JUROR MALONEY:  No.

9          MS. HOSSEINI:  All right.  Thank you.  Anything else

10 you would like to share with us about some of the other topics

11 we've previously talked about since we haven't heard from you?

12         PROSPECTIVE JUROR MALONEY:  My parents went through a

13 divorce when I was a kid -- sorry -- and I was a product of

14 that.  My mom's manipulation to the Court.  So it pulled me

15 away from our dad.  And so that affects me with divorce and

16 custody.

17         MS. HOSSEINI:  Do you think that it might have an

18 effect on you, and it may perhaps be difficult for you to put

19 that aside entirely?

20         PROSPECTIVE JUROR MALONEY:  I know what I'm supposed

21 to do so I will do my best to follow what I'm supposed to do

22 and look at all the facts.  But I am an emotional person and it

23 may weigh heavy on me.

24         MS. HOSSEINI:  Of course.  Thank you for sharing that.

25 I really appreciate it.

1          Ms. Prinzi and Ms. Hakim.  Anything you would like to

2   share with us?  Ms. Prinzi?

3          **PROSPECTIVE JUROR PRINZI:**  Hi.  Thank you.  Should I

4   stand or --

5          **MS. HOSSEINI:**  Whatever you --

6          **THE COURT:**  Sure.

7          **PROSPECTIVE JUROR PRINZI:**  Sure.

8          **THE COURT:**  It's better for your back anyway.

9          **PROSPECTIVE JUROR PRINZI:**  I don't have anything that

10  I think would impede my judgment on this case but I will say

11  I'm a public school teacher and I have a lot of

12  responsibilities with state testing right now going on so I'm

13  just in a very stressful point in my life personally.  I would

14  do my best not to let it affect my day-to-day if I am selected

15  for the jury, but I wanted to be honest.

16         **MS. HOSSEINI:**  Thank you.  Appreciate it.

17         Ms. Hakim, would you like to tell us anything about some

18  of the topics we have discussed?

19         **PROSPECTIVE JUROR HAKIM:**  Hi, my name is Rima Hakim.

20  I don't know if anything is of interest to you.  I think I may

21  have a more, like, nuanced opinion on sting operations in

22  general.  I think they need to be selected a lot more

23  carefully, I guess, as far as what qualifies to be legally

24  required, just kind of based on my background and just kind of

25  experiences you face as a minority.

 1        But I think in general that shouldn't really affect

 2    anything.

 3              MS. HOSSEINI:  Thank you, Ms. Hakim.

 4        Nothing further.  Thank you.

 5              MS. MITCHELL:  Ms. Prinzi.

 6              PROSPECTIVE JUROR PRINZI:  Yes.

 7              MS. MITCHELL:  I'll start with you.  So, do you have

 8    -- would you be concerned about having substitutes cover your

 9    class until mid-week of next week, or is that something that

10    you think your class would be covered as far as having someone

11    there?

12              PROSPECTIVE JUROR PRINZI:  Um, I would be concerned.

13    I know that my district is having a really difficult time with

14    substitutes, and even today, it was a struggle to find somebody

15    to cover my class.

16        Additionally, I'm supposed to take a state test in order

17    to clear my credentials this week.  I'm hoping that if I'm

18    selected for the jury the State would work with me, on, you

19    know, moving that test.  But I -- I don't know for sure what

20    would happen.

21              MS. MITCHELL:  Is the state test one of those

22    standardized state tests or is it one that they can

23    individually give you at any particular time?

24              PROSPECTIVE JUROR PRINZI:  It's the CTEL, yeah, so I'm

25    not sure.  I just know I have to take it.

 1          **MS. MITCHELL:**  And then you said because -- so the

 2   state testing is particularly for you, you are not proctoring

 3   for your students.

 4          **PROSPECTIVE JUROR PRINZI:**  It's both, which makes this

 5   week just my favorite.  But yes, so I'm taking my own test, and

 6   then the students are also -- I'm administering state testing

 7   for them.

 8          **MS. MITCHELL:**  What grade do you teach?

 9          **PROSPECTIVE JUROR PRINZI:**  Fifth.  It's also Puberty

10   Month, just FYI, which I'm also going to be teaching.

11          **MS. MITCHELL:**  That's a fun topic.  I remember when I

12   had to teach that too.  That was very fun.

13       Thank you so much.  Ms. McKinney.

14          **THE COURT:**  Maloney.

15          **MS. MITCHELL:**  Sorry, I can't read my own handwriting.

16   Ms. Maloney.  You said that you would try; you know what you

17   are supposed to do and you would try to work with it.  It

18   sounds like, though, it is still something that you would have

19   to fight against.

20       Do you feel that trying to set your experiences behind

21   would be something you would have to fight against?  Or is it

22   something you could do fairly easily?

23          **PROSPECTIVE JUROR MALONEY:**  I honestly don't know.

24          **MS. MITCHELL:**  If you can pull your mic --

25          **PROSPECTIVE JUROR MALONEY:**  Sorry.  I said I honestly

1  don't know.  I know every case is different and it's not a

2  scenario that I was in.  I mean, this case would not be what I

3  went through, necessarily.

4          **MS. MITCHELL:**  Uh-huh.

5          **PROSPECTIVE JUROR MALONEY:**  But, and, I believe in

6  fairness, so I think it wouldn't be.

7          **MS. MITCHELL:**  You seem really emotional right now, in

8  just trying to talk about it.  Do you feel as though this is

9  bringing up some feelings that you want to work through, some

10  big feelings?  Or is this something that you're able to

11  process?

12          **PROSPECTIVE JUROR MALONEY:**  Honestly, I get anxiety

13  talking in front of people, so --

14          **MS. MITCHELL:**  I can appreciate that.

15          **PROSPECTIVE JUROR MALONEY:**  Sorry.

16          **MS. MITCHELL:**  Not a problem.  Would you prefer to

17  have the conversation at sidebar with the judge?

18          **PROSPECTIVE JUROR MALONEY:**  Sure.

19          **MS. MITCHELL:**  Okay.  Okay.  And then, I don't think I

20  have any further questions at this time.  Thank you.

21          **THE COURT:**  Great.  Okay.  All right.  We're going to

22  go back over here.  That white noise is going to come on again.

23  And Ms. Maloney, if you wouldn't mind coming, you can leave the

24  microphone --

25          (The following proceedings were heard at sidebar)

1          **THE COURT:**  Okay.  So Ms. Maloney, given what the case

2     is about, do you think that you can fairly judge the evidence

3     and render a verdict just based on the evidence that is

4     presented in the case?

5          Or do you think because of your personal experience that

6     you've experienced as a child, that's going to get in the way

7     of being fair in this case?  Not that you are unfair, but just

8     because you have that personal experience.

9          **PROSPECTIVE JUROR MALONEY:**  Um, I think it might,

10     because I don't know the situation completely but my -- I know

11     from my childhood -- I'm really sorry; I cry easily.  I'm

12     really sorry.

13          **THE COURT:**  That's okay.

14          **PROSPECTIVE JUROR MALONEY:**  I can't help it.

15          **THE COURT:**  That's quite all right.

16          **PROSPECTIVE JUROR MALONEY:**  And in front of people,

17     it's worse.

18          **THE COURT:**  Oh, okay.

19          **PROSPECTIVE JUROR MALONEY:**  So, I think because

20     knowing I don't -- you know, I don't know what happened or

21     whatever, but knowing that my mom was able to manipulate --

22     this is --

23          **THE COURT:**  Okay, I think that's okay.

24          **PROSPECTIVE JUROR MALONEY:**  Sorry.

25          **THE COURT:**  I don't want to put you through any more.

1  I appreciate that.  You can go back to your seat.

2         **PROSPECTIVE JUROR MALONEY:**  Thank you.  I'm so sorry.

