Volume 2

Pages 165 - 339

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, JUDGE

```
UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )    No. 22-cr-276-JSC
                                 )
ALLEN GESSEN,                    )
                                 )
            Defendant.           )    San Francisco, California
_____)
```

Tuesday, May 2, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

```
For Plaintiff:         ISMAIL J. RAMSEY
                       UNITED STATES ATTORNEY
                       450 Golden Gate Avenue, 11th Floor
                       San Francisco, California  94102
                 BY:   ILHAM A. HOSSEINI
                       ALEXIS JAMES
                       ASSISTANT UNITED STATES ATTORNEYS


For Defendant:         JODIE LINKER
                       Federal Public Defender
                       450 Golden Gate Avenue
                       Room 19-6884, Box 36106
                       San Francisco, California  94102
                 BY:   CANDIS MITCHELL
                       KARTHIK RAJU
                       DEPUTY FEDERAL PUBLIC DEFENDERS



Reported By:  BELLE BALL, CSR 8785, CRR, RDR
              Official Reporter, U.S. District Court
```

PROCEEDINGS

```
 1   Tuesday - May 2, 2023                           8:35 a.m.

 2                      P R O C E E D I N G S

 3                            -oOo-

 4      (The following proceedings were held in the presence of

 5   the Jury)

 6          THE COURT:  Good morning, members of the jury.  You

 7   may be seated.  Thank you for being so timely this morning.

 8   I'm going to be that broken record, and as I told you yesterday

 9   I just want to emphasize again it is important that you decide

10   this case based solely on the evidence presented here in court

11   and the law as I instruct you.

12      And I'm going to ask you to raise your hand if any of you

13   learned anything or shared any information about this case

14   outside the courtroom yesterday or this morning.

15      (No response)

16          THE COURT:  I didn't think so.  But just had to check.

17      Okay.  We are now going to begin with the government's

18   presentation of evidence.

19      Is the government prepared to call your first witness?

20          MS. HOSSEINI:  Yes, Your Honor.  The United States

21   calls David Rizzo.

22              DAVID RIZZO, GOVERNMENT'S WITNESS, SWORN

23          THE COURTROOM DEPUTY:  Would you please state and

24   spell your name for the record.

25          THE WITNESS:  David Rizzo, R-I-Z-Z-O.
```

1      **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

2                          **DIRECT EXAMINATION**

3  **BY MS. HOSSEINI**

4  **Q**    Good morning.

5  **A**    Good morning.

6  **Q**    Agent Rizzo, can you tell us where you work?

7  **A**    I work for the FBI.

8  **Q**    And how long have you been working with the FBI?

9  **A**    Nineteen years today, actually.

10  **Q**    Can you tell us a little bit, about your position?  Your

11  duties, responsibilities in general?

12  **A**    I currently work in an undercover sensitive operations

13  unit for the FBI.

14  **Q**    How long have you been doing undercover work,

15  approximately?

16  **A**    Since 2009.

17  **Q**    So that's about 14 years?

18  **A**    Roughly.

19  **Q**    All right.  And what type of cases do you work?  Just

20  general topic areas.

21  **A**    Over the years I've worked a large amount of criminal

22  cases, including organized crime, public corruption, I've

23  worked national security cases as well.  That's about the

24  gamut.

25  **Q**    Do you work with a team or do you work solo?

1    **A**    I work with a team.

2    **Q**    Now, directing your attention to June, 2022, were you

3    working as an undercover agent at that time?

4    **A**    Yes, ma'am.

5    **Q**    Did you participate in an investigation involving Allen

6    Gessen?

7    **A**    Yes, ma'am.

8    **Q**    Can you tell us about that investigation and how you were

9    introduced to Mr. Gessen?

10   **A**    Sure.  In broader terms it was an organized crime

11   investigation.  And I was introduced to Mr. Gessen by a

12   gentleman who is a defendant in the case, and his name was

13   Aleksei Kiselev.

14   **Q**    What were you investigating originally in your

15   investigation?

16   **A**    Money laundering.

17   **Q**    And that's before you were introduced to Mr. Gessen?

18   **A**    Yes, ma'am.

19   **Q**    And in that investigation, what was your role?

20   **A**    My role as an undercover, I was portraying myself as an

21   organized crime figure to an Italian organized crime syndicate.

22   I also was a money launderer for the Columbian drug cartel.

23   And, personally, I was crass, I was rude, I was portraying

24   myself as an individual that, in all actuality, I would have

25   much disdain for as an FBI Agent, and a human being.

**RIZZO - DIRECT / HOSSEINI**

1   **Q**   So why was it that you were exhibiting that role?

2   **A**   That role -- that "legend" as we call it in the FBI, that

3   legend fit the persona for the case, international organized

4   crime and money laundering.

5   **Q**   And earlier you told us you worked with a team.  Who else

6   was on that team?

7   **A**   It comprised of two case agents.  Special Agent Chris

8   Bognanno and Special Agent Dave Peacock.  The two case agents.

9   **Q**   Can you tell us a little bit about what their role is as

10  opposed to what your role is.

11  **A**   Yes.  The case agents are really directors of the

12  investigation.  Administratively, they set strategy.

13      My role purely is, in an undercover capacity, to

14  understand what they would like to achieve.  And only from an

15  undercover capacity.  I don't make any administrative decisions

16  on the case.  I defer to them as they do their case strategy.

17  I'm just going in basically as a government witness, if you

18  will.

19  **Q**   Now, you told us that you were introduced to Mr. Gessen

20  through somebody named Aleksei Kiselev.  How is it that that

21  introduction occurred, if you remember?

22  **A**   If I recall correctly, the introduction came over a phone

23  call using Signal.

24  **Q**   What is Signal?

25  **A**   Signal is a messaging app where -- excuse me.  It's a

**RIZZO - DIRECT / HOSSEINI**

1   communications platform where you can message, text message and

2   also call people.  And it really -- it covers people.  It's

3   very anonymous.  You can't tell who the end users are.  It's

4   encrypted from end to end.

5   **Q**    So is it believed to be a more secure form of

6   communication as opposed to some other methods?

7   **A**    It is.

8          **MS. HOSSEINI:**  I would like to pull up Exhibit 11.

9   This is an audio file, Agent Rizzo, dated March 24, 2022.

10  **BY MS. HOSSEINI**

11  **Q**    Have you had a chance to review an audio file with that

12  date, March 24, 2022?

13  **A**    Yes, ma'am.

14  **Q**    And what is that file?

15  **A**    That file is a Signal chat that was recorded -- a

16  conversation, I should say, with Aleksei Kiselev and myself.

17         **MS. HOSSEINI:**  At this time, Your Honor, I would like

18  to move to admit Government Exhibit 11.

19         **THE COURT:**  Any objection?

20         **MR. RAJU:**  No objection, Your Honor.

21         **THE COURT:**  Exhibit 11, admitted.

22      (Trial Exhibit 11 received in evidence.)

23         **MS. HOSSEINI:**  Permission to publish, Your Honor.

24         **THE COURT:**  Yes.

25         **MS. HOSSEINI:**  And I would also like to put up while

1  the audio file is in the background, Exhibit 23 for the

2  witness.

3          THE COURT:  Exhibit 23 is a transcript of the call?

4          MS. HOSSEINI:  Yes, Your Honor.

5          THE COURT:  Is it going to into evidence or is it just

6  an aid to the jury?

7          MS. HOSSEINI:  An aid to the jury.

8          THE COURT:  Okay, so I'm not going to admit it.

9      Members of the jury, so the only evidence is the actual

10  audio, right, what you hear.  The government has prepared a

11  transcript to assist with your listening.  But what governs,

12  and again, the only evidence, is the audio.

13      All right.  You may publish Exhibit 23.

14          MS. HOSSEINI:  Thank you, Your Honor.

15      (Document displayed)

16  BY MS. HOSSEINI

17  Q    And Agent Rizzo, have you had a chance to review

18  Exhibit 23, the transcript, while listening to the portions we

19  will play here today, to the portions of audio?

20  A    Yes, ma'am.

21  Q    Is it a fair and accurate transcription of the audio?

22  A    Yes, ma'am.

23          MS. HOSSEINI:  All right.  If we can please pull up

24  Exhibit 11 in the background, which is the audio.  Exhibit, 23,

25  which is the transcript, and we'll go to the audio file, we'll

1    play from the beginning.  And we'll look at Page 1 of

2    Exhibit 23.

3         (Portion of audio recording played in open court)

4         MS. HOSSEINI:  So we'll pause here for a second.

5    BY MS. HOSSEINI

6    Q    I notice it's quiet.  When do you start your recording,

7    when you're making a recording?

8    A    I start my recording before the phone call is placed.

9    Q    Okay.

10        MS. HOSSEINI:  We'll fast-forward to one minute and

11   16 seconds.  We could listen to a quiet time of one minute and

12   16 seconds, but I thought we can speed it along.

13        (Portion of audio recording played in open court)

14        MS. HOSSEINI:  You can pause here.

15        (A pause in the proceedings)

16        MS. HOSSEINI:  Thank you.

17   BY MS. HOSSEINI

18   Q    Can you tell us who the voices on this recording are, the

19   one that says "UCE-2"?

20   A    That's myself.

21   Q    And the one that says "KISELEV"?

22   A    That's Mr. Kiselev.

23   Q    All right.  So there's some small talk, catching up.

24   We'll fast-forward to seven minutes and ten seconds, which will

25   be Page 5 of Exhibit 23, the transcript, Line 8.

1        (Portion of audio recording played in open court)

2            **MS. HOSSEINI:**  We'll stop there.

3        Thank you.

4    **BY MS. HOSSEINI**

5    **Q**    Now, Agent Rizzo, how did you come up with that number,

6    $100,000?

7    **A**    The number, $100,000, really was based on this

8    conversation.  Mr. Kiselev suggested that it would be high six

9    figures.  And I thought that there are very few people in the

10   United States government that have the power to deport, and

11   probably fewer that would use that power for their own personal

12   gain.  So $100,000 would have been a fair price, considering

13   the risk for that individual.

14   **Q**    And the fact that Mr. Kiselev is the one that said "six

15   figures," did that inform your decision in any way what number

16   you should offer?

17   **A**    Yes.  They were willing to pay.  And when he said "high

18   six figures" I thought that was exorbitant.  So I thought

19   $100,000 would be more appropriate.

20   **Q**    And in your training and experience, having worked as an

21   undercover, did it make sense to have such a number, $100,000

22   for this type of offer?

23   **A**    Again, you know, given the nature of the bribery payment

24   and the risk associated with that -- that individual, that

25   fictitious individual, considering, you know, they have

1   retirement and they're looking at jail, I would think that that

2   would be a fair price.

3   **Q**   If you could put it in context for us, what would this

4   fictitious government official be doing for the $100,000?

5   **A**   This fictitious government official would be in a position

6   to deport Mr. Gessen's ex-wife.

7   **Q**   Okay.  Now, on that recording that we just heard, we heard

8   you say that there's a range of options.  Can you tell us why

9   you said that?

10  **A**   Yeah, I was just trying to feel him out to see what he was

11  looking at.  I -- if you note in the call, so I said, you know:

12  In a perfect world, what would you like?  What would you like

13  to happen?

14      So I just wanted to be flexible and just discuss a range

15  of options.  I wanted to adjust to anything that he may say.

16  **Q**   And is that part of -- the flexibility, is that necessary

17  when you are going in, trying to figure out where this is

18  headed?  Like, was this the first instance where you are being

19  asked about this kind of offer?

20  **A**   Correct.

21          **MR. RAJU:**  Objection as to leading, Your Honor.

22          **THE COURT:**  Sustained.

23  BY MS. HOSSEINI

24  **Q**   Why were you trying to have that flexibility?

25  **A**   The flexibility is a technique that we use in the

**RIZZO - DIRECT / HOSSEINI**

1  undercover world because you just don't know what your target

2  or -- is going to say.  So you have to keep yourself in a

3  flexible situation to be able to adjust, to come up with some

4  sort of amenable story that would want them to further engage

5  in conversation with you.

6  **Q**   Okay.  So at this point had you met Mr. Kiselev?

7  **A**   I believe I have.  I don't recall, ma'am.  This was on

8  March --

9  **Q**   That's okay.  I can skip.  Had you met Mr. Gessen?

10  **A**   No, I had not.

11  **Q**   At this point, during this call (Indicating), did you know

12  his name or was it sort of -- I think it said "My friend" or

13  something like that.  Right?

14  **A**   I did not know him.

15  **Q**   Okay.

16      **MS. HOSSEINI:**  So we'll skip ahead to 14 minutes and

17  38 seconds, which will be Page 9 of the transcript, a little

18  below the bottom half, towards the bottom third.  Starting with

19  "Yeah, so..."

20      (Portion of audio recording played in open court)

21      **MS. HOSSEINI:**  Pause there.

22  **BY MS. HOSSEINI**

23  **Q**   Agent Rizzo, did you get any passports for the person who

24  was to be deported, from Mr. Kiselev?

25  **A**   I did not.

RIZZO - DIRECT / HOSSEINI

1   Q    Okay.

2         MS. HOSSEINI:  Now, let's pull up Government's

3   Exhibit 3 for the witness.

4         (Document displayed)

5   BY MS. HOSSEINI

6   Q    Do you recognize what this is?  It'll come up in just a

7   second.

8         MS. HOSSEINI:  Exhibit 3.

9         (Off-the-Record discussion between counsel)

10        THE WITNESS:  I can --

11        THE COURT:  The witness sees it.

12        MS. HOSSEINI:  I don't.

13        THE COURTROOM DEPUTY:  It's not published on the other

14  end, maybe that's why.

15        MS. HOSSEINI:  May I use yours?

16  BY MS. HOSSEINI

17  Q    Do you recognize this, Agent Rizzo?

18  A    I do.

19  Q    What is it?

20  A    This is the beginning of my text thread with Mr. Gessen on

21  the Signal app.

22        MS. HOSSEINI:  At this time, Your Honor, I would like

23  to move Exhibit 3 into evidence.

24        THE COURT:  Any objection?

25        MR. RAJU:  No objection, Your Honor.

```
 1              THE COURT:  Exhibit 3 is admitted.

 2         (Trial Exhibit 3 received in evidence.)

 3              MS. HOSSEINI:  Permission to publish?

 4         THE COURT:  Yes.

 5              MS. HOSSEINI:  Thank you, Your Honor.

 6         (Document displayed)

 7              MS. HOSSEINI:  Let's blow up the first part of that

 8    text, Mr. Machado, that shows the picture, right above,

 9    including the very top.

10         (Document enlarged)

11    BY MS. HOSSEINI

12    Q    Can you tell us what we see on the screen?

13    A    Yes.  This is Mr. Gessen's profile picture.  Underneath it

14    says "AG."  I entered him into my phone as contact as Allen --

15    "AG" for Allen Gessen, followed by his phone number,

16    [Redacted].

17    Q    That's his phone number?

18    A    Yes, ma'am.

19              MS. HOSSEINI:  And then if we can go back into the

20    full page and zoom in to the bottom half, starting with the

21    date.

22         (Document enlarged)

23    BY MS. HOSSEINI

24    Q    And what are we looking at here?  Can you please read this

25    message?
```

**RIZZO - DIRECT / HOSSEINI**

1  **A**    It is the first Signal message that I received from

2  Mr. Gessen.   It says (As read):

3           "Good morning, David, this is Allen Gessen.

4           I have just arrived in Miami.  I'm entirely

5           at your disposal.  When and where do you

6           propose to meet?"

7  **Q**    What date is that?

8  **A**    That is Thursday, June 2nd.

9  **Q**    Do you remember the year?

10 **A**    2022.

11 **Q**    All right.  And what is your response to that message?

12 **A**    (As read)

13          "Hi, Allen, let's meet at 12 p.m. for lunch

14          at the Boca Raton Resort, 501 East Camino

15          Real, Boca Raton.

16 **Q**    And his response?

17 **A**        "Perfect see you soon."

18 **Q**    And your response?

19 **A**        "Thank you.  I will meet you in the lobby."

20 **Q**    So was this the first time you'd received communication

21 from Mr. Gessen?

22 **A**    Yes, ma'am.

23 **Q**    Okay.  And Signal is still the same app that you explained

24 to us earlier?

25 **A**    Yes, ma'am.

**RIZZO - DIRECT / HOSSEINI**

1   **Q**   Did you have the meeting with Mr. Gessen?

2   **A**   I did.

3   **Q**   When was that?

4   **A**   It was on Thursday, June 2nd.

5   **Q**   What was the purpose of your meeting?

6   **A**   The purpose of the meeting was to meet Mr. Gessen, to talk

7   about the -- our strategy for the deportation of his wife.  His

8   ex-wife; I'm sorry.

9   **Q**   All right.  And while you met with him, did you make any

10  efforts to record or memorialize your meeting in any way?

11  **A**   Yes, ma'am, I did; I had a body recorder on.

12  **Q**   And just generally, what is a body recorder?

13  **A**   A recording device that captures conversation.

14  **Q**   Can we -- we will momentarily put up Exhibit 5 which is an

15  audio file, dated June 2nd, 2022.  Have you reviewed such an

16  audio file?

17  **A**   If that's the meeting that you are referring to, yes.

18  **Q**   All right.

19          **MS. HOSSEINI:**  And can we admit Exhibit 5 into

20  evidence?

21          **THE COURT:**  Any objection to admitting Exhibit 5?

22          **MR. RAJU:**  Excuse me, Your Honor.

23          **THE COURT:**  It's the audio of the June 2nd.

24          **MR. RAJU:**  No objection, Your Honor.

25          **THE COURT:**  Exhibit 5 admitted.

1          (Trial Exhibit 5 received in evidence.)

2          **MS. HOSSEINI:**  And the transcript for that is at

3   Exhibit 6.

4   **BY MS. HOSSEINI**

5   **Q**    Have you had a chance to review Exhibit 6 while listening

6   to the audio file, Exhibit 5?

7   **A**    I have.

8   **Q**    All right.  Is it a fair and accurate transcription of the

9   audio file?

10  **A**    Correct.  But I also need to say there's unintelligible

11  portions of that conversation that are -- that are also noted

12  in that transcript.

13  **Q**    Okay.

14         **MS. HOSSEINI:**  Permission to publish Exhibit 6 as an

15  aid to Exhibit 5.

16         **THE COURT:**  So again, members of the jury, Exhibit 6

17  is just a transcript to help you.  The only evidence is the

18  audio, Exhibit 5.

19         You may.

20         **MS. HOSSEINI:**  Thank you, Your Honor.

21         If we can pull up Exhibit 5 in the background, the audio

22  file, we will play that from the beginning until one minute,

23  five seconds.

24         And that corresponds to Exhibit 6, Page 2, at the very

25  top.

1    (Portion of audio recording played in open court)

2        MS. HOSSEINI:  Can we increase the audio, Mr. Machado?

3    (Portion of audio recording played in open court)

4        MS. HOSSEINI:  We'll pause there.

5  BY MS. HOSSEINI

6  Q    What are those noises we heard?

7  A    That is the -- me walking to the meet location in the

8  lobby.

9  Q    When did you start your recording device?

10 A    At my hotel room.

11 Q    And then what did you do?

12 A    I placed my recorder on my person, and I walked to the

13 hotel lobby to meet Mr. Gessen.

14 Q    So you start the recording device in your room?

15 A    I do.

16 Q    It's on?

17 A    Yes.

18 Q    And then you walk out of your room?

19 A    Yes, ma'am.

20 Q    Okay.  Where did you go?

21 A    I went to the hotel lobby.

22 Q    Okay.

23        MS. HOSSEINI:  Let's fast-forward to three minutes, 30

24 seconds, which corresponds to the top of Page 2 in Exhibit 6.

25    (Portion of audio recording played in open court)

**RIZZO - DIRECT / HOSSEINI**

1   BY MS. HOSSEINI

2   **Q**    And so was this the first time that you actually met

3   Mr. Gessen in person?

4   **A**    Correct.

5   **Q**    And that was at the hotel lobby?

6   **A**    It was.

7   **Q**    Okay.

8         **MS. HOSSEINI:**  We'll fast-forward to six minutes,

9   three seconds.  Which is still on Page 2 of Exhibit 6.

10        (Portion of audio recording played in open court)

11        **MS. HOSSEINI:**  Pause for a second.

12  BY MS. HOSSEINI

13  **Q**    Who is this Alex?

14  **A**    Say again, ma'am?

15  **Q**    Who is Alex?  It says "Alex" at the very --

16  **A**    It's Mr. Kiselev.

17        **MS. HOSSEINI:**  Okay, we'll resume playing.

18        **THE WITNESS:**  Say again?

19        **MS. HOSSEINI:**  I'm sorry, I'm speaking to Mr. Machado,

20  who is pulling up the audio file.

21        (Portion of audio recording played in open court)

22        **MS. HOSSEINI:**  We'll pause for just a second,

23  Mr. Machado.

24        Thank you.

25

1  BY MS. HOSSEINI

2  Q    It sounds like there is a car.  Where are you at this

3  point?

4  A    I believe, ma'am, if I recall correctly, we're taking a

5  shuttle to Marisol.  Or we were waiting for a shuttle to

6  Marisol.  I can't tell if we are in the vehicle or not right at

7  this point.

8  Q    But you are going from the lobby to somewhere else?

9  A    We are going from the lobby to catch the shuttle to go

10  beachside, to a restaurant that is part of the hotel, but not

11  on the main property.

12  Q    Got it.

13        MS. HOSSEINI:  And we will resume playing,

14  Mr. Machado.

15     (Portion of audio recording played in open court)

16        MS. HOSSEINI:  We'll pause here, at 12 minutes and

17  50 seconds.  And we'll fast-forward to 15 minutes and we'll

18  play about 30 seconds, from 15 minutes to 15 minutes and 30

19  seconds, which corresponds with the bottom of Page 6, the last

20  two lines on Page 6.

21  BY MS. HOSSEINI

22  Q    And while we wait for that to pull up, Agent Rizzo, the

23  person who is listed in the transcript as "AG," whose voice is

24  that?

25  A    That's Mr. Gessen.

1  **Q**    And "UCE," whose voice is that?

2  **A**    That's my voice.

3       (Portion of audio recording played in open court)

4       **MS. HOSSEINI:**  Pause there, Mr. Machado.  And we will

5  fast-forward to 18 minutes and 15 seconds, which corresponds to

6  Page 8 of the transcript at the top, second line.

7       (Portion of audio recording played in open court)

8       **MS. HOSSEINI:**  And we'll pause here.

9  **BY MS. HOSSEINI**

10 **Q**    So where have you arrived to at this point in the

11 recording?

12 **A**    We arrived at the oceanside property of Boca Raton Resort,

13 at Marisol Restaurant.

14 **Q**    And why is it that you started recording in your hotel

15 room instead of, for example, starting the recorder now at this

16 point?

17 **A**    It's -- it is appropriate to start -- to start the

18 recording prior to any meetings happening so we can encapsulate

19 the whole event, so there's transparency there.

20      **MS. HOSSEINI:**  Okay.  We will fast-forward to

21 24 minutes on Page 9 in the middle of the page, starting with

22 "Yeah, so look..."  If we can zoom in to that.

23      (Portion of audio recording played in open court)

24 **BY MS. HOSSEINI**

25 **Q**    And so if I can ask you a question -- pause for just a

1    second.

2         Did you make any efforts to determine whether there was a

3    fraudulent visa application or not?

4    **A**    I did not.

5    **Q**    Was that part of what you were investigating?

6    **A**    No, it's not part of my responsibility as an undercover.

7    **Q**    Okay.

8         **MS. HOSSEINI:**  We will continue playing, Mr. Machado.

9         (Portion of audio recording played in open court)

10         **MS. HOSSEINI:**  Pause here.

11   **BY MS. HOSSEINI**

12   **Q**    So why did you say that, "This has nothing to do with me,

13   I'm meeting you for the first time"?

14   **A**    I wanted to establish the fact I didn't ask for the

15   meeting, I didn't ask to meet Mr. Gessen.  This meeting was

16   arranged with Mr. Kiselev and Mr. Gessen.  They wanted to meet

17   me because I had a potential solution to their problem.

18   **Q**    And was it important for you to have any kind of

19   understanding of who had a financial motive?

20   **A**    I'm sorry?

21   **Q**    Did you want to establish whether you would have a

22   financial motive in this scheme?

23         Were you going to get a cut?  Were you going to get money?

24   How would that work?

25   **A**    Correct.  I wanted to understand.  But as you will hear

1    later on in the recording, I made it very clear that I was just

2    doing this as a favor for Mr. Gessen, because of my

3    relationship with Mr. Kiselev.

