Volume 3

Pages 340 - 556

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, JUDGE

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )   No. 22-cr-276-JSC
                               )
ALLEN GESSEN,                  )
                               )
          Defendant.           )   San Francisco, California
_____)

                               Wednesday, May 3, 2023


                **TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:          ISMAIL J. RAMSEY
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                BY:  **ILHAM A. HOSSEINI**
                     **ALEXIS JAMES**
                     **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:          JODIE LINKER
                        Federal Public Defender
                        450 Golden Gate Avenue
                        Room 19-6884, Box 36106
                        San Francisco, California  94102
                BY:  **CANDIS MITCHELL**
                     **KARTHIK RAJU**
                     **DEPUTY FEDERAL PUBLIC DEFENDERS**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

| | |
|---|---|
| 1 | <u>**Wednesday, May 3, 2023**</u>                              <u>**8:37 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **-oOo-** |
| 4 |     (The following proceedings were held in the presence of |
| 5 | the Jury) |
| 6 |          **THE COURT:**  You may be seated. |
| 7 |     Good morning jury, welcome back. |
| 8 |     We will now resume with the cross-examination of |
| 9 | Agent Rizzo. |
| 10 |          **MR. RAJU:**  Thank you, Your Honor. |
| 11 |     <u>**DAVID RIZZO, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**</u> |
| 12 |                    <u>**CROSS-EXAMINATION**</u> |
| 13 | **BY MR. RAJU** |
| 14 | **Q**    Agent Rizzo, how are you? |
| 15 | **A**    Good morning, sir. |
| 16 | **Q**    Good morning. |
| 17 |     You testified earlier yesterday that you work with Agents |
| 18 | Bognanno and David Peacock on this investigation? |
| 19 | **A**    Yes, sir. |
| 20 | **Q**    They are here in court today, correct? |
| 21 | **A**    Yes, sir. |
| 22 | **Q**    They will be testifying at this trial, correct? |
| 23 | **A**    I'm not sure, sir. |
| 24 | **Q**    Okay.  They are sitting at the government's table? |
| 25 | **A**    They are. |

**RIZZO - CROSS / RAJU**

1   Q   Did you speak with them before court today?

2   A   Yes, sir.

3   Q   Did you speak with them before court yesterday?

4   A   Yes, sir.

5     (Reporter clarification)

6   **BY MR. RAJU**

7   Q   Did you speak with them after court yesterday?

8   A   Briefly.

9   Q   Okay.  You had two conversations personally with Allen

10  Gessen, correct?

11  A   Two -- two, yes, personal encounters, yes.

12  Q   And those were on June 2nd?  The first one was on

13  June 2nd?

14  A   Yes, sir.

15  Q   The second one was on June 22 of 2022?

16  A   Yes, sir.

17  Q   And you were wearing the recording device?

18  A   Yes, sir.

19  Q   You knew it was actively recording?

20  A   Yes, sir.

21  Q   And you received training as a special agent, correct?

22  A   Can you expand upon that?

23  Q   I'm sorry?

24  A   Training in what, sir?

25  Q   Did you receive agent training?

1   **A**     Yes, sir.

2   **Q**     Okay.  You received training at Quantico?

3   **A**     Yes, sir.

4   **Q**     Okay.  And you knew that the recording was going to be

5   used for prosecuting Mr. Gessen, correct?

6   **A**     That's correct.

7   **Q**     You were generating evidence, correct?

8   **A**     Correct.

9   **Q**     You knew that that was going to be involved in a

10  prosecution for murder for hire, correct?

11  **A**     I was collecting evidence, sir, yes.

12  **Q**     And you knew the prosecution would be in Federal Court,

13  right?

14  **A**     I didn't know at the time that charges would be brought

15  about, but ultimately we are here today, so yes.

16  **Q**     Do you often testify in state court?

17  **A**     No, sir.

18  **Q**     And you had the chance to make clear in those recordings

19  that you are offering Mr. Gessen the opportunity to kill his

20  wife, correct?  Or his ex-wife.

21  **A**     Can you clarify that question, sir?

22  **Q**     Sure.  You had the opportunity to make clear, using words

23  like "kill" or "murder," that that's what you were offering

24  him, correct?

25  **A**     No, sir.  I did not use terms like "kill" and "murder."

**RIZZO - CROSS / RAJU**

1  Q    Right.  That's exactly what I'm saying.  You didn't use

2  those words, correct?

3  A    That's correct.  We talked in code, sir.

4  Q    Okay.  And when you speak in code, you make assumptions

5  about what he's thinking, correct?

6  A    Do I make assumptions, sir?  I --

7  Q    Do I have to repeat?

8  A    Yes, you do.

9  Q    Okay.  You make assumptions about what's in his head,

10  correct?

11  A    No.  I make assumptions based off of what he says.

12  Q    Did he ever use the word "murder"?

13  A    He did not.

14  Q    He never used the word "kill," correct?

15  A    He did not.

16  Q    It's nowhere in the transcripts that you reviewed,

17  correct?

18  A    That's correct.

19  Q    You testified yesterday for about five and a half hours?

20  A    I'm not sure of the time.

21  Q    Okay.  You testified from 8:30 to 12:00, right?

22  A    Yes.

23  Q    That's three and a half hours?

24  A    Sounds about right.

25  Q    From 1:00 to 3:00 is about two hours?

**RIZZO - CROSS / RAJU**

1   A    Sounds right.

2   Q    Five and a half hours is accurate.

3   A    Okay.

4   Q    In none of those oh recordings do you use the word "kill"?

5   A    No, sir.

6   Q    And in none of those recordings do you use the word

7   "murder," right?

8   A    That's correct, sir.

9   Q    In any of those recordings, does Mr. Gessen use those

10  words?

11  A    Not to my knowledge, sir.

12  Q    You reviewed the transcripts, though, right?

13  A    That's correct.

14  Q    And you made a specific decision not to use those words,

15  right?

16  A    That's correct.

17  Q    You wanted it to be unclear.  Correct?

18  A    Not true, sir.

19  Q    You were afraid if you straight out said to him:  We're

20  going to have your ex-wife killed, that he would say: What the

21  heck are you talking about?  Right?

22  A    No, sir, not true.

23  Q    You wanted it to be clear?

24  A    I wanted it to be clear.  But we were talking in code,

25  sir.  And he understood what I said.

**RIZZO - CROSS / RAJU**

1  Q    So yesterday you stated that on Signal you were talking in

2  code.  Right?

3  A    Yes, sir.

4  Q    But you were having a verbal conversation with him twice,

5  right?  In June of 2022?

6  A    Yes, sir.

7  Q    And those words could have been used, right?

8  A    Correct.

9  Q    And those words were not used.

10 A    No.  Mr. Gessen had a heightened security posture.  And --

11 Q    Were you able --

12 A    As a lawyer, he understood that probably shouldn't talk

13 openly; we should use code words.

14 Q    Yesterday the judge had to remind you a couple of times

15 that you shouldn't speak about what's in Mr. Gessen's mind.

16 Correct?

17      **THE COURT:**  I'm going to object to that on my own.  I

18 don't -- just ask the next question.  I don't think that is

19 necessarily completely accurate.

20      I was giving an instruction to counsel, not to the

21 witness.  Okay.

22 **BY MR. RAJU**

23 Q    You didn't know what was in Mr. Gessen's mind, right?

24 You're not a mind reader.

25 A    No, sir.  I only go off of what he says.

**RIZZO - CROSS / RAJU**

1  **Q**   And he never said the word "murder"?

2  **A**   We established that fact, sir.

3  **Q**   I understand, but I'm asking the questions.

4  **A**   Okay.  I get it.  But I'm just telling you he established

5  that fact.

6  **Q**   I appreciate that.

7  **A**   Okay.

8  **Q**   You had the chance to deliberately elicit those words in

9  your conversations with him in June, correct?

10  **A**   Say it again, sir?

11  **Q**   You had the opportunity to elicit those words

12  specifically, "kill" or "murder" in your conversations with

13  him, right?

14  **A**   I -- I don't know, I don't know what you are saying, sir.

15  You have to ask a more direct question.

16  **Q**   You could have said to him:  We are going to have your

17  wife killed.  Right?

18  **A**   I could have, yes.

19  **Q**   You could have said to him:  We're going to have your wife

20  murdered, right?

21  **A**   I could have.

22  **Q**   You could have said to him:  We are going to have your

23  wife taken out.  Right?

24  **A**   I could have.

25  **Q**   But that was left ambiguous, right?

**RIZZO - CROSS / RAJU**

1    **A**    Not true.

2    **Q**    In your mind.

3    **A**    Now you are getting into my mind, sir, and what I'm

4    thinking.

5    **Q**    Right.  You got into his mind, correct?

6    **A**    I don't know.

7        (Reporter clarification)

8          **THE WITNESS:**  I don't know where counsel's going with

9    this.  I just don't know how to respond.

10       (Reporter clarification)

11   **BY MR. RAJU**

12   **Q**    You testified very differently yesterday when you were

13   speaking with the prosecutors, right?

14   **A**    In what manner, sir?

15   **Q**    You didn't have this feedback with them where you had to

16   ask them what they're saying.  Right?

17   **A**    Say again, sir?

18   **Q**    Okay.  Did you ever discuss with Mr. Gessen what you would

19   do with the dead body?

20   **A**    No, sir.

21   **Q**    Never discussed how that would be disposed of?

22   **A**    No, sir.

23   **Q**    Yesterday you testified that Allen Gessen had reached out

24   to another organized crime syndicate, correct?

25   **A**    That's correct.

**RIZZO - CROSS / RAJU**

1   **Q**   Who was that?

2   **A**   It was an Israeli-based organized crime syndicate,

3   according to Mr. Gessen.

4   **Q**   It was the Mossad, correct?

5   **A**   Yes, sir.

6   **Q**   The Mossad's not an organized crime syndicate, right?

7   **A**   Well, they're former members of the Mossad, sir.

8   **Q**   He said he spoke with the Mossad, right?

9   **A**   Yes, sir.

10   **Q**   They are an intelligence agency, correct?

11   **A**   Yeah.

12   **Q**   You prefer the word "organized crime syndicate," or the

13   phrase.

14   **A**   Yes, sir.  I believed it to be former members of the

15   Mossad, not actual members of the Mossad, for the record.

16   **Q**   You reviewed the transcripts and your paperwork in this

17   case before testifying, right?

18   **A**   Yes, sir.

19   **Q**   Yesterday you repeatedly referred to statements that you

20   made that were giving Mr. Gessen -- you were offering an

21   opportunity to get out.  Right?

22   **A**   Yes, sir.

23   **Q**   If Mr. Gessen's understanding was that you were arranging

24   to have his wife deported, he didn't want an out, right?

25   **A**   I'm sorry; I didn't hear the question.

1   **Q**   You referred to offering him many outs yesterday, correct?

2   **A**   Correct.

3       (Reporter clarification)

4   **BY MR. RAJU**

5   **Q**   If Mr. Gessen's understanding was that you and him were

6   arranging to have his wife deported, he didn't want an out,

7   correct?

8   **A**   He wanted her deported, correct.  Initially.

9   **Q**   And so he wouldn't have wanted an out from that, correct?

10  **A**   That's correct.

11  **Q**   In 2021, you were involved in an investigation of a person

12  named Alex Kiselev, right?

13  **A**   I'm not sure of the exact date, yes, but I have met

14  Mr. Kiselev.

15  **Q**   Does 2021 sound about accurate?

16  **A**   Possibly.

17  **Q**   Do you have a more accurate date?

18  **A**   Can you show me something that would reflect my meeting

19  with Mr. Kiselev?  And then I will -- but yes, if you show it

20  to me I'll tell you what --

21  **Q**   What were the dates that it could have been?

22  **A**   I'm not sure.

23  **Q**   You didn't know about Mr. Gessen until you had a

24  conversation with Mr. Kiselev, correct?

25  **A**   Did I know about Mr. Gessen?  In the context of the

RIZZO - CROSS / RAJU

1    undercover operation?

2    **Q**    Correct.

3    **A**    In the context of my undercover operation, my portion of

4    the undercover operation.

5    **Q**    Yes.

6    **A**    I would not get introduced to Mr. Gessen until March 24th,

7    the Signal conversation.

8    **Q**    Okay.  And who set up that conversation between you and

9    Mr. Gessen?

10   **A**    Mr. Kiselev.

11   **Q**    Okay.  You weren't investigating Mr. Gessen prior to your

12   investigation of Mr. Kiselev, correct?

13            **MS. HOSSEINI:**  Objection.  Sidebar?

14            **THE COURT:**  Okay.

15            **MR. RAJU:**  We can move on, Judge.

16            **THE COURT:**  Yeah.

17            **MR. RAJU:**  Excuse me.

18            **THE COURT:**  Go ahead.

19   **BY MR. RAJU**

20   **Q**    I want to take you to March of 2022.  You had a Signal

21   call with Mr. Kiselev, correct?

22   **A**    That's correct.

23   **Q**    It was admitted into evidence, if you remember, yesterday?

24   **A**    Yes, sir.

25   **Q**    And that call was on March 24th of 2022?

**RIZZO - CROSS / RAJU**

1   **A**   I recall, sir.

2   **Q**   And you recorded that call, correct?

3   **A**   I did.

4   **Q**   There was a transcript that was made of it?

5   **A**   Yes, sir.

6   **Q**   And during that call Mr. Kiselev told you that he had a

7  friend in Boston who was going through a contested custody

8  dispute.  Correct?

9   **A**   Generally speaking, sir.

10   **Q**   And the custody dispute you learned was with his former

11  partner, right?

12   **A**   Yes, sir.

13   **Q**   And that partner you later came to know was Priscilla

14  Chigariro?

15   **A**   Yes, sir.

16   **Q**   And the person who was seeking assistance regarding his

17  former partner was Allen Gessen, correct?

18   **A**   Say again, sir?

19   **Q**   The person that was seeking assistance with his former

20  partner was Mr. Allen Gessen, correct?

21   **A**   Yes, sir.

22   **Q**   And Mr. Kiselev told that you Mr. Gessen's wife was from

23  Zimbabwe?

24   **A**   Yes, sir.

25   **Q**   And you asked what Mr. Gessen was looking for.  Correct?

RIZZO - CROSS / RAJU

1   A       Generally speaking, sir, yes.

2   Q       Specifically, you asked, quote -- and this is in evidence

3   (As read):

4               "Best-case scenario your friend was looking

5               for, I mean, because we have a range of

6               options."

7       You said that?

8   A       Yes, sir.

9   Q       And were you posing as someone engaged in criminal

10  activity?

11  A       Yes, sir.

12  Q       Someone who was working on behalf of South American drug

13  cartels?

14  A       Yes, sir.

15  Q       Someone who was laundering money?

16  A       Yes, sir.

17  Q       And when you used the phrase "range of options," you were

18  telling Mr. Kiselev that Allen's issues with his ex-wife could

19  be addressed using a range of illegal options.  Correct?

20  A       Generally speaking, sir.

21  Q       And in your mind and in the role that you were playing,

22  those range of options included having her killed.  Right?

23  A       Yes, sir.

24  Q       But Alex said to you that the best-case scenario was,

25  quote, her visa gets revoked and she gets kicked out of the

**RIZZO - CROSS / RAJU**

1    country, that's it.  Correct?

2    **A**    Yes, sir.

3    **Q**    So despite the wide range of offers that you extended,

4    Alex only asked about deportation.

5    **A**    That's correct.

6    **Q**    You never suggested having her killed.

7    **A**    That's correct.

8    **Q**    In fact, you never asked about having her killed.

9    **A**    During that call, that's correct.

10   **Q**    Never suggested any physical harm be brought upon her?

11   **A**    That's correct.

12   **Q**    The only person who suggested that could happen was you.

13   **A**    Not during that call.

14   **Q**    When you referred to "range of options," you just said it

15   did include potentially having her killed --

16   **A**    We did not discuss that.

17   **Q**    I'm asking you --

18   **A**    In my mind, it was certainly something I was willing to

19   bring up.  But we did not discuss that, sir.  Let's make that

20   very clear.

21   **Q**    I'm not saying you discussed it, Agent.

22   **A**    Well, you kind of are.  Yes, you are.

23   **Q**    Do you want to take a break?

24   **A**    I'm ready when you are.

25   **Q**    Now, later in that call with Mr. Kiselev, you again came

1    back to saying that "we have a range of options," correct?

2    **A**    You would have to show me the transcript, sir.  I'm sorry.

3    You would have to show me the transcript.

4    **Q**    That's fine.

5              **MR. RAJU:**  Could we kindly have Government Exhibit 11,

6    at Minute 11, please, and the transcript is at Page 7 on

7    Government Exhibit 23.

8        (Document displayed)

9        (Portion of audio recording played in open court)

10             **MR. RAJU:**  Stop.

11   **BY MR. RAJU**

12   **Q**    So you said it again, right?

13   **A**    I heard it one time, and if it's in the transcript another

14   time, then yes.  I will take your word for it.

15   **Q**    It's in the transcript before.

16   **A**    Okay.

17   **Q**    So you offered him the range of options.  He said to you:

18   We're only interested in deportation.

19   **A**    That's correct.

20   **Q**    So you return again to offering him that range of options.

21   **A**    Correct.

22   **Q**    Okay.

23   **A**    But we only discussed deportation.  Am I making that clear

24   to everybody?  Or to you, sir?  We only discussed deportation.

25   Right?

RIZZO - CROSS / RAJU

1   **Q**   If it's unclear to me, I'll ask you.

2   **A**   Okay.

3   **Q**   So despite Alex telling you:  We're only interested in

4   deportation, you returned to the range of options for the

5   second time.

6   **A**   There's always a range of options, sir.  I wanted to keep

7   it open, and I wanted to hear what he had to say.

8   **Q**   But he already told you what he had to say.

9   **A**   And then we just said "range of options" again, sir; we've

10  established that.

11  **Q**   Because you were pushing that, correct?

12  **A**   No, sir.  Not at all.

13  **Q**   Asked twice?

14  **A**   I did.  Not pushing it.

15  **Q**   When Alex and Allen -- when Alex said that Allen wanted

16  his ex deported, you said that, quote, your family has

17  government connections in Immigration.

18  **A**   Generally speaking I'll agree to that.

19  **Q**   When you say "Generally speaking," what does that mean?

20  **A**   Well, I need to see the transcript, sir.  So if you want

21  to bring it up then we'll go through it.

22  **Q**   You don't recall independently --

23  **A**   If you want to bring up the transcript I will verify it.

24  Do you want to bring up the transcript?  I'll verify it.

25          **MR. RAJU:**  Your Honor, if I could just ask that the

 1  witness be directed not to interrupt me.

 2        **THE COURT:**  Okay, we will do just question and --

 3        **THE WITNESS:**  Yes, ma'am.

 4        **THE COURT:**  -- answer.  The government attorney will

 5  have the opportunity to ask you questions following the cross.

 6        **THE WITNESS:**  Thank you, ma'am.

 7  **BY MR. RAJU**

 8  **Q**    Do you recall at any point in any conversation saying that

 9  you had family who had government connections in Immigration?

10  **A**    I would have to see the transcript, sir.

11  **Q**    Okay.  Would it refresh your recollection to review the

12  transcript?

13  **A**    It would be great.  Thank you, sir.

14  **Q**    Thank you.

15        **MR. RAJU:**  Could we kindly pull up for the witness,

16  Exhibit 23 at Page 7.

17      (Document displayed)

18        **MR. RAJU:**  And actually can we play Exhibit 11 between

19  Minutes 11:13 through 11:36?

20      (Portion of audio recording played in open court)

21  **BY MR. RAJU**

22  **Q**    Does that refresh your recollection?

23  **A**    Yes, it sure does, sir.  Thank you.

24  **Q**    You don't really have a contact at Immigration who could

25  affect someone's deportation?

1   **A**    No, sir.  I'm portraying a role.  I'm undercover.  I'm

2   portraying a role.

3   **Q**    If you would just answer the question, I'd be grateful.

4   **A**    Hopefully I'm making it clear.

5   **Q**    If you are not, I'll ask you further questions.

6   **A**    Thank you, sir.

7   **Q**    And by saying you have used that connection before, you

8   wanted Mr. Kiselev to believe that in the past your contact has

9   arranged illegal acts in the immigration arena.  Correct?

10  **A**    That's correct.

11  **Q**    You said in that conversation that Mr. Gessen's former

12  partner could be deported for six figures.  Right?

13  **A**    I think Mr. Kiselev was the first to bring up the

14  high-six-figure range.

15  **Q**    Okay.

16  **A**    I said it was expensive.  And then ultimately I said it

17  would probably be below, low six figures.

18  **Q**    I'm not asking who said it first.  You told Mr. Kiselev

19  that it would be in six figures to have her deported.  Right?

20  **A**    Yes, sir.

21  **Q**    And you said:  Not in the high six figures.

22  **A**    Yes, sir.

23  **Q**    And you said that your government connection would be very

24  effective in arranging the deportation.

25  **A**    I would have to see that, sir, but generally speaking,

 1  yes.

 2          **MR. RAJU:**  Could we kindly play Exhibit 11 at 12:45,

 3  transcript -- Exhibit 23 at 8?

 4      (Portion of audio recording played in open court)

 5  **BY MR. RAJU**

 6  **Q**    Do you not recall these conversations?

 7  **A**    Sir, I just -- for the point of testimony, I need to be

 8  truthful.  I need to see it.

 9      I recall that I testified for close to five and a half

10  hours yesterday.  A lot was said.  I just want to make sure

11  that everybody's clear.  That's all.

12  **Q**    Okay, but you prepared for your testimony, right?

13  **A**    Still a lot of information, sir.

14  **Q**    Okay.  So you don't have a specific recollection about

15  everything that took place?

16  **A**    Say again, sir?

17  **Q**    You don't have a specific recollection about everything

18  that took place?

19  **A**    Well, you are asking me about specific sentences in the

20  transcript, sir.  I would be really comfortable if I just saw

21  them.

22  **Q**    I asked you if you quoted a fee in six figures, and you

23  didn't recall that.  But you testified that yesterday.

24  **A**    Say again, sir?

25  **Q**    I asked you if you recalled conveying a fee of six

**RIZZO - CROSS / RAJU**

1    figures, and you testified to that just yesterday.

2    **A**    I -- I would like to see the transcript.  That's all.  I

3    just want to make it clear.

4    **Q**    Is it different because defense counsel is asking you

5    those questions?

6    **A**    I just want to make it clear.

7    **Q**    Moving ahead to your April meeting, do you recall where

8    that meeting was?

9    **A**    What April meeting are you referring to, sir?

10   **Q**    Do you recall having a meeting in connection with this

11   investigation in April of 2022?

12   **A**    If you show me something, I --

13   **Q**    I'm asking you a specific question.  Do you recall having

14   a meeting in April of 2022, in connection with this

15   investigation?

16   **A**    No.  Can you refresh or recollect my memory?

17   **Q**    Of course.

18        **MS. HOSSEINI:**  Objection, vague as to who the meeting

19   was with.

20        **THE COURT:**  Yes.  Who was the meeting with?

21        **MR. RAJU:**  Okay.

22   **BY MR. RAJU**

23   **Q**    Did you have a meeting in Madrid, Spain, in connection

24   with this investigation in April of 2022?

25   **A**    Yes, sir.

**RIZZO - CROSS / RAJU**

1   **Q**   Okay.  Do you recall who was at that meeting?

2   **A**   Mr. Kiselev was at the meeting.

3   **Q**   Okay.  There were other undercover agents, as well,

4   present.

5   **A**   That's correct.

6   **Q**   That was a lunch meeting.

7   **A**   It was a lunch meeting.

8   **Q**   And the meeting was at the Airbnb that you were staying

9   at?

10   **A**   Yes, sir.

11   **Q**   And towards the end of that meeting, the other undercover

12   agents left and it was just you and Mr. Kiselev.  Correct?

13   **A**   That's correct.

14   **Q**   And you and Mr. Kiselev again discussed your conversation

15   -- you and Mr. Kiselev again discussed your meeting -- excuse

16   me.

17       You and Mr. Kiselev again discussed Mr. Gessen's

18   deportation desire with respect to Priscilla Chigariro.

19   **A**   Yes, sir.

20   **Q**   If you are not clear, I can play you the tape.

21   **A**   If you prefer, that would be fine.

22   **Q**   I just want to make sure --

23   **A**   I mean, if you would like to, I would love to hear it.

24   **Q**   Okay.

25   **A**   No, I'd like to hear it.

1  **Q**    It's not about what you like here.

2  **A**    Okay.  Well, you're asking me a question; you're asking my

3  preference.

4  **Q**    You said that you had already spoken to your contact in

5  ICE, right?

6  **A**    I'm not sure, sir.  I need to see the transcript.

7         **MR. RAJU:**  Could we kindly play Exhibit 126 at 15

8  seconds?

9         **THE COURT:**  Stop for a second.  It's not in evidence.

10  Right?

11         **MS. HOSSEINI:**  (Shakes head)

12         **MR. RAJU:**  Excuse me.  Sure.

13  **BY MR. RAJU**

14  **Q**    In that meeting that you had in Spain, you recorded it,

15  correct?

16  **A**    That's correct.

17  **Q**    You gave that recording to the government?

18  **A**    Yes, sir.

19         **MR. RAJU:**  Move to introduce Exhibit 126.

20         **MS. HOSSEINI:**  No objection.

21         **THE COURT:**  Exhibit 126, admitted.

22      (Trial Exhibit 126 received in evidence.)

23         **MR. RAJU:**  Thank you, Your Honor.

24      (Portion of audio recording played in open court)

25         **MR. RAJU:**  Stop there.

1  BY MR. RAJU

2  Q    So you said having her deported would be no problem.

3  Right?

4  A    That's correct.

5  Q    Do you remember that now?

6  A    Because I heard it, sir.

7  Q    Right.  And you told in that same clip that you would be

8  the intermediary between Allen and your immigration contact.

9  A    I don't recall hearing that, but I -- yes, conceptually,

10  you are correct.

11  Q    And that is because you wanted to arrange a meeting with

12  Mr. Gessen?

13  A    No, I didn't want to arrange -- Mr. Kiselev introduced me

14  to Mr. Gessen, the problem he was having.

15  Q    Did you never want to meet with Mr. Gessen face to face?

16  A    I never initiated the meeting or the contact with

17  Mr. Gessen; Mr. Kiselev did.

18  Q    I'm not asking you who initiated, but, did you want to

19  arrange a meeting with Mr. Gessen?

20  A    Yes.  Following on Mr. Kiselev's recommendation, yes.

21  Q    Thank you, Agent.

22  A    You're welcome, sir.

23  Q    You conveyed the initial payment would be $25,000.  Right?

24  A    Yes, sir.

25  Q    And as a result of that payment, your contact at

1    Immigration would ensure that Priscilla Chigariro got a letter

2    from Immigration.

3    **A**    Yes, sir.

4    **Q**    And that letter would tell her she needs to turn herself

5    in.

6    **A**    Yes, sir.

7    **Q**    And that if she didn't comply, Immigration would get an

8    arrest warrant and use that to deport her.

9    **A**    Yes, sir.

10   **Q**    And after you stated that, you again reminded Alex what

11   you had told him in your March 24th conversation, which was,

12   quote:

13            "There are other options, too, but you have

14            to tell me what you want."

15   **A**    That's correct.

16   **Q**    So again, you are bringing up other options.

17   **A**    Always.  In my -- in the role that I'm playing, I'm always

18   bringing up other options.  That's correct.

19   **Q**    So when he gives you a specific ask, you decide:  I'm just

20   going to give you more options?

21   **A**    Well, if you go back to what you said, I asked him:  You

22   just have to tell me what you'd like.

23   **Q**    He had told you on your March 24th conversation multiple

24   times that they want her deported.

25   **A**    Okay.

RIZZO - CROSS / RAJU

 1  **Q**    Do you agree with that?

 2  **A**    Sure.

 3  **Q**    And we just played it.

 4  **A**    I just agreed with you.

 5  **Q**    Well, you said "Sure."

 6  **A**    Is that not an agreement, sir?

 7  **Q**    Did Alex ask you to elaborate on those other options?

 8  **A**    I don't recall.

 9  **Q**    The fact that he didn't --

10       (Reporter clarification)

11  **BY MR. RAJU**

12  **Q**    It's a fact that he did not ask you to elaborate on those

13  other options.  Correct?

14  **A**    I don't recall.

15  **Q**    Do you recall him asking you to arrange Priscilla's murder

16  during that meeting?

17  **A**    He did not.

18  **Q**    Thank you.  He again only expressed an interest in the

19  government and your contact arranging Priscilla's deportation.

20  **A**    That's correct.

21  **Q**    You assured him that your contact could arrange that.

22  **A**    Yes, sir.

23  **Q**    You said, quote, "It's easy, okay?"

24  **A**    I haven't seen the quote, but conceptually, and generally

25  speaking, yes.

1  Q    Thank you.  I think we just heard, you said your contact

2  had been in government for 18 years?

3  A    I don't recall, but I will take your word for it.

4  Q    I don't want you to take my word for it.

5  A    Okay, then let's hear it.  Please, let's hear it.

6  Q    Let me just ask the questions, if you don't mind.

7  A    Okay.

8  Q    You are testifying in a trial.  Right?

9       Do you recall ever telling Mr. Kiselev or Mr. Gessen that

10 your contact had been in government for 18 years?

11 A    I don't recall the specific number.  If you can play the

12 portion, then I will verify it, sir.

13      MR. RAJU:  Could we kindly play Exhibit 126, the

14 transcript is at -- excuse me.  If we can play 211 -- I mean

15 126, at 2:11.

16      (Portion of audio recording played in open court)

17      MR. RAJU:  Stop.

18      THE WITNESS:  Agreed, sir.

19 BY MR. RAJU

20 Q    Refresh your recollection?

21 A    It does, thank you.

22 Q    Did you review these transcripts before testifying today?

23 A    Which -- the transcript for this particular meeting?

24 Q    Yes.

25 A    No, sir.  Because we're just entering into evidence now.

1    So I didn't have a chance to review it.

2    **Q**    But as part of your preparation for testifying.

3    **A**    I don't think I reviewed these transcripts, no, sir.

4    **Q**    Did you review any documents before testifying?

5    **A**    Yes, sir.

6    **Q**    What documents were those?

7    **A**    The transcripts from my meeting with Mr. Gessen on the

8    2nd, the 22nd of June, and also the 24th of March for

9    Mr. Kiselev call.  Those are the transcripts I reviewed, sir.

10   **Q**    How come you didn't recall the -- or review the April

11   transcripts?  How come you didn't recall the -- stricken.

12   **A**    Sir, I did not review the transcripts --

13          **THE COURT:**  Oh, there's no question.  No question.

14          **THE WITNESS:**  Thank you.

15          **MR. RAJU:**  Thank you, Your Honor.

16   **BY MR. RAJU**

17   **Q**    Then in your conversation with Mr. Kiselev in April, in

18   Spain, you reiterated that she would get a letter, and be

19   immediately arrested and immediately deported.  Fair to say?

