Volume 4

Pages 557 - 759

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, JUDGE

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      No. 22-cr-276-JSC
                               )
ALLEN GESSEN,                  )
                               )
          Defendant.           )      San Francisco, California
_____)

                                      Thursday, May 4, 2023


                    **TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:          ISMAIL J. RAMSEY
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                   BY:  **ILHAM A. HOSSEINI**
                        **ALEXIS JAMES**
                        **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:          JODIE LINKER
                        Federal Public Defender
                        450 Golden Gate Avenue
                        Room 19-6884, Box 36106
                        San Francisco, California  94102
                   BY:  **CANDIS MITCHELL**
                        **KARTHIK RAJU**
                        **DEPUTY FEDERAL PUBLIC DEFENDERS**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

PROCEEDINGS

| | |
|---|---|
| 1 | **Thursday, May 4, 2023**                                    **8:22 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | -oOo- |
| 4 | (The following proceedings were held outside of the |
| 5 | presence of the Jury) |
| 6 | **THE COURTROOM DEPUTY:**  Remain seated and come to |
| 7 | order.  Court's in session. |
| 8 | **THE COURT:**  All right, good morning. |
| 9 | **MS. HOSSEINI:**  Good morning. |
| 10 | **MS. MITCHELL:**  Good morning, Your Honor. |
| 11 | **THE COURT:**  Just for planning purposes, does the |
| 12 | government have any more witnesses in its case-in-chief? |
| 13 | **MS. HOSSEINI:**  No, Your Honor, we will be resting this |
| 14 | morning. |
| 15 | **THE COURT:**  Okay.  And does the defense plan on |
| 16 | putting on a defense? |
| 17 | **MS. MITCHELL:**  We do, Your Honor. |
| 18 | **THE COURT:**  All right.  So maybe, since we have a few |
| 19 | minutes right now before 8:30, we can address some jury |
| 20 | instruction issues in the event we get to closings today. |
| 21 | **MS. MITCHELL:**  Yes, Your Honor.  I believe that we are |
| 22 | going to have one other instruction that we are going to be |
| 23 | requesting.  I had to speak it over with Mr. Gessen.  And we |
| 24 | have one other instruction that we are going to be adding to |
| 25 | the ones that we have submitted. |

**PROCEEDINGS**

1    **THE COURT:**  All right.  I'll consider that when it's

2    submitted.  But with respect to what we have in front of us

3    now, are you prepared to address that?

4         **MS. MITCHELL:**  Yes, Your Honor.

5         **THE COURT:**  Okay.  So with respect to the defendant's

6    theory of defense instruction, I don't believe that instruction

7    is in accordance with the law, as it stands.  So I wouldn't

8    give it.

9         It essentially saying that you can't have an undercover

10   agent in a murder for hire.  That's fine.  I understand the

11   argument.  And it will preserved for appeal.

12        **MS. MITCHELL:**  And Your Honor, we would want to state

13   on the record that we believe that the additional paragraph is

14   an accurate statement of the law, according to *Chong* and a

15   number of other cases.

16        **THE COURT:**  Okay.  All right.  Objection noted, and

17   preserved.

18        All right, and then with respect to the other

19   instructions, other than you are going to have another

20   additional one to propose, did the government have any

21   comments?

22        **MS. HOSSEINI:**  No, Your Honor.  Your Honor's ruled on

23   the theory of the defense case, so we won't argue on that.  And

24   then there is no entrapment instruction, so any argument, if

25   it's made, whether explicit or implicit, in closing we would

1    seek Your Honor to give a curative instruction afterwards.

2              THE COURT:  Okay.

3              MS. MITCHELL:  And then, Your Honor, we would just

4    note that we still have a request for proposed Instruction

5    No. 18, the verdict form, "A verdict form has been prepared for

6    you..." the Court's included after "you have reached unanimous

7    verdict."  Our proposed is still "if you reach a unanimous

8    verdict."  We consider "after" to be slightly presumptive.  And

9    so we would urge the Court to consider "if."

10        And we would renew our request for our proposed

11   Instructions 51 and 52.  Those were the two instructions that

12   incorporated the California jury instructions regarding how

13   jurors should view circumstantial evidence.

14             THE COURT:  I understand.  Objection noted, and

15   preserved.  I'm going to go with the Ninth Circuit model jury

16   instructions.

17             MS. MITCHELL:  Understood, Your Honor.

18             THE COURT:  Okay.  All right.  So we will address

19   whatever when you have that other one, and at 8:30 --

20   hopefully; they have been timely every day -- we will come out,

21   you'll rest, and you will call your first witness.

22             MS. MITCHELL:  Thank Your Honor.

23             MS. HOSSEINI:  Thank Your Honor.

24             MS. MITCHELL:  Would the Court -- since the jury's not

25   here, we could preemptively make our Rule 29 motion.  Or, if

PROCEEDINGS

 1  the Court would like us to do it on the record.

 2      **THE COURT:**  Well, we're on the record.

 3      **MS. MITCHELL:**  Yeah, okay.  With -- with the jury

 4  present.  We would, of course, at the close of the government's

 5  case, make a motion for Rule 29, and argue that under the

 6  standard, the government has yet to prove its case in a way

 7  that the jury could appreciate.

 8      We would argue that as to intent, there hasn't been

 9  sufficient evidence put forth, and the evidence that has been

10  put forth is circumstantial.

11      Additionally, we would want to preserve any arguments

12  related to any other issues that we have not specifically

13  articulated on the record, including but not limited to

14  jurisdictional issues, venue issues, et cetera.

15      **THE COURT:**  Well, as to venue, you -- you are not

16  asking as for a venue jury instruction.

17      **MS. MITCHELL:**  We will be asking for a venue jury

18  instruction at a later date.  We just need to get that proposed

19  and sent to the Court.

20      **THE COURT:**  Well, I think there was actually a

21  proposal in the instructions that were initially proposed to

22  me.  Do you want that instruction?

23      **MS. MITCHELL:**  We actually have a modification, and so

24  we want to send the modification to the Court.

25      **THE COURT:**  All right.  I think, as I read the case

1    law, if they ask for the venue instruction, I give the venue

2    instruction.  So...

3         **MS. HOSSEINI:**  We would just request that it be the

4    one that the Ninth Circuit has approved.

5         **THE COURT:**  Bokay.  All right.  So you don't need to

6    preserve an argument as to a venue instruction, in the sense

7    that I'll give it.  We'll have to see as to what your new

8    proposal is.

9         And then with respect to your -- your Rule 29 motion, I'll

10   deny.  I think the evidence presented is sufficient.  But, all

11   your arguments are preserved for the record.

12        **MS. MITCHELL:**  Thank you, Your Honor.  And we, of

13   course, would be requesting the ability to supplement the

14   Rule 29 motion at the conclusion of the case.

15        **THE COURT:**  Okay.

16        **MS. MITCHELL:**  Thank you.

17        **THE COURT:**  All right.

18        **MS. HOSSEINI:**  Thank you, Your Honor.

19        **THE COURT:**  Thank you.

20        (The following proceedings were held in the presence of

21   the Jury)

22        **THE COURT:**  Good morning, members of the jury.

23   Welcome back.  You may be seated.

24        Does the government have any further witnesses to call?

25        **MS. HOSSEINI:**  No, Your Honor.  The United States

 1    rests.

 2              **THE COURT:**  Thank you.  Ms. Mitchell.  Does the

 3    defense have any witnesses to call?

 4              **MS. MITCHELL:**  We do, Your Honor.  We call Mr. Gessen.

 5                   <u>**ALLEN GESSEN, DEFENDANT, SWORN**</u>

 6              **THE COURTROOM DEPUTY:**  Thank you.  Would you please

 7    state your name for the record.

 8              **THE WITNESS:**  Allen Gessen.  A-L-L-E-N, G-E-S-S-E-N.

 9              **THE COURT:**  All right.  You may be seated.

10    You may proceed.

11              **MS. MITCHELL:**  Thank you, Your Honor.

12                        <u>**DIRECT EXAMINATION**</u>

13    BY MS. MITCHELL

14    Q    Good morning, Mr. Gessen.

15    A    Good morning, Ms. Mitchell.

16    Q    Now, Mr. Gessen, when speaking to Agent Rizzo, were you

17    asking him to arrange for Ms. Chigariro to be killed?

18    A    No.

19    Q    Did you want Ms. Chigariro to be killed?

20    A    No.

21    Q    What, instead, did you intend to happen?

22    A    I intended Priscilla to be returned back to Zimbabwe.

23    Q    Could you move the microphone a little bit closer to you?

24    A    I intended for Priscilla to go back to Zimbabwe.

25    Q    Now I want to talk to you about your relationship with

**GESSEN - DIRECT / MITCHELL**

1   Ms. Chigariro and your children.

2   **A**   Okay.

3   **Q**   How did you first meet?

4   **A**   We met in November of 2011, in Harare, at a fashion event.

5   **Q**   And where is Harare?

6   **A**   It's the capitol of Zimbabwe.

7   **Q**   How long did your relationship last?

8   **A**   With some interruptions, from 2011 until the very end of

9   2018.

10  **Q**   Were you legally married?

11  **A**   No.

12  **Q**   And did you ever refer to her as your wife?

13  **A**   Um, very seldom.  Sometimes, when just it was easier to

14  talk to third parties.

15  **Q**   What was the status of your relationship legally, then, if

16  you were not actually married?

17  **A**   As part of the Zimbabwean custom, to show respect to the

18  parents of your partner, you -- you pay what's called a "bride

19  price."  So I gave Priscilla's father a gift.  And as a result,

20  she was given to me as a bride.  Then typically that is

21  followed by a customary, traditionally -- ceremony.  We're

22  supposed to kill a cow, but I couldn't quite bring myself to do

23  that so we didn't follow through with that procedure.

24  **Q**   Now, according to that custom, if you had followed through

25  with that custom, would you be considered married under

GESSEN - DIRECT / MITCHELL

1   Zimbabwe custom?

2   **A**   As far as my understanding of Zimbabwean law is

3   concerned -- and I had to go do quite a bit of research on

4   that -- the African custom of marriage applies only to

5   Africans.  That's not my term, that's the legal term.  And so

6   we would still not be considered legally married.

7   **Q**   And the term that you use, her father gave her to you, is

8   that language that they would use there in Zimbabwe?

9   **A**   Yes.  And I was allowed to enter her house, her father's

10  home as a guest.  Because prior to that I would not be allowed

11  to go and visit.  So it was -- it was -- it was important to

12  show respect to the family and to the tradition.

13  **Q**   Now, where have you lived together with Ms. Chigariro?

14  **A**   The first, for the first three years or four years we

15  lived -- well, first we lived apart because I was coming and

16  going from Zimbabwe into South Africa.  And then we moved in

17  together around 2012, and lived together in Zimbabwe until

18  2014.

19       Then I went to work in Russia, and Priscilla and our son,

20  [O.G.], stayed in Zimbabwe for the next two years.  And then

21  they joined me in Russia in 2016.  And we lived there until

22  2018, until the end of our relationship.

23  **Q**   And why did the relationship end?

24  **A**   Well, there's the long version and the short version.

25  But, um, towards the end -- we were expecting the birth of our

1   child, [E.G.], our second child, in November of 2018.   Roughly

2   a month before that, Priscilla told me that she met somebody

3   else, and that our relationship was no longer viable, so we

4   separated.

5   **Q**    Now, after your relationship ended, did you physically

6   separate?   Or did you still reside together in the same home?

7   **A**    Um, it was a very difficult period for us, because, one,

8   we were waiting for a child to come home.   In another way we

9   were separating at the same time.   So we were trying to figure

10  out how to manage that entire situation.   And I suggested that

11  we rent a place where our children can always be together and

12  that Priscilla -- take turns staying with the kids so at least

13  we don't keep trying to move them around.

14       And so I rented for us a very large apartment in Moscow

15  for six months, sort of while we were kind of getting our

16  bearings, where Priscilla had her space, I had my space, and

17  then the children had their space, and there was shared spaces

18  in the kitchen.   So that way it was separate but together.

19  **Q**    How long did you have this separate-but-together

20  relationship?

21  **A**    Um, from December to June -- well, from December, 2018,

22  until June of 2019.

23  **Q**    What happened in June of 2019?

24  **A**    Our lease was expiring and it was -- and also it was clear

25  that we were not going to be able to reconcile this time.

**GESSEN - DIRECT / MITCHELL**

1  Russia had no jurisdiction over the kids, so we could not have

2  any sort of custody resolution in Russia.  Priscilla didn't

3  speak Russian, so she could not sustain herself in Russia

4  independently.  So it was necessary for us to move out of

5  Russia.

6       So I resigned from my job with great regret.  I loved the

7  job, and was doing very well.  And in June of 2019, we began

8  the process of moving to the United States.

9       So [O.G.] and I traveled to the United States.

10 **Q**   Now, I want to get into you and [O.G.] traveling to the

11 United States.  And I want to talk about your children, in

12 particular.  So let's talk a little bit about your children,

13 and then come back to you and [O.G.] moving to the United

14 States.

15      How old are your children now?

16 **A**   [O.G.] is now nine.  And he will be turning ten in July.

17 And [E.G.] is now four.

18 **Q**   Which -- what is your relationship like with them?

19 **A**   I have -- well, until my arrest I had a very good

20 relationship with [O.G.].  And I have very -- very -- I just

21 started building my relationship with [E.G.] in August of 2021.

22 **Q**   Now, you say you just started building your relationship

23 with [E.G.].  Why was that the case?

24 **A**   She was living with Priscilla in Zimbabwe.

25 **Q**   How were the children affected by the dissolution of your

**GESSEN - DIRECT / MITCHELL**

1  relationship with Priscilla?

2  **A**    [E.G.] was tiny, so I don't think -- I don't think she

3  noticed.

4  **Q**    Uh-huh.

5  **A**    And I tried to visit every day when I wasn't there.

6       [O.G.] was devastated by the whole situation.  You know,

7  he was witness to arguments.  He wasn't allowed to see me or

8  his grandmother, so it was very -- it was very complicated for

9  him.  He started to -- you know, he was still small; he was

10 five years old.  But it was very hard on him.

11 **Q**    How did you -- did you like being a father?

12 **A**    Yes.

13 **Q**    Why so?

14 **A**    Sorry.  Um, when [O.G.] was born, he -- he and I spent the

15 first 78 days of his life in hospital.  He was in an incubator

16 24 hours.  You wait.

17      And -- sorry.  Can I have a tissue?  I didn't mean to get

18 so emotional.

19 **Q**    Okay.  It's nerve-wracking to be on the stand.

20      (Tissues are placed before the defendant)

21 **A**    Thank you.

22 **Q**    Uh-huh.

23 **A**    Yeah, so when [O.G.] was born he spent the first 78 days

24 in the hospital, in the neonatal unit for premature babies.  I

25 was there with him every day.

1          Well, the first week after he was born I rebuilt the whole

2    neonatal unit in the Harare hospital.  I installed oxygen tanks

3    and humidifiers and changed the lighting to make it more

4    diffused, and covered the incubators, and installed speakers in

5    the incubators for the kids, as well, to listen to Chopin and

6    Debussy, because apparently it's very good.

7          So the period of me just being with him and wondering if

8    he's going to make it just was a, I guess, bonding that I

9    cannot really describe very well.

10   Q    Now you are talking about how you spent a lot of money

11   redoing, essentially, the neonatal care unit in Zimbabwe.  Was

12   that something that people could just do?

13   A    I didn't spend a lot of money.  I -- well, okay, I spent

14   some money, I think probably paying off security in the

15   hospital to allow me to bring in equipment.  But, no, you're

16   generally not allowed to make changes to hospital or a ward by

17   yourself.

18         But -- sorry -- I think at that point I -- I was beyond

19   caring anyway.

20   Q    And you mention you paid off security to do this?

21   A    Well, because, you know, you try to bring in a humidifier

22   or an oxygen tank, you're asked questions why you are bringing

23   the stuff in, and -- yeah.

24   Q    Okay.  So you -- by your description, your bond with

25   [O.G.] was a very tight one.

GESSEN - DIRECT / MITCHELL

1   **A**    It was unique, I think, yes.  Very tight.

2   **Q**    Did you seek to have that same type of relationship with

3   [E.G.]?

4   **A**    Well, [E.G.] had a very normal birth.

5   **Q**    Uh-huh.

6   **A**    You know, we would -- we were denied the pregnancy phase

7   because of the surrogacy arrangement.  But when she came home,

8   as I mentioned, I think it was just very complicated at the

9   time.  So obviously I wanted to build a relationship, but being

10  there only half the time, it was just a very different

11  environment and very different set of circumstances.

12  **Q**    In June of 2019, you and Priscilla are living together in

13  an apartment in Moscow.

14  **A**    Correct.

15  **Q**    And you had decided to completely dissolve the

16  relationship.

17  **A**    Correct.

18  **Q**    All right.  So at that time, did you take [O.G.] from

19  Moscow to come to the United States?

20  **A**    Yes, I did.

21  **Q**    Why did you do that?

22  **A**    Um, well, I think as I already mentioned, we needed to

23  start dealing with legal custody issues because as we were

24  separating, it was very difficult for us to come to many

25  agreements.

**GESSEN - DIRECT / MITCHELL**

1    And I think when -- any divorce is difficult, and a

2  separation is difficult.  But we were stuck in a country where

3  we had no legal status anyway, and it was just impossible to

4  resolve things if you couldn't agree.

5    And [O.G.] was deeply traumatized by what was happening.

6  I had to take him out of the Moscow school because he started

7  falling behind.  He was in an English-speaking school in

8  Moscow.  He needed to start school during the next school year.

9  He needed therapy.  Psychotherapy is not something that's very

10 common in Russia these days; I think it's much more American

11 approach to a particular child.  Psychotherapy is not common in

12 Russia.

13    So we needed to start looking for schools, we needed to

14 start looking for a therapist.  And it was time to start, you

15 know, moving from Russia to the United States.

16 **Q**   Why did you choose the United States as the location you

17 would go to?

18 **A**   Well, Priscilla discussed many options.  We discussed

19 Zimbabwe since we lived there in the past, but the economic

20 situation there was deteriorating.  So we could not really

21 support -- well, I could definitely not support two households

22 in Zimbabwe.  And I had no job there.  Priscilla's businesses

23 did not generate sufficient income.

24    We discussed maybe settling somewhere in Europe.  We

25 discussed maybe Estonia; we discussed Austria.  Priscilla

1   visited -- I -- what I to offered to Priscilla was to pay for

2   her education for a degree to go to do an MBA, because she had

3   wanted to pursue different entrepreneurial adventures.  And I

4   was willing to support that, after the separation, for her to

5   become independent.

6        And then we ultimately decided on the United States

7   because I'm a U.S. citizen, [O.G.] is a regular (phonetic) U.S.

8   citizen by virtue of being my son.  [E.G.], um, would qualify

9   for U.S. citizenship.  And Priscilla, as a parent of U.S. kids

10  -- she has always had a U.S. visa; we traveled here frequently.

11  I had lots of family in the United States.  So it made sense to

12  have the United States as the next step.

13  Q    And why couldn't you, if you happen to know, legally

14  register your children in Russia?

15  A    Well, [O.G.] was -- [O.G.] had his birth certificates, and

16  was called -- naturalization.  It's a certificate of U.S.

17  citizen birth abroad, I think it's called.  So [O.G.] obtained

18  that in Zimbabwe.  So when an American citizen is born abroad

19  to an American parent, you go to the embassy and register the

20  citizenship.

21       The Russian -- the registration of [E.G.] became an

22  absolute nightmare because the Russian surrogacy law was not

23  aligned with the Russian family law.  So as two unwed foreign

24  parents, we could not register [E.G.] naturally, so we needed

25  to file a lawsuit against the registrar in Moscow to obtain the

**GESSEN - DIRECT / MITCHELL**

1    permission to register [E.G.] as our daughter.

2         And we thought -- well, the agency that arranged surrogacy

3    said it will just take two or three months.  In fact, it took

4    almost a year for us to do that.  Two lawsuits, two appeals,

5    three law firms.  But ultimately in October the Russian Moscow

6    court -- I won't -- I won't go into the spelling -- allowed --

7    allowed Priscilla to register [E.G.], as the mother, and then

8    to -- she had the option of adding me as the father to the

9    birth certificate.

10   **Q**    Are you currently listed as the father on [E.G.]'s birth

11   certificate?

12   **A**    No, I'm not.

13   **Q**    Why not?  If you happen to know.

14   **A**    I traveled to Moscow in October of 2019.  We went with

15   Priscilla to the registration office with all the documents.

16   And Priscilla stated that she does not want to record me as the

17   father of [E.G.].  We had another argument.

18        Legally, I -- legally, my time to appeal the judgment has

19   lapsed at that point, so, like, it was the day after the appeal

20   has lapsed.  So I -- I just didn't have an option.  I walked

21   away quite, quite upset.  I thought it was not fair to me; it

22   was not fair to [E.G.].

23        But then a couple of days later I sent all the documents,

24   the registration to Priscilla, so she could proceed to

25   registration.  Because we had no -- neither one of us had any

1   rights to [E.G.] at that point.  So it was, of course,

2   important that at least one of us had parenting rights, so she

3   would not be suddenly taken away if something happened to us.

4   Q    And to be clear, are you the biological father of [E.G.]?

5   A    Yes.

6   Q    When you left Russia to come to the United States, where

7   was Priscilla at that time?  Where was [E.G.] at that time?

8   Where was [O.G.] then?

9   A    When I left Russia to come to the United States?

10  Q    In June of 2019.

11  A    Yes.  So on June 15th of 2021, Priscilla and I finally

12  agreed that we would move to the United States.  And Priscilla

13  went to Zimbabwe to get her U.S. visa.

14  Q    Just to clarify, was this June 15 of 2021 --

15  A    2019, sorry.

16  Q    Thank you.

17  A    Yes.  Sorry about that.

18  Q    Yeah.

19  A    So on June 15, 2019, Priscilla and I finally agreed that

20  we're moving to the U.S.  So we bought a ticket for Priscilla

21  to travel to Zimbabwe to renew her United States visa.  While

22  she was away, I vacated the apartment that we rented for six

23  months.  I moved all the things to storage.

24       I moved with [E.G.] and [O.G.] and their two nannies to

25  our country house, which is about 20 minutes from Moscow.  And

1   -- it's been in the family for the last 70 years.  And then

2   after I settled [E.G.], I traveled with [O.G.] to the United

3   States through Rome.  We just had a layover there overnight,

4   and then we traveled on to Boston.

5   **Q**    Did you tell Priscilla that you were leaving to go to the

6   U.S. with [O.G.]?

7   **A**    No.  Not before I left.

8        (Reporter clarification)

9            **THE WITNESS:**  Sorry, I'll try to enunciate better.

10  **BY MS. MITCHELL**

11  **Q**    Why didn't you tell her?

12  **A**    Our relationship was very complicated.  In 2019, I tried

13  to take [O.G.] to travel twice.  Once in February of 2019, for

14  my birthday, we agreed that I will travel with him to Italy for

15  one week.  And then in April of the same year, I had to travel

16  with him to Dubai to renew his Russian visa.

17       And on both of those occasions to give me [O.G.]'s

18  documents, Priscilla asked me to pay her money in exchange for

19  spending time with him.  And I thought it was wrong.  And I did

20  not want to buy my son.

21       And I just did not want to have another scene in front of

22  him, so I thought it would be -- since I expected Priscilla or

23  [E.G.] to follow within a few weeks, I just thought it would be

24  easier for all concerned if I left, and avoid a big

25  confrontation, a fight, involving the move, involving the --

1    well, vacating the apartment, et cetera.

2    **Q**    Did you expect to be reunited with Priscilla and [E.G.]

3    shortly after you arrived to the United States?

4    **A**    Within six to eight weeks, that was the timeline we had

5    from the lawyers about how soon we will be able to register

6    [E.G.].

7    **Q**    When did you communicate to Priscilla that you had arrived

8    in the United States?

9    **A**    Um, we spoke with Priscilla when we reached Italy.  I

10   spoke to her; she spoke to [O.G.].  Then when we were in the

11   United States we went to my uncle's house, Alexander Gessen,

12   same last name.  And we stayed there for a little bit.  So we

13   were in touch with Priscilla continuously.

14   **Q**    And when Priscilla went back to Russia, we heard testimony

15   that she was not permitted to leave and travel because [E.G.]

16   didn't have documents.

17       What did you think about that, and what did you do about

18   that?

19   **A**    Well, that's true.  We could not both leave Russia.  And

20   [E.G.] was not allowed to travel.  We had -- I don't recall the

21   exact dates but it was very clear that June-July was the end

22   date for the court, for the appeal.  We were very confident

23   about the outcome.  Yes, so this was -- it was a few week's

24   time.

25   **Q**    And so when you say you were confident about the appeal

1    and it was a few weeks' outcome, what appeal specifically were

2    you talking about?

3    **A**    The appeal of the Moscow Court's decision denying our

4    ability to -- our application to register [E.G.] as our

5    daughter.  So we were appealing that decision in the Appellate

6    Court in Moscow.

7    **Q**    And when that appeal was denied, and -- when that appeal

8    was resolved and Priscilla was left in Moscow, did you take any

9    steps to provide for her and [E.G.]?

10   **A**    So, okay.  To be clear, so I left in June.

11   **Q**    Uh-huh.

12   **A**    The appeal was -- we finally -- our application was

13   granted in early October.

14   **Q**    Uh-huh.

15   **A**    And then Priscilla and [E.G.] traveled in November.  So

16   between June and October I provided absolutely for Priscilla

17   and [E.G.].  I stopped providing for Priscilla on the day when

18   she registered [E.G.] as not my daughter.

19   **Q**    And when you say "she registered [E.G.] as not my

20   daughter," that's the day that she did not put your name on

21   [E.G.]'s birth certificate?

22   **A**    That is correct.  And I was very explicit about it.  I

23   said I'm -- I will always try to support my children but you

24   need to put my name on birth certificate.  Yes.

25   **Q**    During the time between June when you left and October

1   when Priscilla was able to leave with [E.G.], did you ever

2   travel to Moscow to see either her or [E.G.]?

3   **A**    Yes.  I visited them once, I believe, in September, in

4   early September of 2019.  Yes.

5   **Q**    And did you permit [O.G.] to have contact with his mother

6   during this time?

7   **A**    Yes.  So she -- I even bought for [O.G.] -- it's called a

8   "portal," it's a special device connected to Facebook that --

9   sort of the camera tracks the child when he moves around.  So

10  it was very easy for them to talk in Messenger.  And it was on

11  24-7, so they could talk any time.

12  **Q**    Was it your goal to keep Priscilla and [O.G.] apart?

13  **A**    No.

14  **Q**    So in October, does Priscilla then arrive in the United

15  States?

16  **A**    In November, Priscilla traveled to Zimbabwe.  Before

17  traveling, she sent a letter.  Well, her lawyer sent a letter

18  to my lawyers -- sorry.  Her lawyers in Zimbabwe sent a letter

19  to my lawyers in Zimbabwe, saying that she's traveling to

20  Zimbabwe, and that she's planning to continue on to the United

21  States, and to confirm that everything that was discussed was

22  -- and agreed is still in force.

23  **Q**    And what were some of the things that were discussed and

24  agreed?

25  **A**    Well, I agreed to pay for all the expenses of the move to

1   the United States.  I agreed to cover all of Priscilla's

2   expenses in the United States for the first couple of years.

3   To support and fund the immigration application and law.  To

4   pay for her education.

5       And that was -- basically it was just some practical

6   logistical things to enable her to exist in the United States

7   for the first -- first couple of years while she is getting on

8   her feet.

9   **Q**   At this time, were there any court cases in any countries

10  resolving -- regarding custody of the children?

11  **A**   In November of 2019 there were no court cases anywhere

12  about the kids, no.

13  **Q**   Were you paying any child support or any financial --

14  giving Priscilla financial support for [E.G.] at this time?

15  **A**   Priscilla had all of property we held jointly in Zimbabwe.

16  And there was quite a bit, so there was no need for me to pay

17  child support at that point.  She was amply provided for.

18  **Q**   And did Priscilla provide child support for you because

19  you had primary custody of [O.G.]?

20  **A**   No.

21  **Q**   Now, after Priscilla arrived in the United States, what

22  happened then regarding your children?

23  **A**   Well, that happened much later.

24  **Q**   Oh, oh, oh, okay.  Sorry, so Priscilla is now in Zimbabwe.

25  **A**   Yes.  So right now we're in November of 2019, and

 1    Priscilla's in Zimbabwe with [E.G.], and I'm in the United

 2    States with [O.G.].  Yes.

 3    **Q**    Okay.  And so in November of 2019, when [E.G.] is in

 4    Zimbabwe, did any court cases get filed subsequent to that?

 5    **A**    The first custody case that was filed anywhere was -- I

 6    filed, myself, at the end of December of 2019, in

 7    Massachusetts, to be able to make medical and educational

 8    decisions legally in Massachusetts regarding [O.G.]

 9    **Q**    And then were there subsequent court filings that were

10    made regarding the custody or care of the children?

11    **A**    It's a long list.  So in March of 2020 I filed what is

12    called the Hague Convention petition under the civil aspect of

13    child kidnapping, requesting that [E.G.] be sent to the United

14    States, according to our agreement.

15          Then three months later, Priscilla filed her own Hague

16    Convention petition to send [O.G.] from the United States to

17    Zimbabwe.

18          Once she filed that, my custody application in

19    Massachusetts was stopped.  Then I filed for paternity of

20    [E.G.] in Zimbabwe.  And then, Priscilla filed for custody of

21    [O.G.] in Zimbabwe.  That was in -- also in June of 2020.

22          And then all of those cases were suspended basically

23    because of COVID, and we were stuck in the legal limbo for the

24    next -- for the next year.

25    **Q**    Now, you mentioned that you filed cases in the Hague.