3      (Prospective Juror Maloney leaves the sidebar discussion)

4         **THE COURT:**  Okay.

5         **MS. HOSSEINI:**  No objection.

6         **THE COURT:**  I would excuse Ms. Maloney.

7         **MS. MITCHELL:**  Yes.  Yes.

8         **THE COURT:**  Okay.  No objections.  All right.

9         **MS. MITCHELL:**  And then --

10        **THE COURT:**  Any other request?

11        **MS. MITCHELL:**  For Ms. Prinzi, I would assume that she

12 should be able to get it covered but, um, that would be my only

13 concern.

14        **THE COURT:**  Yeah, no, I understand.

15        **MS. MITCHELL:**  Uh-huh.

16        **THE COURT:**  But we -- yeah.

17        **MS. MITCHELL:**  We are nearing towards the end.

18        **THE COURT:**  No, not that.  It's just I actually feel

19 like if we enable the public schools, right, to not -- right?

20 Like, if they don't have it, then they need to get more money,

21 then they need to do that.

22        **MS. MITCHELL:**  Uh-huh.

23        **THE COURT:**  So, but otherwise I think she would be a

24 fine juror.

25        **MS. MITCHELL:**  Okay.

```
 1            THE COURT:  So we're going to excuse No. 62, and we
 2      will just put one more in the box.
 3            MS. MITCHELL:  Okay.
 4            THE COURT:  And I'm just going to ask the new juror.
 5            MS. HOSSEINI:  Sure.
 6            MS. MITCHELL:  Uh-huh.
 7            THE COURT:  Is there anything you've heard -- but if
 8      either of you -- I haven't looked as closely at the
 9      questionnaires.  If there's something you really want to ask
10      them, please get up and do so.
11            MS. MITCHELL:  Uh-huh, okay.  Thank Your Honor.
12            THE COURT:  All right.  Thank you.
13            MS. HOSSEINI:  Thank you, Your Honor.
14         (Conclusion of sidebar discussion; the following
15           proceedings were held in the presence and hearing of the
16           Jury:)
17            THE COURT:  Okay, we are going to excuse No. 62,
18      Ms. Maloney.  Thank you so much for your service today.
19            PROSPECTIVE JUROR MALONEY:  Thank you.
20            THE COURT:  One more we are going to call.  We are
21      getting so close, so close.  So one more juror to the box.
22            THE COURTROOM DEPUTY:  Okay.  Juror Surendra
23      Mallempall, would you please come?  Must be -- Juror No. 65.
24      Hello.  Come on down.  You will be sitting right there.
25            THE COURT:  Number one.
```

 1          MS. HOSSEINI:  Corner spot.

 2          THE COURT:  Good morning, Mr. Mallempall.

 3          PROSPECTIVE JUROR MALLEMPALL:  Good morning.

 4          THE COURT:  Good morning.  So, is there any -- you

 5   heard the questions this morning.  I asked about your ability

 6   to presume the defendant innocent, and to put the government to

 7   its burden of proving the defendant's guilt beyond a reasonable

 8   doubt.  Are you able to do that?

 9          PROSPECTIVE JUROR MALLEMPALL:  Yes.

10          THE COURT:  You've got to speak into the microphone.

11          PROSPECTIVE JUROR MALLEMPALL:  Yes, I do.

12          THE COURT:  And also I instructed you about the

13   Fifth-Amendment right of a defendant not to testify, and how

14   you must decide the case based on whether the government has

15   proved its case, its burden, and put aside whether the

16   defendant testifies or not.  Can you follow that instruction?

17          PROSPECTIVE JUROR MALLEMPALL:  Yes.

18          THE COURT:  Okay.  And is there anything else from all

19   the questions you have heard today that you think the parties

20   should know about yourself?

21          PROSPECTIVE JUROR MALLEMPALL:  No, I'm fine.  And I

22   have a little bit difficulties understanding the Court

23   proceedings and court laws.  This is my first thing.  So, those

24   are the things I want to understand a little bit more.

25          THE COURT:  Okay.  And have you understood everything

 1   that's happened so far today in the courtroom?

 2            **PROSPECTIVE JUROR MALLEMPALL:**  Yes.

 3            **THE COURT:**  You have.

 4            **PROSPECTIVE JUROR MALLEMPALL:**  Yes.

 5            **THE COURT:**  Okay, great.  Thank you.

 6       Do the parties have any questions?

 7            **MS. HOSSEINI:**  No questions for Mr. Mallempall, thank

 8   you, Your Honor.

 9            **MS. MITCHELL:**  No questions for the defense side.

10            **THE COURT:**  Great.  Thank you so much.

11       All right, members of the jury, this is -- jury pool, this

12   is the last time we are going to go over here.  And I fully

13   expect when I come back on the record next time we are going to

14   have our jury.  So again, talk among yourselves.  Thank you.

15            **THE COURTROOM DEPUTY:**  But not too loud, please.

16       (The following proceedings were heard at sidebar)

17            **THE COURT:**  Okay.  We are now ready for the exercise

18   of peremptories.  I believe we stayed 2, 1, 2, 1 --

19            **MS. MITCHELL:**  I think that will work.  Something like

20   that.

21            **THE COURT:**  And then we will see where it ends up.

22            **MS. HOSSEINI:**  (Inaudible)

23            **THE COURT:**  Okay.  So we will start then with

24   Ms. Mitchell, your first two.

25            **MS. MITCHELL:**  51 and 50.

**JURY VOIR DIRE**

1          THE COURT:  So the defense excuses No. 51, Mr. Feledy.

2          MS. MITCHELL:  Uh-huh.  And Ms. -- 50,

3    Ms. Ivins-Young.

4          THE COURT:  No. 50.  Okay.  And for the government.

5          MS. HOSSEINI:  No. 29.

6          THE COURT:  No. 29, Mr. Okano.

7          MS. HOSSEINI:  I do just want to put on the record,

8    several -- at several points, several one of us at the

9    government table saw him sleeping.  Throughout the whole thing,

10   pretty much.