4         MS. HOSSEINI:   Okay.   We'll continue playing,

5    Mr. Machado.

6         (Portion of audio recording played in open court)

7         MS. HOSSEINI:   Would you pause?

8    BY MS. HOSSEINI

9    Q    So we heard "The first installment is 25 grand."   What

10   were you explaining?

11   A    I was telling Mr. Gessen that to get the -- the

12   deportation investigation kicked off, that my contact would

13   need $25,000 to initiate a target, a letter that would be sent

14   to his ex-wife's home, notifying her that she would be the

15   subject of a deportation investigation.

16        MS. HOSSEINI:   And we'll resume playing, Mr. Machado,

17   and scrolling down.

18        (Portion of audio recording played in open court)

19        MS. HOSSEINI:   Pause there.

20   BY MS. HOSSEINI

21   Q    So we heard, "If a third of what is true..."   -- sorry --

22   "If what Alex has told me, you have told me, a third of that is

23   true and accurate..."

24        Did you make any efforts determine whether any of these

25   statements that Mr. Kiselev or Mr. Gessen told about you the

1  ex-wife's immigration status, whether it was true or not?

2  **A**    No, ma'am.

3  **Q**    Okay.

4        **MS. HOSSEINI:**  Resume playing, Mr. Machado?

5        (Portion of audio recording played in open court)

6        **MS. HOSSEINI:**  We'll pause here.

7  **BY MS. HOSSEINI**

8  **Q**    So we heard Mr. Gessen say "So they will handle the

9  enforcement part of it as well," at the bottom of Page 11.

10 What is the enforcement part?

11 **A**    I believe that Mr. Gessen was referring --

12       **MR. RAJU:**  Objection.

13       **THE WITNESS:**  Mr. Gessen was --

14       **THE COURT:**  Overruled.  Go ahead.

15       **THE WITNESS:**  Mr. Gessen was referring to the

16 enforcement action, the physical enforcement action of

17 deportation, which is going to her residence or wherever she

18 may be at the time and getting her physically removed from the

19 United States.

20 **BY MS. HOSSEINI**

21 **Q**    As opposed to just the letter going to the home?

22 **A**    That's correct.

23 **Q**    Got it.

24       **MS. HOSSEINI:**  We will resume playing, Mr. Machado?

25       (Portion of audio recording played in open court)

1          MS. HOSSEINI:  Pause here.

2    BY MS. HOSSEINI

3    Q    Why were you saying that your clients are all cartel-level

4    guys?

5    A    Yeah, I'm just giving Mr. Gessen just a snapshot of my

6    legend, if you will, who I am.  As I had mentioned earlier that

7    I'm portraying myself to be a money launderer, money laundering

8    for a drug cartel in Columbia, getting that out there so he

9    understands my background and who he is dealing with.  The same

10   way that earlier in the conversation Mr. Gessen told me about

11   his legal background, and how he came to be here in the United

12   States.

13          MS. HOSSEINI:  Okay.  We will resume playing,

14   Mr. Machado.

15       (Portion of audio recording played in open court)

16          MS. HOSSEINI:  Pause for a second.

17   BY MS. HOSSEINI

18   Q    So what's happening there, with Jared and the menu?

19   A    The waiter came over, interrupted our conversation, at

20   which point I ceased my conversation and waited for him to

21   leave before I continued.

22   Q    So at any point do you stop and resume your recording?  Or

23   is it a continuous playing of the entirety of the

24   conversations?

25   A    The recording goes throughout the entirety of the meeting.

1    So I am capturing everybody who I have interaction with.

2    **Q**    And some of that might be a little bit irrelevant if it's

3    relating to the menu?

4    **A**    Correct, yeah.

5    **Q**    But you still capture everything?

6    **A**    Absolutely.  Even if I have to go the bathroom,

7    unfortunately, you are going to hear that but we leave the

8    recorder on from the start of the meeting to the end of the

9    meeting.

10          MS. HOSSEINI:  Okay, we will resume playing.  And this

11   is on Page 13.

12       (Portion of audio recording played in open court)

13          MS. HOSSEINI:  Pause there.

14   **BY MS. HOSSEINI**

15   **Q**    What is "coke"?

16   **A**    "Coke" is a reference to cocaine.

17          MS. HOSSEINI:  We will resume playing.

18       (Portion of audio recording played in open court)

19          MS. HOSSEINI:  Pause here.

20   **BY MS. HOSSEINI**

21   **Q**    What are you talking about?

22   **A**    Prior -- well, during that conversation, I had two phones

23   on the table.  And when Mr. Gessen -- Mr. Gessen kept on

24   looking at them.  And I can tell that he's clearly

25   uncomfortable because he thinks maybe one of the phones is a

 1   recording device.  And I told him:  Okay, if it makes you feel

 2   comfortable I'll put them in my pocket.

 3        And I believe he said:  I'm used to keeping them in my

 4   room, or something to that effect.

 5        So I think from an operational security perspective,

 6   Mr. Gessen was making sure that we didn't have any recording

 7   devices on the table.

 8            **MR. RAJU:**  Objection; calls for speculation.

 9            **THE COURT:**  Sustained.  Agent Rizzo can testify as to

10   what he understood, but of course, doesn't know what was in

11   Mr. Gessen's head.

12   **BY MS. HOSSEINI**

13   **Q**   Did Mister --

14            **THE COURT:**  I'm not going to strike that; I'll just

15   give that explanation.  Go ahead.

16            **THE WITNESS:**  Understood.

17   **BY MS. HOSSEINI**

18   **Q**   And once Mr. Gessen indicated to you to remove your

19   phones, did you move the phones off the table?

20   **A**   Of course.

21   **Q**   Where did you put them?

22   **A**   I put them in my pocket.

23            **MS. HOSSEINI:**  Okay.  Resume playing, Mr. Machado?

24        (Portion of audio recording played in open court)

25            **MS. HOSSEINI:**  We'll stop here.

1   **BY MS. HOSSEINI**

2   **Q**   Can you tell us a little about what we're listening, to

3   this point, 50,000 vests and --

4   **A**   Well, first of all, ma'am, if I could -- could back up

5   just a little bit, in that conversation, that clip that you

6   just played, Mr. Gessen told me that he understood through his

7   conversations with Mr. Kiselev that there may be an issue with

8   the source of the funds.

9        And I believe if you back up a little bit --

10  **Q**   Sure.  We'll scroll up.

11  **A**   He said "That is something we can definitely kind of

12  cooperate on..."  So Mr. Gessen at that point understands that

13  I'm laundering money for the Columbian cartel.

14        **MR. RAJU:**  Objection.

15        **THE COURT:**  Again, members of the jury, Agent Rizzo is

16  testifying as to what he understood Mr. Gessen to be saying.

17  Not -- he doesn't obviously know what was in Mr. Gessen's head.

18        Okay, go ahead.  You can continue.

19        **THE WITNESS:**  I apologize.

20  **BY MS. HOSSEINI**

21  **Q**   What did you tell Mr. Gessen about the source of funds

22  during that conversation?

23  **A**   I told him the source of funds are derived from narcotics

24  trafficking.

25  **Q**   With that "coke" that we listened to earlier (Indicating

**RIZZO - DIRECT / HOSSEINI**

1    quotation marks)?

2    **A**    The coke reference, that's correct.

3    **Q**    Now, please continue.  You were explaining this portion of

4    the transcript, Page 11, source of funds?

5    **A**    Uh-huh.

6    **Q**    I'm sorry. Page 14, starts with (As read):

7                "Yeah, Alex mentioned to me, well, he didn't

8                mention the source of funds.  He did mention

9                an issue."

10   And then you say:

11              "Right.

12   Mr. Gessen says:

13              "Something we can definitely kind of

14              cooperate on."

15              **MR. RAJU:**  Objection.

16              **MS. HOSSEINI:**  What is it you're talking --

17              **THE COURT:**  Wait.  What is the objection?

18              **MR. RAJU:**  Counsel is reading from the transcript --

19              **THE COURT:**  Well, she is referring to the evidence.

20        The jury -- of course, what you hear on the audio is the

21   only evidence.

22        Overruled.  Go ahead.

23   **BY MS. HOSSEINI**

24   **Q**    So, what is it that you are talking about in that portion?

25   **A**    I'm sorry, I lost the -- the context of -- so can you ask

1    that question again, please?

2    **Q**    Sure.   Yes, of course:   The source of the funds, there may

3    be an issue, definitely, maybe we can cooperate on.   What is

4    that discussion about?

5    **A**    Um, he talked with Mr. Kiselev that there may be an issue

6    with the source of funds.   That issue, as I explained to

7    Mr. Gessen, was those funds come from narcotics trafficking.

8    Specifically, money laundering for the Columbian cartel.

9        Mr. Gessen responded shortly thereafter, "We can

10   definitely cooperate on...:

11       And I said: "Okay.   Good."

12   **Q**    All right, and then below that, the next portion we heard

13   said something about 50,000 vests and 40..., 45... 50 million

14   dollars.   What is it that you are talking about at that point?

15   **A**    Mr. Gessen jumps into a conversation about an investment

16   opportunity that he and Mr. Kiselev know of regarding ballistic

17   vests, and I believe it was helmets as well.

18   **Q**    Did you expect to be discussing that topic, the vests and

19   helmets, when you showed up on June 2nd, 2022, to meet with

20   Mr. Gessen?

21   **A**    No, ma'am.

22   **Q**    What was your expectation of what the discussion topic

23   would be?

24   **A**    The expectation would be to speak about his deporting --

25   or the problem that he had with his ex-wife.   And the potential

1    solution that I had.

2    **Q**    Okay.

3         **MS. HOSSEINI:**   We will fast-forward now to 34 minutes,

4    33 seconds, which is in the middle of Page 15.   Starting with

5    "So... alright.   Before we get into that..."

6         (Portion of audio recording played in open court)

7         **MS. HOSSEINI:**   I'm sorry, I don't think this is

8    matching.   Thirty-four minutes and 33 seconds which will

9    correspond with Page 15, middle of the page.

10        **MS. HOSSEINI:**   Pause here.

11   **BY MS. HOSSEINI**

12   **Q**    What are you talking about when you are talking about

13   keeping this separate?

14   **A**    I'm talking about separating out any type of business

15   conversation or business deal with the deportation strategy,

16   for lack of better terms.

17   **Q**    So what are the two things that need to be separate from

18   each other?

19   **A**    Anything that I'm doing with Mr. Kiselev business-related,

20   or Mr. Gessen business-related, and the deportation strategy or

21   scheme.

22   **Q**    Okay.   So there's the deportation scheme on one side.   And

23   then on the other side, separately, there's business deals.

24   **A**    Correct.

25   **Q**    Okay.

1          **MS. HOSSEINI:**  We'll resume playing.

2      (Portion of audio recording played in open court)

3          **MS. HOSSEINI:**  So why is it that you are stating this

4   installment of $25,000 should go into an account in

5   San Francisco?

6   **A**   I told him that the $25,000 should go into an account in

7   San Francisco because our contact higher up in the government

8   is located in the San Francisco Bay area.  And then that would

9   be the easiest way for him to remit to get the investigation

10  going.

11  **Q**   And again this $25,000 is the first installment for the

12  letter going to the home.

13  **A**   That's correct.

14  **Q**   Okay.  And --

15  **A**   And the total price was 100,000.

16  **Q**   Okay.  I notice that your voice is slightly louder than

17  Mr. Gessen's voice on your recording.  Why is that?

18  **A**   Because the recording device is closer to me.

19  **Q**   Okay.  While you were there with him, could you hear him?

20  **A**   Yes, ma'am.

21  **Q**   Okay.

22          **MS. HOSSEINI:**  We will resume playing, Mr. Machado.

23      (Portion of audio recording played in open court)

24          **MS. HOSSEINI:**  Pause for a second.

25

1  BY MS. HOSSEINI

2  **Q**    Mr. Gessen -- we hear Mr. Gessen say "I think the price is

3  perfectly reasonable..."  Did you guys negotiate on more money,

4  less money?

5  **A**    No.  He said he thought the price was reasonable, $100,000

6  was a reasonable price.

7          MS. HOSSEINI:  Okay.  We will resume playing,

8  Mr. Machado.

9      (Portion of audio recording played in open court)

10         MS. HOSSEINI:  We'll pause here.  We will fast-forward

11  over ordering the food, with your permission.  Let's

12  fast-forward to 43 minutes and 17 seconds which corresponds to

13  Page 21 of the transcript, about the middle of the page,

14  starting with "I think..."  If we can zoom into that portion,

15  Page 21 of the transcript.

16     (Portion of audio recording played in open court)

17         MS. HOSSEINI:  Pause here.

18  BY MS. HOSSEINI

19  **Q**    What -- did you do anything when we heard the word

20  "mazel"?

21  **A**    Mazel, we shook hands.  A handshake.

22  **Q**    You and Mr. Gessen shook hands (Indicating)?

23  **A**    That's correct.  We had a deal.  The previous segment that

24  you listened to culminated that I think we both agreed that we

25  were going to move forward with the deportation strategy.  So

**RIZZO - DIRECT / HOSSEINI**

 1   he said "Mazel."  "Mazel."

 2   **Q**    Right before he said "Mazel," there was a reference to "We

 3   are fundamentally on the same page."  Had you reached an

 4   agreement on the deportation scheme at that point?

 5   **A**    Fundamentally, yes, ma'am.

 6   **Q**    Okay.

 7          **MS. HOSSEINI:**  And we will skip to 47 minutes and

 8   23 seconds, which is on Page 24 of the transcript, in the

 9   middle of the page, starting with "So Mozal in the diamond..."

10       (Portion of audio recording played in open court)

11   **BY MS. HOSSEINI**

12   **Q**    We'll pause here.  Did you get an explanation from

13   Mr. Gessen about what "Mozal" means?

14   **A**    I did.

15   **Q**    What is that?

16   **A**    It's a deal -- it's a contract.  It's a deal.

17   **Q**    Thank you.

18          **MS. HOSSEINI:**  Mr. Machado, please resume playing.

19       (Portion of audio recording played in open court)

20          **MS. HOSSEINI:**  Pause here.

21   **BY MS. HOSSEINI**

22   **Q**    What are you talking about here?  We just heard Mr. Gessen

23   say, "The only thing, please do keep me in the loop there

24   because if the letter is sent out..."

25   **A**    Mr. Gessen, Mr. Gessen is concerned that if a letter gets

```
 1  sent out, his ex-wife --

 2          MR. RAJU:  Objection.

 3          THE WITNESS:  May actually --

 4          THE COURT:  Sustained.

 5      So, what did you understand Mr. Gessen to be saying?

 6          THE WITNESS:  I understood Mr. Gessen saying that he

 7  was concerned with the letter being sent out and that his wife,

 8  if she received the letter, she may take the kids and leave.

 9          MS. HOSSEINI:  All right.  Resume playing,

10  Mr. Machado.

11      (Portion of audio recording played in open court)

12          MS. HOSSEINI:  Pause before we get to the next topic.

13  BY MS. HOSSEINI

14  Q   So what were you discussing in the clip that we just

15  heard?

16  A   In the clip that we just heard --

17          MS. HOSSEINI:  We can look at the transcript at the

18  top of Page 25.

19          THE WITNESS:  Uh-huh.

20          MS. HOSSEINI:  At 47 minutes, 55 seconds.

21      (Document displayed)

22  BY MS. HOSSEINI

23  Q   It says (As read):

24          "And so I know if there's a warning coming I

25           would like to be able to put a, you know, PI
```

RIZZO - DIRECT / HOSSEINI

```
 1                on her, or someone to monitor where they

 2                are."

 3   A    Correct.  Again, Mr. Gessen is concerned with the letter

 4   being sent to his ex-wife, that she may, in fact, leave the

 5   state.  But if he has a warning that the letter is coming, he

 6   would be able to put a PI -- I understand "PI" to be private

 7   investigator -- on her so that they can monitor her.

 8        MS. HOSSEINI:  Okay.  And we will resume playing.  And

 9   I believe we will be on the top of Page 26 at this point.

10        (Portion of audio recording played in open court)

11        MS. HOSSEINI:  Pause.

12   BY MS. HOSSEINI

13   Q    Agent Rizzo, did you look into this child kidnapping case

14   that Mr. Gessen was telling you about?

15   A    I did not.

16   Q    Was that part of what you were investigating?

17   A    It's not part of my responsibility, ma'am.

18        MS. HOSSEINI:  Okay.  We will resume playing.

19        (Portion of audio recording played in open court)

20        MS. HOSSEINI:  We'll pause here.

21   BY MS. HOSSEINI

22   Q    How did Mr. Gessen appear to you when he said "I'm a

23   little pissed off, you know what I mean?"

24   A    He was agitated.

25        MS. HOSSEINI:  Okay.  We will resume.
```

1        (Portion of audio recording played in open court)

2             MS. HOSSEINI:  We can pause here.  And we will

3    fast-forward to 54 minutes and 40 seconds of the recording

4    which corresponds to the top of Page 29, second line, starting

5    with "No, no, no."

6        (Portion of audio recording played in open court)

7    BY MS. HOSSEINI

8    Q    Why did you say "This is purely a favor"?

9    A    Mr. Gessen thought that I was going to get a portion of

10   the $100,000.  I wanted to reiterate to him --

11            MR. RAJU:  Objection.

12            THE COURT:  Sustained.  Again, Agent Rizzo's just

13   testifying to what he believed Mr. Gessen thought.

14        Okay, you can go ahead.

15            THE WITNESS:  Thank you, Your Honor.

16   BY MS. HOSSEINI

17   Q    Based on the conversation you had with Mr. Gessen, what

18   did you believe Mr. Gessen was referring to at this point in

19   the clip that we heard?

20   A    He was referring to the $100,000, that I may be getting a

21   portion of that, but I wanted to reiterate to him that I was

22   not getting a portion, I was doing this as a favor for the good

23   of the overall relationship I had with Mr. Kiselev.

24   Q    So you had no financial motive in the deportation scheme?

25   A    That's correct.

1   **Q**    Why was that important for you to establish?

2   **A**    I -- I just wanted to let him know that I had nothing to

3   do with making any money off this deportation scheme.  It's not

4   what I would typically do.  I was doing this as a favor to him.

5   **Q**    To make it seem that you were not pushing this

6   (Indicating)?

7   **A**    Correct.

8   **Q**    Okay.

9          **MS. HOSSEINI:**  We'll resume playing.

10         (Portion of audio recording played in open court)

11         **MS. HOSSEINI:**  Pause here.  If we can scroll back up,

12  Mr. Machado?

13  **BY MS. HOSSEINI**

14  **Q**    So when we heard Mr. Gessen say "When I do things that are

15  not necessarily on the up and up, I just need to make sure what

16  I'm doing -- I just need to make sure that I'm on the right

17  side of history," what did you understand that to mean?

18         **MR. RAJU:**  Objection.

19         **THE COURT:**  Overruled.

20  **BY MS. HOSSEINI**

21  **Q**    Please answer.

22  **A**    I recognized that Mr. Gessen knew that he -- he was

23  entering into something that is illegal, that is a bribe

24  payment to a government official.  So when he is referring to

25  doing something that's not necessarily on the up and up, that

1  is within -- within the law.  And he wants to make sure that

2  he's on the right side of history.  Meaning that he doesn't

3  want to get caught.

4  **Q**    And so you responded "Yeah," meaning you understood what

5  he was saying?

6  **A**    Correct.

7  **Q**    Okay.

8        **MS. HOSSEINI:**  We'll resume playing, Mr. Machado.

9        (Portion of audio recording played in open court)

10       **MS. HOSSEINI:**  Pause there.

11       And we will fast-forward to --

12       **THE COURT:**  Is this a good place to stop for a morning

13 break?

14       **MS. HOSSEINI:**  Sorry.

15       **THE COURT:**  Yeah, members of the jury we are going to

16 take our first 15-minute morning break.  As always do not

17 discuss anything about this case during your break or with

18 anyone else and we will resume in 15 minutes.  Thank you.

19       (Jury excused)

20       (The following proceedings were held outside of the

21 presence of the Jury).

22       **THE COURT:**  Okay, if you leave, make sure the CSO

23 recognizes you so that he'll let you back in.  All right.

24 Thank you.

25       (Recess taken from 10:00 a.m. to 10:16 a.m.)

RIZZO - DIRECT / HOSSEINI

1          (The following proceedings were held in the presence of

2     the Jury)

3          **THE COURT:**  Thank you members of the jury.  You may

4     sit down.

5          All right, you may proceed.

6          **MS. HOSSEINI:**  Thank you, Your Honor.

7          Mr. Machado, if we can please go to 56 minutes and 45

8     seconds, which is in the middle of Page 30, starting with "Um,

9     let me just tell you a little bit..."

10         And for the record we are still in Exhibit 6 of the

11    transcript, which corresponds with Exhibit 5 of the audio.

12         (Document displayed)

13         **MS. HOSSEINI:**  And it was 56 minutes and 45 seconds,

14    corresponding to Page 30 of the transcript.

15         (Portion of audio recording played in open court)

16         **MS. HOSSEINI:**  The middle of the page.  Middle of the

17    page, starting with "Um, let me just tell you..."

18         (Document enlarged)

19         **MS. HOSSEINI:**  Thank you.

20         (Portion of audio recording played in open court)

21         **MS. HOSSEINI:**  Pause, we'll stop at -- with what's on

22    the screen.

23    **BY MS. HOSSEINI:**

24    **Q**   Agent Rizzo, we heard Mr. Gessen say, "Let me just say

25    that your business is something I've never been involved in.

**RIZZO - DIRECT / HOSSEINI**

1  And Alex has sort of presented it to me that the type of issues

2  we'll be solving are from different sources?"

3      What was your understanding of your business (Indicating

4  quotation marks)?

5  **A**    As I mentioned before I was laundering drug proceeds for a

6  Columbian -- Columbian cartel.

7  **Q**    And then Mr. Gessen says "Um and I would appreciate it

8  if...he wanted to be discreet."

9      Why would there be a need to be discreet?

10 **A**    Because that's illegal.

11 **Q**    And then it says:

12          "Clearly if I were to be in any way involved,

13          um, I need to pause and think about it

14          first."

15      And you said.

16          "Of course, yeah."

17      Why did you say "Of course, yeah"?

18 **A**    I wanted to present him with an out, if you will.  If he

19 was uncomfortable with receiving proceeds or laundered drug

20 proceeds, then I wanted to give him an out.  If he came to me

21 and said "No, I don't want to be involved," then I have to take

22 that for what it is, and then -- and he would be not involved

23 in that situation.

24 **Q**    And earlier in that sentence it says "Alex has sort of

25 presented it to me..."  Who again is Alex?

**RIZZO - DIRECT / HOSSEINI**

1   **A**   Mr. Kiselev.

2   **Q**   And what is it that you are -- what kind of arrangements

3   or deals did you have with Mr. Kiselev?

4   **A**   There were --

5           **MR. RAJU:**  Objection.

6           **THE COURT:**  Overruled.

7           **THE WITNESS:**  There were multiple contracts that

8   Mr. Kiselev, myself and other undercovers were discussing.

9   **BY MS. HOSSEINI**

10  **Q**   Relating to what topic of your investigation?

11  **A**   Money laundering.

12  **Q**   At that point, was Mr. Gessen involved in any of that?

13  **A**   No, ma'am.  Not to my knowledge.

14          **MS. HOSSEINI:**  Okay.  We'll resume playing.

15      (Portion of audio recording played in open court)

16          **MS. HOSSEINI:**  Pause.  Can you scroll back up to that

17  last part?

18      (Document displayed)

19  **BY MS. HOSSEINI**

20  **Q**   Agent Rizzo --

21          **MS. HOSSEINI:**  The bottom of Page 31, Mr. Machado.

22  Right there.  Thank you.

23  **BY MS. HOSSEINI**

24  **Q**   So Mr. Gessen, we heard him say "Three, four-year

25  structures that are -- they're clean, they're elegant,

**RIZZO - DIRECT / HOSSEINI**

1  sustainable."  What were you talking about?

2  **A**    Business, investment structures.

3       **MR. RAJU:**  Objection.

4       **THE COURT:**  Overruled.

5  **BY MS. HOSSEINI**

6  **Q**    Please answer.

7  **A**    Business or investment structures.

8  **Q**    Relating to, again, the source of "your business"?

9  **A**    That's correct.

10 **Q**    And the source of "your business" was the narcotics or

11 coke?

12 **A**    Correct.

13 **Q**    Okay.

14       **THE COURT:**  All right, I'm just going to again caution

15 the jury that Agent Rizzo's talking about his understanding of

16 what they were talking about.