20   **A**    Generally speaking.  But not having listened to -- without

21   listening to that portion, I just don't recall if those are my

22   exact words.

23   **Q**    Sounds about right?

24   **A**    If you say so.

25   **Q**    Well, not -- I am asking you, does that sound right?

1  A    Generally speaking, as I just said.

2  Q    And just a couple of moments after saying -- then you said

3  to him that it would happen because the law is the law, if

4  she's here under false pretenses, it's black and white.  Do you

5  recall saying that?

6  A    I don't, but if you'd like to play it for me, I'd kindly

7  hear it.

8  Q    Okay.  Just a couple of moments later, after you again

9  returned to suggesting -- just a couple moments later, you said

10 you went back to suggesting another unspecified means of

11 addressing the problem.  Right?

12 A    Can you be more clear, sir?

13 Q    Sure.  After he -- after you said that it's black and

14 white that she be removed, you returned to specifying -- you

15 returned to suggesting you have more options.  Right?

16 A    I'm not sure, sir, without having listened.

17 Q    Okay.

18     MR. RAJU:  Can we kindly play Exhibit 126 at 4:59?

19     (Portion of audio recording played in open court)

20     MR. RAJU:  Thank you.

21 BY MR. RAJU

22 Q    Refresh your recollection?

23 A    Yes, sir.

24 Q    And regarding that "other way, too" -- and when you said

25 "other way too," what were you suggesting?

**RIZZO - CROSS / RAJU**

1  **A**    I think if you play the tape, we were talking about

2  killing her.

3  **Q**    Okay.  And in regards to killing her, you said "But that's

4  a whole other price level."

5  **A**    I don't know what I said.  But we did talk about killing

6  her, that's correct.

7         **MR. RAJU:**  Can we kindly play Exhibit 126 at 5:15?

8         (Portion of audio recording played in open court)

9  **BY MR. RAJU**

10 **Q**    Refresh your recollection?

11 **A**    It does.

12 **Q**    So you were saying it's more expensive to have her killed.

13 **A**    Did I say "more expensive" or did I say "a whole 'nother

14 price level," sir?

15 **Q**    You were suggesting --

16 **A**    No, sir; did I say "more expensive" or did I say "a whole

17 'nother price level"?

18         **MR. RAJU:**  Your Honor, if I could kindly ask again,

19 the witness --

20         **THE COURT:**  Yeah.  Just, he'll ask a question; you can

21 answer.

22         **THE WITNESS:**  Okay.

23         **THE COURT:**  And again --

24         **THE WITNESS:**  You're putting words in my mouth, sir.

25         **MS. HOSSEINI:**  Objection.  Your Honor --

1          **THE WITNESS:**   I said "a whole 'nother price level."

2    **BY MR. RAJU**

3    **Q**   If you want to take a break --

4          **THE COURT:**  No, wait, one moment.

5          **MS. HOSSEINI:**  Your Honor, the witness has testified

6    that he has not reviewed this clip, and it's in evidence.

7    Perhaps it will be easier if we just let the whole clip play?

8          **THE COURT:**  No, no, you can have a chance, on

9    redirect, to do it as you like.

10   **BY MR. RAJU**

11   **Q**   If you want to take a break at any time, just let me know.

12   And I can ask the Court.

13   **A**   I would just appreciate you don't put words in my mouth.

14   **Q**   Okay.

15   **A**   That's all.  Did I say it was more expensive?  I didn't.

16   I said "a whole 'nother price level."

17   **Q**   And by "a whole 'nother price level," you meant it would

18   be more expensive.

19   **A**   No, sir.

20   **Q**   What did you mean by that?

21   **A**   It's a whole 'nother pricing level.  That's it.

22   **Q**   So it would be cheaper?

23   **A**   Maybe.

24   **Q**   And so for the second time in this conversation, just like

25   in the Signal conversation, you're returning to offering more

**RIZZO - CROSS / RAJU**

1   serious criminal options.  Fair to say?

2   **A**   That is -- that is correct.

3   **Q**   Okay.  You're inviting him to say that Allen wants her

4   killed.

5   **A**   I'm giving a range of options, sir.

6   **Q**   He has expressed to you repeatedly the one thing they

7   want, which is deportation.

8   **A**   That's correct.

9   **Q**   You continued to come back to offering more serious

10  options.

11  **A**   No.  Just -- I -- not continuing.  Just on that occasion,

12  in that meeting.

13  **Q**   Well, it's the fourth time now.  Right?

14  **A**   I don't believe it was the fourth time.

15  **Q**   We had two in the Signal conversation.

16  **A**   Okay.

17  **Q**   And two in this conversation.

18  **A**   Was it two?

19  **Q**   Yes.  And again, at no point had Mr. Kiselev said:  We

20  want her killed.

21  **A**   That's correct; we talked deportation.

22  **Q**   You just liked offering that option.

23  **A**   That's who I am, sir.  I'm an organized crime figure, and

24  that's exactly what we do.

25  **Q**   In the April 26th meeting with Mr. Kiselev, he never once

1    asked to you arrange Priscilla's meeting.

2    **A**    I'm sorry; can you repeat the question?

3    **Q**    In the April 26th meeting in Spain, Mr. Kiselev never

4    asked you to arrange Priscilla's murder.

5    **A**    No, sir.

6    **Q**    That's despite the fact that you offered that a couple of

7    times.

8    **A**    That's correct, sir.

9    **Q**    Moving to the June 2nd meeting, that was played yesterday,

10   largely.  Do you recall?

11   **A**    Yes, sir.

12   **Q**    And by that time, you had been put into contact with

13   Mr. Gessen by Mr. Kiselev.

14   **A**    That's correct.

15   **Q**    Prior to that meeting, you had never spoken to Mr. Gessen

16   on the phone?

17   **A**    No.

18   **Q**    You arranged a meeting at a restaurant in Boca Raton.

19   **A**    That's correct.

20   **Q**    Florida?

21   **A**    Sorry?

22   **Q**    In Florida?

23   **A**    Yes, sir.

24   **Q**    And you're the one who selected that meeting location?

25   **A**    I'm not sure, sir.  I don't -- I don't recall.  I don't

1    know if it was a -- a collective meeting with the case agents,

2    or a decision.  I don't think it was purely my decision.

3    **Q**    So it's a decision between you and the case agents,

4    perhaps.

5    **A**    I don't recall how it transpired.

6    **Q**    Okay.  Mr. Gessen didn't suggest meeting in Boca Raton,

7    Florida.

8    **A**    I don't know, sir.

9    **Q**    He lives in Massachusetts, you know?

10   **A**    I do.

11   **Q**    And you know that if he's got to go to Florida, he's got

12   to travel.  Right?

13   **A**    That's obvious.  But I didn't -- I don't know how we came

14   up with Florida.  That's all I'm telling you.

15   **Q**    The June 2nd meeting was about two and a half hours in

16   duration?

17   **A**    Roughly.

18   **Q**    I said "about."  And for the first 20 minutes or so, you

19   and Mr. Gessen are chit-chatting about various topics.  Is that

20   accurate?

21   **A**    Yes, sir.

22   **Q**    And you bring up his situation with Priscilla, and tell

23   him you have a solution.  Correct?

24   **A**    Yes, sir.

25   **Q**    In fact you said (As read):

```
 1                    "We have a solution for you.  I guess the

 2                    question is like, in a perfect world, tell me

 3                    what you want.  There is a blank slate.  Just

 4                    tell me what you want."

 5          Do you recall that?

 6  A     Generally speaking, sir.

 7  Q     How about specifically?

 8  A     You'd have to play it.

 9          MR. RAJU:  Could we kindly play Government Exhibit 5,

10  in evidence, played yesterday, at 24:12?

11          (Portion of audio recording played in open court)

12          MR. RAJU:  Thank you.

13  BY MR. RAJU

14  Q     Refresh your recollection?

15  A     Yes, sir.  Thank you.

16  Q     But you knew what he wanted already, right?

17  A     I knew what Mr. Kiselev told me.

18  Q     Okay.

19  A     This is the first time I'm speaking with Mr. Gessen.  So I

20  want to hear it from Mr. Gessen.  Not Mr. Kiselev.

21  Q     Okay.  But again, you were pushing your offer of a range

22  of options.  Correct?

23  A     I -- you would have to play it where I talked about the

24  range of options there, sir.  But yes --

25  Q     Blank slate.
```

**RIZZO - CROSS / RAJU**

1   **A**   Say it again?

2   **Q**   You used the phrase "blank slate"?

3   **A**   Yes.  Tell me what you'd want, you know, given a blank

4   slate, correct.

5   **Q**   Thank you.  So yet again you're suggesting a more serious

6   option.  Fair to say?

7   **A**   No, sir.  I said:  Blank slate, tell me what you'd want.

8   **Q**   And a blank slate would include the full range of illegal

9   options, including murder?

10   **A**   You -- you're -- you are speculating, sir.

11   **Q**   That is a legal --

12   **A**   You're speculating on what I -- I just wanted to hear what

13   Mr. Kiselev had to say.  That's all.

14   **Q**   Mr. Kiselev?

15   **A**   Excuse me.  Mr. Gessen.

16   **Q**   Okay.  But you knew from Mr. Kiselev that he wanted

17   Priscilla deported.

18   **A**   But I needed to hear it from Mr. Gessen, sir.

19   **Q**   He tells you shortly thereafter that he wants her

20   deported.  Is that correct?

21   **A**   Yes, sir.

22        **MR. RAJU:**  Can we kindly play Government Exhibit 5, in

23   evidence, at 24:29.

24        (Portion of audio recording played in open court)

25        **MR. RAJU:**  Thank you.

1  BY MR. RAJU

2  Q      So he said to you (As read):

3              "I would like you to -- myself and children

4              to remain in the United States, and go back

5              to her home country, and not be able to come

6              and harass us again."

7      That's at Page 9 of Government Exhibit 6.

8      (Document displayed)

9  Q      Correct?

10 A      Yes.  Now I can see it.  Yes.

11 Q      And again, you replied that you had a contact that was

12 very high up.  Right?

13 A      Yes, sir.

14 Q      If you'd like, I can give you a copy of the transcript --

15 A      That would be perfect.

16 Q      Okay.  Well, if we need it, we'll get to it.

17 A      Okay.  Thank you.

18 Q      And you had told Mr. Kiselev that you also had a high-up

19 contact in Immigration that could arrange Priscilla's

20 deportation.  Fair to say?

21 A      Yes, sir.

22 Q      You told Allen that you weren't sure exactly how it would

23 get done, but they'd get her deported.  Fair to say?

24 A      Generally speaking.

25 Q      How about specifically speaking?

**RIZZO - CROSS / RAJU**

1   A     If you point out a specific point, then I will agree to

2   it, but yes, generally speaking, I think you're correct.

3          MR. RAJU:  Could we kindly play Government Exhibit 5

4   at 30.   Transcript is Government Exhibit 6 at 12.

5       (Document displayed)

6       (Portion of audio recording played in open court)

7          MR. RAJU:  Thank you.

8   BY MR. RAJU

9   Q     So you said specifically you don't know exactly how they

10  handle their fucking business.   Right?

11  A     Correct.

12  Q     And you also said (As read):

13              "And if they have to go to her house to grab

14              her ass, they'll get it.  They'll fucking get

15              it."

16  A     Yes, sir.

17  Q     That was just played, right?

18  A     Yes, sir.

19  Q     Yesterday you discussed something called a "target

20  package," right?

21  A     Yes, sir.

22  Q     And you testified yesterday that Mr. Gessen sent you that

23  target package?

24  A     Yes, sir.

25  Q     And you testified yesterday that it contained information

1   about where Ms. Chigariro lives.  Right?

2   **A**   Yes, sir.

3   **Q**   It contained information about her car.  Correct?

4   **A**   Yes, sir.

5   **Q**   Contained information about who she associates with,

6   correct?

7   **A**   Yes, sir.

8   **Q**   So when police or agents arrest people, they frequently go

9   to the places that they're known to live.  Right?

10  **A**   That's correct, sir.

11  **Q**   And you just said if they -- on the tape:  If they have to

12  go to her house to grab her ass, they'll fucking get it.

13  **A**   Yes, sir.

14  **Q**   So the information conveyed in that target kit was

15  information that you would need if you were going to, quote --

16  if they were going to, quote, "Go to her house, grab her ass,

17  and they'll fucking get her out."

18      Correct?

19  **A**   That is identifying information; that's correct.  But I

20  would not -- but --

21  **Q**   I'm not asking further.

22  **A**   Say again?

23  **Q**   That's identifying information that could be used to

24  arrest her.

25  **A**   Yes, it could.

**RIZZO - CROSS / RAJU**

1  **Q**    Okay.  When a person is on the run, it is important to

2  have identifying information as to where they might be.

3  Correct?

4  **A**    That's correct.

5  **Q**    You assured Mr. Gessen that this deportation process

6  shortly after was guaranteed, due to government policy.  Right?

7  **A**    I'm sorry; I didn't understand the question.

8  **Q**    You agreed that deportation was assured, due to federal

9  government policy.  Correct?

10  **A**    That's correct.

11  **Q**    Okay.  In fact, you said, quote --

12       **MR. RAJU:**  Actually, can we kindly play Government

13  Exhibit 5, at 37:16?

14       (Document displayed)

15       (Portion of audio recording played in open court)

16  **BY MR. RAJU:**

17  **Q**    And you told Mr. Gessen the cost would be $100,000.  Fair

18  to say?

19  **A**    Yes, sir.

20  **Q**    $25,000 would be the down payment to get the letter sent?

21  **A**    Yes, sir.

22  **Q**    He agreed to that, right?

23  **A**    I believe so, yes, sir.

24  **Q**    And would it be fair to say for the next hour and a half

25  you discuss various other options with Mr. Gessen?  Or various

1   other businesses with Mr. Gessen?

2   **A**    Yes, sir.  In general terms, yes, we did talk about

3   business ventures, correct.

4   **Q**    You discussed him setting up a factory in Estonia, is that

5   correct?

6   **A**    Generally speaking, sir.

7   **Q**    You discussed a business he had for helping farmers in

8   Africa, correct?

9   **A**    Generally speaking, sir.

10  **Q**    You conveyed that you were likely to take -- to make a

11  large investment, using your cartel money, in those businesses.

12  Correct?

13  **A**    Yes, sir.

14  **Q**    And towards the end of that meeting Mr. Gessen asked:  Is

15  there a cheaper option?  Correct?

16  Is there a cheaper way, excuse me.

17  **A**    I believe you are referring, is there a cheaper way to get

18  rid of her, sir.  That was the -- right?

19  **Q**    Well, I'm asking you, did he use the words "Is there a

20  cheaper way?"

21  **A**    Can you point it out in the transcript, sir?

22  **Q**    I'm going to rely upon people's recollection.

23  **A**    Well, as I recall it, sir, he said "Is there a cheaper way

24  to get rid of her?"  So let's be clear and complete his

25  sentence.  "Because that would be good, too."  That's what he

 1   said.

 2   **Q**    Again, if you need a break --

 3   **A**    No.  I just want to make it clear.  He said "Is there a

 4   cheaper way to get rid of her?  That would be good, too."

 5           **MR. RAJU:**  Can we kindly --

 6           **THE WITNESS:**  Do you stipulate to that, sir?

 7   **BY MR. RAJU**

 8   **Q**    It's not for you --

 9   **A**    Okay.  I just want to make it clear.  You need to complete

10   that sentence, because it's very important.

11           **MR. RAJU:**  Your Honor, can you kindly instruct the

12   witness not to tell me what needs to be done?

13           **THE COURT:**  Okay, yeah.

14       He's asking the questions, you answer.  Again, government

15   counsel will have the opportunity to ask you questions on

16   redirect.

17   **BY MR. RAJU**

18   **Q**    You'll have the opportunity with your counsel.

19           **MR. RAJU:**  Could we kindly play Government's Exhibit 5

20   at 1:56:30?

21       (Document displayed)

22       (Portion of audio recording played in open court)

23           **MR. RAJU:**  All right.

24   **BY MR. RAJU**

25   **Q**    You said:  There's a cheaper way to get rid of her.

1    Correct?

2    **A**    "So, I mean, incidentally if there was a cheaper way to

3    get rid of her, that would be good too."

4    **Q**    And you read into that the cheaper way to be to murder

5    her.  Correct?

6    **A**    Yes, sir.

7    **Q**    That was despite the fact that you had told Mr. Kiselev

8    that murder was a whole 'nother price level, correct?

9    **A**    You're correct.  I said "a whole 'nother price level,"

10   sir.  I never said "more expensive."  So let's make that clear.

11   **Q**    Could you just answer the question without elaborating and

12   editorializing --

13   **A**    I need to, sir.  I want to make it very clear to the jury,

14   I want to make it very clear to the defense and to the

15   government.

16   **Q**    Your job is to testify here today.

17   **A**    Very good.

18   **Q**    Not to offer your editorial.

19   **A**    I'm answering your questions, sir.

20   **Q**    We could debate that.

21        On your meeting on June 2nd, the word "murder" never came

22   out of Mr. Gessen's mouth, correct?

23   **A**    That's correct.

24   **Q**    The word "kill" never came out of his mouth, correct?

25   **A**    Yes, sir.

RIZZO - CROSS / RAJU

1    **Q**    That was in your head, correct?

2    **A**    No, sir.  That's what we generally spoke about and --

3    **Q**    Did he ever say the word "murder"?

4    **A**    Say again?

5    **Q**    Did he ever say the word "murder"?

6    **A**    He did not.

7    **Q**    Well, why didn't you clarify it, then?

8    **A**    I don't understand your question.

9    **Q**    Why didn't you say "We're going to kill your wife," then?

10   **A**    Because we were speaking in code.

11   **Q**    Why were you speaking in code?

12   **A**    Because that's what we do.  As organized crime figures,

13   you never openly talk.  You always feel like you're being

14   recorded.  You always feel like you're being watched.  So you

15   use vernacular and terms that are familiar to individuals that

16   don't necessarily spell out "kill" or "murder."

17   **Q**    Moving on to the June 22nd meeting.  That was a meeting at

18   a restaurant in New York?

19   **A**    Yes, sir.

20   **Q**    You chose that restaurant?

21   **A**    I don't know how that restaurant was chosen, sir.  I don't

22   recall.

23   **Q**    Okay.  And again, you used very vague language.  Language

24   that you called "code."  Correct?

25   **A**    Yes, sir.

**RIZZO - CROSS / RAJU**

1   Q    For example, you said "Just so you know, my side is well

2   down the path," correct?

3   A    If you can show me in the transcript, sir, I would -- I

4   would agree to that, but I don't recall.

5           MR. RAJU:   Kindly play Government Exhibit 7 at 43:47.

6   Transcript is at Government's Exhibit 8 at 4.

7       (Document displayed)

8       (Portion of audio recording played in open court)

9   BY MR. RAJU

10  Q    You didn't say what path your side is well down, did you?

11  A    Not in that statement, sir, no.

12  Q    I'm sorry?

13  A    I don't know where you're going to with that, but we said

14  "well down the path."  So can you be a little bit more clear in

15  your question?

16  Q    My question was very clear.  You didn't say what path your

17  side was well down.

18  A    We were talking at that point about the murder for hire,

19  sir.  We were in the murder-for-hire discussions at that point.

20  Q    I'm going to cut you off, because that's not the question

21  I asked.

22  A    Okay.

23  Q    Did you say --

24  A    That was the path we were talking about, sir.  We were

25  talking about murder for hire.

1    **MR. RAJU:**  Your Honor, can I kindly ask --

2    **THE COURT:**  Well, no, I think he's answering your

3   question.

4    **THE WITNESS:**  I am answering, sir.

5   **BY MR. RAJU**

6   **Q**   I appreciate your confidence in self.

7       You didn't say what path your side was down.

8   **A**   Sir, in the context of the conversation, we were talking

9   about murder for hire at that point.  So the path is talking

10  about murder for hire.

11  **Q**   You were talking about murder for hire.  You don't know

12  what was in his head, correct?

13  **A**   Mr. Gessen and I were already talking about murder for

14  hire at that point.

15  **Q**   You don't know what was in his head, do you?

16  **A**   I know what we were speaking about, sir.  I cannot pretend

17  to -- you know, express what any -- anybody's head, but --

18  **Q**   You know what you were speaking about.

19  **A**   What we were speaking about, sir.  We had a meeting.

20  There was -- there was dialogue between myself and Mr. Gessen.

21  It wasn't just a one-way conversation.

22  **Q**   You had a very specific idea of what he was speaking about

23  in your mind.  Correct?

24  **A**   I had a very specific idea what he was speaking, based on

25  the context of our conversation on June 2nd and the meeting on

**RIZZO - CROSS / RAJU**

1    June 22nd, sir.

2    **Q**   You never said "My path is well down" -- "My side is well

3    down the path of arranging her murder," correct?

4    **A**   That's correct.

5    **Q**   You didn't use specific words like "murder," did you?

6    **A**   We established that fact, sir, yes.

7    **Q**   Again, I'm asking the question.  Please answer it.

8        You didn't use the word "kill" in that conversation?

9    **A**   That's correct, sir.

10   **Q**   You didn't use the word "homicide" in that conversation?

11   **A**   That's correct.

12   **Q**   You didn't use the word "slaying" in that conversation?

13   **A**   No, sir.

14   **Q**   And Allen Gessen didn't use any of those words in that

15   conversation.

16   **A**   That's correct, sir.

17   **Q**   You were very specific about other matters, though, right?

18   **A**   Can you elaborate?

19   **Q**   Sure.  When you were discussing making an arrangement in

20   Mr. Gessen's Estonian factory, you said you had a commitment

21   from your cartel to make an $8 million investment.  Right?

22   **A**   Generally speaking.

23   **Q**   Did you say that you are considering making an $8 million

24   investment?

25   **A**   I -- generally speaking, yes.

**RIZZO - CROSS / RAJU**

1  Q     You were specific in saying that you'd try to get the

2  cartel investment up to nine and a half million.  Correct?

3  A     You would have to show me that in the transcript.  I know

4  that eight million and nine and a half million were talked

5  about.  But I believe that Mr. Gessen brought out nine and a

6  half million.

7        But we can go to the transcript, if you like.

8  Q     That's okay.  You were very specific in clarifying with

9  Mr. Gessen how the investment should be paid.  Right?

10 A     I'm not sure what you're asking, sir.

11 Q     The means of payment for your investment.  How it would be

12 paid.  You were specific about that.  Right?

13 A     In what sense, sir?

14 Q     How it would be paid.

15 A     I'm not sure, sir.  You need to be clearer on that.  I --

16 is it that we would be giving money to Mr. Gessen?  The

17 Columbian cartel?

18 Q     Paying by check?  By cash?  You were specific in saying --

19 A     I don't recall if it was wire or cash, sir.

20 Q     Okay.  But you specified a certain means.  Would you agree

21 with that?

22 A     Yes, sir.

23 Q     You were even specific about which kind of soda you

24 preferred, right?

25 A     Yes, sir.

**RIZZO - CROSS / RAJU**

1   Q    Said you preferred Coke over -- Pepsi over Coke.   Right?

2   A    Not Coke, sir.

3   Q    But you didn't want to be specific about using the words

4   "murder" or "kill," or have Mr. Gessen say that.   Correct?

5   A    That's correct.

6   Q    At some point, you said you want to isolate Allen as much

7   as possible.   Is that fair to say?

8   A    Generally speaking, yes, sir.

9   Q    You never specified what you were isolating him from.

10  Correct?

11  A    I don't know that to be true, sir.

12  Q    Excuse me; I'm going to withdraw that question.

13  A    Uh-huh.

14  Q    Did you specify what you were isolating him from?

15  A    Isolating him from being associated with being in the area

16  of maybe the murder scene, or being associated with -- with his

17  ex-wife.

18  Q    That's in your head.   Did you say that, specifically out

19  loud?

20  A    I don't recall.

21  Q    Fair to say you didn't say that?

22  A    I don't recall.

23       **MR. RAJU:**   Can we kindly play Government Exhibit 8?

24  Excuse me.   We'll move on.

25

1    BY MR. RAJU

2    Q    Regarding the dates in July that Mr. Gessen has suggested

3    to you, you said, quote (As read):

4              "Let's just say this.  Let's say the week of

5              July, okay?  Let's say the week of July.

6              This way we have a little bit more time to

7              get everything together."

8    That was played yesterday.  Do you recall?

9    A    Generally speaking, sir.

10   Q    You didn't elaborate what "getting everything together"

11   meant, did you?

12   A    No, but we were talking about the murder for hire for his

13   wife.

14   Q    You were speaking about that.

15   A    We were, sir.  Again, it was a -- it was a dialogue, sir.

16   It wasn't just me speaking.

17   Q    Right, I understand that.

18   A    Okay.

19   Q    But you are getting into his head again, which is

20   something we addressed yesterday.  Right?

21   A    I -- I don't -- I don't understand where you are going

22   with that, sir.

23   Q    He never used the word "murder" and "kill"; we've

24   established that?

25   A    We established that, yes.

1   **Q**   So you have a very particular version of what you were

2   speaking about, right?  And you cannot speak to what he was --

3   what was in his mind.  Correct?

4   **A**   Well, again, we had a conversation.  So if he would say

5   something, I would say something in return, and he would say

6   something, right, that's how a conversation works.

7        So if you are asking me, my -- my conversation is

8   reflective of what he is saying back to me or what I am saying

9   -- you know, I am saying back to him.

10  **Q**   Knowing that you were generating evidence for a criminal

11  case, you did not get specific language down from Mr. Gessen,

12  did you?

13  **A**   Can you elaborate, sir?

14  **Q**   No.

15  **A**   You can't elaborate.

16  **Q**   Knowing that this evidence was going to be used in Federal

17  Court, you did not have Mr. Gessen or you use the word "murder"

18  or "kill."

19  **A**   Sir, we were speaking in code.  And if you recall from the

20  June 2nd meeting, Mr. Gessen had a high level of operational

21  security.  He was --

22        **MR. RAJU:**  I'm going to object.  This is

23  non-responsive.

24        **THE COURT:**  Overruled.  I think it's fair --

25        **THE WITNESS:**  Mr. Gessen had a high level of

1   operational security.  And that was demonstrated in a couple

2   different examples.

3   **BY MR. RAJU**

4   **Q**    No --

5   **A**    The first example was when he felt very uncomfortable that

6   the phones on the table were a recording device --

7   **Q**    You're getting into his head again.

8   **A**    No.

9   **Q**    Yes.

10  **A**    We were speaking about that.  He said:  It could be

11  recording, right?  We laughed about it.  Right?

12  **Q**    Right.

13  **A**    Did we not laugh about it?  Do you recall that, sir?

14  **Q**    Oh, I recall that.

15  **A**    Okay.  So on the June 2nd meeting, he shows his

16  operational security, his operational posture for security to

17  avoid law enforcement scrutiny, because he thinks the phone is

18  going to be recording.

19       Secondly, sir, if I may, --

20  **Q**    (Inaudible)

21  **A**    -- what he said on June 2nd is that none of the

22  conversations that we are having here today can be -- can be

23  documented in Signal.  That demonstrates another level of

24  operational security to avoid law enforcement scrutiny.

25       So I -- I will say that Mr. Gessen has a high level of

1  operational security to avoid law enforcement scrutiny.

2  **Q**    I appreciate your raising your voice.

3       Bribing a public official is a federal offense, correct?

4  **A**    It is.

5  **Q**    And he was asking you to bribe a public official, correct?

6  **A**    Initially.

7  **Q**    That conversation was on Signal, correct?

8  **A**    That conversation was both -- no, I don't recall it on

9  Signal, but the conversation that we had on June 2nd was about

10 bribing a public official.

11 **Q**    And --

12 **A**    Can you -- can you --

13 **Q**    Just continue, please.  That conversation was in person on

14 June 2nd about bribing a public official.  Right?

15 **A**    The initial portion of it.

16 **Q**    And he -- according to you, he was concerned about your

17 taping that.  Right?

18 **A**    He was -- he was concerned that there was a device on the

19 table that was recording.  Correct.

20 **Q**    So it's clear to say he wasn't concerned then about

21 discussing a federal offense, despite the fact that you were

22 recording it.  Correct?

23 **A**    He was more at ease once I put the phones in my pocket.

24 **Q**    He thought you were recording a conversation, and he was

25 discussing a federal offense of bribing a public official.

**RIZZO - CROSS / RAJU**

1  Correct?

2  **A**   He had a heightened sense of awareness that phones could

3  be used as a recording device.

4  **Q**   (Inaudible)

5  **A**   So we put the phones away, sir.

6      (Reporter clarification)

7  **BY MR. RAJU**

8  **Q**   You mention the fact that during these conversations or at

9  some point he was using Signal, right?

10  **A**   Yes, sir.

11  **Q**   You were using Signal?

12  **A**   Yes, sir.

13  **Q**   Signal's a messenger app?

14  **A**   Yes, sir.

15  **Q**   You are aware that as of January, 2022, 40 million users

16  have been using Signal?

17  **A**   I'm not aware of that, sir.

18  **Q**   Okay.  You have used Signal with other people as well?

19  **A**   In -- for work context?  For undercover work context?

20  **Q**   Sure.

21  **A**   Yes, sir.

22  **Q**   How about personal context?

23  **A**   Very rarely.

24  **Q**   But you have.

25  **A**   Very rarely.

**RIZZO - CROSS / RAJU**

| | |
|---|---|
| 1 | **Q**   Thank you. |
| 2 | **A**   You're welcome. |
| 3 | **Q**   In your job, you take on a false persona, right? |
| 4 | **A**   That's correct. |
| 5 | **Q**   You pretend to be someone you're not? |
| 6 | **A**   That's correct. |
| 7 | **Q**   And you wear the same face in those meetings as you are |
| 8 | wearing today.  Correct? |
| 9 | **A**   Same -- |
| 10 | **Q**   Face. |
| 11 | **A**   Can you elaborate, sir? |
| 12 | **Q**   Sure.  You've got the same face in those meetings as you |
| 13 | have today.  Right? |
| 14 | **A**   Yes, sir. |
| 15 | **Q**   When you are lying to people, you have the same face as |
| 16 | you have today.  Correct? |
| 17 | **A**   Sir, are you -- are you insinuating that I'm lying? |
| 18 | **THE COURT:**  No, he'll ask the questions. |
| 19 | **THE WITNESS:**  Okay. |
| 20 | **THE COURT:**  That's okay. |
| 21 | **BY MR. RAJU** |
| 22 | **Q**   It's not compli- -- have you testified in court before? |
| 23 | **A**   I have. |
| 24 | **Q**   Not the first time. |
| 25 | **A**   Not the first time. |

**RIZZO - CROSS / RAJU**

1  Q    When you are lying to people in your operations, do you

2  have the same face as you have on today?

3  A    I am portraying an individual in undercover operations.

4  I'm using a legal tactic that is acknowledged by the Court as

5  legal.  I'm not portraying --

6  Q    You're not a lawyer, sir.

7  A    I am portraying somebody --

8  Q    Please don't make legal statements.

9          **THE COURT:**  No, no, no.  I instruct the jury.  If you

10  have a question, ask a question.  Okay?