1    When I think of the Hague I think of international affairs and

2    things like that.  Why were you filing court cases in the

3    Hague?

4    A    So there is an international convention, the Hague

5    Convention, and the civil aspects of child abduction.  It was

6    signed in the Hague.  That's why it's called the Hague

7    Convention.  But it's litigated in the country where the child

8    is.

9         So I filed my petition in Zimbabwe, in the Supreme Court

10   of Zimbabwe.  And Priscilla filed her petition in the Federal

11   District Court in Massachusetts.  So I was litigating in

12   Africa, and she was litigating in America.

13   Q    So was there ever a time where all of these cases ended up

14   becoming resolved?  The Hague cases?

15   A    Um, so the Massachusetts District Court was a little bit

16   faster.  It denied Priscilla's application.  And then, the

17   Zimbabwean court denied my application in Zimbabwe.

18        I appealed in Zimbabwe.  And then, that appeal was

19   basically paused because Priscilla and [E.G.] came to the

20   United States.  And there was no reason to litigate that at

21   that point.

22        The Supreme Court in Zimbabwe said that there was an

23   agreement to come to the United States, but they were not sure

24   whether it was [E.G.]'s habitual residence -- that's the term

25   that the Court uses -- habitual residence where the child was

**GESSEN - DIRECT / MITCHELL**

1   living before the application was filed.

2       So it was a strange question of law that they did not

3   resolve.

4   **Q**    And so at the time Priscilla came to the United States,

5   the court case in Zimbabwe, the court case in Massachusetts,

6   had both of those been resolved?

7   **A**    When -- no.  No.  No.  When they landed in Massachusetts

8   -- the reason Priscilla traveled to Massachusetts was to

9   litigate, to appear in court in her attempt to bring [O.G.] to

10  Zimbabwe with her.  So that case was the reason why she arrived

11  in Massachusetts with [E.G.].

12  **Q**    Okay.  And were there still outstanding court cases in

13  Zimbabwe that still would have to be resolved?

14  **A**    Yes.  So Massachusetts did not have any jurisdiction over

15  [E.G.] because [E.G.] has not been there for a long enough

16  time.  So my paternity petition to establish that I'm the

17  father of [E.G.] was still pending in Zimbabwe.  And the

18  custody case regarding [O.G.] that Priscilla filed was also

19  pending in Zimbabwe.  So there were two cases concerning both

20  kids.

21  **Q**    So when was it that Priscilla came to the United States to

22  litigate the Massachusetts case regarding custody?

23  **A**    Well, so that case was sort of hanging in limbo, pending

24  the Hague Convention resolution.  So when Priscilla came, the

25  custody issue -- there was no movement in our custody case in

1  the United States.

2      So until December -- I want to say 18th of 2021, there was

3  no movement in our custody case in Massachusetts.  It was just

4  -- it was -- it was dormant for the previous two years.

5  Q    And then what happened after December 18, 2021?

6  A    So on December 18th, the Federal District Court in

7  Massachusetts denied Priscilla's application.

8  Q    Uh-huh.

9  A    And it didn't find that -- anything wrongful about my

10 removal of [O.G.] from Russia.  It found that Russia was

11 [O.G.]'s habitual residence, and there was no reason to return

12 or to send [O.G.] to Zimbabwe.

13     And at that point I was faced with a decision of what to

14 do next, because we had custody pending in Massachusetts but no

15 jurisdiction over [E.G.] in Massachusetts.  And then we had

16 custody pending in Zimbabwe, and Zimbabwe had jurisdiction over

17 both cases, because [O.G.] is also a Zimbabwean citizen and

18 [E.G.] is a Zimbabwean citizen.  So Zimbabwe was the only

19 jurisdiction at that point which actually had jurisdiction over

20 both children.

21 Q    And at the time -- in December, December 19 of 2021, were

22 there any orders by any court about you being able to travel

23 with [O.G.]?

24 A    So during the -- while the Hague petition case was active,

25 there was a court -- the Federal Court order that prohibited me

1    from leaving -- well, prohibited anyone from leaving the state

2    with [O.G.].   [O.G.] had to stay in Massachusetts.

3         Once the decision was handed down by the Federal Court,

4    that order was vacated so it was no longer in force.  And we

5    could travel outside of Massachusetts with [O.G.].

6    Q    What date was it that the Federal Court handed down their

7    order?

8    A    I may be off by a day or two; it's relevant to my

9    Massachusetts case so I -- so I -- um, it was around

10   December 18th or December 19th of 2021.

11   Q    Okay.  Okay.  So after you got the order that said that

12   the Hague case had been dismissed, --

13   A    Yes.

14   Q    At that time you just testified that the only two pending

15   -- the only jurisdiction that had -- that had -- the only

16   location that had jurisdiction over both kids was Zimbabwe.

17        What was your intention?

18   A    So my top priority was to stabilize [E.G.].  [O.G.] was

19   very comfortable.  He was in school.  He had a lot of

20   extracurricular activities.  He rode horses; he played violin.

21   He was -- he was in a safe environment.

22        [E.G.], from the time when we separated, has changed 12

23   addresses.  She has been in situations which -- like, were not

24   necessarily best for her.  And I wanted to make sure that I can

25   be there for her.  So my priority was to establish paternity as

GESSEN - DIRECT / MITCHELL

1   quickly as possible over [E.G.]

2   **Q**    And I want to talk to you about this because this leads

3   into what you were just mentioning, your kidnapping charge or

4   your parental kidnapping charge.

5        So what happened in December of 2021 that led to this

6   charge?

7   **A**    Oh, yes.  So I made probably the first doubtful decision.

8   I took [O.G.].  I dismissed my custody case in Massachusetts.

9   I -- and we traveled first to New York.  Then we -- I decided

10  to take a one-week holiday in Canada.  I had been promising

11  [O.G.] snow and skiing and skating for a while.  And from there

12  I made plans to travel to Zimbabwe.

13       The Consulate in Zimbabwe was instructed, cases were

14  pending.  They were supposed to go on the calendar in January

15  of 2022.  So I was traveling to Zimbabwe with [O.G.] so that I

16  could appear in court there on the paternity case, in the

17  custody case.

18       And also, throughout that entire Hague Convention period,

19  Priscilla was telling the court that she's planning to return

20  to Zimbabwe in December.  Before the judgment, her lawyers were

21  asking the court to hurry up.  You don't tell the court to

22  hurry up, but she asked the court to issue the judgment as

23  quickly as possible, because her visa was expired and she

24  needed to go back to Zimbabwe.

25       So it was my understanding that Priscilla intended to

1   return to Zimbabwe.  And I thought that was the place where all

2   four of us could finally resolve paternity, resolve custody,

3   and have legal basis of how we can jointly take care of our

4   kids going forward.

5   **Q**   Was [O.G.] due to start school break at that time?

6   **A**   [O.G.] was on school break, he was supposed -- so I spoke

7   to his school, that he would be taking some time off.  And then

8   I made arrangements for his schooling, both primary education

9   and violin and horse-riding, in Zimbabwe before I arrived

10  there.  So it was all sort of lined up to make sure that there

11  would be no interruption.

12      That -- again, you know, it's -- it wasn't university, you

13  know, he's still -- he's just learning to count, and to read,

14  so we can do that at home.

15  **Q**   Did you communicate to Priscilla your plans to travel to

16  Zimbabwe?

17  **A**   Yes.

18  **Q**   And how did you communicate those plans?

19  **A**   So two channel -- well, three channels, actually.  So my

20  lawyers had a long conversation with her lawyers, explained the

21  rationale.  And one of the things they explained is that we did

22  not want to fight an appeal of the Hague Convention petition in

23  Massachusetts.  So they explained where we're going.

24      I reached out to a parenting coordinator, Dr. Fleming,

25  Patrick Fleming.  And I notified him that we will probably be

1    not coordinating in the next couple of months.

2         And I wrote to Priscilla about our plans.  And suggested

3    that we would meet in January.  And explained that I will be

4    taking a holiday, offering that she would take a holiday with

5    [E.G.]; she's been wanting to go to Florida.  And sort of take

6    a break from litigation and resume litigation in January.

7         So, yes, these are the three channels that I reached out

8    to her.

9         But, but to be clear, she did not agree.  She did not say:

10   Yes, go ahead.  So I made the decision.  It was my decision.  I

11   was clear about what I wanted to do, but I did not discuss it

12   with Priscilla beforehand, so I own that.

13   Q    Was your -- when you were leaving on -- to go with [O.G.]

14   to Canada, was it your intention to permanently deprive

15   Ms. Chigariro of [O.G.]?

16   A    No.

17   Q    Okay.  What, again was your intention?

18   A    My intention was to arrive in Zimbabwe, for both of us to

19   have access to both children, and for both of us to have legal

20   rights over both children.

21   Q    And we've heard that you had a plane ticket purchased to

22   London.  Did you have continuing travel booked from London to

23   Zimbabwe?

24   A    No.  It was during the COVID vaccination-testing period.

25   So you always needed -- either 48 hours or 72 hours before

1    arriving in some new country, you needed to have a vaccination

2    certificate -- sorry -- results of your COVID test.

3         Just because of the logistics of the flight, it's a long

4    flight to Zimbabwe, it was impossible to book and to know that

5    we would be allowed to enter.  So we're flying to Zimbabwe,

6    flying to London.  We are going to pause there for two days,

7    get tested again, obtain results, and then continue on to

8    Harare.

9    Q    Now, I'm showing you what's been marked as Exhibit 30, and

10   I don't know that this has been admitted yet.

11        (Document displayed to the Defendant)

12            **MS. HOSSEINI:**  No objection.

13            **MS. MITCHELL:**  Oh, okay.

14            **THE COURT:**  Do you want to admit it?  30 is admitted.

15        (Trial Exhibit 30 received in evidence.)

16            **MS. MITCHELL:**  Can we go ahead and admit 30 and

17   publish it to the jury?

18        (Document displayed)

19   **BY MS. MITCHELL**

20   Q    Looking at this temporary order that appears to have been

21   filed on December 21st, 2021, did you see this order before you

22   left the state of Massachusetts?

23   A    No.

24   Q    Did you receive this order at some time later on?

25   A    Yes.

GESSEN - DIRECT / MITCHELL

1  **Q**    When did you receive this order?

2  **A**    Um, it was forwarded to me, I think, on WhatsApp by my

3  lawyer in Zimbabwe when I was in Canada.

4  **Q**    And after you received this order, what did you do?

5  **A**    Um, so I reached out to -- well, I didn't know what to do.

6  I was surprised by it.  So I reached out to my lawyer in

7  Zimbabwe, to understand whether this order would have any

8  bearing on the custody case there.  He assured me that because

9  it was not a substantive order, and it was an *ex parte* order,

10  that it will have no weight in the Zimbabwean court.

11        I then reached out to my lawyers in Massachusetts to ask

12  whether -- since I wasn't served with the documents, with the

13  process, with the order, whether I was bound by the terms of

14  the order that I needed to return.  The Massachusetts lawyer

15  said that it's a very unclear issue.  That technically,

16  constitutionally I'm probably right, but that it would be safer

17  for me to comply with the Massachusetts family court.  So they

18  said that they're not sure what the consequences would be.

19        Again, it's -- from a purely legal standpoint, my

20  understanding was that I was not in violation of that order,

21  but I -- you know, I do understand that a court order is a

22  court order.  So that's probably when I made my second bad

23  decision, which was not to -- not to abide by its terms.

24            **MS. MITCHELL:**  Okay.  And we can take down Exhibit 30.

25        (Document taken off display)

1  BY MS. MITCHELL

2  **Q**   Now, under what circumstances did you return to the United

3  States after you were in Canada?

4  **A**   Um, when -- so I was traveling to London with [O.G.].  My

5  mother, [O.G.]'s grandmother, was traveling with us to help me.

6  And I tend to -- I tend to work even during holidays.  So --

7  and [O.G.] has a very good relationship with her.

8      When we were waiting to board our flight in the Montreal

9  airport, just sitting around, about 20 security agents

10  converged on us.  They grabbed [O.G.], and, like, pulled him

11  away.  They then, like, four people grabbed me, like, held me

12  horizontally, dropped me on the floor.  Then, like, two people

13  were sitting on me.  They searched me.  I peed myself, because

14  I was so scared, and I didn't like it, and I was not sure what

15  was happening to me.  They handcuffed me.  They pushed my

16  mother away.

17      And then, it lasted, I don't know, for about ten, 15

18  minutes, the entire scene.  Then they took me away to -- to the

19  holding cell.  They dragged [O.G.] away -- no, [O.G.] was

20  screaming, "Papa, what's happening?  Papa, what's happening?"

21      It's very difficult to reassure your child when you're

22  handcuffed on the floor.  I tried to reassure him.  And then,

23  my mother tried to comfort [O.G.].  She was told that if she

24  tries to approach him, she will be arrested as an accessory, so

25  they shouted at her as well.

GESSEN - DIRECT / MITCHELL

1      And then I was put in a --

2   **Q**   Take a moment, if you need it.

3   **A**   That's okay.  As long as the stenographer can understand

4   me, I guess.  I'm sorry, as long as the jury can understand me,

5   I guess.

6       Then I was placed in an immigration detention facility

7   near Montreal.  It was very comfortable.  I was there for two

8   and a half weeks.

9       I had a hearing in front of an immigration judge.  I said

10  I would like to consent to being deported.  I was told I could

11  not consent to being deported unless I admit to committing a

12  crime.  So we had a couple of hearings.  They ordered my

13  deportation.

14      I was driven to the border with the United States.  I was

15  handed over to U.S. marshals who arrested me immediately for

16  being a fugitive from justice.  And I said that I wasn't a

17  fugitive, that I was trying to get back to Boston.  And they

18  said it's -- technically I was a fugitive from justice.  So

19  they committed me for 90 days in a facility in northern

20  New York, upstate New York, for an extradition to

21  Massachusetts.  So I then had a hearing a few days later for an

22  extradition.  I consented to being extradited to Massachusetts.

23      Then, a few weeks later, Massachusetts police came,

24  brought me to Massachusetts.  I was put in a jail in

25  Massachusetts for one night, and then I was released

**GESSEN - DIRECT / MITCHELL**

1  immediately the next morning on personal recognzance, because

2  it was pretty clear that I was not a danger to society.  And --

3  yeah -- or to the kids.

4      So, so that was -- I think I spent 37 days in jail.  It

5  was very educational.

6  **Q**   With your experience with being in jail for those 37 days,

7  were you angry with Priscilla?

8  **A**   Um, I think -- I'm not sure it was anger; I think I have

9  been angry with Priscilla before, you know.  And I think that

10 sort of anger is a -- I think I was very surprised.  I think I

11 kind of -- I felt it was unfair, like, to do that.  I felt, um,

12 I felt she abused the system in a way that it shouldn't be

13 abused.

14     I was upset -- yes, look, I was upset.  I was upset, like,

15 I -- anger has, like, an element of violence to it.  I didn't

16 -- there was no violence.  It was more of a, just, sort of:

17 Really?  Like:  Honestly, why?

18     I mean, I think that it was sort -- that was -- that was

19 the feeling, more than, like, the angry feeling.

20 **Q**   Did you want to take revenge against her because of what

21 happened?

22 **A**   No.

23 **Q**   And you mention that [O.G.] seemed to have visually a

24 traumatic reaction to your being arrested.  What was the result

25 to [O.G.] of seeing you being arrested, if you happen to know?

1   A    Well, [O.G.] and I for the following -- so I didn't see

2   [O.G.] for several months after that.  I haven't seen -- I

3   didn't see both kids for several months after that.  I was only

4   able to talk to him occasionally on video from -- from jail.

5   So I -- I organized puppet shows for the kids from the jail,

6   and I was singing to them.  But we were not -- we were not

7   discussing any sensitive topics.

8        When I was able to see [O.G.] that was several months

9   later.  It was in April of the same year, so it was three

10  months later.  The first thing he asked, he was like, "Dad, are

11  you okay?  How was it?"  You know, "Were you hurt?"

12       And that -- can I have some more tissues?

13  Q    Yes.

14       (Request complied with by Ms. Mitchell)

15  A    Just, that boy.  He was -- he was all in that experience

16  that happened three months later.  He was -- um, he was telling

17  me about how excited he was to be with a foster family, and how

18  wonderful these people were, and he was -- like, he was very

19  excited about himself, and he was not harmed at all.  He was --

20  it was just fascinating.  Just, like, so durable.

21       And then all he cared about, he was like, "How are you?"

22  Like, "Are you fine?"  Like, "Did they hurt you?"

23       After the arrest, like, while I was still in the holding

24  cell in the airport, I begged the custo- -- the customs

25  officers to bring [O.G.] to my cell so he could see I was okay.

1   And he was very excited about the stainless-steel toilet.  So

2   we -- [O.G.] was injured beyond belief.  It -- I think it kind

3   of violated his sense of security, it violated his sense of

4   confidence in me as the father, and his safety with me as the

5   father.

6        He was -- um, the world that he knew sort of has collapsed

7   around him.  He's been with me for the previous -- well, me and

8   my mom for the previous three years.  And it just, like, it

9   turned out that I could not protect him; I could not defend

10  him.  In fact I needed protection, I needed to be defended.

11       So Priscilla sought therapy for him.

12       And then we were reunited.  And it took a bit of time to

13  start rebuilding the relationship.  And, yeah.

14       So, [O.G.] was very injured by it and -- like probably by

15  nothing -- nothing like that in his life.

16       Sorry.

17  Q    Do you expect to be vindicated for the parental kidnapping

18  charges?

19  A    Yes.

20  Q    Why so?

21  A    Well, the Massachusetts -- the way I understand

22  Massachusetts law -- I'm not licensed to practice law in

23  Massachusetts.  The way I understand Massachusetts law is that

24  in order to be guilty of parental kidnapping, you need to --

25  when you take the child out of Massachusetts, there needs to be

**GESSEN - DIRECT / MITCHELL**

1  an active court order that prohibits it.  So you are either --

2  either parent is naturally free to travel outside -- within the

3  United States, outside the United States, with children; that's

4  fine as long as there is no court order.

5       Since at the time that I left Massachusetts there was no

6  court order, and, you know, that is -- I mean, I did not leave

7  Massachusetts until the federal order expired, I don't believe

8  I broke the law.  I mean, whether it was the right thing to do

9  or not, I'm not -- I guess that is not the question.  But as

10 far as the law is concerned, my understanding is that I did not

11 break any laws.

12 **Q**   Now, after you were back in Massachusetts, and after the

13 -- in January of 2022, did the custodial arrangement between

14 you and Ms. Chigariro regarding the children change or get

15 formalized in any way?

16 **A**   So the Court order that you showed -- that you showed

17 earlier granted Priscilla full custody over both children.

18 Well, over [O.G.], because I had no rights of custody regarding

19 [E.G.] anyway.  There was no paternity.

20      So when I came back, and I was released I think it was

21 February 9th, I tried -- it was a temporary order, but I tried

22 to have that order changed.  But, the way I understood it is if

23 there's a temporary order in effect it is not changed until the

24 permanent order is issued.  And that could take between a year

25 to two years while the custody is actually being litigated.

1        So I couldn't -- I tried to get that order changed, and

2   basically I had no custody rights regarding [O.G.].

3        I petitioned the Court for normal access to parenting.

4   Priscilla objected.  I was granted supervised access twice a

5   week, I think for two or three hours every time.  I was

6   allowed, I think, two or three phone calls a week.

7        And then I also -- at that point on February 9th, I think,

8   by that time, Massachusetts acquired jurisdiction over [E.G.].

9   So finally Massachusetts had jurisdiction over both kids.  So I

10  filed for paternity of [E.G.] immediately in Massachusetts.

11  And I also filed a note to remove order.  Because basically I

12  had no custody rights over the kids; Priscilla could just move

13  out of state, and I had absolutely no way to object to it.  So

14  I filed to at least make sure that kids stay in Massachusetts.

15  And I -- I believe I also filed for custody of [E.G.]  in

16  Massachusetts.

17       So at that point we had Priscilla's case pending and my

18  paternity case pending and my custody case pending all in

19  Massachusetts.  And by that time, all of the Zimbabwe cases

20  were -- no, sorry, the paternity case in Zimbabwe regarding

21  [E.G.] is still pending.  I think it's still open today.

22  Q    Now, you mentioned that Priscilla had sole custody, and

23  you were granted some temporary visitation with a supervisor.

24  Did that change, over the course of time, in 2022?

25  A    Yes.  I wanted, at any cost, to be reunited with the

1    children.  I felt it was extremely painful and harmful to them

2    to be in that arrangement.  Supervised visits are very, um,

3    difficult to explain, particularly when a child is bigger.  And

4    the supervisor is there to protect the child from the --

5    typically an abusive parent.  So it's very difficult to explain

6    to the child why the supervisor is there, sometimes.  So I

7    thought it was essential to resolve it.

8         So Priscilla and I again entered into negotiations in

9    April of 2022.  And on the 29th of April, we signed a shared

10   custody agreement, giving us equal custody in both children,

11   recognizing my paternity of [E.G.], and providing Priscilla

12   with sufficient means to support herself comfortably in the

13   United States until she receives permanent immigration status.

14   **Q**    Now, I want to clarify something.  You just said by any

15   means, or at any cost, you wanted to be reunited with the

16   children.  Would that include murder of Ms. Chigariro?

17   **A**    No, sorry.  I -- no.  I meant not at any cost; at any

18   reasonable cost.

19   **Q**    Now, you -- in April, 2022, you were having shared custody

20   of the children.  Were parenting decisions being made smoothly

21   between the two of you?

22   **A**    Well, most of the parenting decisions were provided for in

23   the agreement.  We have had difficulty in the past agreeing to

24   things, so it was just easier to record holidays and schools

25   and exchange times and everything else.  So we tried to address

1  all possible points of contention in the agreement, itself.

2       As far as abiding by the terms of the agreement, it was

3  very smooth.  Hand-overs were civil.  Sometimes Priscilla would

4  ask me to pick up a carton of milk when I was dropping off the

5  kids, you know.  So it was very civilized, and not contentious.

6  **Q**   If everything was civil and not contentious, why then were

7  you seeking sole custody of the children?

8  **A**   (Inaudible)

9  **Q**   Well, if everything was civil and everything was going

10 well, why did you want to be the only parent of the children?

11 Why were you seeking to have Priscilla be deported?

12 **A**   That was the -- sort of a legacy situation.  Because when

13 I came back from New York, from Canada, and I was released,

14 February was a very dark month.  I couldn't see the kids; I

15 couldn't talk to the kids.

16      So I filed a whistleblower complaint with the Immigration

17 and Naturalization Service, reporting that Priscilla was

18 illegally in the United States, and -- hoping that she would be

19 deported, and the children would remain, and that I would be

20 reunited with the children that way.

21      So it was not my -- not my proudest moment, but I -- I

22 just did the -- you know, when I'm talking about "any means

23 necessary," that included trying to get Priscilla deported.

24 But that was, I think, late February or -- no, it was early

25 March of -- early March of 2022, when I did not have access to

1   the children.

2   **Q**    Why, then, did you have a meeting later on and follow up

3   to have Priscilla deported at a later date in time?

4   **A**    Also in March, in March of the same year -- so this --

5   when I filed the whistleblower complaint, I called a friend of

6   mine who had very good connections at the INS.  And I -- I

7   mean, INS is not the fastest organization in the world.

8   **Q**    And by "INS," the Immigration Naturalization Service?

9   **A**    Yes.  I think now it is called the United States Customs

10  and Immigration Service, USCIS.  I think INS is the old name.

11  But yes, he had connections in Immigration.  So I had hoped

12  that he could use those connections to make sure that the file

13  did not fall through the cracks, and that it would be acted on

14  and properly investigated.

15  **Q**    I want to take a break from talking about the custody

16  issues, and focus again a little bit on you, and get a little

17  bit of your background, and go back to some of the issues that

18  led to this charge.

19       Where were you born?

20  **A**    I was born in the Soviet Union, in 1975, when it was still

21  the Soviet Union.  Now it's Russia.

22  **Q**    When did you immigrate to the United States?

23  **A**    In 1990.

24  **Q**    Why did you come to the United States?

25  **A**    We came as refugees on religious grounds.

**GESSEN - DIRECT / MITCHELL**

1   **Q**    Are you a U.S. citizen now?

2   **A**    I am.

3   **Q**    And so you've gone through the process of attaining

4   citizenship?

5   **A**    Yes, I have.

6   **Q**    Where did you -- we've heard testimony that you're a

7   lawyer.  Where did you go to law school?

8   **A**    Well, I don't practice law, but I went to law school at

9   the University of Connecticut School of Law.

10  **Q**    And you said you don't currently practice law.  When did

11  you last practice law?

12  **A**    Around 2002.  Yeah.

13  **Q**    What did you do as a lawyer in 2002?

14  **A**    I specialized in intellectual property law.  And, but

15  mostly, but mostly focused on litigation for corporate clients.

16  **Q**    Why did you stop practicing law?

17  **A**    Well, the firm where I originally clerked and started was

18  located in the World Trade Center.  The firm suffered during

19  the bombing.  And tried to kind of rebuild itself afterwards,

20  but sort of fell apart, and the people I was working with were

21  no longer there.  And so I just -- it didn't quite work out the

22  way I intended.  And then -- I think I wanted to leave

23  New York.  And -- yeah.

24  **Q**    In the course of being a lawyer, have you ever worked with

25  immigration or done anything with immigration law?

GESSEN - DIRECT / MITCHELL

1    **A**    No.

2    **Q**    Have you ever studied immigration law?

3    **A**    Yes.

4    **Q**    Why did you study immigration law?

5    **A**    Well, I was interested in immigration law because I was --

6    you know, it was something that was of personal interest to me,

7    so in law school I studied immigration law.  But then I had

8    studied extensively during my -- while I was an inmate in

9    New York state jail.

10   **Q**    And why did you study immigration law while you were in

11   New York state jail?

12   **A**    Because I wanted to have Priscilla deported.

13   **Q**    Now, you mentioned that you lived in a number of different

14   countries with Priscilla.  Have you lived in other countries

15   where bribery is common?

16   **A**    I have lived in other countries where bribery is common,

17   and where bribery is less common, yes.

18   **Q**    And when you lived in these countries where bribery is

19   common, what is the culture?  How does it work?

20   **A**    Well, I make a distinction.  I mean, it's for myself, it's

21   not for legal purposes, it's just -- because bribery, for me,

22   is something where you pay somebody to do something they

23   shouldn't.

24        And then there's kind of -- I would say it's facilitation

25   payments, when you pay somebody to do something that they

1  normally should do as part of their job, but they just don't

2  want to, or they do it too slowly, or they want to be

3  encouraged to do it.  So I would say that it's not the bribery

4  that's common in those countries, but it's those facilitation

5  payments where just to get regular normal services you're

6  expected to make some sort of a contribution.

7  **Q**    What countries have you lived in where you're expected to

8  make some sort of contribution like this?

9  **A**    Russia, Ukraine, South Africa, Lesotho.  Zimbabwe.

10       Yeah, I think that since 2004 until 2019, I have mostly

11  lived in countries where that was part of the culture.

12  **Q**    These facilitation-type payments.

13  **A**    Correct.

14  **Q**    Now, what were you doing for work in 2022?

15  **A**    Starting from 2014, I specialized in working for clients

16  who needed help in detecting fraud, recovering stolen property,

17  preventing fraud.  Many of my clients were insurance companies

18  that were victims of fraud.

19       And I also managed a couple of startups.  I launched two

20  startups that had -- they were focused on using big data and

21  artificial intelligence to detect fraud in insurance claims, in

22  medical insurance and in motor insurance.

23       And then I launched -- well, before my arrest, I was

24  trying to launch two more platforms.  One is called EE Farm.

25  It's a digital platform for small farmers in Africa.  It's

1    being piloted by my former partners in Zimbabwe now.  It's to

2    help little farmers make a little bit more money.  Just

3    subsistence farmers.

4         And the second one, I developed a clothing collection for

5    little children.  And so I was in the process of organizing,

6    launching that.  It's -- I call it the iPhone of children's

7    clothing.

8    Q    What is Geewiz?

9    A    Geewiz is a consulting company.  I was working with them

10   for several months in 2022.  We were providing consulting

11   services to NAVOI Metals -- Metallurgical and Mining Company.

12   And that work was related to, in assessing their purchasing

13   practices, their supply chain, their logistics, and finding

14   fraud and cleaning it up.

15        So it was a fairly short-term engagement to -- to help

16   that company build transparency into its purchasing process.

17   Q    Where is Geewiz located?

18   A    In Estonia.

19   Q    And what --

20   A    That is in Europe.

21   Q    What were you doing in particular for Geewiz?

22   A    I was reviewing purchasing data, looking at purchasing

23   contracts and long-term supply agreements.  I was identifying

24   those agreements that were -- with kind of the way you build

25   fraud into purchasing process, you put companies in between the

1    actual supplier and the buyer.  So I was finding those

2    contracts where the -- where the supplier company was not a

3    real company, but it was a shell designed to funnel the funds

4    to the side.  So it was basically forensic work.

5    **Q**    In addition to your work with Geewiz, were you seeking any

6    other business or investment opportunities?

7    **A**    Not actively, no.

8    **Q**    In 2022, were you trying to develop any other sorts of

9    business opportunities?

10   **A**    In February of 2022, the end of February, my world has

11   changed a lot when Russia invaded Ukraine.  I grew up in

12   Russia; I lived for almost a decade in Ukraine.  And it was

13   deeply personal.  My friends from Russia were running away from

14   Russia, my friends in Ukraine were running -- so I was busy

15   helping the refugees resettle in Europe from Ukraine.

16        And -- I am going to get emotional again.

17        Anyway, but one of the issues I became very closely

18   involved in is that the Ukraine was not ready for a massive

19   invasion, and the Ukrainian Army did not have necessary

20   supplies.  So my friends reached out to me from Ukraine and

21   asked if I could help find bulletproof vests and helmets.