11         MS. MITCHELL:  We also did the same, yes.

12         THE COURT:  Thank you for excusing him.

13         MS. MITCHELL:  Uh-huh.

14         THE COURT:  All right.  From the defense?

15         MS. MITCHELL:  Just 49 and 63.

16         THE COURT:  Number 49, Mr. Austin, and No. 63,

17   Ms. Prinzi.  That is very nice of you.

18         MS. MITCHELL:  Uh-huh.

19         THE COURT:  And for the defense?

20      I mean for the government, sorry.

21         MS. HOSSEINI:  Number 69.  69.

22         THE COURT:  Number 69, who is that?

23         MS. HOSSEINI:  I'm sorry?

24         MS. MITCHELL:  That was Lolli.

25         THE COURT:  Oh, not even within our 32.

```
 1              MS. HOSSEINI:  Oh, I'm sorry.  Should I take that
 2   back?
 3              THE COURT:  You can do it if you want, but it's
 4   wasting it.
 5              MS. HOSSEINI:  That's fine.  We'll keep -- we'll keep
 6   him.
 7              THE COURT:  You don't even have to use them all.
 8              MS. MITCHELL:  Juror 41, that would be Torres.
 9              THE COURT:  Ms. Torres.
10              MS. MITCHELL:  Uh-huh.  And Juror 43, Ms. Nakamoto.
11              THE COURT:  Okay.  And for the government.
12              MS. HOSSEINI:  Juror No. 56.
13              THE COURT:  56.  And that is Mr. Sanchez.
14              MS. HOSSEINI:  Yeah.
15              MS. MITCHELL:  Um, Juror No. 2, Ms. Liu.  And Juror
16   No. 20, Ms. Simmons, S-I-M-M-O-N-S.
17              THE COURT:  Yes.  And the government?
18              MS. HOSSEINI:  That's it, Your Honor.  We'll not be
19   exercising any more peremptories.
20              THE COURT:  Okay.
21              MS. MITCHELL:  We will do -- I think we either choose
22   now, or pass.  And if we pass, the jurors get set.  So --
23              THE COURT:  Yeah.
24              MS. MITCHELL:  I did think we would excuse Juror
25   No. 64, Ms. Hakim.
```

```
 1              THE COURT:  Ms. Hakim, okay.

 2              MS. MITCHELL:  Yes.  And then Juror No. 5,

 3   Ms. Estacio.

 4              THE COURT:  Okay, and I think you may have one more,

 5   or is that 11?

 6              MS. HOSSEINI:  That's ten.  One, two, three, four,

 7   five, six, seven, eight, nine, ten.

 8              THE COURT:  Yeah.

 9              MS. MITCHELL:  Um, I think we might be okay with this.

10              MS. TARAYSUK:  Can I look?

11              MS. MITCHELL:  Yes.

12              MS. HOSSEINI:  Is this for the alternate, Your Honor?

13              THE COURT:  Yeah, the last -- well, it matters to know

14   what order they are in.  Right?  So the first 12 that are

15   seated are already the jury, and the second two are the

16   alternates.  I don't know where we ended up.

17              MS. HOSSEINI:  Because they have had ten peremptories.

18   Right?

19              THE COURT:  Oh, right,, but because I'm seating 14,

20   they get 11.

21              MS. HOSSEINI:  Okay, so is the alternate -- got it.

22              THE COURT:  But I don't know if they will need the

23   alternate but --

24              MS. HOSSEINI:  I see.  Thank you.

25              THE COURT:  Always remember this is my first time.
```

1            **MS. HOSSEINI:**  And it moves so quickly.  We are doing

2    our best.

3            **MS. MITCHELL:**  And so Your Honor, we are going to

4    exercise our last strike with Juror No. 59, Ms. McBride.

5            **THE COURT:**  McBride.  59.  Yes, Dr. McBride.

6            **MS. MITCHELL:**  McBride, yes.

7            **THE COURT:**  Okay.  So, let me read, then, who I think

8    our 14 jurors are, and the first 12 will be our jury, the next

9    two -- let me cross out, make sure I have all...

10        Okay.  So it I believe we have Juror No. 66,

11   Mr. Mallempall.

12           **MS. MITCHELL:**  Uh-huh.

13           **THE COURT:**  Juror No. 4, Ms. Paskowski, Juror No. 6

14   Mr. Azevedo, Juror No. 9, Perez.  Juror No. 10, Mr. Krap.

15           **MS. MITCHELL:**  Uh-huh.

16           **THE COURT:**  Juror No. 13, Mr. Cardenas.  Juror No. 14,

17   Mr. Hoang.

18           **MS. HOSSEINI:**  I'm sorry, what juror, Your Honor?

19           **THE COURT:**  14.

20           **MS. HOSSEINI:**  14, thank you.

21           **THE COURT:**  Juror No. 58, Mr. Campos.  Juror No. 32,

22   Ms. Brown.  Juror No. 33, Ms. Mosk.  Juror No. 35, Mr. Abantao.

23   Juror No. 42, Ms. Ocampobotello.

24        Juror No. 44, Mr. Hamilton.  Thirteen.  And then last,

25   Juror No. 47, Mr. Smith.

```
 1              MS. MITCHELL:  And then, with the way that the jurors

 2     are in, is it Juror No. 65, Mr. Mallempall, and Juror No. 58,

 3     Mr. Campos, who are the alternatives?

 4              THE COURT:  No.

 5              MS. MITCHELL:  Or is the Court going to take them in

 6     the order -- okay.

 7              THE COURT:  Yes, so 46 and 47, Mr. Hamilton and

 8     Mr. Smith, are our alternates.

 9              MS. MITCHELL:  44.

10              THE COURT:  Sorry, 44, thank you.

11              MS. MITCHELL:  Okay.

12              THE COURT:  And 47 are the alternates.

13              MS. MITCHELL:  Thank you, Your Honor.

14              THE COURT:  Okay.

15              MS. MITCHELL:  Thank you.

16              THE COURT:  We got our jury.

17              MS. MITCHELL:  Yes.

18              MS. HOSSEINI:  Thank you, Your Honor.

19              THE COURT:  Thanks you so much.

20         (Conclusion of sidebar discussion; the following

21     proceedings were held in the presence and hearing of the Jury:)

22              THE COURT:  Okay.  Members of our jury pool, thank you

23     so much for your patience this morning.  We do have our jury of

24     14.  I'm going to read the names of the 14, so if your name is

25     read, please stay here.  And then when I'm done the rest of
```

1   you, you are excused from your federal jury service for the

2   year.  You should go to the jury office, right here on this

3   floor, and again, thank you so much for your service today.

4         So, our jury today will be No. 66, Mr. Mallempall.  No. 4,

5   Ms. Paskowski.  No. 6, Mr. Azevedo.  No. 9, Ms. Perez, No. 10

6   -- oh, I'm always going to mispronounce your name, Mr. Krap.

7   No. 13, Mr. Cardenas.  Number 14, Mr. Hoang.  No. 58,

8   Mr. Campos.  No. 32, Ms. Brown.  No. 33, Ms. Mosk.  No. 35,

9   Mr. Abantao.  No. 42, Ms. Ocampobotello.  No. 44, Mr. Hamilton,

10  and No. 47, Mr. Smith.

11        If the 14 of you would please stay, and the rest of you,

12  you are -- oh, did I miss somebody?

13              MS. HOSSEINI:  Your Honor, I just --

14          THE COURT:  Wait, hold on one moment.

15          MS. HOSSEINI:  Mr. Mallempall is Juror No. 65.  I

16  think Your Honor --

17          THE COURT:  Oh, I said 66, all right.  That's you.

18  You have stay.

19        All right.  The rest of you, you are excused.  Thank you

20  again so much for your service.  Go Warriors.

21      (Remaining Jury Venire excused)

22          THE COURT:  Now we have our jury.  Do you want to put

23  them in, in order?

24          THE COURTROOM DEPUTY:  So Ms. Paskowski, go ahead and

25  move one over.  Mr. Azevedo, move one over.  No. 4 will be

1  Ms. Perez, yes.  Then Mister -- is it --

2          **PROSPECTIVE JUROR KRAP:**  Krap, but --

3          **THE COURTROOM DEPUTY:**  How do you want us to -- is it

4  "Carp"?

5          **PROSPECTIVE JUROR KRAP:**  Given -- "Krop."  I don't

6  think you can say that.  Or my first name, Jaromir.

7          **THE COURTROOM DEPUTY:**  Mr. Cardenas.

8          **PROSPECTIVE JUROR CARDENAS:**  Oh, yes.

9          **THE COURTROOM DEPUTY:**  Okay, you are going to move.

10  And Ms. Hoang, go ahead and move there (Indicating).

11          **THE COURTROOM DEPUTY:**  Mr. Campos, move all the way

12  down.  Ms. Brown, come on down.  You got a good seat, it's in

13  the front.

14      Ms. Mosk (Indicating).  That was 8, 9, 10.  And

15  Mr. Abantao, is that the correct way to say -- Mr. Abantao is

16  11.  Ms. Ocampobotello.  And Mr. Hamilton, and Mr. Smith.

17  Okay, that was No. 12, and first alternate and second

18  alternate.

19      There we go.  Boom, boom, boom.  But before -- okay.  You

20  are all comfy?  Can I have you all stand up and raise your

21  right hand again?

22      (Jury Panel sworn in)

23          **THE COURTROOM DEPUTY:**  Thank you.

24          **THE COURT:**  Say "I do" if that's true.