17       If you could maybe frame the question that way.

18       **MS. HOSSEINI:**  Yes, Your Honor.

19       Let's skip forward to one hour, two minutes, 15 seconds,

20 which corresponds to Page 33, about the bottom third, sort of

21 in the middle, starting with "I would be happy..."

22       (Portion of audio recording played in open court)

23       **MS. HOSSEINI:**  Pause.

24 **BY MS. HOSSEINI**

25 **Q**    What are you talking about in this clip?

1  **A**   We are talking about cash investments into previous

2  business discussions through that segment or thread that you

3  just -- or previously heard.  And Mr. Gessen said:  I'd be

4  happy if you give the cash directly to me.  Or something to

5  that effect.

6  **Q**   Okay.  And again there's -- as opposed to whom?  Directly

7  to me, as opposed to whom?

8  **A**   I believe he was talking --

9       **MR. RAJU:**  Objection.

10       **THE COURT:**  Overruled.

11       **THE WITNESS:**  He was talking about Mr. Kiselev.

12  **BY MS. HOSSEINI:**

13  **Q**   Okay.  And Mr. Gessen, we heard him say "So no one can

14  speak on my behalf" and you said "Understood."  What did you

15  understand?

16  **A**   I understood that he was in control of the business, the

17  business ventures that we were discussing.  And that nobody

18  could speak on his behalf.

19  **Q**   Okay.

20       **MS. HOSSEINI:**  We'll skip now to one hour, three

21  minutes and 30 seconds, which corresponds to Page 34, middle of

22  the page, starting with "But so, since I'm not on the

23  ground..."

24       (Portion of audio recording played in open court)

25       **MS. HOSSEINI:**  Pause there.

1    BY MS. HOSSEINI

2    Q    What are you talking about?

3    A    I took my phones that I had in my pocket, as we -- they

4    were in fact hot.  They were burning up.  So I couldn't take it

5    any longer.  So I just took them out and put them -- I said

6    "I'm sorry, I have to take my phones out."  And I pressed the

7    one phone that was hot to Mr. Gessen's arm, said, "Do you see?

8    Do you feel it?  It's hot."

9         We laughed about it and Mr. Gessen said "It's the

10   recording" or "It's recording."  And we both laughed about

11   that.

12        MS. HOSSEINI:  Okay.  We will resume playing.

13        (Portion of audio recording played in open court)

14   BY MS. HOSSEINI

15   Q    And was that true?  The other deals you were -- you had

16   going on with Mr. Kiselev, did they relate to Estonia or not?

17   A    Not to my knowledge, ma'am.

18   Q    Okay.

19        MS. HOSSEINI:  Move forward, about 15 minutes forward.

20   BY MS. HOSSEINI

21   Q    Is it fair to say in the 15 minutes that I'm going to

22   skip, you talked about some other things?

23   A    Yes, ma'am.

24        MS. HOSSEINI:  We'll go to one hour, 21 minutes and

25   48 seconds, which will be Page 43 of the transcript.  And it's

1  about a third of the way into the page, starting with "Yea, you

2  know what, maybe that's something we can discuss..."

3       (Document enlarged)

4       (Portion of audio recording played in open court)

5            **MS. HOSSEINI:**  Pause.

6  **BY MS. HOSSEINI**

7  **Q**   Did you hear Mr. Gessen say "...there's two different

8  conversations"?  What were the two different conversations?

9            **THE WITNESS:**  The deportation.

10           **MR. RAJU:**  Objection.

11           **THE COURT:**  What did you understand he meant by the

12 two conversations?

13           **THE WITNESS:**  I understood that he meant the

14 deportation strategy that we had previously been discussing in

15 that meeting, and then also there was the business discussions

16 that were happening.

17 **BY MS. HOSSEINI**

18 **Q**   So is that why he said "Priscilla," right after two

19 different conversations?

20           **MR. RAJU:**  Objection.

21           **THE COURT:**  Sustained.

22 **BY MS. HOSSEINI**

23 **Q**   Your understanding of the two different conversations,

24 what did "Priscilla" refer to?

25 **A**   The deportation strategy.

**RIZZO - DIRECT / HOSSEINI**

1  **Q**    Okay.  And then, the, right after that, "Bulletproof vests

2  and helmets," what was your understanding --

3  **A**    The business discussion, the business investment of

4  laundering drug proceeds.

5  **Q**    And it appeared in that last clip that we listened to, you

6  sort of redirected back to (As read):

7              "You know what, maybe that's something we can

8              discuss later on down the road but I really

9              like to know, handle the current situation

10             with what Alex is proposing."

11           Why were you redirecting back to what Alex was proposing?

12  **A**    Because the primary purpose of my meeting was to discuss

13  Mr. Gessen's problems that he was having with his ex-wife, to

14  talk about solutions.

15  **Q**    Why was it important to you to do this favor for Alex?

16  **A**    It was -- it was perceived as important because we were

17  working on the bigger portion -- a bigger portion of the case

18  or a different portion of the case.  So for continuity

19  perspective, we wanted to make sure that we were moving both --

20  both goals forward.

21  **Q**    Okay.

22           **MS. HOSSEINI:**  We will resume playing, Mr. Machado.

23           (Portion of audio recording played in open court)

24           **MS. HOSSEINI:**  We'll pause.

25

BY MS. HOSSEINI

**Q**   What were you talking about when you said "We're doing a grain deal"?

**A**   We had previously been talking to Mr. Kiselev about a grain contract in the Ukraine, so that's what I was referring to.  But apparently Mr. Gessen did not know about that.

**Q**   Okay.  And is that why you said "Oh, that's separate, that's another"?

**A**   Correct.

**Q**   Because it appeared to you that Mr. Gessen didn't know about that.

**A**   That's correct.

**Q**   Okay.

    **MS. HOSSEINI:**  And we will keep playing, Mr. Machado.

    (Portion of audio recording played in open court)

    **MS. HOSSEINI:**  We'll pause there.

BY MS. HOSSEINI

**Q**   What was your understanding of what you were discussing there?

**A**   We were talking about the investment of drug proceeds into the -- into companies.  And I had said that my clients want to create another level of anonymity to help launder the money.

    **MS. HOSSEINI:**  Okay.  We will fast-forward to one hour, 29 minutes and 30 seconds, which corresponds to Page 46 towards the bottom third of the page, starting with "So you're

1  telling me, okay..."

2       Page 46.  "So you're telling me..."  Right there.  Thank

3  you, Mr. Machado.

4       (Portion of audio recording played in open court)

5            **MS. HOSSEINI:**  Pause there.

6  **BY MS. HOSSEINI**

7  **Q**    Agent Rizzo, in that clip we heard, you said "What kind of

8  capital outlay would you expect from my client so I can set

9  reasonable expectations for them?"

10      What did you mean by "capital outlay"?

11 **A**    How much -- in terms of investment, how much money in

12 terms of investment would my clients, the Columbian drug

13 cartel, expect to have to lay out in this initial investment.

14 **Q**    So who would provide the capital?

15 **A**    The Columbian drug cartel.

16 **Q**    So the money would go through you to the other side.  You

17 would not -- would you receive money?  Or would you give the

18 money?

19 **A**    We would give money.

20 **Q**    Okay.  And then you said "So that's number one, and number

21 two I just want to make sure that nobody really cares about the

22 source..."  What did you mean by "the source"?

23 **A**     I wanted them to fully understand that the source of the

24 investments were coming from drug proceeds and that I wanted

25 everybody to be comfortable with that.

1   Q    Okay.  I'm going to skip ahead another 20 minutes over

2   some other topics.  We will go to -- as we're scrolling

3   through, can we just briefly touch on some of the topics that

4   you talk about, we are not going to play on Page 55.

5            MS. HOSSEINI:  Can you pull up Page 55, Mr. Machado?

6        (Document displayed)

7   BY MS. HOSSEINI

8   Q    And I'll ask you if you remember, in the middle of the

9   page (As read):

10            ""They are -- they overpay fertilizer..."

11        Was that another topic that you discussed?

12            MR. RAJU:  Objection.

13            THE COURT:  Sustained.  There isn't any audio in

14   evidence, for the transcript to correct.  You can just not show

15   the transcript and ask him if there was any discussion about

16   fertilizer.

17            MS. HOSSEINI:  Sure.

18   BY MS. HOSSEINI

19   Q    Did you discuss fertilizers?

20   A    I don't recall, without hearings the audio, ma'am.  I'm

21   sorry.  But there were a range of other businesses that I think

22   we discussed, to include, like, vending machines or something

23   like that.

24   Q    Okay.

25   A    But I don't recall specifically -- I just want to be

1   perfectly clear -- without hearing the audio.

2   **Q**   That's okay.   I appreciate you being careful.

3         **MS. HOSSEINI:**  We'll skip ahead to one hour,

4   51 minutes, 45 seconds, which corresponds to Page 59, the

5   bottom third.  About the last few lines on that page.

6         (Portion of audio recording played in open court)

7         **MS. HOSSEINI:**  Can we pause.

8         **MR. RAJU:**  Objection.  The transcript is not matching

9   what's being played, your Honor.

10        **MS. HOSSEINI:**  If you could scroll up, Mr. Machado, we

11  will go to one hour, 51 minutes and 45 seconds.  And it will be

12  the bottom of Page 59.

13        (Portion of audio recording played in open court)

14        **MR. RAJU:**  Objection, Your Honor, same issue.

15        **THE COURT:**  Well, it needed to go to Page 60.

16        **MS. HOSSEINI:**  We are at the top of Page 60 now.

17  (Document displayed)

18        **THE COURT:**  There we go, yes.

19        **MS. HOSSEINI:**  That first two lines.  I think we just

20  heard the second line.

21  (Portion of audio recording played in open court)

22        **MS. HOSSEINI:**  Pause here.  And we will fast-forward

23  to one hour, 55 minutes and 50 seconds.  And now we are moving

24  forward to Page 62.  And it will be at the bottom third of the

25  page, pulling up "Okay, all right, all right, well that's..."

1        (Portion of audio recording played in open court)

2            **MS. HOSSEINI:**  Pause for a second.

3    **BY MS. HOSSEINI**

4    **Q**    What was your understanding of which case would be

5    dismissed in June?

6    **A**    Mr. Gessen was talking about his kidnapping case.

7    **Q**    Okay.

8            **MS. HOSSEINI:**  Resume playing, Mr. Machado, thank you.

9        (Portion of audio recording played in open court)

10           **MS. HOSSEINI:**  We'll pause there.

11   **BY MS. HOSSEINI**

12   **Q**    Who said (As read) "So, uh, I mean incidentally, if there

13   was a cheaper way to get rid of her that would be good too"?

14   **A**    Mr. Gessen.

15   **Q**    How did you respond?

16   **A**    My immediate reaction was "Well..."

17   **Q**    And what did he say?

18   **A**    He interrupted me and he said "It's simply more

19   expensive."

20   **Q**    And what did you say?

21   **A**    "No, well, I mean, I have family in your area so..."

22           **MR. RAJU:**  Objection.

23           **THE COURT:**  Overruled.

24   **BY MS. HOSSEINI**

25   **Q**    Please continue.

**RIZZO - DIRECT / HOSSEINI**

1    **A**   I said:  No, well, I mean listen...I have family in your

2    area, so, I don't know how to say this, but like there is a

3    cheaper way and probably a more permanent way to do it.

4    But --"

5    **Q**   What did Mr. Gessen say to that?

6    **A**   "Is there?"

7    **Q**   What did you say?

8            **THE COURT:**  I don't think we have heard the audio yet.

9    Now he's just reading from the transcript.

10           **MS. HOSSEINI:**  I'm sorry.

11   **BY MS. HOSSEINI**

12   **Q**   What was your understanding of a cheaper way to get rid of

13   her?

14   **A**   Mr. Gessen was asking if there is a way to have her

15   killed.

16           **MS. HOSSEINI:**  We'll resume the audio.

17       (Portion of audio recording played in open court)

18           **MS. HOSSEINI:**  Can we back up?

19       Let's go to one hour, 56 seconds, and 30 -- I'm sorry,

20   one hour, 56 minutes and 35 seconds.

21       (Portion of audio recording played in open court)

22           **MS. HOSSEINI:**  We'll pause.

23   **BY MS. HOSSEINI**

24   **Q**   What was your understanding of that clip?

25   **A**   Okay, it's very pivotal when I explain to him that there

 1  -- there -- well, Mr. Gessen said "Is there a cheaper way to

 2  get rid of her?"

 3       And I said "Well..."

 4       He interrupted me and said:  Well, that's simply quite

 5  expensive, or too expensive, something to that end.

 6       That is absolutely very, very important.  Because --

 7            MR. RAJU:  Objection.

 8            THE COURT:  Sustained.  This is just arguing.  He can

 9  say what he understood.

10  BY MS. HOSSEINI

11  Q    What did you understand from that conversation?

12  A    Mr. Gessen said that it was simply too expensive.  And as

13  we see later on in the conversation -- and this is pivotal --

14            MR. RAJU:  Objection.

15            THE COURT:  Sustained.

16  BY MS. HOSSEINI

17  Q    Agent Rizzo, we'll take out the "pivotal."

18  A    Okay.

19  Q    Please continue.

20  A    Because Mr. Gessen had already done research and already

21  received the price from another organized crime syndicate --

22            MR. RAJU:  Objection.

23            THE WITNESS:  -- to have his wife killed.

24            THE COURT:  Sustained, sustained.  This is argument.

25

1  BY MS. HOSSEINI:

2  Q    Well, based on what you heard Mr. Gessen say on that audio

3  clip that said (As read): "If that was an option, I didn't know

4  that was an option.  I researched my sources, the lowest price

5  was $220 and there's one for the Israelis and Eastern Europe

6  and Italy," what was your understanding of that?

7           THE WITNESS:  My understanding --

8           MR. RAJU:  Objection.  Relevance.

9           THE COURT:  Overruled.

10          THE WITNESS:  My understanding was that Mr. Gessen had

11  already researched the option to kill his wife, and had been in

12  conversation or had done some research with another organized

13  crime syndicates, in this case Israelis or Eastern Europe, for

14  the price of $220,000.

15          MS. HOSSEINI:  And we will resume playing the audio

16  which will be around that fourth line where it says "Well, you

17  can't trust..."

18       (Portion of audio recording played in open court)

19          MS. HOSSEINI:  Pause.

20  BY MS. HOSSEINI

21  Q    How come you said "Can I get back to you on that," when he

22  asked you the price?

23  A    Because I didn't want to let him know off the bat that I

24  had a price in my head for a contract.  I didn't want -- I said

25  I wanted to get back to him to let him know what the price is,

1   just to let him know that I had not been thinking about that.

2   **Q**    And when you heard Mr. Gessen say "And more definite,"

3   what was your understanding of that?

4               **MR. RAJU:**  Objection.

5               **THE COURT:**  Overruled.

6   BY MS. HOSSEINI

7   **Q**    Please answer.

8   **A**    "More definite" is permanent, dead.

9   **Q**    And we will resume the audio, and it will pick up with

10  "Because because" which is in the middle of the screen right

11  now.

12       (Portion of audio recording played in open court)

13               **MS. HOSSEINI:**  We'll pause here.

14  BY MS. HOSSEINI

15  **Q**    So when you heard Mr. Gessen say "The issue with

16  immigration, so many lawyers and you get a bad guy and she ends

17  up staying," what was your understanding of that?

18  **A**    Mr. Gessen was telling me he did not have a lot of

19  confidence in the deportation strategy because it involved a

20  lot of lawyers, and there was a chance his ex-wife would remain

21  in the United States.

22  **Q**    Mr. Gessen then says "It just becomes unpredictable, you

23  can fight the system for a couple of years and it becomes a

24  pain."  What was your understanding of that?

25  **A**    Similar to my last comment, is that it could get tangled

1    up in the legal system and then Ms. -- his ex-wife would remain

2    in the United States.

3    Q    So earlier you told us that you had agreed on the

4    deportation scheme.  At this point what is your understanding

5    of what's happening with that deportation scheme?

6    A    Deportation scheme ended and now we have entered into a

7    murder-for-hire situation.

8         MS. HOSSEINI:  We'll resume playing the audio.

9         (Portion of audio recording played in open court)

10        MS. HOSSEINI:  We'll pause there.

11   BY MS. HOSSEINI

12   Q    Agent Rizzo, why did you say "Well, you've got to tell me

13   if that's the route you want take?"

14   A    This is obviously a very serious topic, killing somebody.

15        MR. RAJU:  Objection.

16        THE COURT:  Overruled.

17        THE WITNESS:  Killing somebody is a very serious

18   topic.  So I wanted to give Mr. Gessen an out.  An opportunity

19   to rethink what he had just told me.

20        MS. HOSSEINI:  We will resume playing the audio at the

21   bottom of Page 64, starting with "My secret concern..."

22        (Portion of audio recording played in open court)

23        MS. HOSSEINI:  Pause there.

24   BY MS. HOSSEINI

25   Q    You said "No, no, no, no, no, no," like six times.  Why

```
 1   were you saying that?
 2   A    Mr. Gessen's biggest concern was that the murder did not
 3   take place in the presence --
 4           MR. RAJU:  Objection.
 5           THE COURT:  Overruled.
 6   BY MS. HOSSEINI
 7   Q    Please continue.
 8   A    Mr. Gessen was -- biggest concern was that the murder of
 9   his ex-wife did not take place in the presence of their
10   children.  And I was adamant about that, I said:  No, no, no,
11   that would never happen.  This is strictly business.
12           MS. HOSSEINI:  We will resume playing the audio.
13       (Portion of audio recording played in open court)
14           MS. HOSSEINI:  We'll pause there.
15   BY MS. HOSSEINI
16   Q    You said "I think it's probably half the cost."  Half the
17   cost of what?
18   A    Half the cost of the deportation contract.
19   Q    Remind us again, what was the cost of the deportation
20   contract?
21   A    100,000.
22   Q    Okay.  And then you heard: "Okay, much easier, much
23   easier... very happy to go that route," from Mr. Gessen.  What
24   was your understanding of "that route"?
25   A    The route was the murder-for-hire contract.
```

1           MS. HOSSEINI:  We will resume playing the audio.

2        (Portion of audio recording played in open court)

3           MS. HOSSEINI:  We'll pause.

4    BY MS. HOSSEINI

5    Q    What are you talking about when you are saying "Advance,

6    like, locations"?

7    A    Right.  Like, I would need to know where Mr. Gessen's

8    ex-wife lived in order to carry out the murder.  So I was

9    asking for some locations, some identifiable information for

10   her.

11          MS. HOSSEINI:  Okay.  We will resume playing the

12   audio.

13        (Portion of audio recording played in open court)

14          MS. HOSSEINI:  We'll pause there.

15   BY MS. HOSSEINI

16   Q    What was your understanding of "I will do the full recon

17   for you"?

18   A    Mr. Gessen told me that he's doing the full recon, or

19   reconnaissance, meaning that he will provide me with all the

20   information that I need to carry out the murder of his ex-wife.

21          MS. HOSSEINI:  We will resume playing the audio.

22        (Portion of audio recording played in open court)

23          MS. HOSSEINI:  Pause.

24   BY MS. HOSSEINI

25   Q    Why did you say "But you have to be sure that this is what

1    you want"?

2    **A**    Again, to my earlier point, we are talking about the

3    murder of Mr. Gessen's ex-wife.  I wanted to provide him with

4    an out.  I wanted him to be sure that this is what he wanted.

5    So that's why I asked him.  I think this is the second time.

6    This is our second out that I've given him.

7    **Q**    And Mr. Gessen said "I'm sure, I'm sure."

8         Then you said "All right, Mozal."  What is the reference

9    to Mozal there?

10   **A**    Mozal, mazel or mozal is a contract, which we alluded to

11   earlier.  We shook hands.

12   **Q**    In the same conversation, the same meaning we heard

13   earlier?

14   **A**    That's correct.

15   **Q**    So your understanding was what?

16   **A**    We have a deal.

17   **Q**    You have a deal.  Okay.  And then Mr. Gessen said "We just

18   shifted gears."

19        You said "You're not kidding."

20        Shifted gears from what to what?

21   **A**    From deportation to, now, murder for hire.

22        **MS. HOSSEINI:**  Okay.  We will resume playing the

23   audio.

24        (Portion of audio recording played in open court)

25        **MS. HOSSEINI:**  Pause there.

1    BY MS. HOSSEINI

2    Q    What was your understanding, when you heard Mr. Gessen say

3    "How do you communicate safely?"

4    A    Mr. Gessen was asking me how do I communicate in a safe

5    manner to avoid law enforcement scrutiny.

6    Q    And then you started talking about Signal.  Is this the

7    same application you described earlier?

8    A    Correct.

9         MS. HOSSEINI:  Okay.  We will resume playing the

10   audio.

11       (Portion of audio recording played in open court)

12       MS. HOSSEINI:  Pause.

13   BY MS. HOSSEINI

14   Q    What was your understanding of when you heard Mr. Gessen

15   say "So we will stay on Signal.  None of the words we mention

16   here can end up on there"?

17   A    We agreed to continue our communication when not in person

18   on this -- on the Signal app.  And he says -- directed me,

19   "None of the words that we mention here," anything we talked

20   about to include the murder for hire could not end up on

21   Signal.

22   Q    Did that inform your decision as to how you would

23   communicate with him on Signal in the future?

24   A    Correct.

25   Q    In what way?

RIZZO - DIRECT / HOSSEINI

1   A    I talked in code on Signal because I did not want to use

2   language that was more cop-like or, I would say, could be

3   scrutinized by law enforcement.  So I wanted to talk in code.

4   Q    Based on what he said?

5   A    Based on what he said.  He directed me.

6   Q    Okay.

7           MS. HOSSEINI:  We will resume playing the audio.

8        (Portion of audio recording played in open court)

9           MS. HOSSEINI:  Pause.

10  BY MS. HOSSEINI

11  Q    What was your understanding of "I've been around the

12  block," when you heard Mr. Gessen say that?

13  A    Mr. Gessen was keen to keeping communications secure and

14  private.  So he has good, let's say, security posture.

15  Q    And did that again go to inform how you would communicate

16  with him in the future, on Signal?

17  A    That's correct.  But I did offer him a second meeting as

18  well, if he did not feel like he wanted to put words down in

19  Signal.

20  Q    Okay.

21          MS. HOSSEINI:  We will resume playing the audio.

22       (Portion of audio recording played in open court)

23          MS. HOSSEINI:  We'll pause there.

24  BY MS. HOSSEINI

25  Q    So when you said she's "making your life miserable," was

1  that based on what Mr. Gessen had told you?  Or was that based

2  on some other independent information you had?

3  A     That's based on what Mr. Gessen told me.

4  Q     Okay.

5          MS. HOSSEINI:  We'll resume playing the audio.

6          (Portion of audio recording played in open court)

7          MS. HOSSEINI:  Pause there.

8  BY MS. HOSSEINI

9  Q     What was your understanding of "She put me in fucking

10  jail"?

11  A     Mr. Gessen was put in jail because his ex-wife reported a

12  parental kidnapping.

13          MS. HOSSEINI:  All right.  We will resume playing the

14  audio.

15          (Portion of audio recording played in open court)

16          MS. HOSSEINI:  We'll pause there.

17  BY MS. HOSSEINI

18  Q     In response to Mr. Gessen saying "And this is not a

19  spur-of-the-moment, emotional reaction," you said "No, this

20  sounds like it's been well thought out."

21          Why did you say that?

22  A     Because Mr. Gessen told me that the conversation that

23  we're having related to her murder is not a spur-of-the moment

24  emotional reaction.  And clearly, based on what he told me, and

25  receiving a price for her murder for hire from another

1    organized crime syndicate, I said:  No, this sounds like it's

2    well thought out.

3            MS. HOSSEINI:  We will resume playing the audio.

4        (Portion of audio recording played in open court)

5            MS. HOSSEINI:  Pause there.

6    BY MS. HOSSEINI

7    Q    Why did you say "But you've got to be comfortable with

8    it"?

9    A    Again, that is another out for Mr. Gessen.  I want him to

10   understand that we are talking about murder of his ex-wife, so

11   again, I'm giving him another out.

12   Q    Because you're this bad guy that is capable of doing this

13   murder-for-hire scheme?

14   A    That's correct.

15   Q    Okay, we will resume playing the audio.

16       (Portion of audio recording played in open court)

17           MS. HOSSEINI:  Pause there.

18   BY MS. HOSSEINI

19   Q    How is it that a murder-for-hire scheme is a cheaper

20   option to a deportation scheme?