11      Why don't we move on to the next question.

12  **BY MR. RAJU**

13  Q    Do you mislead people with your stories?

14  A    What, what are you specifically referring to?  In

15  undercover work?

16  Q    The phrase that you just said, "I put on a persona."  When

17  you put on a persona, you mislead people.

18  A    In undercover work, sir?

19  Q    When you put on a persona you are in undercover work,

20  correct?

21  A    You just need to be clear about that, that's all.  Are you

22  talking about undercover work, sir?

23  Q    When you are undercover, you put on a persona.  Correct?

24  A    Yes, sir.  Thank you.

25  Q    Are these are questions complicated?

**RIZZO - CROSS / RAJU**

1   **A**   No, I just want to make it clear.

2   **Q**   You have to be convincing?

3   **A**   Correct.  I have to be real.  I have to be convincing.  I

4   have to establish rapport.

5   **Q**   Thank you.

6   **A**   Ingratiation.

7   **Q**   You tell made-up tales, right?

8   **A**   Say that again, sir?

9   **Q**   You tell made-up tales.

10  **A**   I'm portraying a character, yes, sir.

11  **Q**   You don't have contacts in Cartagena, as you said to

12  Mr. Gessen, correct?

13  **A**   No, sir.

14  **Q**   You made that up?

15  **A**   Yes, sir.

16  **Q**   So in this job you lie?

17  **A**   I'm portraying an individual, sir.

18  **Q**   You tell lies to people in this job?

19  **A**   I play an individual, or character, or legend.

20       **MS. HOSSEINI:**  Objection; it's been asked and

21  answered.

22       **MR. RAJU:**  May I have one moment, Your Honor?

23       **THE COURT:**  You may.

24       **MR. RAJU:**  Thank you.

25       (Off-the-Record discussion between counsel)

RIZZO - CROSS / RAJU

```
1            MR. RAJU:  A couple more questions, and our
2    conversation will be over.
3    BY MR. RAJU:
4    Q    You said that you speak in code.  Right?  In your
5    operations?
6    A    In this specific operation, correct.
7    Q    Does everything need to be qualified?
8    A    Well, I just want to make it clear, sir.  You are asking a
9    very broad question, so I need to make it clear.
10   Q    You didn't qualify anything when you spoke to the
11   government yesterday.  Their questions were much clearer?
12   A    Yes, sir.  They were, actually.
13   Q    You clearly told Mr. Gessen you were a money launderer,
14   correct?
15   A    That's correct.
16   Q    You told him you worked for a Columbian cartel, correct?
17   A    That's correct.
18   Q    Clearly spoke about bribing a public official, correct?
19   A    Yes, sir.
20   Q    Clearly said your cartel people sold cocaine, correct?
21   A    That's correct.
22   Q    So you have the capacity to speak clearly, right?
23   A    Can you elaborate?
24   Q    No.  You have the capacity to speak clearly, correct?
25   A    We're speaking today.
```

1    **Q**    I -- that's obvious to me.

2    **A**    Okay.

3    **Q**    You have the capacity to speak clearly.  Right?

4    **A**    Yes, sir.

5          **MR. RAJU:**  Thank you.  Nothing further.

6          **THE COURT:**  Any redirect?

7          **MS. HOSSEINI:**  Yes, Your Honor.

8                    **<u>REDIRECT EXAMINATION</u>**

9    **BY MS. HOSSEINI**

10   **Q**    Good morning, Agent Rizzo.

11   **A**    Good morning.

12   **Q**    First can we discuss -- I would like to ask you, the fact

13   that you were answering questions differently yesterday than

14   you are today.  And Mr. Raju said that it was because

15   government counsel was asking you questions yesterday, and the

16   defense is asking you questions today.

17        Yesterday when you were answering questions, were you

18   being asked phrases in general?  Or were you listening to the

19   audio and reading the transcript at the same time?

20   **A**    I was listening to the audio and reading the transcript at

21   the same time.

22   **Q**    Is it -- for you, is it easier to listen to the audio and

23   read the transcript and answer questions, or remember one or

24   two words from the entire conversations that you have had?

25          **MR. RAJU:**  Objection, leading.

 1              THE COURT:  Overruled.

 2              THE WITNESS:  It is easier to listen to the recording,

 3     read -- read the transcripts and ask questions -- answer

 4     questions at the same time.

 5     BY MS. HOSSEINI

 6     Q    Okay.  And Mr. Raju asked you about Defense Exhibit 126.

 7     And you said the clip that he played -- do you remember that,

 8     just a little while ago?  And you said you had not listened to

 9     that in preparation for your trial testimony.  Who was on that

10     recording?

11     A    Mr. Kiselev.

12     Q    And you?

13     A    Yes.

14     Q    Was Mr. Gessen in that meeting?

15     A    He was not.

16     Q    The recordings that you listened to in preparation for

17     your testimony, which ones were those?

18     A    Those were the June 2nd and June 22nd recordings with

19     Mr. Gessen.

20     Q    Okay.  Is Mr. Kiselev part of this case?

21     A    No, sir -- no, ma'am.  Sorry.

22     Q    That's okay.  Whatever happened to Mr. Kiselev?

23     A    Mr. Kiselev --

24     Q    Does he have any cases or charges?

25     A    Yes, he has a pending case.  He was arrested, and he's a

1    defendant in another investigation.

2    **Q**    So why did you not review every piece of recordings with

3    respect to Mr. Kiselev for this case?

4             **MR. RAJU:**  Objection.  Calls for a misleading

5    response, Your Honor.

6             **THE COURT:**  Okay.  I'm going to overrule it, but we'll

7    see.  I don't know.

8             **THE WITNESS:**  May I answer?

9    **BY MS. HOSSEINI**

10   **Q**    Yes, please.

11   **A**    Because the case at hand today is focused on Mr. Gessen.

12   **Q**    Okay.  And you told us that the -- Mr. Kiselev's matter.

13   Tell us approximately, was it a long-term investigation,

14   short-term investigation?

15        And, how many meetings you had with Mr. Kiselev, one or

16   multiple?  How was that?

17   **A**    I had multiple meetings with Mr. Kiselev and it was a --

18   considered a longer investigation.

19   **Q**    Mr. Raju said that you were unclear when you were speaking

20   with Mr. Gessen on June 2nd and on June 22nd, and that some of

21   the words that were used were unclear.  Do you remember that?

22   **A**    I recall.

23   **Q**    Okay.  And that you never said "murder," "kill" or

24   "homicide."

25   **A**    Yes, ma'am.

1    Q    Why did you not say "murder," "kill," "homicide" to

2    Mr. Gessen on June 2nd and June 22nd?

3    A    Okay.  As I had mentioned earlier, Mr. Gessen had a high

4    level of operational security.  Using words -- and plus he's a

5    lawyer.  Using words like "murder," "kill" are indicative of

6    cop-speak, or they're indicative of being scrutinized by law

7    enforcement.  So, as an individual who is a member of organized

8    crime, I recognize that and I speak in code.

9    Q    Okay.  And when was it, towards -- I don't mean like the

10   minute and the second, but on your June 2nd meeting, the first

11   meeting you had with Mr. Gessen, when was it that he was

12   uncomfortable about your phones being on the table?  At the

13   beginning or at the end?

14   A    It was towards the beginning of the meeting.

15   Q    Okay.  And then once you realized he's uncomfortable about

16   your phones, what did you do with those phones?

17   A    I put them in my pocket.

18   Q    Okay.  At any time did you take those phones back out of

19   your pocket?

20   A    I did.

21   Q    Why?

22   A    They were burning up my leg.

23   Q    They were hot, the temperature was hot?

24   A    They were hot, yeah.

25   Q    And did that happen later in time?

1    **A**    Yes, ma'am.

2    **Q**    And then when was it that you and Mr. Gessen started

3    laughing about ha, ha, ha, that's a recording?

4    **A**    It was when I took the phones out of my pocket, ma'am.

5    **Q**    What did that indicate to you as to how you should speak

6    with Mr. Gessen in deciding to use words like "murder," "kill,"

7    "homicide"?

8    **A**    Again, recognizing Mr. Gessen had a high level of

9    operational security to avoid law enforcement scrutiny, I made

10   the determination then that I would use code words.

11   **Q**    Okay.  And did it appear to you that Mr. Gessen was a

12   fumbling idiot (Indicating), or intelligent and sophisticated

13   in how he was communicating with you?

14   **A**    Mr. Gessen is a very intelligent man.

15   **Q**    Okay.  And did that inform your decision in how you chose

16   to communicate with him?

17   **A**    Yes, ma'am.

18   **Q**    There were two of you talking, conversing with each other?

19   **A**    Correct.

20   **Q**    At any time, did you believe that he was not understanding

21   what you were saying?

22   **A**    I believe that he was understanding me perfectly clear.

23           **MR. RAJU:**  Objection.

24           **THE COURT:**  Overruled.

25

**RIZZO - REDIRECT / HOSSEINI**

1  BY MS. HOSSEINI

2  **Q**   Okay.  Now, let's look at some of the words that you did

3  use while you were speaking to Mr. Gessen.

4         **MS. HOSSEINI:**  Can we please pull up Exhibit 6,

5  Page 68, Line 1.

6      (Document displayed)

7         **MS. HOSSEINI:**  Exhibit 6, Page 68, Line 1.

8      I'm sorry, my screen is not on.

9         **THE COURTROOM DEPUTY:**  Because it's not published yet.

10        **MS. HOSSEINI:**  Oh, I'm sorry; this is already in

11 evidence.

12        **THE COURT:**  Well, 6 is not in evidence.

13        **THE COURTROOM DEPUTY:**  It's not.

14        **THE COURT:**  6 is the transcript.

15        **MS. HOSSEINI:**  Oh.

16        **THE COURT:**  What is in evidence is the audio.

17        **MS. HOSSEINI:**  Okay.

18        **THE COURT:**  So if you want to play the audio, and then

19 we can use the transcript as an aid.

20        **MS. HOSSEINI:**  I believe that we have listened to

21 this, Your Honor.

22        **THE COURT:**  Before?

23        **MS. HOSSEINI:**  We have listened to this before.

24        **THE COURT:**  Okay.  Is there any objection to showing

25 the transcript?

1          MR. RAJU:  Yes.

2          THE COURT:  Okay.  All right.  I think you need to

3    play the audio, because that's what's evidence.

4          MS. HOSSEINI:  Okay.

5          THE COURT:  6 is an aid.  If we show the transcript

6    without the audio, it's not really being used as an aid.

7          MS. HOSSEINI:  I'm certainly happy to play the audio.

8    Can we go to Exhibit 5, the audio, two hours, two minutes, and

9    about two seconds.  And that would be at the bottom of Page 67,

10   Mr. Machado.

11       (Document displayed)

12       (Portion of audio recording played in open court)

13         MS. HOSSEINI:  We'll pause there.

14   BY MS. HOSSEINI

15   Q    Did you hear "Sometimes they dig their own fucking grave"?

16   A    Yes, ma'am.

17   Q    When does someone go into a grave?

18         MR. RAJU:  Objection.

19         THE WITNESS:  When they're dead, ma'am.

20         THE COURT:  Overruled.

21   BY MS. HOSSEINI

22   Q    Let's look at some of the other words you used.  This

23   would be Page 72, sixth line from the bottom.

24       And the audio will be at two hours, 11 minutes and 17

25   seconds.  Actually, we can go to 20 seconds.

1          (Portion of audio recording played in open court)

2              **MS. HOSSEINI:**  Pause there.

3  **BY MS. HOSSEINI**

4  Q      Did you hear "She'll be taken out without them present"?

5  A      Yes, ma'am.

6  Q      Why did you say "taken out"?

7  A      She would be killed without the children present.

8  Q      Mr. Raju also asked you that there was a deportation

9  scheme at first.

10  A      Yes, ma'am.

11  Q      Okay.  Would a deportation scheme be random?

12  A      No, ma'am.

13  Q      How come not?

14  A      Because it's based on investigation, deportation strategy

15  would include investigative steps.  It would not be random.  It

16  would be deliberate.  It would be purposeful.

17  Q      Do you deport random people?  Or do you have to deport a

18  specific person?

19  A      You have to deport a specific person.

20  Q      Okay.  Would you need to know someone's boyfriend in order

21  to deport that person?

22  A      No, ma'am.

23  Q      How about their landlord?

24  A      No, ma'am.

25  Q      How about if their boyfriend's house is on a through

**RIZZO - REDIRECT / HOSSEINI**

1    street?

2    **A**    No, ma'am.

3         **MR. RAJU:**  Objection; this is leading.

4         **THE COURT:**  Overruled.

5         **THE WITNESS:**  No, ma'am.

6    **BY MS. HOSSEINI**

7    **Q**    How about their lifestyle?

8    **A**    No, ma'am.

9         **MS. HOSSEINI:**  If we can look at Exhibit 31, which has

10   previously been admitted into evidence.

11        (Document displayed)

12        **MS. HOSSEINI:**  We'll scroll down.

13        (Document displayed)

14        **MS. HOSSEINI:**  "Lifestyle observations."

15        The information that's depicted on the screen about where

16   they are when they're with their children and where they are

17   when they're not with their children, would you need to know

18   that for a deportation?

19   **A**    No, ma'am.

20   **Q**    How about where they hand over their children?

21   **A**    No, ma'am.

22   **Q**    How about that it occurs vehicle-to-vehicle?

23   **A**    No, ma'am.

24   **Q**    How about that they party on the weekends?

25   **A**    No, ma'am.

1   **Q**   How about being up late at night?

2   **A**   No.

3   **Q**   And whether they drink or not?

4   **A**   No, ma'am.

5   **Q**   You don't need any of that for deportation?

6   **A**   No, ma'am.

7   **Q**   Okay.  How about their social media accounts?  Would you

8   need that?

9   **A**   No.

10  **Q**   Where their friends are located?

11  **A**   No, ma'am.

12  **Q**   Their car information?

13  **A**   No, ma'am.

14  **Q**   Would you need any of that to make it look like a murder

15  was random?

16  **A**   Yes, ma'am.

17  **Q**   Would you need someone's ex-husband to be isolated if that

18  person was being deported?

19  **A**   No, ma'am.

20       **MR. RAJU:**  Objection, Your Honor there is a line of

21  questioning here about deportation.  The Agent is not a

22  deportation officer.

23       **THE COURT:**  Overruled.

24  **BY MS. HOSSEINI**

25  **Q**   You can answer.

**RIZZO - REDIRECT / HOSSEINI**

1  **A**    Can you ask again, ma'am?

2  **Q**    Mr. Raju asked you about how you told Mr. Gessen that he

3  would need to isolate during a certain period of time.  Right?

4  **A**    Correct.

5  **Q**    If you were talking about a deportation scheme where

6  Priscilla Chigariro would be deported, why would Mr. Gessen

7  need to be isolated?

8  **A**    He wouldn't, ma'am.

9  **Q**    Why not?

10  **A**    Because it's a legal process and it would have nothing to

11  do with Mr. Gessen.

12  **Q**    Okay.  Mr. Raju asked you about the fact that Mr. Gessen

13  said: Is there a cheaper way?  And you wanted to clarify the

14  full sentence.

15       **MS. HOSSEINI:**  So let's go listen to that audio.  It

16  is at Exhibit 5, one hour, 56 minutes and 26 seconds.  And it

17  will correspond to Exhibit 6 at Page 63.

18       It'll start in the middle of the page starting with "So,

19  uh, I mean, incedently (sic)..."

20       (Document displayed)

21       (Portion of audio recording played in open court)

22       **MS. HOSSEINI:**  You can stop there.

23  **BY MS. HOSSEINI**

24  **Q**    So what was the full sentence that Mr. Gessen said?

25  **A**    Mr. Gessen said (As read):

1                    "So, I mean, incidently, if there was a

2                    cheaper way to get rid of her that would be

3                    good too."

4    **Q**    And since you two are speaking, when he said "get rid of

5    her," what was your understanding of that?

6    **A**    To kill her.

7    **Q**    And before this, what scheme had you discussed?

8    **A**    Deportation.

9    **Q**    And then at the end of this sentence it says "too," T-O-O.

10   What does that mean?

11   **A**    Too, another option.   Also.

12   **Q**    So now you are talking about something different?

13   **A**    That's correct.

14   **Q**    So deportation would deport her from the United States to

15   some other country.

16   **A**    Correct.

17   **Q**    And:   Another way to get rid of her would be good, too,

18   led you to believe that you were talking about what?

19   **A**    Killing her.

20   **Q**    And further down after this conversation, what did

21   Mr. Gessen tell you?

22   **A**    Mr. Gessen told me that he had already done his research

23   on a murder-for-hire contract with an organized crime

24   syndicate.   And he received the price of $220,000.

25           **MR. RAJU:**   Objection, misstates the transcript.

1          THE COURT:  Overruled.

2    BY MS. HOSSEINI

3    Q    Were you finished?

4    A    I was finished, ma'am, thank you.

5    Q    Okay.  And so what did that lead you to believe that the

6    two of you -- two participants in this conversation -- that the

7    two of you were discussing?

8    A    Murder for hire.

9          MS. HOSSEINI:  And then further down, if we can just

10   scroll down, Mr. Machado, to Page 64.

11        (Document displayed)

12   BY MS. HOSSEINI

13   Q    When you are discussing this price, after you discussed

14   the 220, you said:

15             "Can I get back to you on that...but I think

16             it will be less money."

17        MR. RAJU:  Objection.

18        THE COURT:  Sustained.

19   BY MS. HOSSEINI

20   Q    Do you remember saying that after --

21        THE COURT:  No, I sustained it, so --

22        MR. RAJU:  Objection.

23        THE COURT:  You are just reading from the transcript,

24   and so that's leading.

25        MS. HOSSEINI:  I'm sorry; let's continue playing the

**RIZZO - REDIRECT / HOSSEINI**

 1   audio from where we left off.

 2         This will be one hour, 57 minutes and two seconds.

 3         (Portion of audio recording played in open court)

 4         **MS. HOSSEINI:**  We'll pause there.

 5   **BY MS. HOSSEINI**

 6   **Q**   So now that we've heard that audio, you said, after you

 7   talked about the two-twenty dollars, you said "That's a totally

 8   different conversation."  Right?

 9   **A**   Yes, ma'am.

10   **Q**   What is the totally different conversation?

11   **A**   Totally different from deportation, now shifting over to

12   murder for hire.

13   **Q**   And we just heard the audio.  When he asked you the price,

14   you said "Can I get back to you on that...but I think it will

15   be less money."

16   **A**   That's correct.

17   **Q**   And what did Mr. Gessen say?

18   **A**   "And more definite."

19   **Q**   What's more definite than deportation?

20   **A**   Death.

21   **Q**   And then what did Mr. Gessen say after that?

22         **MR. RAJU:**  Objection.

23         **THE COURT:**  What do you remember?  Or --

24   **BY MS. HOSSEINI**

25   **Q**   We just heard the audio.  We can play it again.

```
 1   A    (As read)
 2             "And, and because, because, because with the
 3             issue with immigration so many lawyers
 4             and..."
 5          MR. RAJU:  Objection.  Witness is reading from the
 6   transcript.
 7          THE COURT:  Overruled.
 8          THE WITNESS:  I'll start from the beginning (As read):
 9             "And because, because, because with the issue
10             with immigration so many lawyers and...you
11             get a bad guy and she ends up staying."
12   BY MS. HOSSEINI:
13   Q    What did that lead you to believe, now that he is saying
14   that the problem with immigration is that you might get a bad
15   guy and she ends up staying?
16   A    Mr. Gessen is committed to the murder for hire.
17   Q    Mr. Raju also asked you about the fact that when you
18   initially were introduced to Mr. Gessen by Mr. Kiselev, the
19   conversation between you and Mr. Kiselev was just about
20   deportation.  Remember that?
21   A    Yes, ma'am.
22   Q    Okay.
23          MS. HOSSEINI:  Let's go to that audio, um, which will
24   be Exhibit 6 at 70.  And the audio time will be two hours,
25   five minutes, and 45 seconds.  At the bottom of Page 69 of
```

1   Exhibit 6, Mr. Machado.

2         (Document displayed)

3         (Portion of audio recording played in open court)

4            **MS. HOSSEINI:**  Pause.

5   **BY MS. HOSSEINI**

6   **Q**    You said:

7               "I wish Alex would have been here on time."

8      What did Mr. Gessen say to that?

9   **A**    Mr. Gessen said:

10              "Well, then we wouldn't have had this

11              conversation."

12  **Q**    What did that lead you to believe?

13  **A**    He wouldn't have spoken about the murder for hire in front

14  of Mr. Kiselev.

15  **Q**    And the clip that Mr. Raju played you, Defense

16  Exhibit 126, that was from a meeting on April 26, 2022.

17      Right?

18  **A**    I recall.

19  **Q**    Okay.  At that point, had you met with Mr. Gessen?

20  **A**    No, ma'am.

21  **Q**    When did you meet with Mr. Gessen?

22  **A**    I met with Mr. Gessen on June 2nd, 2022.

23  **Q**    Is it fair to say June 2nd comes later, after April 26th?

24  **A**    Yes, ma'am.

25  **Q**    Okay.  So you said that you spoke about the deportation

1   scheme at first when you first met with Mr. Gessen.  At any

2   point did Mr. Gessen say "We shifted gears"?

3   **A**   Yes, ma'am, he did.

4        **MS. HOSSEINI:**  Okay, let's go to that, Exhibit 6,

5   Page 66.

6        And the audio for this will be one hour, 59 minutes and

7   about 56 seconds.

8        (Document displayed)

9        (Portion of audio recording played in open court)

10        **MS. HOSSEINI:**  You can pause there.  Thank you.

11  **BY MS. HOSSEINI**

12  **Q**   So what was your understanding?  You are shifting from

13  what to what?

14  **A**   Deportation to murder for hire.

15  **Q**   And who said "We just shifted gears"?

16  **A**   Mr. Gessen.

17  **Q**   Okay.

18  **Q**   Mr. Raju asked you about the fact that you spoke to Agent

19  David Peacock and Agent Chris Bognanno yesterday or today

20  before or after court.

21        Did you speak to them about the substance of your

22  testimony, other matters?

23        What did you speak about?

24  **A**   No matters about testimony.  Just general, speaking what

25  time did I need to be here, generalities.  But nothing about my

1    testimony.

2    **Q**    Okay.  And lastly, you were asked about how you were

3    posing as an undercover or you had a persona.  Is that legal?

4         Can an FBI agent lawfully pretend to be someone else when

5    they're doing an undercover operation?

6    **A**    Yes, ma'am.

7              **MS. HOSSEINI:**  Thank you.  Nothing further.

8              **THE COURT:**  Mr. Raju?

9              **MR. RAJU:**  Just briefly, Your Honor.  I hope it's

10   brief.

                          **RECROSS-EXAMINATION**

12   **BY MR. RAJU**

13   **Q**    Agent Rizzo, you just used the phrase again, "organized

14   crime syndicate."  Correct?

15   **A**    Yes, sir.

16   **Q**    Do you recall that?

17   **A**    Yes, sir.

18   **Q**    The only organization outside of America that Mr. Gessen

19   said that he spoke with is the Mossad.  Correct?

20   **A**    I'm not sure how the Mossad came up, but yes, I do recall

21   hearing "Mossad."

22   **Q**    And again, that is not an organized crime syndicate.

23   **A**    Yes, sir, that is true.  However, it is very unlikely that

24   an intelligence agency for the Israelis would go and murder an

25   American citizen, or any citizen, for that matter.

**RIZZO - RECROSS / RAJU**

1   Q    So you don't know if he's spoken to an intelligence agency

2   about having her deported, correct?

3   A    I was assuming we were talking about retired Mossad

4   people.

5   Q    A lot of assumptions in this case, right?

6   A    Not entirely true.

7          MS. HOSSEINI:  Objection, argumentative.

8          MR. RAJU:  Cross-examination.

9          THE COURT:  Well, there is a question.  Repeat your

10  question.

11         MR. RAJU:  I'll leave it alone, Judge.  It's okay.

12  BY MR. RAJU

13  Q    You spoke a lot about code, and how you spoke in code,

14  right?

15  A    Yes, sir.

16  Q    Did you speak in code about the details of the murder,

17  such as the type of weapon?

18  A    No, sir.

19  Q    Did you speak in code about how many killers there would

20  be?

21  A    No, sir.

22  Q    You didn't speak in code about what he would tell the

23  kids?

24  A    No, sir.

25  Q    You didn't speak in code about what he would tell family

**RIZZO - RECROSS / RAJU**

1   and friends?

2   **A**     Didn't come up in conversation, sir.

3   **Q**     You're not a deportation officer, correct?

4   **A**     That's correct.

5   **Q**     You don't know immigration law, correct?

6   **A**     Say again, sir?

7   **Q**     You don't know immigration law, correct?

8   **A**     That's fair to say.

9   **Q**     And you don't know how Immigration officers conduct their

10   raids, correct?

11   **A**     Say again, sir?

12   **Q**     You don't know how Immigration officers conduct their

13   raids, correct?

14   **A**     What do you mean by "raids," sir?

15   **Q**     Well, if Immigration needs to locate someone they look for

16   addresses, correct?

17   **A**     As an investigator, I know fundamentally how people are --

18   are found, located, yes.

19   **Q**     How are people found and located?

20   **A**     Through various means, sir.  Through personally

21   identifiable information, date of birth, Social Security

22   number.  We have databases, record locators for addresses and

23   the like.  So, a variety of different ways.

24   **Q**     Sure.  And personal identifying information for a

25   deportation would include an address, correct?

PROCEEDINGS

1    **A**     It could.

2    **Q**     Otherwise, how would they know where to go to find

3    someone, right?

4    **A**     Sure.

5    **Q**     Might ask if someone is staying at a relative's house,

6    correct?

7    **A**     Say again?

8    **Q**     An immigration officer might try to find out if a person

9    is staying at a relative's house if they were trying to locate

10   them, correct?

11   **A**     That's a possibility.

12   **Q**     A significant other?

13   **A**     A possibility.

14          **MR. RAJU:**  Nothing further.

15          **THE COURT:**  All right.  Thank you.  All right.  That

16   concludes your testimony, Agent Rizzo.

17       Members of the jury we will now -- you don't have any

18   questions, do you?

19          **MS. HOSSEINI:**  No, Your Honor.  I was just going to

20   ask if the witness may be excused.

21          **THE COURT:**  Yes, the witness is excused.

22       (Witness excused)

23          **THE COURT:**  And members of the jury we will now take

24   our 20-minute morning break.  Yes, you're welcome, I just

25   wanted to finish the witness.  That's fine.  Please do not

 1  discuss the case whatsoever with anyone or do any research

 2  whatsoever and we will see you back in 20 minutes.  Thank you.

 3      (Jury excused)

 4      (The following proceedings were held outside of the

 5  presence of the Jury)

 6          **THE COURT:**  Okay, let's please be ready to go at

 7  10:30, in your seats, with the witness here.

 8      Thank you, Agent.

 9          **THE WITNESS:**  Thank you, Your Honor.  I appreciate it.

10      (Recess taken from 10:12 a.m. to 10:30 a.m.)

11      (The following proceedings were held outside the presence

12  of the Jury)

13          **THE COURTROOM DEPUTY:**  Okay.  I just want to state on

14  the record that the courtroom is now open.  And we are no

15  longer streaming to the courtroom next door.

16      (The following proceedings were held in the presence of

17  the Jury)

18          **THE COURT:**  Thank you.  You may be seated.

19      Is the government prepared to call your next witness?

20          **MS. JAMES:**  Yes, Your Honor.  The government calls

21  Priscilla Chigariro.

22          **THE COURTROOM DEPUTY:**  There may be a few minutes

23  delay.  She was using the bathroom when I was gathering you

24  guys, so in order to save time -- we're just going to wait for

25  her.  And it's okay.

```
 1         (A pause in the proceedings)

 2              THE COURT:  Good morning.  If you would please stop

 3    right there.

 4              THE COURTROOM DEPUTY:  Would you please raise your

 5    right hand.

 6         PRISCILLA CHIGARIRO, GOVERNMENT'S WITNESS, SWORN

 7              THE COURTROOM DEPUTY:  Could you please state your

 8    full name, and spell it.

 9              THE WITNESS:  My name is Priscilla Chigariro.

10    P-R-I-S-C-I-L-L-A, last name C-H-I-G-A-R-I-R-O.

11              THE COURT:  Great.  Thank you.  You may be seated.

12              THE COURTROOM DEPUTY:  Thank you.

13              THE COURT:  You may proceed, Ms. James.

14              MS. JAMES:  Can you hear me okay, Ms. Ball?

15              THE REPORTER:  (Nods head)

16              MS. JAMES:  Okay.

17                         DIRECT EXAMINATION

18    BY MS. JAMES

19    Q    Good morning.

20    A    Good morning.

21    Q    Is it all right if I call you "Miss Priscilla"?

22    A    Yes.

23    Q    So Miss Priscilla, what do you do for a living?

24              THE COURTROOM DEPUTY:  Oh.

25
```

CHIGARIRO - DIRECT / JAMES

1   BY MS. JAMES

2   Q    What do you do for a living?

3   A    I work in the fashion industry.

4   Q    And do you know someone by the name of Allen Gessen?

5   A    Yes, I do.

6   Q    How do you know him?

7   A    I viewed him as my husband for several years.

8   Q    And when you say viewed him as your husband, what do you

9   mean?

10  A    We were culturally married.  In my country, prior to

11  having an American-style wedding, you can have a cultural

12  marriage.  And you can choose to have both of them, or just

13  one.

14  Q    And so you had the traditional wedding?

15  A    Yes.

16  Q    And what is your relationship to Mr. Gessen now?

17  A    We're no longer together.

18  Q    Could you tell us a little bit about how you and

19  Mr. Gessen met?

20  A    We met through a mutual friend at a fashion event where I

21  was presenting.  He saw me and then asked our mutual friend to

22  introduce us.

23  Q    And around when was that?

24  A    It was around the end of 2011.

25  Q    And so you mentioned that you worked in fashion, and that

**CHIGARIRO - DIRECT / JAMES**

1  you were at a fashion event.  What did you do in fashion, or --

2  currently, or then?

3  **A**    I created Zimbabwe Fashion Week which, is the main fashion

4  week in my country.  And I was previously a model.  I also

5  organized fashion events for other companies that wanted to do

6  events.  And I also helped with the development of fashion in

7  Zimbabwe.

8  **Q**    And in that capacity, were you Miss Zimbabwe or the Face

9  of Miss Zimbabwe?

10  **A**    I was the Face of Zimbabwe in 2000.

11  **Q**    So the two of you meet.  When did you become romantically

12  involved?

13  **A**    Very shortly after we met, about a week after that, we

14  started seeing each other.

15  **Q**    And you then mentioned that the two of you were married

16  traditionally.  When was that?