22   People were just using metal sheets just to protect themselves.

23   Just to supply the soldiers.  And they were sort of private --

24   people were being recruited all the time to recruitment

25   centers, so to equip people with protective ballistic equipment

1    for Ukraine.

2          So I got involved in that very heavily.  I called my

3    friends in Israel; I called my friends living in Turkey.  I was

4    trying to find a supply of those vests.  So I got involved in

5    that in March.  It was extremely difficult, because most

6    countries were refusing to get involved, so they would stop

7    supplying Ukraine with any ballistic equipment.

8          So I had an idea that the best thing to do was to put a

9    factory right in Estonia right on the border with Ukraine, to

10   be able to supply a large amount of vests and helmets to the

11   Ukrainian Army in realtime, rather than try to bring it from

12   China which was trying to be neutral and so refused to ship the

13   product.

14         The primary purpose of that was not a business.  The

15   primary purpose of that was to organize the necessary life --

16   life-necessary supplies.  But obviously it required a

17   significant capital investment.  And, and investors typically

18   want to invest in things that bring a return, so that's why I

19   was hesitating to call it a "business."

20         But yes, I was pursuing that as a business, as a business

21   project in 2022.

22   Q    Who were you working with to build this factory?

23   A    So I brought in a partner from Israel.  It is called

24   Mosada Armor.  M-O-S-A-D-A Armor, without the U.  They were the

25   technical experts.  They were a small-scale producer of

**GESSEN - DIRECT / MITCHELL**

1  top-quality equipment, ballistic equipment.  So they were

2  supposed to be the technical experts.  I brought in an expert

3  in Estonia to coordinate with the Israelis on factory electric

4  supply, press support, et cetera.

5       And then I started trying to organize funding.  So I

6  reached out to somebody I've known for 15 years, to a friend,

7  to see -- he was sort of halfway between Ukraine and Washington

8  -- to see if he could help with funding that project.

9  **Q**    Who was this friend that you reached out to?

10 **A**    His name is Oleksii, O-L-E-K-S-I-I Kiselev, K-I-S-E-L-E-V.

11      (Off-the-record discussion between the Court and the Court

12 Reporter)

13          **THE COURT:**  Let's take our break now.

14      (Recess taken from 9:46 a.m. to 10:07 a.m.)

15      (The following proceedings were held in the presence of

16 the Jury)

17          **THE COURT:**  Thank you, members of the jury.  You may

18 be seated.

19      Ms. Mitchell, you may resume.

20          **MS. MITCHELL:**  Thank you.

21                  <u>**DIRECT EXAMINATION RESUMED**</u>

22 **BY MS. MITCHELL**

23 **Q**    So Mr. Gessen, right before we were taking our break you

24 were telling us that you were looking for funders for a factory

25 that you were hoping to build in Estonia that would make

**GESSEN - DIRECT / MITCHELL**

1    protective gear for Ukrainians fighting against Russians.

2        And you had just told us that you had reached out to your

3    friend, Alex Kiselev, to help you with funding?

4    **A**    That's correct.

5    **Q**    So I want to talk to you about Alex Kiselev.  How did you

6    first meet Alex Kiselev?

7    **A**    I met Alex around 2009 in Kyiv, Ukraine, where I was

8    working at the time.  He was a part of a group of lobbyists --

9    including Paul Manafort and Steve Bannon and some other

10   high-profile American lobbyists -- who worked with the current

11   government of the Ukraine.

12   **Q**    And what did you believe that Alex did for work when you

13   met him?

14   **A**    I thought he was a lobbyist in Washington that represented

15   Ukrainian interests in Washington, D.C.

16   **Q**    And why did you believe that?

17   **A**    I knew many of the people that Alex worked with.  I worked

18   for some of the people he worked for.  I saw the work he was

19   doing, issues that he was resolving.  So all of the topics that

20   concerned any aspects of the United States government went

21   through Alex.

22   **Q**    How would you categorize your relationship with Alex?

23   **A**    Friendly.

24   **Q**    And had you ever done prior business deals with

25   Mr. Kiselev?

**GESSEN - DIRECT / MITCHELL**

1    **A**    We've never done business together.  Well, I guess it

2    depends what the question is, what's a business deal.  Let me

3    clarify.

4         Around 2012, Alex helped obtain funding for a mining

5    operation in Africa.  It was funded by the U.S. government from

6    an overseas private investment corporation.  It's a funding

7    institution in Washington, funded by the U.S. government, that

8    invests in international projects, as far as I understand, that

9    correspond with U.S. geopolitical interests.

10   **Q**    And so Alex helped you get funding for a mining

11   corporation in another country.

12   **A**    He helped obtain funding in the amount of $50 million.

13   That's 5-0.  He organized meetings in Washington with a former

14   director of OPIC, Mr. Peter Watson.  He was involved in

15   arranging all of the meetings, and that funding, yes.

16   **Q**    So what was your purpose in reaching out to Alex for

17   funding for this endeavor that you were trying to do?

18   **A**    In April of 2022, there was a lot of reports in the press

19   about U.S. Congress approving military aid to Ukraine.  The

20   amount named ran from $33 billion, that was the original

21   package, to $45 billion that was ultimately approved.  And I

22   did not know whether that factory would qualify for funding

23   from that source.

24        So I reached out to Alex with a question of whether he

25   could possibly facilitate access for that funding, if my plan

**GESSEN - DIRECT / MITCHELL**

1   qualified for those -- for this money.

2   **Q**    So in reaching out to Alex, were you hoping to get a

3   source of money coming from the United States government?

4   **A**    That is correct.

5   **Q**    And so what, specifically, were you hoping Alex could do

6   as far as funding from the United States government?

7   **A**    Basically to explain to me the process, make the necessary

8   introductions, assist with preparing whatever structuring

9   needed to be done.  I think that military funding probably, at

10  the times of war, is very fluid, structurally so, just to

11  manage that process, however -- whatever that entails.

12      I've never tried to build a ballistics factory before,

13  so...

14  **Q**    And when you say "ballistics," were you actually going to

15  make bullets or anything like that?

16  **A**    Oh, no.  Just protective gear, sorry.  It's called

17  "ballistic protection."

18  **Q**    Had you reached out to Alex for any assistance for any

19  other personal matters?

20  **A**    Well, earlier, about two months prior, I spoke to Alex

21  about having Priscilla deported.  We spoke in March, I think

22  revisited it sometime in April.  But sort of that was

23  overshadowed by the events of the war and what was happening,

24  so it was not, certainly, a daily topic of our conversation.

25  Alex and I talked almost daily.  He also -- yes.  I said that

1    -- I was just -- we spoke just about this.

2        So I also cooperated with Alex.  He asked me to deliver

3    some vests and helmets for his friends in Ukraine.  I delivered

4    to him 200 vests in Ukraine for his -- for his former

5    colleagues.  Comrades.

6        In the prior two years, I reached out to him a couple of

7    times with help in projects I was working on that required

8    American aspect, U.S. aspect.  So he helped me in those

9    projects as well.

10   **Q**   Now, where were you sourcing these vests from?

11   **A**   So the origin was China, but China would not ship to

12   Ukraine.  So it had to go through -- first, through Poland.

13   But then they wouldn't ship to Poland, either, so then we had

14   to go through Czech Republic, through Hungary.

15       So it was all kind of -- it was -- it was all very

16   complicated and very fluid.  And things kept getting changed.

17   Basically it was going from China, to Ukraine.  With a whole

18   bunch of stops in between.

19   **Q**   Now, going back to Alex and Ms. Chigariro and your

20   requesting his assistance in having her deported, why were you

21   requesting Alex's assistance for that?

22   **A**   Well, I've seen Alex in the past assist people with

23   obtaining visas to enter the United States.  So I knew that he

24   had contacts at the, again, INS or the Immigration Service.  I

25   have seen -- so basically he was -- I don't have any other

**GESSEN - DIRECT / MITCHELL**

1  contacts in the U.S. government, so he was basically the guy I

2  called to see if he could help.  He said he -- he will ask

3  around, and he'll let me know.

4  **Q**    What were you hoping he would do for help?

5  **A**    I was hoping he would accelerate the processing of my

6  whistleblower complaint.  And basically, it could take,

7  normally, two, three, four years.  And I had hoped that it

8  would be handled much more quickly.

9  **Q**    And when you say "whistleblower complaint," what exactly

10  did you do as part of this whistleblower complaint?

11  **A**    I went on the website of USCIS, of the Immigration

12  Service.  There is a section called "Whistleblowers" or

13  something like "Whistleblowers."  You fill in the information

14  you know; you fill in the reasons you think the person is here

15  illegally.  You click "Send," and that's the whistleblower

16  complaint.

17  **Q**    And what was the subject of your whistleblower complaint?

18  **A**    That Priscilla was in the United States on a fraudulent

19  visa application, and that she has not complied -- because, not

20  complied with the terms of her visa.

21  **Q**    And by not complying with the terms of her visa, were you

22  making an allegation that she had overstayed her visa?

23  **A**    I have.  And also that she was trying to remain here

24  permanently, and her visa was explicit that it needed a

25  different status if she planned to remain here permanently.  So

1   that, in itself, was a violation.

2   **Q**    Why did you decide to file the whistleblower complaint in

3   the first place?

4   **A**    To regain access to my children as quickly as possible.  I

5   did not know how long the custody court might take.  I also did

6   not know what the outcome of that litigation may be.  So I knew

7   that if Priscilla were to be deported, I would automatically

8   have custody at least of [O.G.], and possibly of [E.G.], if

9   possible.

10  **Q**    Now, did Alex connect you with anyone in association with

11  expediting the whistleblower complaint?

12  **A**    No.

13  **Q**    Did he indicate that he had anyone he could -- that he

14  reached out to with regard to the whistleblower complaint?

15  **A**    Yes.

16  **Q**    Who was the person he said that he reached out to with

17  regard to the whistleblower complaint?

18  **A**    Alex did not refer to that person by name.  He said he had

19  reached out to a high-level contact at INS, and that they were

20  in consultations and conversations.

21  **Q**    And so Alex said that he had reached out to someone who

22  was working at the INS, but didn't give you a name?

23  **A**    Correct.

24  **Q**    Did he ever offer to connect the two of you?

25  **A**    Um, we spoke about it briefly.  I felt there was no need

1    to meet.  I provided Alex with all the documentation that was

2    necessary for the deportation.  And there was no -- nothing

3    really to explain or to discuss with that person, because it

4    was all pretty -- pretty self-explanatory.

5    Q    What was the result of Alex reaching out to his contact in

6    Immigration regarding the whistleblower complaint?

7    A    Nothing.

8    Q    And when was it that Alex said that reached out to his

9    contact?

10   A    Some time in early March.

11   Q    After early March, did you reach out again to Alex to

12   speak about the deportation of Ms. Chigariro or the

13   whistleblower complaint?

14   A    Um, we probably -- we would have discussed it a couple of

15   times in course of the several months that followed.  But we --

16   I have not tried to push the project.  It was just, you know:

17   Is there news?

18        And then I stopped asking once the custody dispute was

19   resolved, and there was just no further point in pursuing that.

20   Q    I want to fast-forward to June of 2022.

21        In June of 2022, what was the state of your relationship

22   with Ms. Chigariro?

23   A    It was very civil.  We -- in June of '22, I think that I

24   asked her:  Let us please add me to [E.G.]'s birth certificate.

25   I think that was the only point of contention.  And:  Can you

1  please instruct the lawyers in Zimbabwe to add me to [E.G.]'s

2  birth certificate?

3       And Priscilla said no, she'd rather do it herself when

4  she's there.

5       And there was -- and I tried to push.  And there was no,

6  like -- like, I just didn't feel it was necessary to -- you

7  know, to push it too hard.  So I left it at that.

8       We had some small disagreements every once in a while, but

9  truly minor.  You know, it's:  Why are you late?  You know,

10 where's the T-shirts?  It's the typical -- typical things, I

11 suspect.

12 **Q**   So during that time, had the custody issue been completely

13 resolved?  Or was it still in a temporary status?

14 **A**   It was a full and final order; it was completely resolved.

15 There was no outstanding issue.

16 **Q**   So then why, in June of 2022, were you still seeking to

17 have Ms. Chigariro deported?

18 **A**   I was not actually seeking to have Ms. Chigariro deported

19 in June of '22.

20 **Q**   If you weren't actively seeking to have her deported, why

21 were you still having conversations with Alex about it?

22 **A**   At the very end of May of '22, Alex told me that he has

23 found an investor for my bulletproof vest project in Estonia.

24 And that he has -- I sent to Alex all the company materials,

25 presentations, cash flow projections.  But Alex was not a very

1    technical finance guy, so he said that it will be necessary for

2    me to meet with that investor, to present the project, myself.

3         So during the second half of May, Alex and I kept

4    discussing that we need to arrange a meeting, the three of us,

5    with the investor so that we could -- so I could present the

6    project completely, explain how it works.  And then he would

7    handle the introduction.

8         So we were discussing meeting somebody, the contact of

9    Alex's, to discuss the investment in the factory.

10   Q    And what was the name of this investor?

11   A    His name was David.

12   Q    What did Alex tell you about David?

13   A    He told me that he was from one of those three-letter

14   organizations.  He did not clarify what he meant.  And Alex was

15   very -- it was very typical of Alex to be quite secretive about

16   his contacts and relationships, so it didn't surprise me.  But

17   from what he said, I inferred he was somehow connected to law

18   enforcement or Department of Defense, or Intelligence.  But

19   anyway, one of the three-letter organizations of which there is

20   so many.

21   Q    And that was what Alex had told you about David.

22   A    Correct.

23   Q    And is that the individual who was testifying here, that

24   was Agent David Rizzo?

25   A    I met him under a different name, but, yes.  That's the

GESSEN - DIRECT / MITCHELL

1   gentleman who was here yesterday.

2   **Q**    So when you went to meet David Rizzo, what was your

3   intention in meeting David Rizzo?

4   **A**    My intention of meeting David Rizzo was to obtain funding

5   for the ballistics factory -- for the ballistics protective --

6   for the factory in Estonia.  I'll not repeat it every time.

7   **Q**    Did you make the arrangements in meeting with David Rizzo?

8   **A**    No.  Alex told me where the meeting will take place.  He

9   and David discussed it.

10       Then the day before -- well, Alex was flying in from

11  Europe because he evacuated his family from Ukraine, and he was

12  living in Moldova at the time.  So he called the day before,

13  stated that he could not make the flight.  That I was to meet

14  David on my own in Florida, in Boca Raton, Florida.

15       I don't think he said Boca Raton.  I think he said Miami,

16  Florida.

17       (Reporter clarification)

18       **THE WITNESS:**  Miami.  Miami, Florida.  And that, by

19  the way, he said he's the same guy who was handling the

20  whistleblower complaint.  So he mentioned that the day before

21  the proposed meeting.

22       I think it was -- so the meeting was June 2nd, and that

23  conversation must have taken place on June 1st.

24  **BY MS. MITCHELL**

25  **Q**    So were you led to believe that David who you were meeting

1  was the same high-level contact that Alex had reached out to,

2  to resolve your whistleblower complaint?

3  **A**    That's what I understood, the day before meeting David;

4  correct.

5  **Q**    And at the time that you met David, had you ever met him

6  before?

7  **A**    No, I had never met him or heard of him.

8  **Q**    Were you privy to any of the other conversations or

9  arrangements that David and Alex were having together?

10  **A**    No.

11  **Q**    Do you know how --

12  **A**    Sorry.  No, I think that -- I know that Alex met -- so

13  Alex referred to some meetings he had with David.  I think some

14  of them took place in Europe.  So he would mention that he --

15  he -- like, he -- he mentioned -- so I connected the dots, so I

16  realize it was the same person he was meeting, but I did not

17  know where what the substance of the meetings was or what they

18  were discussing.

19  **Q**    And you mentioned that Alex had told you that David worked

20  for some three-letter organization.  What did you believe that

21  to mean?

22  **A**    Um, I made some assumptions I wasn't really sure.  I mean,

23  Alex has -- in the course of our relationship, he has mentioned

24  multiple organizations that he had access to.  He, himself,

25  worked on Capitol Hill for several years, so he has worked

**GESSEN - DIRECT / MITCHELL**

1  closely with the U.S. Senate.  He invited me to Donald Trump's

2  inauguration, VIP seats.  He worked with the INS, he worked

3  with the Department of Justice, he worked with the FBI.  And he

4  implied that he worked with the CIA, but we always doubt those

5  statements.

6  **Q**   Did you have any reason to disbelieve what Alex was

7  telling you?

8  **A**    No, I had -- I mean, it was unusual.  But, he tended to

9  deliver on things he said he would deliver on.  So I -- you

10  know, once the person sort of -- once a very incredible story

11  is confirmed you begin to believe it, so I had no reason not to

12  believe him.

13  **Q**   So when you traveled to Boca Raton, did you have at that

14  time any intention to kill Ms. Chigariro?

15  **A**    No.  I think that -- you asked me this question before.

16  Priscilla is -- we didn't get along sometimes in our

17  relationship.  But she is an absolutely extraordinary woman.

18  And she's driven, she is ambitious, she is -- she can do things

19  that most people can't.  In a country that doesn't -- that

20  couldn't -- that doesn't have electricity, she built businesses

21  and opened fashion magazines.

22      I think -- it's just -- Priscilla is -- I'm not saying she

23  is the best parent.  We have a lot of disagreements, we've had

24  a lot of disagreements.  But she -- like, our kids will be

25  proud to be of her when they grow up.  So there is no -- like,

1    I never wanted to, asked anyone, or, like, intended to kill

2    Priscilla.  No.  Like, just -- that is not part of my

3    landscape.

4        I mean, Priscilla, with all our differences and hurting

5    each other, it has never -- it -- it wasn't part of the

6    conversation.

7    **Q**    And so why -- Priscilla is this woman that you describe as

8    being amazing.  Why did you want sole custody of your children,

9    rather than share custody of your children with her?

10   **A**    Look.  I think that many parenting choices and priorities

11   and focus on children's needs is not always necessarily there.

12   I think a person can be a fantastic businessperson, but not

13   necessarily the fantastic parent.

14       I felt that after I took a step back from my career and I

15   focused entirely on [O.G.] and, like, really dedicating time to

16   him, I thought I could give the children more attention.  But

17   again, when I asked to have Priscilla deported, I had no access

18   to the children.  So it's not like I -- you know, suddenly in

19   June it was like:  I want sole custody.  It was more -- when I

20   initiated this whole process, I wanted to have access to the

21   kids.  It was reasonable to be part of their lives.

22       It was not -- when I filed the whistleblower complaint and

23   when I went to Alex, I didn't have kids at all.  So that was

24   when the entire process was started.  And then June was --

25   well, then June rolled about, and, um, things kind of took

GESSEN - DIRECT / MITCHELL

1   their course.

2   **Q**   Now, going back to your meeting with David Rizzo June 2nd

3   in Boca Raton, what was, again, your primary purpose in going

4   to that meeting?

5   **A**   The primary purpose of going to that meeting was to secure

6   funding for a factory in Estonia.

7   **Q**   Do you know what David Rizzo's primary purpose in going to

8   that meeting was?

9   **A**   Now?  Or at the time?

10  **Q**   At that time, did you know what his primary purpose was?

11  **A**   At that time, all the paperwork I was bringing with me was

12  for the factory, to present the business plan for the factory.

13  To explain the cash flows, the capital expenditure, to -- I

14  mean, it was a business investment presentation.

15  **Q**   How long was your meeting?

16  **A**   Um, I think for about -- we were meeting for about two

17  hours, and then spent about half an hour sort of chatting, and

18  while we were making our way back to the hotel.  So, in total,

19  about two-and-a-half hours.

20  **Q**   Why were you willing to fly all the way to Boca Raton from

21  Massachusetts for this meeting?

22  **A**   Well, according to Alex, what I understood is that the

23  investor had -- was willing to commit $10 million for the

24  factory.  And it is a factory that was extremely important to

25  me and extremely important to Ukraine.  And I would fly

1  anywhere for that meeting.  When investors offer you

2  $10 million for something that is very important, then you just

3  go and fly.

4  **Q**    And so as a result of the need to get the money from a

5  possible investor, were you eager -- what were your feelings

6  going into meeting with the person you now know as Agent Rizzo?

7  **A**    Well, I think if you have been an entrepreneur, and you're

8  looking at talking to an investor, you are willing to -- you

9  try to show yourself as -- from your best side.  You try to

10  show your business from the best side.  You -- basically, if

11  they have -- if they like a particular type of coffee, you make

12  sure that coffee is in the room.  If they like cookies, you

13  make sure the cookies are there.

14      It's just you are there for the investor in any capacity

15  you can be, just to make sure that the relation -- you build

16  the trust and you try to build the relationship.

17  **Q**    And prior to meeting with David Rizzo, did you speak with

18  her (sic) before that meeting?

19  **A**    I messaged to him, I think for the first time, when I

20  landed in Miami, on Signal app, to say that I have arrived and

21  to ask where our meeting was to take place.  So, Alex would not

22  tell me in advance the location of the meeting.

23  **Q**    Did you find that strange or unusual?

24  **A**    Not for Alex, no.

25  **Q**    And prior to the meeting with David Rizzo, did you happen

**GESSEN - DIRECT / MITCHELL**

1  to provide him with any prospectus or economic documents

2  related to the factory?

3  **A**    Only through Alex.  So Alex had all the documents.  He

4  said that he had shown them to David ahead of time.

5       The way I understood the meeting was set up is that there

6  was significant preliminary interest, and that my job was to

7  basically explain whatever questions there may be, go through

8  the financial model, answer the remaining questions, and try to

9  close the deal.

10 **Q**    Did you know, before the meeting, where David Rizzo's

11 funding came from?

12 **A**    No.

13 **Q**    So when you got to the meeting, did you discuss the

14 factory?

15 **A**    Not at first.  At first we chatted about the family, the

16 kids.  David mentioned he has lots of clients in Israel.  He --

17 **Q**    Why was that particularly important to you?

18 **A**    It wasn't particularly important to me.  I think that was

19 David's way of bonding with me, perhaps.  But -- I think that

20 we were -- we were trying to bond.  We were trying to, you

21 know, find common -- we talked about cooking; we talked about

22 the kids.

23      Very quickly, the conversation touched upon relationships.

24 He said, you know -- like, I said: Yes, I have personal issues.

25      He goes: Yes, I know; we'll talk about it later.

GESSEN - DIRECT / MITCHELL

1      Then, just small talk.  There was nothing that really

2 stands out as very significant.

3 **Q**    Did you have any -- okay.  I'm going to show you what's

4 been admitted as Exhibit 12.

5      (Document displayed)

6 **Q**    What is Exhibit 12?

7 **A**    Exhibit 12 is a letter of engagement that I sent to David,

8 I think on the day after our meeting.

9 **Q**    Why did you send this to David?

10 **A**    I was really curious about who David was, and that was the

11 only way to ask for his last name.  So it was my sneaky way of

12 getting David's last name without asking him directly.

13 **Q**    Was this letter of engagement done with regard to the

14 factory deal in Estonia?

15 **A**    No.  It has absolutely no functional purpose.  The way it

16 is drafted it has all the appearances of a letter of

17 engagement, without actually being a letter of engagement.

18      **MS. MITCHELL:**  Thank you.

19      (Document taken off display)

20 **BY MS. MITCHELL**

21 **Q**    Let's go to your conversation with David about the

22 factory.

23      When David and you met and he explained his background to

24 you, were you surprised by what he said?

25 **A**    Well, in the beginning of the meeting, David said that he

GESSEN - DIRECT / MITCHELL

1    is into private wealth management.  Those were his words.  He

2    laughed at that.

3         I mean, private wealth management was not entirely

4    consistent with what I thought before, but -- I mean, wealth --

5    basically, people who are involved in wealth management are

6    investors; they invest in different projects.

7         And I wasn't -- I wasn't particularly surprised.  I was

8    just trying to -- you know, when you meet a new person you hear

9    something in advance, but you try to learn a little bit more.

10   So, that made sense.  I wasn't surprised, at first.

11        Then at some point, completely out of the blue and without

12   any reference to anything, David suddenly blurted out that he

13   has clients in Columbia; that they are cartel-level guys.  I

14   think his words were:  They've got fuck-you money, they've got

15   fuck-everyone money, that's the kind of guys I roll with.

16        But he was just sort of making those very strange

17   statements that I found very surprising, and I wasn't really

18   sure what to make of that.  I mean, particularly because, just

19   didn't come out in any natural, like, sequence; it just sort

20   of -- he just put it out there.

21   Q    Why did you find that information surprising?

22   A    It was very inconsistent with what I've heard about him

23   before.  And also, when you talk to somebody, you have sort of

24   -- there's a cooperation principle.  You expect that what you

25   say relates to what they say, and that there's some flow of

1    logic in the conversation.

2         And when that logic is broken and something just is

3    completely out of the blue -- um, I was -- I was trained as a

4    negotiator in my work, and so maybe I'm more sensitive to that

5    than other people.  But, like, when that logic is broken, you

6    kind of -- that's just strange.

7         So this is something that jumped out from me from the very

8    -- like, quite early, about half an hour into the conversation.

9    And I wasn't -- I wasn't sure of what to make of it.

10   **Q**   Was what David Rizzo saying tracking with what you had

11   heard from Alex about him?

12   **A**   No, not at all.  That's what made it so strange.  Because

13   through Alex I have met high-profile, high -- high-standing

14   proper individuals.  And then suddenly, like there's just --

15   no, it didn't -- it didn't track at all.

16   **Q**   What did you think about that, after you heard that

17   information?

18   **A**   Well, I thought I need to circle back to Alex and actually

19   find out who this person is.  It's just, just -- because it was

20   not -- it was not the meeting that I came for.

21   **Q**   Why didn't you say something like that, during the

22   meeting?

23   **A**   Um, I understand that sometimes there's sensitive topics.

24   David was not my contact.  David was not my friend.  I had no

25   relationship with David.  From what I understood, Alex had a

GESSEN - DIRECT / MITCHELL

1  close relationship with David.  And I was not in a position to

2  jeopardize it or to question it.

3      So I thought to the extent I have any issues with David,

4  they're much better resolved through Alex so that -- because

5  there's -- you know, it's a -- I mean, people can -- people are

6  different.  And you don't necessarily need to be, um,

7  challenging them directly.  You just kind of -- if there's --

8  if there's a more indirect way of finding out.

9  **Q**    And what, then, became your method of having a

10  conversation with David after he said those things to you?

11  **A**    Well, I had my agenda very clear.  I was there to obtain

12  funding.  I had no illegal purpose, whatsoever.  And so I was

13  going to listen and learn and try to understand and try to sort

14  things out.  And if there was a match, we could work together.

15  And if there wasn't, we wouldn't.

16      But I -- I did not see any reason to get up and walk away.

17  I thought it was important to hear what the man has to say, and

18  understand if we can work together or not.

19  **Q**    Did you believe him when he said he was an Italian Mafia

20  member working with Columbian drug smugglers?

21  **A**    Well, I think that information was coming in bits and

22  pieces.  So first he said he has those -- the cartel guys, but

23  it was just out of place, so I wasn't sure what relevancy it

24  had with anything we were discussing.  He didn't say:  I'll

25  take cartel money and give it to you.

1    Then sometime later he said that he was involved in money

2    laundering, and that he is into money laundering.

3    That could not be true.  That was clearly a lie.  And the

4    reason is people who are involved in money laundering, last

5    thing they do is tell you that they are involved in money

6    laundering.  It's because it's -- it's -- I mean, it's -- they

7    will tell you everything else before they tell you that, in

8    fact, this is money laundering for a Columbian drug cartel.

9    Q    So have you worked with money launderers before?

10   A    I have met -- I work in forensics.  I specialize in fraud.

11   Well, I specialize in fighting fraud, just to be clear.  I have

12   met people in organized crime, and I have met people who are

13   trying to launder money.  And all of them always claim that

14   they do not launder money.  Whatever it is they do, they do not

15   launder money.

16   So that -- that put me on notice that David was clearly

17   lying.  I didn't know why.  I did not understand at all what

18   his agenda was.

19   So that was the second part.  Then you asked me about

20   whether I thought that he was a mobster from -- an Italian

21   mobster.

22   Q    (Nods head)

23   A    The closest I have ever been to an Italian mobster is in

24   Martin Scorsese's movies and The Godfather, so I had no basis

25   to really know if David was an Italian mobster or not.  It's --

1    he didn't strike me as an Italian mobster, but again, I had

2    really no basis of knowing.  I just thought -- but he didn't

3    say "mobster."  He said -- a few times he used the word

4    "family."  In my mind, like, the term can be both like law

5    enforcement family, or it can be Italian crime family.  Or in

6    fact, like, people call each other "brother," you know, address

7    each other as family even though they are not family at all.

8    So somebody you work with for many years can be called family.

9    So, the McDonald's family.

10        So for me, I didn't -- I don't think that I was actually

11   analyzing whether he was an Italian mobster.  I think I was

12   more focused on the substance of the conversation which was

13   money, drug money, money laundering, and how it fit with my

14   agenda, which, didn't fit very well.

15   Q    What did you resolve to do after you had -- after Alex

16   said these things -- after David said these things to you?

17   A    Well, I resolved to see the meeting through to the end,

18   and to see if we can find some -- at least, at least

19   commercially, a connection point.  And then I needed to go back

20   to Alex and actually understand what is -- what is what, who is

21   who, and, you know, why is he introducing me to people claiming

22   to launder money for Columbian drug cartels.

23        So it was -- it was a very strange conversation that

24   couldn't -- couldn't lead to anything in the future.

25   Q    So I want to go back again to the discussion that you and

**GESSEN - DIRECT / MITCHELL**

1  David had about Ms. Chigariro.

2       What did you believe going into this conversation

3  regarding Mr. Rizzo and Ms. Chigariro?