25          **THE COURTROOM DEPUTY:**  Yeah, if you agree.

1          **THE COURT:**  All right.  Members of the jury, let me

2     tell you a little bit about the schedule today.  We are going

3     to take a lunch break.  There's a cafeteria on the second

4     floor, if you didn't bring your lunch.  You probably didn't

5     bring your lunch.  And you can get lunch there.

6          Ms. Means is going to take you back, show you the jury

7     room, give you badges, show you how you get in and out.  We'll

8     resume at 12:45.  Or should we make it 1:00?

9          **MS. HOSSEINI:**  (Inaudible)

10          **THE COURT:**  We'll make it 1:00 p.m.  And all we are

11     going to do is opening statements.  So I don't think you will

12     be here very late this afternoon because we are not going to

13     start with the evidence until tomorrow morning at 8:30 a.m.

14     So, I'm going to excuse you now.

15          Now you are going to go back, you are going to call your

16     family, you are going to call your work and you are going to

17     tell them:  I got seated on this jury, I'm here for at least

18     this week, maybe a little bit into next week.  And they are

19     going to ask you what kind of case, and what is it about?

20          I'm instructing you, you say "I can't tell you.  The judge

21     ordered me to say nothing."  And the reason is once you even

22     start to say: Well, it is a criminal case, they are going to

23     say, what, well, what is it about?  And then you are going to

24     have to start having a conversation and getting their reactions

25     or opinions.

1          And again, it is so important that you make your decision

2     and the only information you hear is that which is in this

3     courtroom, and presented in this case.  So as I said at the

4     beginning, when you were there, please don't look anything up

5     on the internet, don't put your status on your WhatsApp,

6     Facebook, Instagram, whatever it is these days, "I'm on jury

7     duty," nothing.  Right?  Nothing at all until you are excused

8     as jurors at the very end of the case.

9          When you come back at 1:00, I'm going to give you some

10    more preliminary instructions, and then we'll have opening

11    arguments.  Just argument, not evidence.  And then you will be

12    excused for the day.  But again, I don't recommend leaving the

13    building because you would have to come back through security.

14         So Ms. Means will now take you back to the jury room, and

15    we will resume at 1:00 p.m.

16         (Jury excused)

17         (The following proceedings were held outside of the

18    presence of the Jury)

19         **THE COURT:**  Okay, thank you so much for your

20    cooperation this morning.  So do you have, just, an idea of how

21    long your opening will be?

22         **MS. HOSSEINI:**  I think about 15 minutes.

23         **THE COURT:**  Okay.  All right.  Ms. Mitchell, do you

24    think you will be opening?

25         **MS. MITCHELL:**  Mr. Raju will be doing the opening.  I

 1    think it's is going to be less than 30 minutes.

 2             **THE COURT:**  Okay.  Great.  All right.  Thank you very

 3    much.  We'll see you back here a little before 1:00 p.m.

 4             **MS. MITCHELL:**  Thank you, Your Honor.

 5         (Recess taken from 11:55 a.m. to 12:59 p.m.)

 6             **THE COURT:**  Ms. Means is bringing in the jury; they

 7    are all on time.  They are going to come through this door

 8    (Indicating), because it's too narrow for them.

 9         (The following proceedings were held in the presence of

10    the Jury).

11             **THE COURTROOM DEPUTY:**  You may be seated.

12             **THE COURT:**  Thank you, members of the jury, for being

13    so prompt.  I'm now going to give you some preliminary

14    instructions.

15                         <u>**JURY INSTRUCTIONS**</u>

16             **THE COURT:**  You are now the jury in this case.  Can

17    you hear me okay?  Raise your hand if you can't.

18         You are now the jury in this case, and I want to take a

19    few minutes to tell you something about your duties as jurors

20    and to give you some preliminary instructions.  At the end of

21    the trial, I will give you detailed written instructions that

22    will control your deliberations, and you will also have copies

23    of the written instructions for your deliberations.

24         When you deliberate, it will be your duty to weigh and to

25    evaluate all of the evidence received in the case.  And in that

1  process, to decide the facts.  To the facts as you find them.

2  You will apply the law as I give it to you, whether you agree

3  with the law or not.

4      You must decide the case solely on the evidence and the

5  law before you.

6      Perform these duties fairly and impartially.  You should

7  not be influenced by any person's race, color, religious

8  beliefs, national ancestry, sexual orientation, gender

9  identity, gender or economic circumstances.

10      Also, do not allow yourself to be influenced by personal

11  likes or dislikes, sympathy, prejudice, fear, public opinion,

12  or biases, including unconscious biases.  Unconscious biases

13  are stereotypes, attitudes or preferences that people may

14  consciously reject but may be expressed without conscious

15  awareness, control or intention.  Like conscious bias,

16  unconscious bias can affect how we evaluate information and

17  make decisions.

18      Now as you heard, this is a criminal case brought by the

19  United States government.  The government charges the defendant

20  with murder for hire.  The charge against the defendant is

21  contained in the indictment.  And the indictment simply

22  describes the charge the government brings against the

23  defendant.  The indictment is not evidence, and does not prove

24  anything.

25      The defendant has pleaded not guilty to the charge, and is

1 presumed innocent unless and until the government proves the

2 defendant guilty beyond a reasonable doubt.  In addition, the

3 defendant has the right to remain silent and never has to prove

4 innocence or present any evidence.

5     To help you follow the evidence, I will now give you a

6 brief summary of the elements of the crime that the government

7 must prove to make its case.

8     For murder for hire, the government must show that the

9 defendant used a facility in interstate or foreign commerce

10 with the intent that murder be committed in exchange for a

11 promise and agreement to pay $50,000.

12     The evidence you are to consider in deciding what the

13 facts are consists of, first, the sworn testimony of any

14 witness.  Second, the exhibits that are received in evidence.

15 And third, any facts to which the parties agree.

16     The following things are not evidence, and you must not

17 consider them as evidence in deciding the facts in this case.

18     First, statements and arguments of the attorneys are not

19 evidence.

20     Second, questions and objections of the attorneys are not

21 evidence.

22     Third, testimony that I instruct you to disregard is not

23 evidence.

24     And fourth, anything you may see or hear when the Court is

25 not in session, even if what you see or hear is done or said by

1   one of the parties or one of the witnesses, if it's outside

2   this courtroom, it is not evidence.

3        Evidence may be direct or circumstantial.  Direct evidence

4   is direct proof of a fact, such as testimony by a witness about

5   what that witness personally saw or heard or did.

6   Circumstantial evidence is indirect evidence.  That is it is

7   proof of one or more facts from which one can find another

8   fact.

9        By way of example, if you wake up in the morning and see

10  that the sidewalk is wet, you may find from that fact that it

11  rained during the night.  However, other evidence such as a

12  turned-on garden hose may provide explanation for the water on

13  the sidewalk.

14       Therefore, before you decide that a fact has been proven

15  by circumstantial evidence, you must consider all the evidence

16  in the light of reason, experience and common sense.

17       You are to consider both direct and circumstantial

18  evidence.  Either can be used to prove any fact.  The law makes

19  no distinction between the weight to be given to direct or

20  circumstantial evidence.  It is for you to decide how much

21  weight to give to any evidence.

22       There are rules of evidence that control what can be

23  received into evidence.  When a lawyer asks a question or

24  offers an exhibit into evidence and a lawyer on the other side

25  thinks that it is not permitted by the rules of evidence, that

1  lawyer may object.

2      If I overrule the objection, the question may be answered

3  or the exhibit received.  If I sustain the objection, the

4  question cannot be answered or the exhibit cannot be received.

5  Whenever I sustain an objection to a question, you must ignore

6  the question and not guess what the answer would have been.

7      Sometimes I may order that evidence be stricken from the

8  record and that you disregard or ignore the evidence.  That

9  means that when you are deciding the case, you must not

10 consider the evidence I told you to disregard.