21   A    Right.  As I mentioned earlier, to find somebody high

22   enough and powerful enough in the American government to deport

23   somebody, and use that, that power for personal gain, there are

24   way fewer people.  Sadly, there are lots of people, a sad

25   commentary about today's society, but there are a lot of --

 1          MR. RAJU:  Objection.

 2          THE COURT:  Overruled.

 3          THE WITNESS:  There are a lot of people that are

 4   willing to murder people for a lot less money.

 5   BY MS. HOSSEINI

 6   Q    And have you --

 7          MR. RAJU:  Objection.

 8          MS. HOSSEINI:  Basis?

 9          THE COURT:  He's just saying why he came up with --

10   his understanding.

11       This is your understanding.

12       It's not being offered for the truth of what he -- Agent

13   Rizzo is saying.  It's being offered for why he said that to

14   Mr. Gessen.  So with that clarification, yes.

15          MR. RAJU:  My position is it's speculation,

16   Your Honor.  He is speaking about -- for a lot of other people

17   that is not based upon --

18          THE COURT:  No, no; he is just explaining why he came

19   up with that.  It's not being offered for the truth, that that

20   is, in fact, true.  That's his understanding and why he said

21   it.

22       Okay, go ahead.

23   BY MS. HOSSEINI

24   Q    And have you worked in an undercover capacity in any other

25   murder-for-hire schemes over the years?

**RIZZO - DIRECT / HOSSEINI**

 1   **A**    I have.  And based on my experience, and speaking with

 2   other undercover agents who have conducted multiple

 3   undercovers, $50,000 is a lot --

 4          **MR. RAJU:**  Objection.

 5          **THE WITNESS:**  -- of money for --

 6          **THE COURT:**  Overruled.  Go ahead.

 7          **THE WITNESS:**  $50,000 is a lot of money for a

 8   murder-for-hire contract.

 9   **BY MS. HOSSEINI**

10   **Q**    $50,000 is a lot of money?

11   **A**    That's correct.

12   **Q**    What is, like, the range then?

13   **A**    Um, I spoke with an individual that accepted a

14   murder-for-hire contract for $200.  And I talked to an

15   undercover agent who spoke -- who accepted a murder-for-hire

16   contract on a federal judge for $100,000.  And various ranges

17   in between.

18   **Q**    Let's be clear that these are other cases.

19   **A**    That's correct.

20   **Q**    That's how you acquired your knowledge of what the range

21   of a murder-for-hire scheme would be.

22   **A**    That's correct.

23   **Q**    Okay.  And so why did you offer the higher end of that

24   range in this audio clip that we heard?  You said "Even if it's

25   half."

 1  **A**    Right.  I just, I wanted to offer something that was still

 2  considered a lot of money.

 3  **Q**    Okay.

 4          **MS. HOSSEINI:**  We'll resume playing the audio.

 5      (Portion of audio recording played in open court)

 6          **MS. HOSSEINI:**  We'll pause there.

 7      And Mr. Machado, if we could scroll back up to the top of

 8  this page so we can see what is on the top of the screen.

 9      (Document displayed)

10  **BY MS. HOSSEINI**

11  **Q**    Agent Rizzo, you said "I wish Alex would have been here on

12  time."  And Mr. Gessen said "Well, then we wouldn't have had

13  this conversation."

14      Was Alex supposed to be at that meeting?

15  **A**    He was.

16  **Q**    Did he show up?

17  **A**    He didn't.

18  **Q**    He did not?

19  **A**    He did not.

20  **Q**    And this was just you and Mr. Gessen, then?

21  **A**    That's correct.

22  **Q**    Okay.  What was your understanding of "Well, then we

23  wouldn't have had this conversation"?

24  **A**    I don't believe Mr. Gessen would have talked about

25  murdering his ex-wife in front of Mr. Kiselev.

RIZZO - DIRECT / HOSSEINI

1   Q    And then we just heard Mr. Gessen say (As read):

2            "Sometimes...to be very honest with you, I'm

3            somewhat pissed off.  Cause you had mentioned

4            a number several times in the past and that

5            number was never passed to me."

6   You said:

7            "Oh, it was honestly like three or four

8            months ago."

9        What was your understanding of what you were talking about

10  then?

11  A    I think there was a disconnect between Mr. Gessen and

12  Mr. Kiselev and not communicating --

13            MR. RAJU:  Objection.

14            THE WITNESS:  And not communicating properly.

15            THE COURT:  Overruled.  He is merely reciting what his

16  understanding is.

17       Go ahead.

18            THE WITNESS:  My understanding is that there was --

19  based on what Mr. Gessen told me, there was a disconnect in

20  communication between Mr. Kiselev and Mr. Gessen.  And

21  Mr. Kiselev not relaying on information that I had passed on to

22  him prior about the deportation strategy.

23  BY MS. HOSSEINI

24  Q    And then further down, Mr. Gessen said:

25            "I'm a little disappointed.  But, since we

```
 1              have arrived at a solution that works..."
 2        What was your understanding of that solution that works?
 3   A    Murder-for-hire contract.
 4        MS. HOSSEINI:  And now we will fast-forward to two
 5   hours, ten minutes, and five seconds.
 6   BY MS. HOSSEINI
 7   Q    And just as a reference, is this about two hours into your
 8   recording?  Into your meeting?
 9   A    Yes, ma'am.
10        MS. HOSSEINI:  Okay.  Two hours, ten minutes and five
11   seconds which corresponds to the bottom of Page 71.  About five
12   lines from the bottom starting with "
13             "Yeah.  No, I'm glad we could connect."
14        Bottom of 71 with:
15             "Yeah.  No, I'm glad we could connect."
16        (Portion of audio recording played in open court)
17        MS. HOSSEINI:  Let's pause here.
18   BY MS. HOSSEINI
19   Q    What's happening here?
20   A    Mr. Gessen is showing me pictures of his son and daughter.
21   Q    Can you repeat that for the court reporter?
22   A    Mr. Gessen is showing me pictures of his son and daughter.
23   Q    On a phone?
24   A    On his phone.
25   Q    Okay.
```

1           **MS. HOSSEINI:**  We will resume playing the audio.

2           (Portion of audio recording played in open court)

3           **MS. HOSSEINI:**  Pause there.

4    BY MS. HOSSEINI

5    **Q**    Why did you ask about protecting the kids?

6    **A**    I wanted -- I wanted Mr. Gessen to understand the gravity

7    of the conversation that we were having.  We're talking about

8    the murder of his ex-wife.  And the kids -- no matter what he

9    said, that [O.G.] hates her or whatever, the kids can never

10   recover from that.

11          **MR. RAJU:**  Objection.

12          **THE COURT:**  Sustained.  You should --

13          **MR. RAJU:**  Move to strike.

14          **THE COURT:**  Don't consider the last sentence.

15          **THE WITNESS:**  Okay.  I wanted him to understand the

16   gravity of the situation of killing his ex-wife, and I wanted

17   him to really pause and think about that.  I wanted to give him

18   another out.

19          As a human, I wanted to make sure that --

20          **MR. RAJU:**  Objection.

21          **THE COURT:**  Sustained.

22          **THE WITNESS:**  I wanted to make sure that he understood

23   the gravity of the situation.  We were talking about the murder

24   of his ex-wife.  And how that would impact his children.

25

1   BY MS. HOSSEINI

2   Q    Was this a way to make sure you understood each other?

3   That you understood what he was saying?

4   A    Yes, ma'am.

5        MR. RAJU:  Objection.

6        THE COURT:  Sustained.  That's leading.

7   BY MS. HOSSEINI

8   Q    Why did you say that?

9        Why talk about the kids once you saw pictures of their

10  kids, and back to the mother?

11  A    Yeah, I just wanted to make sure that he understood the

12  impact that it would have on his children.

13  Q    And you said you wanted to give him an out.  Did he take

14  the out at this point?

15  A    He did not.

16       MS. HOSSEINI:  We'll resume playing the audio.

17       (Portion of audio recording played in open court)

18       MS. HOSSEINI:  Can you pause?

19  BY MS. HOSSEINI

20  Q    Agent Rizzo, you said, "She'll be taken out without them

21  present."

22       What did you mean by "taken out"?

23  A    Right.  The prior sentence from Mr. Gessen, "As long as

24  they're not witnesses."

25       So I responded by saying "No, they won't be; she'll be

**RIZZO - DIRECT / HOSSEINI**

1    taken out without them present."  Killed.  Murdered.

2        MS. HOSSEINI:  Okay.  We will resume playing the

3    audio.

4        (Portion of audio recording played in open court)

5        MS. HOSSEINI:  Pause here.

6    BY MS. HOSSEINI

7    Q    We're hearing some movement.  Do you remember what was

8    happening?

9    A    I believe we were getting up and departing from lunch.

10   Q    And you're about to start walking out of a restaurant?

11   A    That's correct.

12   Q    Okay.

13       MS. HOSSEINI:  We'll fast-forward to two hours,

14   27 minutes and 35 seconds.

15   BY MS. HOSSEINI

16   Q    And do you remember how you left?  Did you take the same

17   shuttle back from the restaurant?

18   A    We did.

19   Q    Okay.

20       MS. HOSSEINI:  We'll just play the audio, Mr. Machado.

21       (Portion of audio recording played in open court)

22       MS. HOSSEINI:  We'll pause there.

23   BY MS. HOSSEINI

24   Q    Is that you now walking away from the restaurant?

25   A    That's correct.

 1           MS. HOSSEINI:  Okay.  We'll fast-forward to two hours,

 2   28 minutes and 44 seconds.  And we'll play that audio.

 3        (Portion of audio recording played in open court)

 4           MS. HOSSEINI:  Pause there.

 5   BY MS. HOSSEINI

 6   Q    We heard "Let's plan it for the end of July when you have

 7   the kids."  What was that in reference to?

 8   A    To murdering his ex-wife.

 9           MS. HOSSEINI:  Go forward two minutes of walking, and

10   we get to two hours, 31 minutes and 55 seconds.

11        (Portion of audio recording played in open court)

12   BY MS. HOSSEINI

13   Q    What did we just hear on that clip?  Sounded like a door?

14   A    That's something we call a "postamble."  I do a preamble

15   to start the recorder.  I do a postamble when it is feasible to

16   do so.  In this case, at the end of the recording.

17   Q    All right.  Agent Rizzo, the person that you met with on

18   June 2nd, 2022 in Boca Raton, Florida, do you see that person

19   in the courtroom today?

20   A    I do.

21   Q    Can you please describe where he's seated or what he's

22   wearing.

23   A    He is sitting at defense table.  He is wearing a brown

24   vest with a white shirt.

25           MS. HOSSEINI:  Let the record reflect that the witness

RIZZO - DIRECT / HOSSEINI

1   has identified the defendant.

2          Now, if we can go to Exhibit 19, for the witness.

3          (Photograph displayed to the Witness)

4   BY MS. HOSSEINI

5   Q    Do you recognize this, Agent Rizzo?

6   A    That is the front of the Boca Raton Resort.

7   Q    Okay.  And this is a multi-page exhibit.

8          What are they?  Is this a document, photo?  If you can

9   tell us what this is.

10  A    It looks like it's a photograph, ma'am.

11  Q    And is it a fair and accurate reflection of the Boca Raton

12  Resort?

13  A    Yes, ma'am.

14  Q    As it was on June 2, 2022?

15  A    Yes, ma'am.

16  Q    All right, sir.

17          MS. HOSSEINI:  We would like to move to admit

18  Exhibit 19 into evidence.

19          THE COURT:  Page 1?

20          MS. HOSSEINI:  The entire compilation.

21          THE COURT:  You need to lay a foundation for the rest

22  of the photos.

23  BY MS. HOSSEINI

24  Q    Have you reviewed the entire --

25          MS. HOSSEINI:  We will scroll through, Mr. Machado.

```
 1              (Photographs displayed to witness only)

 2              MS. HOSSEINI:  Thank you.

 3    BY MS. HOSSEINI

 4    Q    Have you reviewed all of the pages in this Exhibit 19?

 5    A    Keep on going, please.

 6              (Photographs displayed to the witness)

 7    Q    And that was 12 pages, Agent Rizzo.  Are all 12 pages

 8    photographs of the Boca Raton Resort?

 9    A    That's correct.

10    Q    And are they all a fair and accurate depiction of how it

11    appeared on June 2nd?

12    A    Yes, ma'am.

13    Q    All right, sir.

14              MS. HOSSEINI:  We would like to move to admit

15    Exhibit 19, all 12 pages.

16              THE COURT:  Any objection?

17              MR. RAJU:  No.

18              THE COURT:  Exhibit 19 admitted.

19         (Trial Exhibit 19 received in evidence.)

20              MS. HOSSEINI:  Permission to publish.

21              THE COURT:  Yes.

22         (Photograph displayed)

23    BY MS. HOSSEINI

24    Q    What are we looking at on Page 1?

25    A    Looks like the front of the Boca Raton Resort.
```

**RIZZO - DIRECT / HOSSEINI**

1   **Q**    Page 2?

2        (Photograph displayed)

3   **Q**    What is that?

4   **A**    It looks like another -- another view of the Boca Raton

5   Resort.

6   **Q**    All right.  Page 3.

7        (Photograph displayed)

8   **A**    Yet another view of the Boca Raton Resort.

9   **Q**    Do you recognize the individual who is standing in the

10  middle of the page, wearing a black top, brown pants?

11  **A**    I believe that to be Mr. Gessen.

12  **Q**    Looking at Page 4.

13       (Photograph displayed)

14  **Q**    What is this?

15  **A**    It appears to be a photograph of -- from the inside of the

16  Boca Raton Resort.

17  **Q**    And do you recognize the individual depicted on Page 4?

18  **A**    I do.

19  **Q**    Who is that?

20  **A**    That is Mr. Gessen.

21  **Q**    Looking at Page 5.

22       (Photograph displayed)

23  **Q**    Who is that?

24  **A**    That is Mr. Gessen.

25  **Q**    Looking at Page 6.

**RIZZO - DIRECT / HOSSEINI**

```
 1        (Photograph displayed)

 2   Q    And on Page 6 we see two individuals.  The individual on

 3   the left, do you recognize who that is?

 4   A    Mr. Gessen.

 5   Q    The individual on the right?

 6   A    That's me.

 7   Q    We notice that on Exhibit 6 -- I'm sorry, Exhibit 19,

 8   Page 6, there is a black box drawn on the face of the

 9   individual on the right.  Have you seen this photograph prior

10   to that redaction being applied?

11   A    I have.

12   Q    Whose face is it behind that black box?

13   A    That's my face.

14   Q    All right.  Go on to Page 7.

15        (Photograph displayed)

16   Q    Who are these individuals?

17   A    Mr. Gessen and myself.

18   Q    And the same question about whose face behind the redacted

19   box.

20   A    It's mine.

21   Q    Going to Page 8.

22        (Photograph displayed)

23   Q    What do we see here?

24   A    This is an offshoot of the lobby.  It's a corridor where

25   we were walking out to the shuttle.
```

RIZZO - DIRECT / HOSSEINI

1    Q      From the lobby to the restaurant?

2    A      From the hotel lobby, there was a walkway to catch the

3    shuttle.  So this is still part of the main resort.

4    Q      I see.

5           MS. HOSSEINI:  Next page, please?

6        (Photograph displayed)

7    BY MS. HOSSEINI

8    Q      Now we're looking at Page 9.  What do we see here?

9    A      This is a photograph of the Marisol Restaurant which was

10   beachside, part of the Boca Raton Resort --

11   Q      Do you recognize the individual in the middle of the

12   screen, wearing a black shirt, with a shaved head?

13   A      That is Mr. Gessen.

14   Q      Where would you have been sitting in relation to him?

15   A      Directly -- well, I think I was sitting to his right.  So

16   my face is blocked there.

17   Q      Same table?

18   A      Same table.

19   Q      Okay.

20           MS. HOSSEINI:  Next page, please.

21       (Photograph displayed)

22   BY MS. HOSSEINI

23   Q      What do we see on this page?

24   A      Similar to the last photograph, Mr. Gessen, my -- my face

25   is being blocked by his head.

RIZZO - DIRECT / HOSSEINI

1   **Q**   And this is still the restaurant?

2   **A**   Yes, ma'am.

3   **Q**   And the next page, please?

4       (Photograph displayed)

5   **Q**   Is this just another shot of the same thing?

6   **A**   Yes, ma'am.

7   **Q**   Do you see a little bit of a redaction now on the middle

8   of the page?

9   **A**   I do.

10  **Q**   And whose face is behind that redacted box?

11  **A**   That's mine.

12  **Q**   All right.

13          **MS. HOSSEINI:**   If you can go back to Exhibit 3, which

14  has previously been admitted.

15      (Document displayed)

16  **BY MS. HOSSEINI**

17  **Q**   And if you can refresh us, what is this again, Mister --

18  I'm sorry, Agent Rizzo?

19  **A**   This is a -- the beginning of my SMS -- or -- excuse me --

20  Signal thread with Mr. Gessen.  This is Mr. Gessen's profile.

21  I have him listed as "AG" or Allen Gessen, followed by his

22  phone number.

23  **Q**   And earlier you read that first few boxes that said "Good

24  morning," and then "I'll see you soon, I'll meet you in the

25  lobby."  So we'll pick up after that.

1              MS. HOSSEINI:  And we'll scroll down.

2         And can we zoom in a little bit, Mr. Machado?

3              THE WITNESS:  Yeah, I cannot see this here.

4         (Document enlarged)

5    BY MS. HOSSEINI

6    Q    It says AG called you at 8:54 a.m.  Does Signal allow you

7    to make phone calls?

8    A    It does.

9    Q    And then if you can read the bottom of that text.

10   A    (As read)

11              "Thanks again for traveling down to meet me,

12              enjoyed the conversation.  We have

13              significant opportunities ahead of us that

14              will be mutually beneficial.  Safe travels

15              back to Massachusetts."

16   Q    Are you sending that text?

17   A    Yes, ma'am.

18   Q    What is the response you get?

19   A    "Thank you for a great meeting and confidence.  We speak

20   the same language.  That's rare."

21   Q    And who wrote that?

22   A    Mr. Gessen.

23   Q    What was your response?

24   A    "Agreed.  Talk soon."

25              MS. HOSSEINI:  Can you scroll down, Mr. Machado?

RIZZO - DIRECT / HOSSEINI

1        (Document displayed)

2            **MS. HOSSEINI:**  And if we can just keep scrolling down

3    because I know this is cut off.

4        (Document displayed)

5            **MS. HOSSEINI:**  To that part.  Thank you.

6    **BY MS. HOSSEINI**

7    **Q**    Can you read the top box in gray?

8    **A**    Says (As read):

9                "Good evening, David.  As discussed, I am

10               drafting the letter of engagement and need to

11               confirm the spelling of your name:"

12   **Q**    And we can skip over the name.  But was that first name

13   David, and then the last name there, whose name was that?

14   **A**    That's my undercover alias.

15   **Q**    Okay.  And then your response to that was?

16   **A**    "Great, no middle initial.  I will have my family lawyer

17   review but I am sure it is standard."

18   **Q**    And the response to that?

19   **A**    "Perfect.  It's a formality for reasons discussed.  It

20   doesn't need to delay any substantive progress."

21   **Q**    What was this letter of engagement?

22   **A**    This letter of engagement was proposed by Mr. Gessen as we

23   were leaving the restaurant.  Mr. Gessen understood the

24   sensitive subjects that we talked about.  We talked about --

25           **MR. RAJU:**  Objection.

 1              **THE COURT:**  Again, the agent is talking about his

 2    understanding of what Mr. Gessen understood.

 3         You may proceed.

 4              **THE WITNESS:**  We talked about a deportation strategy

 5    for his ex-wife.  We talked about laundering of drug proceeds

 6    into businesses.  And then we talked about murder for hire.

 7    And so all three of those obviously are sensitive subjects.

 8    Mr. Gessen is a lawyer, by trade and by his own admission.

 9    Mr. Gessen is sending me a letter of engagement to -- to

10    basically officially cover our meeting.

11              **MR. RAJU:**  Objection.

12              **THE COURT:**  Overruled.

13    **BY MS. HOSSEINI**

14    **Q**    Okay.  And before we get to the letter of engagement, just

15    to be clear, these Signal messages that we're reading, where do

16    they come from?  Which phone?

17    **A**    They came from my undercover phone.

18    **Q**    Okay.  And how is it that they were extracted from the

19    undercover phone?

20    **A**    The FBI and other law enforcement agencies have a piece of

21    software -- I think it's Celebrite -- that's used to extract

22    data off cellphones.  And this appears to me the format that

23    which Celebrite generates a report.

24    **Q**    Okay.

25    **A**    So I think that is what you are looking at.

RIZZO - DIRECT / HOSSEINI

```
 1              MS. HOSSEINI:  And can we go to Exhibit 12 for the

 2    witness.

 3         (Document displayed)

 4    BY MS. HOSSEINI

 5    Q    Do you recognize this, Agent Rizzo?

 6    A    This is the letter of engagement that Mr. Gessen sent me.

 7    Q    How is it that you recognize this?  Have you seen it

 8    before?

 9    A    Say again, ma'am?

10    Q    Have you seen this document before?

11    A    Yes, ma'am.

12    Q    As, as something Mr. Gessen sent you?

13    A    I -- I reviewed it when he sent it to me.  Is that what

14    you are asking?

15    Q    Yes.

16    A    Okay.

17    Q    All right.

18              MS. HOSSEINI:  I would like to move to admit

19    Exhibit 12 into evidence.

20              THE COURT:  Any objection?

21              MR. RAJU:  No.

22              THE COURT:  Exhibit 12 admitted, may be published.

23         (Trial Exhibit 12 received in evidence.)

24              MS. HOSSEINI:  Thank you, Your Honor.

25         (Document displayed)
```

1          **MS. HOSSEINI:**  If we could zoom in to the top,

2   Mr. Machado?

3          (Document enlarged)

4   **BY MS. HOSSEINI**

5   **Q**    What do we see here?

6   **A**    It's -- the letterhead, Allen A. Gessen, Esquire, licensed

7   in the state of New York, attorney registration number.  And

8   then an address corresponding, and also I see a website that

9   says GESSEN.LAW.

10  **Q**    And then below that there is a name, David, with the last

11  name?

12  **A**    That's correct.

13  **Q**    That is your undercover name, still?

14  **A**    It is.

15  **Q**    And then the phone number below that, whose phone number

16  was that?

17  **A**    That's my phone number.

18  **Q**    Okay.  Now, still looking at Page 1, Paragraph 1, last

19  sentence.  It says:

20              "I have undertaken your representation in

21              connection with the matters described below:"

22          What was your understanding of what that meant?

23  **A**    Mr. Gessen is now going to be representing me as -- as my

24  attorney.

25  **Q**    Was Mr. Gessen, in fact, representing you as your

1    attorney?

2    **A**    No.

3    **Q**    So why does it say that?

4            **MR. RAJU:**  Objection.

5            **THE COURT:**  Overruled.

6            **THE WITNESS:**  Again, my understanding is that

7    Mr. Gessen is a lawyer, that he wanted to send me a letter of

8    engagement representing him -- himself as my lawyer, because he

9    was trying to cover his tracks.

10           **MR. RAJU:**  Objection.

11           **THE WITNESS:**  Based on the sensitivities of the

12   discussions we had.

13           **THE COURT:**  Overruled.

14           **MS. HOSSEINI:**  All right.  Let's go back into

15   Exhibit 3, which has been previously admitted.

16       And we're going to go to Page 4, Mr. Machado.

17       (Document displayed)

18   **BY MS. HOSSEINI**

19   **Q**    And if you can read the fourth gray box, Agent Rizzo.  If

20   we could get the date, too?

21   **A**    Yes, ma'am.  Can you please --

22           **MS. HOSSEINI:**  Could we get the date, too,

23   Mr. Machado, the date above that?  Thank you.

24       (Document displayed)

25

1    BY MS. HOSSEINI

2    Q    What is the date of this message?

3    A    Friday, June 3rd.

4    Q    This the day after your meeting?

5    A    Yes, ma'am.

6    Q    Okay.  And, if you can read this message.

7    A    (As read)

8              "Good morning, David.  I am now comfortably

9              in the chilly and cloudy Boston.  It was a

10             pleasure to meet you yesterday, and I

11             impatiently await your confirmation on the

12             two matters discussed.  I would like to

13             re-affirm that I am prepared to proceed.

14             Attached is the letter of engagement as per

15             our conversation.  Please review it with your

16             counsel and let me know if it's acceptable.

17             Also please insert an address."

18   Q    And then we see (As read): "DOCX.Gessenlawletter..."

19        Was that the letter of engagement attached to that

20   message?