17  **A**    It was a year, approximately, after we met, around

18  November of 2012.

19  **Q**    And at this time, November of 2012, are the two of you

20  living together?

21  **A**    He was coming up and down.  He wasn't based in Zimbabwe

22  yet.  We would meet and stay in hotels, either in Zimbabwe or

23  South Africa.  We hadn't started living permanently yet.

24  **Q**    And did there come a time when you did permanently live

25  together?

CHIGARIRO - DIRECT / JAMES

1   **A**    Yes.  The following year, we started living together.

2   There was a client that he brought to Zimbabwe who bought a

3   premises, and we started living in that house.

4   **Q**    And while you were living in Zimbabwe together, did you

5   have any children?

6   **A**    Yes.  The following year, in 2013, we had our first child.

7   Our son, [O.G.]

8   **Q**    And that was in Zimbabwe, correct?

9   **A**    That was in Zimbabwe.

10  **Q**    So at the time your son was born, what was your

11  relationship like between you and Mr. Gessen?

12  **A**    We had started having some issues with our marriage, but

13  we were trying to work things out.

14  **Q**    And were you still living together?

15  **A**    Yes, we were.

16  **Q**    Did you remain living together throughout your time in

17  Zimbabwe?

18  **A**    Not throughout all of it.  In about March of 2014, we

19  separated.

20  **Q**    And in 2014 you separated.  Where were you living?

21  **A**    He had my things removed from our home and sent to my

22  father's house.  So I was living with our son at my father's

23  house.

24  **Q**    And where was Mr. Gessen living?

25  **A**    He was in Harare for some time before he moved and

1   relocated to Russia.

2   **Q**    And where was your son living at this time?

3   **A**    He was with me, all the time.

4   **Q**    So you were the primary parent?

5   **A**    Yes, throughout his toddler years up until he was five, I

6   was his primary parent.

7   **Q**    And did there come a time where you left Zimbabwe?

8   **A**    Yes.  In 2016 we decided that my son and I would move to

9   Russia, because I had been trying to have another child.  I had

10  two miscarriages between 2014 and 2016.  And we moved to Russia

11  so that we could use surrogacy services that were not available

12  in Zimbabwe.

13  **Q**    And when you say "we," are you talking about you and

14  Mr. Gessen?

15  **A**    Yes, it was a mutual agreement.  We had been looking for a

16  place where -- which offered surrogacy.  And Russia was the

17  most convenient place, because he was already based there.

18  **Q**    Now, you previously mentioned that there was a time where

19  you and Mr. Gessen were separated before the surrogacy that you

20  just mentioned.

21  **A**    Yes.

22  **Q**    Did the two of you get back together?

23  **A**    Yes.  We were only separated for about a month in 2014,

24  and then we reconciled.  Though we didn't start living

25  100 percent then, because he was based in Russia.

1          We did get a new home where we -- where my son and I moved

2     into, and he would come and stay with us there when he was in

3     the country.

4     Q    So just to be clear, you were in Zimbabwe, your son was in

5     Zimbabwe.

6     A    Yes.

7     Q    And Mr. Gessen would visit back and forth between Zimbabwe

8     and Russia?

9     A    That's correct.

10    Q    Okay.  So you mentioned eventually moving to Russia in the

11    context of the surrogacy?

12    A    Yes.

13    Q    When did you move to Russia?

14    A    I think it was around September of 2016.

15    Q    And you mentioned surrogacy.  But, did you actually

16    continue with having a child through surrogacy?

17    A    Yes.  It took two years before we had our second child,

18    our daughter.  She was born in November of 2018.  I had IVF

19    twice, and the surrogate was able to give birth in November of

20    2018.

21    Q    So in 2018, now that your second child is born, what is

22    your relationship like between you and Mr. Gessen?

23    A    We had separated, but we were still living in the same

24    apartment.  In around August of that year we had our last major

25    disagreement, and it was at that point I decided not to

1   continue with the marriage.

2   **Q**   That is August of what year?

3   **A**   In 2018.  It was prior to our daughter being born.

4   **Q**   So you're separated, but the two of you are living

5   together, still?

6   **A**   Yes.  We were living in Russia, primarily.  I had moved to

7   Russia in August after the Fashion Week, which happened at the

8   end of August.  I moved to Russia, and limited my travel whilst

9   I waited for our daughter to be born.

10      Prior to the move I communicated with him, and I told him

11  I no longer wanted to continue with the relationship.  But we

12  decided to remain in the same home until our daughter was born,

13  and we would then decide what to do after that.

14  **Q**   And at this time that you're living together but

15  separated, how are you paying for things?

16      How are you, you know, making a living?

17  **A**   From the onset of our relationship, because he made more

18  money than I did, he had been the breadwinner and I had sort of

19  scaled down or sacrificed my ability to make more money so that

20  I could raise our children and take care of our home.  So he

21  continued to pay the bills.

22  **Q**   So he was the primary breadwinner?

23  **A**   He was the primary breadwinner.

24  **Q**   Now let's fast-forward to June of 2019.  Are you still

25  living in Russia at this time?

1  **A**    Yes.  In June of 2019, I was still in Russia, because our

2  daughter didn't have any travel documents.  She also didn't

3  have her birth certificate as yet.

4  **Q**    And what -- like, at this time, what are you doing for

5  work?  Is it still the same scenario that you mentioned before?

6  **A**    At that time, I was running businesses remotely from

7  Russia.  I had a restaurant that was operating in Harare, a

8  boutique, a beauty -- beauty spa, and I still managed and ran

9  the Fashion Week, but I was doing everything remotely.

10 **Q**    Now, due to this work, did you ever have to travel back to

11 Zimbabwe to check on those businesses or do anything with that

12 work?

13 **A**    Yes, I did.  I had to travel back monthly.  But because my

14 daughter had been born, I had scaled down.  And I wasn't

15 traveling as much.  I think I only traveled in February to

16 extend my visa, to get a new Russian visa.  And then I didn't

17 travel again until around June.

18 **Q**    And the two times that you just mentioned now with

19 traveling, were you able to bring your daughter with you?

20 **A**    No.  I wasn't.  I had to leave her behind.  In February,

21 when I traveled, I left her with Allen and our nanny.  I wasn't

22 planning to be gone for a long time, so I traveled to Zimbabwe

23 with our son.  And then I was there for about -- for long

24 enough just to extend my visa.

25      And then he came and stayed longer with my son whilst I

1  returned to Russia to be with our daughter.

2  **Q**    And by "he," you mean Mr. Gessen came to Zimbabwe?

3  **A**    Yes.

4  **Q**    Now, in June, 2019, when you said you were traveling to

5  Zimbabwe, on that time did you travel with your children?

6  **A**    No.  I was only supposed to be gone for about three days.

7  I left on a Thursday, and I intended to fly back on a Sunday.

8       There had been a bit of a disaster at my restaurant.  The

9  general manager had very suddenly resigned.  And the CFO at the

10 time asked me if I could come back, urgently, to help.

11 **Q**    So I just want to be clear.  This is June of 2019.

12 Correct?

13 **A**    Yes.

14 **Q**    How old are your children during this time?

15 **A**    My daughter was seven months old.  And our son was five.

16 **Q**    Now, you said you intended to be in Zimbabwe for two to

17 three days.  Were you in Zimbabwe that long?

18 **A**    My intent was to return on the Sunday.  But when I got to

19 the airport, the airline told me that there was no ticket for

20 me on that day.

21      I contacted Allen, and he told me that he had thought I

22 had said I wanted to fly on the Monday.  So it was already too

23 late for -- to make any changes, so I had to wait until the

24 following day.

25 **Q**    So in your travel back and forth between Russia and

1   Zimbabwe, Mr. Allen -- excuse me -- Mr. Gessen was the one

2   making the travel arrangements?

3   **A**     Yes.  Because he was primarily in charge of all of the

4   financial arrangements in our family, he's the one who booked

5   tickets as well.

6   **Q**     So were you able to eventually get back to Russia?  Just

7   with that timeframe that you mentioned, the two to three days,

8   were you able to get back to Russia?

9   **A**     I was only able to get on the plane on the Monday.  And I

10  arrived in Russia on Tuesday morning.

11  **Q**     And when you got to Russia, what, if anything, happened?

12  **A**     When I got off the plane, I turned on my phone and I got a

13  series of WhatsApp messages from Allen, informing me that he

14  had left, that he had taken our son, and that he was coming to

15  the United States.  He was going to take our son to see medical

16  doctors.

17       (A cup of water is placed before the Witness)

18            **THE WITNESS:**  Thank you.

19       And he had -- he didn't indicate when he would return or

20  anything else.

21  **BY MS. JAMES**

22  **Q**     Now, had Mr. Gessen traveled to the United States with

23  your son before?

24  **A**     Yes, he had.  In 2018.

25  **Q**     And was that any different than what you're talking about

**CHIGARIRO - DIRECT / JAMES**

1   right now?

2   **A**    It was very different.  For most of the travel, if not

3   all, he always had a permission letter from me to be able to

4   travel, and we made all of the arrangements prior to travel.

5   And I always knew where they would be, because I would either

6   meet them there, or they would go and come back.  So he had a

7   letter.  I signed a letter giving him permission to travel with

8   our son in 2018.

9        I didn't, this time.  I didn't know about it.

10  **Q**    So you land in Russia, and that's when you find out that

11  Mr. Gessen and your son had traveled to the United States.

12  What do you do next?

13  **A**    I immediately started making phone calls.  Because the

14  airport is about an hour from the center of Moscow where we

15  were living, I ordered a car and first I contacted Allen,

16  asking him how he could do that, what was going on.  Initially

17  he just ignored me, and then I started calling his phone.

18       And then eventually he started responding to my messages,

19  saying that he would be -- he wasn't saying anything very

20  clear.  He was just saying he did not take him away because I

21  was asking him how he could do that, why he was taking our son

22  away from me.  And he kept saying:  Oh, he's going to see

23  medical doctors, et cetera.  So he wasn't very clear.

24       But I knew, I knew what was happening.  So I immediately

25  started calling the United States Embassy in Russia.  And I

```
 1   called the State Department.  I also called some friends to ask

 2   what, if anything, I could do.  And I called my sister in

 3   Zimbabwe, as well.

 4   Q    Now, before we elaborate there, did Mr. Gessen have your

 5   daughter as well?

 6   A    No.  He left her.  He left her in Russia with the nanny.

 7   His family had a country home about an hour outside Moscow.  He

 8   left them there.

 9   Q    Now, could your younger child travel, even if Mr. Gessen

10   wanted to, with him?

11   A    No.  She only at the time had a birth record.  When the

12   surrogate gave birth, the hospital issued a birth record just

13   to record her birth, et cetera.  That's the only document that

14   she had.

15   Q    Now, you mention that you -- you did a series of things

16   when you realized that your son was -- was not in Russia.  Did

17   you have any reason to believe that he wasn't going to be in

18   Russia later?  Or that he wasn't coming back?

19   A    Because I knew Allen, and this was way out of the scope of

20   anything that had ever happened, I -- I -- I knew what was

21   happening.  I knew that he had no intention of bringing him

22   back.  I knew it wasn't a shorter trip.  This was nothing like

23   anything that had ever happened before.

24        MS. MITCHELL:  Objection.  Calls for speculation.

25   Move to strike.
```

1              **THE COURT:**  Overruled.

2    **BY MS. JAMES**

3    **Q**    And to your knowledge, did your son have any medical

4    issues that needed to be handled in the United States?

5    **A**    He didn't.  I was the primary caregiver for both of our

6    children.  I handled all of their doctors' visits.  I'm the one

7    who primarily looked for the doctors.  I'm the one who

8    interacted with the doctors.  If there had been any issues that

9    were concerning, I would have known, and I would have been the

10   one to make the arrangements.

11        (Reporter clarification)

12   **BY MS. JAMES**

13   **Q**    Now, you mentioned that your son didn't have, to your

14   knowledge, any medical issue that would have required him to go

15   to the United States without your knowledge.

16   **A**    Yes.

17   **Q**    That's where we were.

18        So at this point, had you talked to Mr. Gessen, and had

19   any indication of when he would be coming back?

20   **A**    I asked him.  And he was vague.  He didn't say whether or

21   not he was returning.  He, in essence, refused to answer my

22   question.  He just kept reiterating that he was not taking my

23   son away.  That if I wanted to see him, I could just go to the

24   United States and see him there.

25   **Q**    Now, did you go to the United States at that time when he

1    said you just could go?

2    **A**    I couldn't.  It was impossible.  I hold a Zimbabwean

3    passport.  For me to be able to travel to the United States I

4    would have to go to Zimbabwe and apply for a visa -- it's a

5    lengthy process -- before I would be allowed to come to the

6    United States.  But in addition, our daughter was in Russia.  I

7    couldn't just leave her.

8    **Q**    Now, outside of your daughter, do you have other family in

9    Russia at this time?

10    **A**    No.  It was just my daughter and the nanny and myself.

11    **Q**    Do you speak Russian?

12    **A**    No.

13    **Q**    So you were handling -- you mentioned going to the

14    embassy.  You mentioned making phone calls.  You were doing

15    this by yourself?

16    **A**    Yes.

17    **Q**    Now, why -- did you go to law enforcement while you were

18    in Russia?

19        Did you try to file a report or something along those

20    lines?

21    **A**    Yes.  Whilst I was in the car on my way into Moscow, I

22    also made arrangements for the nanny to come and meet me at the

23    apartment.

24        When I arrived at the apartment where we were living, I --

25    I also found out that he had emptied our apartment.  All the

CHIGARIRO - DIRECT / JAMES

1   furniture was gone, and the only thing remaining was my bed and

2   a suitcase of clothing.  So I called law enforcement then, and

3   they came to the apartment.

4   **Q**   And what happened with law enforcement when you informed

5   them what was happening?

6   **A**   They -- they came; they made a report of the things that

7   had been removed from the apartment.  And then we went to the

8   police station.

9          **MS. JAMES:**  Your Honor, may I just approach?

10  Thank you.

11     (A box of tissues is placed before the Witness)

12          **THE WITNESS:**  Thank you.

13  **BY MS. JAMES**

14  **Q**   Are you okay to continue?

15  **A**   Yeah.

16  **Q**   Now, you previously mentioned that Mr. Gessen handled your

17  flight back in June of 2019.

18  **A**   Yes.

19  **Q**   Who in -- and then you also mentioned that you handled

20  primary care of your children.  Who handled your living

21  arrangements?

22  **A**   Um, he also handled our living arrangements.  He told me

23  when I arrived and I asked him about what he had done with our

24  possessions, he told me that I had until the end of the month

25  to live in that apartment.  This was around July -- sorry,

**CHIGARIRO - DIRECT / JAMES**

1   June 23rd.  I had until the end of June, and I had to find

2   somewhere else to live.

3       Because he had already blocked my access to our accounts,

4   I wasn't able to make any arrangements of my own.  He told me

5   to find an Airbnb, and I -- I should move there.

6       So after -- after I went to the police station with the

7   police in Moscow, they called my embassy, the Zimbabwean

8   Embassy in Russia.  And they sent a representative and a

9   translator to help me with the report.

10      At the end of the report, they informed me that according

11  to Russian law, any parent could take their child wherever they

12  wanted, and they didn't view it as a crime.  So I would have to

13  find a solution from my own country.

14      So I --

15  **Q**   (Inaudible)

16  **A**   I -- my embassy assisted me in making a report in Zimbabwe

17  with Foreign Affairs, and gave me a power of attorney to give

18  my sister so that she would go and make the reports for me.

19  **Q**   And what kind of reports were those?

20  **A**   I filed a Hague petition.  I started the process of filing

21  a Hague petition.  But that required a report from Interpol, as

22  well as Foreign Affairs, to be sent from Zimbabwe to the State

23  Department in the United States.

24  **Q**   Now, I understand you are not an attorney.  But from --

25  petitioning the Hague, yourself, what does that mean?  Like,

1   why did that process have to happen?

2   **A**   A Hague petition is created specifically for parental

3   child abduction.  If your -- if another parent abducts a child

4   and takes them to a country which has a treaty agreement with

5   your country, you can have your child returned.  You can

6   request to have your child returned.

7   **Q**   Now, again, why are you in, oh, so many words, elevating

8   it to this level at this point?

9   **A**   It was the only option that I had, because I couldn't get

10  any assistance in Russia.  So it was the only thing that I

11  could do.

12  **Q**   And could you remind us, how old are your two children at

13  this time?

14  **A**   My daughter was seven-eight months, and our son was five.

15  He was just about to turn six in July.

16  **Q**   And were you worried about your son's safety?

17  **A**   I was worried about his mental well-being.  He had never

18  been apart from me for more than just a couple of days.  I knew

19  that he was worried; I knew that he was wondering where I was.

20  And on the one occasion that I was able to speak to him, he

21  kept asking me when I was coming.  I knew that he would be

22  worried.  He was only six.

23  **Q**   Now, you mentioned the one occasion that you were able to

24  speak with him.  So you were able to speak with your son while

25  he was in the United States and you were in Russia?

1  **A**    Yes.

2  **Q**    How did that conversation -- not the substance, but how

3  did you achieve that conversation?

4  **A**    I begged Allen to let me speak to him.  He resisted for a

5  long time, but eventually I'm sure our son also pressured him

6  to allow him to speak to me.

7  **Q**    So did there ever come a time where, while you were still

8  in Russia trying to get your son back, that you saw your son?

9  **A**    No.

10  **Q**    Did there ever come another time where you saw Mr. Gessen?

11  **A**    Yes.  He came to Russia on two occasions.  I asked him why

12  he didn't bring our son, if he was not trying to keep him away

13  from me.

14      And he told me that he was at school; it was more

15  important for him to continue with his new life in the United

16  States.

17  **Q**    And when are the approximate times that Mr. Gessen visited

18  Russia without your son?

19  **A**    He came once, I think it was in August of 2019, and then

20  he came again in October of 2019.

21  **Q**    Now, you mentioned not having any family in Russia, and

22  that Mr. Gessen handled the finances.  Where are you living in

23  Russia at this time then?

24  **A**    I had -- he had sent -- he had actually sent money to pay

25  for an Airbnb for one month, which was July.  When August came

1  around, I asked him for more money because I obviously had to

2  pay, and he said no.  He said that it had been my choice to

3  live in the Airbnb; I could have stayed in his family's country

4  home, if I wanted to, and that was free.

5       But I couldn't, because our daughter could only -- in

6  Russia if you have no medical documents or if you have no ID

7  documents, you -- you can't get any medical services.  And our

8  daughter didn't.  So the only place where I could take her was

9  the hospital which assisted with the surrogacy.  So I never

10 wanted to be more than a half-an-hour walk, at least, away from

11 there.

12 **Q**   So you mentioned your daughter not having birth records.

13 Is that because they didn't exist?  Or you didn't have them?

14 **A**   When Allen took our son, he also took our daughter's birth

15 records, which made it impossible for me to be able to get

16 anything for her.  So I was essentially stuck with nothing.

17 **Q**   And how do you know that Mr. Gessen took the birth

18 records, versus, you know, maybe they were lost?

19 **A**   I asked him for them.  I asked him where he had left them.

20 And he said that he would give them to me when the time was

21 right.

22 **Q**   And did there ever come a time when you were able to get

23 these birth records back?

24 **A**   Yes.  In November of that year, about two months after I

25 already had the ruling which had allowed me to get her birth

**CHIGARIRO - DIRECT / JAMES**

1   certificate, he had a lawyer who represented him send me an

2   email informing me that she had been told that she could

3   release my daughter's birth record.

4   **Q**   So by the end of 2019, where are you living?

5   **A**   I was still in Russia.  I was now living with an employee

6   from the Zimbabwean Embassy.

7   **Q**   You said, an employee of the Zimbabwe Embassy?

8   **A**   Yes.  At some point I ran out of money, and I -- I had no

9   food; I had nowhere to stay.  So I went to my embassy.

10  **Q**   Now, you're trying to figure out -- you're in Russia at

11  this time.  It's late 2019.  What are you doing while you're in

12  Russia?

13  **A**   There were a lot of court cases that had been filed

14  against me in Zimbabwe, so I was having to handle those on a

15  daily basis.  I was still also working on the Hague petition to

16  have my son returned.  By November, I had a case agent from the

17  State Department.  So I was working with them to solidify my

18  petition.

19  **Q**   And you mentioned traveling back and forth to Zimbabwe.

20  So you were able to travel to Zimbabwe.

21  **A**   I would have had to leave my daughter alone, but -- so I

22  couldn't.

23  **Q**   And as far as -- essentially, why would it be different

24  for you to be able to travel to Zimbabwe versus you being able

25  to travel to the United States?

1    **A**    Zimbabwe's my home country, so I don't need a visa or

2    permission to go.   I couldn't travel to the United States

3    because I had no visa.

4    **Q**    And you mention different petitions and different court

5    proceedings.   Are you trying to leave Russia?

6    **A**    Yes.   I was trying to leave Russia.   I wanted to leave

7    Russia.   I wanted to return to Zimbabwe, because I would be

8    more effective in my fight to get my son back from Zimbabwe.

9    But because he was withholding our daughter's birth record, I

10   couldn't leave.

11   **Q**    And so once you did receive your daughter's birth records,

12   were you able to leave Russia?

13   **A**    Yes.   Almost immediately.   I received her birth record on

14   the 7th, and I left on the 12th.

15   **Q**    Where did you go?

16   **A**    I went straight to Zimbabwe.

17   **Q**    And again, why did you go to Zimbabwe?

18   **A**    Our daughter still didn't have a passport.   I was just

19   issued a temporary travel document by the Zimbabwean Embassy.

20   And I was given an exit visa by Russian authorities.   So

21   Zimbabwe was the only place that we could go.

22   **Q**    And so once you go back to Zimbabwe, what are you doing

23   while you are there?

24   **A**    I -- um, I continued to fight to try to get my son back.

25   The Hague process is a bit lengthy.

1    And also my inability to be able to communicate

2    effectively, I didn't -- because of everything that had

3    happened in Zimbabwe, Allen had -- was in the process of trying

4    to dispose of our property there.  My businesses were all

5    closed.  My finances were limited.  And my ability to

6    communicate was also limited.

7    Q    Now, how long are you in Zimbabwe at this time?

8    A    Um, in all, I stayed in Zimbabwe from November, 2019,

9    until the end of July, 2021.

10   Q    So this is throughout the pandemic.

11   A    Yes.  The country went into lockdown in March of 2020.

12   Q    Did that affect your petitions and court cases?

13   A    Yes.  Everything pretty much came to a standstill.  The

14   American Embassy also closed.  So they were not issuing any

15   visas at all.  And the court process here in the United States

16   also slowed down, and everything was now being done via Zoom,

17   so everything was happening incredibly slowly.

18   Q    Now during this time period, November 2019, to I think you

19   said the end of July of 2021, have you talked to [O.G.]?

20   A    Yes.  I talked to him as often as I could.  There were

21   some bad situations and circumstances that were happening in

22   Zimbabwe that limited me as well from talking to him as often

23   as I wanted to.  Including, like, network issues and so on.  So

24   I -- I tried to talk to him as often as I could.

25   Q    And did you see your son in person throughout this time?

1   **A**    No.  Not once.

2   **Q**    Now, you mentioned these petitions.  I kind of want the

3   lay of the land.  As it relates to you, your son, what are the

4   different petitions that are going on right now, at this time

5   that we're discussing?

6   **A**    Okay.  When I got to Zimbabwe, I filed for custody in

7   Zimbabwe because I needed a declarator which I could send to

8   the United States to support my petition, my Hague petition.

9   The declarator would just sort of explain the laws of Zimbabwe.

10  That with a marriage that was structured like ours, the custody

11  would default to me in the event of our separation.

12      I had also filed the Hague petition.  And I discovered

13  that Allen had filed for custody in Massachusetts.  I was

14  served with the documents in January of 2020.  And I was

15  supposed to appear in a court in Massachusetts.  I informed the

16  State Department as soon as I got those documents, and they

17  were able to stop those proceedings.

18  **Q**    So essentially there are three major petitions going on.

19  The one in Zimbabwe, the Hague, and then the one that was filed

20  by Mr. Gessen.  Correct?

21  **A**    That is correct.

22  **Q**    Now, while you are in Zimbabwe, did you at any point

23  attempt to get to the United States now?  Well, at that time?

24  **A**    I couldn't.  I still didn't have a passport for my

25  daughter.  And because lockdown began in March of 2020, it was

1  just a couple of months after I'd returned to Zimbabwe, the

2  American Embassy was closed.

3  **Q**    So closer to July of 2021, were you able to figure out a

4  way to get to the United States?

5  **A**    Yes.  The State Department and the lawyers that were

6  representing me in Massachusetts petitioned for me to get an

7  expedited visa.  Though the embassy was not operating fully,

8  the fact that we now had a court date allowed them to process a

9  visa for myself, my daughter, and my sister.

10  **Q**    So you needed it to appear for your court case,

11  essentially?

12  **A**    Yes.  I was issued a visa so that I would be able to

13  attend the hearing.

14  **Q**    And was your daughter able to come with you?

15  **A**    Yes.  She came with me.

16  **Q**    Now, you mentioned there being limited contact between you

17  and your son.  Was there contact between Mr. Gessen and your

18  daughter?

19  **A**    He never requested any.

20  **Q**    So were you able to get to the United States on this visa,

21  then?

22  **A**    Yes.  I was.

23  **Q**    So what happened once you got to the United States?

24  **A**    I was here for just a day, and then the hearing started.

25  So for the first week we were going to court, and I was unable

1    to see my son.

2    **Q**    Now, which -- which court case is this that you are

3    appearing for the visa -- with the visa on?

4    **A**    This was the Hague petition.

5    **Q**    And what is the Hague petition to decide, given your

6    knowledge of filing it?  What is the decision for?

7    **A**    The Hague petition was to decide -- the key elements would

8    be to decide whether or not our son was indeed wrongfully

9    removed, and which country was his habitual home.

10   **Q**    And we'll come back to that.  But at this time, do you

11   know who has legal custody of your son?

12   **A**    None of us had legal custody, had any rights to legal

13   custody.

14   **Q**    And who had physical custody?

15   **A**    Allen had physical custody, but it was, um, not by law.

16   It was just more the position that we were here in -- we were

17   in limbo, because nothing had been ruled, as yet, by any court.

18   **Q**    So because the Court decisions were pending, there was no

19   decision on legal custody.

20   **A**    There was no decision on legal or determined physical

21   custody.

22   **Q**    So while these cases are proceeding, including the Hague

23   petition, do you have some sort of visitation schedule or

24   visitation rights with your son?

25   **A**    I had to negotiate with Allen a visitation schedule, but

1   he limited it to just four overnights in a month, and a couple

2   of hours during the week, but that was only around December of

3   2021.  Initially, he wouldn't allow me any overnights at all.

4   **Q**   And during this same period, what is the visitation

5   schedule for Mr. Gessen with your daughter?

6   **A**   He said that he was not prepared or ready to have any

7   visitation with her, so she -- she wasn't part of the schedule.

8   **Q**   So you mentioned that by December, 2021, that's when

9   there's overnight visitation.

10  **A**   Yes.

11  **Q**   What is your relationship at that time with Mr. Gessen?

12  **A**   Um, it was bad.  We only spoke through our attorneys.

13  **Q**   And again, at this point, what is the legal custodial

14  status of your son?

15  **A**   We were still in limbo.  There were no decisions that had

16  been made.  The Hague petition had still not been decided on,

17  and the custody cases were both at a standstill.

18  **Q**   Directing your attention to the end of the month, around

19  December 20th of 2021, were there -- did anything happen with

20  any of these petitions in your cases?

21  **A**   Yes.  We finally got a ruling for the Hague petition.  The

22  judge ruled that -- he did find that our son had been

23  wrongfully removed from Russia.  But unfortunately, he ruled

24  that he didn't believe Zimbabwe was our son's habitual home,

25  and unfortunately, because Russia and the United States did not

1    have an agreement, a treaty agreement, he couldn't send our son

2    back to Russia.

3    **Q**    And can your son go back to Zimbabwe, based on this

4    decision?

5    **A**    No.

6    **Q**    I just want to be clear.  This is one decision of the

7    three cases we have mentioned that are -- that petitions were

8    open for.

9    **A**    Yes.

10   **Q**    So is the legal custodial status any clearer, based on

11   this decision from the Hague?

12   **A**    The only thing that was now more evident is that we were

13   now under the jurisdiction of Massachusetts.  So we would have

14   to default to Massachusetts law.  And according to the laws of

15   Massachusetts for unwed couples, the mother gets custody of the

16   children.

17   **Q**    And you mentioned that there is a family court petition

18   happening in Massachusetts.  That's one of the three that you

19   mentioned.

20   **A**    Yes.

21   **Q**    Previously.  What's happening with the Massachusetts

22   petition, now that this Hague decision has come out?

23   **A**    At that time, we were given a court day, which was January

24   the 10th of 2022, when we were supposed to return to court,

25   which was not very long after this decision for the Hague

1  petition came out.  So we agreed during mediation and through

2  our lawyers to a holiday schedule where our children -- well,

3  our son would spend half of the holiday with me, and then the

4  other half with Allen.

5  Q    Now, directing your attention to December of 2021.  Did

6  anything happen with your family petition, the Massachusetts

7  one, on that day?

8  A    Yes.  The day after we got the Hague ruling, my lawyer

9  informed me that Allen had withdrawn his custody application

10 from the family court.

11 Q    Now, what does that withdrawal mean for custody, if you

12 know?

13 A    It -- it meant that there was -- we were now 100 percent,

14 like, under the jurisdiction of Massachusetts law.  There was

15 nobody still -- I had more rights to custody, because there was

16 nothing in writing.  And when there is nothing in writing, they

17 default automatically to the common laws.

18         MS. MITCHELL:  Your Honor, I would object and move to

19 strike that, as a statement of law.

20         THE COURT:  Yeah, sustained.  I don't -- yeah.  I'm

21 going to sustain that.

22     You should disregard that answer.

23     (Reporter clarification)

24 BY MS. JAMES

25 Q    Now that there is the dismissal, is there still the

1    Zimbabwe petition pending?

2    **A**    Yes.  What had happened with the Zimbabwean petition I

3    filed, Allen's lawyer didn't respond.  So what happens

4    typically if you don't respond to a petition, there's a default

5    judgment.

6         **MS. MITCHELL:**  Again, objection.  Move to strike, for

7    the same reasons.

8         **THE COURT:**  Okay.  Do you want rephrase the question?

9    **BY MS. JAMES**

10   **Q**    From your understanding, going to through all of these

11   legal processes, as a party to the legal process, what is just

12   your understanding of what happens?

13   **A**    I was informed by my lawyer that due to the fact that he

14   had not responded to my application, there would be a default

15   judgment issued by --

16        **MS. MITCHELL:**  Objection.  Hearsay, lack of personal

17   knowledge.

18        **THE COURT:**  Sustained.  Just -- yeah.

19   **BY MS. JAMES**

20   **Q**    Now --

21        **THE COURT:**  You should disregard that testimony.