4  **A**   Um, so I understood from -- from the last conversation I

5  had with Alex, that the process was on the way.  That it was --

6  that it was going forward.  I had not believed that I need to

7  pay for -- for that.  I had no expectation of making a payment.

8       And I did not really believe that any involvement from me

9  was necessary at that point for -- for the whistleblower

10  complaint deportation to do anything.  I just kind of left it

11  alone.

12  **Q**   So at this time, did you believe that David was in some

13  way expediting the previously-existing whistleblower complaint?

14  **A**   Correct.

15  **Q**   And at the meeting, did that belief about what David was

16  doing for the whistleblower complaint change?

17  **A**   So David told me that he's well aware of what's going on,

18  and that they have a solution.  He then asked me -- I think his

19  words were "If it's a blank slate, what exactly do you want?"

20  Which is a little bit surprising, because we were well on the

21  way.

22       Then after I said that I would like for Priscilla to go

23  back to her country and for the children to remain in the

24  United States, he said that it's going to cost $100,000.  And

25  then he explained to me the process that it would take, which

1   was a little bit different from the way Alex had described it

2   to me previously.

3   Q    And what was the process that Alex had described to you?

4   A    So Alex said that at the conclusion of the investigation,

5   Priscilla would receive a self-depart letter, basically an

6   instruction to depart from the United States within the next 72

7   hours.  And that she would be able to depart voluntarily.  And

8   that only if she did not depart would there be some sort of

9   enforcement action.

10       What David said was that as soon as the investigation is

11  formally launched, Priscilla would receive notice that the

12  investigation had been launched.  Her lawyers would be able to

13  respond to that.  And that at the end of the investigation,

14  four or six months down the road, she would be -- I think the

15  term he used was to "surrender to the authorities."  And then

16  she's would be deported.

17       So even though this seems like fine differences, in a way

18  they are quite significant in their consequences.  So I took

19  notice of those differences, and was curious about them.

20  Q    What did you think when David said it would cost $100,000?

21  A    Well, my first thought was that I didn't have $100,000.  I

22  had some savings in 2019 when moved to the United States, and

23  it was intended for the move.  That money primarily went into

24  two Hague Convention litigations, plus four custody

25  litigations.  So I was in debt.

1    And it was -- well, my first thought was:  Where am I

2    going to get $100,000, basically.

3    **Q**    Did you agree to paying $100,000 to David for what he was

4    going to do for the deportation?

5    **A**    I did eventually, yes.

6    **Q**    Why did you agree to paying David $100,000?

7    **A**    Well, both David and I think -- sorry, I won't speak for

8    David.  I was portraying myself as a successful businessman.  I

9    was portraying myself as somebody who had -- has no problems in

10   life, in business.  That I'm -- I can set up a factory; I can

11   do this.

12       You know, you kind of -- you -- okay.  Not you, me.  When

13   I speak to investors, I try to give them confidence that, in

14   fact, they are not throwing money down the drain, but in fact,

15   they will get their money back, and hopefully with a return.

16       So I couldn't very well tell David that I didn't have

17   $100,000, because also he would tell Alex, and that would

18   potentially jeopardize that relationship because Alex was

19   also -- you know, I'm saying we were friendly, but I think that

20   Alex's interest -- he's very much pursuing his self-interest,

21   and our relationship was very much an expectation of some sort

22   of mutual profit.  So I didn't want him to drop me.  And so, so

23   I basically had to play along that $100,000 is not a big deal.

24   **Q**    What did you believe that you were going pay $100,000 for?

25   **A**    For having Priscilla deported from the United States.

1   **Q**    And did you consider this a legal way to have Priscilla be

2   deported?

3   **A**    So before we met I was -- I basically reported a federal

4   immigration violation to the federal government, through both

5   proper and improper channels.  I did not think I was doing

6   anything illegal.

7        When David asked me for $100,000, I think I crossed that

8   line.  I kind of -- I realized that we were in a space that I'm

9   in a legal space.  I was somewhat uncomfortable with it, but I

10  did what I thought was the best choice at the moment.  Again,

11  I'm not saying it was the best choice in the moment.

12       Then -- yes.  So no, so at that point I knew that I had

13  kind of crossed that Rubicon.  That I was in the illegal

14  territory.

15  **Q**    Did you have a conversation with David about the cost of

16  the bribing the immigration official?

17  **A**    Yes.

18  **Q**    And what was that conversation?

19  **A**    Well, it was basically the entire $100,000 was intended

20  for -- for somebody -- I think he said:  We have somebody high

21  up in the INS, it's a very senior-level guy.  And that that

22  money's going to him, because he's close to retirement.

23       So he was -- he described to me basically the person to

24  whom money was going.

25  **Q**    And with the $100,000, you mentioned that you didn't have

1  that much money.  What did you -- did you have another

2  conversation with David about cost, in relationship to the

3  $100,000?  Or the cost of bribing the official.

4  **A**   Um, well, toward the end of our meeting when we paid the

5  bill and paid for coffee, and we were about to get up, I was

6  very much bothered about:  What am I supposed to do with the

7  $100,000 that I didn't have.  So I wanted to revisit it with

8  David, and see if we could somehow find a lower price.

9       So I -- I returned to -- I returned to the subject of

10  Priscilla's deportation.  I said that the first priority is to

11  resolve that issue, and to have her sent back.  And I said I

12  wished there was a cheaper way to get rid of her, because this

13  is simply more expensive than I had expected.

14  **Q**   Uh-huh.

15  **A**   So I was looking for a way to make it less expensive

16  because -- so that I would not embarrass myself, and still --

17  you know, and retain my credibility.

18  **Q**   And what was your thought would occur as a less-expensive

19  option?

20  **A**   So before the whistleblower complaint was filed, and

21  before I asked Alex to engage with David, I had several kind of

22  chats with him about what the possible options are for removing

23  Priscilla from the United States.  So, there was the legal

24  option that I just described.

25       Alex said: Why don't you just get her arrested?  Isn't she

1   into drugs or something?  You know, like, do you -- you know,

2   isn't there something to arrest her for?

3            **MS. HOSSEINI:**  Objection, improper.

4            **THE COURT:**  Sustained.

5        You should disregard that statement.

6        Next question.

7            **THE WITNESS:**  Because --

8   **BY MS. MITCHELL**

9   **Q**    So were you considering having Priscilla arrested?

10  **A**    Yes.

11  **Q**    Has there ever been a time where you have alleged to have

12  been involved with getting Priscilla arrested before?

13  **A**    Yes, I have.

14  **Q**    And what time was that?  Without mentioning the reason why

15  the arrest occurred, what time was that?

16  **A**    It was alleged a couple of times in Zimbabwe.

17  **Q**    Now, going back to --

18  **A**    Sorry, I didn't finish.

19        We also discussed the option of expedited removal, which

20  is that there is apparently the enforcement arm of the

21  Immigration Service, I think it's the Immigration Customs

22  Enforcement who actually take people and physically remove them

23  from the United States in particular circumstances.

24        So I was asking Alex if this was something that he could

25  help with, was the expedited removal.  "Removal" is the term we

1   used.

2   **Q**    And so was that what you were anticipating would be a less

3   expensive option for removing Ms. Chigariro from the United

4   States?

5   **A**    I was not sure if Alex discussed this with David or if

6   Alex discussed it with anyone else.  So I didn't know if this

7   is something David was aware of.  So I wanted to put it out

8   there, to see if David has perhaps heard of something like

9   that.  And if maybe, if -- so without asking him directly --

10  well, okay.

11       Since this was originally involving illegality, I didn't

12  want to go out and say:  Hey, did you and Alex discuss getting

13  Priscilla arrested?  Or -- and at that point, Alex was not

14  implicated for -- in a bribery scheme.  So I didn't want to

15  implicate him.

16       So I was thinking along those lines.  Basically:  Is there

17  a cheaper way to remove Priscilla from the United States,

18  somehow?  Yes.  That's what I had in mind when I asked if there

19  was a cheaper option to get rid of her.

20  **Q**    Okay.  I want to go through some of the clips that we

21  heard discussed -- we heard played earlier on in the case, and

22  ask about what you were actually thinking during the time some

23  of these statements were made.

24       **MS. MITCHELL:**  If we could have Exhibit 6, Page 10, on

25  the screen.  And play Exhibit 5, at 25:20, please.

**GESSEN - DIRECT / MITCHELL**

1          (Document displayed)

2          (Portion of audio recording played in open court)

3              **MS. MITCHELL:**  We can pause here.

4    **BY MS. MITCHELL**

5    **Q**    So when you were having this conversation with David

6    Rizzo, what was the impact of what he was saying to you?

7    **A**    Continue?

8    **Q**    What did you think when he was talking about Priscilla in

9    this way?

10   **A**    About fraudulent visa application?

11   **Q**    Yes.

12   **A**    Well, I understood that he received the package of

13   documents that I sent to Alex that summarized -- well, I had

14   prepared a dossier that summarized the grounds for deportation

15   and he was demonstrating that he was familiar with those

16   documents and with those grounds.

17   **Q**    Did you interpret that to mean that he had been working on

18   the fraudulent visa application, and had in some way been

19   trying to remedy that?

20   **A**    Yes.

21             **MS. MITCHELL:**  Turning to Exhibit 6 at 63.

22         (Document displayed)

23             **MS. MITCHELL:**  And then on the audio, one hour, 56

24   minutes, 28 seconds.

25         (Portion of audio recording played in open court)

GESSEN - DIRECT / MITCHELL

1          **MS. MITCHELL:**  Pause here.

2  **BY MS. MITCHELL**

3  **Q**    So, what was going through your head at the time you said

4  "...incedently (sic) if there was a cheaper way to get rid of

5  her that would be good too"?

6  **A**    How do I not pay $100,000 to have Priscilla removed?  That

7  was the only question I had.

8  **Q**    And when you said "get rid of her," what were you

9  referring to?

10  **A**    To remove her from the country.

11          **MS. MITCHELL:**  If we can continue?

12          (Portion of audio recording played in open court)

13          **MS. MITCHELL:**  Pause here.

14  **BY MS. MITCHELL**

15  **Q**    Can you explain what you meant there, and how you

16  interpreted what Mr. Rizzo was saying to you?

17  **A**    So I think the most important thing I heard here was that

18  there was a cheaper way.  So there was an answer to how to

19  resolve it.

20          The more -- I was -- I focused on "more permanent" because

21  that was something David introduced in the conversation.  And I

22  was -- I started to think about what are the more permanent

23  options might be.  So then it made sense to me because if you

24  are removed for cause, for more severe cause, then it's much

25  more difficult to reenter the country.  So I was -- so "more

**GESSEN - DIRECT / MITCHELL**

1  permanent" meant it is more difficult to return to the United

2  States.

3  **Q**    In your mind, what were you contemplating could be these

4  more permanent options?

5  **A**    Well, again, I was not sure what to make of David's entire

6  family -- like a family in your area, so I wasn't sure what to

7  make of the statement.  So I was thinking:  Are they going to

8  drive her out?  Are they going -- again, all of this is just a

9  game -- like, all like this is a farce, and in fact, you know,

10  by talking about removal, so I wasn't sure what to make of it,

11  entirely.

12       So I was -- basically what I was trying to do is I was

13  trying to reconcile what he was saying with what I discussed

14  with Alex, and see if those things match.  That's what I was

15  trying to do in that part of the conversation.

16  **Q**    At any time when Mr. Rizzo said "more permanent," did you

17  contemplate that he was referring to killing or murdering

18  Priscilla?

19  **A**    No, there was no reason to think so.  I mean, we just met

20  that day for the first time.  I haven't in any way hinted that

21  I want Priscilla dead, not even -- not directly, or indirectly

22  through code.  I just never suggested it.

23       And, why would somebody just offer to kill your ex if you

24  have been just -- just out of the blue?  So, no, it did not

25  occur to me.

1    MS. MITCHELL:  And, if we could continue?

2    (Portion of audio recording played in open court)

3    MS. MITCHELL:  Can we pause here?

4    BY MS. MITCHELL

5    Q    So you seem to have affirmed it very quickly.  Did you

6    take any time to think about it?

7    A    Well, I was -- okay.  There was no doubt that I would need

8    to reconfirm everything with Alex, because, again, before I

9    would agree with anything with David, I would need to talk to

10   Alex and actually validate who that person is.  So I was -- I

11   was prepared to proceed because it was a cheaper option, a --

12   clear about the goal.

13       At that point it became sort of -- I wasn't really going

14   to commit myself to anything further until I had a chance to

15   talk to Alex and understand who I'm dealing with.

16   MS. MITCHELL:  And, if we can continue?

17   (Portion of audio recording played in open court)

18   MS. MITCHELL:  Can we pause here?

19   BY MS. MITCHELL

20   Q    And so when you are talking about researching your

21   sources, and the lowest price was $220, and there was one for

22   the Israelis and Eastern Europe and Italy, what are you

23   referring to here?

24   A    So back in February when I came -- just returned from

25   Canada and New York, I was complaining to one of my Israeli

1    friends about not being able to see the kids, and not being

2    able to talk to the kids, and I was miserable.  So I made a

3    joke, I think, more than anything.

4        I said:  Look, you Israelis are well known to -- kind of

5    transporting people from place to place.  Can you just, like,

6    grab Priscilla and just ship her to Zimbabwe somehow?

7        And he said:  It's going to be very expensive.

8        And I said:  Well, how much is it going to be?

9        He said:  At least -- it's not 220.  He said:  It's going

10    to -- $250,000, at least.

11        I was like:  That's expensive.

12        And he said:  It'll cost you probably about 10,000 just

13    to -- just to -- just to do recognizance (sic) in that.  I was

14    like:  Okay, so we will just table that.

15        And I was -- I was mentioning it here because I was

16    stalling.  I was trying to understand, again, what David was

17    trying to say.  And trying again to understand whether this is

18    something that was coming through Alex, or if this is something

19    completely new, and how I should treat it.

20    Q    And when you say "Eastern Europe and Italy," what are you

21    referring to there?

22    A    I actually don't know.  To be honest, I have no

23    recollection of saying it, so I -- it is what it is.

24    Q    And so when you had talked about the conversation that you

25    had with your friend and he had said "$250,000," what was that

1  specifically for?

2  **A**   Well, we didn't get into great specifics.  The general was

3  to physically remove Priscilla from the United States,

4  illegally, and physically place her outside of the United

5  States.  It was for -- basically for abduction and kidnapping.

6          **MS. MITCHELL:**  If we can continue?

7          (Portion of audio recording played in open court)

8  **BY MS. MITCHELL**

9  **Q**   So when you said "I have friends in the north end and it

10  is a totally different conversation," how did you interpret

11  that?

12  **A**   Well, it was very consistent with everything David was

13  saying for the first two hours of the conversation, sort of the

14  parts that I found not very credible.  I'm not sure what to do

15  with that.  So I again just would need to refer back to it.

16  But clearly, he was hinting at some sort of mob connection.

17  And I was -- I was not sure how to take it in the beginning of

18  the conversation, towards its end.

19          **MS. MITCHELL:**  Continue.

20          (Portion of audio recording played in open court)

21          **MS. MITCHELL:**  Can you pause here.

22  **BY MS. MITCHELL**

23  **Q**   What do you mean by "more definite," and his response, to

24  "Permanent"?  What did you interpret that to mean, and what did

25  you mean by saying "more definite"?

1    **A**      So, for me the word "definite" means something that is

2    certain to happen, that is more likely to happen.  Because the

3    way the original deportation option was described, it left a

4    lot of possibilities that it won't happen.  That it will not

5    come to conclusion.  So the "more definite" means that this is

6    something that is brought to conclusion.

7          Now, David's response to it is "Permanent," which is very

8    different from "definite."  Permanent is something that's

9    irreversible.  Permanent is something that is kind of -- that's

10   there to last.

11         So for me, I was saying one thing; David was saying

12   something else.  I was very clear about what I was -- what I

13   was interested in.  David was saying "Permanent."  I, again --

14   I think that -- well, it's very hard right now to separate my

15   reading of it today, and then what I was thinking in the

16   moment.  It's -- it's -- in retrospect, you sort of see the

17   language, and you try -- you know, you try to think what you

18   thought at the moment.

19         His words originally were "More permanent."  I mean, it's

20   like being more pregnant.  It's -- "More permanent" meant it's

21   not permanent.  It means it's a -- it's a longer-term solution.

22         So I think that I -- I didn't really distinguish with, you

23   know, with nicety whether it's more permanent, or it's

24   permanent.  I was focused on it being definite, and he

25   confirmed it, so I didn't make the conclusion at the time.

GESSEN - DIRECT / MITCHELL

1  **Q**    And again, with this, were you -- associating this with

2  immigration, what were you believing "more definite,"  "more

3  permanent" -- or "permanent" would have been with relation to

4  immigration?

5  **A**    If you are deported for, let's say, overstaying your visa,

6  you can reapply within a year or two.  If you are removed for a

7  cause, you know, that's a significant cause, then sometimes you

8  might not be allowed to reenter for ten years.

9        So in immigration law there is a very -- you know, there

10  are very clear distinction in terms of permanent removal versus

11  you know, like, it's just -- it's just -- you know, it's a

12  temporary situation.  So, I didn't see any issue in that.  It

13  makes perfect sense, in the immigration context.

14        **MS. MITCHELL:**  Okay.  If we can continue?

15        (Portion of audio recording played in open court)

16        **MS. MITCHELL:**  Pause here.

17  **BY MS. MITCHELL**

18  **Q**    Now, that was a little hard to hear, but what were you

19  saying right here?

20        What was going through your head as you were saying this?

21  **A**    Well, this relates exactly to the word "definite."  I was

22  saying that if you're going through the regular deportation

23  process you are not sure what the outcome will be, because

24  lawyers can file appeals; there may be judges that will not

25  agree with the decision.  And so you do not know if it's going

**GESSEN - DIRECT / MITCHELL**

1    to end up where it ends up.

2        So I was just explaining that there's no definite outcome

3    in a whistleblower complaint.  That's what I was saying.

4        **MS. MITCHELL:**  Okay.  If we can continue?

5        (Portion of audio recording played in open court)

6        **MS. MITCHELL:**  Can we pause here?

7    **BY MS. MITCHELL**

8    **Q**    What did you think he meant by "clean," "quick," and

9    "final"?

10   **A**    May I respond to the rest of that sentence as well?

11   **Q**    Sure.

12       **MS. MITCHELL:**  Let's go ahead and have it played

13   first, yeah.

14       (Portion of audio recording played in open court)

15       **THE WITNESS:**  Starting with "Well I told Alex..."

16   **BY MS. MITCHELL**

17   **Q**    Uh-huh.  Go ahead.

18       **MS. MITCHELL:**  And, continue playing.

19       (Portion of audio recording played in open court)

20       **THE DEFENDANT:**  That's the part.

21   **BY MS. MITCHELL**

22   **Q**    So what did you mean here, when you responded?

23   **A**    Well, I was actually referring to the earlier part of the

24   sentence, beginning with the word "Well I told Alex this..."

25   because for me this was the key sentence.

GESSEN - DIRECT / MITCHELL

1   **Q**    Okay.

2   **A**    The moment David referred that he had this conversation

3   with Alex before, I knew that we were talking about the same

4   thing.

5   **Q**    Uh-huh.

6   **A**    So that was the reference point that, for me, that was the

7   confirmation I was waiting for from David, basically that I was

8   seeking from the start, that in fact Alex did talk to him about

9   the other options, about expedited removal option, and that we

10  were on the same page.

11       So from that point forward, I realize we're talking about

12  the arrest -- expedited removal which is bypassing the regular

13  deportation process, and engaging in either arresting Priscilla

14  or having her detained and removed very quickly.

15       So for me -- so then when he said "clean," "quick" and

16  "final" that all fell in place because there was no long

17  process.  It was much quicker, and the return would be

18  impossible for a few years, at least.

19  **Q**    So by expedited removal, were you anticipating that

20  Priscilla was going to be arrested, or something along those

21  lines?

22  **A**    Well, we didn't -- we never went into the detail of how

23  the process works, so my understanding of it is based more on

24  popular culture than anything that Alex had told me.  In many

25  films I've seen people kind of being grabbed by the -- by ICE,

1    and two days later they're out in Mexico or someplace else.

2    You know.  So it's a very typical storyline of many films.

3         So I assume that ICE has that capacity to, in some

4    circumstances, just take an illegal immigrant and remove that

5    person from the United States, bypassing the legal protections.

6    I mean, the newspapers are basically all about that.

7         So I was very -- I was -- I wasn't clear about the exact

8    process; I was clear about the outcome.  And I had a very good

9    understanding of what we were talking about.

10   **Q**   So you were anticipating that because of your previous

11   conversations with Alex about expedited removals, that somehow

12   this clean, quick and final process that David was speaking

13   about was going to be somehow, Immigration was just going to

14   arrest Priscilla without going through the standard deportation

15   process.

16   **A**   Correct.

17   **Q**   Okay.  And what about that second part?

18            "My secret concern is that they cannot do

19            this in front of the kids."

20        What were you thinking when you said that?

21   **A**   Well, this immediately -- the prospect of the arrest

22   immediately brought to mind my arrest six months earlier by

23   immigration officials, in front of [O.G.], which was the most

24   traumatic event in his life.  So I wanted to make absolutely

25   sure that -- like, that neither Priscilla nor I would be

1    arrested in front of the kids.  I mean, it just could not

2    happen; we could not put [O.G.] through that again.

3        And as ugly as this -- as what I was doing was, I was --

4    you know, it -- I was -- I was trying to make peace with myself

5    about what I was doing, but I was not going to subject [O.G.]

6    to watching his mother being arrested.  Or -- you know, it was

7    just something that could not happen.

8            **MS. MITCHELL:**  Could you continue playing, please.

9            (Portion of audio recording played in open court)

10           **MS. MITCHELL:**  Pause here.

11   **BY MS. MITCHELL**

12   **Q**    Can you describe for us what you were saying about -- and

13   what you understood when David Rizzo talked about asking Alex

14   in Spain?

15   **A**    Okay, so I knew that Alex and David met.  And I knew that

16   they discussed the immigration issues.  So I -- that meant that

17   they discussed not just the deportation option that we decided

18   ultimately to proceed with, but the removal option as well.

19       So it reaffirmed basically that Alex, David and I were all

20   on the same page about the range of options, and about what we

21   were trying to do.

22   **Q**    And what about -- he said he had some Israeli people that

23   could do it.  What did you think about that?

24   **A**    David kept introducing Israelis throughout the

25   conversation, so I actually did not give it a significant

1   amount of attention.  He just was very focused on the Israelis.

2   **Q**    And when you had the conversation with your Israeli friend

3   about possibly forcibly kidnapping Priscilla, Ms. Chigariro,

4   did -- was Alex part of that conversation?

5   **A**    No.

6   **Q**    Okay.  Did Alex know that you had had that conversation

7   with your Israeli friend?

8   **A**    I might have mentioned it to him, but I'm not sure.

9   **Q**    All right.

10          **MS. MITCHELL:**  If we could continue?

11          (Portion of audio recording played in open court)

12          **MS. MITCHELL:**  Let's pause here.

13  **BY MS. MITCHELL**

14  **Q**    What did you think when he asked you about locations, and

15  providing locations?

16  **A**    Well, to detain somebody, you need to know where they are.

17  **Q**    Did you find anything strange about that, if he had access

18  to individuals who could deport Ms. Chigariro?

19  **A**    Not at all.

20  **Q**    Why not?

21  **A**    Well, there are millions of illegal immigrants in the

22  United States.  And they cannot be found or deported, because

23  the federal government is failing to do so.  So I didn't find

24  it surprising at all.

25          **MS. MITCHELL:**  Let's continue.

1          (Portion of audio recording played in open court)

2          **MS. MITCHELL:**  Pause here.

3     **BY MS. MITCHELL**

4     **Q**    And what did you mean when you said "I will do the full

5     RECON for you"?

6     **A**    Well, obviously David needed information to find the car,

7     address, passport.  You know, basically whatever information

8     logically a person needs to be able to find somebody and deport

9     them.

10         **MS. MITCHELL:**  If we can continue?

11         (Portion of audio recording played in open court)

12         **MS. MITCHELL:**  If you can pause here.

13    **BY MS. MITCHELL**

14    **Q**    Now, when he said "that really changes the complexion of

15    the problem," what did you interpret that to mean?

16    **A**    Well, I think that this entire part of the conversation is

17    kind of -- David has started thinking of, like, the

18    construction about how to get it, how to organize it.  So I

19    sort of thought -- I saw his -- um, him trying to put things

20    together as to how to organize all of that.

21         So it kind of reaffirmed my thinking that he was law

22    enforcement, because it was very clear he was kind of -- his

23    operational hat was on.  You know, he was thinking

24    operationally at that point.  You know: How do you go about

25    getting somebody out of the country?

1       So he was basically -- he -- he changed very much at that

2   moment.  He was suddenly focused very much on the substance of

3   the issue.

4   **Q**   Now, if you believe that he was law enforcement, why did

5   you believe he was willing to do this?

6   **A**   Because there are probably corrupt law enforcement people.

7   We had -- we were discussing a $10 million investment from

8   which I expected he might want to have a part.

9       So at some point earlier in the conversation, I asked

10  David if he's planning to keep any part of the $100,000 that --

11  that we were discussing.  And David said: No, no, no, all of

12  this is going straight to the immigration guy; I'm just doing

13  this purely as a favor.  We are talking about much bigger

14  things.  I have a personal number I need to work towards.

15      So, again, my understanding of the corruption in the

16  government comes from newspapers and television and films.  I

17  have not previously bribed a government official.  But popular

18  culture would make me believe it is a pretty commonplace event.

19  There are corrupt FBI Agents; there are corrupt people

20  throughout the government, Immigration.

21      So, was I shocked?  No, I wasn't shocked.  I thought that

22  basically David was interested in building a relationship in

23  which he would be making money.

24          **MS. MITCHELL:**  We can continue.

25      (Portion of audio recording played in open court)

1          **MS. MITCHELL:**  Can we pause here?

2     **BY MS. MITCHELL**

3     **Q**    When he said "Mozal," what did you interpret that to mean?

4     **A**    "Deal."

5     **Q**    And at that time, what did you think you were making a

6     deal to do?

7     **A**    Well, we weren't making a deal, because he was still going

8     to confirm the price.  But, so it wasn't really mozal.  He was

9     suggesting that we have changed -- we have changed the path we

10    are going to take.

11         **MS. MITCHELL:**  Okay, if we can continue.

12         (Portion of audio recording played in open court)

13    **BY MS. MITCHELL**

14    **Q**    All right.  And so here it's:

15              "We just shifted gears."

16              "You're not kidding."

17         If this was all still immigration, why would this be a

18    shifting of the gears?

19    **A**    Well, because it was going to be clean, quick.  It was not

20    something that would take months and months and months, so this

21    was something completely -- and shifting gears is shifting

22    speed for me.  So it's not changing the direction of travel,

23    it's changing the speed of travel.  So I meant making it quick.

24         **MS. MITCHELL:**  Okay.  If we can continue?

25         (Portion of audio recording played in open court)

GESSEN - DIRECT / MITCHELL

```
 1            MS. MITCHELL:  All right, let's pause here.
 2    BY MS. MITCHELL
 3    Q     What did you mean?
 4               "Alex isn't the first to get the mandate.  I
 5               think it's good for you to have the mandate."
 6    A     Can you replay that again?  Because actually, I have no
 7    idea what that means.
 8    Q     Sure.
 9          (Portion of audio recording played in open court)
10            MS. MITCHELL:  Can we pause again?
11            THE WITNESS:  I can't hear it.
12    BY MS. MITCHELL
13    Q     Okay.
14    A     I -- I -- I -- I don't know what the mandate is here, and
15    it doesn't make any sense in the context.
16    Q     Okay.  Could the word "mandate" there be not exactly what
17    you said?
18    A     Perhaps.  We could listen to it again, but I couldn't hear
19    very well, so --
20    Q     Do you remember if -- at the time this conversation was
21    happening, what you were responding to, or what you were
22    thinking about in response to what he said about "I asked Alex
23    in Spain"?
24    A     No.  Well, before this testimony, I was clearly reviewing
25    the transcript and those parts that I remembered and -- but
```

**GESSEN - DIRECT / MITCHELL**

1   this, I could not reconstruct from memory.

2   **Q**    Okay.

3          **MS. MITCHELL:**  If we could continue?

4          (Portion of audio recording played in open court)

5          **MS. MITCHELL:**  Can we pause here?

6   **BY MS. MITCHELL**

7   **Q**    What do you understand Signal to be?

8   **A**    The messaging app that was discussed yesterday.

9   **Q**    How -- have you used Signal before?

10  **A**    I use it regularly, yes.

11  **Q**    Would you -- how would you use Signal before?

12  **A**    Both for personal messaging and professional messaging.

13  **Q**    And when Agent Rizzo suggested using Signal or asked you

14  about Signal, were you comfortable with using it?

15  **A**    Particularly after I became involved with Ukraine I

16  preferred to use Signal.  My work was of potential interest to

17  Russian intelligence.  I did not want to be compromised.  I

18  could not use Telegram, which has been compromised.  I was

19  concerned about using WhatsApp, which can be compromised.

20         So Signal is quite secure, so basically since the

21  beginning of '22, that has been my primary communication

22  platform.

23  **Q**    And were you planning on using Signal specifically because

24  you intended to do something illegal, or you were discussing

25  things that might possibly be illegal?

GESSEN - DIRECT / MITCHELL

1   **A**   No, just some of the things, things that I wanted to keep

2   private.

3   **Q**   Okay.

4           **MS. MITCHELL:**   If we can continue?

5           (Portion of audio recording played in open court)

6           **MS. MITCHELL:**   Can we pause here?