11     In deciding the facts of this case, you may have to decide

12 which testimony to believe, and which testimony not to believe.

13 You may believe everything a witness says, or part of it, or

14 none of it.

15     In considering the testimony of any witness, you may take

16 into account:

17     First, the witness's opportunity and ability to see or

18 hear or know the things testified to;

19     Second, the witness's memory;

20     Third, the witness's manner while testifying;

21     Fourth, the witness's interest in the outcome of the case,

22 if any;

23     Fifth, the witness's bias or prejudice, if any;

24     Sixth, whether other evidence contradicted the witness's

25 testimony;

1    Seventh, the reasonableness of the witness's testimony in

2  light of all of the evidence;

3    And eighth, any other factors that bear on believability.

4    You must avoid bias, conscious or unconscious based on a

5  witness's race, color, religious beliefs, national ancestry,

6  sexual orientation, gender identity, gender or economic

7  circumstances in your determination of credibility.

8    The weight of the evidence as to a fact does not

9  necessarily depend on the number of witnesses who testify about

10  it.  What is important is how believable the witnesses are and

11  how much weight you think their testimony deserves.

12    I will now say a few words about your conduct as jurors.

13  First, keep an open mind throughout the trial, and do not

14  decide what the verdict should be until you and your fellow

15  jurors have completed your deliberations at the end of the

16  case.

17    Second, because you must decide this case based only on

18  the evidence received in the case, and on my instructions as to

19  the law that applies, you must not be exposed to any other

20  information about the case or to the issues it involves during

21  the course of your jury duty.

22    Thus, until the end of the case, and unless I tell you

23  otherwise, do not communicate with anyone in any way, and do

24  net let anyone else communicate with you in any way, about the

25  merits of the case or anything to do with it.

**JURY INSTRUCTIONS**

1   This restriction includes discussing the case in person,

2   in writing, by phone, tablet or computer, or any other means.

3   Via email, text message or any internet chatroom, blog, website

4   or application, including but not limited to Facebook, YouTube,

5   Twitter, Instagram, LinkedIn, Snapchat, TikTok or any other

6   forms of social media.

7   This restriction also applies to communicating with your

8   fellow jurors.  With each other.  You should not discuss the

9   case with each other until the end and I tell you it is time to

10   do so.  And it applies to communicating with anyone else,

11   including your families, your employer, the media or the press

12   and the people involved in the trial.  Although you may notify

13   your family and employer that you have been seated as a juror

14   in the case and how long you expect the trial to last.  But if

15   you are asked or approached in any way about your jury service

16   or anything about this case you must respond that you have been

17   ordered not to discuss the matter.  In addition, you should

18   report the contact to the Court.

19   Because you will receive all the evidence and legal

20   instruction you properly may consider to return a verdict, do

21   not read, watch or listen to any news or media accounts or

22   commentary about the case, or anything to do with it, although

23   I have no information that there will be news reports about

24   this case.  Do not do any research such as consulting

25   dictionaries, searching the internet or using other reference

1   materials and do not make any investigation or in any other way

2   try to learn about the case on your own.

3       Also, do not do any research about this case or the law or

4   the people involved, including the parties the witnesses or the

5   lawyers or the judge until you have been excused as jurors.  If

6   you happen to read or hear anything touching on this case in

7   the media turn away and report it to me as soon as possible.

8   These rules protect each party's right to have this case

9   decided only on evidence that has been presented here in court.

10  Witnesses here in court take an oath to tell the truth.  And

11  the accuracy of their testimony is tested through the pretrial

12  process.  If you do any research or investigation outside the

13  courtroom, or gain any information through improper

14  communications, then your verdict may be influenced by

15  inaccurate, incomplete or misleading information that has not

16  been tested by the trial process.  Each of the parties is

17  entitled to a fair trial by an impartial jury and if you decide

18  the case based on information not presented in court you will

19  have denied the parties a fair trial.

20      And remember, you have taken an oath to follow the rules

21  and it is very important that you follow these rules.  A juror

22  who violates these restrictions jeopardizes the fairness of

23  these proceedings and a mistrial could result that would

24  require the entire trial process to start over.  If any juror

25  is exposed to any outside information, please notify the Court

1   immediately.

2        At the end of the trial you will have to make your

3   decision based on what you recall of the evidence.  You will

4   not have a written transcript of the trial.

5        I urge you to pay close attention to the testimony as it

6   is given.

7        If you wish, you may take notes to help remember the

8   evidence.  If you do take notes, please keep them to yourself

9   until you and your fellow jurors go to the jury room to decide

10   the case.  Do not let note-taking distract you from being

11   attentive.  When you leave the Court for recesses, your notes

12   should be left in the jury room.  Do not take them home at the

13   end of the day.  No one will read your notes.

14        Whether or not you take notes, you should rely on your own

15   memory of the evidence.  Notes are only to assist your memory.

16   You should not be overly influenced by your notes or those of

17   your fellow jurors.

18        The next phase of the trial will now begin.  First, each

19   side may make an opening statement.  An opening statement is

20   not evidence.  It is simply an outline to help you understand

21   what that party expects the evidence will show.  A party is not

22   required to make an opening statement.  That's where we'll end

23   for today.

24        Then the government will present evidence and counsel for

25   the defendant may cross-examine.  Then, if defendant chooses to

offer evidence, counsel for the government may cross-examine.
After the evidence has been presented, I will instruct you on
the law that applies to the case, and the attorneys will make
closing arguments.  And after that, you will go to the jury
room and deliberate on your verdict.

Only the lawyers and I are allowed to ask questions of
witnesses.  A juror is not permitted to ask questions of
witnesses.  If, however, you are unable to hear a witness or a
lawyer, please raise your hand, and I will correct the
situation.

We will be having exhibits shown on the screens in front
of you, and if we think an exhibit is being shown and it's not
on your screen, also, please let us know.

During the trial, I may need to take up legal matters with
the attorneys privately.  We'll try very hard to do them -- we
get here early in the morning, and do it before you get here.
But sometimes we may need to do it by having a conference at
the bench over there on the side while you're present, or by
calling a recess.

Please understand that while you are waiting, we are
working.  The purpose of these conferences is not to keep
relevant information from you, but to decide how certain
information is to be treated under the rules of evidence, and
to avoid confusion and error.

Of course we'll do what we can to keep the number and

1   length of these conferences to a minimum.  I may not always

2   grant an attorney's request for a conference.  Do not consider

3   my granting or denying a request for a conference as any

4   indication of my opinion of the case, or what your verdict

5   should be.

6       Thank you for your attention.  And we will now begin with

7   the government's opening statement.

8       MS. HOSSEINI:  Thank you, Your Honor.

9                    <u>OPENING STATEMENT</u>

10  BY MS. HOSSEINI

11      Allen Gessen, the defendant in this case, hired a criminal

12  to arrange the murder of his ex and the mother of his two young

13  children.  He agreed to pay $50,000 to have her murdered.

14      He paid roughly half of that, about $23,000 as the

15  deposit.  He helped plan the murder, when it would happen, that

16  it should appear random, and that it should not happen in front

17  of their kids.  He sent a packet of information often called a

18  "target package" with her name, picture, address, social media

19  accounts, current boyfriend, landlord, and information about

20  her car and where her friends were located.

21      Mr. Gessen had it all figured out.  He planned the murder.

22  He paid for the murder.  And he even had a cover story.  But

23  what he didn't know was that the person he hired to kill his ex

24  was an undercover agent.  And all of Mr. Gessen's words, all of

25  his planning, was captured on recordings.