21   A    I believe so.

22   Q    Okay.  And then you just read for us, in the middle of the

23   screen:

24             "Impatiently await your confirmation on the

25             two matters discussed."

**RIZZO - DIRECT / HOSSEINI**

1     What were those two matters?

2  **A**   It was the laundering of drug proceeds through business

3  investments with Mr. Gessen, and it was the murder for hire.

4       **MS. HOSSEINI:**  Now let's go to Page 5.

5     (Document displayed)

6       **MS. HOSSEINI:**  And the last box, if we can capture the

7  date, thank you.

8     (Document displayed)

9  **BY MS. HOSSEINI**

10  **Q**   Can you please read this text.

11  **A**   (As read)

12       "Good morning.  Allen.  It looks like we have

13       the green light to move forward with our

14       special project in Boston.  My associates in

15       New Jersey are working out the details but

16       the number I received them" -- "received them

17       would represent a significant cost savings."

18  **Q**   Did you write this text?

19  **A**   I did.

20  **Q**   Okay.  What is a "green light to move forward with our

21  special project in Boston"?

22  **A**   I told Mr. Gessen in this text message that I had spoken

23  to my associates, my associates in New Jersey who are going to

24  be helpful -- or, excuse me, responsible for arranging the

25  murder for hire for his wife, and that we have had the go-ahead

1  to move forward with that project, the special project in

2  Boston.

3  **Q**    Why did you write "special project in Boston" and not

4  "murder-for-hire of your ex-wife"?

5  **A**    Again, directing you back to our conversation with

6  Mr. Gessen on the 2nd, he had mentioned that none of what we

7  talked about at the table should be put down in Signal or -- or

8  written down in Signal.

9  **Q**    And then you said "My associates in NJ..."

10   What's "NJ"?

11 **A**    New Jersey.

12 **Q**    "...are working out the details but the number I received

13 would represent a significant savings."

14   What did you mean by that?

15 **A**    It would be a significant cost savings from the $100,000

16 for the deportation scheme.  It would be much less.

17 **Q**    Murder for hire would be cheaper than deportation?

18 **A**    That's correct.

19 **Q**    And who are these associates in New Jersey?

20 **A**    Fictitious mob associates.  That's all.

21 **Q**    Okay.  And what was your understanding of where

22 Mr. Gessen's ex-wife was located?

23 **A**    In the Boston area.

24       **MS. HOSSEINI:**  Can we go back into Page 6,

25 Mr. Machado?  We will scroll down.

**RIZZO - DIRECT / HOSSEINI**

1      (Document displayed)

2   **BY MS. HOSSEINI**

3   **Q**    What is Mr. Gessen's response?

4          **MS. HOSSEINI:**  We'll zoom into the middle of the page,

5   starting with "Good morning, David."

6      (Document displayed)

7          **THE WITNESS:**  (As read)

8           "Good morning, David.  That's excellent news.

9           I can travel anytime."

10  **Q**    What was your understanding of the arrangement you had

11  with Mr. Gessen at that point (Indicating)?

12  **A**    Say again?

13  **Q**    What was your understanding of the arrangement you had

14  reached with Mr. Gessen at that point (Indicating)?  Those two

15  texts?

16  **A**    I'm not sure I understand your question.

17  **Q**    Were you making progress?

18  **A**    Yes, we were making progress.  Correct.

19  **Q**    Okay.

20          **MS. HOSSEINI:**  And if we can scroll back into Page 6

21  or whatever page we're in at this point.  At the bottom.

22      (Document displayed)

23  **BY MS. HOSSEINI**

24  **Q**    Can you read your text on June 7th?

25  **A**    (As read)

1              "Hi Allen, getting ready to sign the

2              engagement letter but just wanted to make

3              sure I would not be getting a bill from you.

4              $1,200 per hour?  Man, I'm in the wrong

5              business!!!"

6    Q    What were you referring to?

7    A    I was referring to the letter of engagement that

8    Mr. Gessen sent me.  I told him that we were prepared to sign

9    it, but I wanted to confirm that he would not be charging us

10   $1,200 per hour.

11   Q    Is that a reference to something that was in the letter of

12   engagement?

13   A    Yes, ma'am.

14        MS. HOSSEINI:  And can we scroll down and read the

15   response?

16        (Document displayed)

17   BY MS. HOSSEINI

18   Q    I notice there is some duplication in the way this is

19   produced.  Is that a function of the way Celebrite spits out --

20   A    The report, that's correct.  Just to make sure there is

21   continuity of the entire thread, you will often see the

22   duplicate text in a previous conversation, to make sure you're

23   getting the context of everything.

24   Q    Okay.  And the response from Mr. Gessen?  If you can read

25   that, please?

**RIZZO - DIRECT / HOSSEINI**

1   **A**   Sure.   (As read)

2           "Hi David!   You will note a sentence I

3           inserted to address this particular concern:

4           'No bill shall be issued unless and until

5           specific issues, assignments or questions are

6           added as addenda this letter of engagement.'

7           So, no, no surprises!"

8   **Q**   What was your understanding if you would be paying $1,200

9   an hour or not?

10  **A**   I would not be.

11  **Q**   Again, did you understand that letter of engagement to be

12  an actual contract?

13  **A**   No.

14  **Q**   What was it?

15  **A**   It was a vehicle to cover Mr. Gessen's tracks.

16          **MR. RAJU:**   Objection.

17          **THE COURT:**   Overruled.

18          **MS. HOSSEINI:**   We'll scroll through.

19      (Document displayed)

20  **BY MS. HOSSEINI**

21  **Q**   And did you send that letter of engagement back to

22  Mr. Gessen?

23  **A**   It was ultimately sent back to him.

24  **Q**   It was sent back to him.   And then is that the PDF image

25  we are looking at here?

```
 1   A    I believe so.

 2        MS. HOSSEINI:  Can we keep scrolling down?

 3        (Document displayed)

 4   BY MS. HOSSEINI

 5   Q    Mr. Gessen's response to that was, that gray box at the

 6   top?

 7   A    "Excellent!  Thank you.  Let's get some good stuff done."

 8        MS. HOSSEINI:  Okay.  We'll keep scrolling.

 9        (Document displayed)

10        MS. HOSSEINI:  We'll keep scrolling down and then we

11   will stop there.

12        (Document displayed)

13   BY MS. HOSSEINI

14   Q    What does that gray box say at the top of the screen?

15   A    (As read)

16            "Have a good trip!  We are moving forward

17            with securing off take agreements for the

18            vests - should have more confidence by the

19            time you are back."

20   Q    And your response to that?

21   A    (As read)

22            "I will be discussing our meeting last week

23            (vests & helmets) with my associates from

24            Columbia when I arrive in Costa Rica.  Stay

25            tuned."
```

1   **Q**   And what is this reference to vests and helmets?

2   **A**   Vests and helmets were the investment business discussions

3   we had on June 2nd with Mr. Gessen.

4   **Q**   Okay.

5           **MS. HOSSEINI:**  We will keep scrolling down.

6   (Document displayed)

7   **BY MS. HOSSEINI**

8   **Q**   Can you read that box?

9   **A**   (As read)

10          "To the extent that it matters, I was..."

11  (Reporter clarification)

12          **THE WITNESS:**  I'm sorry, ma'am.

13          "To the extent that it matters, I was

14          admitted to the New York bar 20 years ago and

15          practiced as litigation attorney in the firm

16          of Thacher Proffitt and Wood.  I then joined

17          world's number one strategy consulting group

18          McKinsey and Company.  I was then recruited

19          as a fund manager for non-core assets of

20          Rinat Akhmetov (Europe's richest person) and

21          then appointed as CEO in one of his

22          companies:  Ukraine's fastest-growing

23          supermarket retail chain, Ukrainian Retail,

24          LLC.  I then managed multiple investment

25          funds, family offices, and several start ups.

```
 1              I do consulting work on special and sensitive

 2              situations."

 3   Q    Why was Mr. Gessen sending that to you?

 4         MR. RAJU:  Objection.

 5   BY MS. HOSSEINI

 6   Q    What was your understanding of why you were receiving that

 7   message from Mr. Gessen?

 8   A    Mr. Gessen is sending me his bona fides because I just

 9   informed him that I'm going to meet with the Columbian cartel

10   bosses.  So he's giving me his background so I can pass it

11   along to them.

12         MS. HOSSEINI:  We will keep scrolling.

13      (Document displayed)

14   BY MS. HOSSEINI

15   Q    And what was your response to that?

16   A    (As read)

17              "As impressive as your background is my

18              associates in Columbia know that I will only

19              bring trusted vetted people into our

20              ventures.  We operate in a high risk/high

21              reward environment but safety is our number

22              one priority."

23         MS. HOSSEINI:  Keep scrolling down.

24      (Document displayed)

25         THE WITNESS:  (As read)
```

RIZZO - DIRECT / HOSSEINI

```
 1                 ""They will like the fact you can provide

 2                 more top cover for the influx of cash

 3                 generated on a quarterly basis."

 4            MS. HOSSEINI:  Keep scrolling.

 5        (Document displayed)

 6  BY MS. HOSSEINI

 7  Q    Mr. Gessen's response?

 8  A    "At the end of the day it's always about the man."

 9            MS. HOSSEINI:  Keep scrolling down.

10        (Document displayed)

11  BY MS. HOSSEINI

12  Q    If we can have you read that blue box in the middle of the

13  screen?

14  A    (As read)

15                 "Hi Allen, I'm back from Costa Rica and ready

16                 to move forward with our next meeting.  I'm

17                 trying to balance some upcoming meetings and

18                 travel.  Does late morning or early afternoon

19                 on 6/22 in Manhattan work for you?"

20  Q    Is that just setting up another meeting?

21  A    That's correct.

22  Q    Okay.

23            MS. HOSSEINI:  Keep scrolling.

24        (Document displayed)

25
```

RIZZO - DIRECT / HOSSEINI

1    BY MS. HOSSEINI

2    Q    What's Mr. Gessen's response?

3    A    (As read)

4            "Hi David.  Welcome back.  June 22nd is

5            perfect.  Are we discussing moving forward on

6            both projects?"

7    Q    What are these both projects again?

8    A    The investment of drug proceeds into Mr. Gessen's business

9    opportunities, and also the murder for hire for his ex-wife.

10           MS. HOSSEINI:  We'll keep scrolling down.

11       (Document displayed)

12   BY MS. HOSSEINI

13   Q    Your response?

14   A    (As read)

15           "Yes, but the emphasis will be on our Boston

16           project.  Please be prepared to bring

17           whatever working material you have.  I'm

18           heading into a meeting.  Let's touch base

19           again later this week."

20   Q    What was the Boston project?

21   A    The murder of his ex-wife.

22   Q    What working material were you referring to?

23   A    Money, and identifying information.

24   Q    Okay.  Keep scrolling.

25       (Document displayed)

**RIZZO - DIRECT / HOSSEINI**

1   Q    And what was Mr. Gessen's response to that?  At the --

2          MR. RAJU:  Objection.

3   BY MS. HOSSEINI

4   Q    Can you read what's in evidence?

5          MR. RAJU:  (Inaudible)

6          THE COURT:  No, I think she is referring to what's

7   written in the text.  Go ahead, you can answer.

8          MS. HOSSEINI:  Mr. Machado, if you can scroll the

9   other way, please.

10       (Document displayed)

11         MS. HOSSEINI:  Yeah, there it is.

12  BY MS. HOSSEINI

13  Q    That gray box, what was the gray box, the response from

14  Mr. Gessen to you?

15  A    "OK.  Thanks"

16         MS. HOSSEINI:  And if we can keep scrolling down?

17       (Document displayed)

18         THE WITNESS:  (As read)

19          ""Good afternoon, David.  Ahead of the..."

20         MR. RAJU:  Objection.  The witness is reading from the

21  screen, Your Honor.

22         THE COURT:  That's all right.  It's in evidence.  The

23  texts are all in evidence.

24       Overruled.  You can go ahead.

25         THE WITNESS:  (As read)

```
 1                  ""Good afternoon David.  Ahead of the 6.22
 2             meeting can you please give me an indication
 3             of how likely we are to proceed with the
 4             funding for the factory.  We are preparing
 5             for the tender in Sweden that is happening in
 6             July and I need to know if I need to go
 7             looking for" -- excuse me -- "I need to know
 8             if I need to go look for funding.  Sorry to
 9             rush you but it's important."
10   BY MS. HOSSEINI
11   Q    So you would be providing funding?
12   A    No, the Columbian cartel guys would be providing funding.
13   Q    Okay.
14        MS. HOSSEINI:  Keep scrolling down, please.
15   (Document displayed)
16        THE WITNESS:  Would you like me to read --
17   BY MS. HOSSEINI
18   Q    Sure.  You can read the middle sentence that starts with
19   "Can you help me..."
20   A    (As read)
21             "Can you help me articulate what an 8M" --
22             8 million -- "investment would look like in
23             terms of return (timeframe)"
24   Q    What are you talking about there?
25   A    I'm asking him what would be the appropriate time or the
```

**RIZZO - DIRECT / HOSSEINI**

```
 1   timeframe -- if we made -- or if the Columbian cartel made an

 2   investment into Mr. Gessen's companies, what would be the time

 3   that we'd get our money back?

 4   Q    Okay.

 5        MS. HOSSEINI:  If we can keep scrolling down, please.

 6        (Document displayed)

 7   BY MS. HOSSEINI

 8   Q    And then there is a response from Mr. Gessen.  Can you

 9   read that?

10   A    (As read)

11             "Good afternoon David.  Yes.  Understood.  8M

12             investment doesn't quite get us through the

13             door.  9.5M does."

14        MS. HOSSEINI:  Okay.  Sorry, we will just scroll

15   through.

16        (Documents displayed)

17   BY MS. HOSSEINI

18   Q    So this is still referencing the same thing you were just

19   talking about?

20   A    Uh-huh.

21   Q    Okay.

22        MS. HOSSEINI:  We will keep scrolling, continuing

23   down.

24        (Documents displayed)

25
```

1   BY MS. HOSSEINI

2   Q   So you are still continuing discussing the same topic.

3        MS. HOSSEINI:  We'll keep scrolling down.  And then,

4   right there, Mr. Machado.

5   BY MS. HOSSEINI

6   Q   Can you please read the box, the second blue box on the

7   screen?

8   A   (As read)

9         "Switching gears.  Will you be prepared to

10         bring half of the documents we discussed.  My

11         guys are lined up and are waiting."

12   Q   You are switching gears from what to what?

13   A   From the money, money laundering business investment

14   opportunity to the murder to hire.

15   Q   So from the 8.5 million deal that we just read to the

16   murder for hire?

17   A   That's correct.

18   Q   And then it says "Will you be prepared to bring half of

19   the documents we discussed."

20   A   Uh-huh.

21   Q   What is "documents" referring to?

22   A   Money.

23   Q   And then it says "My guys are lined up and are waiting."

24   What is that referring to?

25   A   They are -- they are waiting to receive payment so they

1   can go ahead and initiate the contract to murder.

2   **Q**   Okay.  We'll keep scrolling down.  What is Mr. Gessen's

3   response?  I think they will duplicate further down so it's not

4   cut off.

5        What is Mr. Gessen's response?

6   **A**   (As read)

7              "In general, yes.  I'd need to know the

8              entire list of documents that you need.  And

9              when do you need to receive the rest of the

10             document production."

11  **Q**   What was your understanding of "documents" referring to?

12  **A**   Money.

13  **Q**   And the next text from Mr. Gessen, can you read that?

14  **A**   (As read)

15             "Also sending documents by electronic means

16             might be easier."

17  **Q**   What was your understanding of sending documents by

18  electronic means?

19  **A**   He would wire the money.

20        **MS. HOSSEINI:**  Would you please scroll down,

21  Mr. Machado.

22        (Document displayed)

23  **BY MS. HOSSEINI:**

24  **Q**   And then your response to that was the blue box.

25  **A**   (As read)

**RIZZO - DIRECT / HOSSEINI**

1              "For your protection and ours paper is

2              preferred.  Avoiding any scrutiny would be a

3              good thing."

4  **Q**    What do you mean when you said "paper is preferred"?

5  **A**    Cash.

6  **Q**    Why did you say "For your protection"?

7  **A**    Because a wire ultimately can be traced back to an

8  individual.  So, to provide another layer of anonymity.

9  **Q**    Okay.  And what's Mr. Gessen's response to that?

10 **A**    (As read)

11             "I understand.  It's just ironic that we're

12             trying to do the opposite in the other

13             project.  Yes, it can be done."

14 **Q**    What was your understanding of that message?

15 **A**    That we are -- we're trying to achieve two different

16 things but working together.  The stark contrast, it is a stark

17 contrast of the two projects that we're working on.

18 **Q**    How were the two projects contrasted?

19 **A**    Well, in the business investment, I would be more -- we

20 would be providing him with funding.  And for the

21 murder-for-hire project, he would be providing us with money.

22 **Q**    Okay.  We will continue scrolling down.

23       (Documents displayed)

24       **MS. HOSSEINI:**  Keep scrolling down.

25

RIZZO - DIRECT / HOSSEINI

BY MS. HOSSEINI

Q    And then can you read your text on Monday, July -- I'm
sorry, Monday, June 20th.

A    (As read)

        "Allen.  Just wrapping up some family time
        this weekend.  Are you OK to meet in New York
        City on Wednesday?  Hope you are well."

Q    And Mr. Gessen's response?

A    (As read)

        "Good evening David.  Yes.  All in order."

Q    Were you planning another meeting?

A    Yes, ma'am.

Q    Okay.

        MS. HOSSEINI:  Keep scrolling down.

    (Document displayed)

BY MS. HOSSEINI

Q    Please read your text in blue.

A    (As read)

        "I will send you details tomorrow.  Plan on a
        lunch downtown.  I have most news on the
        financing stuff.  I will expect you will
        bring half the amount for our other project.
        My guys are ready to put in some work."

Q    And again, can you please tell us what is "the financing
stuff" and what is "our other project"?

RIZZO - DIRECT / HOSSEINI

1    **A**    "The financing stuff" is the laundering of drug proceeds

2    into a business investment for Mr. Gessen.

3    **Q**    And "our other project"?

4    **A**    Murder-for-hire contract.

5    **Q**    And Mr. Gessen's response?

6    **A**    (As read)

7              "I need to know the full amount to know how

8              much half."

9         **MS. HOSSEINI:**  Keep scrolling down.

10    (Document displayed)

11    **BY MS. HOSSEINI**

12    **Q**    And what was your response to that?

13    **A**    "25.  Full amount is 50."

14    **Q**    What did you mean by that?

15    **A**    $25,000 is half the amount that's due.  And then 50 is the

16    full amount.

17    **Q**    For what?

18    **A**    50,000.

19    **Q**    For what?  Which one?  Which project?

20    **A**    For the murder for hire.

21    **Q**    I'm sorry, I cut you off.  I didn't mean to.

22    **A**    For the murder for hire.

23    **Q**    Okay.  And then your next response.

24    **A**    (As read)

25              "Also, any information you think would be

1         helpful, that would be much appreciated"

2    **Q**   What other information were you asking for?

3    **A**   Basically asking him for identifying information on his

4    ex-wife.

5    **Q**   Okay, keep scrolling please.  Mr. Gessen's response to

6    that.

7    **A**   (As read)

8              "I'll be in New York City for a few days,

9              let's finalize the details on Wednesday and

10             I'll get you all that -- all the information.

11             I will be staying at Long Island City with

12             the family so Midtown East Side would be

13             greatly preferred if possible."

14   **Q**   What was your understanding as to whether or not you would

15   receive identifying information about the ex-wife from

16   Mr. Gessen at that point?

17   **A**   He was prepared to deliver.

18   **Q**   Were you expecting to receive something?

19   **A**   Say again?

20   **Q**   Were you expecting to receive something?

21   **A**   Yes, ma'am.

22   **Q**   Okay.

23        **MS. HOSSEINI:**  We'll keep scrolling down.

24        (Document displayed)

25        **MS. HOSSEINI:**  Now it says Tuesday, June 21st.  And

RIZZO - DIRECT / HOSSEINI

```
 1    we'll keep scrolling.

 2         (Document displayed)

 3    BY MS. HOSSEINI

 4    Q    If you can read the second box on the screen.

 5    A    (As read)

 6              "Allen, I hope you arrive safely.  12 p.m.

 7              reservations Reserve Cut 40 Broad Street.

 8              Looking forward to catching up with you."

 9    Q    What is this about?

10    A    This is setting up a meeting time and a meeting location

11    with Mr. Gessen.

12    Q    What city?

13    A    New York City.

14    Q    Okay.

15         MS. HOSSEINI:  Scrolling down.

16         (Document displayed)

17    BY MS. HOSSEINI

18    Q    And Mr. Gessen's response?

19    A    (As read)

20              "Hi David.  Great.  See you tomorrow.  Is

21              12.30 an impossibility?"

22    Q    Your response.

23    A    "Not at all!"

24    Q    Scrolling down.  Mr. Gessen's response.

25    A    "Great.  Then let's do 12.30.  Thank you."
```

**PROCEEDINGS**

1  **Q**    Scrolling down.

2       (Document displayed)

3  **Q**    And then, now we see it says "Wednesday, June 22."  Can

4  you read your response?

5  **A**    (As read)

6            "Hi Allen.  I got here a little early.

7            Restaurant is on 2nd floor."

8  **Q**    What's Mr. Gessen's response?

9  **A**    "Hi David.  I'm about ten minutes away."

10 **Q**    And then your response to that.

11 **A**    "Great.  I will wait outside for you.

12       **MS. HOSSEINI:**  Can you scroll down a little bit?

13       (Document displayed)

14       **MS. HOSSEINI:**  And we'll stop here with this exhibit.

15       **THE COURT:**  It's five until 12:00.  Should we stop now

16 for lunch?

17       **MS. HOSSEINI:**  Yes, Your Honor.

18       **THE COURT:**  All right.  Members of the jury, we'll

19 take a 50-minute lunch break.  We'll resume at 12:45 p.m.  As

20 always -- this clock is all messed up.

21       As always, please do not discuss the case with anyone.

22 You may run into some of the parties or the lawyers in the

23 cafeteria, they are going to ignore you.

24       All right?  Thank you very much.

25       (Jury excused)

1          (The following proceedings were held outside of the

2     presence of the Jury)

3               **THE COURT:**  Great.  Thank you.

4               **MS. MITCHELL:**  Thank Your Honor.

5          (Recess taken from 11:56 a.m. to 12:44 p.m.)

6          (The following proceedings were held outside of the

7     presence of the Jury)

8               **MS. MITCHELL:**  And just, Your Honor, we would like to

9     object to the line of questioning of the agent specifically as

10    to his thoughts of Mr. Gessen throughout the entirety of any

11    time he was asked a question about:  What was your

12    interpretation, or what was your belief about what Mr. Gessen

13    thought or was saying here, as to relevance.  Specifically

14    because if he is not an expert or someone else who is offering

15    up some sort of opinion for that reason or formulating a reason

16    for that opinion, it's not relevant to what he believed

17    Mr. Gessen was thinking, unless he took some specific act or

18    did some sort of action based off of that.

19         And here, the agent is instead essentially just

20    interpreting what he -- what Mr. Gessen's statements are, what

21    he believes Mr. Gessen's statements to be.

22         And we would have a continuing objection to the line of

23    questioning resulting --

24              **THE COURT:**  Okay, all right; I'm going to overrule

25    that.  He's the other party to the conversation.  So he said

 1  what he said, based on his interpretation of what was being

 2  said but the objection is noted.

 3       And I do think those objections Mr. Raju made were

 4  appropriate for me to clarify to the jury that he's testifying

 5  as to his understanding, although I think it's obvious he

 6  doesn't know, but I think those were appropriate.  And I

 7  clarified as well.

 8            **MR. RAJU:**  (Nods head)

 9            **THE COURT:**  Do we know where Agent Rizzo is?

10            **MS. HOSSEINI:**  Yes, both of the agents are getting

11  him.  I thought we saw him earlier and then we asked him to

12  step back out.

13       (The following proceedings were held in the presence of

14  the Jury)

15            **THE COURT:**  Members -- members of the jury, welcome

16  back.  Be seated, please.  Sorry about the delay.  That was my

17  fault.  Hopefully you used it to stretch, since you sit so

18  much.

19       All right.  Are we ready to resume with your witness?

20            **MS. HOSSEINI:**  Yes, Your Honor, thank you.