22        **MS. JAMES:**  Sorry, Your Honor.

23   **BY MS. JAMES**

24   **Q**    Now that -- I want to direct your attention back to

25   December of 2021.  What is the visitation -- remind us what the

1   visitation schedule is like, and the arrangements.

2   **A**   That week was the final week of school, and it was also

3   Christmas week.  Our son was going to spend Christmas with me.

4   And then after that, he would spend time with Allen and his

5   family.

6   **Q**   And how do you normally, like, technically work your

7   visitation?  Do you pick the kids up from somewhere?  Does

8   Mr. Gessen drop the kids off?

9       How does that work?

10  **A**   I was supposed to pick [O.G.] up from school on that

11  Tuesday, on Tuesday the day after the ruling came out.

12  **Q**   And did you pick up your son from school?

13  **A**   No.  Around 2:00 on that Tuesday my attorney contacted me,

14  and she asked me if I had heard from Allen or from our son.

15  She told me that she had received this dismissal -- well, this

16  cancellation of this application that he had done.  And she

17  asked me to call our son's school to ask if he was there.

18      I called the school, and they told me that Allen had sent

19  them an email in the morning saying our son was sick, and he

20  wouldn't be in school.

21  **Q**   Now, based on learning that information, what did you do?

22  **A**   I immediately started trying to contact Allen.  I sent him

23  a message, and he told me he was driving; he would talk to me

24  later.

25      I started calling our son; he had a phone.  He didn't pick

1    up; the phone was off.  I called his tablet, and he picked up

2    for a second, but put the phone down.

3          It made me worried, so I called my attorney, and I told

4    her.  And she told me to drive to the family court immediately.

5    **Q**    And after learning that, did you drive to the family

6    court?

7    **A**    Yes.  It took me an hour.  I drove to the Middlesex Family

8    Court.  I arrived soon after 3:00 p.m. and she arrived straight

9    after that.  The court closed at 3:30.  We were able to see a

10   judge around 3:25.

11   **Q**    Now, why -- from your understanding, why did you rush to

12   court?

13   **A**    Because I was -- I was afraid that he had taken him again.

14   He had kidnapped him again.  I couldn't reach any of them.  I

15   was supposed to pick him up from school that day.  He had not

16   informed me of any change of plans.  He had not told me that my

17   son was sick.  So I knew that there was something happening.

18   **Q**    Now, were you worried about the physical safety of your

19   son?

20   **A**    No.  I was -- I was worried more about his emotional

21   well-being, as well as what had previously happened.  The

22   two-year separation had been very hard for him.  I didn't want

23   this to happen again.

24   **Q**    And so, physically, you believed he was safe.

25   **A**    Yes.  I didn't believe that Allen would harm him,

1   physically.

2   **Q**   Now, you mentioned that you went to court.  What happened

3   when you went to court?

4   **A**   The judge issued an order which said that Allen should not

5   leave Massachusetts with our son.  She also put him on the

6   no-fly list.  And she gave me custody.  I was given custody of

7   our son.

8   **Q**   Like a temporary --

9   **A**   Temporary custody.

10  **Q**   And what did you do next after receiving that order?

11  **A**   I drove to Concord, which is the town where they lived,

12  which is about 45 minutes away.  And I went to the police

13  station there.  I was given some officers who drove with me to

14  Allen's residence.

15      When we arrived, the house was dark.  They went around to

16  look and see if there was anyone there, and then they came back

17  and told me that no one was there.

18  **Q**   Now, just to be clear, you mentioned Concord and

19  Middlesex.  You're talking about Massachusetts, right?

20  **A**   In Massachusetts.

21  **Q**   Now, again, what is your immigration status in the United

22  States at this time?

23  **A**   I was here on a B-2 visa -- that's a tourist visa -- which

24  I had extended.

25  **Q**   And when -- when you say you "extended," when did you

**CHIGARIRO - DIRECT / JAMES**

1   extend it?

2   **A**   I extended it in December of 2021 because, I was only

3   legally allowed to be in the United States for six months at a

4   time.  So when I extended it, I was given another six months.

5   **Q**   And while you are in the process of extending the visa,

6   are you able to leave the United States freely?

7   **A**   No.  I was not allowed to leave the United States.

8   **Q**   And where's your daughter, again, at this time?

9   **A**   She was with me.

10  **Q**   Now, you've mentioned that you filed -- you want to the

11  police about what happened?

12  **A**   Yes.

13  **Q**   Do you remember speaking with detectives or officers about

14  this case?

15  **A**   Yes.  On the first day I was issued two officers.  I don't

16  recall their name.  But the following day I was called by a

17  Detective Sergeant Young.

18  **Q**   And what did you do -- while the police are doing whatever

19  they're doing, what are you doing in regards to getting your

20  son back?

21  **A**   I couldn't do anything.  I was basically sitting, waiting

22  by the phone to be told what was going on.  But my lawyer

23  called the State Department and every agency that she could, to

24  try to make sure that they would not be able to leave the

25  country.

1    **Q**    And at this point, had you spoken with Mr. Gessen?

2    **A**    No.  I was only able to reach him about two days after

3    that, with a court order.  The judge said that any -- if we

4    were able to reach him by any means possible, it would show

5    that he had received the order.

6        He had blocked my American number on WhatsApp, but I had

7    my old phone from Zimbabwe.  So I used that to send him the

8    order, and it confirmed that he had received it.

9        And he sent me back a message telling me to stop

10   contacting his family; I was causing them unnecessary distress.

11   **Q**    And in the midst of this conversation, did he tell you

12   where he was?

13   **A**    No, he refused to say where he was.

14   **Q**    Did he tell you where he might go?

15   **A**    On the first day, I discovered an email that he had sent

16   saying that he was going to New York, and that I could go to

17   Florida, which is what I had requested a few weeks prior, to

18   prepare for Christmas.

19       In the email he said to me:  Oh, since you wanted to go

20   Florida I will even pay for your tickets and you can go to

21   Florida, and then we'll see each other in January.

22   **Q**    Did he send you tickets for Florida?

23   **A**    No.  It was just a message, I think, to justify his

24   disappearance.

25           **MS. MITCHELL:**  Objection; calls for speculation.

1          **THE COURT:**  Sustained.

2      You should disregard that answer.

3  **BY MS. JAMES**

4  **Q**    If you could just answer yes or no, did you receive

5  tickets to Florida?

6  **A**    No.

7  **Q**    Did the two of you discuss the actual plans of you going

8  to Florida?

9  **A**    No.

10 **Q**    Did you discuss where you would pick up the kids, switch

11 the kids, and get to Florida?

12 **A**    No.

13 **Q**    Were there any arrangements, concrete arrangements for you

14 -- you and the children to go to Florida?

15 **A**    None.

16 **Q**    Did you eventually see your son again?

17 **A**    I did, on the 7th of January.

18 **Q**    Did you -- before the 7th of January, did you speak with

19 your son?

20 **A**    Yes, I did.  About eight days after he disappeared, I was

21 able to speak to our son for the first time.

22 **Q**    And when you spoke to your son, were you able to get

23 information about where he was?

24 **A**    No.  He was being supervised by his father.  I could just

25 ask how he was doing.

**CHIGARIRO - DIRECT / JAMES**

1   **Q**    And then, how do you know that he was being supervised by

2   Mr. Gessen?

3   **A**    He was sitting right next to him.

4   **Q**    And between the email, and then the -- the eight days

5   later that you mentioned the Florida email, did Mr. Gessen

6   contact you again?

7   **A**    No, he did not.

8   **Q**    You mentioned that you used a different phone number to

9   serve or to show the order.  Did you continue speaking after

10  that?

11  **A**    He blocked that number, straight after sending his

12  message.

13  **Q**    Now, you mention that you saw your son again on

14  January 7th.  Correct?

15  **A**    Yes.

16  **Q**    Did you go to court or anything like that before you saw

17  your son on January 7th?

18  **A**    Yes.  When we initially filed -- when -- when all of this

19  initially transpired, the judge issued a date for when we would

20  come back for the actual hearing, because it was an *ex parte*

21  order that we had received.  So on the 5th of January we were

22  all supposed to return to court, including Allen and his

23  lawyer.

24          So we went to court.  His lawyer was present, but he was

25  not.

CHIGARIRO - DIRECT / JAMES

1   **Q**    Now, you said you mentioned seeing your son on

2   January 7th.  How?

3   **A**    After the 5th I was informed that they had purchased

4   tickets to fly to London.  They were stopped at the airport in

5   Montreal, about to board a flight to London.  The marshals then

6   called my attorney.  And she told me to drive to the Canadian

7   border to pick up our son.

8   **Q**    So once you learned that information, what did you do?

9   **A**    I -- I got a friend to drive with me.  It was about five

10  hours.  And there was a snowstorm at the time.  So we drove to

11  the Canadian border, slept overnight, and then in the morning

12  we drove to the border where I met the marshals and Child

13  Services who had our son.

14  **Q**    And did you speak with Mr. Gessen at that time?

15  **A**    No.

16  **Q**    So what did you do after receiving your son?

17  **A**    I took him home.  He was distressed.  I was very worried

18  about -- about him.  And he told me everything that he had

19  seen, and what had happened.  So I immediately started looking

20  for a therapist.

21      I also had to get him back into school, to try to

22  stabilize his life as much as possible.  So I got him back on a

23  Friday, and then Saturday and Sunday I had to go buy him

24  clothes and get him ready for school.  And then Monday, he was

25  back at school.  I spoke to his school.  They helped me to

1    support him.

2          And I found him a therapist.

3    **Q**    Now, when you picked up your son at the border, did you

4    know where Mr. Gessen was?

5    **A**    All I knew was that he had been detained by the Canadian

6    immigration authorities.

7    **Q**    How did you know that?

8    **A**    The marshals informed me.

9    **Q**    And did you ever learn from Mr. Gessen where at the --

10   where he went, once he was detained?

11   **A**    Yes.  About a week or so after that happened, he requested

12   contact with the children.  And he was able to make video calls

13   from the facility where he was being held.

14   **Q**    Where was that?

15   **A**    It was the immigration detention in Montreal.

16   **Q**    And do you know how long he was there?

17   **A**    I think he was there for about a month.

18   **Q**    And while -- during any of these video calls, did he say

19   he went anywhere else?

20   **A**    After -- after that, he was transported to upstate

21   New York to a prison there, before being extradited to

22   Massachusetts.  He discussed all of this on a video call with

23   our son.

24   **Q**    Now, did the incident of him taking your son in the United

25   States, did that affect the family court proceedings, to your

**CHIGARIRO - DIRECT / JAMES**

1   knowledge?

2   **A**    It basically gave me an advantage.  When he was released

3   from prison, he applied to have our son returned to him.  And

4   that was denied by the judge.

5   **Q**    Now, by the time Mr. Gessen is released, what is your

6   relationship like, the two of you?

7   **A**    It was probably at its worst.  We -- we had -- we had not

8   been speaking, and we were now 100 percent.  There was no

9   personal communication.

10  **Q**    The only time you heard from him was when he was speaking

11  to your son?

12  **A**    Yes.

13  **Q**    Now, you mention that Mr. Gessen, once released, filed for

14  return of your son.

15  **A**    Yes.

16  **Q**    Did he do the same for your daughter?

17  **A**    No.  He just -- he filed in a different court that he

18  believed that I was planning to remove both children from

19  Massachusetts, and to have her documents taken away, her travel

20  documents.  So I just complied.  He -- it was an *ex parte*

21  hearing.

22  **Q**    And by -- around what time is this, that your -- that this

23  occurred?

24  **A**    This was about mid-February.

25  **Q**    Of what year?

**CHIGARIRO - DIRECT / JAMES**

1    **A**    Of 2022.

2    **Q**    Now, directing your attention to about April of 2022, what

3    is the status of the different disputes that you have over your

4    children?

5    **A**    I had withdrawn my petition in Zimbabwe; it was no longer

6    necessary.  So I had that withdrawn in January of 2022.  The

7    Hague petition was over with.  The custody was now a new one,

8    with me being the one that had filed.  So that was pending.

9          So in April Allen's attorney reached out to mine, and

10   stated that they were ready to settle, to settle our custody

11   issues, as well as child support, going forward.

12   **Q**    And did you settle those issues?

13   **A**    Yes.  I had been wanting to settle things from the very

14   beginning of all of this, so I was happy when I heard that.  I

15   wanted everything to end.

16   **Q**    So by April of 2022, who has custody, who has physical and

17   legal custody of your children?

18   **A**    I had temporary full legal and physical custody of both

19   children.

20   **Q**    And is Mr. Gessen paying child support at that time, or

21   instructed to pay child support at that time?

22   **A**    Yes.  He had started paying the minimum child support in

23   February.  Soon after he was released from prison, that's when

24   he started to pay the minimal.  And then in April, he offered

25   elevated child support as part of the agreement.

1   **Q**    So in April of 2022, what is the two of you's relationship

2   like?

3   **A**    We didn't speak.  We communicated still through our

4   lawyers.

5   **Q**    Now, in your opinion, and from what you have seen with

6   your son, do you think that he's been affected by what's

7   happened here today -- or what you just discussed happening

8   today?

9   **A**    Vastly.  He couldn't sleep for a long time.  He kept

10  thinking about -- because he saw his father being arrested by

11  the marshals in the airport, it was very traumatic for him.  He

12  was only nine, so he couldn't understand what had happened.

13  And he was worried that they had hurt his dad.

14  **Q**    And you mentioned that you sought therapy for your son.

15  **A**    Yes.

16  **Q**    Is he still on therapy?

17  **A**    Yes, he is.

18  **Q**    Directing your attention to July 28 of 2022, did you speak

19  with the FBI on that date?

20  **A**    Yes, I did.

21  **Q**    What did you learn?

22  **A**    They came to my house at around 6:00 in the morning, and

23  they informed me that they had arrested Allen on

24  murder-for-hire charges.

25        I initially didn't know what that meant.  And then they

1   explained to me that he had hired someone to kill me.

2   **Q**   Now, prior to that day, did you have any knowledge of that

3   investigation of those charges, anything like that?

4   **A**   No.  I -- I actually thought things were -- things were

5   finally okay between us, because after we signed the agreement,

6   um, he -- he changed.  He was much more cooperative and I --

7   actually, I really thought that we were now at the stage where

8   we could actually cooperate.  He was much more flexible, like,

9   about changing times to meet, to exchange the children, as well

10  as where -- where I could go with the children.

11       I wrote to him in June, telling him that I wanted to take

12  our son to New York for a concert because it was his birthday

13  in July.  And he agreed.  And he actually also decided to go to

14  New York at the same time, and we could better exchange

15  children.  So it seemed like all of a sudden, things were --

16  were actually perfect.

17  **Q**   So you didn't make any reports about a murder for hire to

18  the FBI or to police or anything like that.

19  **A**   I didn't even know anything, anything was going on.

20       (Off-the-record discussion between counsel)

21  **BY MS. JAMES**

22  **Q**   After being contacted by the FBI in connection with this

23  investigation, were you shown any of the evidence as part of

24  this investigation?

25  **A**   No.  Um, the only information that I knew was what was

1   online, which is the same thing that they told me.

2   **Q**   Now, could you remind the Court where you currently

3   reside?

4   **A**   I live in Massachusetts.

5   **Q**   And do you still have custody of your children?

6   **A**   Yes, I do.

7   **Q**   So if you live in Massachusetts and you have custody of

8   your children, why are you here today?

9   **A**   I was subpoenaed.

10       **MS. JAMES:**  No further questions, Your Honor.

11       **THE COURT:**  Thank you.

12      Ms. Mitchell?

13       **MS. MITCHELL:**  Yes, Your Honor.  One moment.

14      (Off-the-Record discussion between counsel)

15                    **CROSS-EXAMINATION**

16  **BY MS. MITCHELL**

17  **Q**   Good morning, Ms. Chigariro.  How are you doing today?

18  **A**   I'm okay.

19  **Q**   Okay.  I just have a few questions for you.

20  **A**   Okay.

21  **Q**   You were just talking about how the agents came to your

22  apartment in July of 2022.  Correct?

23  **A**   Yes.

24  **Q**   And at that time, they explained to you that Mr. Gessen

25  had been arrested for a murder-for-hire charge.

CHIGARIRO - CROSS / MITCHELL

1    **A**    Yes.

2    **Q**    At the time you heard that, you were completely surprised

3    that this was something that Mr. Gessen was accused of.

4    Correct?

5    **A**    Yes.

6    **Q**    You had no reason to believe that you were the subject of

7    a murder-for-hire charge in July of 2022.  Correct?

8    **A**    Correct.

9    **Q**    Now, I want to talk about another occasion involving

10   Mr. Gessen and custody of your children that happened in

11   Zimbabwe.

12       In December of 2019, you were falsely arrested.  Correct?

13   **A**    Yes.

14   **Q**    And you were falsely arrested because someone lied to the

15   police or government officials regarding an offense.  Correct?

16   **A**    That is correct.

17   **Q**    And you believe that the person who did this was

18   Mr. Gessen.  Correct?

19   **A**    Correct.

20   **Q**    And you believed he did this to get physical custody of

21   your daughter, [E.G.]

22   **A**    Yes.

23   **Q**    Those charges were dropped.

24   **A**    I was acquitted, yes.

25   **Q**    You were acquitted of that.  And you eventually regained

1   custody of [E.G.].

2   **A**    I never lost custody.

3   **Q**    At the time the case was pending, you were arrested, and

4   Mr. Gessen came to the police station and picked up [E.G.].

5   Correct?

6   **A**    No.  She's never been in his custody.

7   **Q**    At that time, though, you believe that Mr. Gessen did this

8   to get physical custody of [E.G.], though?

9   **A**    He made an application to -- for her to be transferred

10  into his custody, which the judge denied.

11  **Q**    You thought that Mr. Gessen had bribed someone to make

12  this happen, correct?

13  **A**    The sequence of events led me to believe that.

14  **Q**    You thought that he had used the power of the law and the

15  courts against you to try to gain custody of his daughter.

16  **A**    As a citizen of Zimbabwe, I'm aware of how things work.

17  **Q**    And in Zimbabwe, sometimes people resort to bribes to make

18  things happen.

19  **A**    Most of time.

20          **MS. MITCHELL:**  Thank you.

21          **THE COURT:**  Anything further?

22          **MS. JAMES:**  Briefly, Your Honor.

23                    <u>**REDIRECT EXAMINATION**</u>

24  BY MS. JAMES

25  **Q**    Miss Priscilla, I want to go back to June of 2019, when

1  you previously testified that you landed in Russia after being

2  in Zimbabwe for a few days.

3  **A**    Yes.

4  **Q**    When you learned that Mr. Gessen had taken your son to the

5  United States, were you surprised that he did that?

6  **A**    Yes.  I was shocked, because he had previously told me he

7  would never do that.

8  **Q**    And for you, was it outside the realm of possibility?

9  **A**    Yes.  I've never -- I've always wanted to believe that

10  people wouldn't do anything so evil.  And, that he would care

11  more about our son's emotion than to do anything that would

12  harm him.

13  **Q**    And, fast-forwarding to December of 2021, when you were in

14  the United States and your son again -- Mr. Gessen has again

15  taken your son, were you surprised when he did it then?

16  **A**    I was shocked that he would attempt to do that again,

17  here, after everything that had transpired.  It didn't make any

18  logical sense.

19  **Q**    So it was a matter of it didn't make sense for it to

20  continue happening?

21  **A**    Yes.

22           **MS. JAMES:**  Thank you.

23           **THE COURT:**  Anything further?

24           **MS. MITCHELL:**  No, Your Honor.

25           **THE COURT:**  Thank you.  You are excused.

 1       (Witness excused)

 2       **THE COURT:**  Members of the jury, would you like to

 3  take an early lunch break?  Or would you like us to start with

 4  the next witness?  It's about 11:36 or so.

 5       Keep going?  Okay.  We will stop at noon, regardless of

 6  where we are.

 7       Is the government prepared to call your next witness?

 8       **MS. JAMES:**  Yes, Your Honor.  The government calls

 9  Detective Sergeant Jeffrey Young.

10       **THE COURT:**  If you like we can all stretch, better for

11  our backs and our health.

12       And I'm not to despair about that basketball game today,

13  that Anthony Davis cannot possibly play like that in every

14  game.

15       Okay.  You may be seated.

16             **JEFFREY YOUNG, GOVERNMENT'S WITNESS, SWORN**

17       **THE WITNESS:**  Yes, I do.

18       **THE COURTROOM DEPUTY:**  Can you please state your name

19  for the record.

20       **THE WITNESS:**  Jeffrey Young.

21       **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

22       **THE COURT:**  Good morning.

23       You may proceed.

24       **MS. HOSSEINI:**  Thank you, Your Honor.

25

1                          <u>DIRECT EXAMINATION</u>

2    **BY MS. JAMES**

3    **Q**    Good morning.

4    **A**    Good morning, counselor.

5    **Q**    Is it okay if I just call you Detective Young versus

6    Detective Sergeant Young?

7    **A**    That's fine.

8    **Q**    Are you currently employed?

9    **A**    I am, yes.

10   **Q**    Where do you work?

11   **A**    The Concord Police Department in Concord, Massachusetts.

12   **Q**    And how long have you worked with the Concord Police

13   Department?

14   **A**    Since 2006.

15   **Q**    What is your position with the Concord Police Department?

16   **A**    I am the detective unit supervisor.  My title is Detective

17   Sergeant.

18   **Q**    And how long have you had that position?

19   **A**    Since 2018.

20   **Q**    Could you tell us a little bit about your responsibilities

21   and duties in that position?

22   **A**    Yes.  I oversee the detective unit which is the

23   investigative unit within the police department.  We oversee

24   criminal prosecutions.  The handling of evidence.  Crime scene

25   response.  Crime scene processing, evidence handling, and

**YOUNG - DIRECT / JAMES**

1    coordinating with the District Attorney's Office.

2    **Q**    Detective Young, are you an attorney?

3    **A**    I'm a licensed attorney, yes.

4    **Q**    Now, directing your attention to December 24th of 2021,

5    were you working that day?

6    **A**    I was, yes.

7    **Q**    What, if anything, happened that day?

8    **A**    Um, that day is -- I became involved, um, on the 28th.

9    But the police department initially became involved with a

10   custody matter on the 24th.  And the patrol division initially

11   took a report of a possible child that hadn't been returned to

12   his mother after a custody order had been issued.

13           **MS. JAMES:**  Sorry, one moment.

14   **BY MS. JAMES**

15   **Q**    Now, do you know when that report was filed?

16   **A**    Yes.

17   **Q**    What date?

18   **A**    The 21st of December, 2021.

19   **Q**    And what happened once you received the information about

20   that report?

21   **A**    I went through the initial report to get some background

22   on what was going on.  And I discovered, based on reviewing the

23   reports from the patrol division, that Ms. Priscilla had come

24   to the police department on the 21st of December, saying that

25   she had an order from the Middlesex Probate and Family Court in

**YOUNG - DIRECT / JAMES**

1    Massachusetts, that gave her legal and physical custody of her

2    eight-year-old son [O.G.], and she was concerned that the boy's

3    father was going to take him out of the country and not return

4    him to her as directed by the Court order.

5        So she came to the Concord Police Department and presented

6    the officers there with that information in that order, and

7    they began trying to locate where [O.G.] was to try to bring

8    him back to his mother.

9    **Q**    And is that what led you to get involved in this

10   investigation?

11   **A**    Yes.  So I became involved after several days when it was

12   referred to the detective unit on the 28th, because all the

13   parties involved had not been able to find out where [O.G.]

14   was, and his mother had come to the station again and said she

15   was concerned that his father was going to take him out of the

16   country.  So the detective unit became involved at that point.

17   **Q**    Once your unit was involved and once you were involved did

18   you try to contact the father of the abducted child?

19   **A**    Yes, I did.  I attempted in the morning of December 28th,

20   to call Mr. Gessen on the phone number that was listed in the

21   police report, to try to find out where he was, to try to find

22   out where his son [O.G.] was, and to try to facilitate bringing

23   the child back to his mother as directed by the Court order.

24   **Q**    And do you recall what phone number that was?

25   **A**    No.  I read it from the police report that morning.

**YOUNG - DIRECT / JAMES**

1   Q    So if I showed you your police report, would that refresh

2   your recollection?

3   A    Yes, it would.

4        MS. JAMES:  Your Honor, may I show the witness their

5   police report?

6        THE COURT:  (Inaudible)

7        MS. JAMES:  Counsel, do you want --

8        MS. MITCHELL:  Yes.

9        (Witness examines document)

10  BY MS. JAMES

11  Q    Detective, take a look, and look back up once your

12  recollection is refreshed.

13  A    It is refreshed, thank you.

14  Q    Do you recall the last four digits of the phone number

15  that you used to try to contact Mr. Gessen?

16  A    Yes.  That was 6119.

17  Q    Could you just look -- thank you.

18  A    I did, yes.

19  Q    You already looked it over.

20  A    Yes.

21  Q    Now, were you able to reach Mr. Gessen when you dialed

22  that number?

23  A    I did not reach a person when I dialed that number.  I

24  tried it several times that morning, on December 28th.  And

25  each time, I received a voicemail message in return saying

1  "This is Allen Gessen, leave a message."

2      So, based on that, I assumed I was calling the correct

3  number for Mr. Gessen.  I left him, I believe, three, three

4  separate messages saying:  Please call the police department as

5  soon as possible.

6      And it wasn't until later that day, I believe around

7  noontime, that he called me back on my work line.

8  **Q**    Did you speak with him when he called you back?

9  **A**    I assumed I was speaking with him, yes.  I answered the

10  phone and a male party -- a male on the other end of the line

11  said "This is Allen Gessen, I'm sorry that I didn't answer your

12  phone calls earlier; I was having trouble with my phone."  And

13  we had a conversation at that time.  Yes.

14  **Q**    And did he indicate at that time where he was?

15  **A**    No, he didn't, actually, at that time.  I asked him -- you

16  know, I told him I was concerned for the welfare of his son and

17  that I was concerned that he was out of the country.  I asked

18  him where he was.  And he said he was, in fact, out of the

19  country.

20      I asked him if he would tell me where he was.  And he said

21  he would rather not say.  I then asked him if his son was okay.

22  That was my primary concern, that the little eight-year-old boy

23  was okay.  He said his son was with him, that he was happy,

24  unharmed and healthy.  And again I asked him where he was, and

25  he said he wasn't -- he wouldn't tell me.

1        I then asked him if he was aware of the custody order from

2    the probate and family court in Massachusetts.  And he said he

3    was aware of that order.  And I asked him at that time if he

4    was going to comply with that order and bring the child back

5    into the mother's custody.  And he said at that time, he was

6    speaking with his attorney, and he was not sure if he was going

7    to comply with that order or not at this time.

8        And then I advised him that it was in his best interest to

9    comply with the order and bring the child back from wherever he

10   was, and bring him back into the mother's custody.

11   **Q**    Now, as part of your investigation, did you view the

12   actual order that the mother said she had?

13   **A**    Yes.

14   **Q**    And after speaking with Mr. Gessen on the phone, did there

15   come a later time where you spoke with him again?

16   **A**    I didn't actually speak with him on the phone.  I received

17   an email from him on my department email the next day.

18   **Q**    And what, in substance, did that email say?

19   **A**    The email responded -- it was a followup, I guess, on our

20   conversation from the day before.  He again said that he was

21   out of the country, and that he believed it was in the best

22   interest of his son to be with him, and that he was still

23   looking at options about what was going to happen, and that he

24   was not sure whether he was going to comply with that order or

25   not.

1    He also said that he was aware that, you know, he had

2    rights, and as a person that could have possibly been

3    represented by an attorney he said that he was still kind of

4    going over options, but understood that what he is telling me

5    was without the advice of an attorney at that time.

6    Q    Now, what did you do once you read that email?

7    A    At that time, it was -- it was the 28th -- no, it was the

8    29th of December.  I began coordinating with state, local and

9    federal law enforcement partners to try to find out where

10   eight-year-old [O.G.] was at that time.

11       We had information from Mr. Gessen that he was out of the

12   country.  And I was concerned that he was -- he was going to

13   leave the country, and we wouldn't have any idea where this

14   little boy was at that time.

15   Q    Now, you mentioned that Mr. Gessen told you both on the

16   phone and email that he was out of the country.  Did he

17   indicate which country he was in?

18   A    No -- I'm sorry.  I didn't mean to interrupt you.  No, he

19   did not indicate which country he was in.

20   Q    Now, considering this was a child abduction case, was

21   there an Amber Alert issued?

22   A    There was an NCIC entry -- excuse me -- made by the

23   Concord Police Department, directing any law enforcement

24   officers that came into contact with Mr. Gessen and his son to

25   immediately stop and hold them, because of the -- the probate

**YOUNG - DIRECT / JAMES**

1  and family court order.

2  **Q**    So an NCIC alert, but not an Amber Alert?

3  **A**    No, not an Amber Alert, no.

4  **Q**    Why was there no Amber Alert?

5  **A**    Amber Alerts are for in-state and inside the United

6  States.  There was no point in putting out an Amber Alert if he

7  was saying he was out of the country.

8  **Q**    So what did you do next as part of your investigation?

9  **A**    Through federal law-enforcement contacts, I was then made

10  aware that he had entered into Canada, and was in Montreal, and

11  had booked a flight to London from Montreal for himself and for

12  his son [O.G.].

13      And during the course of that part of the investigation,

14  our main goal was to make sure that they didn't get on a plane.

15  I was very concerned that if they left territorial North

16  America, it would have been infinitely harder to return the

17  young boy to his mother.

18      So through vigorous investigation and coordination with

19  federal law enforcement partners, we were able to stop him from

20  getting on the plane, and keep him from leaving the country.

21  **Q**    And as for your piece of the investigation, did you get an

22  arrest warrant in connection with the kidnapping?

23  **A**    There was -- it was several days later, the Concord Police

24  Department obtained an arrest warrant for the Mass. general

25  law, criminal violation of parental kidnapping, yes.

**YOUNG - CROSS / MITCHELL**

1  **Q**    Now prior to December 21st -- excuse me, 28th, when you

2  were involved in this investigation, 2021, did you know or had

3  you even heard of Allen Gessen?

4  **A**    No.  I had not.

5  **Q**    Had you seen him in person?

6  **A**    No, I had not.

7  **Q**    Had you talked to him on video chat?

8  **A**    No, I had not.

9  **Q**    Other than your phone conversations, had you met Allen

10 Gessen?

11 **A**    No, I had not.

12 **Q**    Did you have any other information about any other

13 investigations into Allen Gessen other than parental

14 kidnapping?

15 **A**    No, I do not.

16 **Q**    Why are you here, then?

17 **A**    I received a federal subpoena from the U.S. Attorney's

18 office telling me to be here.  And if I didn't appear, it could

19 incur criminal liability on myself.  So that's why I'm here.

20         **MS. JAMES:**  Thank you.  No further questions.

21         **THE COURT:**  Ms. Mitchell?