7   **BY MS. MITCHELL**

8   **Q**   What was he referring to?  What did he mean by -- or what

9   did you understand him to mean by "eight to ten cells"?

10  **A**   He has -- he has eight to ten cellphones.

11  **Q**   Uh-huh.

12  **A**   That's what I understood.

13  **Q**   Now, we heard testimony earlier that there have been some

14  cellphones on the table, and that you had paid attention to

15  them, and seemed concerned about them.  Can you tell us a

16  little bit about that?

17  **A**   Um, well, when David early on in the conversation

18  mentioned that he launders money, and I did not know what to

19  make of that, just the first thing that came to my mind is, you

20  know, why would you say something like this out loud to a

21  complete stranger, with your electronic devices all around you?

22  You claim to have been doing it for 15 years.  I mean, you --

23  you can't be doing it for 15 years, be so open about it and not

24  have been arrested, unless you, yourself, are an agent.

25          So, for me, it was -- it was just out of -- I was -- I

**GESSEN - DIRECT / MITCHELL**

1    looked at them very significantly; I was like:  Seriously?

2    (Indicating)  And then David caught on to my gesture and

3    offered to put them away.  I was comfortable either way.

4    **Q**    And he mentioned the term "operational security" when

5    describing what was going on and what was happening in

6    relationship with that.  Were you familiar with that term

7    before you heard it before -- in court?

8    **A**    I think he used "operational posture."

9    **Q**    "Operational posture."

10   **A**    I learned the term yesterday, and he complimented me on

11   it.  So I apparently have high operational posture.  I did not

12   know that.

13   **Q**    Have you ever before, in other conversations with

14   individuals, wanted to have cellular devices taken off of a

15   table or taken away from the space that you were in?

16   **A**    I have.

17   **Q**    And why were you doing that?

18   **A**    Um, mostly it was in Russia, Ukraine.  The intelligence

19   services there are very active.  Businessmen are prosecuted and

20   persecuted by the government regularly.  So, you know, many,

21   many successful businessmen are forced to leave Russia or

22   imprisoned in Russia.  So people are extremely careful about

23   how they talk, who they talk to.

24        And it's -- success is a danger in Russia.  Like, if you

25   are successful, you are very likely to become a target of law

GESSEN - DIRECT / MITCHELL

1    enforcement.

2        So it was basically -- for me it was very natural to have,

3    you know -- and also the type of work.  You know, I was doing

4    forensic work.  I was -- my -- my under -- I was fighting

5    against significant organized crime syndicates, in Russia.

6    And, and for reasons of personal safety, I did not want myself

7    to be a target, or my children to be targets.

8        So security's something I take seriously.  Security is a

9    part of my work and it's very much a part of my background.  So

10   it was very natural for me to be concerned about security.

11   Q    And we also heard conversation about how -- we also heard

12   testimony about how the conversation you were having with

13   Agent Rizzo was coded.  Did you engage in using coded language

14   when having the conversation with him?

15   A    No.  I was -- I was not aware that I was using code when I

16   was talking to -- I wasn't 100 percent transparent.

17       For example, as I've mentioned, that when I was talking to

18   -- I was trying to not step across his relationship with Alex,

19   so I was careful not to volunteer too much.  But I had not said

20   anything in code that I'm aware of, for the duration of the

21   conversation.

22   Q    Did you believe that Agent Rizzo was speaking in code to

23   you?

24   A    I thought Agent Rizzo was very transparent in everything

25   he said.

**GESSEN - DIRECT / MITCHELL**

1   **Q**    And so did you believe, in the course of the conversation

2   you were having with him, that the two of you understood each

3   other?

4   **A**    Um, I had a feeling we had different agendas, but I don't

5   think there was significant -- well, to the extent he was

6   sending messages to me in code, I didn't get those messages.

7   And I think that, based on the interpretation I heard

8   yesterday, we clearly had very different understanding of what

9   was being discussed.

10          **MS. MITCHELL:**  If we can continue?

11      (Portion of audio recording played in open court)

12          **MS. MITCHELL:**  Can we pause there.

13  **BY MS. MITCHELL**

14  **Q**    What did you mean by that?

15          "None of the words that we mention here can

16          end up on there."

17  **A**    Well we discussed a broad range of illegal possibilities.

18  And I certainly did not want to have anything like that on my

19  phone.  No Columbian drug cartels, no money laundering, no

20  bribes.

21      I also did not want to dis- -- my son very often has my

22  phone.  I did not want to receive any messages that would

23  discuss anything related to Priscilla, Priscilla being

24  deported, Priscilla being removed.

25      Generally it's like, you know, messages come in, the kids

GESSEN - DIRECT / MITCHELL

```
 1   open them.  When they can read, and they ask questions, you
 2   just are very careful about what -- what ends up on the phone.
 3           MS. MITCHELL:  We can continue.
 4       (Portion of audio recording played in open court)
 5           MS. MITCHELL:  If we can pause here.
 6   BY MS. MITCHELL
 7   Q    And when you say "the goal can be delivered," what were
 8   you referring to?
 9   A    Priscilla would be removed.
10   Q    And what about:
11           "I can travel to where you are with the paper
12            versions of what you need."
13   A    Well, again, this had to do with creating a record.  So I
14   wanted to make sure that there could be no connection between
15   me and Priscilla's removal.  It was important that I can be in
16   no way tied to it.
17   Q    Why was it important to you that there wasn't a record
18   connecting you to Priscilla's removal from the United States?
19   A    Well, when I filed the whistleblower complaint, I
20   mentioned this to my lawyers in Boston that I wanted to have
21   Priscilla deported.  And I talked to two lawyers about that.
22   And they both strongly advised against it.  They said that if
23   the family court ever found out that I was in any way involved
24   in Priscilla's deportation, the family court judge is likely to
25   strip me of custody, and I would have issues with accessing the
```

1    kids.  So I could have no connection, whatsoever, to

2    Priscilla's deportation.  There could be no record of it,

3    anywhere.

4         And I mean, these are documents that could end up

5    potentially with the government.  At the end of the day there

6    would be a paper trial; at the end of the day there would be

7    some record of my supplying information.

8         So it was very important for me that there was no track

9    record, no -- no record of me being any way connected to -- I

10   drafted a memorandum for the whistleblower complaint.  That

11   memorandum was in an unmarked PDF, a sheet of paper that had no

12   name, no address, no information to connect that memorandum to

13   me.

14        So I was extremely careful from, starting from March, to

15   make sure that every document I sent to Alex as grounds for

16   deportation was a public document.  I have never sent any

17   document that I only had access to.  I only had documents that

18   were in the public domain, that could be received from

19   anywhere.  So I wanted to make -- be very sure that deportation

20   could not be tied to me.

21   Q    And when you filed the whistleblower complaint regarding

22   Priscilla overstaying her visa, did that complaint tie to you,

23   specifically?

24   A    No.  The whistleblower complaint is anonymous.

25   Q    And did you have to include any other specific details

**GESSEN - DIRECT / MITCHELL**

1   that would be specific to you when you filed that whistleblower

2   complaint?

3   **A**   No.   Your IP address can be tracked, I suspect.   So I used

4   a VPN to conceal my IP address.   Speaking of security posture.

5   **Q**   Uh-huh.

6   **A**   And I have not -- you can provide your details if you

7   want, but I haven't.

8   **Q**   Okay.

9         **MS. MITCHELL:**   If we can continue?

10        (Portion of audio recording played in open court)

11        **MS. MITCHELL:**   Actually, can we go to the next page?

12   And starting in at 2:02:23.

13        (Document displayed)

14        (Portion of audio recording played in open court)

15        **MS. MITCHELL:**   Can you go back a little bit?   Let's

16   see.

17        **MS. TARASYUK:**   (Inaudible)

18        **MS. MITCHELL:**   Okay.

19        (Portion of audio recording played in open court)

20        **MS. MITCHELL:**   We can pause here.

21   **BY MS. MITCHELL**

22   **Q**   What did you interpret him to mean by "Sometimes they dig

23   their own fucking grave"?

24   **A**   People do things to cause their own problems.   Basically,

25   it's -- it's an idiom that has many meanings.   I did not read

GESSEN - DIRECT / MITCHELL

1    it to mean getting killed.

2    **Q**    Okay.

3         **MS. MITCHELL:**   If we can continue at hour 2, minute 4,

4    second 21.

5         (Document displayed)

6         (Portion of audio recording played in open court)

7         **MS. MITCHELL:**   Can we pause here?

8    **BY MS. MITCHELL**

9    **Q**    All right.  And for this part of the conversation, where

10   he said he was going to get back to you in the next 24 or 48

11   hours, what did you think he was going to get back to you with?

12   **A**    With a proposal and price, and with a confirmation that he

13   can -- he can actually do what he's saying he can do.

14   **Q**    And then, again, with the "location, photographs,

15   vehicle," what did you interpret that to mean?

16   **A**    That is their recon package that I promised to supply to

17   him, basically information to be able to locate Priscilla.

18   **Q**    And if you thought at this time that there was a

19   possibility that Agent Rizzo was a corrupt law enforcement

20   officer, why did you think that you needed to provide this

21   information to him?

22   **A**    Well, you -- any investigation needs to begin somewhere.

23   So he asks for it; I did not see any reason not to provide it

24   to him.  It's -- look.  When you try to locate an individual --

25   again, it's not like I've done it many times, you know, as law

1    enforcement, but it -- particularly when a person has -- is

2    here illegally, has no Social Security number, has probably no

3    bank account, has -- does not -- lives with friends, has no

4    family in the -- how exactly are you going to go around finding

5    this person?  You -- once you have the car registration, you

6    see if you can begin somewhere.  So it just made sense.  You

7    know.  And why make things more complicated, when you can make

8    things simple?

9              MS. MITCHELL:  If we can continue?

10        (Portion of audio recording played in open court)

11             MS. MITCHELL:  Let's pause here.

12   BY MS. MITCHELL

13   Q    So what did you understand this to mean?

14   A    Well, since we were no longer in the high-level INS person

15   who was about to retire, but we were's talking about

16   enforcement actions, some sort of enforcement action, I assumed

17   he was referring to some sort of operational-level law

18   enforcement officer -- or ICE agent, or whoever it is he

19   meant -- but, basically for whom $50,000 would be a lot of

20   money.  To most people, $50,000 is a lot of money.

21        So I didn't have a very clear picture.  Again, something I

22   would need to discuss with Alex to find out the details.

23   Q    And to your mind, would it seem more or less expensive to

24   have someone murdered, versus bribing an immigration official?

25   A    Uh, I honestly don't know.  I mean, it just seems like it

1  would -- it should -- it should cost more to have somebody

2  killed, but, then, I don't know the market.

3          **MS. MITCHELL:**  If we can continue?

4      (Portion of audio recording played in open court)

5          **MS. MITCHELL:**  And -- I'm sorry, at hour 2, minute 5,

6  second 51.

7      (Document displayed)

8      (Portion of audio recording played in open court)

9          **MS. MITCHELL:**  If you can pause here.

10  BY MS. MITCHELL

11  **Q**    What did you mean by this?

12  **A**    Well, there's a big part of the meeting that he skipped,

13  in which David was talking to me about the $1 million that he's

14  going to give to Alex.  And David was under the impression that

15  Alex and I were involved in some sort of a wheat deal.  And

16  within that transaction, he was supposed to get $1 million.

17  And --

18  **Q**    To be clear, Alex was supposed to give you $1 million?

19  **A**    Sorry.  David was supposed to give Alex $1 million.

20  **Q**    Okay.

21  **A**    And, but, I know Alex well.  And giving Alex $1 million is

22  not a safe proposition, because you're probably not going to

23  see that money again.  So I was very concerned that if David

24  thinks that I would be responsible for that money in any way,

25  that I'm connected with Alex in that way, I made it very clear

1    to him in that conversation that if he gives $1 million to

2    Alex, that I'm not responsible for that $1 million.

3        But I didn't exactly say -- well, I was trying to tell him

4    basically that:  Look, you have dealings with Alex, you're

5    dealing with Alex; you have dealings with me, you're dealing

6    with me.  But don't hold me responsible for the million dollars

7    that you're going to give Alex.  I think I said nobody can

8    speak on my behalf.  You know, if you give me $1 million, I

9    will be responsible.

10       But, so, I was very clear that we would not be able to

11   have that conversation because it's -- I would not necessarily

12   tell him the same thing in front of Alex.

13   Q    Now, were you involved with any -- any of these other

14   operations that we've heard alluded to regarding Alex in Spain

15   that Agent Rizzo was meeting with him about?

16   A    Besides the fact that -- well, I knew from Alex that he

17   was going to meet with someone who was going to give him

18   $1 million.  I've heard about that.  I had no knowledge,

19   whatsoever, of anything else Alex discussed with David.

20           MS. MITCHELL:  If we could continue with this.

21       (Portion of audio recording played in open court)

22           MS. MITCHELL:  Pause here.

23   BY MS. MITCHELL

24   Q    What did you mean, the number was mentioned to you several

25   times in the past?

**A**    Well, David and I had -- there was a clear lapse of
communications between me, Alex, and David about the money.  So
David thought that I was told that I need to pay a $100,000
bribe.  I told him several times that I did not know about the
money.

So I was very frustrated, because if I had known that this
entire -- that this was how it was going to develop, I would
have stopped Alex a long time prior.  You know, just:  This was
not the idea, Alex.  And so, I was angry that I ended up in
this situation.

I mean -- okay.  I think I was very frustrated towards the
end of the meeting.  I was not happy about where we were going.
I was not happy with the fact that I sort of -- how would you
say it?  Okay.  I was going down a certain path.  About this
factory.  And I had to -- and then I crossed one bridge when we
came to $100,000.  And then I crossed another one when I
realized I didn't have a $100,000, and we were talking about a
much more aggressive removal which I didn't want to do in the
first place.  So I was kind of digging my hole deeper and
deeper, digging my own grave.

And so I was -- I was frustrated because -- with myself; I
was frustrated with that I didn't have proper information.  And
it was just a very -- so I was just venting towards the end of
the meeting that, you know, I wish I had known earlier what was
going on; I wish I had known that this was a bribe.  You know,

1    much of this could have been avoided.  I couldn't say this to

2    David, but, you know, that's what I was thinking.

3    **Q**    And so the frustration was with Alex, because if Alex had

4    told you that what you had thought was someone just helping

5    with a whistleblower campaign for free instead of someone

6    expecting $100,000 bribe, you never would have followed up with

7    that aspect of getting Alex's help?

8    **A**    Look, I think, to be honest, Alex was the scapegoat.

9    Right?  I was blaming myself because, I mean, I'm the one who

10   ended up in this situation.  So Alex was a convenient scapegoat

11   because I could point to a very specific thing, that I did not

12   have this information.  And if I had this information, maybe it

13   would have all been different.

14        But, so, it was just -- you know, I think that it was -- I

15   was just projecting.  But, yes, that's exactly what I meant,

16   that I'm pissed off that Alex did not tell me this was -- this

17   was the conversation, because then it would have been easier.

18             **MS. MITCHELL:**  If we can continue here?

19        (Portion of audio recording played in open court)

20             **MS. MITCHELL:**  Can we pause here?

21   BY MS. MITCHELL

22   **Q**    What was the solution that you arrived at that worked?

23   **A**    The removal that we settled on, that seems to be -- if

24   David confirmed it.

25             **MS. MITCHELL:**  Your Honor, this might be a good time

1    for us to break for lunch.

2              **THE COURT:**  All right.  Why don't we do that, since we

3    took morning break a little early.

4        Members of the jury, we are going to take a break for a

5    45-minute lunch.  We'll resume at 12:35.

6        As always, please do not discuss the case, or do any

7    independent research, whatsoever.

8        Thank you.

9        (Jury excused)

10       (The following proceedings were held outside of the

11   presence of the Jury)

12             **THE COURT:**  Okay.  Thank you.

13             **MS. MITCHELL:**  Thank you, Your Honor.

14       (Recess taken from 11:46 a.m. to 12:39 p.m.)

15       (The following proceedings were held in the presence of

16   the Jury)

17             **THE COURT:**  Thank you, members of the jury.  You may

18   be seated.

19       We will resume with the direct of Mr. Gessen.

20                   <u>**DIRECT EXAMINATION RESUMED**</u>

21   **BY MS. MITCHELL**

22   **Q**   Okay, Mr. Gessen.

23       If we could continue with the audio file that we were

24   listening to, we will continue here at two hours, six seconds,

25   37 -- two hours, six minutes, 37 seconds.

1          (Portion of audio recording played in open court)

2    BY MS. MITCHELL

3    Q    And when you are heard this, what did you interpret that

4    to mean?

5    A    Um, I thought he was referring to the same, um, topic we

6    had discussed before, that there's a person at the Immigration

7    Service, that there was going to be a price, and he understood

8    the process.

9    Q    And when he said "I told him right away," who did you

10   think Agent Rizzo was speaking about?

11   A    Alex.

12   Q    And then, just to be clear because we had a little bit of

13   a technical difficulty, what's Alex's legal name, again?

14   A    Oleksii, O-L-E-K-S-I-I.

15   BY MS. MITCHELL

16   Q    And you -- and the English version of that would be

17   "Alex."

18   A    Correct.

19   Q    Okay.

20        MS. MITCHELL:  Now, if we can take down this exhibit

21   and close the audio file.

22        (Document taken off display)

23        MS. MITCHELL:  Thank you.

24   BY MS. MITCHELL

25   Q    Now, at the time you had had this conversation on

1  June 2nd, what was the total price that you had agreed to or

2  believed was being discussed for the removal of Ms. Chigariro?

3  **A**    David did not name a specific price.  He said he would

4  need to check.  But he said it would be what -- half, I think,

5  he -- basically, around $50,000.

6  **Q**    Was the $50,000 more financially feasible for you than the

7  $100,000?

8  **A**    It was still a stretch, but it was definitely more

9  feasible, yes.

10  **Q**    And again, was there anything about the $50,000 price that

11  made you think murder of Ms. Chigariro was something that

12  Agent Rizzo was discussing?

13  **A**    (Inaudible)

14      (Reporter clarification)

15          **THE WITNESS:**  No.

16  **BY MS. MITCHELL**

17  **Q**    And, why not?

18  **A**    Well, I just -- there was nothing in our conversation to

19  reference murder, directly or indirectly.

20  **Q**    And so at the conclusion of your conversation with

21  Agent Rizzo on June 2nd, what did you believe that both of you

22  were working towards doing with Ms. Chigariro?

23  **A**    We were working towards removing Priscilla from the United

24  States.

25  **Q**    And how did you believe that would be accomplished?

Case 3:22-cr-00276-JSC   Document 88   Filed 06/19/23   Page 114 of 204          670
GESSEN - DIRECT / MITCHELL

1  **A**    With the help of the enforcement arm of Immigration

2  Service.

3  **Q**    Now, you had spoken about how you were affected by not

4  being able to see your children and not being able to be around

5  your children.  How did you perceive this would affect them if

6  Ms. Chigariro was removed from the United States?

7  **A**    Um, I think I tried to -- I knew that it was going to be

8  very difficult for [E.G.]  [E.G.] grew up with Priscilla.

9  Priscilla's the only parent she really knows.

10        Um, and I mean, being separated from your mother for any

11  period of time for a child that age is difficult.

12  **Q**    Did you intend to permanently deprive the children from

13  their mother?

14  **A**    No.

15  **Q**    What was your intention about what would happen after

16  Ms. Chigariro was removed from the United States?

17  **A**    Well, I was -- first of all, it was important that I was

18  not connected to Priscilla's deportation, so it would not

19  affect her perception of me.

20        I was in the process of launching a business in Zimbabwe,

21  the EE Farm platform for farmers that I mentioned earlier.  It

22  was in the pilot phase, and it would have required me to travel

23  there regularly.[O.G.] has visited more than 20 countries by

24  the age he was six, so we're very comfortable traveling.  So I

25  expected for us to co-parent somehow, internationally.

1   **Q**   And when you were speaking about the permanence of the

2   removal, what if one of your children had wanted to return to

3   Zimbabwe with Priscilla?  What would have happened then?

4   **A**   I haven't really considered this possibility.  I was open

5   to the possibility that [E.G.] would be potentially spending

6   much more time with Priscilla than me, at least until she

7   reached school age.  That is something that we had discussed

8   with Priscilla previously.  And one of the proposals was that

9   she would stay in Zimbabwe, I would stay in the United States.

10  And until [E.G.] is about six or seven, she would stay there,

11  and then somehow make her way to the United States.

12  **Q**   You mentioned just now that you were very concerned about

13  Priscilla's perception of you.  Why were you concerned about

14  her perception of you, if you were responsible for her

15  permanent removal from the United States?

16  **A**   Well, I think it's essential that if you're going to

17  co-parent with somebody, that you have some degree of ability

18  to cooperate.  And if you do violence against that person, if

19  you hurt that person, then that person's never going to trust

20  you again.  So if Priscilla knew that I was behind her

21  deportation, it would make it impossible for us to have any

22  sort of co-parenting afterwards.  Okay, not impossible, but

23  much, much more -- much more difficult.

24  **Q**   Were you anticipating, then, that after Priscilla was

25  removed, that you would be engaged in co-parenting with the

GESSEN - DIRECT / MITCHELL

1  children?

2  **A**    Yes.

3  **Q**    But if she was removed physically from the United States,

4  what did you see this co-parenting realistically looking like?

5  **A**    I cannot tell you honestly that I have thought about it in

6  great detail.  We -- we have been a very international family.

7  I have traveled from Russia to Zimbabwe two or three times a

8  month, sometimes, to spend time with [O.G.] when he was three

9  years old, he was four years old.  That never really caused an

10  issue; we're very close.  It's -- obviously it was -- so with

11  videos and phones and -- it's possible to arrange some sort of

12  holiday schedule.

13      Anyway, I didn't -- I don't -- I think that it's -- there

14  are workable solutions for international co-parenting.  It's

15  not ideal, but then our situation was not ideal anyway, so...

16  **Q**    And why not go back to the family court, and seek some

17  sort of remedy in the family court if you disagreed with

18  Priscilla's parenting to the point that you felt that permanent

19  removal from the United States was the only best solution for

20  your children?

21  **A**    I didn't think so.  This is -- I think -- the problem was

22  that I launched a certain process earlier on, back in March.  I

23  did not know whether we were going to reach a settlement and

24  custody agreement, or whether we were going to keep fighting

25  for the next year and a half.  So when I launched the process I

GESSEN - DIRECT / MITCHELL

1   had no -- I did not envision that within a month and a half

2   after that we would settle, find understanding, agree on

3   co-parenting.

4        So what I should have done is stop the process in its

5   tracks.  And if it had been active at that time, if I had known

6   it would cost money, I probably would have.  But they sort

7   of -- things took their course; the process sort of the

8   percolated.

9        And by the time I met with David for the first time on

10  June 2nd, it was -- I wasn't sure how to really back out

11  without -- you know.

12       So at that point in time, removing Priscilla from the

13  United States was not the ideal solution.  There was -- it was

14  -- it was -- I was trying to sort of balance -- as I said, I

15  dug myself a hole through kind of starting down that path.  And

16  then I couldn't turn back, so I was trying to make the best of

17  it, but, ended up in a very uncomfortable place.

18  **Q**   Why would you be willing to spend $50,000, then, if you

19  had just ended up in a place where you just dug a hole for

20  yourself?

21  **A**   Well, again, it's -- David and I were engaged in very

22  serious discussion about the factory.  I -- he and Alex have

23  already invested, you know, four months, so to speak, into --

24  into something on my behalf.  Backing out of that at that point

25  would be embarrassing.

1      And also, I think that when I weighed those -- when I

2   weighed it, I did think that if I had more control over the

3   children's lives, whether -- and it was -- it was sort of -- I

4   did convince myself that it would be better for the kids if I

5   made the decisions about their education, if I made the

6   decision -- but there was nothing to go to court with, you

7   know.  There was no legal reason to change the custody

8   arrangement.  There was no really urgent reason to change the

9   custody arrangement.  It was fine.

10      You know, you might be concerned about what the other

11   parent feeds the child.  Or, you know, whether they do the

12   homework at home.  But it's not -- there was nothing, no basis

13   to go back to the family court.  I had no reason to go back to

14   the family court at that point.

15   Q    Did you think that you were a better parent to your

16   children than Priscilla?

17   A    I did.

18   Q    Why?

19   A    I think that they received more attention.  I think I am

20   more focused on their development, and can dedicate more time

21   to their -- to them.

22   Q    Now, in the course of the conversation with Agent Rizzo,

23   there were some words that were used like "mozal" and "todah."

24   What language are those words from?

25   A    Hebrew.

GESSEN - DIRECT / MITCHELL

1  **Q**    Do you speak Hebrew?

2  **A**    No.

3  **Q**    How did you know what those words meant, then, if you

4  don't speak Hebrew?

5  **A**    Well, I have some basic knowledge of Hebric, and read it.

6  But I certainly don't speak it fluently.  So "todah" is "thank

7  you," and it's is very basic.

8      I was involved briefly in the diamond industry.  And in

9  the diamond industry, to this day, everything is done with a

10 handshake throughout the world.  So when people shake hands

11 they say "Mozal," which means "We have a deal."  And it is

12 sometimes more reliable than the written contract.

13 **Q**    Do you speak any other languages?

14 **A**    I speak Polish, fluently.  I speak Russian, English, and

15 then just pieces of this and that.

16 **Q**    Then, is English your first language?

17 **A**    No, I learned English after immigrating to the United

18 States.

19 **Q**    Do you sometimes -- strike that.

20     All right, so let's continue with the next in-person

21 meeting you had with Agent Rizzo.  When was your next meeting

22 with Agent Rizzo?

23 **A**    On June 22nd.

24 **Q**    Where was that meeting?

25 **A**    In New York.

**GESSEN - DIRECT / MITCHELL**

1  **Q**    Why did that meeting take place in New York, if you know?

2  **A**    I understood that David lived in New Jersey, and I was on

3  holiday in New York with my family.  It was convenient to have

4  the -- hold the meeting there.

5  **Q**    Before you had the meeting with David Rizzo, did you

6  happen to speak with Alex about him and his background?

7  **A**    Yes.

8  **Q**    What did Alex tell you about his background?

9  **A**    I called Alex immediately after finishing my meeting with

10  David on June 2nd.  And I was not happy with that conversation

11  at all.  I -- I asked him a lot of questions.

12      My first question was whether he was trying to set me up,

13  because my first suspicion was that David was an undercover

14  agent who was trying to entrap me somehow into -- sorry --

15  somehow try to involve me into his -- his agenda.  Um --

16  **Q**    By "his agenda," what agenda were you thinking about?

17  **A**    Well, during the meeting that started out as a legitimate

18  investment scheme, we ended up discussing three illegal

19  proposals.  The first one was bribery, the second was money

20  laundering, the third one was a different type of bribery.

21      So as I mentioned, I think, in the beginning, the way

22  David communicated, the way he spoke very openly about things

23  made me suspicions.  So one of the things I wanted to check

24  with Alex was how well he knew David, and whether in fact he

25  was an undercover agent, and whether I was being investigated.

1    So Alex assured me that that was not the case.  My --

2    **Q**    Did Alex clarify for you whether or not Agent Rizzo was,

3    in fact, a money launderer working with the Columbian cartel?

4    **A**    Yes, Alex was very emphatic that he was not.

5    **Q**    And did Alex inform you again of who he believed that

6    Agent Rizzo was working for?

7    **A**    He didn't say who he was working for.  He said who he was

8    not working for -- he was not working for.

9    **Q**    And did he talk about what the source of the possible

10   $10 million investment into the factory was?  Where the money

11   was coming from?

12   **A**    He said it was coming from a legitimate source, as we

13   discussed, and I don't need to worry.

14   **Q**    Did you speak with Alex about the bribery scheme that then

15   turned into a forcible removal?

16   **A**    Yes, I did.

17   **Q**    And in the course of your conversation with Alex, did, at

18   any point in time, the concept of murder for hire come up?

19   **A**    No.

20   **Q**    What was the tenor and nature of your conversation with

21   Alex about the bribery scheme that turned into forcible

22   removal?

23   **A**    Well, at first I was upset at the fact that I did not know

24   about the $100,000.  He explained to me that his plan was to

25   cover that, and that basically he hoped that I would not need

1    to.  I told him that that was just not -- not the right -- I

2    appreciated the gesture, but he should have let me know.

3         Then, I told him that we discussed the $50,000 price tag.

4    And if it made sense to him, and if he -- if he understood.  He

5    said he would clarify it, and get back to me.

6    Q    And what did you think he meant by "clarify"?

7    A    He would speak to David.

8    Q    And, but clarify what?  What was unclear at this time?

9    A    The process that would be utilized.

10   Q    And so when you say "the process that would be utilized,"

11   was that the process that would be utilized for the forcible

12   removal?

13   A    Correct.

14   Q    Okay.  Did you and Alex have other conversations about

15   either the factory in Estonia or the forcible removal of

16   Priscilla sometime between July -- June 4th, 2022, and your

17   next meeting with Alex Kiselev -- pardon me -- with

18   Agent Rizzo?

19   A    We discussed the factory continuously.  We were trying to

20   find secure alternative source of funding for the factory.  It

21   wasn't connected to money laundering, but it was connected to

22   trying to avoid bringing an investor.  And we tried to fund the

23   factory through the pre-orders, pre-sales of the vests.

24        Then, about Priscilla, about removing Priscilla, Alex got

25   back to me very quickly.  And, and clarified, clarified the

**GESSEN - DIRECT / MITCHELL**

1  process for me so that we were clear on that.

2  **Q**    Do you know how Alex clarified the process?  Do you know

3  if he actually spoke to Agent Rizzo in clarification?

4  **A**    That was my understanding.

5  **Q**    But do you know if he actually did that?

6  **A**    I do not.

7  **Q**    Okay.  Has Alex ever been less than truthful with you?