**OPENING STATEMENT / HOSSEINI**

1    By way of background, the agent was actually investigating

2  other people for money laundering.  He was working undercover,

3  as someone who was laundering money for drug cartels.  One of

4  those other targets introduced Mr. Gessen to the agent, asking

5  him to help Mr. Gessen figure out a way to get his ex out of

6  his life.

7    At first, the plan was to have her deported from the

8  United States by bribing an immigration official.  Mr. Gessen

9  believed that the agent had contacts in government so he wanted

10  the agent to bribe an immigration official to deport his ex

11  from the United States.

12    The agent and Mr. Gessen first met in person on June 2,

13  2022, about ten, eleven months ago, at a resort at Boca Raton,

14  Florida.  At that meeting Mr. Gessen talked a little bit about

15  himself.  He said he was 47 years old.  He was a lawyer in

16  New York.  Practiced law for about a year and a half, and then

17  went to Moscow, and he did some consulting work in different

18  parts of the world.

19    The agent then asked him:  Tell me what you want.

20  Mr. Gessen said that he wants his ex to go back to her home

21  country while he and their two children remain in the United

22  States.  He said he's a U.S. citizen; his son is a U.S.

23  citizen.  And his daughter can apply for naturalization by the

24  end of July.  So, about two months later.  But his ex was in

25  the United States on a visa and did not have permanent legal

1   status.  So Mr. Gessen and the agent talked about planning a

2   deportation scheme.

3        The plan was to bribe a corrupt immigration official who

4   would start an immigration investigation into her status, send

5   her a deportation letter and have her deported in about six

6   months.  The deportation scheme would cost $100,000.

7        During their meeting, they also discussed some potential

8   financial deals they could arrange in the future.  Maybe they

9   could do a deal with bulletproof vests and helmets.

10       After about two hours into their meeting, Mr. Gessen

11  asked:  If there was a cheaper way to get rid of her, that

12  would be good, too.  He then said:  It's simply more expensive.

13       The agent said: No, well, I mean, listen, I don't know how

14  to say this but, like, there is a cheaper way and probably a

15  more permanent way to do it, but...

16       Is there?  Asked Mr. Gessen.

17       Yeah.  That's up to you, said the agent.

18       I'm prepared to proceed, said Mr. Gessen.

19       You will hear evidence that Mr. Gessen intended to kill

20  his ex.  You will hear that in his own words.

21       Right after he asked if there was a cheaper way to get rid

22  of her, Mr. Gessen said that he researched his sources, and the

23  lowest price he could find was $220,000.

24       The evidence will show that before meeting the agent,

25  Mr. Gessen had hired someone from Mossad (Indicating quotation

1   marks) or an Israeli team (Indicating quotation marks) to do a

2   recon on his ex.  Mr. Gessen said he paid them $10,000 to do

3   the recon, but they came back with a price quote of another

4   $210,000 to complete the job.  To do the murder.

5        Mr. Gessen asked the agent to give him the price.  The

6   agent said he would have to get back to him about that, but

7   that he thought it would be less money.  And more definite,

8   said Mr. Gessen.

9        He explained how the issue with the immigration route was

10  not definite.  The lawyers would get involved, you get a bad

11  official and she would end up staying.  That the immigration

12  route was unpredictable, and you can fight the system for a

13  couple of years and it becomes a pain.

14       When the agent asked him if he wanted to pursue the murder

15  for hire route, Mr. Gessen said that his only concern was that

16  they can't do it in front of the kids.  The agent said they

17  wouldn't do it in front of the kids.

18       The agent asked Mr. Gessen to provide some information,

19  like locations of where she would be.  Mr. Gessen said he could

20  provide the schedule and the locations.  His exact words were:

21            "I will do the full recon for you."

22       They agreed to meet again.  Mr. Gessen said that he would

23  bring the schedules, addresses, descriptions and photographs.

24  Mr. Gessen said that he is ready.  And that this is not a

25  spur-of-the-moment emotional reaction (Indicating quotation

marks).

Once again, the agent told him:  Got to be comfortable with it.

And Mr. Gessen said:  I'm comfortable.

Mr. Gessen showed a picture of his kids on his phone to the agent (Indicating).  After seeing the picture of the kids, the agent asked:  How do we protect the kids?  They're too young.  They're going to lose their mother.  She's gone.  How do we protect the kids?

Mr. Gessen responded to that by saying that their son doesn't like her anyway.  And their daughter is too young to remember.

In talking to the agent, Mr. Gessen shed light on his motive for wanting to kill her.  He explained that she had caused him to go to jail.  He said that about six months before, end of 2021, he took their son from the United States to Canada.  And she told the police that he had taken their son without telling her.  So the police charged him with parental kidnapping.

He was arrested, brought back to the United States.  And as part of that process, he went to jail for 35 days.  And he ended up going to a few different jails, as he was brought back from Canada to the United States.

And that's why he wanted to kill her.  The evidence will show that he was angry about the Canada parental kidnapping

1   incident.  And he wanted to have full custody of their

2   children.  To get rid of his ex.

3        You will hear about their relationship.  How they met in

4   Zimbabwe.  They began dating.  They had a traditional marriage.

5   They had their first child in Zimbabwe.  Their son.

6        After some time, they moved to Russia because of

7   Mr. Gessen's work.  While they lived there, they had a second

8   -- they had their second child.  Their daughter.  And over

9   time, their relationship soured and they were not getting

10  along.

11       While they were living in Russia in 2019, Mr. Gessen took

12  their son and moved to the United States without telling her.

13  Although Mr. Gessen was a United States citizen and could

14  easily travel to and from the United States, she could not.

15  Mr. Gessen had lived in the United States, had worked as a

16  lawyer in New York.  But because she was a Zimbabwean national,

17  she would need a visa to come to the United States.

18       After some time, she was able to come to the United States

19  because she had filed a petition claiming international child

20  abduction.  And you will hear that they had lawsuits in family

21  court in Massachusetts, fighting over custody of their son and

22  daughter.

23       Now that I have outlined why he wanted to kill her, I want

24  to talk about what he did to cover up the murder-for-hire

25  scheme.

First he told the agents that they needed to communicate (Indicating quotation marks).  During that first meeting in Boca Raton, Mr. Gessen and the agent talked about communicating.  And how they -- how they will use the Signal app, which is a messaging app with end-to-end encryption, and is believed to be secure.

Mr. Gessen said:  None of the words we mention here can end up on there (Indicating quotation marks).  Can end up on Signal.  The day after their meeting, Mr. Gessen sent a text to the agent saying: I would like to reaffirm that I am prepared to proceed.  Attached is the letter of engagement.

The letter of engagement made it seem as though Mr. Gessen was the agent's lawyer for a project in the European Union. The evidence will show that that was not the case.  It was just to cover up the murder-for-hire scheme.

Mr. Gessen and the agent met a second time in New York on June 22nd, 2022, about three weeks after that first meeting. They finalized their arrangement.  The murder would cost $50,000.  They agreed that 50 percent of it must be paid now, and the other 50 percent when the murder is done.

Mr. Gessen didn't bring cash to the meeting, but he brought a gold coin worth $2,000.  He gave the gold coin to the agent as a down payment.  He agreed to wire the rest of the money into a San Francisco bank account.  But he said he would make sure that there was no trail.  If he's sending money from

his affiliated entities, he said, he needs to make sure there

can be no connection to him.

After the second meeting, Mr. Gessen enabled a feature on

the Signal app that would make his messages disappear.  He also

sent a consultancy agreement (Indicating quotation marks) to

the agent which made it seem like the agent's company was

providing consulting services to an Estonian company.

But the evidence will show that this was just a fake

contract to hide the true nature of the money, that it was for

the murder of his ex.  This agreement was a phony cover to

avoid having any evidence showing that he was paying for the

murder of his ex.  He had told the agent that he had a holding

company in Estonia, and he used that as part of the cover

story.