21                 <u>**DIRECT EXAMINATION RESUMED**</u>

22  **BY MS. HOSSEINI**

23  **Q**   We were looking at Exhibit 3, Agent Rizzo, and just got to

24  the end of that exhibit.  If we could go to Page 20.

25       (Photograph displayed)

1   **Q**    What are we looking at here?

2   **A**    This appears to be the photograph of Allen Gessen's

3   profile page for Signal.

4          **MS. HOSSEINI:**  If we can scroll down to the next page.

5       (Document displayed)

6   **BY MS. HOSSEINI**

7   **Q**    What is this?

8   **A**    This is the contacts page.  His, his profile page, Allen

9   Gessen, "AG," phone number.

10  **Q**    Okay.  Now I would like to pull up Exhibit 7 which is an

11  audio file dated June 22nd, 2022.  And the accompanying

12  transcript, which is Exhibit 8.

13         Taking that audio file, have you had a chance to listen to

14  that?

15  **A**    The meeting on June 22nd, ma'am?

16  **Q**    Yes.

17  **A**    Yes, ma'am.

18  **Q**    All right.  Is it a fair recording of a meeting you had on

19  June 22nd, 2022?

20  **A**    Yes, ma'am.

21         **MS. HOSSEINI:**  We would like to move Exhibit 7 into

22  evidence, Your Honor.

23         **THE COURT:**  Any objection?

24         **MR. RAJU:**  There is not.

25         **MS. HOSSEINI:**  Permission --

1          **THE COURT:**  Exhibit 7 admitted.  You may publish it.

2      (Trial Exhibit 7 received in evidence.)

3  **BY MS. HOSSEINI**

4  **Q**    And Exhibit 8, the transcript, have you reviewed that

5  transcript while listening to the audio, Agent Rizzo?

6  **A**    Yes, ma'am.

7  **Q**    Is it a fair and accurate transcription of the recording

8  of the June 22, 2022 meeting?

9  **A**    Yes, ma'am.  And I will also note that there are several

10  portions of the conversation that are unintelligible, just like

11  the first transcript.

12  **Q**    And they're noted in brackets, "UI"?

13  **A**    Yes, ma'am.

14  **Q**    Okay.

15          **MS. HOSSEINI:**  Can we please play the beginning of

16  Exhibit 7, which is Page 2 of Exhibit 8, the transcript.

17      (Document displayed)

18      (Portion of audio recording played in open court)

19          **MS. HOSSEINI:**  We can pause there.

20  **BY MS. HOSSEINI**

21  **Q**    The process of recording, is it the same as the last time

22  that you described?

23  **A**    That's correct.  It's called a "preamble," and we do it

24  when we start the recorder.

25  **Q**    Okay.

1    **A**    "Recording device," I should say.

2    **Q**    I'm sorry; I didn't catch that last part?

3    **A**    The recording device.

4    **Q**    All right.  We'll skip ahead to 35 minutes, 16 seconds,

5    which is on -- it's actually on the screen, at Page 2 of

6    Exhibit 8.

7         So if you can take us forward in time, I know we just

8    heard the preamble.  And then, where -- what location we're at,

9    once the conversation starts.

10   **A**    Correct.  I started the recorder at my hotel which was, I

11   believe, the Downtown Marriott.  I walked to 40 Broad Street to

12   Reserve Cut.  And by the time Mr. Gessen arrived, 35 minutes

13   had elapsed; 35 minutes, 18 seconds.

14   **Q**    And Reserve Cut is a restaurant in New York?

15   **A**    Yes, ma'am.

16   **Q**    Okay.

17        **MS. HOSSEINI:**  May we please play the audio.

18        (Portion of audio recording played in open court)

19        **MS. HOSSEINI:**  Pause there.  And we'll fast-forward to

20   37 minutes, which corresponds to Page 3, Line 5 of Page 3,

21   starting with "Yeah, I, uh, I was wondering..."

22        (Document displayed)

23        (Portion of audio recording played in open court)

24        **MS. HOSSEINI:**  We'll stop there.

25

1  BY MS. HOSSEINI

2  Q    So we hear some music.  Where is that music coming from?

3  A    It's coming from the restaurant, ma'am.

4  Q    Okay.  So at this point you are at the restaurant.

5  A    Yes, ma'am.

6       MS. HOSSEINI:  Okay.  We will fast-forward to

7  41 minutes which will be Page 4 of the transcript, second

8  line.

9       (Document displayed)

10      (Portion of audio recording played in open court)

11      MS. HOSSEINI:  Pause there.

12  BY MS. HOSSEINI

13  Q    Why did you tell him he should be out of state,

14  Agent Rizzo?

15  A    During that segment of audio, I had advised Mr. Gessen

16  that we need to make sure that he's disassociated from the

17  murder as much as possible.  He said that he could be out of

18  state.  I advised that he should be, because that would give

19  him an alibi.

20      MS. HOSSEINI:  Let's resume playing the audio.

21      (Portion of audio recording played in open court)

22      MS. HOSSEINI:  Stop there.  We'll scroll back up so we

23  can see the top.

24  BY MS. HOSSEINI

25  Q    When Mr. Gessen said "I know her boyfriend," would that be

 1   helpful -- would that information be helpful to you if this

 2   were a deportation scheme?

 3   A    No, ma'am.

 4   Q    Why not?

 5   A    Because we're not interested in deporting her boyfriend;

 6   we're interested in deporting her.

 7            MS. HOSSEINI:  Okay.  Let's resume the audio.

 8        (Portion of audio recording played in open court)

 9            MS. HOSSEINI:  Pause there.

10   BY MS. HOSSEINI

11   Q    On the audio we heard, "So, 50 percent we have agreed to

12   now..."

13        And you said "Correct."

14        "And the other 50?"

15        "When it's done, and only when it's done."

16        What were you talking about at that point?

17   A    When it's done and only when it's done?  Is that what

18   you're referring to?

19   Q    The 50 percent and --

20   A    Right, 50 percent down payment which would have been

21   $25,000.  And then "When it's done, only when it's done," is

22   after she was killed.

23   Q    Fifty percent now, 50 percent when it's done?

24   A    That's correct.

25            MS. HOSSEINI:  Okay.  We'll resume with the audio.

```
 1            (Portion of audio recording played in open court)

 2            MS. HOSSEINI:  We'll pause for a second.

 3     BY MS. HOSSEINI

 4     Q    How much money would be two grand?

 5     A    $2,000.

 6            MS. HOSSEINI:  Let's resume playing the audio.

 7            (Portion of audio recording played in open court)

 8            MS. HOSSEINI:  Pause there.

 9     BY MS. HOSSEINI

10     Q    What happened there in that last two seconds that we

11     heard?

12     A    What part are you talking about, ma'am?

13     Q    You said "mazel," Mr. Gessen said "mazel"?

14     A    Right.  We agreed to a deal.  Handshake.

15     Q    Handshake, agreed to a deal?

16     A    Correct.

17     Q    Okay.  Was this in regard to wiring money?

18     A    Yes, ma'am.

19     Q    Okay.

20            MS. HOSSEINI:  Resuming the audio.

21            (Portion of audio recording played in open court)

22            MS. HOSSEINI:  We'll pause there.

23     BY MS. HOSSEINI

24     Q    Would a car registration number be helpful for you if this

25     was a deportation scheme?
```

**RIZZO - DIRECT / HOSSEINI**

1  **A**    No, ma'am.

2  **Q**    Why not?

3  **A**    The federal government would -- would have all that

4  information.   They have the ability to locate people fairly

5  easy, ma'am.

6          **MS. HOSSEINI:**   Let's resume the audio.

7      (Portion of audio recording played in open court)

8          **MS. HOSSEINI:**   Let's pause.

9  **BY MS. HOSSEINI**

10  **Q**    You just heard Mr. Gessen say "She just won the green card

11  lottery."

12      And you said "She did?   Well, I'm glad we didn't go that

13  route then."

14      What was your understanding of that route (Indicating

15  quotation marks)?

16  **A**    The deportation route, ma'am.   Because if she in fact

17  received a green card, she would now be an American citizen,

18  legal in the United States.   And it would be impossible to

19  deport her.

20          **MS. HOSSEINI:**   Okay.   We will resume the audio.

21      (Portion of audio recording played in open court)

22          **MS. HOSSEINI:**   Let's pause.

23  **BY MS. HOSSEINI**

24  **Q**    When Mr. Gessen said "Any way we can do any sort of an

25  invoice from the company because the money will be coming

1  from," you said "Sure."  What was your understanding of that

2  piece of the conversation?

3  **A**   It was my understanding that Mr. Gessen wanted to provide

4  some cover for the money laundering -- excuse me -- the wire

5  transfer.

6          **MS. HOSSEINI:**  We will resume audio.

7          (Portion of audio recording played in open court)

8          **MS. HOSSEINI:**  Let's pause.

9  **BY MS. HOSSEINI**

10 **Q**   At the top of the screen, and we just heard on the audio,

11 you said "This is serious business...you open that window, you

12 can't close it..."

13         What did you mean when you said "serious business"?

14 **A**   Serious business.  We're talking about murder.  So when

15 you murder somebody, you can't bring them back from the dead,

16 right?  So I said "When you open that window, you can't close

17 it."

18         This again was another out for Mr. Gessen.  I just wanted

19 to make sure that he's comfortable with moving forward.

20 **Q**   Did he take the out?

21 **A**   No.  In fact, he said "I don't wish to close it."

22 **Q**   And then right after that we heard you say:

23             "So, I just want to make sure you're

24             comfortable with it and you know that it is a

25             permanent solution, right?  Because this is,

1              this is final..."
2          What were you talking about in that sentence?
3      A    Again, another out.  I just wanted to -- for him to
4      understand that we are talking about murder, we are going to
5      murder his ex-wife.  And so it's permanent.  It's death.  And I
6      just wanted to make sure that he was good with it.
7              MS. HOSSEINI:  Let's resume audio.
8          (Portion of audio recording played in open court)
9              MS. HOSSEINI:  Pause here.
10     BY MS. HOSSEINI
11     Q    Did you actually receive a gold coin?
12     A    Yes, ma'am.
13     Q    I would like to show you Exhibit 1.
14             MS. HOSSEINI:  Permission to approach the witness,
15     Your Honor?
16             THE COURT:  Yes, you may.
17     BY MS. HOSSEINI
18     Q    Do you recognize Exhibit 1?
19     A    Yes, ma'am.
20     Q    What is it?
21     A    It's a gold coin that Mr. Gessen gave me.
22             MS. HOSSEINI:  I would like to move Exhibit 1 into
23     evidence.
24             THE COURT:  Any objection?
25             MR. RAJU:  Could I just take a look at that,

1    Your Honor?

2            **THE COURT:**  Of course.

3            **MR. RAJU:**  Thank you.

4            **THE COURT:**  Maybe you can tell us how you know it's

5    the coin that he gave you.

6            **THE WITNESS:**  It has identical markings, as I recall,

7    Your Honor.

8            **THE COURT:**  Go ahead, Mr. Raju.

9        (Mr. Raju examines item)

10           **MR. RAJU:**  Can I have a brief voir dire, Your Honor?

11           **THE COURT:**  Yes.

12       Well, is that all right?  Or do you want to try to lay a

13   further foundation before he questions him?

14           **MS. HOSSEINI:**  Sure.  I can do that.

15   **BY MS. HOSSEINI**

16   **Q**   I'm going to give you the two bags (Indicating), Agent

17   Rizzo.

18   **A**   Yes, ma'am.

19   **Q**   If you could look at those two labels, tell me if you see

20   any writing on those labels that would lead you to place this

21   item as something you received in the investigation that you

22   were telling us about.

23   **A**   Correct.  It's FBI valuable evidence.  It's an evidence

24   tag.  It has a bar code associated with it.  It has the sealing

25   official's printed name, which is Special Agent Dave Peacock.

1   And his signature.  And a witnessing official's printed name,

2   which I think is John Clemens.

3   **Q**    Okay.  Do you know who Dave Peacock is?

4   **A**    Yes, ma'am.  He's sitting at the government's table right

5   now.  He's the agent right there.

6   **Q**    What was his role in the investigation that you have been

7   talking about?

8   **A**    He was one of the case agents.

9   **Q**    Okay.  Is there also a case number on that label that you

10  have been looking at?

11  **A**    Yes, ma'am.

12  **Q**    All right.  And I would like to approach and give you

13  another document, if you can just look at this document.

14  **A**    Uh-huh.

15  **Q**    And see if this further helps you locate a case number.

16  **A**    Uh-huh.  Just the case number, ma'am?

17  **Q**    Sure.

18      (Witness examines document)

19  **A**    The case number is 281H-SF-2074415-UCO.

20  **Q**    And does that correlate with the physical item that you

21  are looking at?

22  **A**    Yes, ma'am.

23  **Q**    Okay.  And what is the document?  You don't have to read

24  from it, but just tell me, what is the document you're looking

25  at?

1    **A**    I just need to back up because there are two case files on

2    here.  There's .UCO, and then there's the main case file,

3    281H-SF-2074415, which matches up to what's on that evidence

4    label.

5    **Q**    And what is the document?  Just generally describe what

6    that document is.

7    **A**    It's the June 2nd, 2022, meeting with Mr. Gessen in

8    Boca Raton.

9    **Q**    Is it a report of some kind?

10   **A**    It's a record of report, an FD-302.

11   **Q**    Okay.  Now that you've compared the case number in that

12   report and the physical item, how is it that you can tell this

13   item (Indicating) is from that investigation?

14   **A**    There's a chain of custody.  I handed it to the case

15   agent.  Case agent filed it into evidence.

16   **Q**    Uh-huh.

17          **MS. HOSSEINI:**  At this time, Your Honor, we would like

18   to move Exhibit 1 into evidence.

19          **THE COURT:**  Any objection?

20          **MR. RAJU:**  No objection.

21          **THE COURT:**  All right.  Exhibit 1 admitted.

22       (Trial Exhibit 1 received in evidence.)

23          **MS. HOSSEINI:**  Permission to publish?

24          **THE COURT:**  Yes, you may.

25

1        (Item published to the Jury)

2   **BY MS. HOSSEINI**

3   **Q**    Agent Rizzo, on the audio, this one, the June 22nd

4   recording, Exhibit 7 that we have been listening to, we could

5   hear some background noise.  Could you tell us what that

6   background noise was?

7   **A**    Can you expand on that question?  There was a lot of

8   background noise.  We were in a restaurant.

9   **Q**    I just mean in general.

10  **A**    Yeah, it's general restaurant noise.  There was music in

11  the background, as I recall.  There's other patrons dining, so

12  there's conversation.  There's a lot going on in a restaurant

13  in lower Manhattan during lunchtime.

14  **Q**    How far were you sitting from Mr. Gessen during that

15  meeting, June 22, 2022?

16  **A**    I was sitting across the table.  If I can approximate --

17  approximate, I would say probably maybe three feet?  I'm not

18  sure.  But it was close.

19  **Q**    Same table?

20  **A**    Same table.

21  **Q**    Okay.  Could you hear him on that day?

22  **A**    I can.

23  **Q**    Okay.

24  **A**    I could.

25  **Q**    And generally speaking, was the recorder placed closer to

1  you or closer to Mr. Gessen?

2  **A**    It was placed closer to me.

3  **Q**    Okay.  And the audio that we have heard, is it what you

4  heard on that day, on June 22nd?

5  **A**    That's correct.

6  **Q**    I'm going to fast-forward over some other topics that are

7  discussed.  I'm going to fast-forward to one hour, 35 minutes,

8  and seven seconds, which will be Page 27 of the transcript.

9  So, skipping ahead several pages.

10      Page 27 at the bottom third of the page, starting with "So

11  how often do you get the kids?"

12      (Document displayed)

13      (Portion of audio recording played in open court)

14          **MS. HOSSEINI:**  Pause.

15 **BY MS. HOSSEINI**

16 **Q**    At this point in the conversation, why did you say "But I

17 wanna make sure that you're comfortable and you don't have any

18 regrets"?

19 **A**    Again, consistent with my earlier statements, I wanted to

20 present Mr. Gessen with an out.  I just want to make sure that

21 he understands the gravity of the situation.  I want to give

22 him another out.

23 **Q**    Did he take the out?

24 **A**    No.

25 **Q**    What did he say?

1   **A**    "Oh, yeah, hundred percent.  Hundred percent on board."

2        **MS. HOSSEINI:**  We will resume the audio.

3        (Portion of audio recording played in open court)

4        **MS. HOSSEINI:**  Pause here.  Let's fast-forward the

5   audio to one hour, 44 minutes and 20 seconds, which corresponds

6   with Page 32, in the middle of the page, starting with "So,

7   hey, we'll call this..."

8        (Document displayed)

9        (Portion of audio recording played in open court)

10       **MS. HOSSEINI:**  Pause there.

11  **BY MS. HOSSEINI**

12  **Q**    What happened there?

13  **A**    As I recall, Mr. Gessen, we were -- I asked him what the

14  value of that coin was.  And I recall Mr. Gessen looked up the

15  value on his phone.  The current value for an American Double

16  Eagle.  And he came back with 1-9-5-0, 1,950, $1,950.

17  **Q**    Why did the value of the coin matter?

18  **A**    Well, it was part of the down payment.

19  **Q**    So this is $2,000?

20  **A**    We were calling it $2,000, correct.

21       **MS. HOSSEINI:**  Fast forward to one hour, 47 minutes

22  and 30 seconds, which is on Page 34 of the transcript,

23  somewhere in the middle.  Middle half, middle third, really,

24  starting with, "Uh, basically I think what needs to happen..."

25       (Document displayed)

1          (Portion of audio recording played in open court)

2          **MS. HOSSEINI:**  Let's pause.

3    **BY MS. HOSSEINI**

4    **Q**    What did you mean when you said "Do you have any

5    preference in the means?  Or do you just want her gone?"

6    **A**    I asked Mr. Gessen if he had a preference on how he wanted

7    her killed.

8          **MS. HOSSEINI:**  Let's resume audio.

9          (Portion of audio recording played in open court)

10         **MS. HOSSEINI:**  Let's pause.

11   **BY MS. HOSSEINI**

12   **Q**    So why would lifestyle and proclivities of the ex-wife

13   matter as it relates to it appearing random?

14   **A**    We just wanted to make sure that we were able to locate

15   her.  If we knew that she was at a certain place and time, if

16   she had certain habits that she liked or places that she liked

17   to hang out, it would give us advance intelligence or more

18   intelligence that we needed to carry out the hit.

19         **MS. HOSSEINI:**  Resume audio.

20         (Portion of audio recording played in open court)

21         **MS. HOSSEINI:**  We'll pause there.

22       Let's fast-forward to one hour 53 minutes and 30 seconds,

23   which corresponds to Page 36 of the transcript, at the bottom

24   third, starting with "Alright, hey, this is it then."

25       (Document displayed)

**RIZZO - DIRECT / HOSSEINI**

```
 1         (Portion of audio recording played in open court)
 2         MS. HOSSEINI:  Let's pause there.
 3    BY MS. HOSSEINI
 4    Q    So had you reached an agreement on how payment would be
 5    made?
 6    A    Via wire.  To -- to an account that we had set up in
 7    San Francisco.
 8         MS. HOSSEINI:  Let's fast-forward to one hour,
 9    59 minutes and 30 seconds.  Which is on Page 38, the last
10    four or five lines.
11         (Document displayed)
12         MS. HOSSEINI:  Starting with "Which way are you
13    walking?"
14         (Portion of audio recording played in open court)
15         MS. HOSSEINI:  Stop here.
16    BY MS. HOSSEINI
17    Q    Was that the end of your meeting on June 22nd?
18    A    Yes, ma'am.
19         MS. HOSSEINI:  Okay.  Let's fast-forward to two hours,
20    six minutes and 30 seconds.
21         We're going to fast-forward about seven minutes, and then
22    we will get to two hours and six minutes.
23         (Portion of audio recording played in open court)
24    BY MS. HOSSEINI
25    Q    And what was that that we heard?
```

**RIZZO - DIRECT / HOSSEINI**

1  **A**    That was my postamble, that denoted the end of the

2  recording.

3  **Q**    Okay.

4        **MS. HOSSEINI:**  Now, for the witness, could we please

5  put up Exhibit 20.

6  **BY MS. HOSSEINI**

7  **Q**    And this is a two-page exhibit, Agent Rizzo.  We will

8  scroll through Page 1 and Page 2.

9        (Photographs displayed to the Witness)

10  **Q**    Do you recognize this?

11        (Witness examines photographs)

12  **A**    It's a photograph of Mr. Gessen.

13  **Q**    And the page above it, if you can scroll up?

14        (Photograph displayed to the Witness)

15  **A**    It's a photograph of myself and Mr. Gessen.

16  **Q**    Do you know where the photograph was taken, like what

17  location?

18  **A**    At the restaurant in New York, Reserve Cut.

19  **Q**    Is that a fair and accurate depiction of what the

20  restaurant appeared on June 22, 2022?

21  **A**    From what I recall, yes.

22        **MS. HOSSEINI:**  I would like to admit Government

23  Exhibit 20.

24        **THE COURT:**  Any objection?

25        **MR. RAJU:**  No objection, Your Honor.

RIZZO - DIRECT / HOSSEINI

```
 1              THE COURT:  Exhibit 20, admitted.

 2          (Trial Exhibit 20 received in evidence.)

 3              MS. HOSSEINI:  Permission to publish?

 4              THE COURT:  Yes.

 5          (Photograph displayed)

 6   BY MS. HOSSEINI

 7   Q     What do we see on Page 1?

 8   A     I see a picture at a table with myself and Mr. Gessen.  My

 9   face is redacted.

10   Q     You are on the left?

11   A     Yes, ma'am.

12   Q     And the individual on the right is --

13   A     Mr. Gessen.

14   Q     And so is this how far apart you were sitting when you and

15   Mr. Gessen were conversing on June 22nd?

16   A     Yes, ma'am.

17   Q     Okay.

18              MS. HOSSEINI:  Can we go to Page 2.

19          (Photograph displayed)

20   BY MS. HOSSEINI

21   Q     Who's on Page 2?

22   A     Mr. Gessen.

23              MS. HOSSEINI:  Can we put up Exhibit 2 for the

24   witness.

25          (Photograph displayed)
```

 1            MS. HOSSEINI:  I'm sorry, just for the witness.  This

 2    has not been admitted into evidence yet.  I'm sorry.

 3        (Photograph displayed to the Witness)

 4    BY MS. HOSSEINI

 5    Q    Exhibit 2 is also a two-page exhibit, Agent Rizzo.  Do you

 6    recognize this exhibit?

 7    A    Yes, ma'am.

 8            MS. HOSSEINI:  Can you scroll so the witness can see

 9    Page 2?

10        (Photograph displayed to the Witness)

11    BY MS. HOSSEINI

12    Q    What is it?

13    A    The gold coin that I received from Mr. Gessen.

14    Q    Does it fairly depict the gold coin that you were talking

15    about?

16    A    Yes, ma'am.

17            MS. HOSSEINI:  I would like to move Exhibit 2 into

18    evidence.

19            THE COURT:  Any objection?

20            MS. SAHOURIA:  No objection, Your Honor.

21            THE COURT:  Exhibit 2 admitted.

22        (Trial Exhibit 2 received in evidence.)

23            MS. HOSSEINI:  Permission to publish?

24            THE COURT:  Yes.

25        (Photograph displayed)

1    BY MS. HOSSEINI

2    Q    Is that the photo of the gold coin that we saw earlier?

3    A    Yes, ma'am.

4    Q    And Page 2?

5         (Photograph displayed)

6    Q    Other side of the coin?

7    A    Yes, ma'am.

8    Q    Okay.  Now let's go back to Exhibit 3 which has previously

9    been admitted into evidence.  And we will go to Page 19.

10        You remember we were reading these earlier, Agent Rizzo?

11   A    Yes, ma'am.

12   Q    We are going to skip to Page 19 since we have read the

13   first eighteen and a half pages or so.

14        MS. HOSSEINI:  And Mr. Machado, if we can pull up the

15   middle bottom of this exhibit, which is Page 19 of Exhibit 3.

16        (Document displayed)

17   BY MS. HOSSEINI

18   Q    What do you see here on the screen?

19   A    I see that there's messages that says (As read):

20             "AG" -- Allen Gessen -- "set the disappearing

21             message timer to 1 week."

22             "AG set the disappearing message timer to 1

23             day."

24   Q    And for context, Exhibit 3 was the text messages on Signal

25   between you and Mr. Gessen.  Is that right?

1    **A**    That's correct.

2    **Q**    Okay.

3            **MS. HOSSEINI:**  If we can zoom back out so we're in the

4    whole page, just so we can get the date.