22                    **CROSS-EXAMINATION**

23 BY MS. MITCHELL

24 **Q**    Sergeant Young, I just have a few questions for you.

25 **A**    Sure.

**YOUNG - CROSS / MITCHELL**

1    **Q**    You are not also involved of any investigations with an

2    individual named Alex Kiselev, correct?

3    **A**    No, counsel, I have no idea who that person is.

4    **Q**    Your involvement in this case just began with the

5    allegation of Mr. Gessen being involved with parental

6    kidnapping.

7    **A**    That's correct.  My part -- um, I have no idea what's

8    going on in court right here today.  I'm here to talk about

9    what happened in December of 2021.

10   **Q**    Now, when you made conversations with Mr. Gessen in

11   December of 2021, you were made aware that there was a court

12   order that he was supposed to return his son to the state of

13   Massachusetts, correct?

14   **A**    Yes.  I believe it was to return the son to the custody of

15   the mother who was in Massachusetts.

16   **Q**    You have no idea when Mr. Gessen or if Mr. Gessen ever

17   received that court order.

18   **A**    No, I don't, counsel.

19   **Q**    And he informed you, after having a conversation with you,

20   that he was going to follow up with his lawyer, and would make

21   decisions afterwards.  Correct?

22   **A**    Yes, I believe so.

23   **Q**    During that conversation, he was pleasant; he was polite?

24   **A**    Yes, he was very -- very pleasant.

25   **Q**    Now, you just testified that you were made aware that

**PROCEEDINGS**

1    Mr. Gessen had booked a flight to London?

2    **A**    That's correct.

3    **Q**    You don't know if that flight would later on continue to

4    Zimbabwe, do you?

5    **A**    No, counsel, I don't know the answer to that.

6              **MS. MITCHELL:**  Thank you.

7              **THE COURT:**  Anything further?

8                        <u>**REDIRECT EXAMINATION**</u>

9    **BY MS. JAMES**

10   **Q**    On cross, you mentioned that you don't know when, if ever,

11   Mr. Gessen was served with that court order that you saw,

12   correct?

13   **A**    That's correct, counsel.

14   **Q**    When you spoke with him either via the email or the phone

15   conversation, did Mr. Gessen mention knowing about the court

16   order?

17   **A**    Yes, he did say that he knew about the order.

18             **MS. JAMES:**  Thank you.

19             **THE COURT:**  Anything further?

20             **MS. MITCHELL:**  No, Your Honor.

21             **THE COURT:**  Thank you for making the trip out.

22             **THE WITNESS:**  Thank you, Your Honor.

23             **THE COURT:**  You are excused.

24             **THE WITNESS:**  Thank you.

25        (Witness excused)

1      **THE COURT:**  All right.  Members of the jury, right on

2   time we will take our lunch break, and resume at 12:45.  As

3   always, please do not discuss the case with anyone, including

4   each other.

5      Thank you.

6      (Jury excused)

7      (The following proceedings were held outside of the

8   presence of the Jury)

9         **THE COURT:**  Okay.  Please be ready -- oh yes.

10        **MS. HOSSEINI:**  Your Honor, just to be clear, these

11   last two witnesses are also out-of-town witnesses.  They have

12   been excused.  They can catch their flights?

13        **THE COURT:**  They can.

14        **MS. HOSSEINI:**  All right.

15        **THE COURT:**  I mean, as we discussed, subject to the

16   defense coming up with some reason that they couldn't ask a

17   question; they learned something.  But yes.

18        **MS. HOSSEINI:**  Thank Your Honor.

19        **THE COURT:**  Yes.  They should catch their flight.

20   Unless they want to stay and try to watch the Warriors, as

21   opposed to the Celtics.  Both of who lost their first games.

22      Okay.  All right.  Please be back at 12:45, with your

23   witness ready to go.  And, who is our next witness?

24        **MS. HOSSEINI:**  Ben Fierberg.

25        **THE COURT:**  Okay.  Great.  Thank you.

PROCEEDINGS

```
 1          (Recess taken from 11:58 a.m. to 12:48 p.m.)

 2          (The following proceedings were held outside of the

 3     presence of the Jury)

 4          MS. HOSSEINI:  So Your Honor, I'm just previewing into

 5     the afternoon.

 6          THE COURT:  Yes.

 7          MS. HOSSEINI:  We have two witnesses.  One will be

 8     very short, and then we are calling one of the case agents, and

 9     then we're done with witnesses.

10          THE COURT:  Okay.

11          MS. HOSSEINI:  So I just wanted to let Your Honor know

12     that the crosses of the witnesses were shorter than we

13     anticipated.

14          THE COURT:  Sure.

15          MS. HOSSEINI:  So perhaps it is a situation where we

16     could let the jury be excused earlier, so we could get

17     clarification from Your Honor about whether that other

18     undercover agent that was the subject of the in limine would be

19     testifying or not.

20          THE COURT:  Yes.  So what we can do -- and actually we

21     can do it now.  There weren't really jury instruction disputes

22     except for --

23          MR. RAJU:  We're going to have a theory-of-defense

24     instruction, so I'm assuming that we are going to need to have

25     some conversation about that, yes.
```

PROCEEDINGS

1          THE COURT:  So what we will do is we'll excuse the

2    jury, and we will do our jury charge, right, our jury charge

3    conference.

4          MS. MITCHELL:  Would the Court like a written

5    theory-of-defense instruction?  Would the Court like that now

6    in advance of our case that we put on?

7          THE COURT:  Well, I don't -- well, do you have it?

8          MS. MITCHELL:  I could probably get something to you

9    in writing, but it may affect --

10         THE COURT:  Let's do this.  Let's bring the jury in.

11      If you're done and you rest, that's fine.

12         MS. HOSSEINI:  We're not going to rest, Your Honor,

13   because it depends on whether we call that undercover agent or

14   not.

15         THE COURT:  But I thought the understanding was that

16   would be the rebuttal.  So for example, they may or may not

17   move for an entrapment instruction.  I may or may not grant an

18   entrapment instruction.  If I say no, then it wouldn't come in

19   for that purpose.  Right?

20      Now, you may have some argument with respect to the

21   defense that has been made.  So maybe what we can do is you can

22   tell us what the theory-of-defense instruction, about what it

23   can be, just so I can figure out -- well, A, you may not object

24   to calling -- them calling that witness.  This is, with respect

25   to the IRS matter.

PROCEEDINGS

```
 1            MS. HOSSEINI:  Yes, Your Honor.  We believe, in our
 2   view, that --
 3            THE COURT:  No, no, let's not argue it now, because we
 4   have the jury waiting.  So let's just table everything now.
 5   I'll excuse the jury for the day when you're gone, and then
 6   we'll talk.
 7            MS. MITCHELL:  Okay.
 8            MS. HOSSEINI:  Thank Your Honor.
 9            THE COURT:  Okay.
10       (The following proceedings were held in the presence of
11   the Jury)
12            THE COURT:  Thank you, members of the jury.  You may
13   be seated.
14       Is the government prepared to call your next witness?
15            MS. JAMES:  Yes, Your Honor.  The government calls
16   Agent Ben Fierberg.
17            BENJAMIN FIERBERG, GOVERNMENT'S WITNESS, SWORN
18            THE WITNESS:  I do.
19            THE COURTROOM DEPUTY:  Can you please say your name
20   and then spell your last name.
21            THE WITNESS:  First name is Benjamin, common spelling.
22   Last name is Fierberg, F-I-E-R-B-E-R-G.
23            THE COURTROOM DEPUTY:  Thank you.
24            THE COURT:  You may be seated.
25            THE WITNESS:  Thank you, Your Honor.
```

1        **THE COURT:**  You may proceed, Ms. James.

2        **MS. JAMES:**  Thank you, Your Honor.

3                        **DIRECT EXAMINATION**

4   BY MS. JAMES

5   **Q**    Good afternoon.

6   **A**    Good afternoon.

7   **Q**    Are you currently employed?

8   **A**    Yes.

9   **Q**    Where are you currently employed, and what is your

10  position?

11  **A**    I'm employed with the Federal Bureau of Investigation.

12  And my position is Special Agent.

13  **Q**    And how long have you been employed by the FBI?

14  **A**    Since 2017.

15       (Reporter clarification)

16  **Q**    And just generally speaking, what are your duties and

17  responsibilities as a Special Agent?

18  **A**    To investigate violations of federal law.

19  **Q**    Now, directing your attention to July 28, 2022, were you

20  working that day?

21  **A**    I was.

22  **Q**    Where were you working?

23  **A**    In Massachusetts.

24  **Q**    Do you remember specifically what part of Massachusetts?

25  **A**    Yes.  I traveled to Falmouth, Massachusetts.

FIERBERG - DIRECT / JAMES

1   **Q**   And is that in Cape Cod?

2   **A**   It is.

3   **Q**   Why were you there?

4   **A**   I was there to conduct the arrest of Allen Gessen.

5   **Q**   While you were there, did you encounter Allen Gessen?

6   **A**   I did.

7   **Q**   Was he alone?

8   **A**   There were other individuals at the residence.

9   **Q**   Do you know who these other individuals were?

10  **A**   I personally viewed or interacted with Lenna Gessen, and I

11  observed the two children present there.

12  **Q**   Did you have any other involvement in this investigation

13  other than this going to arrest Mr. Gessen?

14  **A**   My involvement was operational.  I wasn't involved

15  necessarily with the investigative operations.  The case team

16  was traveling overseas, and that is why I was tasked with

17  traveling to Massachusetts.

18          **MS. JAMES:**  Thank you.  No further questions.

19          **THE COURT:**  Any questions?

20          **MR. RAJU:**  No questions, Your Honor.

21          **THE COURT:**  You are excused, Agent.

22          **THE WITNESS:**  Thank you.

23      (Witness excused)

24          **THE COURT:**  Is the government prepared to call your

25  next witness?

1          **MS. HOSSEINI:**  Yes, Your Honor.  The United States

2     calls David Peacock.

3          **DAVID PEACOCK, GOVERNMENT'S WITNESS, SWORN**

4          **THE COURTROOM DEPUTY:**  Say your name, and spell it for

5     the record.

6          **THE WITNESS:**  David Peacock.  First name David, last

7     name Peacock, P-E-A-C-O-C-K.

8          **THE COURT:**  Thank you.  You may be seated.

9                    **DIRECT EXAMINATION**

10    BY MS. HOSSEINI:

11    **Q**    Good afternoon.

12    **A**    Good afternoon.

13    **Q**    Can you please tell us where you work?

14    **A**    I work for the Federal Bureau of Investigation here in

15    San Francisco.

16    **Q**    And how long have you worked for the Federal Bureau of

17    Investigation?

18    **A**    In total, for 15 years.

19    **Q**    What positions have you held at the FBI?

20    **A**    I held the position staff operations specialist, which is

21    akin to an operations analyst.  Targeting analyst, essentially.

22    And, did that for seven years.

23         And then for the rest of my time I have been an agent here

24    in San Francisco.

25    **Q**    And just generally speaking, what are your

1    responsibilities as an agent?

2    **A**    As an agent I'm assigned to the organized crime squad.

3    Particularly I conduct investigations into Eastern European

4    groups.  And throughout those investigations, I look into

5    bribery, extortion, money laundering and murder for hire.

6    **Q**    Now, directing your attention to June of 2022, the year

7    2022, did you participate in an investigation involving Allen

8    Gessen?

9    **A**    Yes, I did.

10   **Q**    Can you tell us a little bit about your investigation and

11   how you were introduced to Mr. Gessen?

12   **A**    Yeah.  So it's a larger investigation into money

13   laundering for two other individuals.  And my co-case agent and

14   I were working that investigation since, I believe, April of

15   2020.  And then, it was a conversation that Mr. Kiselev, who

16   was another subject of that investigation, sought to have with

17   our undercover, with one of our undercovers.

18   **Q**    Okay.  You said "one of our undercovers."  Were there more

19   than one undercovers in that larger investigation, the

20   money-laundering one where Mr. Kiselev was one of the targets?

21   **A**    Yes.

22   **Q**    So can you tell us a little bit about the dynamics between

23   the case team and the undercover agents?

24   **A**    Sure.  So the case team is two agents in this

25   investigation.  We are kind of the orchestrators of the

1  investigation.  We make all the investigative decisions, to

2  include techniques that we are going to use; individuals that

3  we are looking at, obviously; and in what general direction the

4  investigation is going to go.  That's all -- those decisions

5  are made by the case -- case team.

6  **Q**    And then what part does the undercover agent play?

7  **A**    So if -- if it's chosen that you'll utilize an

8  investigative technique to include an undercover, that would be

9  purely their role.  They're -- they're utilized as a tool to

10  collect evidence.  And they can meet with people in person, or

11  they can, you know, collect evidence in other -- other ways to

12  include communications, telephone calls, et cetera.

13  **Q**    Okay.  Are you an undercover agent?

14  **A**    No, I am not.

15  **Q**    Is Agent Bognanno, the other co-case agent, an undercover

16  agent?

17  **A**    No, he is not.

18  **Q**    So the FBI differentiates among those two roles?

19  **A**    Yes, there's special training required for undercover

20  employees.

21  **Q**    And is it a situation where the case team has one side and

22  the undercovers have another side?  Or is it a situation where

23  you're working together?

24  **A**    We work together.  And the undercover specifically carries

25  out their part of the investigation by request of us.  Or, you

1  know, they're notified how to conduct that portion of the

2  investigation.

3  **Q**   And so how involved were you and Agent Bognanno in this

4  investigation?

5  **A**   Fully involved.  This is our investigation, from the

6  start.  And like I said, we utilized different investigative

7  techniques to include undercovers, but in the grand scheme of

8  things, it is our investigation.

9  **Q**   And what are some of the investigative steps that you and

10  Agent Bognanno took in this investigation?

11  **A**   So we had a variety of -- well, from the start, you

12  initially start with collecting basic information about

13  somebody who is -- who has allegations of conducting criminal

14  activity.  We met with sources.  We conducted the records

15  checks.  Served subpoenas for bank records and --

16  **Q**   Are you talking about the larger money-laundering case?

17  **A**   That's correct.

18  **Q**   Okay, I'm sorry; I should redirect.  With respect to --

19  starting from June, 2022, with respect to the investigation of

20  Mr. Gessen.

21  **A**   Yes.  Okay.

22  **Q**   What are some of the things you and Agent Bognanno did?

23  **A**   So, um, specific to that investigation, as I say, we would

24  do a basic background check to understand more of that

25  individual.  We would evaluate their communications, accounts,

1  potentially telephones or emails or something like that.  We

2  would conduct investigation into financials.

3       And then in this particular instance, we chose to utilize

4  an undercover employee.

5  **Q**    And were you aware that the undercover agent would be

6  meeting with Mr. Gessen on two occasions in June of 2022?

7  **A**    Not initially, but it --

8  **Q**    I mean, once the plan was put in place, were you aware?

9  Or did the undercover just do his own thing?

10  **A**    No, absolutely we were aware of all -- all meetings.  It's

11  our job to ensure the safety and security of the undercover

12  employee, as well as to collect and establish a -- a chain of

13  custody for any evidence that's collected throughout the

14  undercover meetings.

15  **Q**    And how was that done in this case?

16  **A**    So specifically, the chain of custody regarding the

17  recordings, for instance, as soon as the meeting is over, we

18  will have a location that was predetermined where we meet the

19  undercover and collect that recording device from the

20  undercover.

21       It would then be taken into our custody.  And that's the

22  next step of the chain of custody.  Depending on travel, you

23  know, it's either going back with us to San Francisco, or in

24  certain instances we would lock it in a safe overnight, and

25  then travel the next day.

1      All -- in all instances, evidence ends up back at the

2    field office where Special Agent Bognanno or I would then check

3    the evidence in to the official evidence unit here in

4    San Francisco.

5    **Q**    So the undercover agent does the recording, then takes the

6    recording, gives it to you or Agent Bognanno, and then you take

7    it and put it in evidence.

8    **A**    That's correct.

9    **Q**    Okay.  How about communications on a phone, like an

10   undercover phone on Signal?  What would happen to that?

11   **A**    So there's a variety of ways to -- to document that

12   intelligence or that -- that evidence, excuse me.  We can do so

13   by maintaining the phone, itself, obviously as a piece of

14   evidence, and it stays within FBI space or it is checked into

15   evidence.

16        We can also take photographs of the communications, and

17   those are also logged as evidence within a report.

18   **Q**    So what happened to the undercover phone in this case?

19   The phone that the undercover agent used to communicate with

20   Mr. Gessen?

21        We read some of those Signal messages, like Government

22   Exhibit 3, for example.

23   **A**    Correct.

24   **Q**    What happened to that phone?

25   **A**    Ultimately it was turned over to the case agents, and we

1   maintain it in our possession here in San Francisco.

2   **Q**    Is that in evidence?  Is it like in an evidence bag?

3   **A**    It is.

4   **Q**    Okay.  How about any physical items that might be received

5   by an undercover agent?  What happens to those?

6   **A**    Those are logged in the same manner that I explained

7   earlier.  So they would be placed in the care of one of the

8   investigative agents.  One of or both, depending on if it's a

9   valuable item.

10        And then those items would follow the same process.  They

11   would be transported back to the field division and placed into

12   our evidence unit for safekeeping and chain-of-custody

13   purposes.

14   **Q**    Okay.  Since you mentioned a valuable item, do you

15   remember Government Exhibit 11, the gold coin?  Can you explain

16   the chain of custody for that item?

17   **A**    Yeah, I would have to look at the exact chain, but to my

18   recollection, I obtained that from Special Agent Bognanno in --

19   or we both obtained it, sorry, from the undercover in New York.

20   And then it was transported back in my care to San Francisco.

21        And then if I remember correctly, Special Agent Jonathan

22   Clemens, who is also on our investigative squad, took the coin,

23   along with me, to check it into evidence where it was properly

24   checked in.

25   **Q**    Okay.  And were you on scene on June 2nd, 2022?  Were you

PEACOCK - DIRECT / HOSSEINI

1   in Boca Raton, Florida, on that day?

2   **A**    Yes, I was.

3   **Q**    Okay.

4        **MS. HOSSEINI:**  Can we look at Government Exhibit 19.

5   **BY MS. HOSSEINI**

6   **Q**    What was your role?  Why were you there?

7   **A**    I don't -- I don't see an exhibit.

8   **Q**    Oh.  19.

9        (Photographs displayed)

10       **MS. HOSSEINI:**  It was previously entered into

11  evidence.

12       Is it not?

13       **THE COURT:**  No, it's in evidence.

14       **MS. HOSSEINI:**  19?

15       **THE COURT:**  Uh-huh.

16       **MS. HOSSEINI:**  Okay.  Thank you, Your Honor.

17       Page 1, please.

18       (Photograph displayed)

19  **BY MS. HOSSEINI**

20  **Q**    What is this, what are we looking at, Agent Peacock?

21  **A**    This is the Boca Raton Resort.  This is just the outdoor,

22  um, car -- car area where, you know, people are arriving near

23  the lobby.

24  **Q**    Who took this photo?

25  **A**    I took this photograph.

1  Q    And so why were you on scene on that day in Boca?

2  A    I had a -- kind of a cross-selection of duties.  First and

3  foremost was to be on surveillance to identify Mr. Gessen

4  arriving at the Boca Raton Resort.   In this particular picture

5  I'm in a vehicle, where I witnessed him arriving at the

6  Boca Raton Resort.

7       MS. HOSSEINI:  Can we go to Page 3, please, still in

8  Exhibit 19.

9       (Photograph displayed)

10  BY MS. HOSSEINI

11  Q    And what are we looking at here?

12  A    So this is another photograph that I took from the vehicle

13  I was in.  And this is Mr. Gessen dropping his vehicle off with

14  a valet at the front of the Boca Raton Resort.

15  Q    Okay.  And so you said you're there to provide support and

16  surveillance?

17  A    Correct.

18  Q    All right.  How about some documents that an undercover

19  agent may receive?  We've seen some here like the letter of

20  engagement, Exhibit 12, consultancy agreement, Exhibit 13.

21       What happens to those documents?  Do you put those in the

22  FBI case file at all?

23  A    Yes.  We would receive that from the undercover.  And

24  document it appropriately, in a report.

25  Q    Okay.  And during your investigation, was there a time

1    when the undercover phone was in the San Francisco FBI office?

2    **A**    Yes, there was.

3    **Q**    Were messages being sent while the phone was in the

4    San Francisco office?

5    **A**    Yes.

6           **MS. HOSSEINI:**  Can we please look at Exhibit 3,

7    Page 10, which has previously been entered into evidence.

8           (Image displayed)

9           **MS. HOSSEINI:**  Can we zoom into the bottom portion of

10   that exhibit, please.

11          (Document enlarged)

12   **BY MS. HOSSEINI**

13   **Q**    Under the message Monday, June 13th, Agent Peacock, can

14   you read the message please?

15   **A**    Sure.  (As read)

16           "Hi Allen, I'm back from Costa Rica and ready

17           to move forward with our next meeting.

18           "I'm trying to balance some upcoming meetings

19           and travel.  Does late morning early

20           afternoon 6/22 in Manhattan work for you?"

21   **Q**    Where was that message sent from?

22   **A**    From the San Francisco FBI office.

23   **Q**    Did you see that message being typed out and sent?

24   **A**    Yes, I did.

25   **Q**    From San Francisco.

1   **A**    Yes.

2   **Q**    And it was to set up the June 22nd meeting with

3   Mr. Gessen?

4   **A**    That's correct.

5   **Q**    Okay.  As part of your investigation, did you have an

6   occasion to learn about any wires?

7   **A**    Yes, I did.

8   **Q**    Tell us a little about that.

9   **A**    So I also maintain the, um, the undercover bank account at

10  Bank of America.  It was a business bank account, for the

11  purposes of receiving wires in this case.

12  **Q**    Just this case?  As in Mr. Gessen's case?  Or also the

13  other case?

14  **A**    Also the other case.  So overall, the larger

15  investigation, but the bank account was set up and ready to

16  receive wires from Mr. Gessen as well.

17  **Q**    Okay.

18       **MS. HOSSEINI:**  I'm going to show, just for the

19  witness, please, Exhibit 22.

20       (Document displayed to the Witness)

21  **BY MS. HOSSEINI**

22  **Q**    Do you recognize this document, Agent Peacock?

23  **A**    Yes, I do.

24  **Q**    What is it?

25  **A**    This is documentation from the MLI undercover bank account

1  ending in 3647 of an incoming wire for $17,975, on --

2  **Q**    We'll get to that in just a minute.  If you can just tell

3  me that that is something that you have seen before?

4  **A**    Oh, sorry.  Yes, I have seen this.

5         **MS. HOSSEINI:**  We would like to move into evidence

6  Exhibit 22.

7         **THE COURT:**  Any objection?

8         **MR. RAJU:**  No.

9         **MS. MITCHELL:**  No objection.

10        **THE COURT:**  22 is admitted.

11     (Trial Exhibit 22 received in evidence.)

12        **MS. HOSSEINI:**  Permission to publish?

13        **THE COURT:**  Yes.

14     (Document displayed)

15 **BY MS. HOSSEINI**

16 **Q**    So Agent Peacock, tell us what we are looking at on the

17 screen.

18 **A**    So I got ahead of myself.  Um, this is a documentation on

19 the Bank of America website for the MLI undercover FBI account

20 ending in 3647.  And specifically it notes a posting date of

21 6/29, so June 29th, 2022, in the amount of $17,975.

22     In the description you will note it is incoming from

23 GEEWIZ ÖU at a Citibank account, and specifically references a

24 consultancy agreement.

25 **Q**    So you are looking at under "DESCRIPTION," line five, it

PEACOCK - DIRECT / HOSSEINI

1    says "SND BANK"?

2    **A**    Yes, correct.

3    **Q**    "CITIBANK."   That means a sending bank?

4    **A**    To my understanding, yes.

5    **Q**    And then below that it says "ACCORDING CONSULTANCY

6    AGREEMENT"?

7    **A**    Correct.

8    **Q**    Okay.   And so, put this in context in your investigation.

9    What was this wire, from who to where?

10   **A**    So based on my knowledge of the investigation, and the

11   meetings, and the communications that had occurred up to that

12   point, this was the first installment of -- it was supposed to

13   be $18,000 -- coming in from Mr. Gessen to the undercover's MLI

14   bank account.

15   **Q**    And how come it's not 18,000, it's $17,975?

16   **A**    So I had to actually research that, but I determined,

17   based off of just open-source research, that Citibank charges a

18   transfer fee.   So instead of it being 18,000 it is 17,975.

19   **Q**    Like a $25 wire fee?

20   **A**    Correct.

21   **Q**    Okay.

22        **MS. HOSSEINI:**   And can we go to Page 2 of Exhibit 22,

23   Mr. Machado?

24        (Document displayed)

25

1    BY MS. HOSSEINI

2    Q     And what are we looking at on Page 2, Agent Peacock?

3    A     So this is the second wire.  And again, it is being sent

4    into the MLI undercover bank account ending in 3647.  The

5    posting date is July 8, 2022.  In the amount of $4,975.

6          And the same description referencing it being originated

7    from GEEWIZ ÖU, and the sending bank being Citibank, with the

8    reference made to a consultancy agreement.

9    Q     And the same $25 wire fee appears to have applied here?

10   A     That's correct.  The wire was supposed to be $5,000.  And

11   instead, it appears a $25 wire fee was subtracted, to make it

12   $4,975.

13   Q     Okay.  Now, you said the post date was July 8, 2022.  That

14   date, July 8, was that significant in your investigation in any

15   other way?

16   A     Yes, it was.

17   Q     How?

18   A     On that same date, the undercover received the target

19   package from Mr. Gessen via Signal.

20         MS. HOSSEINI:  And can we go to Exhibit 31, please,

21   which has previously been admitted into evidence.

22         (Image displayed)

23         (Document displayed)

24   BY MS. HOSSEINI

25   Q     The date at the top, is that what you are referring to,

1    Agent Peacock?

2    **A**    Yes, ma'am.

3    **Q**    So the second wire that you just told us about in that

4    target package, Exhibit 31, were sent at the same date?

5    **A**    That's correct.

6         **MS. HOSSEINI:**  Now, just for the witness, I would like

7    to show you Exhibit 15.

8         (Document displayed to the Witness)

9    **BY MS. HOSSEINI**

10   **Q**    Do you recognize this?

11   **A**    Yes, I do.

12   **Q**    How do you recognize it?

13   **A**    That is a photograph that I took.  I accessed the MLI

14   undercover bank account ending in 3647 via a burner phone.

15   **Q**    We'll get into that in a second.

16        **MS. HOSSEINI:**  I would like to move it into evidence,

17   Your Honor, Exhibit 15.

18        **THE COURT:**  Any objection?

19        **MS. MITCHELL:**  No objection.

20        **THE COURT:**  15, admitted.

21        **MS. HOSSEINI:**  Permission to publish?

22        **THE COURT:**  Yes.

23        (Trial Exhibit 15 received in evidence.)

24        (Document displayed)

25

PEACOCK - DIRECT / HOSSEINI

1    BY MS. HOSSEINI

2    **Q**    So can you tell us if you made any effort to actually

3    confirm whether money was actually received into the undercover

4    bank account?

5    **A**    Yes, I did.

6    **Q**    Tell us about what we're looking at here.

7    **A**    So around the time that we were expecting -- based on

8    conversations with -- between Mr. Gessen and the undercover, we

9    were expecting a wire to hit the MLI undercover bank account.

10        And I accessed the bank account ended in 3647 via a burner

11   phone.  And I -- I identified that it was a processing incoming

12   wire for $17,975 on June 29, 2022

13   **Q**    Okay.

14        **MS. HOSSEINI:**  And just for the witness, I would like

15   to show you Exhibit 26.

16   **BY MS. HOSSEINI**

17   **Q**    Tell me if you recognize this document.

18        (Document displayed to the Witness)

19   **A**    Yes, I do.

20   **Q**    What is it?

21   **A**    The subpoena results.  We had served a subpoena, and these

22   are the results from Citibank.

23        **MS. HOSSEINI:**  I would like to move Exhibit 26 into

24   evidence.

25        **MS. MITCHELL:**  No objection.

1     THE COURT:  26, admitted.

2         (Trial Exhibit 26 received in evidence.)

3   BY MS. HOSSEINI

4   Q    All right.  Agent Peacock, if we can look on Page -- if we

5   can -- so this is the Citibank records, you said.  And why did

6   you choose to look at Citibank?

7   A    Based off of the wire transaction that was apparent within

8   our undercover account, it had indicated an incoming wire from

9   Citibank.

10  Q    Okay.

11       MS. HOSSEINI:  If we can go to Page 2, please.

12       (Document displayed)

13  BY MS. HOSSEINI

14  Q    Tell us what you see under "Debit Party" and "Credit

15  Party."

16  A    Under "Debit Party," it appears it's coming from LHV PANK,

17  which, I believe that's Estonian for "bank."  And it's located

18  specifically in Tallinn, Estonia.

19  Q    Under "Credit Party," is that the Bank of America account

20  you were telling us, that's the FBI undercover account?

21  A    That's correct.

22  Q    Now, were you surprised that an Estonian bank was --

23  A    Can I correct that?  I would like to just note the credit

24  party is Bank of America, in fact, but the beneficiary is the

25  more accurate reflection of it being MLI and the account

1   number.

2   **Q**   I see.  So MLI is the account holder; the account is in

3   the name, MLI Ventures?

4   **A**   Right.  And the ID is the bank account number.  3647.

5   **Q**   We're going to get the bank account number.  You are ahead

6   of me, Agent Peacock.

7       But while we are on the debit party side of this document,

8   were you surprised that an Estonian bank was where this wire

9   was being sent from?

10          **MS. MITCHELL:**  Objection, relevance, as to the agent's

11   emotional state.

12          **THE COURT:**  Overruled.

13   **BY MS. HOSSEINI**

14   **Q**   You can answer.

15   **A**   No, I was not surprised.

16   **Q**   Why not?

17   **A**   Previously, I was aware that Mr. Gessen and the undercover

18   had a conversation related to Mr. Gessen having some sort of

19   business ventures in Estonia.

20   **Q**   And was that on the recording that we listened to

21   yesterday?

22   **A**   Yes.

23          **MS. HOSSEINI:**  Now Mr. Machado, if we can please

24   put up Page 7 of Exhibit 13, side by side with Page 2 of

25   Exhibit 26.

1          (Documents displayed)

2          MS. HOSSEINI:  And if we can look under -- sorry --

3    fees and expenses, I believe it is.  Can we highlight that?  Or

4    does that not work with the --

5          THE WITNESS:  I can -- I can read it.

6    BY MS. HOSSEINI

7    Q    And I can just ask you generally, you have seen these

8    documents before.  Looking at the bank records from Citibank

9    and this consultancy agreement that was part of your

10   investigation, what conclusion did you reach, based on those

11   two documents?

12   A    I -- I concluded that those wires were sent to match up

13   with the consultancy agreement.

14   Q    Okay.

15         MS. HOSSEINI:  And in the consultancy agreement, if we

16   can just look at that on Page 8, Mr. Machado.