8  **A**    I suspect so, yes.

9  **Q**    So going back to that meeting with Agent Rizzo on

10 June 22nd, what was your purpose for being in New York that

11 day?

12 **A**    I was there with my son, [O.G.], and with my mom.

13 **Q**    And were you there for a particular reason?

14 **A**    No, we just -- to visit museums, went to the Carnegie

15 Hall; [O.G.] really wanted to go.  We went to the Whitney

16 Museum, the Museum of Modern Art, so not really -- just

17 cultural development.

18 **Q**    Did you purposely travel to New York to meet with

19 Agent Rizzo about some sort of plan to murder Ms. Chigariro?

20 **A**    No.  We met with -- we coordinate with Priscilla.  I think

21 that we swapped kids in New York.  So she also came, dropped

22 off [E.G.] so there was -- there was quite a bit of going back

23 and forth, so it was a coordinated event.

24 **Q**    So the visit to New York then was essentially a family

25 holiday, and you had the meeting with Agent Rizzo on the side.

GESSEN - DIRECT / MITCHELL

1   **A**   Correct.

2   **Q**   So where did you meet with Agent Rizzo?

3   **A**   At a restaurant in lower Manhattan.

4   **Q**   Had you been to this restaurant before?

5   **A**   No.

6   **Q**   Did you suggest the restaurant for meeting?

7   **A**   No, David suggested it.

8   **Q**   When you met at the restaurant, what generally did you

9   discuss?

10  **A**   We discussed the factory investment.  And we discussed the

11  removal of Priscilla.

12  **Q**   At that time, did you take any opportunity to clarify with

13  Agent Rizzo what his background was, or what he was doing for

14  work?

15  **A**   No.

16  **Q**   Why not?

17  **A**   Um, look, I've known Alex for 15 years. I -- like, I've

18  never met David before.  Whatever else he was doing, I didn't

19  want to necessarily be involved.

20      I found him, on the personal level, not particularly

21  pleasant to deal with.  I think -- he said he was crass.  He

22  was crass.  And so I did not seek to build a relationship with

23  him or to develop any sort of independent contact with him.

24  **Q**   But I want to clarify.  You said you did not seek to be

25  involved with David.  Were you still seeking to do a deal with

GESSEN - DIRECT / MITCHELL

1   him, if you could?

2   **A**    Yes.

3   **Q**    Okay.  And at that time, what did you believe the source

4   of the funds to be?

5   **A**    I did not know the source of the funds, for sure.

6   **Q**    If, in fact, he would have been really a money launderer,

7   would you have taken the funds from him?

8   **A**    I thought about it for a while.  I'm not sure what the

9   answer is.  It's -- that factory was, as I mentioned, not

10  really a business.  It was -- it was something that was

11  necessary to save lives, there and now.

12      I thought to myself that since all I want to do is borrow

13  money and give it back, that basically my role in a potential

14  money laundering scheme would be all right.  So I did think

15  about it.  But as I said, I was trying to also find out

16  alternatives so that I wouldn't have to do it.

17      I do want to clarify, though, that during the second

18  meeting, David completely changed his approach to money

19  laundering.  He said that the money will come from a bank

20  account, from a construction company.  That he -- that it will

21  be compliant with KYC requirements, know-your-client

22  requirements, compliance requirements.

23      So we -- so the conversation completely shifted from

24  the -- sort of this drug cartel money launderer to a much more

25  legitimate source of funds, as Alex suggested.  So it was a

**GESSEN - DIRECT / MITCHELL**

1   much more -- and I think I mentioned in the meeting with him

2   that I was much more comfortable doing business this way.

3        I forwarded to him, I believe, a potential loan agreement.

4   Yes.  I sent to him for them to review.  And I suggested that

5   they do due diligence on the company.  I suggested that they

6   introduce a person to the board of directors of the company, so

7   that they have transparency.  I suggested to him that they

8   introduce the chief financial officer, if they wanted to have

9   transparency into money movements.

10       It was a very normal conversation, much more normal

11  conversation than we had on June 2nd.

12  **Q**   So in mentioning these things, you were talking about --

13  whomever was responsible for giving the money to you through

14  Agent Rizzo, you were suggesting that they actually be a member

15  of the board running the factory?

16  **A**   Correct.  Well, I think it is important for the investors

17  to have visibility into the company, and this is just some of

18  the best practices.  An investor would have an accountant or

19  somebody who fixes the books, so they're not worried about, you

20  know, how the money is utilized and et cetera.  Particularly

21  when you don't know somebody well.

22  **Q**   I want to show you what has yet to be admitted as

23  Exhibit 127.

24       (Document displayed to the Witness)

25  **Q**   Can you take a look at Exhibit 127.  Do you see that on

GESSEN - DIRECT / MITCHELL

1    your screen?

2    **A**    I do.

3    **Q**    What do you recognize that to be?

4    **A**    Um, it is one of the versions, I think, of the very first

5    version of the potential capital drawdown and repayment

6    schedule for the ballistics factory in Estonia.

7    **Q**    Who created that document?

8    **A**    I did.

9    **Q**    And does that document look the same as the way it looked

10   when you created it?

11   **A**    To the best of my recollection, yes, it does.

12          **MS. MITCHELL:**  At this time I would like to admit

13   Exhibit 127.

14          **MS. HOSSEINI:**  No objection.

15          **THE COURT:**  Okay, 127 admitted.

16          **MS. MITCHELL:**  And publish it to the jurors.

17       (Trial Exhibit 127 received in evidence.)

18       (Document displayed)

19   **BY MS. MITCHELL**

20   **Q**    Did you give this document or a document similar to this

21   to Agent Rizzo?

22   **A**    This is one of the documents I gave to him at the meeting

23   on June 2nd.

24   **Q**    Can you describe for us what we see here in this document?

25   **A**    Yes.  So when you talk about capital drawdown, you create

1   a certain loan amount.  And then the party that takes the

2   money, borrows the money, can take the money as it needs it

3   over a certain period of time.

4        So, here, we expected to take about six months for the

5   money to come into the factory.  It was tied to the purchase of

6   the equipment, to the purchase of the raw materials, et cetera.

7        And then, the repayment is when the business repays the

8   loan to the lender.  So we expected the repayment to begin

9   several months later, and to be concluded by October of 2023.

10  **Q**   And this was part of the materials you gave him because

11  you were intending to set up a legitimate business?

12  **A**   Correct.

13       **MS. MITCHELL:**  Okay, we can take down this exhibit.

14       (Document taken off display)

15  **Q**   Now I want to go to some of the payments for

16  Ms. Chigariro's deportation.

17       What were you intending to pay Agent Rizzo that day for

18  Ms. Chigariro's removal from the United States?

19  **A**   So, I think it was the morning of the meeting, that David

20  said that I need to pay the first half of the full amount.  I

21  responded that to know what is the first half, I would need to

22  know the full price.  He told me that the full price for the

23  removal would be $50,000.  So he required $25,000.

24       I did not have that balance in my bank at the time.  And I

25  certainly didn't have that amount in cash.  The only thing I

GESSEN - DIRECT / MITCHELL

1  had was a gold coin, which is sort of -- I carry in the wallet

2  with me for emergencies.

3      And so that was sort of the valuable thing I had on me, on

4  that day, which I hoped would be sufficient to -- to be -- at

5  least to show my seriousness.

6  Q    Why did you have a gold coin?

7  A    Well, when the COVID first began and there were empty

8  supermarket shelves, and there were lockdowns that were

9  happening, countries become very destabilized.  I had some

10 savings, and I was thinking of what is the best way to preserve

11 savings in the moment of crisis.  That was in early -- when did

12 COVID -- in 2020?  Early 2020.

13 Q    (Nods head)

14 A    So I purchased several -- I think maybe $50,000 worth of

15 gold coins as sort of a secure savings in physical-physical

16 coins.

17     And once things stabilized and logjam ended, I sold them,

18 deposited the funds.  And I think I kept one or two coins just

19 because I never had gold before, so just to -- a gold coin

20 seemed like a nice thing to have.

21 Q    Now, for the remainder of the funds, if you were paying

22 $2,000 for the gold coin, you would then owe 20 -- no.

23 $23,000.  Math.

24     So if you had to pay $23,000, how were you planning on

25 getting that $23,000 to Agent Rizzo?

**GESSEN - DIRECT / MITCHELL**

1    **A**    So the plan -- the plan I had was I reached out to the

2    company for whom I was doing consulting work at that time, and

3    I asked if they could basically not pay to me for my work, but

4    to pay to another company for my work, provided that the amount

5    of work stayed the same.

6         So that will serve -- there was two payments of money.  I

7    don't remember exactly the order, but basically some of the

8    money was for the money already earned, and some was an advance

9    against the future, future earnings that I was planning to

10   make.

11   **Q**    So I'm going to show you what's already been admitted as

12   Exhibit 13.

13        (Document displayed)

14        (Off-the-Record discussion)

15   **BY MS. MITCHELL**

16   **Q**    So for Exhibit 13, is this a contract that you prepared?

17   **A**    Can you scroll to the last page, please?

18        (Documents displayed)

19        (Witness examines document)

20   **A**    No.

21   **BY MS. MITCHELL**

22   **Q**    It's not something that you prepared?

23   **A**    No.

24   **Q**    Who prepared this?

25   **A**    Well, this is a contract signed by David.

GESSEN - DIRECT / MITCHELL

1    **Q**    Uh-huh.

2    **A**    And I do not know -- I -- it is not the document that I

3    sent to him.  That is the document that David sent to me, after

4    signing it.  I haven't compared them side by side.

5         But, looking at it yesterday, I had an impression that

6    some things had been changed between the time that I sent the

7    contract to David, to the time it was returned back to me.

8    **Q**    Did you send David a consultancy agreement, though?

9    **A**    I did.

10   **Q**    And why did you send him a consultancy agreement?

11   **A**    To provide a basis for the transfer of funds.

12   **Q**    And the transfer of funds, meaning that you were going to

13   essentially have David sign on as a consultant with your same

14   -- with the company that you were already working for.

15   **A**    Correct.

16   **Q**    And that company was Geewiz?

17   **A**    Correct.

18   **Q**    All right.  And so, you just informed us that you

19   essentially had Geewiz pay him what was supposed to be your

20   salary.

21   **A**    My consulting fees, yes.

22   **Q**    And why did you set up the money transfer this way?

23   **A**    So that it would not be traced back to me directly.  I

24   mean, it was a very -- easy to kind of connect the dots.  And

25   so I was receiving funds from the same company, but I thought

1    it was okay.

2    **Q**    Did you direct Geewiz how much they should pay Agent Rizzo

3    instead of you?

4    **A**    Well, I asked.  I couldn't direct them.  But, yes, I

5    asked.  And they were willing to accommodate me.

6    **Q**    Now, with Geewiz, is this some sort of organization that

7    you have -- CEO or financial control over of in any way?

8    **A**    No.

9         (Document taken off display)

10        **MS. MITCHELL:**  Thank you.

11   **BY MS. MITCHELL**

12   **Q**    So we heard a little bit about your June 2nd conversation.

13   And you were able to go through and explain some things that

14   you were actually thinking.

15        So I want to do the same thing with the June 22nd

16   conversation.

17   **A**    Okay.

18   **Q**    I want to hear what you were actually thinking during

19   portions of that conversation.

20        (Document displayed)

21        **MS. MITCHELL:**  And so first I would like to bring up

22   Exhibit 7 at minute 44, second 36, showing on the screen

23   Exhibit 8 at Page 5.

24        (Document displayed)

25        (Portion of audio recording played in open court)

GESSEN - DIRECT / MITCHELL

1  BY MS. MITCHELL

2  Q    Can you explain to us what you interpreted "disassociated

3  with this as much as possible"?

4  A    That I would not be connected to the removal.

5         MS. MITCHELL:   Then can we continue?

6       (Portion of audio recording played in open court)

7  BY MS. MITCHELL

8  Q    And pausing here, can you explain to us what you

9  understood "random act" to be?

10 A    Sure.  Well, basically Priscilla may be subject to

11 deportation, but if she were -- she's not an international

12 terrorist that is wanted by the FBI or someone.  So if there

13 was a raid on her apartment to arrest her, clearly, there must

14 be a reason behind it.  I mean, she knows she is not an

15 internationally-wanted criminal.

16     So "random" means that it is not in any way connected to

17 -- like, it doesn't seem clear where it originates from.  It's

18 not connected to me; it's not -- it's random.

19 Q    Meaning perhaps not on a day where you have particular

20 filings for something with your child custody case, or you have

21 some sort of argument that occurs between the two of you?

22 A    I didn't think about it that way.  I did mean -- that

23 certainly would be a legitimate interpretation, but -- I mean,

24 basically, "random" meant that it cannot be specifically

25 targeting Priscilla in connection to me.  Like, so that it was

GESSEN - DIRECT / MITCHELL

1    -- it was all part of the same narrative.

2    **Q**    So if I'm interpreting what you are saying correctly --

3    and please let me know if I'm saying this wrong -- meaning that

4    you were hoping that it would be something where multiple

5    people were arrested or multiple people were picked up at the

6    same time, so it didn't appear specifically that Priscilla was

7    targeted?

8    **A**    Correct.

9    **Q**    Okay.  All right.

10          **MS. MITCHELL:**  So let's go to minute 46, second 49.

11   Exhibit 8, Page 6.

12         (Document displayed)

13         (Portion of audio recording played in open court)

14          **MS. MITCHELL:**  Pause here.

15   **BY MS. MITCHELL**

16   **Q**    So, did you suggest the dates that Ms. Chigariro was going

17   to be removed from the United States?

18   **A**    Yes.

19   **Q**    And what was this part about Agent Rizzo talking about the

20   last week of July?

21   **A**    Last week of July was the time when both kids were with

22   me; we were planning to go on holiday.  So we would assure that

23   Priscilla would not be detained in their presence.

24   **Q**    And then, "Hundred percent," talking about "...because

25   somebody is going to talk to you, right?"

1      Why would anyone talk to you if she's being deported or

2   she is being removed from the United States?

3   **A**   In the past three years -- well, more than three years.

4   But specifically in the last three years, many troubles have

5   befallen Priscilla.  Different ones.  For example, she was

6   arrested.  And what I heard was she assumed that it was because

7   of me.

8      So anything bad that would happen, her lawyers would try

9   to get involved.  If she's detained, deported, so:  Are you

10  connected?  Are you related?  Why -- like, where are you in

11  this?

12     So basically somebody would be talking to me, meaning

13  depositions, meaning court proceedings.  I needed to be not

14  connected with her.

15          **MS. MITCHELL:**  Can we continue playing?

16      (Portion of audio recording played in open court)

17          **MS. MITCHELL:**  We can keep going.

18      (Portion of audio recording played in open court)

19          **MS. MITCHELL:**  We can -- we can pause here.

20  **BY MS. MITCHELL**

21  **Q**   Why would you need to limit your physical contact with her

22  if she was going to be removed from the United States?

23  **A**   I didn't give it much thought.  It was just, he was -- he

24  was mentioning something that made sense, kind of, bad things

25  are about to happen, just stay away, it just made perfect sense

GESSEN - DIRECT / MITCHELL

1  not to be anywhere near.

2  **Q**    And again, what did you think the bad thing was that was

3  going to happen?

4  **A**    She was going to be detained or arrested and removed.

5        **MS. MITCHELL:**  Let's go to Exhibit 7.  So the audio

6  exhibit at minute 49.  Page 7.

7        (Document displayed)

8        (Portion of audio recording played in open court)

9        **MS. MITCHELL:**  Pause here.

10 **BY MS. MITCHELL**

11 **Q**    What did you take to mean from the statement, "These guys

12 are animals"?

13 **A**    Stupid.

14 **Q**    What do you mean by that?

15 **A**    Simple; not sophisticated; don't understand, like,

16 financial instruments.  Like, basically not very bright people.

17        **MS. MITCHELL:**  Moving to 50 minutes, 45 seconds.

18        (Document displayed)

19        (Portion of audio recording played in open court)

20 **BY MS. MITCHELL**

21 **Q**    Why, again, were you talking about giving a vehicle

22 registration number to Agent Rizzo?

23 **A**    Well, it was related to the same conversation we had in

24 the previous meeting, which I needed to provide basic

25 information so they would be able to begin somewhere to track

GESSEN - DIRECT / MITCHELL

1    Priscilla.

2              MS. MITCHELL:  And you can continue.

3         (Portion of audio recording played in open court)

4              MS. MITCHELL:  Let's pause here.

5    BY MS. MITCHELL

6    Q    In light of the prior conversation, what did you

7    understand "professionals" here to mean?

8    A    Law enforcement professionals.  These people have access

9    to databases; they can look into things.  They can track

10   things.  So --

11   Q    So if they were law enforcement professionals, why did

12   they need your assistance in providing information?

13   A    Well, because you still need to begin somewhere.  It's

14   much easier if you already have something to go by.  If you

15   want to arrest somebody or detain somebody, you -- particularly

16   if that person does not have legal presence in the United

17   States, you have to have some information just to go off.

18   Q    At this time, do you happen to know if Ms. Chigariro had a

19   Social Security number?

20   A    She did not.

21   Q    Do you know if she happened to have a permanent address?

22   A    She did not.

23   Q    Do you know, happen to know if Ms. Chigariro at this time

24   was working at a job?

25   A    She was not.

```
 1            MS. MITCHELL:  Now, let's move to minute 53 at 43
 2   seconds.
 3        (Portion of audio recording played in open court)
 4            MS. MITCHELL:  We can pause here.
 5   BY MS. MITCHELL
 6   Q    What does this mean?
 7        If she just won the green card lottery and his response is
 8   "Well I'm glad we didn't go that route then," what did you
 9   interpret that to mean?
10   A    If Priscilla were to be deported because of the original
11   plan, the $100,000 plan, then having a green card -- a valid
12   green card would pause those proceedings.
13        So I still -- since I was not exactly sure what legal
14   basis they're going to use for removal, I did not know what the
15   green card was relevant to Priscilla being removed.  Whether it
16   would in any way interfere with the second option.
17        And the part that I heard is that I'm saying:  But this is
18   still the basis we are going use.  That is my response to him
19   saying it makes it a bit more difficult.
20        It says --
21   Q    So you were saying essentially to the fact where he said
22   "I'm glad we didn't go that route then," meaning:  I'm glad we
23   didn't go the route of bribing an immigration agent to deport
24   her --
25            MS. JAMES:  Objection, leading.
```

1          THE COURT:  Sustained.

2          MS. MITCHELL:  All right.  Clarifying, then.

3   BY MS. MITCHELL

4   Q    When he said "Well, I'm glad we didn't go that route

5   then,"  what did you interpret that to mean?

6   A    I interpreted it to mean deportation.

7   Q    And when you said "Well, we could still," what did that

8   mean?

9   A    Can you replay that segment again?  Because I just don't

10  want to go over the transcript.

11  Q    Sure.

12         MS. MITCHELL:  Starting again at 53:43.

13     (Document displayed)

14     (Portion of audio recording played in open court)

15         MS. MITCHELL:  Let's pause again.

16  BY MS. MITCHELL

17  Q    So, when you say "Well, we could still..."?

18  A    Right.  So, so I think the missing part of the sentence in

19  the transcript says the base we were going to use still

20  applies.

21  Q    Uh-huh.

22  A    That's what I'm -- what I'm hearing.  So that would -- the

23  base -- meaning immigration path, meaning removal -- that we

24  were going to use still applies, meaning it is still relevant.

25  So I was reinforcing the fact we are in fact still talking

1  about deportation -- well, some sort of removal, using the

2  Immigration Service.

3  **Q**    Because if you had been planning to have Ms. Chigariro

4  murdered, would you still be planning on using some sort of

5  immigration deportation fraud scheme?

6  **A**    I don't think green card would have any relevance to a

7  murder-for-hire scenario.

8         **MS. MITCHELL:**  Can we go to hour 1, 37 minutes, ten

9  seconds.

10        Actually, I'm going to skip that one.

11        Let's go to hour 1, 48 seconds -- 48 -- hour 1, 48

12  minutes, 18 seconds.

13        (Document displayed)

14        (Portion of audio recording played in open court)

15        **MS. MITCHELL:**  Let's pause there.

16  **BY MS. MITCHELL**

17  **Q**    What did you mean by this part of the conversation?

18  **A**    Well, it is the same conversation we're having earlier,

19  that it is very important that there is no connection between

20  me and removal.  That there is no logical sort of basis to

21  assume that it was me that was behind it.

22  **Q**    And what about the question about the "preference in the

23  means?  Or do you just want her gone?"

24        What did you interpret that to mean?

25  **A**    Basically whether -- you know, whether I want it to be

1   cruel or whether I want it to be -- you know, whether I want

2   her to be roughed up when she's being arrested.

3        I -- as I said, David sometimes spoke in a language that

4   didn't necessarily ring with me, so I wasn't all that sure what

5   he was saying.  What I was concerned about is that it's not

6   connected to me.  That it be random.  That was important to me.

7            MS. MITCHELL:  Okay.  We can take down this part of

8   the audio.

9        (Document taken off display)

10  BY MS. MITCHELL

11  Q    Now, in the recording -- Agent Rizzo stated on the stand

12  and in the recording, we heard snippets where he tried to talk

13  you out of removing Ms. Chigariro.  Why didn't you take him up

14  on that?

15  A    I did not recall that.

16  Q    Did -- at any point in time, did Agent Rizzo try and say:

17  You don't have to do this?  Are you sure?  This is permanent?

18  Are you sure you want to do this?

19  A    Yes.  Well, absolutely -- I think he asked me about the

20  second option in comparison to the first option, which is that

21  it was permanent.

22  Q    Uh-huh.

23  A    I think he said that: If you open that window, you don't

24  -- you cannot close it.

25  Q    Uh-huh.

1  **A**     Alex used the same language.  Basically, that once the

2  federal government sort of gets involved, it's very difficult

3  to reverse the process.  Once the process begins, there's no

4  way of stopping it.  So I need to be very sure that I want to

5  have Priscilla removed.

6  **Q**     Did Alex try and talk you out of having Priscilla removed?

7  **A**     No, I don't think he had a position on the subject.

8  **Q**     All right.  Now, at the time you concluded the

9  conversation on the 22nd, did you think Ms. Chigariro was going

10 to be murdered?

11 **A**     No.

12 **Q**     Now, why didn't you take the time to sit -- to have a

13 conversation, either on Signal or in person, with Mr. Rizzo to

14 specifically lay out exactly what was going to happen for

15 Ms. Chigariro to be removed?

16 **A**     Well, because I was not very comfortable discussing

17 details with David.  I thought that we didn't have that sort of

18 relationship of trust.  I still didn't know who he was.  After

19 getting his last name from the engagement letter, I did

20 research him.  I could not find any references to him on the

21 internet; I could not find him.  So I was much more comfortable

22 talking to Alex, through Alex.

23       And, you know, we were discussing serious criminal

24 behavior.  So I was not going to really discuss it with David.

25 **Q**     Would you then be -- even though you say you're not

 1  discussing serious criminal behavior with David, were you

 2  engaging in any kind of coded language with the conversations

 3  you were having with him here?

 4  **A**   I wasn't trying to, consciously.  So I cannot say yes or

 5  no.  I would need to look at specific language.

 6  **Q**   Do you believe you were being open and forthright about

 7  your desire to have Ms. Chigariro removed permanently from the

 8  United States?

 9  **A**   I was.

10  **Q**   So I want to move on to your messages on Signal.  When you

11  exchanged Signal messages with Agent Rizzo on Signal, did you

12  intend for Ms. Chigariro to be killed?

13  **A**   No.

14  **Q**   Why did you want to have your conversations on Signal?

15  **A**   It was just one of the platforms we could use.

16  **Q**   I want to show you what's already been admitted as

17  Exhibit 31.

18      (Document displayed)

19  **Q**   Scrolling through Exhibit 31, --

20      (Documents displayed)

21  **Q**   -- did you send this message to Agent Rizzo?

22          **THE WITNESS:**  Do you mind scrolling to the bottom so I

23  can --

24      (Documents displayed)

25          **THE WITNESS:**  I've sent some parts of this message to

GESSEN - DIRECT / MITCHELL

1    David.

2    **BY MS. MITCHELL**

3    **Q**    When you say "some parts," what do you mean by that?

4    **A**    Can you go page by page?

5    **Q**    Sure.

6        (Documents displayed)

7    **A**    So I sent the -- I did not use the word "subject."  I sent

8    the name, date of birth, Zimbabwe national.

9        **MS. MITCHELL:**  Can we go to the next page on

10   Exhibit 31, Page 2.

11       (Document displayed)

12       **THE WITNESS:**  I sent the current address, social media

13   accounts.  Instagram, Facebook, yes.

14       **MS. MITCHELL:**  Scrolling to Exhibit 31, Page 3.

15       (Witness examines document)

16       **THE WITNESS:**  I did not send the affiliated persons.

17   My daughter was three years old at the time.  For some reason

18   here, it says "5."

19       She was not renting from anyone.  She was just staying

20   with a friend.  So she didn't have a landlord.

21       So, the affiliated persons, I did not provide.  I provided

22   the vehicle information.

23   **Q**    So I want to clarify.  Where it says "AFFILIATED PERSONS,"

24   did you in your message to him write the phrase "AFFILIATED

25   PERSONS"?

**GESSEN - DIRECT / MITCHELL**

1  **A**    No, I did not.  So that entire section is not right.

2  O.G.], I think, this is -- what is the --

3  **Q**    Let me clarify.  Did you write in the information,

4  "Current boyfriend" and include in that information?

5  **A**    No.  So the entire section starting with the words

6  "AFFILIATED PERSONS" up to the part that says "VEHICLE," is not

7  me.

8      [O.G.] was eight years old at the time, not -- what date

9  was this message sent?

10  **Q**    I think this was July -- I'm uncertain.  I feel like it

11  might have been July -- sometime before July 16th.

12  **A**    The government did not mention the date?

13  **Q**    No, there's a date; I just don't happen to know it off the

14  top of my head.

15  **A**    Okay.  So I think that it was -- the message was sent some

16  time in early July.  [O.G.] was eight years old.  And [E.G.]

17  was three years old.

18      **MS. MITCHELL:**  And then, scrolling more to Exhibit 31,

19  Page 4.

20      (Document displayed)

21      **THE WITNESS:**  I did not send this section.

22  BY MS. MITCHELL

23  **Q**    Nothing in this section is something that you wrote?

24  **A**    Correct.

25  **Q**    Okay.

1          **MS. MITCHELL:**  Scrolling to Exhibit 31, Page 5.  Oh,

2     this is it.  Okay.

3     **BY MS. MITCHELL**

4     **Q**    So what you attest that you wrote of this exhibit is just

5     the beginning of this exhibit.

6     **A**    Correct.  The information that I promised to provide at

7     the meeting with David.

8     **Q**    I am showing you what has already been admitted as

9     Exhibit 28, Page 11.

10         (Document displayed)

11    **A**    Yes.

12    **Q**    On these messages that were sent on Saturday July 16th and

13    Monday, July 18th, did you write either of these messages?

14    **A**    No.

15    **Q**    Did you send any of this information to Agent Rizzo?

16    **A**    I do not remember sending this information to David.

17    **Q**    Did you ever tell this information to Agent Rizzo?

18    **A**    I might have provided the address in Belmont.  Because I

19    do not remember exactly when -- when I learned that Priscilla

20    will be moving to Belmont.  So I might have provided that.

21         I did not provide the "New information" message.

22         **MS. MITCHELL:**  Okay.  Taking those messages down.

23    **BY MS. MITCHELL**

24    **Q**    I want to talk to you about one message on Signal.  I'm

25    showing you what's been marked as Exhibit 4, Page 11.

GESSEN - DIRECT / MITCHELL

```
 1        (Document displayed)
 2    BY MS. MITCHELL
 3    Q    There is a message there in the middle of the screen
 4    (As read):
 5              "One quick question.  If there are any guests
 6              present do you have any problem with showing
 7              them the exit?  My guys says (sic) we need a
 8              plan for extra guests at the show."
 9         And then you respond:
10              "I am absolutely ambivalent to the modalities
11              and circumstances..."
12         What did you mean in your response to that question?
13    A    Well --
14    Q    And what did you interpret that question to mean?
15    A    My -- the tone of my response is kind of that -- I'm on
16    holiday with kids; why are you bothering me?
17         But the question was very consistent with our earlier
18    conversation, which is that there may be other illegal
19    immigrants present when the raid happens.  And they will be
20    exited, meaning removed from the country.
21         So I read this question to mean exactly what it says.  If
22    there are other guests -- meaning illegals -- that are netted
23    during the raid, do I have a position?
24         Priscilla was staying with a Zimbabwean family; I didn't
25    know their legal status.  Her sister was there.  I don't know
```

1    her legal status.  I expect she was on an expired visa.  So I

2    made some assumptions about who this might be, but basically,

3    as long as it was something that was lawful, then I don't --

4    didn't have a problem with it.

5              MS. MITCHELL:  Let's take down this exhibit.

6         (Document taken off display)

7    BY MS. MITCHELL

8    Q    Now, we have heard some testimony about Mossad.  What do

9    you understand -- who do you understand the Mossad to be; what

10   do you understand the Mossad to be?

11   A    Mossad is an Israeli intelligence agency.

12   Q    Do you have any connections to the Mossad?

13   A    Um, about 15 years ago I worked for a short period of time

14   with the former director of the Mossad.

15   Q    Would you consider the former director of the Mossad to be

16   part of an international crime syndicate or ring?

17   A    Probably not.

18   Q    Have you ever reached out to the Mossad to have something

19   happen to Ms. Chigariro?

20   A    No.

21   Q    Why, then, did you discuss reaching out or talking to the

22   Mossad with Agent Rizzo, about Ms. Chigariro?

23   A    Can you remind me of the context?  Because I don't

24   remember when I first mentioned it.