As planned, Mr. Gessen wired the money to the

San Francisco bank account.  He sent two wires.  The first on

June 29, 2022, for $18,000, and the second on July 8, 2022, for

$5,000, totaling $23,000.

As a result of his action, Mr. Gessen was charged with the

crime murder for hire.  The United States must prove this crime

beyond a reasonable doubt.  We will prove this crime beyond a

reasonable doubt with the evidence in this case.

First, you will hear testimony.  You will hear from the

undercover agent.  He will tell you how at first he talked to

Mr. Gessen about planning the deportation scheme, to bribe an

**OPENING STATEMENT / HOSSEINI**

1  immigration official to deport Mr. Gessen's ex.  And how that

2  plan quickly changed to murder for hire.

3      He will explain how he received a target package from

4  Mr. Gessen with a lot of personal information about his ex.

5  That he had a limited time to view that target package.  He

6  needed a PIN that Mr. Gessen sent to him that it could only be

7  accessed once, and then after he saw it that one time it

8  disappeared.

9      In addition to hearing testimony you will receive other

10  forms of evidence.

11      Let's talk about the other evidence in this case.  Aside

12  from hearing testimony from the witnesses (Indicating), you

13  will also hear the audio recordings.  The recordings of the

14  meetings between the agent and Mr. Gessen.  The agent recorded

15  both of those meetings in their entirety.  The one in

16  Boca Raton, Florida and the one in New York.  You will hear the

17  agent's voice.  You will hear Mr. Gessen's voice.  You will

18  hear Mr. Gessen's words.  You will hear him say:  This is not a

19  spur-of-the-moment emotional reaction, when he's talking about

20  the murder-for-hire scheme.

21      You will hear the agent say that he wants to make sure

22  that Mr. Gessen is comfortable with the murder-for-hire scheme,

23  and if he has any regrets.  You will hear Mr. Gessen say:  Oh,

24  yeah, 100 percent.  100 percent on board.

25      You will hear Mr. Gessen said that the murder should

1  appear random (Indicating quotation marks) because the police

2  will suspect him, that he would be the number-one suspect.

3       You will read the text messages on Signal between

4  Mr. Gessen and the agent.  Those messages that he thought

5  nobody would ever see because he set them to disappear.

6       You will see that on the Signal text message, after the

7  second meeting on June 22nd, Mr. Gessen enabled this

8  disappearing message feature on Signal.  But the agent noticed

9  that, and started taking pictures with his other phone

10  (Indicating), before those messages could disappear.  And you

11  will see those photos of the messages that had disappeared and

12  would disappear.

13       You will see photos of Mr. Gessen and the agent sitting in

14  the restaurant, having lunch during their meeting, the one in

15  Boca Raton and the one in New York.

16       You will see physical evidence, the actual gold coin that

17  Mr. Gessen gave to the agent in New York as part of the

18  deposit.  You will see the bank record showing the two wires

19  that were sent for the murder-for-hire scheme, totaling about

20  $23,000.

21       You will see the documents that Mr. Gessen sent to the

22  agent for the cover story.  The letter of engagement, the

23  consultancy agreement.  These documents that he used to try to

24  hide the fact that the money he was sending was for the murder

25  of his ex.

1      Lastly, you will see the target package that Mr. Gessen

2  sent to the agent on Signal, and how, despite the disappearing

3  message feature, the agent was able to quickly preserve what he

4  had received from Mr. Gessen.  And you will see the target

5  package has her name, picture, address, and a lot of other very

6  personal information.

7      At the end of the case, we will have another opportunity

8  to speak with you.  At that time, you will have met all the

9  witnesses in the case, heard all of the testimony, and seen all

10  of the evidence.

11      At that time, we will ask you to return the only verdict

12  consistent with the evidence.  And that is a verdict of guilty

13  on the crime of murder for hire.

14      **THE COURT:**  Thank you.

15      **MS. HOSSEINI:**  Thank you.

16      **THE COURT:**  Mr. Raju?

17      **MS. MITCHELL:**  Thank you, Your Honor.

18                **OPENING STATEMENT**

19  BY MR. RAJU

20      Members of the jury, this is Allen Gessen.  He is a

21  loving, caring and adoring father to [E.G.], his four-year-old

22  daughter, and to [O.G.], his nine-year-old son.

23      Like many mothers and fathers, Allen is a very protective

24  parent, perhaps a little over-protective.  His greatest hopes

25  are for the happiness and well-being of his children.

1    And like others, Allen has his faults.  I'm not going to

2  stand here and tell you that Allen is a perfect person.  In

3  trying to resolve the years-long separation and custody issues

4  with his ex-partner, Allen made imperfect decisions borne out

5  of frustration, and the love that he shares for his children.

6  But to be clear, you'll learn that Allen's decisions never

7  included a desire or an effort to kill anyone, never mind the

8  mother of his young children.

9    And so when the government gets up here and claims that

10 Allen hired an undercover FBI agent to kill his former partner

11 so that he can gain full custody of the children, the evidence

12 will show you that simply is not true.  To be sure, Allen is

13 not guilty of the charge against him.

14    Now, by way of background, Allen was born in the Soviet

15 Union.  And in 1990 he emigrated to the United States as a

16 refugee, and he later became a citizen.

17    But the story of Allen and Priscilla actually begins in

18 2011 in Harare, Zimbabwe, at a fashion show.  That's where

19 Allen was living at the time, and that's where he met his

20 former partner, Priscilla Chigariro.

21    Though never officially married, Allen and Priscilla had a

22 whirlwind romance.  And in 2013, their son [O.G.] was born in

23 Zimbabwe.  Allen and Priscilla then moved to Russia, where they

24 lived between 2016 and 2018.  In November of 2018, their

25 daughter [E.G.] was born via gestational surrogacy.  And

1    shortly before [E.G.]'s birth, Allen and Priscilla

2    unfortunately separated.

3        And as we often know, or as we know often happens in

4    separations where a couple shares young children, parenting

5    decisions became the source of a lot of frustration.  They

6    became the source of a lot of disagreement.

7        You will hear that in 2019 Allen saw the growing emotional

8    impact that the constant fighting and relationship issues were

9    having on the children.  Allen decided to leave Russia, and he

10   brought [O.G.] with him to the United States.  You will learn

11   he expected Priscilla and [E.G.] to follow so that they could

12   work on their issues together in the United States.

13       Allen knew it would take a little bit of time for

14   Priscilla and [E.G.] to come here because [E.G.] and him were

15   not married -- excuse me -- Priscilla and him were not married.

16   Priscilla was not a United States citizen.  And due to the fact

17   [E.G.] was born via surrogacy, her immigration to the United

18   States was a little complicated.

19       The government will tell you -- or in fact, they already

20   told you that Allen kidnapped [O.G.] to the United States.  But

21   the evidence you will see will show that simply wasn't the

22   case.  Several international custody proceedings ensued, first

23   through the Hague, then in Zimbabwe, and finally in

24   Massachusetts.

25       But you will learn that by 2021, Allen, Priscilla, [E.G.]

 1    and [O.G.] were all living in Massachusetts, although Allen and

 2    Priscilla remained separated.  You will hear that despite

 3    Priscilla filing charges against Allen in December of 2021, for

 4    another alleged kidnapping, this time to Canada, you will learn

 5    that just four months later the Massachusetts family court

 6    agreed in April of 2022 that both parents should share 50/50

 7    equal custody of the children.  And while the custody battle --

 8    the custody dispute was settled, both Allen and Priscilla

 9    continued to disagree on how best to raise the children.

10        Frustrated with the toll these disagreements were

11    continuing to have on the children, Allen reached out to a

12    business associate and friend of his named Alex Kiselev, who

13    Allen believed had high-level connections in the federal

14    government.  The evidence will show you that Allen was

15    desperate to remove the instability that he believed Priscilla

16    was causing in the family, and he decided to look for a way to

17    have her deported to Zimbabwe since she was not a citizen.