5        (Document displayed)

6    **BY MS. HOSSEINI**

7    **Q**    Do you see the date anywhere on this page, Agent Rizzo?

8    If we can --

9    **A**    You'll have to make it bigger, ma'am.

10   **Q**    Yeah, it's very tiny.

11   **A**    On the top I see -- okay.  I see Wednesday, June 22nd,

12   there you go.

13   **Q**    So were the disappearing messages enabled -- I'm sorry.

14   The disappearing message feature, was that enabled before or

15   after June 22nd?

16   **A**    It appears after, ma'am.

17   **Q**    And what happened on June 22nd?

18   **A**    June 22nd, Mr. Gessen and I had a meeting and came to an

19   agreement to murder his ex-wife, where he made a payment, in

20   the form of a gold coin, for $2,000.

21   **Q**    And is that the audio that we just listened to?

22   **A**    Yes, ma'am.

23   **Q**    And is that the day that you received the gold coin from

24   Mr. Gessen?

25   **A**    Yes, ma'am.

**RIZZO - DIRECT / HOSSEINI**

1    Q    Okay.

2         MS. HOSSEINI:  Mr. Machado, can we please put up

3    Page 23 of Exhibit -- the same exhibit, side by side with

4    Page 19, the page that we were just looking at.

5         (Documents displayed)

6    BY MS. HOSSEINI

7    Q    And so on the right, Agent Rizzo, is Page 19.  What we

8    were just looking at.  You told us that in the middle it said:

9         "AG set disappearing timer to 1 week."

10        Do you know what that means?

11   A    It means that the message will disappear after a period of

12   time, in this case one week.

13   Q    And below that it says "1 day"?

14   A    That's correct.  The message will in fact disappear after

15   one day.

16   Q    And is that something you enabled?

17   A    No, ma'am.  It was enabled by Mr. Gessen.

18        MR. RAJU:  Objection.

19   BY MS. HOSSEINI

20   Q    Based on reading that --

21        THE COURT:  Well, maybe sustained.  Can you ask the

22   question again?

23   BY MS. HOSSEINI

24   Q    Based on what you're reading on the screen where it says

25   that "AG set the disappearing message timer to 1 day," what did

1  that lead you to conclude?

2  **A**    That Mr. Gessen set the message timer to expire in one day

3  or one week.

4  **Q**    And since these messages you said are from your phone, at

5  any time did you enable any disappearing message features on

6  your phone?

7  **A**    No, ma'am.

8  **Q**    So that's what we saw on the right.  On the left, Page 23

9  of the same exhibit, it looks a little different.  Can you tell

10  us why?

11  **A**    Because it's a photograph of my phone.

12  **Q**    So why did you start photographing your phone?

13  **A**    When I realized that Mr. Gessen was setting timers on

14  messages to delete, I needed to capture and memorialize those

15  messages so they could be submitted into evidence.

16      The way that I sought about doing that at that particular

17  time and the easiest way for me at that time was to take a

18  photograph.  So I would have a photograph before -- of the

19  message before it disappeared.

20          **MS. HOSSEINI:**  Mr. Machado, the one on the right, is

21  it possible -- and I don't know if it is -- to move it up just

22  slightly so that the two messages can line up, the two boxes

23  where it said:

24          "Hi Allen I got here a little early,

25          restaurant is on 2nd floor."

1      That's okay.  We'll just look at it the way it is, perhaps

2  the side-by-side feature is a little complicated.  Let's go

3  back to how it was.

4      (Document displayed)

5          **MS. HOSSEINI:**  Thank you.

6  **BY MS. HOSSEINI**

7  **Q**    Agent Rizzo, can you see those two lines lining up, those

8  two boxes:

9          ""Hi Allen, I got here a little early.

10         Restaurant is on the 2nd floor."

11     Do you see that on the right and on the left?

12 **A**    I do.

13 **Q**    Below that it says:

14         "Hi David I'm about 10 minutes away."

15     Do you see that on both the right and the left?

16 **A**    I don't.  Excuse me.  I do.

17 **Q**    Okay.  Below that, the blue box says:

18         "Great.  I will wait outside for you."

19     Do you see that box both on the right and on the left?

20 **A**    I do.

21 **Q**    Okay.  And now, looking below, on the left, it says

22  (As read):

23         "If the lawyers for the investors want to

24         conduct due diligence let them please send

25         the information request.  I expect that they

**RIZZO - DIRECT / HOSSEINI**

1              will want incorporation documents for GS and

2              certificate of good standing."

3      Do you see that message on the right?

4   A   I do not.

5   Q   Why wasn't it on the right?

6   A   Because it was set to disappear.

7   Q   So at this point these messages are being deleted?

8   A   They are -- they are disappearing, using the Signal app.

9   Q   Okay.  And you mention that you started taking photographs

10  of your phone.  You mean, like you have another phone that's

11  taking a photograph of --

12  A   That's correct.

13  Q   -- this phone?  Two phones (Indicating)?

14  A   Yes, ma'am.

15  Q   Okay.  Does your undercover phone not have a capability to

16  just take a screenshot with the buttons on the phone?

17  A   It -- it does, ma'am.

18  Q   So why didn't you do that?

19  A   Based on some of my training and experience, some of these

20  apps that you use, if you do in fact screenshot, it could alert

21  the individual who sent the message.  So in the abundance of

22  caution, I decided not to screenshot.  I decided to take a

23  picture with another phone.

24  Q   Because you didn't want the Signal application to

25  automatically notify Mr. Gessen that you had screenshotted his

1    message?

2    **A**    Correct.  And I don't know the features of Signal, but I

3    just wanted to be extra careful.  I don't know if that's

4    actually the capability they have.  But just based on some of

5    the experience that I -- I know in messaging apps, that is a

6    possibility.

7           **MS. HOSSEINI:**  Let's look for the witness, please, the

8    screen, Exhibit 4.

9    **BY MS. HOSSEINI**

10   **Q**    Exhibit 4, Agent Rizzo, is a 13-page exhibit.

11          **MS. HOSSEINI:**  Mr. Machado, if you can scroll through

12   it so the witness has a chance to see.

13       (Photographs displayed to the Witness)

14   **BY MS. HOSSEINI**

15   **Q**    And Agent Rizzo, tell me if you recognize this exhibit.

16       (Witness examines photographs)

17   **A**    These are photographs of my phone, ma'am.

18   **Q**    And do they fairly and accurately depict what you

19   photographed?

20   **A**    I believe so.

21          **MS. HOSSEINI:**  I would like to move to admit Exhibit 4

22   into evidence.

23          **THE COURT:**  Any objection?

24          **MR. RAJU:**  There is not, Your Honor.

25          **THE COURT:**  Exhibit 4 admitted.

1          **MS. HOSSEINI:**  Permission to publish?

2          **THE COURT:**  Yes.

3      (Trial Exhibit 4 received in evidence.)

4          **MS. HOSSEINI:**  So lets pull up the bottom portion of

5  this page.  So this is now saying the same thing:

6              "AG set the disappearing message timer to 1

7              day."

8      But below that there is a message.  What does it say?

9  **A**    "Perfect.  Thank you."

10 **Q**    I'm sorry; the blue box.  I apologize.

11 **A**    I'm sorry.  In the blue box there is a consulting

12 agreement.  And it says (As read):

13              "Did you need the signed copy...I forgot to

14              send it."

15 **Q**    Okay.

16         **MS. HOSSEINI:**  And if we can put this exhibit,

17 Exhibit 4, Page 1, side by side with Exhibit 3, Page 19.

18     (Images displayed)

19 **BY MS. HOSSEINI**

20 **Q**    Was this one of the messages that was being deleted?

21 **A**    Yes, ma'am.

22 **Q**    Because it doesn't appear on the text thread, the

23 Exhibit 3 that we were reading earlier?

24 **A**    That's correct, ma'am.

25 **Q**    And is that why you were taking a photo of the phone?

**RIZZO - DIRECT / HOSSEINI**

1   A    Yes, ma'am.

2         MS. HOSSEINI:  Okay, let's look at Exhibit 13 for the

3   witness, please.

4       (Document displayed to the Witness)

5         MS. HOSSEINI:  And Exhibit 13 is a nine-page document,

6   Agent Rizzo.

7   BY MS. HOSSEINI

8   Q    If you can tell us if you recognize this exhibit.

9       (Witness examines document)

10  A    I cannot read all the fine print, but it appears to be the

11  consulting, consultancy agreement sent by Mr. Gessen.

12        MS. HOSSEINI:  I would like to move this into

13  evidence, Exhibit 13.

14        THE COURT:  Any objection?

15        MR. RAJU:  No objection, Your Honor.

16        THE COURT:  13 admitted and may be published.

17      (Trial Exhibit 13 received in evidence.)

18      (Document displayed)

19        MS. HOSSEINI:  If we can blow up the top half of the

20  page.

21      (Document enlarged)

22  BY MS. HOSSEINI

23  Q    It says "Consultancy Agreement."  Below that, there's a

24  date.  What is that date?

25  A    June 24, 2022.

**RIZZO - DIRECT / HOSSEINI**

1  **Q**    And this is two days after the meeting that you had with

2  Mr. Gessen, when you received the gold coin?

3  **A**    Yes, ma'am.

4  **Q**    Okay.  I see below that, it says:

5         "GeeWiz OÜ & MLI Ventures, Incorporated."

6  Do you recognize any of those names?

7  **A**    MLI Ventures, ma'am.

8  **Q**    What is that?

9  **A**    MLI Ventures was a company, an undercover company that was

10 set up by the FBI to receive wire transfers.

11 **Q**    Is that the company you were using as the undercover

12 company during the investigation?

13 **A**    Yes, ma'am.

14 **Q**    Okay.  And if you could just read that first paragraph,

15 starting with "We are writing to confirm..."

16 **A**    (As read)

17         "We are writing to confirm the terms of our

18         agreement (hereinafter 'the agreement')

19         concerning the provision of consultancy

20         services by MLI Ventures, USA (hereinafter

21         'the consultant') to GEEWIZ OÜ, Republic of

22         Estonia, (hereinafter 'GEEWIZ') and

23         affiliates, collectively referred to as 'the

24         parties' and separately, the party."

25 **Q**    Was your company, MLI Ventures, providing consulting

**RIZZO - DIRECT / HOSSEINI**

1   services to this GEEWIZ OÜ?

2   **A**   No, ma'am.

3   **Q**   Have you heard of -- or actually let me just -- let me

4   just confirm.

5        So, your company, MLI Ventures, was not providing

6   consulting services to GEEWIZ OÜ.

7   **A**   That's correct.

8   **Q**   And, after "GEEWIZ OÜ," it says "Republic of Estonia."

9   Did you have any conversations with Mr. Gessen about Estonia?

10  **A**   Yes, ma'am.  In our June 2nd meeting.

11  **Q**   What did he say?

12  **A**   He said, I believe, if I recall, not having looked back at

13  the transcript, but that he had businesses set up in Estonia.

14  **Q**   Did he tell you if he had a holding company in Estonia?

15  **A**   I don't recall.

16  **Q**   Okay.

17  **A**   You have to refresh my memory.

18  **Q**   That's okay.

19       **MS. HOSSEINI:**  We can scroll down to Page 7.

20       (Document displayed)

21       **MS. HOSSEINI:**  And blow up the bottom half.

22       (Document enlarged)

23  **BY MS. HOSSEINI:**

24  **Q**   On the left it says "Consultant MLI Ventures."  There's an

25  address, there's bank account details, Bank of America account

1   number.  Can you tell us why that was there?

2   **A**   Yeah.  That is the signatory page.  And it has my account

3   -- it has the account details for MLI, in order to route money.

4   **Q**   What is it that you told Mr. Gessen about this account?

5   **A**   I told him that we have a business account set up in

6   San Francisco, that he would be able to wire the remaining

7   funds for the down payment for the murder for hire.

8   **Q**   In reality, was it an undercover FBI bank account?

9   **A**   It was, ma'am.

10  **Q**   Okay.  Below there's a signature.  Whose -- did an FBI

11  agent sign that portion of the consultancy agreement?

12  **A**   Yes, ma'am.

13  **Q**   Okay.  And on the right, it says "Client: GEEWIZ OÜ," and

14  there is some additional bank account details.  It says "ASLHV

15  Bank" and it says "Tallinn" and below that there is a signature

16  line which is blank.

17      And then the name is some other name.  It does not list

18  Mr. Gessen's name.  Were you surprised that it didn't list

19  Mr. Gessen's name?

20  **A**   I was not surprised.

21  **Q**   Why not?

22  **A**   Because Mr. Gessen was using this instrument to cover his

23  tracks for the payment for the murder for hire.

24          **MR. RAJU:**  Objection.

25          **THE COURT:**  Overruled.

1   BY MS. HOSSEINI:

2   Q    Please continue.

3   A    I -- I don't know what more to say.

4   Q    Oh, okay.

5   A    I think I said it.  Mr. Gessen is using this instrument to

6   cover his tracks for the murder for hire.

7   Q    And earlier we heard a reference to sending an invoice and

8   having an agreement.  Was that relating to something like this

9   (Indicating)?

10  A    I don't understand your question, ma'am.

11  Q    That's okay.  I'll move on.  At any point during your

12  conversations, did Mr. Gessen have concerns about things being

13  traced back to him?

14  A    Yes, ma'am.

15  Q    What did he say, generally?

16  A    Generally speaking, he was concerned that a wire may be

17  traceable back to him, as an individual.  So he wanted to make

18  sure that he did not have any exposure that way.

19  Q    Meaning he wouldn't want to put his name on the document?

20  A    Yes, ma'am.

21  Q    Okay.

22       MS. HOSSEINI:  If we can look at Page 8 of this

23  exhibit.

24       (Document displayed)

25       MS. HOSSEINI:  It is so tiny we are going to try to

1    zoom in to Page 8 under "MLI Ventures, Incorporated."

2        (Document enlarged)

3    **BY MS. HOSSEINI**

4    **Q**    And it says (As read):

5                ""The consultant shall provide the following

6                services in the interest of GEEWIZ within the

7                framework of the project with joint stock

8                company Navoi Mining and Metallurgical

9                Company."

10        Was your company, MLI Ventures, providing consulting on

11   mining and metallurgical company for GEEWIZ OÜ?

12   **A**    No, ma'am.

13   **Q**    So why does it say that?

14   **A**    Again, I think it's a way to cover, cover Mr. Gessen's

15   tracks.

16   **Q**    Scrolling down to -- further down on Page 8.  Under "Term"

17   there's a date (As read):

18                "Services specified in clause 1 of this

19                schedule are provided by consultant from

20                July 27, 2022 to July 31, 2022."

21        That end-of-July date, was that anything of interest?

22   **A**    Yes, ma'am.

23   **Q**    How?

24   **A**    That was the date that we agreed upon, or at least the

25   date range, to have his wife killed, ma'am.

1  Q    Below that, it says "Fees and payment terms."  And then it

2  says:

3              "GEEWIZ shall pay the consultant the fee for

4              the services provided in the total amount of

5              23,000" --  and then parentheses -- "(30,000

6              U.S. dollar) by bank transfer to the

7              consultant account "

8       And then it says (As read):

9              "1 ,payment in the total amount of 18,000

10             U.S. dollar is made until July 1.  And 2nd,

11             payment in the total amount of 5,000 U.S.

12             dollar made until July 15, 2022."

13      What was your understanding of payments being made at that

14  time?

15  A    That was the remainder of the down payment for the murder

16  for hire, 18,000 and 5,000, 23,000, combined with the gold coin

17  which was 2000.  And 25,000, total.

18      Does that make sense?

19  Q    Yes.  So my math is not that great but let me try to do

20  it.  18,000 plus 5,000 equals 23,000.

21  A    23,000.

22  Q    Plus 2,000 accounting for the value of the gold coin?

23  A    Yes, ma'am.

24  Q    Equals 25,000?

25  A    Yes, ma'am.

1   Q    Which is 50 percent of the $50,000 that you had agreed

2   upon?

3   A    That's correct.

4   Q    Okay.

5         MS. HOSSEINI:  Now, going back to Exhibit 4, which has

6   previously been admitted, Page 2.  At the top of Page 2.

7        (Image displayed)

8   BY MS. HOSSEINI

9   Q    So tell us again what was -- what are these photos?

10  A    This looks like a photograph of my undercover phone.

11  Q    All right.  And at the top -- and we'll blow up half of

12  this page.  And can you please read what that says?

13  A    (As read)

14        "I am glad you are having a good time."

15       The following message is a link to a site.  The third

16  message is:

17        "Duration: 120 minutes."

18       And the PIN is 123450.  And:

19        "Content can be accessed only once but can be

20         copied and forwarded."

21  Q    Okay.  What was that link?

22  A    That link, when you clicked on it, if I recall correctly,

23  opened up a document that was a targeting package.

24  Q    Who sent that link to whom?

25  A    Mr. Gessen sent that link to me.

**RIZZO - DIRECT / HOSSEINI**

1   **Q**   Okay.  Did you click on that link?

2   **A**   I did.

3   **Q**   Okay.  And how long did you have to access it?

4   **A**   Two hours.

5   **Q**   Did you need a PIN for it?

6   **A**   Yes, ma'am.

7   **Q**   Who gave you the PIN?

8   **A**   Mr. Gessen.

9   **Q**   What was your understanding of how many times you could

10  access that link?

11  **A**   Once, only, but can be copied and forward.

12  **Q**   Okay.  And so you said you received a targeting package.

13  **A**   Correct.

14  **Q**   Now I would like to show you Exhibit 29.

15          **MS. HOSSEINI:**  For the witness.

16          It is a four-page exhibit, Exhibit 29.

17          (Document displayed to the Witness)

18  **BY MS. HOSSEINI**

19  **Q**   Can you tell us if you recognize this exhibit?

20  **A**   I do.

21  **Q**   What is it?

22  **A**   It is the document that was revealed once I clicked on the

23  link.

24  **Q**   And does it fairly and accurately depict what you saw when

25  you clicked on the link?

1    **A**    Can you please blow it up?

2    **Q**    Yeah.

3          (Image enlarged)

4    **A**    Pardon.

5          (Witness examines image)

6    **Q**    Is that what you received, Agent Rizzo?

7    **A**    Yes, ma'am.

8          **MS. HOSSEINI:**  All right.  I would like to admit

9    Exhibit 29 into evidence.

10         **THE COURT:**  Any objection?

11         **MR. RAJU:**  No objection, Your Honor.

12         **THE COURT:**  29, admitted.

13     (Trial Exhibit 29 received in evidence.)

14         **THE COURT:**  Ms. Hosseini, because the jury was ready

15    at 12:45, they have been going for an hour and a half.  So I

16    would like to take a quick ten-minute break.  This will be our

17    last break before we end at 3:00.  Okay?

18         **MS. HOSSEINI:**  Thank you, Your Honor.

19         **THE COURT:**  All right.

20     (Jury excused)

21     (The following proceedings were held outside of the

22    presence of the Jury)

23         **THE COURT:**  Unless you need to use the facilities, I

24    would prefer everybody stay here.

25     (Recess taken from 2:14 p.m. to 2:23 p.m.)

**RIZZO - DIRECT / HOSSEINI**

```
 1          (The following proceedings were held outside of the

 2     presence of the Jury)

 3          MS. HOSSEINI:  Just a scheduling issue, so we don't

 4     have hiccups.  I just conferred with Ms. Mitchell, and we

 5     believe this witness will be on until past 3:00 today.  So we

 6     are hoping to release our second witness, who is a civilian.

 7          THE COURT:  Oh, yes.

 8          MS. HOSSEINI:  Okay.

 9          THE COURT:  Okay.  We can bring the jury in.

10          (The following proceedings were held in the presence of

11     the Jury)

12          THE COURT:  Thank you, members of the jury.  And you

13     can sit down.  We will be stopping at 3:00, just so you know,

14     so you can get home in time to make your food for the

15     LeBron/Steph showdown tonight.

16          All right.  You may resume.

17          MS. HOSSEINI:  Thank you, Your Honor.

18                    DIRECT EXAMINATION RESUMED

19     BY MS. HOSSEINI

20     Q    Agent Rizzo, we were looking at Exhibit 29, which was just

21     admitted into evidence.

22          (Document displayed)

23     Q    Can you please tell us what that is?

24     A    It is the target package that was the result when I

25     clicked on the link that Mr. Gessen provided me.
```

1  Q    And so I'm looking at the left top part, it says "Note to

2  Self."  Why does it say that?

3  A    Because I copied all of that content and I put it in a

4  note to self feature on my undercover phone.

5  Q    So you accessed that link that we were looking at earlier?

6  A    Correct.

7  Q    And it gave you some information?

8  A    Correct.

9  Q    Was it this information in blue?

10 A    Yes, ma'am.

11 Q    And then you took that information, you pasted it in to a

12 note?

13 A    Copied and pasted in notes to self.

14 Q    Okay.  And we'll scroll down, Page 1 of Exhibit 29.

15      (Document displayed)

16      On to Facebook Page 2, on to Page 3, on to Page 4.

17      (Documents displayed)

18 BY MS. HOSSEINI

19 Q    And what's Page 4?  Is it just showing you that this was a

20 note to self?

21 A    It appears that way, ma'am.

22 Q    Okay.  What did you do with this note to self?

23 A    I copied, pasted, put to note to self and I forwarded it

24 to Special Agent Chris Bognanno, who is a case agent.

25 Q    Why did you do that?

1    **A**    I forward it to him so he could memorialize and preserve

2    this evidence.

3    **Q**    Was it being memorialized or preserved elsewhere in the

4    Celebrite text thread?

5    **A**    Well it wouldn't have come up in the Celebrite, ma'am.

6    **Q**    Because it would have been deleted from that?

7    **A**    That's correct.

8    **Q**    Okay.  And you said you sent it to Agent Chris Bognanno,

9    the case agent.

10        I would like to show Exhibit 28, for the witness, please.

11        (Document displayed to the Witness)

12        **MS. HOSSEINI:**  We'll scroll through these, this is a

13    17-page document.  Agent Rizzo, tell me if you recognize this

14    document, what it is and how you recognize it.

15    **A**    This is Special Agent Bognanno's undercover phone, which I

16    occasionally used to contact him using my undercover phone.

17    **Q**    Okay.  And so is this a thread between you and Special

18    Agent Bognanno?

19    **A**    Yes, ma'am.

20        **MS. HOSSEINI:**  I would like to move into evidence

21    Government's Exhibit 28.

22        **THE COURT:**  Any objection?

23        **MR. RAJU:**  No objection.

24        **THE COURT:**  28, admitted.  And may be published.

25        (Trial Exhibit 28 received in evidence)

1    **BY MS. HOSSEINI**

2    **Q**    Let's look at the top.

3          (Document displayed)

4    **Q**    It says "Christopher Belefiore."  I thought you said the

5    agent's name was Christopher Bognanno.

6    **A**    It is, ma'am.

7    **Q**    Can you explain the difference?

8    **A**    That was an alias, a false ID that he was using on his

9    undercover phone.

10   **Q**    Why was there a need for that?

11   **A**    Well, because we wouldn't want to identify him as his true

12   name.

13   **Q**    Why not?

14   **A**    Because he probably could be researched and looked up

15   pretty easily and people would find out that he was an FBI

16   agent.

17   **Q**    And would that pose any concerns for you or for your

18   investigation?

19   **A**    Operational security, yes, ma'am.

20   **Q**    So just a layer of operational security that the

21   undercover phones are talking to each other?

22   **A**    Yes, ma'am.

23   **Q**    -- with undercover aliases or pseudonyms?

24   **A**    Correct.  And if I may, the reason why I'm forwarding it

25   to his undercover phone, I did not want to compromise the

1  information that was on my undercover phone and send it to an

2  FBI phone, in the event that somebody would search through my

3  phone, they would see that I had had contact with the FBI.

4      Understood?

5  **Q**   So it's to preserve the undercover phone in a way that it

6  cannot be in contact with an actual FBI phone.

7  **A**   Correct.

8  **Q**   Okay.  And these messages or these -- are these from your

9  undercover phone?

10  **A**   These messages are a text string between myself, using my

11  undercover phone, and Special Agent Bognanno, using his

12  undercover phone.

13  **Q**   Okay.

14      **MS. HOSSEINI:**  If we can just scroll through,

15  Mr. Machado.  We'll go to --

16      (Documents displayed)

17      **MS. HOSSEINI:**  We'll just scroll down.

18  **BY MS. HOSSEINI**

19  **Q**   Tell me where you see the same target package that you

20  referred to earlier.