17         (Document displayed)

18         MS. HOSSEINI:  Under "MLI Ventures," if we can zoom in

19   to that.

20         (Document enlarged)

21   BY MS. HOSSEINI

22   Q    There's a reference to -- Line 2, towards the end of that

23   line:

24             "NAVOI MINING AND METALLURGICAL COMPANY."

25         Were any of the undercover agents doing any kind of

PEACOCK - DIRECT / HOSSEINI

1  consulting services for an Estonian company that referenced

2  mining and metallurgical companies?

3  **A**    No, they were not.

4  **Q**    So why does it say that here?

5  **A**    I believe this is a way to obfuscate the transfer of the

6  funds by placing a phony company in here as a client.

7          **MS. MITCHELL:**  Objection, speculation.

8          **THE COURT:**  Overruled.

9  **BY MS. HOSSEINI**

10  **Q**    You may answer.

11  **A**    I think that's the end of my answer.  You know, I've never

12  heard of this company.  And I believe that utilizing a company

13  like this is a way for obfuscating the true nature of the

14  transfers.

15  **Q**    Okay.

16          **MS. HOSSEINI:**  And if we can go to Page 8 of the same

17  exhibit, Mr. Machado?

18      (Document displayed)

19          **MS. HOSSEINI:**  And if we can pull up Fees and Payment

20  Terms Section, No. 3.

21      (Document displayed)

22  **BY MS. HOSSEINI**

23  **Q**    Agent Peacock, can you tell us the two -- enumerated 1 and

24  2 lines -- what they say?

25  **A**    Sure.  Line 1 (As read):

1          "Payment in the total of 18,000 U.S. dollars

2          is made until July 1st, 2022."

3     And then Line 2 or Item 2:

4          "Payment in the total amount of 5,000 U.S.

5          dollars is made until July 15, 2022."

6  **Q**   And how does the amounts and the dates match with the

7  wires that you told us about earlier?

8  **A**   So the -- the first wire had hit our account on June 29th.

9  So this is maybe the next day -- I'm not -- next day or within

10 a day or two of arriving.

11     And then the second one was on July 8th, so this is

12 roughly just about a week after that $5,000 wire hit the

13 account.

14 **Q**   Around the same timeframe?

15 **A**   Yes.

16 **Q**   And what about the amounts?

17 **A**   So, minus the wire fees that I noted earlier, these are

18 identical amounts.

19          **MS. HOSSEINI:**  May I have a moment, Your Honor?

20     (Off-the-Record discussion between counsel)

21          **MS. HOSSEINI:**  No further questions.

22          **THE COURT:**  Any cross-examination?

23          **MS. MITCHELL:**  Yes, Your Honor.

24

25

1                    <u>CROSS-EXAMINATION</u>

2    **BY MS. MITCHELL**

3    **Q**   Good afternoon, Agent Peacock.

4    **A**   Good afternoon.

5    **Q**   Now, your investigation of Mr. Kiselev began prior to

6    2021.  Correct?  Around that time, a little bit before then?

7    **A**   Yeah, a little before then.

8    **Q**   You didn't know about Mr. Gessen until Mr. Kiselev asked

9    you for help with a friend's problem.

10   **A**   Well, we still didn't know it was Mr. Gessen at this

11   point.

12   **Q**   In fact, he was not part of your initial investigation of

13   Mr. Kiselev?

14   **A**   Mr. Kiselev?

15   **Q**   Yes.

16   **A**   The initial investigation into what?

17   **Q**   Mr. Gessen was not part of the investigation of

18   Mr. Kiselev, correct?  Initially?

19   **A**   Not initially, but we were aware of him on a different

20   avenue of investigation prior to the undercover.

21   **Q**   But it was because Mr. Kiselev informed you of who

22   Mr. Gessen was.

23   **A**   That's correct.

24   **Q**   You were not involved in investigating him in any child

25   custody issues, correct?

PEACOCK - CROSS / MITCHELL

1    **A**    No, the FBI does not investigate child custody issues.

2    **Q**    And you weren't involved in the Massachusetts parental

3    kidnapping case at all.

4    **A**    No.

5    **Q**    Now, you just testified that you're part of a team?

6    **A**    That's correct.

7    **Q**    And that team consists of a number of agents.

8          But, some of the ones that we have heard about in court

9    today are Agent Rizzo, and Agent Bognanno.  Correct?

10   **A**    That's correct.

11   **Q**    All right.  Now, you read each other's reports?

12   **A**    Generally speaking, yes.

13   **Q**    You want to be aware of what each other are doing.

14   **A**    Excuse me?

15   **Q**    You want to be aware of what each other are doing.

16   **A**    Yes.

17   **Q**    Okay.  And you look out for each other?

18   **A**    In what manner?

19   **Q**    You try and make sure that each -- you try and make sure

20   that you are protected, for instance.

21   **A**    For an undercover?  Absolutely.

22   **Q**    Specifically, Agent Rizzo engages in situations that could

23   be dangerous?

24   **A**    Yes.

25   **Q**    And so you want to make sure that your team provides

PEACOCK - CROSS / MITCHELL

1   surveillance for him?

2   **A**   Yeah, we would provide surveillance, absolutely.

3   **Q**   And you would want to make sure that you are aware of

4   possible dangers at a scene, correct?

5   **A**   Correct.

6   **Q**   And you know it's important for Agent Rizzo to keep his

7   cover intact.  That -- um, I can't remember -- I can't remember

8   what he referred to it as.  His -- persona.

9   **A**   Yeah.  I would say, generally speaking, depending on the

10  issues that he's working, that's highly important.  Because if

11  he doesn't, he could be identified as a potential law

12  enforcement officer.  And that would be very dangerous for him.

13  **Q**   So as part of keeping his persona intact, he is pretending

14  to be an Italian mobster who works with Columbian drug

15  smugglers.

16  **A**   Correct.

17  **Q**   And he, in order to do so, has to tell mistruths, and has

18  to convince others of those mistruths that he is telling them?

19  **A**   So I'm not undercover; I don't know how to exactly

20  classify what it is that he does; excuse me.  He is trained in

21  those manners, so I can't speak on his behalf.

22  **Q**   You can't speak on his behalf.  But, Agent Rizzo is not,

23  in fact, a money launderer for Columbian drug smugglers?

24  **A**   He is a sworn FBI agent.

25  **Q**   So when he tells people that he is a money launderer for

1   Columbian drug smugglers, he is not telling the truth, correct?

2   **A**    He is playing a role.

3   **Q**    He is playing a role.  So in that role he is essentially

4   acting.

5   **A**    He's playing a role.  I can't -- I can't expand upon it

6   much more than that.

7   **Q**    Okay.  But in the course of playing a role, he is telling

8   people he is a Columbian money launderer, when in fact, he is

9   actually an FBI Agent.

10  **A**    That's true.

11  **Q**    And it is not true that he is an Italian mobster.

12  **A**    No.  He's an FBI agent.

13  **Q**    And it's not true that he works with Columbian drug

14  smugglers.

15  **A**    That's true.

16        **MS. HOSSEINI:**  Asked and answered.

17        **THE COURT:**  Overruled.

18  **BY MS. MITCHELL**

19  **Q**    You would agree that Agent Rizzo is good at his job?

20  **A**    I've heard he's great at his job.

21  **Q**    Okay.  To your knowledge, has his cover ever been blown?

22  **A**    Not to my knowledge.  I've only worked with him for this

23  investigation, so I can't speak to his entirety of his career.

24  **Q**    But for the two -- approximately two and a half years that

25  you have been working with him on this investigation, no one

1  has been able to pierce through the persona that he uses?

2  **A**    I don't understand "pierce through."  I don't --

3  **Q**    No one's accused him of being an FBI agent.

4  **A**    Not that I'm aware of.

5  **Q**    Now, you just told us that you provided surveillance

6  for the June 2nd meeting.  I want to talk to you about that

7  June 2nd meeting.  Did you listen to the recording of the

8  meeting?

9  **A**    Live?  Or --

10 **Q**    Afterwards.

11 **A**    Afterwards?  Yes.

12 **Q**    So you reviewed the discussions between Mr. Gessen and

13 Mr. Rizzo, Agent Rizzo?

14 **A**    Yes.

15 **Q**    And they discussed Mr. Gessen -- Mr. Gessen trying to

16 bribe a United States official to deport Ms. Chigariro from the

17 United States.  Correct?

18 **A**    Can you repeat that question again?  Sorry.

19 **Q**    As part of the discussions that you overheard, you heard

20 Mr. Gessen discussing bribing a United States official in order

21 to deport Ms. Chigariro from the United States.

22 **A**    Yes.

23 **Q**    And you also heard Mr. Gessen and Agent Rizzo discussing

24 money laundering.

25 **A**    Yes.

PEACOCK - CROSS / MITCHELL

1  Q    You also heard Mr. Gessen and Mister -- and Agent Rizzo

2  discussing other investment schemes.

3  A    Yes.

4  Q    You heard them discussing military supplies for Ukraine.

5  A    I -- I heard them discussing the factory that would create

6  military supplies.

7  Q    Ballistic vests and helmets.

8  A    Yeah.

9  Q    You never heard Mr. Gessen say "I want to hire you to

10 murder Ms. Chigariro."

11 A    No, I never heard that.

12 Q    Never heard him say "I want you to kill Ms. Chigariro."

13 A    I never heard the word "kill," no.

14 Q    And the same goes for Agent Rizzo.  You never heard him

15 use the word "murder" in the conversation, correct?

16 A    Correct.  I think he was speaking in code the entire time,

17 so he would not use those terms.

18 Q    Now, I want to clarify this.  You said he was speaking in

19 code the entire time.  Yes?  But --

20 A    Related to the murder for hire, yes.

21 Q    Related to the murder for hire.  But he was very clear

22 about the fact that he was a money launderer?

23 A    Yes.

24 Q    He was very clear about the fact that he worked for a

25 Columbian cartel?

PEACOCK - CROSS / MITCHELL

1    **A**    Yes.

2    **Q**    He was very clear about the fact that he was trying to

3    find someone to launder money?

4    **A**    Yes.

5    **Q**    He was very clear about the fact that the Columbian

6    cartel's drug of choice was cocaine?

7    **A**    He said "coke," but yes.

8    **Q**    Okay.  So he was very clear about some things.

9    **A**    Is that a question?

10   **Q**    Yes.

11   **A**    He was clear about some things.

12   **Q**    You don't know why he was not as clear about the

13   murder-for-hire scheme.

14   **A**    I know that, um, based off of his interactions, that he

15   understood Mr. Gessen to have an elevated sense or a concern

16   for operational security.

17   **Q**    Uh-huh.

18   **A**    Related to that matter.  And that was how he chose to

19   communicate with him, utilizing code words.

20   **Q**    When you say "operational security," you mean concern

21   about discussing something that was illegal.

22   **A**    Yes.

23   **Q**    And bribery of a government official is illegal, correct?

24   **A**    It is.

25   **Q**    And money laundering for a Columbian drug cartel is

**PEACOCK - CROSS / MITCHELL**

1  illegal, correct?

2  **A**   I think they are all illegal; I just think they are on

3  different scales of illegal.

4  **Q**   But you would agree that those are both illegal

5  activities.

6  **A**   I do.

7  **Q**   Okay.  And those were clearly articulated by both parties.

8  Correct?

9  **A**   Which --

10  **Q**   It was clearly articulated by Agent Rizzo, those two

11  illegal activities.  Correct?

12  **A**   Yes.

13  **Q**   Now, when you were doing surveillance of that meeting, you

14  actually had visual contacts, you could see Mr. Gessen and

15  Agent Rizzo during the course of their meeting?

16  **A**   I saw them early in the meeting.  I didn't see them in the

17  second half of the meeting.

18  **Q**   And by "the second half of the meeting," you mean actually

19  in the restaurant?

20  **A**   Correct.

21  **Q**   So I want to --

22  **A**   Personally, I didn't see it.

23  **Q**   You didn't personally see it --

24  **A**   There was another agent who saw that.

25  **Q**   And you saw the photos of the other agent later on.

PEACOCK - CROSS / MITCHELL

1   **A**   Correct.

2   **Q**   So let's look at some of those factors.  I want to look at

3   what's already been admitted as Exhibit 19.

4       (Photograph displayed)

5   **Q**   Turning first to Exhibit 19, Page 6.

6       (Photograph displayed)

7   **Q**   This was a photograph taken in the lobby of the hotel?

8   **A**   Correct.

9   **Q**   Did you actually take this photograph?

10  **A**   I did not.

11  **Q**   But you couldn't -- you saw these photographs after they

12  were taken?

13  **A**   Yes.

14  **Q**   Were you aware of the placement of the agent who took

15  these photographs?

16  **A**   Yes.

17  **Q**   And you had walked through this lobby and could judge the

18  distance this agent was from Mr. Gessen and Agent Rizzo?

19  **A**   I mean, I walked through the lobby, but looking at the

20  photograph I can't tell you, you know, the exact distance.

21  Yeah.

22  **Q**   From your personal knowledge, would you say the agent was

23  ten feet away?

24  **A**   Again, I -- I can't tell by the photograph.  And I wasn't

25  the one that took it.  I can't answer that question, sorry.

 1   **Q**    It does not appear, though, that from this photograph the

 2   agent who took it was immediately adjacent to either of the two

 3   parties.  Correct?

 4   **A**    No, it doesn't appear immediately adjacent.

 5   **Q**    And "immediately adjacent" I guess is a little vague.

 6   They weren't two to three feet away.  Correct?

 7   **A**    No.

 8   **Q**    And turning to Exhibit 19, 008.

 9        (Photograph displayed)

10   **Q**    Did you happen to take this photograph?

11   **A**    I did not.

12   **Q**    And this is a photograph, though, of Agent Rizzo and

13   Mr. Gessen walking?

14   **A**    I can't confirm that.  I didn't -- I didn't see this and I

15   didn't take the photograph, but, um, I do know that I spoke

16   with the agent that did take this photograph, and he indicated

17   this was the two of them walking.

18   **Q**    And I know that you were not personally there when this

19   happened, but you would estimate that the person who took this

20   photo was more than ten feet away at the time this photograph

21   was taken.

22   **A**    Yes.

23   **Q**    Now, I would like to show you Exhibit 19 at Page 9, and

24   19 at Page 12, if I could have both of those up at the same

25   time.

**PEACOCK - CROSS / MITCHELL**

1      (Photographs displayed)

2  **Q**    Now, these appear to be two different photographs taken

3  where one is slightly more encompassing what's in the

4  foreground, showing the bar with all the bottles, and the other

5  one is a little bit further up so you can see above the bar.

6  Is that correct?

7      Would I accurately describe both of those that way?

8  **A**    I would say so, yes.

9  **Q**    And you were not the individual who took these

10 photographs, correct?

11 **A**    No, I was not.

12 **Q**    And the photograph obviously is not taken by a person who

13 is sitting immediately adjacent to either Agent Rizzo or

14 Mr. Gessen.  Correct?

15 **A**    Correct.

16 **Q**    All right.  And all of these photos that we've shown, none

17 of the agents who took them were close enough to overhear the

18 conversation of the two individuals.  Correct?

19 **A**    That's correct.

20 **Q**    And you did not personally have a listening device at the

21 table while this conversation was going on between Mr. Gessen

22 and Agent Rizzo.

23 **A**    In fact, we did.

24 **Q**    You, you personally, you -- Agent Rizzo did, but you

25 personally did not have a separate listening device at the

1    table?

2    **A**    I had a live listening device at the table.  I heard the

3    conversation.

4    **Q**    So you overheard their conversation live.

5    **A**    Yes.

6    **Q**    Excellent.  When you overheard this conversation live, and

7    when you listened to the tape, at no time did you hear

8    Mr. Gessen specifically say anything along the lines of:  I

9    wanted -- I want to kill my ex.

10   **A**    As I've stated earlier, I've never heard that term.

11   **Q**    And if you had heard that term or a term similar to it,

12   you would have included that in the report.  Correct?

13   **A**    If I heard that exact term?

14   **Q**    Yes.

15   **A**    I would have probably quoted it.

16   **Q**    You would have quoted it.  It would have been very

17   important for you, if you had heard a term that was -- that

18   exact term.  Correct?

19   **A**    Potentially, yes.

20   **Q**    And so when you're talking about quoting it, it's because

21   those words that were said, if they were said by Mr. Gessen,

22   would have been very important to your case.

23   **A**    I mean, I think the theme of murder for hire is important,

24   period.  If he made that statement, that word, that would be

25   important as well.

**PEACOCK - CROSS / MITCHELL**

1   Q    But it would have been important to show what Mr. Gessen

2   was thinking.  Correct?

3   A    Again, I -- I can't say what he's thinking.  But if I

4   heard that term, it would have been important, yes.

5   Q    And -- because based on -- the only way you could tell

6   what Mr. Gessen was thinking was what he said.

7   A    Well, I wasn't in conversation with him, so I couldn't

8   read his body language.  I couldn't understand what direct

9   exchange was going on between Mr. Gessen and the undercover.

10       So, as a bystander on surveillance, and listening to the

11  call, I had a different perspective of how everything was going

12  down.

13  Q    You are not looking at the total package of what's going

14  on; you are only listening to the words he said.

15  A    I don't understand your question.

16  Q    Because you are listening live at the table, you weren't,

17  as you mentioned, looking at body language and everything else.

18  You were listening just to the words he said.

19  A    That's correct.

20  Q    And so the words he said were the thing that you were most

21  focused on.

22  A    Yeah, words.  For a live transmission, that's the only way

23  I'm going to be able to assess what the meeting is about.

24  Q    And so it would have been helpful for you, listening in on

25  a live transmission, for Mr. Gessen to -- if you're

1    investigating him for a murder for hire, to affirmatively ask

2    that someone be murdered.  Correct?

3    **A**    It would help me?

4    **Q**    Yes.  Prove up the case?

5    **A**    I guess there is a variety of ways to prove up the case.

6    **Q**    But it would have been helpful for you if he would have

7    affirmatively asked that someone be murdered.  Correct?

8    **A**    I don't think people speak like that when they are

9    speaking in code, but it could be helpful.

10   **Q**    I understand you don't think people speak like that when

11   they are speaking in code, but you just agreed that it would

12   have been helpful.  Yes?

13   **A**    Sure.

14   **Q**    All right.  I want to talk to you about the June 22nd

15   meeting.  I'm going to show you what's already been admitted as

16   Exhibit 2.

17       (Photograph displayed)

18   **Q**    Were you there at the meeting on June 22nd?

19   **A**    Yes, I was.

20   **Q**    You were doing observation of the meeting as well?

21   **A**    I was in the vicinity of the location, I wasn't in the

22   restaurant.  Another agent or another two agents were.

23   **Q**    Were you also doing a live listening of the meeting at

24   that time?

25   **A**    I don't believe so.

1  Q    But you -- did you listen to the recording afterwards?

2  A    Yes.

3  Q    Okay.  And listening to the recording afterwards, you

4  heard David Rizzo and Mr. Gessen discuss a gold coin.  Correct?

5  A    Yes.

6  Q    And you believe that Exhibit 2 is a photograph of the gold

7  coin that was exchanged.

8  A    Yes.

9  Q    And this gold coin was considered to be partial payment

10  for a murder-for-hire scheme?

11  A    That's correct.

12  Q    And at that time, you thought that Mr. Gessen had come to

13  the restaurant because he had wanted Ms. Chigariro murdered.

14  That was your operational belief.

15  A    So the progression from Boca Raton had lended itself to a

16  follow-on meeting in New York where documents -- quote-unquote,

17  documents, which is cash, is what the undercover had requested,

18  will be provided, as well as the target package.

19  Q    And was this gold coin (Indicating) also provided?

20  A    It was.

21  Q    This gold coin, when it was provided, though, did not --

22  Mr. Gessen never said:  "Here is the payment for the murder,"

23  correct?

24  A    Again, I think, they're speaking in code; they are not

25  going to say "Here's a payment for murder."

1   **Q**   But you would agree the words "murder" were never said?

2   **A**   Correct.

3   **Q**   "Kill" was never said?

4   **A**   Correct.

5   **Q**   "I hope she dies" was never said?

6   **A**   I don't recall that.

7   **Q**   But, no phrases such as that?

8   **A**   Not that I'm aware of.

9   **Q**   No conversation occurred about:  Where we're going to put

10  the body, correct?

11  **A**   No.  I think that would have been out of the context,

12  because the undercover was not charged with actually conducting

13  the murder.  He was hiring a hit squad to do so.

14  **Q**   There was never a hit squad actually hired, though.

15  **A**   This was -- this was an FBI agent he was speaking to, so

16  no.

17  **Q**   Just wanted to clarify that no one was ever actually

18  hired.

19  **A**   That's correct.

20  **Q**   And Mr. Gessen never spoke to an individual pretending to

21  be a hitman.  Correct?

22  **A**   He spoke to the undercover who indicated he was involved

23  in organized crime, essentially Italian organized crime who had

24  access to individuals who could do that.  But he, himself, was

25  not portraying himself as a hitman.

1  **Q**    The undercover -- when you say "the undercover," this is

2  -- Agent Rizzo never promised to be a person who was going to

3  actually kill Ms. Chigariro.

4  **A**    No.  His persona was not that type of individual.

5  **Q**    Now, you never specifically spoke to Mr. Gessen about this

6  gold coin (Indicating), did you?

7  **A**    Mr. Gessen?

8  **Q**    Yes.

9  **A**    Did I speak to --

10  **Q**    Yes.

11  **A**    I've never spoken with Mr. Gessen, period.

12  **Q**    So you have never asked him if he wanted to have

13  Ms. Chigariro murdered.

14  **A**    I've never met Mr. Gessen, in person.  No.

15  **Q**    All right.  Thank you.

16          **MS. MITCHELL:**  You can take down Exhibit 2.

17      (Photograph taken off display)

18  **BY MS. MITCHELL**

19  **Q**    You are familiar with Signal?

20  **A**    I am.

21  **Q**    It's the messaging application that we have been talking

22  about in this case?

23  **A**    That's correct.

24  **Q**    And it's available on app stores of phones.

25  **A**    Yeah.  I believe you download it from the app store.

1  Q    It's not a special application that only people involved

2  in organized crime have access to.

3  A    Not that I'm aware of, no.

4  Q    And it's an application that you can use to send text

5  messages, make phone calls, things like that.

6  A    Encrypted in nature, yes.

7  Q    Uh-huh.  Now, you mentioned "encrypted."  Lots of other

8  applications send encrypted messages, correct?

9  A    Correct.

10  Q    Even in iMessage, the regular messaging application on an

11  iPhone sends an encrypted message, correct?

12  A    I'm not aware, and I'm not a tech person, so I can't speak

13  to that.

14  Q    But you are aware that there are other applications that

15  send encrypted messages.

16  A    Sure.

17  Q    And not all applications that send encrypted messages are

18  exclusively used by people committing criminal acts.  Correct?

19  A    Yeah, I can't speak to that.  I -- I believe people just

20  use it, depending on whatever they want to use it for.  People

21  use it for whatever they want to use it for.

22  Q    You never separately communicated with Mr. Gessen using

23  Signal, correct?

24  A    No.

25  Q    Now, Agent Rizzo, in pretending to be a money launderer,

1   spoke with Mr. Gessen about various schemes.  And I want to

2   talk a little bit about some of those schemes.

3       One of the ones that was discussed was a factory in

4   Estonia that was supplying protective gear for Ukrainians?

5   A   As I testified earlier, I don't know if it was

6   specifically for Ukrainians.  I just know it was helmets and

7   vests, I believe.

8   Q   And Agent Rizzo was pretending to look for businesses to

9   launder fictitious money through.

10  A   Correct.

11  Q   He wasn't actually going to launder the money.

12  A   He was going to provide the -- as far as I know, he was

13  going to provide the money, and it would be laundered through

14  whatever company that was.

15  Q   But he wasn't going to do so within a legal purpose.  It

16  was all part of a law enforcement scheme?

17  A   Yeah.  The FBI did not have access to Columbian drug

18  cartel money.

19  Q   So in part of looking for this money laundering, he was

20  looking for business deals?

21  A   Sure.

22  Q   And he was looking for investment projects for his

23  fictitious cartel that he was working for.

24  A   Yes.

25  Q   All right.  And Agent Rizzo did do some work in Europe,

1    correct?

2    **A**    On this case?  Or on other cases?

3    **Q**    In this case.

4    **A**    Yes.

5    **Q**    In fact, we heard testimony --

6    **A**    A larger case.

7    **Q**    And we heard testimony that he was in Spain for one

8    meeting?

9    **A**    Correct.

10    **Q**    So I want to talk to you about the letter of engagement in

11    this case.  If we could look at Exhibit 12, that I believe has

12    already been admitted.

13        (Document displayed)

14    **Q**    This letter of engagement is a letter that was allegedly

15    sent by Mr. Gessen to Agent Rizzo.  Correct?

16    **A**    That's correct.

17    **Q**    All right.  And it is a letter of engagement where

18    Agent Rizzo would have to essentially hire Mr. Gessen to

19    be his attorney.  That's what this purports to be?

20    **A**    Correct.

21    **Q**    All right.  I want to highlight under the paragraph "SCOPE

22    OF REPRESENTATION."

23        It says there that this is for (As read):

24            "Legal analysis and support in assessing and

25            assuring regulatory compliance and overall

PEACOCK - CROSS / MITCHELL

```
 1              risk assessment and mitigation for potential
 2              new investment projects within the European
 3              Union."
 4        Correct?
 5   A    Yes.
 6   Q    That's what this letter of engagement was promising to do
 7   for Agent Rizzo.
 8   A    Yeah, it looks like the scope of representation is what
 9   you just stated.
10   Q    Okay.  All right.  I want to show you what's been admitted
11   as Exhibit 29.
12        (Document displayed)
13   Q    Have you ever seen Exhibit 29 before?
14   A    Yes, I have.
15   Q    What do you recognize Exhibit 29 to be?
16   A    So this is -- sorry, I'm having a hard time seeing the top
17   of this.
18   Q    We can zoom in closer.
19   A    Can I take this camera off?
20        THE COURT:  Oh, yeah, you can take it off, yes.
21        THE WITNESS:  Thank you.
22        (Witness examines document)
23        THE WITNESS:  So this looks to me like the note to
24   self that the undercover made on his undercover telephone
25   related to the target package.
```

1   BY MS. MITCHELL:

2   Q    And this was supposedly sent to him on July 8th.

3   A    I don't see a date on there, but yeah, I do believe that

4   the target package was sent on July 8th.

5   Q    I want to show you what's been admitted as Exhibit 28,

6   Page 1.

7        (Document displayed)

8   Q    I believe this has also been admitted.  This is not your

9   Signal application, correct?

10  A    No it is not.

11  Q    This is the Signal application for Christopher Bognanno,

12  your partner in the FBI?

13  A    That's correct.

14  Q    I want to show you Exhibit 28 at Page 6.

15       (Document displayed)

16  Q    Now, this appears to show information about Ms. Chigariro.

17  Correct?

18  A    The second half, yes.

19  Q    And this actually shows that this was sent on July 8th?

20  A    Correct.

21  Q    And based off of testimony that we have heard, Agent Rizzo

22  sent this to Agent Bognanno.  Correct?

23  A    Correct.

24  Q    All right.

25           MS. MITCHELL:  Now, I want to put up Exhibit 29,

1    Page 1, and Exhibit 28, Page 6, both up at the same time.

2         (Documents displayed)

3            MS. MITCHELL:   I guess I should say 28, Page 7.

4         (Document displayed)

5    BY MS. MITCHELL

6    Q    All right.   And we can see here that the beginning of

7    what's on the right side of the screen, is that supposed to be

8    the top part associated with the message that is on the left

9    side of the screen there?

10        (Witness examines documents)

11   A    I mean --

12   Q    If it would help I can go to Page 28, Page 8, if that's

13   helpful.

14   A    Sure.   Thank you.

15        (Document displayed)

16        (Witness examines document)

17   A    Yeah.   I do see the same line of messaging, now, under

18   "AFFILIATED PERSONS."

19   Q    And so, as you just mentioned, there is no date on

20   Exhibit 29.   That's the message on the left side.   Correct?

21   A    Can you -- can you move it back a page?   Just so I can

22   confirm?

23   Q    This is the very first page of Exhibit 29.

24   A    Okay.

25   Q    Yeah.

PEACOCK - CROSS / MITCHELL

1   **A**    I don't see a date, no.

2   **Q**    And that is the one that's got "Note to Self" at the top.

3   **A**    Correct.

4   **Q**    And you were informed by Agent Rizzo that the -- what

5   was sent on Exhibit 29 and what we see on Exhibit 28, the two

6   screens there, were messages that were originally sent by

7   Mr. Gessen to him, that he then forwarded along to Agent

8   Bognanno.   Correct?

9   **A**    Well, he didn't send it directly to him.   He had it

10  available on a -- like a hidden site with a key code or a code

11  to locate it and access the information.

12  **Q**    So Agent Rizzo informed you that what he has on the note

13  to self was what he actually accessed.

14  **A**    Correct.

15  **Q**    From that hidden site.   And you have no other independent

16  confirmation that this is the information that was what was

17  found on that hidden site.   Correct?

18  **A**    I believe we're only able to access it once, so no, the

19  other case agent and I were not able to access it to verify

20  anything, and wouldn't do so, just in concern of security,

21  operational security.

22       **MS. MITCHELL:**   All right.   So you can take down both

23  exhibits.

24       (Documents taken off display)

25

PEACOCK - CROSS / MITCHELL

1    BY MS. MITCHELL

2    **Q**    And you were just talking about how agents are trained to

3    do particular things in order to accomplish their goals.

4    Correct?

5    **A**    Generally speaking, yes.

6    **Q**    And so one of those things they are trained to do is to

7    preserve evidence?

8    **A**    Yes.

9    **Q**    Sometimes that includes photographing evidence?

10   **A**    Correct.

11   **Q**    Sometimes that includes taking a screenshot of evidence?

12   **A**    Yes.

13   **Q**    Because it's important to have this record in case the

14   messages were to disappear.

15   **A**    Yes.

16   **Q**    Or in case you are only able to access the records just

17   the one time.

18   **A**    Correct.

19   **Q**    All right.  Now, best practice as an agent is to always

20   make sure that you can preserve the evidence as soon as

21   possible, so long as you are in a safe place to preserve it.

22   Correct?

23   **A**    I don't know if it's just being in a safe place, but

24   operationally speaking, you know, operations can play a role in

25   that too.  As soon as it's kind of feasible, would be

1    appropriate.

2    Q    So I want to show you Exhibit 4.

3         (Photograph displayed)

4    Q    And we heard testimony that these are photos that were

5    taken of Agent Rizzo's undercover phone while he was using

6    another camera to take photographs of it.

7    A    I don't believe it was a camera; I think it was another

8    cellphone with a camera.

9    Q    Okay.  So he was using a cellphone with a camera to

10   preserve the images on his undercover phone.  Correct?