25   Q    I believe you were speaking about -- there was a

1  conversation regarding $10,000 on a recon- -- recognizance

2  (sic) mission, and it was related to the $220,000 conversation.

3  **A**    Right.  So I was -- as I think I mentioned, a contractor

4  on the factory in Estonia was a company called Mossad Armor.

5  And one of the people I talked to there, about is it possible

6  to just grab Priscilla and bring her out of the United States.

7  So I just referred to it as "Mossad" because it sounded more,

8  you know, like more along what David would say, so I just

9  matched his style a little bit.

10  **Q**    Did you ever spend $10,000 on a recognizance mission

11  related to Priscilla?

12  **A**    No.

13  **Q**    On the day that you were arrested, why did you think you

14  were being arrested?

15  **A**    Earlier that day, I received a message from a friend of

16  mine who was in Madrid, that he just saw Alex Kiselev be

17  arrested in Madrid.  So I was wondering about that.  And when

18  agents came to arrest me, I thought it was in connection to

19  Alex.

20  **Q**    And did you think that it was in connection with regard to

21  money laundering, or another offense?

22  **A**    Um, so I think I mentioned that I supplied Alex 200 sets

23  of vests and helmets.  The total value of that was $160,000.

24  And Alex said that he's going to have the money that can be

25  collected by the suppliers, in Madrid on the 27th -- well, on

**GESSEN - DIRECT / MITCHELL**

1    the day of my arrest, basically.

2        So my friend who came to meet with Alex watched Alex be

3    arrested by somebody in Spain, messaged me and said:  What are

4    you getting me into?  So I did not -- I had -- did know what it

5    was in connection to.  I assumed it was in connection to Alex.

6    **Q**    Now, on the day of your arrest, or at any period of time

7    that we have spoken about, did you ever intend to have

8    Ms. Chigariro killed?

9    **A**    No.

10   **Q**    Did you ever want to have Ms. Chigariro killed?

11   **A**    No.

12           **MS. MITCHELL:**  No further questions.

13           **THE COURT:**  Okay.

14           **MS. HOSSEINI:**  Your Honor, may we approach at sidebar?

15           **THE COURT:**  Yes.

16       (The following proceedings were heard at sidebar)

17           **MS. HOSSEINI:**  So, Your Honor, on direct the defendant

18   said, quote, "I had no illegal purpose whatsoever," end quote,

19   and meeting with the undercover on June 2nd.

20       He also said "I have previously" -- I'm sorry -- "I have

21   not previously bribed government officials.  My knowledge comes

22   from films and newspapers."

23           **THE COURT:**  Yes.

24           **MS. HOSSEINI:**  About how bribery and all of that

25   works.  And he has left the jury with the impression that he

GESSEN - DIRECT / MITCHELL

1  just walked in, his friend Kiselev introduced him to this guy;

2  he thought he was a law enforcement officer.  When, in fact, he

3  met with the other undercover a year prior.

4          THE COURT:  Yes.

5          MS. HOSSEINI:  For a bribery --

6          THE COURT:  .Yes, you want to be able to bring --

7          MS. HOSSEINI:  Yes.  I would like to impeach him with

8  that.

9          THE COURT:  I think that is appropriate.

10          MS. MITCHELL:  Your Honor, I would like to clarify.

11  He then went on to admit that he was willing to bribe this

12  particular immigration officer and, in fact, committed to

13  bribing an immigration officer.

14          THE COURT:  But he also said that he had never bribed

15  an official before.  I think it's relevant if he had discussion

16  about bribing an IRS official.

17          MS. MITCHELL:  However, he never did bribe that IRS

18  official.

19          THE COURT:  That's -- I understand.

20          MS. HOSSEINI:  But he wanted to.

21          THE COURT:  I want that nuance.  I think that it

22  opened the door for it to come in as impeachable.

23          MS. HOSSEINI:  Additionally, Your Honor, they moved,

24  in limine, to make sure no one talked about cocaine.  And then

25  we didn't bring it up, and then he said that she was arrested

1   for drugs.  I objected; Your Honor sustained it.

2          THE COURT:  And I instructed the jury not to consider

3   it.

4          MS. HOSSEINI:  So we're not going to ask about it?

5          THE COURT:  About his drug use?

6          MS. HOSSEINI:  Yeah.

7          THE COURT:  No.

8          MS. HOSSEINI:  Okay.

9          MS. MITCHELL:  I think -- yeah, I think it was a

10  complete error on his part.

11         THE COURT:  I think so, too.  And I instructed the

12  jury.

13         MS. HOSSEINI:  Same thing, they moved in limine that

14  we cannot bring up to buy transportation of the child when he

15  took the kid to Dubai, then when we said this witness is going

16  to be excused so she can fly back to Boston, he is now

17  explaining his version of it.  So the defendant is not some

18  innocent little person who doesn't know; he's a lawyer.

19         THE COURT:  Do you want ask him about Dubai?  What are

20  you -- what are you asking for?

21         MS. HOSSEINI:  It just appears that these are

22  underhanded efforts to keep evidence out of the government's

23  case, and then bring in his version when the witness is no

24  longer available to testify.

25         THE COURT:  Well, it's not that she's not available.

1    You can have her get on a plane and come back tomorrow.  So --

2              MS. HOSSEINI:  That's fine, Your Honor.

3              THE COURT:  The question is --

4              MS. HOSSEINI:  I won't ask about that.

5              THE COURT:  Okay.  If you're asking if you can ask

6    about it, the answer is yes.  They opened the door.  I didn't

7    know what you were -- yes, you can question her about it, if

8    he's talked about it on direct.

9              MS. HOSSEINI:  Okay.

10             MS. MITCHELL:  But I think that the reason why they

11   would want to get into that, he also admitted on direct that he

12   had taken the son out of the country without permission or

13   without first getting Ms. Chigariro's permission do so.  So I

14   don't know what additional information could be solicited that

15   would be different from what he's already provided on direct.

16             THE COURT:  Would be presented, no doubt, in a

17   different way.  He opened the door.  The government's allowed

18   to question about that.

19             MS. HOSSEINI:  All right.  Thank you, Your Honor.

20             THE COURT:  Okay.

21             MS. MITCHELL:  And Your Honor, one thing that we have

22   noticed is Juror No. 5 seems to be falling asleep.  I don't

23   know if --

24             THE COURT:  In the front or in back?

25             MR. RAJU:  He's in the back.  Got the mask on.

 1          **MS. MITCHELL:**  Yeah.  I don't know if the Court wants

 2     to give everyone a stretch break.

 3          **THE COURT:**  Sure.

 4          **MS. MITCHELL:**  Or -- I might have been boring them a

 5     little bit.  But he -- he definitely appears on multiple

 6     occasions to have just nodded off.

 7          **THE COURT:**  Okay, all right, thank you.

 8        (Off-the-Record discussion between counsel)

 9          **THE COURT:**  All right, we will stop at -- what time is

10     it right now?

11          **MS. MITCHELL:**  1:44.

12          **THE COURT:**  We will probably stop at 2:00.  Do you

13     want to start?  Or stop?

14          **MS. HOSSEINI:**  Whatever Your Honor prefers.

15          **THE COURT:**  Why don't we start at 2:00, and go until

16     3:00, and resume tomorrow.

17          **MS. HOSSEINI:**  Okay.

18          **MS. MITCHELL:**  Okay.

19        (Conclusion of sidebar discussion; the following

20     proceedings were held in the presence and hearing of the Jury:)

21          **THE COURT:**  Okay, members of the jury -- sorry about

22     that break.  We were figuring things out.  What we are going to

23     do is take a 15-minute break now, resume at 2:00.  We will stop

24     at 3:00.  So, regardless, we will stop at 3:00.  But let's take

25     a 15-minute break now, we can all wake up, stretch, get some

1  water.  And, yeah.

2       (Jury excused)

3       (The following proceedings were held outside of the

4  presence of the Jury)

5            **THE COURT:**  Okay.  See you at 2:00.

6       You can step down.

7            **THE WITNESS:**  Thank you.

8       (Recess taken from 1:46 p.m. to 2:02 p.m.)

9       (The following proceedings were held in the presence of

10 the Jury)

11           **THE COURT:**  Thank you, members of the jury.

12      Ms. Hosseini, you may proceed.

13                      <u>**CROSS-EXAMINATION**</u>

14 **BY MS. HOSSEINI**

15 **Q**    Good afternoon, Mr. Gessen.

16 **A**    Good afternoon, Ms. Hosseini.

17 **Q**    You're a lawyer?

18 **A**    Sorry?

19 **Q**    You're a lawyer?

20 **A**    I'm licensed, yes.

21 **Q**    You went to law school?

22 **A**    I did.

23 **Q**    University of Connecticut?

24 **A**    Yes.

25 **Q**    You were licensed in 2021?

**GESSEN - CROSS / HOSSEINI**

1    **A**    Yes.

2    **Q**    You practiced law in New York?

3    **A**    Yes.

4    **Q**    Your office was in the World Trade Center Financial

5    Center?

6    **A**    Trade Center.

7    **Q**    On Wall Street?

8    **A**    Yes.

9    **Q**    You were at the firm of Thacher, Proffitt & Wood.

10   **A**    Correct.

11   **Q**    You practiced as a litigation attorney.

12   **A**    Yes.

13   **Q**    And then you joined McKinsey & Company.

14   **A**    Yes.

15   **Q**    Which you considered to be the world's number-one strategy

16   consulting group?

17   **A**    I do.

18   **Q**    You were recruited as a fund manager for non-core assets

19   of the richest person in Europe.

20   **A**    Yes.

21   **Q**    You were then appointed as a CEO in one of his companies.

22   **A**    Yes.

23   **Q**    Which was the fastest-growing supermarket retail chain?

24   **A**    In Ukraine.

25   **Q**    In Ukraine.

GESSEN - CROSS / HOSSEINI

```
 1   A    Yes.

 2   Q    You managed multiple investment funds.

 3   A    Yes.

 4   Q    You managed family offices.

 5   A    Yes.

 6   Q    You did some consulting work on special and sensitive

 7   situations.

 8   A    I did.

 9   Q    Is it fair to say you're very intelligent and an

10   accomplished attorney?

11   A    Sure.

12   Q    And you did consulting work in different parts of the

13   world.  Russia, Ukraine, Africa?

14   A    Yes.

15   Q    On some sensitive matters?

16   A    Yes.

17   Q    You said you were trained in negotiations.

18   A    I did.

19   Q    And that you studied immigration law.

20   A    Yes.

21   Q    You ran several companies as an executive manager.

22   A    Yes.

23   Q    You were on boards of several public companies in Europe.

24   A    Of one public company in Europe.

25   Q    And you worked with several startups?
```

GESSEN - CROSS / HOSSEINI

```
 1  A    Yes.

 2  Q    You know how to manage businesses and operate them.

 3  A    I do.

 4  Q    You worked with many governments in Africa and Eastern

 5  Europe?

 6  A    Mostly in Africa, but yes.

 7  Q    And you know how to structure financial deals so that they

 8  are clean, elegant and sustainable (Indicating quotation

 9  marks)?

10  A    Yes.

11  Q    On June 2nd, 2022, your current base of operations was in

12  Estonia?

13  A    I haven't been in Estonia since 2019, so I was based in

14  Boston, Massachusetts.

15  Q    So your current base of operations was not in Estonia?

16  A    Correct.

17  Q    Okay.

18       MS. HOSSEINI:  Can we pull up Exhibit 5 at one hour,

19  four minutes, 30 seconds, corresponding with Page 34 of

20  Exhibit 6.

21       (Document displayed)

22       MS. HOSSEINI:  If you can pull up the bottom third of

23  the page.

24       (Document enlarged)

25
```

GESSEN - CROSS / HOSSEINI

**BY MS. HOSSEINI**

**Q**    So you told Agent Rizzo on June 2nd that your current base of operations was in Estonia?

**A**    Yes.

**Q**    You had companies there?

**A**    Yes.

**Q**    You had a holding company there?

**A**    Um, yes, I told him, correct.

**Q**    And that you chose Estonia because no one asks questions about Estonian transactions?

**A**    Correct.  To clarify, that means that it has a very high reputation in the banking community, it's -- it's unlike Lithuania, for example.

**Q**    And when you met Agent Rizzo, or who you now know to be Agent Rizzo -- you called him "David" so we can call him "David" -- you said that you thought that he was a law enforcement officer with a three-letter agency?

**A**    Correct.

**Q**    And that he was an investor?

**A**    Correct.

**Q**    And that he was a mobster, a money launderer that was laundering money for drug cartels?

**A**    Well, I think what I testified to is that I was trying to reconcile those three identities into some semblance of logic, yes.

GESSEN - CROSS / HOSSEINI

1    **Q**    And you said that it didn't track, right?

2    **A**    Correct.

3    **Q**    Those three things, in your mind, it didn't track, right?

4         And you were introduced to him by Alex Kiselev?

5    **A**    Yes.

6    **Q**    Who was your friend.

7    **A**    Yes.

8    **Q**    And that even though it didn't track, you continued to

9    talk to him for another two and a half hours.

10   **A**    I did.

11   **Q**    And you started texting back and forth with him on Signal.

12   **A**    I did.

13   **Q**    And then you agreed to meet him again on June 29th, about

14   three weeks later.

15   **A**    On June 22nd.

16   **Q**    I'm sorry, June 22nd, yes, about three weeks later.

17   **A**    Correct.

18   **Q**    Even though you thought he was a law enforcement officer,

19   you didn't go back to Alex Kiselev and say: Hey, your friend's

20   kind of weird; let's not do business with him?

21   **A**    Correct.

22   **Q**    You did not walk away from that.

23   **A**    I did not walk away from that, no.

24   **Q**    You continued to converse with him on Signal and you met

25   with him again on June 22nd?

**GESSEN - CROSS / HOSSEINI**

1   **A**    I did.

2   **Q**    And even though you thought he might be a mobster because

3   he was saying things like "I don't get into the coke but I just

4   handle the money side of it," you did not report to him the

5   FBI, like:  Hey, I was going meet with this legitimate investor

6   and he said all these criminal things.

7        You didn't report him to any law enforcement agency, did

8   you?

9   **A**    Well, yes.  My trying to report things to a legitimate law

10  enforcement agency doesn't work out very well.

11  **Q**    You didn't report him.  Right?

12  **A**    I did not report him, no.

13  **Q**    Okay.  You didn't walk away from him.

14  **A**    I did not walk away from him.

15  **Q**    And he told you:  My clients are badasses (Indicating

16  quotation marks).

17  **A**    He did.

18  **Q**    That he worked for the Columbian cartel.

19  **A**    He did.

20  **Q**    That his clients were in Cartagena (Indicating quotation

21  marks).

22  **A**    Yes.

23  **Q**    And in fact, you testified to this on direct, but he said

24  "My clients don't have fuck-you money, they have fuck-everyone

25  money."

GESSEN - CROSS / HOSSEINI

```
 1    A      Yes.

 2    Q      And you still met with him again.

 3    A      Yes.

 4    Q      And when you met with him on June 2nd, 2022, you said your

 5    intention was to discuss funding.

 6    A      Correct.

 7    Q      For your project.   Right?

 8    A      Correct.

 9    Q      Okay.   And when you were both speaking, he said to you on

10    June 2nd (As read):

11               "So tell me what you want.   There's a blank

12               slate."

13         Right?

14    A      Yes.

15    Q      And you said (As read):

16               "For her to go back to her home country and

17               for the two kids to remain with me in the

18               United States."

19         Right?

20    A      I think very similar to that, yes.

21    Q      You didn't say: I want to talk to you about funding for my

22    project.

23    A      No.

24    Q      Even though that was your intention?

25    A      I think that there was a previous sentence to his
```

**GESSEN - CROSS / HOSSEINI**

1   question, so he said a very -- so we need to put in it context,

2   for my answer to make more sense.

3   **Q**   He asked you:  There's a blank slate; tell me what you

4   want.

5   **A**   But I think the previous sentence before that referred

6   specifically to Priscilla Chigariro.  So he wasn't asking me

7   about my random thoughts; we were discussing a specific topic.

8   And in the context of this topic, I explained to him exactly

9   what I wanted.

10  **Q**   You didn't say: Actually, I came to talk to you about

11  funding.

12  **A**   I didn't, no.

13  **Q**   And then he told you about the deportation scheme?

14  **A**   Yes.

15  **Q**   Okay.  He said it would cost $100,000.

16  **A**   Yes.

17  **Q**   And that the first installment to send a letter to her

18  home would be $25,000.

19  **A**   Correct.

20  **Q**   And you said, quote, "The price is eminently reasonable"

21  (Indicating quotation marks)?

22  **A**   Correct.

23  **Q**   And then a little bit later about the price, you said,

24  quote (As read):

25          "I am 100 percent, it is a perfectly

1              reasonable price that is offered."

2          (Indicating quotation marks)  End quote.  Right?

3    **A**    Correct.

4    **Q**    And today you said that actually, the price was high, and

5    you were just projecting (Indicating quotation marks).  Right?

6    **A**    I'm not sure I used the term "projecting," but maybe.  I

7    was trying to demonstrate a greater amount of wealth than I

8    possessed, yes.

9    **Q**    Did you lie to him?

10   **A**    Yes.

11   **Q**    And he said that he's not pushing you, he's just doing a

12   favor for Alex.  Right?

13   **A**    Correct.

14   **Q**    And then it appeared that his phones, the two phones on

15   the table, were making you uncomfortable.

16   **A**    At some point during the conversation, yes.

17          (Document taken off display)

18   **Q**    And he agreed to move his phones from the table and put

19   them in his pockets (Indicating).

20   **A**    I do not remember that detail, but possibly, yes.

21   **Q**    We heard that on the audio that we listened to a couple

22   times, right?

23   **A**    Right.  It makes sense.  I'm just saying I do not remember

24   exactly how it happened, but that makes a lot of sense, yes.

25   **Q**    And then you talked about how your travel was limited

**GESSEN - CROSS / HOSSEINI**

1   because you had a parental kidnapping case.  Right?

2   **A**   Correct.

3   **Q**   And then you talked about how you went to jail in this

4   parental kidnapping case.  Right?

5   **A**   I did.

6   **Q**   And you also talked about it earlier today.  Right?

7   **A**   Yes.

8   **Q**   You became emotional?

9   **A**   I did.

10  **Q**   It brought tears to your eyes?

11  **A**   Well, it wasn't the case that brought tears to my eyes.

12  It was the children that brought tears to any eyes.  But, I

13  mean --

14  **Q**   Thank you for that.

15  **A**   I did -- the earlier conversation did bring me to tears,

16  correct.

17  **Q**   It appears like it must have been a difficult experience

18  for you.

19  **A**   It was.

20  **Q**   You were handcuffed.

21  **A**   I was.

22  **Q**   You said -- sorry, I did not mean to interrupt you.  You

23  were handcuffed?

24  **A**   Yes.  Sorry.

25  **Q**   And you said you actually urinated on yourself during that

GESSEN - CROSS / HOSSEINI

1   process.

2   **A**   Correct.

3   **Q**   And then, you spent some time in an immigration prison in

4   Canada?

5   **A**   Detention center, yes.

6   **Q**   Detention center.  You were driven to the border?

7   **A**   Yes.

8   **Q**   Handed to the federal marshals?

9   **A**   Yes.

10  **Q**   They handed you to the New York State Police?

11  **A**   Yes.

12  **Q**   And then you eventually made your way to Massachusetts.

13  **A**   Yes.

14  **Q**   During that process, it took about 35 days and two to

15  three jails for you to finally get to Massachusetts.

16  **A**   Yes.

17  **Q**   And earlier today you said that you were not angry about

18  that.  Right?

19  **A**   Yes.

20  **Q**   You said, because anger connotates a level of violence.

21  **A**   Yes.

22  **Q**   And you were not angry.

23  **A**   Well, I think I was trying to define my feelings a bit

24  more precisely.

25  **Q**   Uh-huh.

GESSEN - CROSS / HOSSEINI

1   **A**      It was definitely a mixture of emotions.  And I wasn't --

2   I wasn't -- the emotion that comes to mind first was not -- it

3   was not anger, yes.

4          **MS. HOSSEINI:**  Okay.  Can we please pull up Exhibit 5,

5   52 minutes, 23 seconds, which corresponds to Page 27 of

6   Exhibit 6.

7          (Document displayed)

8          (Portion of audio recording played in open court)

9          **MS. HOSSEINI:**  Mr. Machado, can you pull up the text,

10  one, two, three, four -- fourth line from the bottom, Page 27.

11         (Document displayed)

12         **MS. HOSSEINI:**  Just, fourth line from the bottom.

13  It's not on this one.

14         (Document displayed)

15         (Document enlarged)

16         **MS. HOSSEINI:**  And play that again, please?

17         (Portion of audio recording played in open court)

18         **MS. HOSSEINI:**  Stop there.

19  **BY MS. HOSSEINI**

20  **Q**     So on June 2nd, you said:

21              "...for 35 days in prison, like let's just

22              say I'm a little pissed off..."

23         Right?

24  **A**     Correct.

25  **Q**     You were pissed off on June 2nd.

GESSEN - CROSS / HOSSEINI

1    **A**    Yeah.

2    **Q**    Okay.  And while you were discussing that parental

3    kidnapping case, you talked about how Priscilla was the victim

4    in that case?

5    **A**    Yes.

6    **Q**    And -- the "technical victim," I think you said.  Right?

7    **A**    Right.

8    **Q**    And that she was a witness in that case.

9    **A**    Correct.

10   **Q**    And that there wasn't a deal in that case because the

11   prosecutor would have to talk to her in that case.

12   **A**    Well, I think I'm saying here that the criminal case is

13   finally out the window, so I'm clearly not very worried about

14   it.

15   **Q**    Okay.  All right.

16        **MS. HOSSEINI:**  Well, we can pull up Exhibit 7 -- so

17   it's a different audio file -- at 41 minutes, 58 seconds.

18   Which is Page 4 of the transcript.

19        (Document displayed)

20        **MS. HOSSEINI:**  And this will be about halfway in the

21   middle of the page, Mr. Machado, starting with:

22             "I thought it was all resolved.  It's not

23             resolved?"

24        (Document displayed)

25        (Portion of audio recording played in open court)

1              MS. HOSSEINI:  We can pause there.

2    BY MS. HOSSEINI

3    Q    So at that time, that case was still pending?

4    A    Uh, yes.

5    Q    And then after speaking with David on June 2nd, going back

6    to June 2nd, you discussed his business (Indicating quotation

7    marks).  Right?

8    A    I think I asked him about his business.  About his

9    company.  But he did not respond.

10   Q    And then you did talk about his different sources

11   (Indicating quotation marks).  Right?

12   A    You would need more specific about specific content --

13   Q    Oh, sure.

14            MS. HOSSEINI:  Exhibit 5, 56 minutes 45 seconds,

15   Page 30.

16       (Document displayed)

17            MS. HOSSEINI:  Bottom half of the page.

18       (Document enlarged)

19       (Portion of audio recording played in open court)

20            MS. HOSSEINI:  You can stop there.

21   BY MS. HOSSEINI

22   Q    Is that more specific?

23   A    Very much so.

24   Q    Okay.  So is it fair to say that you were saying if you

25   were going to get involved in his business, and take money,

**GESSEN - CROSS / HOSSEINI**

```
 1   which would be drug money, you would have to -- I believe it's
 2   (As read):
 3              "...if I were to be in any way involved, I
 4              need to pause and think about it first."
 5   A    Correct.
 6   Q    And even today, on the stand earlier, you said that you
 7   weren't sure if you were going to take drug money for the
 8   funding of your factory.  Right?
 9   A    Correct.
10   Q    Yet every time that you talked about Priscilla being
11   removed, you exhibited no hesitation.
12   A    Correct.
13   Q    You said "I'm ready"?  "I'm prepared"?
14   A    Correct.
15   Q    I know you're nodding, but for the record, can you
16   please --
17   A    Right.  So, yes, correct.
18   Q    Thank you.
19   A    Yes.
20   Q    You said:  "I'm ready"?  "I'm prepared"?
21   A    I'm not sure I used exact those words, but I have not
22   hesitated, correct.
23   Q    You did not hesitate at all?
24   A    I did not.
25   Q    And it came up multiple times.
```

GESSEN - CROSS / HOSSEINI

1    **A**     Several times.

2    **Q**     David said: Are you sure you are comfortable with this?

3    Something to that effect?

4    **A**     Uh, yes.

5    **Q**     Okay.  And then later on when you are talking to -- right

6    after you're talking about your travel on June 2nd, still, you

7    said (As read):

8                    "Soo, I mean, incedently (sic), if there was

9                    a cheaper way to get rid of her that would be

10                   good too."

11       And David said:  "Well..."

12       You said:  "It's simply more expensive..."  Right?

13   **A**     That was not the end of the sentence.

14       **MS. HOSSEINI:**  We can pull it up.  Exhibit 5, one

15   hour, 56 minutes, 26 seconds, at Page 63.

16       And it's the bottom half of the page.

17       (Document displayed)

18       (Document enlarged)

19       (Portion of audio recording played in open court)

20       **MS. HOSSEINI:**  You can stop there for now.

21   **BY MS. HOSSEINI**

22   **Q**     So on direct you said that you were asking for a cheaper

23   way, a cheaper deportation option.  Correct?

24   **A**     Correct.

25   **Q**     You just said it's simply more expensive.

GESSEN - CROSS / HOSSEINI

1  **A**    Than I thought.

2  **Q**    But you're asking about a cheaper way.  And then it says

3  it would be "good too."  So that would be a different option,

4  would it not?

5  **A**    In the method, yes.  But in the purpose, no.

6  **Q**    And you're trained in negotiations.

7  **A**    Correct.

8  **Q**    And you stated that the price was eminently reasonable,

9  and that it's a perfectly reasonable price.

10  **A**    Yes.

11  **Q**    Doesn't seem like a lot of trained negotiations, does it?

12       (Reporter clarification)

13  **BY MS. HOSSEINI**

14  **Q**    Doesn't seem like a lot of negotiating, does it?

15  **A**    Um -- well, this would be a very long conversation.  If I

16  can -- okay.  So, in my opinion, we were discussing a

17  $10 million funding deal.  And --

18  **Q**    Actually, we're talking about a cheaper way to get rid of

19  her.

20  **A**    Yes.

21  **Q**    We're not talking about your $10 million deal.

22  **A**    Listen, negotiations have multiple layers.  So you don't

23  always talk directly specifically about the very --

24  Paragraph 2, No. 27, Bullet Point X.  You sometimes talk about

25  personal things.  You build personal bonds.  You introduce

**GESSEN - CROSS / HOSSEINI**

 1   other topics into the conversation that you can discuss as a

 2   sideline to the main business.  So you have -- it's a -- you

 3   don't necessarily negotiate every point and every penny.  You

 4   focus on the bigger picture.

 5       Just like David did, when David said: Look, we're talking

 6   about much bigger things here; I don't want to earn anything

 7   from that $100,000.

 8       So it's me saying that something is eminently reasonable

 9   in the context of a large transaction versus me trying to

10   actually try to save money because I don't have a lot of money,

11   I think that's different conversation.  That is exactly how I

12   conduct negotiations.

13   **Q**   Okay.  So at this point before this conversation, you're

14   talking about travel.  And now you're the one who says:

15           "Soo, uh, I mean, incedently, if there was a

16           cheaper way to get rid of her that would be

17           good too."

18       You have introduced that topic.  Correct?

19   **A**   Yes, I'm saying:  By the way, you know, like, is there a

20   cheaper way to do it.  Correct.

21   **Q**   Okay.  "It's simply more expensive."

22   **A**   Than I expected, yes.

23   **Q**   That's not what it says.

24   **A**   Well, I didn't prepare the transcript.

25   **Q**   You didn't prepare the transcript?  You heard the audio,

GESSEN - CROSS / HOSSEINI

1   though.

2   **A**   I did.  And you can see there's an unintelligible part

3   right there in square brackets.  So it designates that

4   something is not on the transcript that's actually in the tape.

5   **Q**   Okay.  So let's go.  We'll flip the page and go to the

6   audio.

7        Right after that, then you talk about how the issue with

8   immigration is that so many lawyers get involved.  Right?

9   **A**   Correct.

10  **Q**   And you get a bad guy, and she ends up staying.

11  **A**   Yes.

12  **Q**   And that it becomes unpredictable.

13  **A**   Correct.

14  **Q**   And you also said:

15           "You can fight the system for a couple of

16           years and it becomes a pain."

17  **A**   Right.

18  **Q**   And right before that, David said:

19           "Oh, it's a totally different conversation."

20  **A**   Right.

21  **Q**   So now, this different conversation is going to be

22  different because immigration schemes have their problems; it's

23  a pain.  Right?

24  **A**   The immigration scheme, the deportation scheme that we

25  specifically discussed had its pitfalls, yes.

GESSEN - CROSS / HOSSEINI

1   Q     Uh-huh.  And let's talk about what you say right after the

2   cheaper option.

3         Going back to that audio, it's one minute, 57 seconds, and

4   zero seconds -- I'm sorry.  One hour, 57 minutes.

5         Would you like to hear the audio?  Just briefly?  One

6   hour, 57 seconds, and it corresponds to Page 63.

7         (Document displayed)

8         (Portion of audio recording played in open court)

9              MS. HOSSEINI:  Let's stop there.

10  BY MS. HOSSEINI:

11  Q     So on direct examination, you testified that you believed

12  that this was now a more permanent form of deportation --

13  A     Correct.

14  Q     -- that you were discussing.

15  A     Correct.

16  Q     As opposed to, like, regular deportation?

17  A     Well, I referred to it, I think, as "removal".

18  Q     But they're both -- you were talking about immigration

19  still at this point.  But different types of deportations?