18        Allen asked Alex Kiselev to connect him to one of his

19    government contacts so that Allen could pay a bribe and so that

20    Priscilla could be deported.

21        This, of course, was a remarkably poor exercise of Allen's

22    judgment.  And you will learn that it is not the source of any

23    pride.

24        Alex Kiselev put Allen in touch with a person who used the

25    name David Rizzo.  David Rizzo turned out to be an undercover

1   FBI agent.  Alex told Agent Rizzo that Allen wanted to have

2   Priscilla deported.  Undercover Agent Rizzo told Alex that he

3   had a high-level contact in Immigration.  He assured him:  I

4   have a high-level contact in Immigration, who he had used

5   before, and who could guarantee Priscilla's deportation if

6   Allen paid a bribe of $100,000.

7        Allen met with David in New York and in Boca Raton in June

8   of 2022, and they agreed on the $100,000 bribe for Priscilla's

9   removal from the United States.  And on repeated occasions,

10  despite being told that Allen's sole desire, his singular

11  desire was to have Priscilla deported, you will hear that

12  Agent Rizzo, Undercover Agent Rizzo persisted in emphasizing

13  that he can offer an option beyond deportation.  You will see

14  that Agent Rizzo used obtuse and vague language to strongly

15  encourage Allen to arrange with him to have Priscilla killed.

16  And when I say "arrange with him," I mean Undercover Agent

17  Rizzo.

18       And you will learn that while Agent Rizzo pitched this

19  option, his offers were consistently rejected.  To be sure, the

20  evidence will show that in the two face-to-face meetings that

21  Allen had with Agent Rizzo, Allen never asked or solicited

22  Agent Rizzo's efforts to kill Priscilla.  Not one time.  You

23  will learn that idea came from Undercover Agent Rizzo, and only

24  Undercover Agent Rizzo.  Allen Gessen never agreed to that

25  idea.

1    And as I said earlier, Allen isn't a perfect person.  He's

2    not a choirboy.  But the evidence will show that he never

3    solicited Agent Rizzo to murder Priscilla.  He never did.

4    Now, after agreeing with Undercover Agent Rizzo to have

5    Priscilla deported for the payment of a $100,000 bribe, Allen

6    asked Undercover Agent Rizzo if there was a cheaper option.

7    Agent Rizzo said that indeed there was.  And you will learn

8    that Allen didn't believe for one moment that the cheaper

9    option would be having Priscilla killed.  Indeed, you will

10   learn that Undercover Agent Rizzo, himself, had said that his

11   idea of having Priscilla killed was, quote, "a whole 'nother

12   price level."

13   So David told Allen -- Undercover Agent David Rizzo told

14   Allen there was indeed a less expensive option.  It would cost

15   one half of the $100,000 bribe price.  It would cost $50,000.

16   And without David or Allen articulating what the cheaper option

17   entailed, Allen and David agreed to use that unstated but less

18   expensive choice.

19   To Agent Rizzo, that unspecified cheaper option was having

20   Priscilla murdered.  To Allen, you will learn the cheaper

21   option meant a less-expensive way to accomplish Priscilla's

22   deportation.  To Allen, the cheaper path was not having a

23   hitman murder his ex-partner.

24   The evidence will show that Allen solicited Agent Rizzo,

25   Undercover Agent Rizzo to do one thing, and one thing, only.

 1  That is, use his connections in the federal government to have
 2  Priscilla deported.  That is it.  And Allen wanted her deported
 3  for the least expensive price.  Allen Gessen never agreed or
 4  intended for Agent Rizzo to conjure up a murder plot.

 5      Members of the jury, this case is going to feature
 6  undercover testimony.  It is going to feature hidden
 7  recordings, and it is going to feature some likely emotional
 8  testimony.  But your job is not to be swayed by emotion or
 9  sympathy, but to evaluate whether or not the government has
10  proven that Allen committed murder for hire beyond a reasonable
11  doubt.

12      So I urge you to pay careful attention to all the evidence
13  in this case.  And if you do pay careful attention, I'm
14  confident that at the close of this trial, you will agree and
15  you will return a verdict of not guilty.

16      Thank you.

17          THE COURT:  Thank you.

18      So members of the jury, that concludes the proceedings for
19  today.  We'll commence tomorrow at 8:30 a.m. with the first
20  witness.  I believe, Ms. Means, we will have coffee?

21          THE COURTROOM DEPUTY:  Yeah.

22          THE COURT:  And pastries for you.  It's not healthy
23  food, so --

24          THE COURTROOM DEPUTY:  Light refreshments.

25          THE COURT:  Light refreshments.  Let me -- one thing I

**PROCEEDINGS**

1    noticed in looking, I think we have five jurors in the North

2    Bay, including three in Santa Rosa.  Given the lack of public

3    transportation, you may want to think about carpooling.  I just

4    bring that up to you.  Hopefully you can find each other.

5         But just keep in mind, you are not to talk about the case

6    with each other at all.  So if you're carpooling, do not talk

7    about why you are carpooling together.  Talk about other

8    things.

9         And again, I'm going to sound like a broken record, but at

10   the end of every day and at the beginning of every day I'm

11   going to remind you that as you leave here for the night, you

12   must not conduct any independent research about this case, the

13   matters in the case, the legal issues, any of the lawyers,

14   anything you have heard about them, and keep an open mind.  You

15   have heard zero evidence.  No evidence, whatsoever.  You will

16   start hearing the evidence tomorrow morning.

17        So thanks again for agreeing to serve.  And we will see

18   you and start tomorrow promptly at 8:30.

19        (Off-the-Record discussion between the Court and Clerk)

20        **THE COURT:**  Oh, yeah.  When you come in the courtroom,

21   or when you go at lunch, you may run in, see the lawyers or the

22   clients or anything in the hallways.  They're going to ignore

23   you, because I've instructed them not to talk to you.  So don't

24   take offense.  They are just following my orders.

25        All right.  Thank you very much.

1      **THE COURTROOM DEPUTY:**  All rise for the jury.

2      (Jury excused)

3      (The following proceedings were held outside of the

4   presence of the Jury)

5      **THE COURT:**  Okay.  Thank you very much.  So we will

6   see you tomorrow at 8:00.  And, as we said, we will have a sign

7   that the courtroom is closed, except for the people who we said

8   could be in here.  And so the jury will have no idea of that,

9   and it will be streaming next door and we will have a sign on

10   the door for that.  So if we can have the agent here just so we

11   can make sure with our IT that it's set up properly.

12      **MS. HOSSEINI:**  At 8:00 Your Honor?

13      **THE COURT:**  Yeah, 8:00, 8:15?  What would you prefer?

14   In civil cases I always said here, get here at 8:00 because

15   they always have 25 minutes of arguments before trial starts.

16   You probably won't have that so 8:15 is fine if that works for

17   everyone.

18      **MS. HOSSEINI:**  Thank you, Your Honor.

19      **THE COURT:**  Great.  Thank you so much.

20      (Proceedings concluded)

21

22

23

24

25

## **I N D E X**

Monday, May 1, 2023 - Volume 1

|  | **PAGE** | **VOL.** |
|---|---|---|
| Jury Voir Dire | 37 | 1 |
| Jury Instructions | 135 | 1 |
| Opening Statement by Ms. Hosseini | 145 | 1 |
| Opening Statement by Mr. Raju | 155 | 1 |

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **BOGNANNO, CHRISTOPHER** | | |
| (SWORN) | 9 | 1 |
| Offer of Proof - Direct by Ms. Hosseini | 9 | 1 |
| Cross-Examination by Ms. Mitchell | 26 | 1 |

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Tuesday, June 13, 2023