21      (Documents displayed)

22      **MS. HOSSEINI:**  Actually, let's stop on Page 6, if you

23  can scroll back up.

24  **BY MS. HOSSEINI**

25  **Q**   The date says Friday, July 8.

RIZZO - DIRECT / HOSSEINI

 1    **A**    Uh-huh.

 2         **MS. HOSSEINI:**  And then if you can scroll down a

 3    little bit, Mr. Machado.

 4         (Documents displayed)

 5         **MS. HOSSEINI:**  Again, duplication.

 6    **BY MS. HOSSEINI**

 7    **Q**    And then we see that blue box which says "SUBJECT," there

 8    is a name and there is identification.

 9         Is this where you pasted the note to self, into this

10    portion of the text thread with Special Agent Bognanno?

11    **A**    Yes, ma'am.

12    **Q**    All right.  Now I would like to show you, for the witness,

13    please, Exhibit 31.

14         (Document displayed to the Witness)

15    **Q**    Do you recognize this exhibit?  Tell me if you recognize

16    it, what it is, and how you recognize it.

17         And this is a four-page exhibit.

18    **A**    Correct.  It's the information that I provided to Special

19    Agent Bognanno, using his undercover phone.

20    **Q**    Okay.

21         **MS. HOSSEINI:**  I would like to admit into evidence

22    Exhibit 31.

23         **THE COURT:**  Any objection?

24         **MR. RAJU:**  No, Your Honor.

25         **THE COURT:**  31, admitted.

1          (Trial Exhibit 31 received in evidence.)

2          (Document displayed)

3     BY MS. HOSSEINI

4     Q    What are we looking at here?

5     A    This is a targeting package provided by Mr. Gessen.

6     Q    What is a targeting package?

7     A    Targeting package for -- generally speaking, is a series

8     of identifying information on an individual that would assist

9     or aid in locating that individual, and would provide a variety

10    of different identifiers.  It could be name, date of birth,

11    address, vehicle registration, stuff like that.  Known spots to

12    hang out or where they're usually at.  Generally speaking,

13    that's what a targeting package is.

14    Q    Personal information?

15    A    Personally identifying information, correct.

16    Q    So let's see.  We see a picture.

17    A    I do.

18    Q    Okay.  Below that it says "SUBJECT."  And then there is a

19    name, Priscilla Chigariro; DOB, and then there's a date.  Age,

20    there's an age.  And says "Zimbabwean National."

21          MS. HOSSEINI:  If you can scroll down.

22          (Document displayed)

23    BY MS. HOSSEINI

24    Q    So to be clear, this Exhibit 31 is what you saw when you

25    clicked on that link that Mr. Gessen sent you?

RIZZO - DIRECT / HOSSEINI

1   **A**   Yes, ma'am.

2   **Q**   Okay.  And is this message still on your actual undercover

3   phone, and did you compare it to make sure it was the same?

4   **A**   Yes, ma'am.

5   **Q**   All right.  Looking down, it says "Current address."  And

6   then there is an address.  It says "Social media account,

7   Instagram," two links, "Facebook," another link.

8        **MS. HOSSEINI:**  Let's scroll through.

9        (Documents displayed)

10  **BY MS. HOSSEINI**

11  **Q**   Now, looking at Page 3 it says "Affiliated persons:

12  current boyfriend."  There's a name, a location, an age.  And

13  then a parenthetical which says "Relationship about one month

14  old."

15       The information that I have been referencing in this

16  Exhibit 31, why would Mr. Gessen -- or why did you need that

17  kind of information?

18  **A**   It would be helpful in locating her, and maybe where she

19  lays her head down at night to go to sleep.

20  **Q**   Would her boyfriend information be helpful if this were a

21  deportation scheme?

22  **A**   Yes, ma'am -- excuse me, a deportation scheme?

23  **Q**   If it were a deportation scheme, would the boyfriend

24  information be helpful?

25  **A**   No, ma'am.

**Q**    Okay.  It says "Ex-husband:  Allen Gessen, Concord Massachusetts, Age: 47.  Two children:  9 and 5.  Landlord:" there is a name, a parenthetical that says "Rents out one room."

Friends:  In Belmont and Sudbury."

Why would the landlord and the friend information be helpful if this were a murder-for-hire scheme?

**A**    It is establishing a pattern of life, where she would be on a regular basis, who she associates with.

**Q**    Would that information be helpful in making it look random?

**A**    It could.

**Q**    Would her landlord and her friends be helpful if it were a deportation scheme?

**A**    No, ma'am.

**Q**    Looking below that, it says "VEHICLE," and then there is some information about the vehicle, license plate, the color.

        **MS. HOSSEINI:**  And we will scroll down.

    (Document displayed)

**BY MS. HOSSEINI**

**Q**    "LIFESTYLE OBSERVATIONS."

There's information about -- it says (As read):

        "Subject leads a dual lifestyle:  When with

        children and without.  Time allocation about

        50/50%.

1              "When children are with subject she stays at

2              Worchester but spends very little time at

3              home.

4              "When children are with ex-husband subject

5              stays at her boyfriend's house in Cambridge.

6              "Handover of children usually occurs at

7              Verrill Farm in Concord.  Vehicle to vehicle.

8              "When without children subject goes out ..."

9      And then it goes into partying on weekends, late nights,

10  drinks.

11             "Subject has a history of violence and

12             criminality in Zimbabwe."

13      So those lifestyle observations, why was that important

14  for you to know?

15  **A**    It describes her proclivities, where she would hang out.

16  It would be helpful to the team that was actually going to

17  murder her to understand these things, to get a bead on her,

18  where she's located, what she's doing.  And it would help

19  orchestrate the murder.

20  **Q**    So one, to identify, and two, to orchestrate it as

21  appearing random?

22  **A**    Correct.

23  **Q**    Okay.  Now, did you do anything to verify this information

24  of partying heavily, late nights, drinking, criminality?  Did

25  you verify any of that?

1   **A**   No, ma'am.

2   **Q**   Do you know if any of that is true?

3   **A**   I don't.

4        **MS. HOSSEINI:**  Okay.  Now let's go back to Exhibit 28

5   which has previously been admitted.

6   **BY MS. HOSSEINI**

7   **Q**   I'm taking you back to Exhibit 28, Agent Rizzo.  This is

8   the text thread with Special Agent Bognanno that you told us

9   about.

10       We'll go to Page 11 -- I'm sorry, Page 7.

11       (Document displayed)

12  **Q**   So you told us that you texted this target package that

13  you received on Signal from Mr. Gessen by clicking on that

14  link, and you sent it to Special Agent Bognanno so he could

15  preserve it because they were being deleted.  Right?

16  **A**   Correct.

17  **Q**   Okay.  Scrolling down now, after this, to Page 11.

18       (Document displayed)

19  **Q**   It says:

20           "Sat, July 16."

21       Can you read that message?

22  **A**   (As read)

23           "Subject rented an apartment at 23 Oxford

24           Circle in Belmont, Massachusetts and will be

25           moving there July 27th to the 30th."

1  **Q**    Who sent that message to whom?

2  **A**    Mr. Gessen sent that message to me.

3  **Q**    And then did you send it to Special Agent Bognanno?

4  **A**    I did.

5  **Q**    Why?

6  **A**    If I recall correctly it would have disappeared if I

7  didn't.  So again, to memorialize it as evidence.

8  **Q**    And why would you need an update on the location of the

9  ex-wife?

10 **A**    Because that was the week that we were planning to kill

11 her.  And she --

12 **Q**    That last -- I'm sorry?

13 **A**    That last week.  And that's -- she -- she moved into a new

14 residence.

15 **Q**    And that would be helpful to know the new residence?

16 **A**    Yes, ma'am.

17 **Q**    Okay.  Looking below that, scrolling down a little bit,

18 Monday, July 18, it says "New information."  Can you please

19 read that?  And you can leave that last address at the end with

20 just the --

21 **A**    Correct (As read):

22            "Subject was observed today picking up her

23            children from her ex-husband at the Brookline

24            Reservoir at 10.35 a.m.

25            "Subject is usually staying at the current

**RIZZO - DIRECT / HOSSEINI**

1                   boyfriend's house located at or near

2                   Brookline, Massachusetts.  Not a through

3                   street."

4   **Q**   Who wrote that message?

5   **A**   Mr. Gessen.

6   **Q**   How did you receive it?

7   **A**   Via text message, on Signal.

8   **Q**   And then you sent it to Special Agent Bognanno?

9   **A**   I did.

10  **Q**   For the same reason, to preserve it because it was getting

11  deleted on Signal?

12  **A**   That's correct.

13  **Q**   And what was your understanding of who Subject (Indicating

14  quotation marks) was referring to?

15  **A**   Mr. Gessen's ex-wife.

16  **Q**   And why was it important for you to have this information

17  about picking up kids at a time and where the boyfriend's

18  location was, and whether or not it was a through street?

19  **A**   Because it was additional information.  If we could not

20  locate her at her residence, there would be an alternate

21  residence which we can go to and probably find her.

22  **Q**   Whether or not the boyfriend's street was a through

23  street, would that be helpful if this were a deportation

24  scheme?

25  **A**   No, ma'am.

1   Q     Now, let's go back to Exhibit 4, which has previously been

2   admitted into evidence.

3         These are the messages, Agent Rizzo, that you told us that

4   you took with your phone because they were being deleted on

5   Signal, so you're taking a picture of your phone with your

6   other phone.

7   A     Yes, ma'am.

8   Q     And if we can go to Page 2.

9         (Document displayed)

10  Q     And we just looked at the top part of this Page 2.  Right?

11  A     Yes, ma'am.

12  Q     And that was the link that you just told us that was the

13  target package, Exhibit 31.  Right?

14  A     Yes, ma'am.

15  Q     Okay.  And your response to that was in the middle, blue

16  box.

17  A     "Message received."

18        **MS. HOSSEINI:**  We'll just go through, if we can zoom

19  into this, Mr. Machado and we will read the rest of this

20  thread.

21        (Document displayed)

22  **BY MS. HOSSEINI:**

23  Q     What is Mr. Gessen's response?

24  A     (As read):

25              "Thank you.  Please note that I will be away

**RIZZO - DIRECT / HOSSEINI**

1          on holiday with both the kids twice this

2          summer, July 9-16 and 24 through 30.  I am

3          available to meet at other times."

4  **Q**    Why was that time of interest?

5  **A**    Because as we agreed upon, he was going to have the kids

6  during that time.  We did not want to have her murdered with

7  her kids present.

8  **Q**    Okay.  What's your response to that?

9  **A**    (As read)

10          "Duly noted.  BTW" -- by the way -- "my guys

11          in SF said something hit MLI.  Thank you."

12  **Q**    What are you talking about, "Something hit MLI"?

13  **A**    The wire transaction from Mr. Gessen hit our undercover

14  business account in San Francisco.

15  **Q**    And was Mr. Gessen's response to that?

16  **A**    (As read)

17          "Excellent.  Looking forward to my holiday

18          and making progress on both our projects."

19  **Q**    And both projects again, that he's referring to?

20  **A**    It was the business deal where we'd be using our laundered

21  money from the drug cartels to invest in his business, and the

22  murder for hire.

23          **MS. HOSSEINI:**  Scroll down, Mr. Machado?

24      (Document displayed)

25

RIZZO - DIRECT / HOSSEINI

1  BY MS. HOSSEINI

2  **Q**    What is this message?  And who's sending it to whom?

3  **A**    This message was sent by Mr. Gessen.  It's two pictures.

4  Would you like me to read it?

5  **Q**    Please.  Thank you.

6  **A**    (As read)

7          "Hey David!  Hope you and the family are

8          well.  My kids had the best time on the beach

9          last week.

10          "Please confirm that we are moving along on

11          schedule with both projects."

12  **Q**    And what is your response to that, seeking confirmation?

13  **A**    (As read)

14          "Hey Allen.  Beautiful pictures.  Thank you

15          for sending them along.  They look so happy!

16          "We'll have the work completed on the Boston

17          project by next week.  Everything is looking

18          promising.

19          "In terms of our work overseas everything

20          will be reviewed by next week as well."

21  **Q**    So in the middle of the page it says:

22          "We'll have the work completed on the Boston

23          project..."

24          And the "Boston project" is referring to?

25  **A**    The murder of Mr. Gessen's ex-wife.

**RIZZO - DIRECT / HOSSEINI**

1  Q     And the next sentence, "our work overseas" is referring

2  to?

3  A     The business venture of investing laundered proceeds to --

4  into Mr. Gessen's businesses, or business ventures.

5  Q     Pardon me.  And Mr. Gessen's response to that message is?

6  A     (As read)

7              "Great.  Thank you for the update!  I look

8              forward to seeing you soon and doing great

9              work together."

10        MS. HOSSEINI:  Scroll down.

11     (Document displayed)

12 BY MS. HOSSEINI

13 Q     Can you read -- there is some duplication with the

14 messages.  Let's pick up where we left off in the middle, where

15 it says "It will be very important..."

16 A     (As read)

17              "It will be very important to keep your

18              distance and limit your contact with your

19              associate in Boston over the next 10 or so

20              days.  It will pay off in dividends."

21 Q     What are you saying there?

22 A     I'm advising Mr. Gessen that he should have limited

23 contact with his ex-wife, to distance himself from the murder.

24 Q     And why are you saying that?

25 A     Because I wanted to let him know that we are looking out

RIZZO - DIRECT / HOSSEINI

1  for his best interests and we didn't want him to be associated

2  with the murder.

3  Q    Okay.  What's his response to that?

4  A    (As read)

5          "It's not a problem.  We don't work together

6          anymore."

7  Q    And again you used the word "your associate in Boston."

8  Why were you using code?

9  A    As per the instruction of Mr. Gessen on our June 2nd

10  meeting where he said the things that we talk about at the

11  table should not be mentioned in Signal.  So he was using

12  operational security to avoid law enforcement scrutiny.

13  Q    Okay.

14      MS. HOSSEINI:  We'll keep scrolling down.

15  (Document displayed)

16  BY MS. HOSSEINI

17  Q    If you can read the blue box that we see on the screen,

18  your message:

19  A    (As read)

20          "How are we doing brother.  We are close to

21          finalizing our business in Boston.  I need to

22          know about the 'Little' details.

23          Specifically the 27th or 28th.  Is that good

24          timing?"

25  Q    What are you saying in that message?

**RIZZO - DIRECT / HOSSEINI**

1   A    I am confirming with Mr. Gessen that, when I say "little

2   details," that he will have the kids with him.  When I say

3   "little" in quotes I'm referring to the children, that he will

4   have them on the 27th or 28th, because that's when we plan to

5   murder his ex-wife.

6   Q    That message ends with "Is that good timing?

7        What's the response?

8   A    (As read)

9             "I am very well my brother.  It is good to

10            hear from you.  On the 27th and 28th the kids

11            and I will be at the seashore.  I will be

12            accessible by phone.  28th is probably

13            better."

14  Q    What month are you referring to, 28th of what month?

15  A    July, ma'am.

16  Q    What is your response to that message?

17  A    (As read)

18            "Enjoy your vacation, brother.  Assuming you

19            will be going to Cape Cod or Martha's

20            Vineyard?

21            "Either one is beautiful.  Have a great

22            time."

23        **MS. HOSSEINI:**  Scrolling down.

24      (Document displayed)

25

RIZZO - DIRECT / HOSSEINI

1   **BY MS. HOSSEINI**

2   **Q**    And we will pick up at the bottom.  Gray box at the

3   bottom.

4   **A**    (As read)

5          "Cape Cod indeed.  With the family!  The kids

6          really love it there.  We are going camping."

7   **Q**    And you said "Sounds great.  Enjoy!"

8   **A**    Yes, ma'am.

9   **Q**    Scrolling down.

10   (Document displayed)

11   **A**    Continue reading?

12   **Q**    Yes.  Let's pick up at the bottom where it says "Just as

13   the buffer, what day are you leaving..."

14   **A**    (As read)

15          "Just as a buffer, what day are you leaving

16          for the Cape?

17          "I'm pretty sure the 28th will work but want

18          to keep my guys up to date."

19   **Q**    So what is Mr. Gessen's response to that a message?

20   **A**    (As read)

21          "I am leaving for Cape Cod on the morning of

22          the 28th and will be there until the morning

23          of the 31st.  Earlier in the week I will be

24          boating in Gloucester on the 25th and driving

25          to New Hampshire 26 or 27."

1 **Q** And your response?

2 **A** "Very helpful - thank you."

3 **Q** Why was it important once again to confirm this timing?

4 **A** Again, we wanted to make sure that Mr. Gessen had custody

5 of his children.  We did not want to -- we want to make sure

6 that we didn't carry out the murder with the kids present.

7   But it was important for Mr. Gessen to be disassociated

8 and removed as far as possible when the murder did happen.

9 **Q** And we'll scroll down.

10  (Document displayed)

11 **Q** And his response to that, the last gray box on the screen?

12 **A** (As read)

13    "I will be with my kids and family at all

14    times so might not be able to answer a call

15    right away if you need to get in touch."

16 **Q** Your response?

17 **A** "Got it."

18 **Q** We'll scroll down.

19  (Document displayed)

20 **Q** And your response to that?  In the middle gray box after

21 "Got it."

22 **A** Well, that's Mr. Gessen.

23 **Q** I'm sorry, Mr. Gessen's response to your response.

24 **A** (As read)

25    "And David, thank you for your support on

1              this project.  Its long term positive returns

2              and social impact cannot" -- sorry -- "Its

3              long term positive returns and social impact

4              cannot be overstated!"

5     **Q**    Your response to that message.

6     **A**    (As read)

7              "Very happy for you, Brother.  We are happy

8              to provide you with the relief you so richly

9              deserve!  Gonna be a great year for you and

10             profitable for us."

11    **Q**    Scrolling down.

12            (Document displayed)

13    **Q**    Can you read the top gray box?

14    **A**    (As read)

15             "I hope your trip is going well.  I am

16             leaving for Cape Cod tomorrow (Wednesday,

17             July 27) at 4 p.m. and will only be back at

18             home on Sunday, the 31st.

19             "I might not be accessible at all times

20             during the holiday so I just wanted to

21             confirm that I am fully committed to

22             achieving the results in all of our projects.

23             "If you need to reach me or to share

24             information you can always do so through Alex

25             who has been briefed.  But I think we have

1          discussed all the details for this weeks

2          week.

3          "With warmth, Allen."

4  **Q**    Why was it important for you to know when Mr. Gessen was

5  leaving and when he was returning from Cape Cod?

6  **A**    We wanted to coordinate.  I wanted to make sure that we

7  understood that we were coordinating the time that Mrs. -- that

8  his ex-wife would be killed.

9  **Q**    And when it says "I might not be accessible at times,"

10  what was your understanding of what Mr. Gessen was saying in

11  that message?

12  **A**    My understanding is that he would probably turn off his

13  phone.

14  **Q**    Keep scrolling down.

15     (Document displayed)

16  **Q**    Your response to that, at the blue box, if you can read

17  it?

18  **A**    (As read)

19          "Hi, Allen, I trust this email finds you

20          well.  The project is in its final stages and

21          I suspect it will be completed on the 28th.

22          I am seeing Alex tomorrow and the next day.

23          I will relay the details when I see him when

24          the project is finished.  Keep yourself busy

25          and make sure you are putting charges on your

**RIZZO - DIRECT / HOSSEINI**

```
 1              credit card while you are away.  Makes

 2              everything easier."

 3   Q    Why were you telling him to put charges on his credit

 4   card?

 5   A    Strengthens his alibis.

 6   Q    Scrolling down.

 7        (Document displayed)

 8   A    "Thank you, David."

 9        Is that what you want me to read?

10   Q    Yes, can you please continue reading the rest?

11   A    Yes, Mr. Gessen says:

12              "Thank you, David."

13        My message is next:

14              "One quick question.  If there are any guests

15              present do you have any problem with showing

16              them the exit?  My guys said we need to plan

17              for extra guests at the show."

18   Q    What were you saying there?

19   A    I was asking Mr. Gessen if there was anybody with his

20   ex-wife at the time we were going to conduct the killing, would

21   he have any problem with us killing that person as well.

22   Q    What was Mr. Gessen's response?

23   A    (As read)

24              "I am absolutely ambivalent to the modalities

25              and circumstances as long as we achieve
```

**RIZZO - DIRECT / HOSSEINI**

```
 1              project objectives.  Additional unexpected

 2              expenses are part of doing business."

 3   Q    What was your understanding of that message?

 4   A    Mr. Gessen did not care either way on how it was carried

 5   out.  He just wanted the objective to be achieved and he -- he

 6   didn't care about if we killed the boyfriend, if he was there.

 7   Q    What's the next box say?

 8   A    (As read)

 9              "And, yes, I always use a credit card.  Helps

10              keep track for tax purposes.  Cash is too

11              cumbersome."

12   Q    And your response.

13   A    (As read)

14              "I don't expect any additional costs.  Same job."

15   Q    And his response.

16   A    (As read)

17              "I meant the collateral.  I meant it's fine."

18   Q    What was understanding of who "the collateral" was

19   referring to?

20   A    "The collateral" would have been his ex-wife's boyfriend.

21   Q    Scrolling down.

22        (Photograph displayed)

23   Q    If we can scroll further down to read that last few

24   messages, Agent Rizzo.

25        (Document displayed)
```

 1   **A**     "Went sailing today."  The child's name -- "is studying

 2   yachting."

 3   **Q**     Your response?

 4   **A**     "Priceless.  What more can I say?"

 5   **Q**     His response.

 6   **A**     "That as a father you appreciate another father who

 7   cares."

 8   **Q**     Scrolling down.  Your response in blue at the bottom?

 9   **A**     (As read)

10          "100 percent.  Your kids and your

11          grandchildren will appreciate you and honor"

12          -- "and honor you in the way you deserve."

13   **Q**     His response?

14   **A**     (As read)

15          "Thank you, my brother.  Our cause is just."

16   **Q**     Any response from you to that?

17   **A**     I -- I couldn't say any more.  I -- I was just stunned.

18          **MR. RAJU:**  Objection.

19          **THE COURT:**  Overruled.

20   **BY MS. HOSSEINI**

21   **Q**     And to be clear, the messages we just read in Exhibit 4,

22   all of these messages were deleted from Exhibit 3, the Signal

23   thread?

24   **A**     That's correct.

25   **Q**     And that's why they all appeared to have been photographed

**PROCEEDINGS**

1   from another phone?

2   **A**    That's correct.

3          **MS. HOSSEINI:**  May I have a moment, Your Honor?

4          **THE COURT:**  Yes.

5          **MS. HOSSEINI:**  No further questions, Your Honor.

6          **THE COURT:**  All right.  Members of the jury, that

7   concludes the evidence for today.

8       It's just the beginning of the trial.  Please keep an

9   open, open mind.  Do not discuss the case with anyone.  Do not

10  do any research or anything about this at all.

11      Do not -- when you go home to your family and they ask you

12  how your day was:  Great.  The judge ordered I can't say

13  anything more.

14      We'll see you tomorrow, back here by 8:30, when the

15  evidence will resume.  Thank you very much.

16      (Jury excused)

17      (The following proceedings were held outside of the

18  presence of the Jury)

19          **THE COURT:**  So I just need to discuss one scheduling

20  matter.  Judge Chesney has a sentencing at 2:30.  So, do we

21  think we will be done with Agent Rizzo by -- yeah.  Okay.

22      I thought so, but I just wanted to make sure I don't have

23  to make other arrangements.  Okay.  We will see you all then

24  tomorrow at 8:15.

25          **MS. MITCHELL:**  Thank Your Honor.

PROCEEDINGS

1          THE COURT:  Thank you very much.

2      (Proceedings concluded)

## <u>I N D E X</u>

Tuesday, May 2, 2023 - Volume 2

**<u>GOVERNMENT'S WITNESSES</u>**                                    <u>PAGE</u>   <u>VOL.</u>

**<u>RIZZO, DAVID</u>**
(SWORN)                                                     166     2
Direct Examination by Ms. Hosseini                          167     2

## **E X H I B I T S**

| **<u>TRIAL EXHIBITS</u>** | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 1 | | 284 | 2 |
| 2 | | 292 | 2 |
| 3 | | 177 | 2 |
| 4 | | 300 | 2 |
| 5 | | 180 | 2 |
| 7 | | 274 | 2 |
| 11 | | 170 | 2 |
| 12 | | 246 | 2 |
| 13 | | 301 | 2 |
| 19 | | 238 | 2 |
| 20 | | 291 | 2 |
| 28 | | 313 | 2 |
| 29 | | 310 | 2 |
| 31 | | 317 | 2 |

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Tuesday, June 13, 2023