11   A    Correct.

12   Q    And the testimony was that he was doing this because these

13   messages could possibly disappear.

14   A    Absolutely.

15   Q    And so I want to scroll through Exhibit 4, until we get to

16   Page 2.

17        (Photograph displayed)

18   Q    We have this message here that says the Safe Secret info

19   message, correct?  That is at the very top?

20   A    Correct.

21   Q    And I want to go back to Exhibit 29-01, if we can show

22   that on the either side.

23        (Photograph displayed)

24   Q    Now, this was the message that we have heard came from

25   clicking on the link in Exhibit 4 at 002.  Correct?

 1   **A**    Correct.

 2   **Q**    All right.  So the image on the left when you clicked on

 3   the link, Agent Rizzo was able to access the information that

 4   we have preserved on the image on the right.  Correct?

 5   **A**    Correct.

 6   **Q**    All right.  Now, this link at the top says that the

 7   duration that the link would be available is 120 minutes;

 8   that's two hours.

 9   **A**    Correct.

10   **Q**    We don't have a photograph of the screen while Agent Rizzo

11   is actually accessing that link.

12   **A**    Um, I don't -- I don't know what else is in evidence, but

13   I can't -- I don't see one on the screen.

14   **Q**    You have never seen it.

15   **A**    A photo of him accessing it?

16   **Q**    You have never seen a photo of that page, that link when

17   he accessed it, you never saw a photo of what was actually on

18   that page.

19   **A**    I haven't seen the photo.  He told me he -- or he told the

20   case team that he copied the information, and then put it in to

21   his notes for safekeeping, for evidentiary purposes.

22   **Q**    So you don't know actually what was on that screen.

23   **A**    I didn't -- I wasn't there with him, no.  And I didn't

24   have access to that phone at that time.

25   **Q**    And as you've mentioned, Agent Rizzo did not take a

1  photograph of what he actually saw on that screen.  All you

2  have is his word of what was there.

3  **A**    Yeah, I don't know of any photograph.

4  **Q**    All right.  I want to show you Exhibit 28 at Page 11.

5       (Document displayed)

6  **Q**    Now, there are two other messages there.  One that was

7  received -- and if we can blow in, zoom in to the one on

8  July 16th and the one on July 18th.

9       (Document enlarged)

10  **Q**    So we see one that is received on July 16, that's the one

11  that starts with "Subject rented."  Correct?

12  **A**    Correct.

13  **Q**    And then there's another one that's July 18th.  That one

14  starts with "New information."

15  **A**    That's correct.

16  **Q**    All right.  I want to turn back to Exhibit 4.

17       (Document displayed)

18       **MS. MITCHELL:**  And keep Exhibit 4, Page 1 and Exhibit

19  28, Page 11 up.  And is it possible to scroll through Exhibit 4

20  while it is up on the screen like this?

21       **MS. TARASYUK:**  Yes.

22       **MS. MITCHELL:**  Okay.

23  BY MS. MITCHELL

24  **Q**    Scrolling through Exhibit 4 while it is on the screen like

25  this, please stop us if you see either one of the other two

1   messages that were sent on July 16 or July 18.

2       (Documents displayed)

3          MS. MITCHELL:  You can scroll a little bit slower.

4       (Documents displayed)

5   BY MS. MITCHELL

6   Q    Do you happen to see those, either one of those two

7   messages in the scroll?

8   A    I haven't seen them, no.

9   Q    Okay.  I believe that's the last page.  All right, keeping

10  those same -- going back again to Exhibit 4, Page 1, on the

11  left side.

12      (Document displayed)

13         MS. MITCHELL:  And then can we pull up Exhibit 4 --

14  okay.  So we have got Exhibit 4 on the right side.  I want to

15  go back to Exhibit 29, Page 1 on the left-hand side.

16      Oh, actually, I should say Exhibit 28, Page 1.  Or --

17  sorry, so many different pages.  Ah.  Exhibit 4, Page 2 on the

18  left hand.  Sorry.

19      (Document displayed)

20  BY MS. MITCHELL

21  Q    All right.  So we have that link to Safe Secret on the

22  left-hand side.  Right?  Correct?

23  A    Correct.

24  Q    And that was how we were told one of those messages had

25  been sent to Agent Rizzo.  Correct?

PEACOCK - CROSS / MITCHELL

1   **A**    Correct.

2   **Q**    And, I want to again scroll through Exhibit 4 and can you

3   let me know if you ever see another link to the Safe Secrets?

4        (Reporter clarification)

5        (Documents displayed)

6            MS. MITCHELL:  Actually, I want to get back to

7   Exhibit 4, Page 2.

8        (Document displayed)

9   **BY MS. MITCHELL**

10  **Q**    This should be -- these two pages match, correct?

11       Exhibit 4, Page 2, Exhibit 4, Page 2, you see both of

12  those on the same side.  So you do see the Safe Secret there.

13  **A**    Yes.

14  **Q**    So I want you to stop me again if you see on the scrolling

15  Exhibit 4 that Safe Secret link.

16       (Photographs displayed)

17           MS. HOSSEINI:  Objection.  Both are the same exhibit.

18           THE COURT:  I don't understand.  The question is if,

19  in Exhibit 4, you see it a second time.  Is that it?

20           MS. MITCHELL:  Yes.

21           MS. HOSSEINI:  A second time.  I see.

22       (Documents displayed)

23  **BY MS. MITCHELL**

24  **Q**    In that scroll, did you happen to see another Safe Secret

25  link?

1    **A**    No, I did not.

2    **Q**    So there's not a link for a message sent on July 12th,

3    then?

4    **A**    I wasn't operating the phone and I don't know how that

5    information came in, so I can't speak to -- to that.

6    **Q**    And, and so you have no idea how that information actually

7    got to Agent Rizzo.

8    **A**    That specific information, yeah, I'm not really aware of

9    exactly how that came in.

10    **Q**    All right.  And so I want to show you Exhibit 29, Page 2,

11    on the left-hand side.

12        (Document displayed)

13    **Q**    And Exhibit 28, Page 10, on the right-hand side.

14        (Document displayed)

15    **Q**    Now, looking at Exhibit 28, Page 10, that's the right-hand

16    side, and 29, 2, it appears that 28 at Page 10 is the

17    continuation of the very top part of the first message on the

18    left-hand side.  Correct?

19        One is truncated, and the other one continues?

20    **A**    Yes.

21    **Q**    So you would agree that the two messages at the very top

22    are exactly identical except for the truncation.

23    **A**    What -- yeah, from what I can see on the right, it appears

24    that they're identical messages.

25    **Q**    But there is a difference between these two images,

1   correct?

2   **A**   Yes.  One's a note to self, and the other is the

3   conversation between the undercover and my co-case.

4   **Q**   And it also appears that there is a message that was sent

5   to your -- sent to Agent Bognanno that is not there on the note

6   to self.  Correct?

7   **A**   Correct.

8   **Q**   There's, in fact, a message that was sent on Saturday,

9   July 16th, that is present with Agent Bognanno's message and

10  there is no message that's been saved under note to self that

11  was sent on Saturday, July 16th.  Correct?

12  **A**   Yes.

13  **Q**   Which means that Agent Rizzo here on this documentation,

14  where he has said he has saved these messages, has not

15  preserved a copy of the July 16th message.  Correct?

16  **A**   He may have preserved it in a different way.  I don't

17  know; he could have taken a photo of it.  I just -- I haven't

18  seen that, so I can't speak to it.

19  **Q**   It's not in evidence.  We don't have a copy of this photo,

20  if it was preserved in a different way.

21  **A**   Okay.

22  **Q**   And so there's no documentation to establish where this

23  message from July 16th came from.  Correct?

24  **A**   Not that I'm aware of, while sitting up here, no.

25  **Q**   Uh-huh.

PEACOCK - REDIRECT / HOSSEINI

1          MS. MITCHELL:  No further questions..

2                    REDIRECT EXAMINATION

3   BY MS. HOSSEINI

4   Q    Agent Peacock, we were just looking at Exhibit 28, which

5   was the thread of texts between the undercover agent and Agent

6   Bognanno, his alias.  Right?

7   A    Correct.

8   Q    And then we were looking at Exhibit 29, which was the note

9   to self?

10  A    Correct.

11  Q    Ms. Mitchell was asking you about how some of the messages

12  were preserved in the note to self.  And some of the messages

13  were preserved by texting Agent Bognanno.

14  A    Correct.

15  Q    At the end of the day, were those messages preserved in

16  either the note to self or the text thread?

17  A    As far as I know, yes.

18  Q    Would it have been better if they were documented in both

19  instances?

20  A    Yes, it would have probably been cleaner.

21  Q    Would it have changed the conclusion of -- would it have

22  changed the evidence that you received in your investigation,

23  if you saw two of the same thing instead of just one?

24          MS. MITCHELL:  Objection, leading.

25          THE COURT:  Sustained.

PEACOCK - REDIRECT / HOSSEINI

1   BY MS. HOSSEINI

2   Q    If the documentation was more fulsome, what would have

3   that changed, in your investigation?

4            MS. MITCHELL:  Objection, leading.

5            THE COURT:  Overruled.

6            THE WITNESS:  Nothing.

7   BY MS. HOSSEINI

8   Q    If you saw ten pictures of the same thing, how would that

9   have changed your investigation?

10  A    Nothing.  It would not change.

11  Q    And the way Signal spits out the images, is there a

12  difference between a note to self and a note function and a

13  text thread between individuals?

14            MS. MITCHELL:  Objection, lack of foundation.

15            THE COURT:  Sustained.

16  BY MS. HOSSEINI

17  Q    Have you used Signal?

18  A    Yes, I have.

19  Q    Is a note to self the exact same identical thing as a text

20  thread?

21            MS. MITCHELL:  Objection, foundation.

22            THE COURT:  You have to break it down.

23       Have you used the note to self?

24            THE WITNESS:  Yes, I have used note to self.

25

**PEACOCK - REDIRECT / HOSSEINI**

1  BY MS. HOSSEINI

2  Q    Have you texted on Signal?

3  A    Yes, I have.

4  Q    Did they appear exactly the same?

5  A    No.  They do not.

6  Q    And why is it that Agent Rizzo is either texting

7  Agent Bognanno, or taking photos, screenshots of his phone?

8        MS. MITCHELL:  Objection.  Calls for speculation.

9        THE COURT:  Overruled.  It is proper, given the cross.

10        THE WITNESS:  Ask the question again, please?

11  BY MS. HOSSEINI

12  Q    Why is it that Agent Rizzo is employing these methods of

13  preserving evidence such as putting it in a note to self or

14  texting Agent Bognanno?  What is happening to that message that

15  is on Signal?

16  A    It's disappearing.

17  Q    Who is making it disappear?

18  A    Mr. Gessen.

19        MS. MITCHELL:  Objection, speculation.

20        THE COURT:  Overruled.

21        THE WITNESS:  Mr. Gessen.

22  BY MS. HOSSEINI

23  Q    Sorry.  We are speaking over each other.  Who is making it

24  disappear?

25  A    To my understanding, Mr. Gessen is making it disappear.

1  **Q**    Ms. Mitchell asked you if you heard the recording, whether

2  live on that day or afterwards, if you ever heard Mr. Gessen

3  say "kill" or "murder."  Do you remember that?

4  **A**    I do remember.

5  **Q**    And you didn't hear "kill" or "murder"?

6  **A**    No, I did not.

7  **Q**    Did you hear Mr. Gessen say "If there was a cheaper way to

8  get rid of her, that would be good too"?

9  **A**    Yes, I did.

10 **Q**    After that, did you hear Agent Rizzo say "That's a totally

11 different conversation"?

12 **A**    Yes.

13 **Q**    After that, did you hear Mr. Gessen say "And more

14 definite"?

15 **A**    Yes.

16 **Q**    After that, did you hear Mr. Gessen say (As read):

17            "Because the issue with immigration, there's

18            so many lawyers and you get a bad guy and she

19            end up staying, it just becomes unpredictable

20            you can fight the system for a couple years

21            and it becomes a pain."

22            **MS. MITCHELL:**  Objection, as to the form of the

23 question.

24            **THE COURT:**  Overruled.

25            **THE WITNESS:**  Yes, I did hear him say that.

**PEACOCK - REDIRECT / HOSSEINI**

1   BY MS. HOSSEINI

2   Q    Did you hear a reference to her being taken out

3   (Indicating quotation marks)?

4   A    Yes.

5   Q    Did you hear Mr. Gessen saying "We just shifted gears"

6   (Indicating quotation marks)?

7   A    Yes, I did.

8   Q    Did you hear Mr. Gessen say "None of the words we mention

9   here can end up on there," meaning Signal?

10  A    Yes.

11  Q    So then, did you hear Mr. Gessen say "This is not a

12  spur-of-the-moment emotional reaction"?

13  A    Yes, I did.

14  Q    Did you hear Agent Rizzo referring to what he said was the

15  murder-for-hire scheme to be -- it will be so fast and clean

16  (Indicating quotation marks)?

17  A    Yes.

18  Q    In your experience, are deportations fast and clean?

19          MS. MITCHELL:  Objection, speculation.

20          THE COURT:  Lay a foundation.  Sustained.

21  BY MS. HOSSEINI

22  Q    Based on your understanding as a citizen living in the

23  United States, are deportations typically fast and clean?

24          MS. MITCHELL:  Foundation.  Objection.

25          THE COURT:  Sustained.

BY MS. HOSSEINI

Q    So since you didn't hear -- the words that you did hear

that we just went through, and the fact you didn't hear

Mr. Gessen say "I, Allen Gessen, hereby want to murder my ex,"

did that surprise you?

        MS. MITCHELL:   Objection, argumentative.

        THE COURT:   Sustained.

BY MS. HOSSEINI

Q    Was Mr. Gessen a lawyer?

A    Yes.

Q    Did it appear to you that he wanted to not be explicit in

the language that he wanted to use?

        MS. MITCHELL:   Objection.   Speculation.

        THE COURT:   Overruled.

        THE WITNESS:   Yes.   Absolutely.

BY MS. HOSSEINI

Q    And Ms. Mitchell mentioned that Agent Rizzo was clear

about the money laundering, right, that he was going to be

conducting financial transactions and doing some movement of

money from his supposed to clients who were drug cartels.

Right?

A    Yes, he was clear.

Q    At the point that he was introduced to Mr. Gessen, did he

already have that legend, that persona?

A    Yes, it had been established some time before.

PEACOCK - REDIRECT / HOSSEINI

1   Q      From where?   In what context had it been established?

2   A      From prior meetings with other subjects.

3   Q      Were one of those subjects Mr. Kiselev?

4   A      Yes.

5   Q      Did Mr. Kiselev introduce Mr. Gessen to Agent Rizzo?

6   A      Yes.

7   Q      So would it make sense if Agent Rizzo all of a sudden had

8   a different story, or was not clear about who he was?

9          MS. MITCHELL:  Objection.

10          THE COURT:  Sustained.

11  BY MS. HOSSEINI

12  Q      Why, why -- why would Agent Rizzo be clear about the money

13  laundering?

14          MS. MITCHELL:  Speculation, objection.

15          THE COURT:  Overruled.

16  BY MS. HOSSEINI

17  Q      You may answer.

18  A      He had to maintain his persona as a money launderer for

19  the Columbian drug cartel, and that persona should carry from

20  Mr. Kiselev's interactions to Mr. Gessen's interactions with

21  him.

22  Q      And at that point, the investigation into Mr. Kiselev, had

23  that concluded or was that on ongoing?

24  A      It was still ongoing.

25  Q      And was there another target in the case with the money

**PEACOCK - REDIRECT / HOSSEINI**

1  laundering and Mr. Kiselev?

2  **A**    Yes.

3  **Q**    How about that target?  Was his investigation concluded or

4  on ongoing?

5  **A**    It was still ongoing.

6  **Q**    And so there were other investigations with at least two

7  targets that were ongoing.

8  **A**    That's correct.

9  **Q**    And you mentioned that there's a scale when it comes to

10  criminality.  What were you talking about?  Is there a

11  difference between money laundering and murdering your ex-wife,

12  on your scale?

13  **A**    Absolutely.

14  **Q**    How?

15  **A**    Money laundering is a, you know, white-collar crime.  Not

16  that there can't be victims in white-collar crime.  But as you

17  graduate up to something like murder for hire, that is killing

18  an individual.  And that is the ultimate crime, in my book.

19  **Q**    In the money-laundering deals, would any life have been

20  lost, were they talking about that or were they talking about

21  movement of money?

22  **A**    Just movement of money, no lives lost.

23  **Q**    While we are on the topic of money laundering,

24  Ms. Mitchell showed you that engagement letter, about how it

25  was about the scope of a project in the European Union.  Do you

**PEACOCK - REDIRECT / HOSSEINI**

1    remember that?

2    **A**    Yes.

3    **Q**    Would a money launderer need a letter of engagement?

4         **MS. MITCHELL:**  Speculation.

5         **THE COURT:**  You can answer, to the extent you can.

6         **THE WITNESS:**  As far as I'm aware of, a money

7    launderer would not need a letter like that, except for

8    purposes of covering their tracks.

9    **BY MS. HOSSEINI**

10   **Q**    And you were shown some surveillance photos.  You said you

11   didn't take some of those photos.

12        But, do you know exactly where the other agent who was

13   there for those photos, where he was standing?  Or whether his

14   camera or phone had a zoom capability to make it appear further

15   or closer?

16   **A**    Yes, I do.

17   **Q**    Typically, when you go on surveillance, do you have some

18   level of need to be discreet?

19   **A**    Always.

20   **Q**    And to not be noticed?

21   **A**    Yes.

22   **Q**    Is it a good idea to not be, like, trying to make it

23   appear as though you're taking a picture of someone you are

24   investigating (Indicating)?

25        **MS. MITCHELL:**  Objection, leading.

1          **THE COURT:**  Sustained.

2    **BY MS. HOSSEINI**

3    **Q**    How do you typically take photos of individuals you are

4    investigating?

5    **A**    In a manner that nobody -- not even the general public

6    would be able to identify that we were taking those photos.

7    **Q**    Like, what are you doing if you're on your phone?

8    **A**    Act like I'm on a telephone call while I'm snapping

9    photos.  Or I would utilize an extended zoom feature on an

10   actual camera where I'm not in the immediate area, but I can

11   see visually the individuals I'm trying to photograph.

12   **Q**    So you can take photos without someone noticing that you

13   are taking photos of them.

14   **A**    Yes.

15   **Q**    And during those recordings, during those meetings when

16   the records were made on June 2nd, at any point did you hear

17   that Mr. Gessen was concerned that something was being

18   recorded?

19   **A**    Yes.

20   **Q**    Tell us generally when that was.

21   **A**    They were seated at the restaurant, Marisol, and the

22   undercover had one or two phones out on the table that I'm

23   aware of.

24          And according to the undercover, Mr. Gessen continued to

25   stare at the phones, and that was a cue to the undercover that

 1   he needed to ask if it was okay if they were out, or if he

 2   should put them away on his person.

 3       The overall agreement was that it would make him more

 4   comfortable if they were on his person.  So the undercover

 5   agent put the phones away.

 6   **Q**   So knowing that fact, does it surprise you that Mr. Gessen

 7   did not say "kill" and "murder" on those recordings?

 8       **MS. MITCHELL:**  Objection.  Relevance, as to his

 9   emotional reaction.

10       **THE COURT:**  Overruled.

11   **BY MS. HOSSEINI**

12   **Q**   You may answer.

13   **A**   No, it does not surprise me.

14   **Q**   Why not?

15   **A**   You know, Mr. Gessen was operating in a manner, um,

16   displaying a few different levels of operational security, or a

17   few different ways of being operationally secure.

18       And that, itself, culminates with us having an

19   understanding that he's attempting to obfuscate, you know, the

20   meeting, the conversation, whatever it may be.

21       **MS. HOSSEINI:**  Thank you.  Nothing further.

22       **THE COURT:**  Anything further?

23       **MS. MITCHELL:**  Briefly, Your Honor.

24                      **RECROSS-EXAMINATION**

25

1   BY MS. MITCHELL

2   Q    Agent Peacock, you just testified that murder for hire is

3   the ultimate crime.

4   A    Personal opinion, yes.

5   Q    Okay.  And, extremely much more serious than bribing a

6   government official?

7   A    I wouldn't even say murder for hire.  Just murder, itself.

8   I have a -- I have a personal feeling about that, yeah.

9   Q    So just -- just to clarify, you think murder for hire is

10  more serious than bribing a government official.

11  A    Depending on if the murder for hire occurs outside of the

12  aspect of law enforcement scrutiny, and it could actually

13  affect somebody's life and it could be taken, yes, absolutely.

14  Q    You were asked about a quote of Mr. Gessen's that was

15  given on June 2nd, "So if there was a cheaper way to get rid of

16  her, that would be good too," correct?

17       That was something that was said by Mr. Gessen?

18  A    I would have to see it on a transcript, just for verbatim

19  purposes.

20       MS. MITCHELL:  So Exhibit 6, Page 63, just for Agent

21  Peacock, please.

22       (Document displayed to the Witness)

23  BY MS. MITCHELL

24  Q    Middle of the transcript.

25       (Document enlarged)

1   **A**     Yes.

2   **Q**     So seeing that refreshes your recollection as to what was

3   said by Mr. Gessen?

4   **A**     Yes.

5   **Q**     And Mr. Gessen said "If there was a cheaper way to get rid

6   of her that would be good too"?

7   **A**     Yes.

8   **Q**     But the immediate sentence before that, Mr. Gessen said

9   "For sure the priority is to get the fuck out of here."

10  Correct?

11          (Document displayed)

12          (Witness examines document)

13  **A**     That's where it appears, yes.

14  **Q**     And so his expression of a cheaper way to get rid of her

15  is immediately after he says "The priority is to get the fuck

16  out of here."

17  **A**     My answer, in context, it leads right into a question

18  related to murder for hire after that.

19  **Q**     Your assumption about murder for hire.

20  **A**     Talking about a permanent way to do it.

21  **Q**     Again, that's your assumption that that's what "permanent"

22  meant.  Correct?

23  **A**     Correct.

24  **Q**     You don't know what "permanent" meant.

25  **A**     I already said "Correct."  Yeah.

**PROCEEDINGS**

1          **MS. MITCHELL:**  Thank you.

2          **MS. HOSSEINI:**  Stipulations?

3          **THE COURT:**  Okay, all right.

4      Agent, you may step down.

5      (Witness excused)

6          **THE WITNESS:**  Thank you.

7          **THE COURT:**  You have some stipulations to read?

8      Okay.  Members of the jury, we're not taking a break

9  because we're actually going to be done for the day early

10 today.  So that's why I'm keeping you a little bit longer.

11     (Off-the-Record discussion between counsel)

12         **THE COURT:**  Did you want to do them now?  Or first

13 thing in the morning?

14         **MS. HOSSEINI:**  Either way.  Your Honor.

15         **THE COURT:**  Why don't we do them -- if you have them

16 out, why don't we read them, and then we'll excuse the jury.

17     (Off-the-Record discussion between counsel)

18         **THE COURT:**  A stipulation, members of the jury, is a

19 fact to which the defense and the government have agreed.  And

20 so you, too, are to accept them as a fact that has been proved

21 in the case.

22         **MS. HOSSEINI:**  And Your Honor, this is Exhibit 32.  We

23 would like to move it into evidence, and then read it.

24         **THE COURT:**  All right.  Any objection?

25         **MS. MITCHELL:**  No objection.

PROCEEDINGS

1          **THE COURT:**  32, admitted.

2          (Trial Exhibit 32 received in evidence.)

3          **MS. HOSSEINI:**  And there is a correction for the

4    record, Your Honor.

5          For Stipulation No. 5, the word "flight" has been

6    changed to "drive," and has been initialed both by myself

7    and Ms. Mitchell.

8          It is hereby stipulated and agreed --

9          (Reporter clarification)

10         (Document displayed)

11         **MS. HOSSEINI:**  It is hereby stipulated and agreed

12   between plaintiff the United States of America, by its

13   undersigned counsel.  And defendant, Allen Gessen, by his

14   undersigned counsel, that:

15         1.  The Signal application and the defendant's cellular

16   phone were a facility in interstate or foreign commerce.

17         2.  The defendant's flight from Boston to Miami on June 2,

18   2022, is travel in interstate commerce.

19         3.  The defendant's flight from Miami to Boston on June 2,

20   2022, is travel in interstate commerce.

21         4.  The defendant's drive from Boston to New York City on

22   June 21, 2022, is travel in interstate commerce.

23         5.  The defendant's drive from New York City to Boston on

24   June 29, 2022, is travel in interstate commerce.

25         "Drive" is corrected in handwriting, initial by I.H. and

1    C.M.

2        6.   The following two wire transmissions sent from an

3    account in the name of GEEWIZ ÖÜ at AS LHV Bank in Tallinn,

4    Estonia, to Citibank in the United States, which were sent

5    through the SWIFT INTERNATIONAL WIRE SYSTEM and then received

6    by Bank of America Account 334030493647 in the name of MLI

7    Ventures, LLC in San Francisco, California, were a facility in

8    interstate or foreign commerce.

9        (a) Wire transmission posted on June 29, 2022, for

10   $18,000, minus the incoming wire fee, for a total of $17,975;

11       (b)   Wire transmission posted on July 8, 2022, for $5,000,

12   minus the incoming wire fee for a total of $4,975.

13       It is so stipulated and agreed.

14       Signed by Ilham Hosseini, Alexis James, Assistant United

15   States Attorneys; Candis Mitchell, Karthik Raju, Assistant

16   Federal Public Defenders.

17       **THE COURT:**  All right, thank you.

18       All right, members of the jury, that concludes the

19   evidence for today.  We are on schedule.  We are completely on

20   schedule.  Things went a little faster today, so that is why

21   we're done a little bit early.

22       As always, still, please, no discussion of this case with

23   anyone; no independent research.  And we will see you back here

24   tomorrow at 8:30 a.m.

25       Thank you.

**PROCEEDINGS**

 1          (Jury excused)

 2          (The following proceedings were held outside of the

 3    presence of the Jury)

 4          **MS. MITCHELL:**  Your Honor, my suggestion is that what

 5    we end up doing is we will affirmatively state that we are not

 6    intending to have the Court instruct the jury as to entrapment.

 7    Thus, making the issue very clear for everyone.

 8          And then, I think for scheduling for tomorrow, our goal

 9    would be Mr. Gessen is anticipated to testify tomorrow, that we

10    have Mr. Gessen testify tomorrow; parties submit in writing

11    today any modifications or suggestions that we have for jury

12    instructions.  We have a discussion tomorrow afternoon about

13    what the jury should be instructed on.

14          And then we proceed Friday with the intention of doing

15    closing arguments and charging the jury.

16          **THE COURT:**  Okay.  In the event Mr. Gessen decides not

17    to testify, because it is his decision up to the very last

18    minute, then what do we do?  Because I will have the jury here.

19    Yes.  What do we do?  I mean, I think -- I guess what I'm

20    saying is you should be prepared to close.

21          Now, we may start late with the jury because we are going

22    to have to do the jury charge.  But I'd like you both to be

23    prepared to close, if need be.

24          **MS. MITCHELL:**  Understood.

25          **THE COURT:**  Okay.  Now, with respect to the agent, I

1   do think regardless -- well, it would be impeachment or

2   rebuttal.

3       In other words, I haven't heard anything up to this point,

4   that I would change my ruling with respect to whether the IRS

5   incident would come in.

6       **MS. HOSSEINI:**  Okay.  Your Honor, I would just simply

7   note for the record that in opening the defense said that it

8   the undercover was the one that used that language, and that

9   that idea, meaning the murder for hire, came from the

10  undercover, and that Mr. Gessen never agreed to it, he never

11  solicited it.

12      And then, on the cross of Agent Rizzo, they said:  Well,

13  you're the one who was pushing it; you're pushing it again.

14  That essentially is a factual entrapment argument.

15      So I just want to make sure I am clear that if they're

16  saying they're not going to argue entrapment, those arguments

17  are not going to be put forth to the jury in closing.

18      **THE COURT:**  I'm not going to instruct the jury on

19  entrapment.  And I think, with respect to -- we're talking

20  about the IRS incident.  If Mr. Gessen was denying the INS

21  scheme, then I think it would come in.  But he's admitting to

22  it.  He's admitting to -- they admitted in opening, Mr. Raju

23  that he did it.

24      So I don't think that the IRS scheme adds anything at all,

25  since he's admitting to paying -- a scheme to pay a bribe of an

**PROCEEDINGS**

1    INS official.  Essentially the same thing, right?  IRS, INS,

2    one letter difference.

3        So I don't -- I think its prejudicial value outweighs any

4    additional value.

5            **MS. HOSSEINI:**  Understood, Your Honor.

6            **THE COURT:**  And then they'll argue what they argue,

7    but I'll instruct them just what the burden's in, as the

8    parties agreed to.  And I will not instruct, as Ms. Mitchell

9    said, on entrapment.  I will not be giving that instruction.

10       Okay.  So if you do have any additional instructions, make

11   sure they get filed by -- what time?

12           **MS. MITCHELL:**  We should be able to file by 5:00

13   today.

14           **THE COURT:**  By 5:00?  I don't know.  Maybe the

15   government -- by 5:00, then.

16       Okay.  So we will see you here then at 8:15 again.

17           **MS. MITCHELL:**  Thank Your Honor.

18           **THE COURT:**  Okay.  Thank you.

19       (Proceedings concluded)

20

21

22

23

24

25

<u>**I N D E X**</u>

Wednesday, May 3, 2023 - Volume 3

<u>**GOVERNMENT'S WITNESSES**</u>                               <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**RIZZO, DAVID (RECALLED)**</u>
(PREVIOUSLY SWORN)                                  341    3
Cross-Examination by Mr. Raju                       341    3
Redirect Examination by Ms. Hosseini               398    3
Recross-Examination by Mr. Raju                     415    3

<u>**CHIGARIRO, PRISCILLA**</u>
(SWORN)                                             420    3
Direct Examination by Ms. James                     420    3
Cross-Examination by Ms. Mitchell                   462    3
Redirect Examination by Ms. James                   464    3

<u>**YOUNG, JEFFREY**</u>
(SWORN)                                             466    3
Direct Examination by Ms. James                     467    3
Cross-Examination by Ms. Mitchell                   475    3
Redirect Examination by Ms. James                   477    3

<u>**FIERBERG, BENJAMIN**</u>
(SWORN)                                             481    3
Direct Examination by Ms. James                     482    3

<u>**PEACOCK, DAVID**</u>
(SWORN)                                             484    3
Direct Examination by Ms. Hosseini                  484    3
Cross-Examination by Ms. Mitchell                   505    3
Redirect Examination by Ms. Hosseini               537    3
Recross-Examination by Ms. Mitchell                 547    3

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 15 | | 498 | 3 |
| 22 | | 495 | 3 |
| 26 | | 500 | 3 |
| 32 | | 551 | 3 |
| 126 | | 362 | 3 |

## CERTIFICATE OF REPORTER

       I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Thursday, June 15, 2023