20  A     Roughly, yes.

21        (Reporter clarification)

22             THE WITNESS:  Roughly, yes.

23  BY MS. HOSSEINI:

24  Q     And at this point, David had spent some time explaining to

25  you why $100,000 was the cost.  Right?

**GESSEN - CROSS / HOSSEINI**

1   **A**    Correct.

2   **Q**    That it would be a government official who would agree to

3   accept a bribe and risk a lot.  His pension, his life, his

4   family, his career.  Right?

5   **A**    High-level INS employee, close to retirement, I think he

6   put it.

7   **Q**    And that there aren't a lot of those people who are

8   willing to take bribes to deport some random person.  So the

9   price was going to be $100,000.  That's something you had

10  already discussed with David.  Right?

11  **A**    I haven't discussed the number of people who would be

12  taking the bribe to deport someone.  So, no, we haven't

13  discussed it.

14  **Q**    Okay.  So you had not discussed how many officials there

15  might be who would potentially accept that bribe.

16  **A**    No.

17  **Q**    But he did tell you that his guy, the government official,

18  would be risking a lot.  And that's why it was going to be

19  $100,000?

20  **A**    Correct.

21  **Q**    Okay.  And now, for this more permanent deportation, it

22  was going to be half the money?

23  **A**    Correct.

24  **Q**    And that made sense to you?

25  **A**    It did.

**GESSEN - CROSS / HOSSEINI**

1  **Q**    And you are a trained lawyer?

2  **A**    Yes.

3  **Q**    And you studied immigration law?

4  **A**    Right.

5  **Q**    And that this more permanent form would be much easier

6  (Indicating quotation marks)?

7  **A**    Correct.

8  **Q**    And that made sense to you?

9  **A**    It does.

10 **Q**    And this more permanent form would be for cause, you said

11 on direct.  Right?

12 **A**    Probably.

13 **Q**    So it would be cheaper to do more work, for a government

14 official.

15 **A**    The way I understood it, then, a formal deportation

16 process requires multiple steps.  You need to conduct a formal

17 investigation.  You need to have one hearing, another hearing,

18 review.  If -- following that, after coordinating that,

19 requires quite a bit you work, preparing proper filing,

20 prepare -- laying the foundation, preparing the record.  And

21 then justifying the deportation, in order to prepare the letter

22 to depart.

23      If you are going to bribe somebody in the enforcement arm

24 of things where you just pay somebody to basically break the

25 law -- and that's the thing, that in the first part, the idea

1    was to that the law would be followed.  It would be

2    accelerated, but things would be done in accordance with the

3    law.

4         In the second plan, the law would be clearly broken, and

5    somebody would break the law.  But as far as some particular

6    administrator within the INS specifically, you know, following

7    the process for multiple steps, that it would be much easier.

8    That's how he explained it to me.

9         I have never done it, so I do not know if my

10   interpretation is correct.  I am just speculating.

11   **Q**    Okay.  So it would be $100,000 for a government official

12   to follow the process.

13   **A**    Correct.

14   **Q**    But it would be $50,000 for that government official to

15   not follow the law, break the law.  Does that make sense to

16   you?

17   **A**    Not for that government official, but for a very different

18   agency that I was not exactly sure what they were going to do.

19   So it made some sense.  But, as I said, much of it didn't --

20   **Q**    But David never said there was a different guy who would

21   do it for cheaper.

22   **A**    Well, I think originally David said that he has --

23   **Q**    One guy.  My guy.

24   **A**    Well --

25        (Reporter clarification)

1          **THE WITNESS:**  Sorry.

2     **BY MS. HOSSEINI**

3     **Q**    I'm sorry.  Please continue.

4     **A**    In the recording we heard yesterday, David said that he

5     has people at INS and at ICE.  That's what he had told Alex

6     Kiselev.  So I knew that he had contacts at both of those

7     organizations.  That information was passed to me.

8          So I did not know if we were talking about the same guy or

9     a different guy.  It was not clear at that point in the

10    conversation.

11    **Q**    And you didn't ask.

12    **A**    No.

13    **Q**    And it's not on the audio.

14    **A**    No.

15    **Q**    But you said that today.

16    **A**    I said what?

17    **Q**    That that was what you had interpreted, without saying it,

18    right?  That's what you said today.

19         Let me rephrase.

20         So when David said "my guy" --

21    **A**    Right.

22    **Q**    He said:  I don't know what agency it is, it might be INS,

23    or I don't know what they're called.

24         He was talking about the fact that he didn't know exactly

25    which agency it was.  Right?

1          **MS. MITCHELL:**  Objection, calls for speculation.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  Well, we are referring now to a very

4    different part of the conversation.  Correct?

5    **BY MS. HOSSEINI**

6    **Q**    You discussed an immigration official that David knew,

7    with David, on June 2nd.  Right?

8    **A**    In the beginning of the conversation, around half an hour

9    in, he mentioned that he has been working with an immigration

10   official.  And that the price tag was $100,000, yes.  So we did

11   discuss that earlier in the -- about an hour and a half prior.

12   **Q**    Okay.  David never said: I have another guy.

13   **A**    Well, I think he did.  He says he had friends in the north

14   end, or he -- like, I'm not sure -- oh, he said:  I have family

15   in Boston.  So he was clearly referring to some other group of

16   people.

17          And I did not know who those people were, but they were

18   clearly not the same INS agent whom he discussed an hour and a

19   half previously in different context.

20   **Q**    And you didn't ask who those other people are?

21   **A**    I did not.

22   **Q**    And what that option would be?

23   **A**    I did not.

24   **Q**    And how come that having a more permanent removal would

25   cost half as much?

GESSEN - CROSS / HOSSEINI

1    **A**    I did not.

2    **Q**    And how come it would be much easier to do the more

3    permanent removal for cause?

4    **A**    Well, I think I testified earlier that I was going to

5    clarify those issues through the person who introduced us.  I

6    was not very comfortable with David at that point.  I did not

7    really want to pursue that conversation, and to understand much

8    more.  I just wanted to put it in pause, talk to Alex,

9    understand what is going on, who I'm talking to, and then

10   continue if I'm comfortable.

11   **Q**    And then, did you continue?  Were you comfortable?

12   **A**    I did.  We continued in June 20 -- well, I think that

13   after speaking to Alex, I confirmed to David via Signal.  I

14   think it was the day or two days after the meeting, I sent to

15   him that I just wanted to confirm -- I'm sending this very

16   formal SMS -- sorry, a very formal Signal message to David

17   saying that I'm comfortable with both options.

18        I sent that message to David, after understanding better

19   what we're talking about.

20   **Q**    But you never asked David how come it's cheaper to do more

21   work?

22   **A**    I thought it was less work, not more work.

23   **Q**    So removing someone for cause versus just removing them is

24   less work?

25   **A**    Well, let me give you a hypothetical, if I may.

**GESSEN - CROSS / HOSSEINI**

1  Q    Well, you could just answer the question.

2  A    Well, I can't, because I don't have information you're

3  asking.  So I'm -- I'm purely speculating, and I'm --

4  Q    Okay.  Did you ask David about the details of the plan,

5  and how come this new plan was cheaper?

6  A    I did not.

7  Q    Okay.  And at that point, David had also explained the

8  timeframe that it would take.  He said about six months.

9  Right?

10 A    At what time?

11 Q    The timeframe for the initial deportation plan that you

12 and him were discussing at the beginning of June 2nd, 2022.

13 A    Correct.

14 Q    So for $100,000, it would be about six months?

15 A    Correct.

16 Q    But then for $50,000, it was going to be fast and quick?

17 A    Right.

18 Q    And that made sense to you?

19 A    Yes.

20 Q    As you are discussing this new plan with David, he asked

21 you if you can provide locations.  Right?

22      (Document taken off display)

23 A    Well, he asked for some -- I'm not sure he said the word

24 "locations" but he asked for information, yes.

25 Q    And you said that you will provide locations and

1  schedules.  Right?

2  **A**     Probably.  I mean, I definitely did.  I'm just not sure

3  exactly if the flow of the conversation is exactly the same,

4  but yes.

5  **Q**     If you would like to listen to the audio, I'm happy to

6  play it for you.

7  **A**     No, I'm just -- it's easier to work with a transcript to

8  the extent -- to the extent we are going to be referring to

9  specific points.

10 **Q**     Oh, sure.  Yeah, that would be easier.

11            **MS. HOSSEINI:**  Exhibit 5, hour one, 58 minutes,

12 30 seconds.  Page 65.

13       (Document displayed)

14       (Portion of audio recording played in open court)

15            **MS. HOSSEINI:**  We can pause there.

16 **BY MS. HOSSEINI**

17 **Q**     So you offered schedules in addition to locations.  Right?

18 **A**     Once, yes, about the children, yes.

19 **Q**     And you said:

20            "I will do the full RECON for you."

21 **A**     Yes.

22 **Q**     Even though you are paying $50,000 for someone else to

23 handle this.

24 **A**     Yes.

25 **Q**     I mean, you could have just passed the name and date of

GESSEN - CROSS / HOSSEINI

1   birth of the person you wanted deported, could you not?

2   **A**   I could have.  But he asked the locations, and therefore,

3   he needed support.

4   **Q**   And you didn't say:  Look, I'm paying $50,000; why can't I

5   just give you a name and date of birth and you handle it?

6   **A**   I didn't say that.

7   **Q**   And then David said:

8        "You have to be sure this is what you want."

9        Right?

10  **A**   Um, at some point, yes.

11  **Q**   And you said:

12       "I'm sure."

13  **A**   Yes.

14  **Q**   And you said:

15       "We just shifted gears."

16       Right?

17  **A**   Right.

18  **Q**   And then you talked about communicating safely (Indicating

19  quotation marks).

20  **A**   Yes.

21       (Document taken off display)

22  **Q**   And that:  None of the words we talk about here can end up

23  on Signal (Indicating quotation marks).

24  **A**   Correct.

25  **Q**   But you said earlier that you didn't think you guys needed

GESSEN - CROSS / HOSSEINI

1   to speak in code?

2   **A**   Verbally, no.

3   **Q**   And then David says, as you were speaking, that (As read):

4           "Sometimes -- I hate to say it, but sometimes

5           they dig their own fucking grave."

6       (Indicating quotation marks)

7   **A**   Yes.

8   **Q**   I'm sorry?

9   **A**   Yes.

10  **Q**   Okay.  And then you talk about having gone to jail.

11          "She put me in fucking jail."

12      (Indicating quotation marks)  Is that right?

13  **A**   I would need to check the sequence, but --

14  **Q**   Oh, sure.

15          MS. HOSSEINI:  Let's pull that up.  Exhibit 5, two

16  hours, two minutes, 20 seconds, Page 68, top half of the page.

17      (Document displayed)

18      (Portion of audio recording played in open court)

19          MS. HOSSEINI:  You can stop there.

20  **BY MS. HOSSEINI**

21  **Q**   So after David said "Sometimes they dig their own fucking

22  grave," you said "Truly, I have been so bothered," and then you

23  talk a little bit about how -- fighting part of organized crime

24  insurance fraud.  And then you said:

25          "She put me in fucking jail?"

GESSEN - CROSS / HOSSEINI

1        Right?

2   **A**    I think that the transcript very loosely corresponds with

3   the recording, but -- so, but the parts you are quoting, I

4   think -- I did say she put me in jail.  Yes.  I did say that

5   part.

6   **Q**    Right.  You didn't say: Actually, things are civil now,

7   like you did earlier today.  That by June of 2022, the

8   relationship between you and Priscilla was civil (Indicating

9   quotation marks).

10  **A**    No, I would not say that right at that point.

11  **Q**    Not at that time.  But just today, right?

12  **A**    Correct.

13  **Q**    Uh-huh.  And earlier you said that Alex has government

14  contacts, and that's how you were introduced to David, through

15  Alex.  Right?

16  **A**    Correct.

17  **Q**    Then why did you say "If Alex was there we wouldn't have

18  had this conversation" (Indicating quotation marks)?

19  **A**    Because during this conversation, I have commented on

20  Alex's lack of reliability, if given money.  And I would not

21  have mentioned that if Alex were present.

22  **Q**    What does that have to do with this conversation

23  (Indicating quotation marks)?  Because at this point you are

24  talking about this new scheme (Indicating quotation marks).

25  Right?

1  **A**    No, I was -- we were just -- actually, this was at the

2  conclusion of the meeting.  And I was referring to the entire

3  conversation, to the entire meeting that we had.

4  **Q**    Actually, this is after you said you shifted gears

5  (Indicating quotation marks).

6         **MS. HOSSEINI:**  We could pull it up.  Exhibit 5, two

7  hours, five minutes, 50 seconds.  Page 70.

8      (Document displayed)

9  **BY MS. HOSSEINI**

10 **Q**    And for your reference, "We shifted gears" was on Page 66.

11          "Yeah, I wish Alex would have been here on

12          time."

13     Is what David said, top of Page 70.

14     And then you said:

15          "Well then we wouldn't have had this

16     conversation."

17     Right?

18 **A**    Yes.  But when David says he wishes Alex were here, he is

19 not talking about the removal scheme.  He's talking about our

20 meeting in Florida.  So he is the one who changes the subject,

21 because there was no -- it was -- he was just making general

22 comment about the fact that we expected to meet, the three of

23 us, rather than the two of us.

24 **Q**    That's confusing to me.  Because then the next topic --

25 the next sentence that you say is (As read):

**GESSEN - CROSS / HOSSEINI**

1              "I'm somewhat pissed off because he mentioned

2              a number several times in the past and that

3              number was never passed to me."

4    **A**    Right.

5    **Q**    The number of the payment.

6    **A**    Right.

7    **Q**    And Alex was going to pay for the bribery scheme, in the

8    beginning.

9    **A**    Well, I didn't know he was going to pay for it.  I --

10   **Q**    That's what you said.

11   **A**    When?

12   **Q**    Earlier.

13   **A**    I said he was going to handle it.  I didn't think -- I

14   didn't say he was going to pay it.

15   **Q**    Oh, there's a difference between handling the payment and

16   making the payment?

17   **A**    The way Alex explained it to me the first time, when we

18   were first discussing the entire deportation scheme, I asked

19   Alex if there's a payment due.  And Alex said: No, don't worry

20   about it.

21        And I said:  Are you sure?

22        He was like:  No, no, don't worry.  Like this guy wants a

23   promotion.  I'm going to call this guy, and he's going to call

24   that guy, and they're going to -- like, basically:  Don't worry

25   about it; it's handled.

1    So he never mentioned to me there was going to be a bribe

2    involved, but he said that he was going to return a favor, you

3    know, pull some strings.  I'm not sure exactly.  But it was --

4    he was explaining that it would be -- it was a favor for a

5    favor, and that's what it was going to work.

6        But this conversation that is here, he says:

7            "I wish Alex were here."

8    I was like:

9            "Well, then we wouldn't have the conversation that

10   we had."

11       And then I'm moving on to the topic entirely unrelated to

12   what we were discussing 30 seconds prior.

13   **Q**    Let's go what you talk about after that.

14       **MS. HOSSEINI:**  This is at two hours, 11 minutes,

15   17 seconds, Page 72.

16   **BY MS. HOSSEINI**

17   **Q**    And just to put it in context, at this point you have

18   shown David a picture of your kids.  Right?

19       (Document displayed)

20   **A**    I did show him the picture of my kids, yes.

21   **Q**    Okay.  And David said -- and David said (As read):

22           "How do we protect the kids?  I mean, they're

23           too young.  How do we protect the kids?

24           They're going to lose their mother, right?

25           She's fucking gone, how do we protect the

GESSEN - CROSS / HOSSEINI

```
 1            kids?"

 2   A    Is the transcript part of the record?  Or should we refer

 3   to --

 4   Q    Do you remember him saying that?

 5   A    I did not remember this conversation --

 6   Q    Oh, you don't.  Oh, I'm sorry.

 7   A    -- precisely, so yes.

 8            MS. HOSSEINI:  Let's play the audio, two hours,

 9   11 minutes, 17 seconds.

10        (Portion of audio recording played in open court)

11        (Document displayed)

12            MS. HOSSEINI:  Back up like ten seconds.

13        (Portion of audio recording played in open court)

14            MS. HOSSEINI:  You can stop there.

15   BY MS. HOSSEINI

16   Q    You heard the audio?

17   A    Yes.

18   Q    Okay.  He asked you (As read):

19            "How are we going to protect the kids?"

20   A    Yes.

21   Q            "They're too young."

22   A    Yes.

23   Q            "How are we going to protect the kids?  They're.

24             going to lose their mother, right?"

25   A    Right.
```

1  Q        "She's fucking gone.  How do we protect the kids?"

2  A    So David used the same exact language, "She's gone, she's

3  fucking gone," around half an hour into our meeting on

4  June 2nd, exactly the same words while we're discussing the

5  deportation scheme.  David uses very aggressive language

6  throughout.  "Gone, she's fucking gone" is the way he talks.

7       So I didn't see anything here that was particularly

8  troubling.  It was very consistent with the way he was

9  describing the previous situation and the previous deportation

10  scheme.

11       I responded that [O.G.] wants her gone.  [O.G.] was very

12  stressed out about -- during that period.  I actually do not --

13  I do not hear what I'm saying about [E.G.].  He says she won't

14  remember, but I do not -- I do not hear what I say about

15  [E.G.].  So I'm not exactly sure what I said.  But --

16  Q    But at this point, you testified earlier that [E.G.] has

17  only grown up with Priscilla.

18  A    Correct.

19  Q    Correct.  And, in fact, you said that's the only parent

20  she knows.

21  A    Yes.

22  Q    And Priscilla and [E.G.] were not in the United States

23  when you and [O.G.] were in the United States.

24  A    Not for the entire time, right.

25  Q    Right.  They lived in Zimbabwe for part of that time?

GESSEN - CROSS / HOSSEINI

```
1    A      Yes.

2    Q      And in Russia for part of that time.  Right?

3    A      Correct.

4    Q      And you also said that you wanted to be reunited with your

5    children at any cost.

6    A      Oh, I testified that, right.

7    Q      Right.  And then your lawyer helped you and said: Oh --

8           MS. MITCHELL:  Objection.

9           MS. HOSSEINI:  I'll rephrase.

10   BY MS. HOSSEINI

11   Q    And then your lawyer said:  When you said at "any cost,"

12   did that mean murder?

13          And you said:  At any reasonable cost.  Right?

14   A    Right.

15   Q    So to have Priscilla deported from the United States was

16   reasonable?

17   A    No.

18   Q    To have [E.G.] separated from the only parent that she

19   knew was reasonable?

20   A    No.

21   Q    To have Priscilla kidnapped and removed from the United

22   States by some person or group was reasonable?

23   A    No.

24   Q    And you also said that you were not happy after that

25   June 2nd meeting.
```

1   A    Yes.

2           MS. HOSSEINI:  If we can go to Exhibit 3, Page 2.

3       (Document displayed)

4           MS. HOSSEINI:   The bottom of that page, the gray box

5    at the very bottom.

6       (Document displayed)

7    BY MS. HOSSEINI

8    Q    The next day you said (As read):

9               "Thank you for a great meeting and

10              confidence.  We speak the same language.

11              That's rare."

12   A    Yes.

13   Q    You said that to David, right?

14   A    I did.

15   Q    Were you portraying something (Indicating quotation

16   marks)?

17   A    I was being polite.

18   Q    And then you met with him on June 22nd?

19   A    I did.

20   Q    Out of politeness?

21   A    No, because we needed to continue to discuss the factory

22   funding which he confirmed prior to that.

23   Q    I'm sorry, I did not hear you.

24   A    Because we needed to continue to discuss the factory

25   funding that he had confirmed.  He was prepared to move

1    forward, so it was important that we close that deal.

2    **Q**    But you started your June 22nd meeting talking about

3    Priscilla, right?

4    **A**    I believe David introduced the topic.

5    **Q**    You started complaining about her and how she had called

6    [O.G.] and it was your time to be with [O.G.].  Is that not

7    right?

8    **A**    Yes, now that you remind me that when I sat down to lunch

9    with David, I started having SMS messages coming in.  It was

10   Priscilla messaging me about scheduling the evening call with

11   [O.G.] for that evening.  And that was during my parenting

12   time.

13        She called him in the morning.  He was in a great mood.

14   Then like his mood did not go -- like, it went down after their

15   conversation, and he said he didn't want to talk.  So she said

16   "I'm going to call you tonight."

17        And she and I started messaging.  I said, you know, can

18   you please, you know, maybe not call tonight; let him take

19   initiative.

20        So we were having this -- you know, one of those small

21   disputes that, as I mentioned earlier, we had.  And it was

22   continuing when I sat down with David at lunch, so I needed to

23   explain to him why I was busy.  I think that part of that

24   conversation with Priscilla was still on my phone.

25   **Q**    And it was during this June 22nd meeting that you guys

1  started talking about how this new scheme needed to appear

2  random (Indicating quotation marks).  Right?

3  **A**    Yes.

4  **Q**    Okay.  So they were going to do a deportation raid on a

5  bunch of people.

6  **A**    Correct.

7  **Q**    And make it look random.

8  **A**    Um, well, the very fact that there would be several people

9  would, in itself, make it look random.

10 **Q**    But there's no talk on the audio of several other

11 immigration raids, is there?

12 **A**    Well, there is no specific talk on the audio at all.

13 **Q**    I guess I'm just struggling with that a little bit,

14 because deportations are typically pretty targeted and not

15 random.  Right?

16 **A**    Uh, no.

17 **Q**    They're not?

18 **A**    Well, so, for example, if local police raid a party

19 because they suspect an illegal activity going on, and there

20 are several people at the party that happen to be illegal

21 immigrants, those people would be handed over to -- to ICE,

22 possibly for enforcement if there is a file open for their

23 deportation.

24       And then, though no one specifically was targeted, several

25 people got netted during that raid, it is random.  It is not

GESSEN - CROSS / HOSSEINI

1    related to a specific deportation target.  It makes sense.

2        So it's not targeted, in a sense.  It may involve local

3    law enforcement, it may involve federal law enforcement.  It

4    may involve a raid on someplace that is not Priscilla's

5    residence, where -- you know, where somebody is for a visit and

6    there is a party there.

7        So anything that makes it seem like the specific law

8    enforcement action is not connected to a specific person makes

9    it seem random.

10   Q    Okay.  But Priscilla wasn't an illegal immigrant, right?

11   A    She was.

12   Q    She was?

13   A    Well, her visa has expired, so --

14   Q    She applied for a renewal application of that visa, did

15   she not?

16   A    I did not know that.

17   Q    Uh-huh.  She came to the United States through legitimate

18   means.  Right?

19   A    Uh, define "legitimate."

20   Q    She came to the United States through the State

21   Department, based on her pending Hague application, correct?

22   A    Well, would a fraudulent visa application constitute a

23   legitimate basis in your opinion?

24   Q    You tell me.  You're the one who studied immigration law.

25   A    And my testimony was that she was not in the United States

**GESSEN - CROSS / HOSSEINI**

1   on a legitimate basis.

2   **Q**    Even though she came to the United States through the

3   State Department, to testify in court for an international

4   court hearing.

5   **A**    Well, if you mislead the State Department or apply to stay

6   under false pretenses, then State Department is an instrument

7   in an illegal scheme, yes.

8   **Q**    So which is it?  That she had an expired visa or that she

9   misled the State Department?

10  **A**    Both.

11  **Q**    But she renewed her visa application, so that's out.

12  **A**    I do not -- well, you are testifying to that, I am not.

13  **Q**    I'm asking you if you knew whether she renewed her visa

14  application.

15  **A**    But I already testified I did not know.

16  **Q**    But you said on June 29th that she had won the green card

17  lottery.

18  **A**    On June 22nd.

19  **Q**    I'm sorry.  I don't know why I keep messing that up.

20  You're correct.  I apologize.  On June 22nd.

21  **A**    Right.

22  **Q**    You said she had won the green card lottery.

23  **A**    Correct.  And --

24  **Q**    So she would have some kind of green card.  Some kind of

25  adjustment of status in the United States.  Right?

**GESSEN - CROSS / HOSSEINI**

1  **A**      No.  Winning the green card lottery provides basis to

2  apply for change of status potentially, which may be granted

3  within the following 24 months or so.  So --

4  **Q**      Precisely.  So she's not an illegal immigrant.

5  **A**      Typically, you need to exit the United States if your

6  current visa has expired, reapply for a green card, and reenter

7  the United States legally with the new status.

8      So to the extent that she has overstayed her visa at that

9  time, she was an illegal immigrant.

10 **Q**      You are saying you assumed she overstayed her visa because

11 you didn't know that she had actually applied for a renewal of

12 her visa?

13 **A**      Well, I -- the visa I knew about, I knew when it expired

14 because it's six months from the date of arrival.  I did not

15 have a lot of insight into, you know, updated status, yes.

16 **Q**      But even the fact that she had won the green card lottery,

17 you just said that gave her a basis to continue her immigration

18 process.  Right?

19 **A**      To apply from outside the United States.

20 **Q**      Okay.  And deportation is a process, is it not?

21 **A**      Legally, yes.

22 **Q**      They have to serve you with notice?

23 **A**      That is exactly the plan that was -- that was the $100,000

24 plan, yes.

25 **Q**      You get a hearing?

GESSEN - CROSS / HOSSEINI

```
 1    A     Yes.
 2          (Reporter clarification)
 3    BY MS. HOSSEINI
 4    Q     You get a hearing?  Right, Mr. Gessen?
 5    A     Correct.
 6    Q     And you go before an immigration judge?
 7    A     Um, yes.
 8    Q     And there's a determination made as to whether you should
 9    be deported or not?
10    A     Correct.
11    Q     And then the government has to confirm that the country
12    that you're supposed to be deported to will accept you or not.
13    A     Not if you're a citizen of that country.
14    Q     But they have to make sure you are a citizen of a specific
15    country.  Right?
16    A     Not if they have your passport from that country.
17    Q     And they have to fingerprint you before they deport you?
18    A     That part, I do not know.
19    Q     You studied immigration law.
20    A     Um, well, I think the teach has shifted from the
21    deportation proceeding to the removal proceeding.  So the --
22    the fingerprinting would take place afterwards.
23          But I think also there is a -- well, I studied immigration
24    law 25 years ago, so don't -- don't hold me to it.  I may be
25    mistaken.
```

1   **Q**    I thought you said you studied immigration law when you

2   were in Canadian jail.

3   **A**    Yes, but not the part about the fingerprinting.

4   **Q**    Okay.

5            **THE COURT:**  Ms. Hosseini, is this a good time to stop?

6            **MS. HOSSEINI:**  Yes.

7            **THE COURT:**  Let's talk about where we are.

8        Members of the jury, we will start tomorrow at 8:30.  I

9   can't tell you if you're going to get the case, if there'll be

10  closing arguments tomorrow or not.  If we don't give you the

11  case, as we said, we would end at 1:30, without lunch tomorrow.

12   If we do get you the case, it's up to the jury.

13       You can still decide to leave at 1:30, or you can decide

14  to stay.  If we do stay here, we have ordered we'll have lunch

15  for you.  But if we don't finish, then you leave; we may still

16  have lunch.  I don't know.

17       Anyway, I hope that's not too confusing.  We'll see you

18  tomorrow at 8:30.  As always, though, please.  No discussion of

19  the case with anyone, whatsoever, or any independent research.

20       Thank you.

21       (Jury excused)

22       (The following proceedings were held outside of the

23  presence of the Jury)

24           **THE COURT:**  So do we have any idea, I mean, about

25  schedule?

PROCEEDINGS

 1              MS. HOSSEINI:  Um --

 2              THE COURT:  It's okay.  I mean, whatever it is, it is.

 3    He was on the stand a long time.  I understand.

 4              MS. HOSSEINI:  Yeah, Your Honor.  He went from like

 5    8:30 to 2:00.  So I think -- I'm not good at guessing these,

 6    but I would say maybe an hour.

 7              THE COURT:  Yeah.  Okay.  All right.

 8       Do you have any other witnesses?

 9              MS. MITCHELL:  I don't believe we'll have any other

10    witnesses.

11              THE COURT:  All right.

12              MS. MITCHELL:  So I do think that we should be able to

13    close tomorrow.

14              THE COURT:  Okay.

15              MS. MITCHELL:  I can get the Court and government

16    counsel our other proposed instruction hopefully within the

17    next two hours, so that everyone can have a chance to review

18    it.

19              MS. HOSSEINI:  Thank you.

20              THE COURT:  Okay.  And you don't anticipate having a

21    rebuttal?  Any rebuttal witnesses.

22              MS. HOSSEINI:  We will have one, very briefly.  Maybe

23    five minutes, Your Honor.

24              THE COURT:  Okay, great.  We'll see you tomorrow

25    morning.  Thank you very much.

1        **THE WITNESS:**  Your Honor, may I ask a question?

2        **THE COURT:**  No, not of me.

3        **THE WITNESS:**  Okay.  It was about --

4        **THE COURT:**  Sorry, but you can't.

5        **THE WITNESS:**  It was whether I could talk to my

6   counsel.  That is my question.

7        **THE COURT:**  Oh.  Mrs. Mitchell, Mr. Gessen would like

8   to speak with you.

9        **MS. MITCHELL:**  So long as it's not the subject of the

10  testimony, yes.

11       **THE COURT:**  Yeah.  You can't talk about it.

12     We're off the record.

13     (Proceedings concluded)

<u>**I N D E X**</u>

Thursday, May 4, 2023 - Volume 4

|  | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| The Government rests | 563 | 4 |

| <u>**DEFENDANT'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**GESSEN, ALLEN**</u> | | |
| (SWORN) | 563 | 4 |
| Direct Examination by Ms. Mitchell | 563 | 4 |
| Cross-Examination by Ms. Hosseini | 711 | 4 |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 30 | | 588 | 4 |
| 127 | | 683 | 4 |

<u>**CERTIFICATE OF REPORTER**</u>

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Saturday, June 17, 2023