Volume 5

Pages 760 - 950

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, JUDGE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
  VS.                          )   No. 22-cr-276-JSC
                               )
ALLEN GESSEN,                  )
                               )
            Defendant.         )   San Francisco, California
_____)

                                   Friday, May 5, 2023


                   **TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:          ISMAIL J. RAMSEY
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                   BY:  **ILHAM A. HOSSEINI**
                        **ALEXIS JAMES**
                        **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:          JODIE LINKER
                        Federal Public Defender
                        450 Golden Gate Avenue
                        Room 19-6884, Box 36106
                        San Francisco, California  94102
                   BY:  **CANDIS MITCHELL**
                        **KARTHIK RAJU**
                        **DEPUTY FEDERAL PUBLIC DEFENDERS**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

1   **Friday, May 5, 2023**                                        **8:28 a.m.**

2                      **P R O C E E D I N G S**

3                              -oOo-

4      (The following proceedings were held outside of the

5   presence of the Jury)

6          **THE COURTROOM DEPUTY:**  Remain seated and come to

7   order.

8          **THE COURT:**  Good morning.  The jury is all here, very

9   timely jury.

10     I reviewed the defense instruction.  I'm not prepared to

11  discuss it right now, but maybe we can discuss it when we

12  conclude with the evidence.

13     Before I instruct we'll take a break, and we will figure

14  it out then.  Does that make sense?

15         **MS. HOSSEINI:**  Yes, Your Honor.

16         **MS. MITCHELL:**  Thank Your Honor.

17         **THE COURT:**  Is there anything else to discuss?

18         **MS. MITCHELL:**  I don't believe so.

19         **THE COURT:**  All right.  Oh, do you want to have

20  Mr. Gessen take the stand, and we will bring the jury in.

21     (The following proceedings were held in the presence of

22  the Jury)

23         **THE COURT:**  Good morning, members of the jury.  You

24  may be seated.  And I just want to thank you and commend you

25  for being so timely all week.

1    All right.  We are now going to resume with the

2    cross-examination of Mr. Gessen.

3              **ALLEN GESSEN, DEFENDANT, RECALLED**

4              **CROSS-EXAMINATION RESUMED**

5    **BY MS. HOSSEINI**

6    **Q**    Good morning, Mr. Gessen.

7    **A**    Good morning, Ms. Hosseini.

8    **Q**    Yesterday you talked about when you were researching your

9    sources for $220,000, it was just a joke.  Right?

10   **A**    It wasn't a joke.  I think that, um, what -- well, it

11   wasn't research.  It was sort of a conversation that was -- I

12   was emotional, I was talking to a good friend, and I was

13   definitely not -- I was definitely not joking, I was thinking

14   out loud, but kind of it didn't go further than that.

15   **Q**    Okay.

16             **MS. HOSSEINI:**  So I'm going to ask to put on the

17   document reader the official transcript from yesterday's

18   proceedings.

19             **THE COURT:**  Any objection?

20             **MS. MITCHELL:**  Um, I -- I believe that the government

21   could impeach Mr. Gessen if that's the intention to do so

22   without showing the jury the transcript, as it would contain

23   other information not particularly related to the question

24   that's being asked.

25             **MS. HOSSEINI:**  Just that portion.

1          THE COURT:  She just wants to show that portion.

2          MS. MITCHELL:  So long as it would just be

3     specifically related to that portion.  Otherwise I would argue

4     that it would be improper impeachment.

5          MS. HOSSEINI:  I can show Ms. Mitchell the question,

6     Your Honor.

7          THE COURT:  Okay.

8          MS. HOSSEINI:  All right.

9        (Off-the-Record discussion between counsel)

10         THE COURT:  Okay, you may go ahead.

11         MS. HOSSEINI:  Thank you, Your Honor.

12     I need the document reader, please.

13         THE COURTROOM DEPUTY:  I don't think it's on because

14    the light is not -- I think up there.

15       (A pause in the proceedings)

16         THE COURT:  You can just read it.

17         MS. HOSSEINI:  Sure.

18    BY MS. HOSSEINI

19    Q    So there was a question from Ms. Mitchell and it said

20    (As read):

21              "So when you are talking about researching

22              your sources and the lowest price was

23              $220 and there was one for the Israelis in

24              Eastern Europe and Italy, what are you

25              referring to here?

1          "**ANSWER:**  So back in February when I came --

2          just returned from Canada and New York, I was

3          complaining to one of my Israeli friends

4          about not being able to see the kids, and

5          being able (sic) to talk to the kids, and I

6          was miserable.  So I made a joke, I think,

7          more than anything."

8    **A**    I think that the next sentence there is that I made a joke

9    that:  You Israelis are well known for transporting people from

10   country to country.  Israelis transported Nazi war criminals,

11   so -- obviously we were not in that space.  And then I

12   continued with a non-joke which was the following, which was

13   the continuation of the question.

14        So yes, the "joke" refers to:  You Israelis transport

15   people from place to place.  I don't recall -- if you just

16   continue reading, we will hear what I said.  I don't need to

17   recall it.

18   **Q**    The question was when you're researching your sources and

19   the price was 220 --

20        (Reporter clarification)

21   **BY MS. HOSSEINI**

22   **Q**    The question was (As read):

23          "And so when you are talking about

24          researching your sources, and the lowest

25          price was 220, and there was one for the

1                     Israelis and Eastern Europe and Italy, what

2                     are you referring to here?"

3           Your answer was that you:

4                     "...back in February when I came -- just

5                     returned from Canada and New York, I was

6                     complaining to one of my Israeli friends

7                     about not being able to see the kids and not

8                     being able to talk to the kids, and I was

9                     miserable.  So I made a joke, I think, more

10                    than anything."

11     A    What is the question?

12     Q    The question that I asked you earlier was that when you

13     were researching your sources for the lowest price of 220, was

14     that a joke?  You said no.  And then I read this (Indicating).

15          Was it a joke or was it not a joke?

16     A    The part about Israelis transporting people from country

17     to country was a joke.  Me asking the question if it was

18     possible to remove Priscilla from the United States was not a

19     joke.

20     Q    And then on that topic, you said yesterday that you didn't

21     pay Mossad guys for recon, $10,000 for recon.  Is that right?

22     A    Correct.

23     Q    That it was in fact a ballistics company in Israel called

24     "Mossad Armor."  Correct?

25     A    I said I was speaking with a friend who was affiliated

1    with Mossad Armor.  I think that was my testimony.  I did not

2    say that Mossad Armor is Mossad.

3    **Q**    Right.  So you said that you -- you did not pay $10,000 to

4    any Israeli or Mossad-related group to do recon.  Is that

5    right?

6    **A**    Correct.

7    **Q**    Okay.  So no payment of $10,000 for recon on Priscilla?

8    **A**    No.  To no one in Israel, to -- no Mossad, no Mossad

9    Armor, no $10,000.  Correct.

10         **MS. HOSSEINI:**  Okay.  Now, if we can please go to

11   Exhibit 7, at 51 minutes and 23 seconds.  And this will be Page

12   8 of the transcript.  The bottom of Page 8, and going on to the

13   top of Page 9.

14        (Document displayed)

15        (Portion of audio recording played in open court)

16         **MS. HOSSEINI:**  You can stop there.

17   BY MS. HOSSEINI

18   **Q**    So did you just hear that last clip of the audio?

19   **A**    I did.

20   **Q**    Where David said "So 220 grand, did that include that you

21   pay them ten grand that you come out for reconnaissance," and

22   your answer was "Yeah"?

23   **A**    I did not hear my answer, to be honest, in the recording.

24   I can only see it in the transcript.

25   **Q**    Looking at the context of the transcript, doesn't it look

GESSEN - CROSS / HOSSEINI

1  like you said "Yeah"?

2  **A**   Um --

3  **Q**   But you didn't say:  No, what are you talking about?

4  **A**   Do you want me to testify to the contents of the

5  transcript or do you want me to testify to what was said in the

6  conversation?

7  **Q**   What did you say in that conversation?

8  **A**   I do not recall exactly.  But I could not confirm paying

9  $10,000 if I did not pay $10,000.

10  **Q**   Okay.  So then he goes on to say:

11          "Those guys are good but they're not 220

12          grand good."

13      And you say:

14          "I think it is a question of risk management

15          as long as..."

16      Doesn't that appear like you agreed to the fact that you

17  did pay them, you're explaining why it's so expensive, because

18  it's an issue of risk management?

19  **A**   We haven't played that part of the audio.  I'm not sure

20  that I would make that inference that you are making, no.

21  **Q**   Okay.

22          **MS. HOSSEINI:**  Let's play the audio.  Can we just

23  resume playing that?  Back up five seconds, please.

24          (Portion of audio recording played in open court)

25          **MS. HOSSEINI:**  We can stop there.

GESSEN - CROSS / HOSSEINI

1    BY MS. HOSSEINI

2    Q    Did you hear that part?

3    A    Well, I hear David very well.  I do not hear myself very

4    well.

5    Q    You did not hear yourself saying "I think it's the

6    question of risk management"?

7    A    Yes, I did hear that.

8    Q    Okay.  Yesterday you also testified to the fact that you

9    lived in cultures where payments like are bribes were

10   essentially facilitation (Indicating quotation marks).  And

11   those were normal.  Right?

12   A    In some countries they are more common, yes.

13   Q    All right.  You are a lawyer in the United States, right?

14   A    I am.

15   Q    And you immigrated to the United States in 1990.  Right?

16   A    Yes.

17   Q    That is about 33 years ago.

18   A    Correct.

19   Q    You went to law school in the United States?

20   A    I did.

21   Q    Practiced law in New York?

22   A    Yes.

23   Q    You know American culture and American laws.

24   A    I haven't lived in the United States for close to 15

25   years.  So most of my professional development has been outside

1  of the United States.  But if you would like me to concede that

2  facilitation payments are not as common in America as they are

3  in Russia, I will agree with that.

4  Q    And as a lawyer, did you know that bribery was illegal?

5  A    Under the Foreign Corrupt Practices Act, facilitation

6  payments are not illegal; bribery is illegal.  So I know that

7  facilitation payments and bribery are treated differently under

8  the Foreign Corrupt Practices Act, which applies to American

9  lawyers practicing or working outside of the United States.

10  Q    The FCPA, the Foreign Corrupt Practices Act, applies to

11  foreign companies -- I mean, applies to conduct in foreign

12  countries.  Correct?

13  A    Correct.

14  Q    You here were talking about deporting Priscilla through an

15  American official, correct?

16  A    I thought I was answering the question for my experience

17  of bribery outside of the United States.  But, here, I was

18  talking about a facilitation payment to an American government

19  official, yes.

20  Q    It has nothing to do with the Foreign Corrupt Practices

21  Act.

22  A    I thought I was talking about other countries.  If I

23  answered the wrong question, I'm sorry.

24  Q    I just want to make sure my question is clear.  And if my

25  question is not clear, I'll try to be more clear.

**GESSEN - CROSS / HOSSEINI**

1    Yesterday you also said that you sent that engagement

2    letter which is Government's Exhibit 12 as a sneaky way

3    (Indicating quotation marks) to get David's last name.  Right?

4    **A**    Yes.

5    **Q**    Why didn't you just ask him "What's your last name?"

6    **A**    Um, I think it would be awkward.

7    **Q**    "Hey, we are going to do some deals together; what's your

8    last name?"

9    **A**    This is the type of information that a person typically

10   volunteers if they wanted it known, so I felt more comfortable

11   being less direct.

12         **MS. HOSSEINI:**  Can we please pull up Exhibit 3 at

13   Page 3.

14    (Document displayed)

15   **BY MS. HOSSEINI**

16   **Q**    Looking at this message -- looking at this message, at the

17   bottom of the page, you said (As read):

18              "Good evening, David.  As discussed, I am

19              drafting the letter of engagement and need to

20              confirm the spelling of your name:  David..."

21    And then there's a last name, question mark.

22    So at that point you already had his last name before you

23   sent the engagement letter.  Didn't you?

24   **A**    I think I asked him on the bus when we were -- on June

25   2nd, maybe to enter the contact.  I do not remember exactly

1    when I asked.  I asked in connection with the engagement

2    letter, and I'm confirming the spelling here.

3         But whether I asked for the first time on Signal or

4    whether I asked for the first time in a conversation, there is

5    roughly -- on June 2nd --

6    **Q**    Hold on.

7    **A**    Sorry.

8    **Q**    I just want to make sure I'm clear.  Yesterday you

9    testified --

10   **A**    Right.

11   **Q**    -- that you sent him the engagement letter because it was

12   a sneaky way to get his last name, correct?

13   **A**    No, I testified that I have proposed to prepare an

14   engagement letter as a way of asking for his last name.

15   Whether I asked him in a conversation or in Signal, I do not

16   believe I testified that yesterday.

17   **Q**    I just asked you the same question a few questions ago.

18   And you said yes.  And now that I've shown you this text

19   (Indicating) the answer has changed.

20   **A**    The question you asked me was whether I have proposed to

21   prepare the engagement letter as a means of getting his name.

22   And then you said:  Why didn't you just ask him "What is your

23   last name," and I --

24   **Q**    Because it would be awkward.

25   **A**    Yes.  So I used it as an excuse using the agreement

1    letter.  Whether I did it in person or in writing, I do not

2    recall.  So I -- I found a reason, an excuse to ask for the

3    last name.

4    **Q**    Was it awkward?

5    **A**    No, it was very comfortable.

6    **Q**    Then why did you need to send him an engagement letter?

7    **A**    Because I undertook during the meeting that I will prepare

8    an engagement letter, so I was following through with that.

9    **Q**    So you had his last name.

10   **A**    After asking for it, yes.

11   **Q**    And then, and then --

12           **MS. HOSSEINI:**  Let's scroll down to the next page,

13   Mr. Machado.

14       (Document displayed)

15   **BY MS. HOSSEINI**

16   **Q**    And then after that --

17           **MS. HOSSEINI:**  Keep scrolling, please.

18       (Document displayed)

19   **BY MS. HOSSEINI**

20   **Q**    Then you send him an engagement letter.  So the engagement

21   letter was not a sneaky way (Indicating quotation marks) to get

22   David's last name, because you already had it.  Right?

23   **A**    What do you mean?

24   **Q**    The engagement letter was not a sneaky way (Indicating

25   quotation marks) to get David's last name because you already

GESSEN - CROSS / HOSSEINI

1    had David's last name.

2    **A**    Um, I am afraid that we are talking in circles.

3         So at some point between the end of the transcript and

4    June 2nd, and this message, I had to get David's last name.  So

5    I -- probably I said at the meeting, I said:  What's your last

6    name for the engagement letter, da, da, da, drafted it down,

7    and reconfirm it in Signal, after which I inserted it into the

8    engagement letter because -- and send it to him after

9    confirming him his last name.  Um --

10   **Q**    I just asked you, why didn't you ask him what his last

11   name was.  You said it would be awkward.

12   **A**    Yes.

13   **Q**    Now you are saying you did ask him his last name after --

14   **A**    In context of the engagement letter.

15   **Q**    Please continue.

16   **A**    Sorry.

17   **Q**    That's okay.  Go ahead.

18   **A**    I don't see the inconsistency in my testimony, but I'm not

19   sure where I'm failing to explain myself.

20   **Q**    That's okay.  We'll move on.

21        In 2019, you took your son from Russia to the United

22   States without telling Priscilla.  Correct?

23   **A**    Without asking for her permission, yes.

24   **Q**    You are not disputing that, right?

25   **A**    No.

**GESSEN - CROSS / HOSSEINI**

1   **Q**   And you said yesterday that your goal was not to keep

2   Priscilla and your son apart.   Is that right?

3   **A**   Correct.

4   **Q**   You did know that she had no way to come to the United

5   States, because of her immigration status.

6   **A**   Um, Priscilla flew to Zimbabwe on June 18, to apply for

7   the U.S. visa -- actually to renew her U.S. visa because she

8   has had a U.S. visa several times.   So she flew to Zimbabwe to

9   obtain a U.S. visa, so I knew that she was supposed to obtain a

10  u.S. visa.

11  **Q**   Then why didn't you just tell her?

12  **A**   Tell her what?

13  **Q**   Then why didn't you just tell her that you were going to

14  the United States with your son, if you knew she was coming?

15  **A**   I wrote to her in WhatsApp messages that I'm leaving.   Oh,

16  you mean why did -- why did I not consult with her before

17  leaving.

18  **Q**   Right.   The plan was that both of you were going to come

19  to the United States together?

20  **A**   Correct.

21  **Q**   Why didn't you tell her?

22  **A**   So we were having significant disputes involving -- in the

23  Moscow apartment.   It was important to vacate it because the

24  lease was expiring.   Priscilla did not want to vacate the

25  apartment.   Also had disputes about whether we should all wait

1  for [E.G.]'s documents so we could travel together versus

2  whether [O.G.] should go ahead so that he could go to school

3  and get therapy.

4      So rather than have another confrontation and another big

5  argument possibly involving the kids, I made a decision to

6  travel in advance, to avoid a fight, basically.

7  **Q**   So there was not a plan to go to the United States

8  together because you would be fighting over it?

9  **A**   There was a plan to go the United States.  There was not a

10  plan to go to -- a specific date.  The plan was to arrive in

11  the United States, to be here together, once [E.G.]'s documents

12  were completed.

13  **Q**   So if she went to go get a U.S. passport in Zimbabwe --

14  **A**   Visa.

15  **Q**   Sorry, U.S. visa.  Thank you.

16  **A**   Right.

17  **Q**   How come it took her two years to come to the United

18  States after the State Department had to facilitate it for her

19  Hague Convention hearing?

20  **A**   Well, there were two factors.  First, it was the delay in

21  obtaining [E.G.]'s documents between June when we left and

22  November of 2019.  Then after Priscilla arrived --

23  **Q**   And you knew that, right?  So you knew that when you left

24  Russia on June 23, 2019, with your son, Priscilla could not

25  come to the United States, first, because she did not have a

1   U.S. visa, and second, because your daughter could not leave

2   Russia.  You knew that.

3   **A**    Yes.  We both testified to that in our Hague Convention

4   hearings, that we expected [E.G]'s documents to be ready in a

5   few weeks, so the delay until November was unexpected.  I knew

6   she could not go right away, yes.  Absolutely.

7   **Q**    Okay.

8   **A**    So, but we both assumed it would be a few weeks'

9   separation.

10       (Reporter clarification)

11           **THE DEFENDANT:**  We both assumed it would be a

12   separation of a few weeks.  "A separation of a few weeks" would

13   be a better --

14   **BY MS. HOSSEINI**

15   **Q**    But you had [E.G.]'s birth record, didn't you?

16   **A**    I did.

17   **Q**    How was she going to leave Russia in a few weeks' time

18   when you had [E.G.]'s birth record?

19   **A**    Well, when the court documents finally came out, and our

20   petition to register [E.G.] as our daughter, I immediately flew

21   to Moscow with all the birth records.  And I intended to

22   participate in the registration process.

23       From the time the court order is issued in Russia until

24   the time it comes into force, it's a 30-day period during which

25   the court order -- during which you can file an appeal.

GESSEN - CROSS / HOSSEINI

1      So the court order was granted I think at the very end of

2  September.  It came into force at the very end of October.  I

3  was in Moscow on the day it came into force.  And we came to

4  the registrar's office together, with all the documents to

5  register [E.G.]

6  **Q**   And on that trip, you did not take your son to Russia so

7  that he could see his mom, did you?

8  **A**   I did not.

9  **Q**   Uh-huh.  You took a five-year-old child from his mother,

10 and you went from Russia to the United States.

11 **A**   Right.

12 **Q**   Without telling the mother.

13 **A**   Yes.

14 **Q**   Knowing that the mother cannot leave because she doesn't

15 have a U.S. visa and her daughter's birth record is not with

16 her.

17 **A**   Correct.

18 **Q**   And then you flew back.  After she asked you that she

19 wanted to see her son, you went back to Russia, but you didn't

20 take your son to visit his mother, did you?

21 **A**   I was flying for two days.  [O.G.] at the time was six

22 years old, and Priscilla finally was able to travel.  So

23 everybody assumed that she would be in the United States within

24 a couple of weeks.  So dragging a six-year-old back and forth

25 from the United States to Moscow for a two-day trip did not

1    seem like a good idea, no.

2        Maybe it was not the right decision, but that's the

3    decision I made, yes.

4    Q    You mentioned the texts earlier between you and Priscilla.

5    Let me ask you a few questions about those.

6        She texted you "What have you just done?" when she

7    realized that you were leaving Russia, correct?

8            **MS. MITCHELL:**  Objection, testifying as to documents

9    not in evidence.

10           **THE COURT:**  Overruled.

11   **BY MS. HOSSEINI**

12   Q    You can answer.

13   A    Um, well, she asked me -- I'm not sure what she was

14   referring to.  I think -- there was two things that happened.

15       One thing that happened was that I moved all the furniture

16   except for Priscilla's personal things and jewelry into

17   storage.  And then I left with [O.G.].  So there were kind of

18   two things going on that were a shock to Priscilla.  In that

19   particular sentence, I don't know which she refers to.  Both

20   were shocking.

21   Q    Okay.  So then your response to that was "We are going on

22   a trip."

23   A    Um, possibly.

24   Q    Then she texted you later saying "Please don't do this.

25   He is my child too."  And you texted back "Please trust me."

GESSEN - CROSS / HOSSEINI

1   **A**    Yes, I recall that.

2   **Q**    You still didn't take your son back to visit his mother

3   when you went to Russia, right?

4   **A**    No.  And I traveled to Russia twice, actually, like I

5   think I testified yesterday, both in August and November.  And

6   I did not bring him, no.

7   **Q**    Neither time.  Not in August and not in November.

8   **A**    Correct.

9   **Q**    And in that recording we heard with David Rizzo, at some

10  point towards the end of your meeting with him on June 2nd, you

11  said that [O.G.] hates Priscilla with a passion.  Do you

12  remember saying that?

13  **A**    I do.  That refers to a much later period, though.

14  **Q**    Because in this text thread, you texted her "He loves you

15  amazingly."

16  **A**    He did.

17        **MS. MITCHELL:**  Objection.  Again, she is referring to

18  text messages that Mr. Gessen has no ability to see or comment

19  on --

20        **THE COURT:**  He can answer if he remembers, and he says

21  he does.  Overruled.

22        **THE DEFENDANT:**  Yes.  At that time, he cared for her

23  very much and loved her very much, yes.

24  **BY MS. HOSSEINI**

25  **Q**    You still didn't take him to go visit his mother in

**GESSEN - CROSS / HOSSEINI**

1  August, nor in November.

2  **A**   Correct.

3  **Q**   Even though he loved his mother amazingly (Indicating

4  quotation marks).

5  **A**   Yes.

6  **Q**   And again, when you went from the United States to Canada

7  in the end of 2021, yesterday you said your goal was not to

8  keep them apart.  Is that right?

9  **A**   Correct.

10  **Q**   And you knew that Priscilla's immigration status was in a

11  pending posture in the United States in 2021.  Right?

12  **A**   I knew that -- can you clarify the question?

13  **Q**   What did you believe was Priscilla's immigration status at

14  the end of 2021?

15  **A**   I knew that her U.S. visa was expiring within the

16  following few weeks and that she was planning to return to

17  Zimbabwe.

18  **Q**   So you knew that she would not be able to easily travel in

19  and out of Canada, right?

20  **A**   Um, in Canada for just a few days for a quick ski trip, so

21  not going to remain in Canada.

22  **Q**   I thought yesterday you said you had a flight to London,

23  and that is when the law enforcement encountered you before you

24  could board the flight to London.

25  **A**   I did.  But that means we were not going to remain in

1  Canada.

2  **Q**   She could not travel to Canada or London if she has a

3  pending visa application.  Correct?

4  **A**   I did not know she had a pending visa application

5  anywhere.

6  **Q**   Did you know that her immigration status was such that she

7  could not easily travel in and out of the United States?

8  **A**   Uh, correct, yes.

9  **Q**   And yesterday you said you went to Canada because you said

10  you wanted to show your son snow.  Right?

11  **A**   Uh no, to spend time in the snow.  He had seen snow many

12  times.  He lived in Russia for three years, so --

13  **Q**   Was there no snow in New York, Vermont, Maine,

14  Massachusetts?

15       **MS. MITCHELL:**  Objection.

16       **THE COURT:**  Overruled.

17       **THE DEFENDANT:**  There is snow in New York and

18  Massachusetts, yes.

19  **BY MS. HOSSEINI**

20  **Q**   But going across the border traps Priscilla in a situation

21  where she can't cross the border, does it not?

22  **A**   It does.

23       **MS. MITCHELL:**  Objection.

24       **THE COURT:**  Overruled.

25

GESSEN - CROSS / HOSSEINI

1   BY MS. HOSSEINI

2   Q    You may answer.

3   A    It does.  I'm sorry; I did answer it.

4   Q    And yesterday you testified that by June of 2022, the

5   issues between you and Priscilla had resolved.  Is that right?

6   A    For the most part, yes.

7   Q    And that things were civil (Indicating quotation marks).

8   Right?

9   A    Yes.

10  Q    And that the disagreements were truly minor (Indicating

11  quotation marks).  Is that right?

12  A    Yes.

13  Q    Like, if you're late, or "Where's the T-shirt," were the

14  examples you gave.  Right?

15  A    Right.  I think I might have mentioned that we had one

16  dispute about trying to update [E.G.]'s birth certificate in

17  Zimbabwe.  I'm not sure if I mentioned yesterday.  But that's

18  one of the more significant issues we had.

19  Q    Okay.  But isn't it true that on June 2nd, you said she

20  was making your life miserable (Indicating quotation marks)?

21  A    I might have said that.

22  Q    And that:  I have been so bothered (Indicating quotation

23  marks)?

24  A    I might have said that as well.

25  Q    And this was in the context of the conversation where you

**GESSEN - CROSS / HOSSEINI**

1  said "She put me in fucking jail."  (Indicating quotation

2  marks)

3  **A**    She did, yes.  I felt -- I felt that way.

4  **Q**    And later you said this situation was your biggest

5  impediment (Indicating quotation marks).

6  **A**    Uh, yes.

7  **Q**    So it was not as civil and resolved as you said yesterday?

8  **A**    Well, I didn't testify that I liked Priscilla in June of

9  2022.  I said we were civil and we didn't have conflicts.  I

10  didn't -- I didn't testify that -- I thought she was a great

11  person.  I think, like, towards me and our relationship, it was

12  a tense relationship, it always has been.  But we were civil,

13  we were polite, we did not have arguments.  So I felt it was

14  civil.

15      You know, it was at least -- I don't think Priscilla likes

16  me very much either.

17  **Q**    I think there's a difference between resolved, civil, and

18  truly minor disagreements like being late, and "Where's the

19  T-shirt," and making someone's life miserable, being the

20  biggest impediment in their life.  Do you not think so?

21  **A**    In terms of biggest impediment, I did not remember the

22  exact context.  So, if you could refer to a quote.  I'm not

23  sure.  The biggest impediment to what?

24  **Q**    Sure.

25          **MS. HOSSEINI:**  Exhibit 7, hour 1, 47 minutes, 30

1    seconds.  Page 34.

2         (Portion of audio recording played in open court)

3         **MS. HOSSEINI:**  Again, that was hour 1, 47 minutes and

4    30 seconds.  Page -- starting with "Basically" in the middle of

5    the page.

6         (Document displayed)

7         (Portion of audio recording played in open court)

8         **MS. HOSSEINI:**  We can stop.

9    **BY MS. HOSSEINI**

10   **Q**    Did you hear yourself say "biggest impediment"?

11   **A**    Yes.  And I'm referring to my U.S. passport was

12   surrendered to the authorities.  While -- during the pendency

13   of the case I could not travel outside of the United States for

14   work.  So the "biggest impediment" does not refer to Priscilla.

15   The "biggest impediment" refers to the pending criminal charge

16   of parental kidnapping in Massachusetts.

17   **Q**    And you blamed her for that pending criminal charge,

18   didn't you?  Because she's the one who put you in fucking jail

19   (Indicating quotation marks).

20   **A**    If that's your testimony, I guess, yes.

21   **Q**    I'm sorry, I didn't hear that.

22   **A**    If that -- if that is your testimony, then yes.

23   **Q**    It's not my testimony.  My job is to just ask questions.

24   It is your testimony.

25   **A**    Okay.  I didn't quite connect the dots that way, but I did

**GESSEN - CROSS / HOSSEINI**

1  feel that Priscilla was responsible for filing the complaint

2  with the family court and alleging parental kidnapping.  I was

3  not happy about that.  That case was an impediment to my

4  travel, and my ability to work and make a living.

5  **Q**   Let's talk about that case.  I think yesterday you said

6  that it was unfair (Indicating quotation marks) that she caused

7  you to go to jail.  Right?

8  **A**   Probably.

9  **Q**   And this is now the second time that you have taken your

10  son across international borders.  And she reported it to law

11  enforcement.

12  **A**   The third time.

13  **Q**   The third time.  Okay.  Once was from Russia to the United

14  States?

15  **A**   Russia to Dubai was the first time.

16  **Q**   Oh, Russia to Dubai was the first time.  Second time was

17  Russia to the United States?

18  **A**   Yes.

19  **Q**   And the third time is United States to Canada?

20  **A**   Correct.

21  **Q**   And after you did this the third time, she reported it to

22  law enforcement.  She went to a police station and said "My son

23  is not in school; I think the father may have taken him"?

24  **A**   She reported it to law enforcement all three times.

25  **Q**   Okay.  And then she got a court order.

**GESSEN - CROSS / HOSSEINI**

1    **A**    In -- in Massachusetts she first got the family court

2    order, and then reported me to the authorities.  That was the

3    difference between this and the prior cases.

4    **Q**    And you thought this was unfair.

5    **A**    Yes.

6    **Q**    Okay.  But your cause was just.

7          **MS. HOSSEINI:**  Exhibit 4 at Page 13, please.

8          (Image displayed)

9          **MS. HOSSEINI:**  The bottom of the page, please.

10   **BY MS. HOSSEINI**

11   **Q**    "Our cause is just."  Do you see that?

12   **A**    I do.

13   **Q**    That was one of the deleted text you sent to David Rizzo?

14   **A**    Yes.

15   **Q**    At the very end?

16   **A**    Uh-huh.

17   **Q**    So your trying to deport Priscilla from the United States

18   to Zimbabwe is just (Indicating quotation marks)?

19   **A**    In retrospect, having time to reflect, it was definitely a

20   bad decision.  I -- in my mind, I justified myself and my

21   actions, that in fact that would be the best for the children,

22   yes.

23   **Q**    At that time, you believed your cause was just (Indicating

24   quotation marks).

25   **A**    Correct.

**GESSEN - CROSS / HOSSEINI**

1  **Q**   Yet you thought when you took your son across

2  international borders for the third time and she went to the

3  police and the court, that was unfair.

4  **A**   I thought what was unfair was going to the court in

5  Massachusetts, and lying to the court in many respects to

6  obtain *ex parte* order for full custody.

7      When I traveled three times across international borders,

8  all three times I did not break laws.  I may have not made the

9  right decisions, but --

10  **Q**   Did she break laws by going to the police department and

11  reporting it?

12  **A**   No.

13  **Q**   So going to the police and to the court is unfair, but

14  bribing an official to deport her is just?

15  **A**   Obstruction of justice is not legal.  So going to -- going

16  to bribe an immigration official is not legal.  None of it is

17  really fair or just.  You're right.

18  **Q**   Okay.  You also said yesterday that you felt that she

19  abused the system (Indicating quotation marks)?

20  **A**   Yes.

21  **Q**   When she reported it to law enforcement --

22  **A**   No.

23  **Q**   When you went from the United States to Canada?

24  **A**   When she went to the family court.

25  **Q**   Oh, when she went to the family court, that was abusing

**GESSEN - CROSS / HOSSEINI**

1  the system (Indicating quotation marks).

2  **A**    I consider obstruction of justice abuse of the system,

3  yes.

4  **Q**    So going to a court to lawfully report that her child had

5  been taken across international borders for the third time is

6  abusing the system?

7  **A**    No, perjury is abusing the system.

8  **Q**    I'm sorry?

9  **A**    Perjury -- sorry, sorry.  Let me do this.

10    Perjury is abusing the system.

11  **Q**    You weren't there.  How do you know -- so now you're

12  telling us she perjured herself?

13  **A**    Well, I had all the court records because I'm the

14  defendant in a criminal case in Massachusetts, so obviously I

15  looked through all the testimony and affidavits that was

16  submitted by Priscilla and her attorney after I left for

17  Canada.  It contains many, many lies, unfortunately.  And so

18  yes, that is perjury.  These are sworn affidavits; they were

19  incorrect.

20    And on the basis of those sworn affidavits, the court was

21  just so shocked by the alleged conduct that they granted a very

22  unusual *ex parte* order granting Priscilla full custody.

23  **Q**    Okay, so let's talk about that.

24  **A**    I can --

25  **Q**    Sorry?

**GESSEN - CROSS / HOSSEINI**

1    **A**    I can enumerate the list of all the inaccuracies from

2    those affidavits if you need me to.

3    **Q**    No.  Let's talk about the conduct that you just brought

4    up.  The conduct here is for the third time you took your son

5    across international borders.

6    **A**    Correct.

7    **Q**    The conduct is that she then reported it to the police

8    department, Concord, Massachusetts Police Department.  Correct?

9    **A**    Uh, no.

10   **Q**    We didn't hear from a detective a few days ago talking

11   about how she went to the police station and reported it?

12   **A**    If Priscilla simply reported to the police department

13   because I did not break any laws at the time of my departure,

14   nothing would have happened.

15       So first she went to the family court and obtained an *ex*

16   *parte* custody order.  And she then reported it to the police.

17   I think that it's important that the order of events is clear,

18   and not try to skip a step.

19   **Q**    Okay.  So when she went to the family court to get a court

20   order, she told them that you took [O.G.] from the United

21   States to Canada.

22   **A**    No.

23   **Q**    You had not taken him from United States to Canada?

24   **A**    That is not what she told the court.

25   **Q**    Were you there?

1  **A**    Well, I was not in Canada at the time.  At the time she

2  went to court, I was still in the United States, in New York.

3  **Q**    So you're traveling to Canada, but she has no idea where

4  you are, does she?

5  **A**    Well, she told the court that she had no idea where I was,

6  although she did know where I was.

7  **Q**    She found out that [O.G.] was not in school.  Correct?

8  **A**    Correct.

9  **Q**    And she did not know where you were.

10 **A**    She did.  I think she testified that she received an email

11 from me that updated her where I was.  So I'm not sure why she

12 -- why you are misstating her testimony.

13 **Q**    Let's talk about when she found out.  Okay?  When you

14 talked to Detective Young.  He asked you, "Where are you?"

15       You said "Out of the country."  Right?

16 **A**    Yes.  That was about a week after we left.

17 **Q**    That was about a week after.  And at that point he also

18 asked you "Which country?"

19       You said "I would rather not say."

20 **A**    I did not recall that conversation the same way.  I cannot

21 really testify to what Detective Young's recollection of that

22 conversation is.

23 **Q**    I'm just asking you about your recollection.  Did you tell

24 Detective Young which country you were in?

25 **A**    Well, there was no reason to conceal it.  I was posting on

1  Facebook that I was in Canada, so I was not trying to hide from

2  the authorities.  Priscilla knew I was in Canada, Facebook knew

3  I was in Canada.  So it's pretty easy to find out.

4  **Q**    So you still think she abused the system when you took her

5  son across international borders for the third time?

6  **A**    When I took my son to Canada without her permission, I did

7  perhaps something that was wrong.  Priscilla lying to the Court

8  is abusing the system.

9       I'm not blaming Priscilla for my departure.  I'm totally

10 responsible for that part. I did and I have admitted this

11 several times.  Taking my child out of the country, without her

12 permission, several times, yes.  Out of several countries.

13 **Q**    You think bribing a government official to deport her is

14 abusing the system (Indicating quotation marks)?

15 **A**    Yes.

16 **Q**    And that parental kidnapping case, that created problems

17 for you, did it not?

18 **A**    Well, I was put in jail for over a month and then I could

19 not travel for work, so yes, it created problems.

20 **Q**    It limited your travel?

21 **A**    Yes.

22 **Q**    And it also gave Priscilla custody.  Right?

23 **A**    Uh, no.

24        **MS. HOSSEINI:**  Can we pull up Exhibit 30, please.

25        **THE DEFENDANT:**  And I can clarify the custody was

1    given to Priscilla prior to the criminal case, so the criminal

2    case did not create the custody issue.  Just, the order of

3    events is different.

4    BY MS. HOSSEINI

5    Q    Okay, let's just look at it so we're clear.

6         (Document displayed)

7    Q    This is the court order, right?

8    A    Yes.

9            MS. HOSSEINI:  Can we just blow up the 1, 2, 3, 4?

10        (Document enlarged)

11           MS. HOSSEINI:  Thank you.

12   BY MS. HOSSEINI

13   Q    So then you were required to surrender your son's passport

14   to the Court.  Right?  Under No. 1?

15   A    Yes.

16   Q    And Priscilla was going to have sole legal and physical

17   custody of your son.  Right?

18   A    Yes.

19   Q    And that he would be placed on the no-fly list.

20   A    Yes.

21   Q    So it also limited his travel.  Correct?

22   A    Yes.

23   Q    And that neither party shall remove the child from the

24   Commonwealth of Massachusetts without a court order.

25        So it also limited travel in the United States.  Correct?

1    **A**    Correct.

2    **Q**    Okay.

3    **A**    This order was issued on December 21st, 2021.

4    **Q**    Uh-huh.

5    **A**    Right.  So my criminal case I think was launched on the

6    28th of December, just so we're clear on the dates.

7    **Q**    But this court order (Indicating) was issued after

8    Priscilla went to court saying "I don't know where my son is; I

9    think the father took him."  Right?

10   **A**    Yes.

11   **Q**    Okay.  And after that, I think you said you had to have

12   supervised visits with your children?

13   **A**    A couple months later, yes.

14   **Q**    You didn't have the same access to your children as you

15   had before the parental kidnapping case and this court order.

16   Right?

17   **A**    Um, I think that the -- if we could be more precise in

18   definitions.  I did not have the same access to the children

19   after the issuance of this order.  Not after the parental

20   kidnapping case.

21       The criminal case had minimal impact, except for my arrest

22   and inability to travel.  The family court order had impact on

23   my ability to see the children.

24       So it's just -- um, I think it's easier to be clear.  Each

25   of the legal acts has different legal consequences.

**GESSEN - CROSS / HOSSEINI**

1    Q    Sure.  That's a great point.  Thank you for that

2    clarification.

3         The access to the children was limited as a result of the

4    court order.

5    A    Correct.

6    Q    And the court order was entered because Priscilla went to

7    court and said "My son's not in school; I don't know where he

8    is; the farther may have taken him."

9    A    Correct.

10   Q    Okay.  So this is because of what Priscilla did that you

11   went to court.  The court order.

12   A    Um, yes.

13   Q    Okay.  And yesterday you said that you did not want to

14   take revenge on Priscilla.  Correct?

15   A    Correct.

16   Q    And that murder would be revenge, and you did not want to

17   have her murdered.

18   A    I did not want to have her murdered, correct.

19   Q    So deportation is not revenge?

20   A    Um, it depends on the motivation, I guess, of a person.

21   It could be both as revenge or it could be to act in the best

22   interest of the children.  Priscilla's deportation -- Priscilla

23   was not the -- how to say -- the primary reason I was doing

24   what I was doing.

25   Q    The end goal would be to take Priscilla out of your life,

GESSEN - CROSS / HOSSEINI

1    would it not?

2    **A**    To take Priscilla out of the United States, correct.

3    **Q**    And you would have access to the children.

4    **A**    I would have custody of the children.  Correct.

5    **Q**    In fact, you said that on one of those recordings, right?

6    **A**    What, exactly?

7    **Q**    You said if -- you said in Massachusetts, if one parent

8    gets deported, the other one gets sole custody.

9    **A**    Correct.

10   **Q**    Okay.  Yesterday you also testified about how you were

11   using the company Geewiz to conceal the fact that you were

12   planning Priscilla's deportation?

13        (Document taken off display)

14   **A**    To kind of conceal the connection between me and her

15   deportation, yes.

16   **Q**    And was it just the deportation?  Or the kidnapping?

17   **A**    The removal, I think I used the word.

18   **Q**    Removal (Indicating quotation marks)?

19   **A**    "Kidnapping" is a new term I haven't used yesterday, so --

20   **Q**    What would you like to call it?  Deportation and --

21   **A**    Removal.

22   **Q**    Removal, okay.  Both of which would be facilitated through

23   David Rizzo.  Correct?

24   **A**    Correct.  Either one of which would be facilitated through

25   David Rizzo.

**GESSEN - CROSS / HOSSEINI**

1   Q      Sorry.  Either one of which would be facilitated through

2   David Rizzo.  So the point of using Geewiz was so that it would

3   not be connected to you.

4   A      Correct.

5   Q      And so Priscilla wouldn't know that you were involved in

6   the removal.

7   A      Correct.

8   Q      And that once she was deported, yesterday you said you

9   planned to co-parent with her internationally.

10  A      Correct.

11  Q      And that made sense to you.

12  A      At the time, yes.

13  Q      You both lived in Boston, and you want her deported to

14  Zimbabwe so you can both co-parent internationally.

15  A      Um, yes.

16  Q      The two of you living in Boston, is that closer, in terms

17  of geography?  Or the United States and Zimbabwe?

18  A      Definitely in Boston is closer than Boston and Zimbabwe.

19  Q      Nonetheless, your goal was not to separate Priscilla from

20  the children, was it?

21  A      My goal was to have greater decision-making authority in

22  the children -- children's lives, and to make more decisions.

23  So, yes.  The separation -- a partial separation would

24  contribute to that goal, yes.

25  Q      And that goal would be easier if Priscilla was out of the

GESSEN - CROSS / HOSSEINI

1    picture.

2    **A**    Out of the country, yes.

3    **Q**    After four years of fighting over custody across multiple

4    countries, you now wanted to have her deported so you could

5    co-parent internationally.

6    **A**    Um, I think that what I tried to explain yesterday --

7    maybe I didn't do a very good job -- that when I launched the

8    whistleblower complaint and asked Alex to introduce me to

9    somebody at the INS, that was in March when I had no access to

10   the children.  So at the time when I began that process, my

11   goal was to have some access through -- to the kids.

12        If -- I would not have initiated that process in June,

13   because by June, pretty much -- okay, not everything was

14   resolved, but most things were resolved.  I sort of continued

15   down that path because it was awkward for me to -- to stop.

16   But -- and I should have.  And I kind of dug myself into a hole

17   by kind of going down that same trajectory.

18        And, no.  No useful purpose was to be achieved through

19   deporting Priscilla in June-July of 2022.  It's -- it's kind of

20   -- you do something stupid, and then you sort of just keep

21   going down that -- it's like dominoes.  So I think I was in

22   that space where I should have said "Stop" at that point, and

23   then I didn't.  So it's -- yeah.  That's on me.

24   **Q**    Let's unpack that a little bit.  You said that in March

25   you started the process.  Correct?

GESSEN - CROSS / HOSSEINI

1   **A**   Correct.

2   **Q**   You met David Rizzo for the first time on June 2nd,

3   correct?

4   **A**   Correct.

5   **Q**   He asked you on June 2nd: "So tell me what you want.

6   There's a blank slate."

7   **A**   Correct.

8   **Q**   Did you say:  Actually, my Priscilla issues have been

9   resolved; let's talk about funding for my factory?

10  **A**   Well, uh --

11  **Q**   Did you say that, or not?

12  **A**   I did.  Yes, I did say that.

13  **Q**   You said that?  You said:  My issues with Priscilla have

14  been resolved?

15  **A**   No, sorry.  I did -- I did not say that, yes.  Sorry.

16  **Q**   Right.  Instead, you said -- he said "There's a blank

17  slate, tell me what you want."

18  **A**   Yes.

19  **Q**   And you said "For her to go back to her home country and

20  for me and the children to remain in the United States."

21  **A**   Yes, I did say that.

22  **Q**   At that time, June, when your issues with Priscilla were

23  supposedly civil, resolved (Indicating quotation marks), and

24  your disagreements were truly minor (Indicating quotation

25  marks).  Correct?

**GESSEN - CROSS / HOSSEINI**

1    **A**    Yes.

2    **Q**    You also said yesterday that you wanted this immigration

3    raid to look random (Indicating quotation marks).  Correct?

4    **A**    The removal, yes.

5    **Q**    Sorry, the removal -- thank you for clarifying.  The

6    removal (Indicating quotation marks) to look random.

7    **A**    Yes.

8    **Q**    Which would mean that it would be a lot of -- a bunch of

9    other illegal immigrants rounded up together so that it doesn't

10   look targeted and doesn't come back to you?

11   **A**    Well, it doesn't need to be a bunch of illegal immigrants.

12   It's some group of people, some sort of gathering that does not

13   make it specific to Priscilla, yes.

14   **Q**    Typically when law enforcement does a raid, it is a

15   situation where there's allegations of an employer having taken

16   advantage of all their employees who don't have legal status,

17   or something of that nature.  Is it not?

18           **MS. MITCHELL:**  Objection; calls for speculation.

19           **THE COURT:**  Overruled.

20   **BY MS. HOSSEINI**

21   **Q**    You may answer.

22   **A**    Um, I guess if there is enforcement actions specifically

23   by the immigration authorities, that would make sense.

24           Also I believe there is any action by just regular law

25   enforcement not connected directly to immigration, then if an

1    illegal immigrant is discovered during such an arrest, such a

2    raid, then the illegal immigrant who is subject to immediate

3    removal would be handed over to the immigration authorities for

4    immediate removal.

5        So I was not sure exactly how the process would work in

6    this case.  But, uh, it could be as you suggested, it could be

7    as I just described, or it could be in some other way.

8    Q    So how -- what was the plan for it to look random?

9    A    Um, it was David's -- David helped to organize it.  I

10   think what he mentioned is that we don't really have great

11   control over how it happens.  So I assumed he -- David --

12   somebody acting on his behalf that had all the details.

13   Q    You didn't ask, like: Hey, what's the plan?  To stick

14   Priscilla into a group of a bunch of people who don't have any

15   legal status so that it doesn't blow back on me?

16   A    Well, I think I was very clear about what I wanted, that i

17   wanted her removed, and that it does not relate back to me.

18   The exact method of how he was going to do it, he was quite

19   clear that he has people who are well-organized, who can track

20   cars, who are effective at what they do.

21       So the exact -- I had no insight into law enforcement

22   activity, and no wish to know, really.

23   Q    So how are they -- fine.  They have her car information

24   and her location information.  But, how are they going to take

25   her and stick her in a random raid?

**GESSEN - CROSS / HOSSEINI**

1      How's that going to work?

2  **A**   Um, well, I think I testified yesterday that my knowledge

3  of that comes mostly from popular culture.  So, like, I -- so

4  for example, local police show up to pick up a witness to

5  deliver it for testimony in a case.  And one of them says:  Oh,

6  she was removed from the -- from the United States to Mexico

7  just yesterday.  They did it very quickly.

8      So I don't know -- I don't -- I'm not -- I really -- it's

9  -- I'm not an expert in that.

10 **Q**   But that's not a random raid.  That's targeted to that one

11 witness.  And you wanted a random raid, did you not?

12 **A**   Well, he said:  If we have a choice in the matter, how

13 would you want it?  I think that was the question.  And I think

14 David is the one who used the word "random" earlier, so I -- I

15 parroted that.

16 **Q**   But yesterday you testified that when you were using the

17 word "random," you were talking about wanting a random raid so

18 that the removal (Indicating quotation marks) doesn't get

19 connected to you.  Is that not right?

20 **A**   Yes, I testified that when I used the word "random," I

21 meant that it shouldn't be able to connect to me.  I used the

22 raid as an example of a situation that it could -- came to my

23 mind how it could be one of the scenarios how it could be done.

24 **Q**   You were concerned enough about being connected to it that

25 you used an Estonian company, Geewiz, for the payment.

1    Correct?

2    **A**    Well, I think from the very first moment that David

3    mentioned the money in the first conversation, around

4    Minute 37, I'm saying, uh, either it can be no connection to

5    me, I should -- there should be no paper trial.  I mentioned

6    that from the very first time when we were speaking clearly

7    about deportation.

8         So, yes.  I was very concerned that any illegal activity

9    should not have direct link to me.  Yes, absolutely.

10   **Q**    Okay.  So then wouldn't the logical followup be to ask

11   him:  How are you going to do this so that it doesn't look

12   targeted and it looks random?

13   **A**    I haven't asked.  In the first instance we were discussing

14   deportation, he said -- I think David's statements when he

15   talked about immigration in the first conversation were:  Look,

16   I try to keep away from the government, I'm not sure exactly

17   how they work, I don't -- I don't suppose to understand the

18   process.  So he was putting distance between himself and the

19   people who would be responsible for deportation.

20        I did not ask any followup questions to clarify in the

21   first instance.  I did not ask any followup questions to

22   clarify in the second instance.  Maybe it would make sense.  I

23   did not, in either scenario, ask for clarification.

24   **Q**    You certainly planned the time, that it would be the last

25   week of July.  Correct?

GESSEN - CROSS / HOSSEINI

1  **A**     I was very specific that children should not witness it,

2  yes.  Absolutely.

3  **Q**     You didn't ask how it would be random, such that it would

4  not blow back on you, did you?

5  **A**     Well, the safety of my children is my responsibility.

6  Removal of an illegal immigrant is not.  So things that I can

7  control, I'm very specific about.  Things I cannot control, I'm

8  not very specific.

9  **Q**     And to be clear, Priscilla's legal status was lawful.  She

10 is not an illegal immigrant.

11 **A**     She was.

12 **Q**     She came to the United States.  --

13 **A**     Right.

14 **Q**     -- on a visa facilitated through the United States

15 Department of State as part of her Hague Convention case.

16 **A**     Yes.  Which expired in February of 2022.

17 **Q**     And she extended that visa.  She submitted a renewal

18 application that was pending.  Correct?

19 **A**     I did not know about that.  I do not know about that

20 today.

21 **Q**     If you wanted her deported, wouldn't you want to know if

22 she, in fact, has lawful status or is an illegal immigrant?

23 **A**     How was I supposed to do that?

24 **Q**     You have contacts.  You could have asked her.

25 **A**     When I submitted the list of documents through Alex to

**GESSEN - CROSS / HOSSEINI**

1  David as grounds for deportation, there was multiple grounds.

2  A violation of immigration law that would make it possible to

3  deport her.  Whether her status was current or not current was

4  not really relevant to most of those grounds.

5       My understanding was that her visa expired in February.

6  That was what she testified to in court earlier, that it was

7  only until February, her lawyer was very specific that she

8  needs to leave the country by February of 2022, and I had no

9  means of updating that information.  I'm not an immigration

10  officer.

11  **Q**   You did study immigration law, though.

12  **A**   But not enough to get access to the immigration database

13  of individual aliens.

14  **Q**   You testified that the visa was for six months and it

15  could be renewed.  Do you remember that?

16  **A**   When?

17  **Q**   Did you know that?

18  **A**   Did I know it, when?

19  **Q**   When you talked to David Rizzo in June of last year.

20  **A**   But you just said that Priscilla testified that her visa

21  was renewed.

22  **Q**   Whoever brought up her testimony, forget that.  I'm asking

23  you, in June of 2022, did you know that she was an illegal

24  immigrant?  Or you didn't know; you thought maybe she was?

25  Which one?

1   **A**    My understanding was that she was an illegal immigrant.

2   **Q**    Without having asked her.

3   **A**    I think we're splitting hairs.  I'm not sure -- what would

4   you like me to say?

5   **Q**    I want you to say whatever the answer is.

6          In June of 2022, why did you think she was an illegal

7   immigrant?  Was it because you asked her?  Or you verified it

8   in some way?

9   **A**    No.  Based --

10  **Q**    Okay.

11  **A**    Based on my understanding of -- that she was granted visa

12  with the help of the State Department specifically to appear in

13  the Hague Convention case, I understood it was a B-2 visa, six

14  months in duration, that expired in February of 2022.  I did

15  not have information whether she renewed it, updated it,

16  reapplied for a changed status or anything else.  I just knew

17  that it expired.

18         I also knew there was multiple grounds for possible

19  deportation.  Which one David's contacts were going to use, I

20  did not know.

21         No investigation is required to check whether the visa has

22  expired.  Investigation is required to verify facts of alleged

23  fraud, of alleged violation of visa terms, things like that.

24  That would not have anything to do with whether the visa has

25  expired or was current.

**GESSEN - CROSS / HOSSEINI**

1  **Q**    Having studied immigration law, was it your understanding

2  that visas can be renewed?

3  **A**    In some cases, at the discretion of the INS, yes.

4  **Q**    Did you ask Priscilla whether her visa was renewed?

5  **A**    Uh, I doubt it.

6  **Q**    Did you do anything else to confirm whether her visa had

7  expired or was renewed?

8  **A**    No.

9  **Q**    And still on the topic of this random raid (Indicating

10  quotation marks) for the removal option, you said that you

11  didn't get any details from David.

12  **A**    Correct.

13  **Q**    You left that up to him.  Right?

14  **A**    Right.

15  **Q**    You trusted him, that he would make it look random,

16  sufficiently random?

17  **A**    Um, I didn't trust David very much.  And David did not say

18  that he will -- he can make it look random.  I think David --

19  David's words were that we can't really control it.  So it was

20  not really up to him.

21      I told him what I thought was important.  I did not ask

22  for clarification.  And I didn't -- he did not pretend to know

23  for sure.

24  **Q**    He did not say "We can't control it."  He said "Do you

25  have a preference in the means?"  Correct?

1   **A**    I think his words were "It's not like we have any say in

2   this," or "It's not like we have a way to affect it, but do you

3   have a preference?"  Yes.

4   **Q**    Uh-huh.  But you did not ask for details, did you?

5   **A**    No.

6   **Q**    And if, in fact, it was a random raid, why would someone

7   need to talk to you?

8   **A**    Because, as I think I testified yesterday -- the --

9   **Q**    If it was a random raid --

10  **A**    Yes, sorry.  I think I testified -- may I continue?

11      Sorry.

12      As I think I testified yesterday, Priscilla has very

13  effective, very aggressive legal counsel.  That it would be

14  greatly suspicious that any immigration action against her was

15  precipitated by me, and they would definitely investigate and

16  try to get to the bottom of it.

17      Under the Freedom of Information Act and other possible

18  litigation, they could subpoena those documents, see what --

19  the grounds for deportation, were there grounds for removal,

20  try to get to the bottom of what happened.  Possibly see

21  reports, possibly see materials I sent.

22      So in potential litigation, if I -- if, for example, if

23  Priscilla were to file for custody in Boston saying that I had

24  to do with her deportation, my lawyers told me that if there's

25  any evidence connecting me to her deportation or removal, that

1    I will lose custody and the kids might go back with her.  So it

2    was very important that there can be no connection, whatsoever,

3    between me and her removal from the United States.  For custody

4    purposes.

5    **Q**    If it was so important that it appeared random, why didn't

6    you ask David how he's going to make it look random?

7    **A**    Because David specifically said that he doesn't really

8    have great control over it to --

9    **Q**    No, he didn't.  We already established that.  He said "Do

10   you have any preference in the means?  Not sure that we have a

11   say in it."

12   **A**    I think that you're misstating my testimony deliberately,

13   and I would appreciate if we then go to the audio and actually

14   listen to what David said, rather than misrepresent what David

15   said.

16   **Q**    Sure.

17   **A**    Thank you.

18          **MS. HOSSEINI:**  Let's pull it up.  Exhibit 7, hour 1,

19   minute 48, 20 seconds.  Page 4.  And this will be the bottom

20   third, bottom half of the page starting with

21   "Under-understood."

22        (Document displayed)

23        (Portion of audio recording played in open court)

24          **MS. HOSSEINI:**  Stop there.

25

1  **BY MS. HOSSEINI**

2  **Q**    Do you see anywhere where he said "We cannot control it"?

3  **A**    He says "Not that we'll have a choice in the matter."

4  "Not that we will have a choice in the matter."  That is

5  exactly -- in my opinion, means we do not control it, yes.

6       And that is the earlier part of the sentence that was

7  missing from your question.

8  **Q**    No.  This says:

9            "Not that we'll have a choice in the matter,

10           but do you have any preference in the means?"

11  **A**    Right.

12  **Q**    The means of removing her is what you testified to

13  yesterday.  Correct?

14  **A**    Correct.  Yes.

15  **Q**    That is different than how it's going to be random.  The

16  random raid is different than her being removed, the means of

17  removing, is it not?

18  **A**    You lost me.

19  **Q**    If this was going to be a random raid, it was important

20  that it not blow back on you.  Correct?

21  **A**    Correct.

22  **Q**    You did not ask about any details about how this random

23  raid would be conducted.  Correct?

24  **A**    Correct.

25  **Q**    That, you didn't -- you thought you would be number-one

**GESSEN - CROSS / HOSSEINI**

1   suspect.  Correct?

2   **A**    Correct.  In the removal, yes.

3   **Q**    Why would you need to isolate yourself if it was going to

4   be a random raid?

5   **A**    Because we will not have a choice in the matter.  So he

6   did not guarantee it will be random -- random act.  He asked me

7   if I would -- if I had a preference of how it would be done.

8   And I said:  As long as it's random, it's fine.  As long as

9   it's not connected to me, it's fine.

10  **Q**    Why would you need to put charges on your credit card if

11  this is a random raid?

12  **A**    Um, I think we're in a very different part of the

13  transcript now.

14  **Q**    Do you remember David Rizzo telling you to put charges on

15  your credit card when this removal was going to happen?

16  **A**    Yes, I think that it was roughly a month and a half later.

17  I mean, after this conversation.  I do remember David sending

18  that message.  I do remember thinking to myself:  This is

19  crazy.  And then, but I don't think that it was in the same

20  conversation as here.

21  **Q**    Correct.

22  **A**    Yes.

23  **Q**    You wanted the removal (Indicating quotation marks) to be

24  random.  Is that accurate?

25  **A**    Correct.

**GESSEN - CROSS / HOSSEINI**

1  **Q**    And this is June 29 -- June 22nd.  Correct?

2  **A**    Correct.

3  **Q**    And the removal was going to happen at the end of July.

4  Correct?

5  **A**    Yes.

6  **Q**    So the plan was that it would happen about a month and a

7  half later.  Correct?

8  **A**    Correct.

9  **Q**    And the messages between you and David Rizzo, the ones

10  that you deleted from Signal, in those messages you said you

11  would always put charges on your credit card during that time

12  period when the removal was to happen.  Correct?

13  **A**    I have never deleted messages from Signal.

14  **Q**    Okay.

15          **MS. HOSSEINI:**  Let's go to Exhibit 4.

16          **THE DEFENDANT:**  May I ask for more water, please?

17      (A pause in the proceedings)

18          **MS. HOSSEINI:**  Exhibit 4 at Page 4.

19      (Off-the-Record discussion)

20      (Image displayed)

21  **BY MS. HOSSEINI**

22  **Q**    Do you have the screen up, Mr. Gessen?

23  **A**    I do.

24  **Q**    In the bottom of the page it says that (As read):

25          "It will be very important to keep your

1          distance and limit your contact with your

2          associate in Boston over the next 10 days or

3          so."

4      You wrote:

5          "It's not a problem.  We don't work together

6          anymore."

7  **A**   Right.

8  **Q**   Wasn't this telling you to isolate yourself and stay away

9  from Priscilla?

10  **A**   Yes.

11  **Q**   So if this is a random raid, why do you need to isolate

12  yourself from her?

13  **A**   Because he is being overly cautious.

14  **Q**   I don't see the logic in that.

15  **A**   I also struggle to see --

16          **MS. MITCHELL:**  Was that a question?

17          **THE COURT:**  Sustained.

18  **BY MS. HOSSEINI**

19  **Q**   Why would you need to isolate yourself if there's going to

20  be a random raid of a bunch of illegal people?

21  **A**   Well, he didn't say there's going to be a random raid of a

22  bunch of illegal people.  He said that he cannot control the

23  means.

24          So I wasn't exactly sure how it was going to be done, if

25  it's going to be an arrest, if it's is going to be a bust, if

1   it's going to be -- uh -- I really did not know what -- what --

2   how they were going to do it.

3       So he did not ask for anything unreasonable.  That was the

4   expectation, that myself and the children will be far away when

5   the removal happens.  So that -- so it's -- it was important to

6   limit contact and keep the distance.  That was consistent with

7   our conversation.

8   **Q**   It was very important for it to appear random, but you had

9   no questions for him about how.

10       **MS. MITCHELL:**  Objection, asked and answered.

11       **THE COURT:**  Sustained.

12   **BY MS. HOSSEINI**

13   **Q**   You just said earlier that Priscilla had effective and

14   aggressive legal counsel (Indicating quotation marks).  Right?

15   **A**   Yes.

16   **Q**   So wouldn't they fight a deportation proceeding?

17   **A**   They would.

18   **Q**   And I believe yesterday you said that Priscilla was

19   amazing (Indicating quotation marks)?

20   **A**   Yes.

21   **Q**   Extraordinary (Indicating quotation marks)?

22   **A**   Yes.

23   **Q**   A former model?

24   **A**   I did not say that, but she's a former model, yes.

25   **Q**   Former model.  You said she built businesses in a country

1  without established electricity, or something like that, right?

2  **A**    Something like that, yes.

3  **Q**    She was successful.

4  **A**    Yes.

5  **Q**    And that the kids would be proud of her.

6  **A**    Yes.

7  **Q**    But you still wanted her removed from their lives?

8  **A**    Yes.

9  **Q**    Were you jealous of her success?

10  **A**    No.  I was very proud of it.  While we were together.

11  **Q**    You also said yesterday that you suspected that David

12  Rizzo was a law enforcement officer.  Right?

13  **A**    Yes.

14  **Q**    Yet you went on to plan committing crimes with him, right?

15  **A**    I understood him to be a corrupt law enforcement officer,

16  yes.

17  **Q**    That made sense to you?

18  **A**    Yes.

19  **Q**    Yesterday you testified that when you were meeting David

20  Rizzo for the first time, that your agenda was very clear.

21  Right?

22  **A**    Yes.

23  **Q**    You were there to obtain funding.

24  **A**    Yes.

25  **Q**    You said, quote:

GESSEN - CROSS / HOSSEINI

1                    "I had no illegal purpose, whatsoever."

2    **A**    Correct.

3    **Q**    A little bit later you said, quote:

4                    "My understanding of the corruption in the

5                    government comes from newspapers and

6                    television and films."

7         Correct?

8    **A**    In the U.S. government, yes.

9    **Q**         "I have not previously bribed a government official."

10   **A**    Correct.

11   **Q**    Is that what you said?

12   **A**    Yes.  In the United States.

13   **Q**         "But popular culture would make me believe it is a.

14                    pretty commonplace event."

15   **A**    Correct.

16   **Q**    But isn't it true that on May 27, 2021, a year before

17   meeting David, you met with someone named Ravi?

18   **A**    Uh, yes.

19   **Q**    And he was a person who was laundering money for drug

20   cartels through MLI Ventures.

21   **A**    Uh, no.  Well, I mean, maybe he was, but I did not know he

22   was laundering money for drug cartels for MLI Ventures.  Ravi

23   is somebody I met, correct.

24   **Q**    And Mr. Kiselev is the person who introduced you to Ravi.

25   Right?

**GESSEN - CROSS / HOSSEINI**

1  **A**   Correct.

2  **Q**   And you and Mr. Kiselev wanted Ravi to help you bribe a

3  government official to get confidential tax records from the

4  IRS.

5  **A**   Uh, no.

6  **Q**   I'm sorry?

7  **A**   No.

8  **Q**   That's not correct?

9  **A**   That is not correct.  Well, it's partially not correct.

10  **Q**   Explain the partiality, please.

11  **A**   How much detail do you want?

12  **Q**   How much you would like to give?

13  **A**   So in early 2021, I was approached by a client from

14  Russia.  A depositor in a bank in Russia who lost a significant

15  amount of money in a collapsed Russian bank.

16      His information was that the owners of the bank had

17  funneled the depositor's funds through shell companies out of

18  Russia, and ran away.  The bank collapsed, and the owners of

19  the bank settled in the United States.

20      And I was approached to try to help them recover the funds

21  from the people who were in the United States.  The amount that

22  was stolen was about $500 million, in total.

23      My advice to them was to file a whistleblower complaint

24  with the Internal Revenue Service.  Because if the Internal

25  Revenue Service is successful at recovering funds concealed

 1    from the IRS, or due taxes, the person who files the

 2    whistleblower complaint receives a 25 percent -- well, up to

 3    25 percent reward for being the whistleblower.  And I said that

 4    in my opinion, this is one of the best ways to go.

 5          I discussed this plan with Alex Kiselev, and asked him if

 6    he knows any lawyers who specialize in IRS whistleblowing.  I

 7    then spoke to two or three attorneys, who all indicated to me

 8    that it's an extremely long process, it takes two or three

 9    years, and that IRS is very slow in investigating such

10    complaints.

11          I then asked Alex if he knows anyone who could facilitate

12    -- that if I were to file a whistleblower complaint, if he

13    knows anybody at the IRS who can move that file to the front of

14    the line and accelerate its processing.

15          He said he'll investigate.

16          A couple weeks later he suggested that I meet with Ravi,

17    who he said had strong IRS contacts.  He was into finance.

18          I met with Ravi.  But I told him what we are looking to do

19    is to try to take a look at the tax records of some people who

20    are filing taxes in the United States to see if they're

21    under-reporting their assets, foreign assets or income.

22          Part of the reason I used that legend is so that the

23    whistleblower idea would not necessarily translate to somebody.

24          Ravi suggested to me that whistleblowing is the better

25    path.  I agreed with him.  And I filed a whistleblower

1    complaint with the IRS.  And we stopped talking to Ravi back

2    then.

3    **Q**    But during your conversation with Ravi, you also discussed

4    that you would -- you and Mr. Kiselev would want to get those

5    confidential tax records from the IRS by bribing an IRS

6    official.

7    **A**    Yes.  We did discuss that.  Correct.

8    **Q**    And it would -- one option was the whistleblower option,

9    which Ravi told you to pursue.  Right?

10   **A**    Correct.

11   **Q**    And the other option was to get the records through

12   bribery, and extort or settle with those people who were

13   allegedly withholding taxes.  Correct?

14   **A**    I wouldn't use the word "extort" necessarily, but it would

15   be, yes, to bribe, to try to get access to confidential tax

16   records, and to see how we could use it, yes.

17   **Q**    And it turned out that Ravi was another undercover agent.

18   Right?

19   **A**    In fact, Ravi -- well, David, in our conversation with

20   him, referred to Ravi as part of his sort of crime family.  So

21   he said:  You already met Ravi earlier.  Correct.

22        So Ravi was a -- Ravi's legend was that he was a banker,

23   he was from India.  He was very presentable, very

24   well-expressed.  So he was -- he was an associate of David's,

25   as I was led to understand later in the meeting.

1  Q    So Ravi and David were people Mr. Kiselev introduced you

2  to.

3  A    Uh, correct.

4  Q    So then your understanding of corruption and bribing a

5  government official on June 2nd did not come from television

6  and media.  Because a year prior, you had already been talking

7  to Ravi about bribing an IRS official.  Correct?

8  A    When I was talking to Ravi I was not surprised, but, but

9  my understanding of how corruption works comes from the popular

10 culture, correct.

11      I have never bribed a government official in the United

12 States, if that's your question.  I have -- I wasn't surprised

13 that it's common; I'm not surprised that it's quite common.

14 But I have not engaged in it, actually, no.

15 Q    You just talked about it.  You didn't actually do the

16 bribery?  Is that what you're saying?

17 A    Well, I thought I was doing the bribery when I was sending

18 money through David to -- to somebody in the government.  So I

19 guess that's my first offense.

20 Q    You wanted Priscilla out of your life, right?

21 A    No.  I wanted Priscilla out of the United States.

22 Q    You wanted custody of the children?

23 A    I did.

24 Q    You loved your kids.  Right?

25 A    I do.

GESSEN - CROSS / HOSSEINI

1   Q    In fact, when you were testifying, you talked about how

2   your son was born early and you had to pay off security in

3   Zimbabwe to bring oxygen into the hospital for him.  Right?

4   A    Correct.

5   Q    And when you talked to David Rizzo, you talked about how

6   you wanted Priscilla's kids.  Right?

7   A    Well, that I wanted to have kids with -- with Priscilla.

8   I said -- I think I was not saying I want her killed, to take

9   them away, but that when I met her, that I was so impressed

10  with her that I really wanted to have children with that woman.

11  Yes.

12  Q    And that the kids were incredible.  Correct?

13  A    Yes.

14  Q    They came out like dream kids (Indicating quotation

15  marks).

16  A    Well, yeah.

17  Q    That's what you said.  Right?

18  A    Yeah, well, it's, I guess, every parent feels this way, so

19  yes, I just --

20  Q    In terms of character and quality.

21  A    Yes.

22  Q    You have no regrets about your kids or having them.

23  A    Correct.

24  Q    And you fought for them.  Right?

25  A    I did.

GESSEN - CROSS / HOSSEINI

1  **Q**    You fought for them in court?

2  **A**    I did.

3  **Q**    You had to deal with Priscilla and fight for her -- fight

4  with her for the kids?

5  **A**    Yes.

6  **Q**    You filed a lawsuit in Zimbabwe?

7  **A**    I filed several lawsuits in Zimbabwe, yes.

8  **Q**    You filed a petition under the Hague Convention for the

9  kids?

10  **A**    I did.  For [E.G.].

11  **Q**    For [E.G.].  And she -- you defended against a petition

12  that Priscilla filed under the Hague Convention for [O.G.].

13  Correct?

14  **A**    Yes, I did.

15  **Q**    You filed for custody in two different counties in

16  Massachusetts?

17  **A**    Well, the case, the original case I filed in '21 for

18  [O.G.] was in Middlesex county in Massachusetts.  Then

19  Priscilla filed also in Middlesex County.  But because

20  Priscilla was living in Worcester, I had to file for [E.G.] in

21  the Worcester County, so it was just because the kids were

22  living at two separate addresses.  Right.

23  **Q**    And you had to figure out how to share custody with

24  Priscilla?

25  **A**    Yeah.

**GESSEN - CROSS / HOSSEINI**

1    Q    You moved internationally several times, right?

2    A    During which period?

3    Q    You said three times.  Let's break it down.  Once you went

4    to Dubai, correct, with your son?

5    A    I -- yes.

6    Q    Another time you moved in 2019 from Russia to the United

7    States with your son.  Correct?

8    A    Oh, okay.  So, the Dubai trip I mentioned because I also

9    removed [O.G.] from Priscilla's care without her permission

10   initially for a period of two weeks.  I then came back to

11   Russia with [O.G.], and then I moved with [O.G.] in June of

12   2019 to move to the United States.

13        And then I left with [O.G.] through Canada on the way to

14   Zimbabwe, and it was not very clear how long the trip might be.

15   Correct.

16   Q    Uh-huh.  And then you took him from the United States to

17   Canada at the end of 2021.  Correct?

18   A    Yes.

19   Q    That's the whole thing that landed you in jail.

20   A    Yes.

21   Q    And yesterday you said, quote:

22            "I wanted at any cost to be reunited with the

23            children."

24   A    Correct.

25   Q    You were willing to bribe a government official for your

GESSEN - CROSS / HOSSEINI

1   kids.

2   **A**    Yes.

3   **Q**    You were willing to engage in orchestrating Priscilla's

4   removal for your kids.

5   **A**    Correct.

6   **Q**    And you were willing to engage in orchestrating

7   Priscilla's kidnapping or abduction for your kids.

8   **A**    I thought about it.  But, yes, that -- that did not go

9   very far.

10  **Q**    That someone would just kidnap the mother of your

11  children, take her to another country, and you would separate

12  those children from their mother for you to have your kids.

13  **A**    Look, it was a -- it was a thought that I had.  Um, it's

14  -- I was very, very frustrated in February when it happened.

15  So, yes, it was something I looked at.

16  **Q**    So you were willing to commit crimes for your kids.

17  Bribery, deportation.

18  **A**    I -- I am willing to commit crimes for my kids, yes.

19  **Q**    You were not immediately willing to take drug money, to

20  take funding for your factory.  You said you needed to pause

21  and think about it first.  Right?

22  **A**    Yes.

23  **Q**    And over the course of the two recordings that we have

24  listened to, there are multiple times where David gives you an

25  out.  Correct?  Out of the deportation removal scheme.

GESSEN - CROSS / HOSSEINI

1    Correct?

2    **A**    Well, he's asking me, I guess, like, I guess that's an FBI

3    term of art, "gives me an out."  He asks me if I'm comfortable

4    with it, he asks me do I understand that this is final, do I

5    understand that once you open that window -- I think that is

6    his words -- that you cannot close it.

7           So he does check with me that in fact I am comfortable

8    doing what I'm planning to do, yes.

9    **Q**    He says this is serious business.

10   **A**    Yes, absolutely.

11   **Q**    Are you sure?  Are you comfortable?  Is this what you

12   want?  Things along that line?

13   **A**    He does ask that, yes.  And I confirm it.

14   **Q**    Not once do you pause and think.

15   **A**    Uh, I pause and think repeatedly during this conversation.

16   I think that it's -- it was by no means an easy, easy decision.

17   It was by no means -- I think that I'm saying somewhere that

18   this is not a spur-of-the-moment action, this is something that

19   I thought about long and hard.

20   **Q**    Uh-huh.

21   **A**    I think that part of that statement is me trying to

22   convince myself that this is the right thing to do.  I think --

23   it is -- it is clearly such a wrong thing to do, that you need

24   to justify it -- well, I needed to justify it to myself, sort

25   of that:  Yes, this is this -- that I have the moral right to

**GESSEN - CROSS / HOSSEINI**

 1    do it, and just trying to convince myself that that's the right

 2    thing to do for the kids.

 3         So I'm not -- I'm not very proud of it, no.  But -- and

 4    particularly in June, it was entirely unnecessary.

 5    **Q**    On the audio, each time he asks you if you're sure,

 6    comfortable, each time, you immediately affirm that you are

 7    sure and comfortable.  Correct?

 8    **A**    Soon thereafter.  I don't know, like, immediately -- well,

 9    yes.  I -- I confirm it, yes.

10    **Q**    No hesitation.

11    **A**    If there -- if there is any hesitation, it's not very

12    long.  Yes.

13    **Q**    You were willing to have a bunch of innocent people get

14    deported, to make your scheme look random for your kids.

15    **A**    To the extent that there were some other illegal

16    immigrants involved, I -- yes, I -- I accepted that as a -- as

17    a -- as a consequence, yes.

18    **Q**    And when David Rizzo asked you about other extra guests at

19    the show (Indicating quotation marks), you said, quote:

20              "I am absolutely ambivalent to the modalities

21              and circumstances as long as we achieve

22              project objectives."

23         End quote.

24    **A**    Correct.

25    **Q**    So you didn't care about those other people who got

1    randomly deported, as long as Priscilla got out.

2    **A**    I cared.  But I -- I -- I just, I guess I just needed it

3    to be done with and not -- and -- and it -- I was -- I was, I

4    felt, trapped in this situation, and I just, um -- yeah, I felt

5    that if somebody else gets deported -- I suspect it's

6    Priscilla's sister -- then I was -- I was fine with that, yes.

7    **Q**    And you would do anything for your kids.

8    **A**    Um, look.  I would do a lot for my kids, yes.  I think

9    from a -- for my kids, more than for anything else.  Yes.

10   **Q**    Would you perjure yourself for your kids?

11   **A**    I would.

12        **MS. HOSSEINI:**  Thank you.

13        Nothing further.

14        **THE COURT:**  All right.  Members of the jury, we will

15   take a 15-minute morning break.

16        As always, please do not discuss the case or do any

17   independent research.  We'll see you back in 15 minutes.

18        (Recess taken from 10:00 a.m. to 10:21 a.m.)

19        (The following proceedings were held in the presence of

20   the Jury)

21        **THE COURT:**  Thank you.  You may be seated.

22        Any redirect, Ms. Mitchell?

23        **MS. MITCHELL:**  Yes, Your Honor.

24                    <u>**REDIRECT EXAMINATION**</u>

25

BY MS. MITCHELL

Q   So, good morning to you, Mr. Gessen.

A   And good morning to you, Ms. Mitchell.

Q   The government, as their last question, asked you if you were willing to commit perjury for your children.  Have you, in any part of the proceedings here, perjured yourself in your testimony?

A   No, I haven't.

Q   Has there been anything about these proceedings that made you think you even needed to perjure yourself for your kids?

A   No.

Q   I want to clarify a few of the issues that the government brought up regarding traveling with your son, [O.G.].

A   Okay.

Q   You mentioned that there were three, three previous trips that you had taken with [O.G.] out of the country where Priscilla had not previously given you permission to do so.  I want to talk to you about those trips.

A   Okay.

Q   The first trip to Dubai, why were you going there?

A   It wasn't -- we were living in Russia at the time.  [O.G.] was -- we were there all on temporary visas because none of us are Russian citizens.  [O.G.]'s visa was expiring on the 24th of April of 2019, and he needed to -- needed to leave Russia to reapply for the Russian visa to be able to return to Russia as

**GESSEN - REDIRECT / MITCHELL**

1  soon as it was ready.

2  **Q**   So was Dubai the country that you went to in order for

3  [O.G.] to reapply for a new visa?

4  **A**   Correct.  It was -- because we needed to travel on his

5  Zimbabwean passport, Zimbabwean passport, there's not very many

6  countries you can go without a visa.  So we traveled to Dubai

7  -- well, we traveled to Dubai, and then Singapore for a holiday

8  while waiting for his visa.  Correct.

9  **Q**   And were you intending to not return to Russia with [O.G.]

10  when you left to renew his visa?

11  **A**   I was planning to return to Russia as soon as the visa was

12  ready.

13  **Q**   So to clarify, then, did [O.G.] have to leave Russia at

14  some point in time in order to renew his visa?

15  **A**   Well, unless -- yes, otherwise he would be there

16  illegally, and he could be -- not get a new visa, and then he

17  would not be able to come back to Russia in the future.

18  **Q**   So when you went to Canada, how long were you --

19  **A**   If I may clarify, it doesn't explain why I didn't ask for

20  Priscilla's permission.

21  **Q**   Why didn't you ask for Priscilla's permission for that

22  trip?

23  **A**   So I asked Priscilla that we need to get [O.G.] out of the

24  country roughly two weeks before his visa expired.  And I said

25  "Let me take him out."

1          And she said "You need to pay me $10,000 in order for you

2     to travel with [O.G.]."

3          I refused to pay the money.  She refused to allow me to

4     travel.  And I traveled without her permission.

5          She then filed a police report in Russia, knowing why I

6     was gone.  She filed an international notice against me as well

7     for child kidnapping.

8          And I returned to Russia two weeks later to bring [O.G.]

9     home.  And there were no further issues about that.

10    Q    Did you ever -- were you ever prosecuted for child

11    kidnapping, based off of what happened with the trip to Dubai?

12    A    No.  There was nothing illegal.  I could travel legally

13    outside of Russia with [O.G.] without permission of the second

14    parent.

15    Q    And for Canada, how long were you intending to go to

16    Canada?

17    A    Um, roughly seven days.

18    Q    And why did you go to Canada first before traveling on to

19    London and then Zimbabwe?

20    A    Well, we left Quebec -- I haven't been there for a long

21    time.  [O.G.] loves the snow, and he always wanted to learn to

22    play hockey and to skate.  And we just found a fantastic place

23    about a hundred kilometers north of Montreal, and went there

24    for a few days.

25    Q    After you were leaving Canada, what was your intention,

1  again, after leaving Canada?

2  **A**    We were going to Zimbabwe via London.

3  **Q**    And what did you anticipate would happen after you got to

4  Zimbabwe?

5  **A**    I was supposed to appear in the paternity case for [E.G.].

6  That was my top priority.  And to establish my paternity.  And

7  I was going to appear in the custody case regarding [O.G.].

8  And potentially, once my paternity was established, there would

9  be a custody case about [E.G.].

10      So basically we needed to resolve custody dispute in a

11  single jurisdiction where -- like, both kids in the

12  jurisdiction -- in a location which had jurisdiction over both

13  children.

14  **Q**    And was Priscilla anticipated to be at those court

15  appearances?

16  **A**    I expected her to be there, yes.

17  **Q**    When you left Russia to come to the United States, you

18  mentioned some of the issues that you were concerned about were

19  therapy and schooling for [O.G.].

20  **A**    Correct.

21  **Q**    Why were you concerned about therapy and schooling for

22  [O.G.]?

23  **A**    Um, [O.G.] was struggling, began struggling in early 2019.

24  He was witness to some confrontations we've had.  He wasn't

25  allowed to see his grandmother.  He had -- he could not really

1   understand why I wasn't there all the time.  And he started

2   falling behind in school.  He was in the British system, so

3   school begins earlier there, in terms of age.  So he started

4   struggling.  He had issues sleeping.

5        So it was just, it was -- I mean, he was a kid going

6   through a separation of his parents.  I guess it's pretty

7   standard.

8   Q   Which parent was more proactive about trying to get [O.G.]

9   assistance with the problems that he was going through during

10  that time?

11  A   I was.

12  Q   And what did you intend to do, when you got to the United

13  States, regarding those treatments?

14  A   Well, I thought [O.G.] had some early issues with small

15  motorics development.

16  Q   Can you repeat that?

17  A   Small motorics development, small movement.  So it was age

18  and premature birth-related, so I thought he would be best

19  served in the Montessori system, so I was trying to find a

20  school for him, a Montessori school for him.  And that was a

21  primary concern.

22       And then once he arrived, he was so -- I don't know, he

23  was rejuvenated here.  He was so excited about traveling; he

24  was excited about being here.  So it kind of -- he stopped

25  being stressed, so therapy did not seem necessary at that

**GESSEN - REDIRECT / MITCHELL**

1  point.

2  **Q**    And again, who was more proactive, once you got to the

3  United States, regarding schooling and other treatments for the

4  children?

5  **A**    Once I left the United States?

6  **Q**    Once you got to the United States.

7  **A**    Well, Priscilla was in Zimbabwe -- in Russia, not

8  Zimbabwe, so she could not be involved.  So basically she had

9  complete decision-making authority over [E.G.], and I had

10  complete decision-making authority over [O.G.].

11  **Q**    And when you had this decision-making treatment over

12  [O.G.], did his behaviors and education improve?

13  **A**    Yes, completely.

14  **Q**    Now, yesterday there was a little bit of confusion about

15  the different means that -- which you anticipated that Agent

16  Rizzo was going to, in his undercover persona, assist you -- or

17  assist Priscilla with being removed or deported from the United

18  States.  And I believe that we mentioned two -- or -- two

19  different schemes.  There was one that was related to bribery,

20  and one that was related to removal.

21      What exactly did you anticipate would happen as the

22  difference between the bribery scheme and just the removal

23  scheme?

24  **A**    Well, they were both bribery schemes.  I think the -- so,

25  okay.  For convenience purposes, let's say -- call it the

1  deportation scheme and the removal scheme, I think.

2  **Q**    Deportation scheme and removal scheme.

3  **A**    So the deportation, as -- there was also some confusion.

4      But at first -- well, so the understanding, as David

5  explained it to me, was that after the first payment, Priscilla

6  would receive notice that an investigation has been launched.

7  And some things would happen.

8      And then, a few months later, she would receive a letter

9  telling her to -- I think, to surrender.  I think that's

10 what -- the term he used.  So, and that was $100,000 in total.

11     The removal scheme was bypassing the investigation of the

12 INS, somehow securing grounds for enforcement action

13 immediately.  There would be an up-front payment of 50 percent,

14 or $25,000.

15     Then enforcement, meaning she would be taken into custody

16 either by Immigration or by other law enforcement, and then

17 removed from the United States using Immigration Services, and

18 then the balance would be due.

19 **Q**    And why did you think that there was going to be a price

20 difference between the two?

21 **A**    The first scheme was, technically speaking, legal.  So it

22 had to follow multiple process steps that needed to be very

23 closely monitored, supervised by the senior INS officer.  And I

24 imagine it would require his interaction with multiple

25 participants.  It would require somehow influencing or

1    preparing for immigration judge to review.

2        Anyway, it had -- it was sort of an accelerated legal

3    process which needed to be very carefully navigated.

4        The second scheme was clearly illegal.  Not just in the

5    terms of bribery, but in terms of the substance of the action.

6        So I think that the funding of the first one was more of a

7    facilitation payment to try to get them to do the right thing

8    over time.  Which was just do it faster.

9        The second one is to get them to do something illegal,

10   such as altering the immigration records or something else to

11   provide a legal basis for removal, and then removing.  So it

12   was just that step.

13       So, unfortunately, sometimes crime is much cheaper than

14   lesser crime.

15   Q    And you mentioned for the first -- the first scheme, the

16   deportation scheme, that you thought that there were multiple

17   bases for Ms. Chigariro's deportation based off of, I think you

18   said, visa expiration, and then fraud in the visa application.

19   A    Correct.

20   Q    Can you explain for us a little bit more about what the

21   fraud for the visa application basis could be?  Without going

22   into details about what you mentioned.

23           MS. HOSSEINI:  Objection.  Calls for speculation.

24           THE COURT:  Overruled.

25           THE DEFENDANT:  Well, the grounds for -- when I say

1  "fraudulent" is when you don't provide accurate and complete

2  information in your visa application, that constitutes fraud in

3  the visa application.

4      I thought that if Priscilla had provided full and complete

5  information and honest answers in her application, then her

6  application would be rejected because she would not qualify for

7  a U.S. visa.

8  **BY MS. MITCHELL**

9  **Q**   And to be clear, this is the application she applied for

10 to come in as part of the Hague case.  Correct?

11 **A**   That is correct, yes.

12 **Q**   Okay.

13 **A**   Yes.

14 **Q**   So please continue as to the fraud in the visa application

15 for that.

16 **A**   So I had some information about Priscilla that, if it was

17 included in her visa application -- and it had to be

18 included -- would be that -- she would probably not be granted

19 a visa.  So I suspected that that information was not present

20 in her visa application, and therefore, the visa application

21 was fraudulent.

22     So what I provided was -- that information was provided to

23 the INS as grounds for deportation.

24     Does that make sense?

25 **Q**   Yes, that makes sense.

1   **A**    Okay.

2   **Q**    One of the questions the government asked you, if you were

3   willing to commit crimes for your children.  Were you willing

4   to murder Priscilla Chigariro for them?

5   **A**    No.  And I don't think it is in the best interest of the

6   children to have their mother murdered.

7              **MS. MITCHELL:**  No further questions.

8              **THE COURT:**  Anything further?

9              **MS. HOSSEINI:**  Briefly, Your Honor.

10                        **RECROSS-EXAMINATION**

11  **BY MS. HOSSEINI**

12  **Q**    You just said that you suspected that the information that

13  you knew of was not included in Priscilla's visa application.

14  Correct?

15  **A**    Yes.

16  **Q**    Did you fill out her visa application?

17  **A**    Did I --

18  **Q**    Did you fill out her visa application?

19  **A**    No.

20  **Q**    Did you review the visa application before it was

21  submitted?

22  **A**    No.

23  **Q**    You also said that you were -- so, the three times that we

24  have established where you took your son across international

25  borders without telling Priscilla.

 1   **A**    Without getting Priscilla's permission.  But, telling

 2   Priscilla every time.

 3   **Q**    Okay.  There was Dubai, Russia, 2019, and Canada at the

 4   end of 2021.  Correct?

 5   **A**    Russia to Dubai, Russia to the United States, United

 6   States to Canada.  Correct.

 7   **Q**    And you said when you went from the United States to

 8   Canada that third time, you were going to go to London and then

 9   go to Zimbabwe.

10   **A**    Yes.

11   **Q**    So that you can go and resolve a child custody dispute in

12   Zimbabwe.

13   **A**    Uh, most important, the paternity case in Zimbabwe.

14   **Q**    But the agreement that you reached with Priscilla in the

15   United States established paternity.

16   **A**    But that was five months after my trip.  I -- I went from

17   the United States to Canada in December of '21.  And the

18   agreement established it on May 15, '22.

19        So at the time when I was traveling, the United States did

20   not have jurisdiction over [E.G.], and the paternity was not

21   established.

22   **Q**    You were in negotiations and trying to figure it out here

23   in Massachusetts with Priscilla.  Correct?

24   **A**    No.

25   **Q**    You could not talk to her about trying to figure that out

1  in Boston?  And you had to go to Zimbabwe so you could figure

2  it out there?

3  **A**    Well, um -- sorry.  I suppose theoretically, of course,

4  you could.  In practice, it has proven impossible.

5  **Q**    Impossible?

6  **A**    We have --

7  **Q**    You just said it was established.

8  **A**    Well, for the duration of the Hague -- during the Hague

9  Convention litigation, we engaged State Department federal

10  mediators to try to help us navigate that, the dispute, and

11  resolve it amicably.  The issues before the mediator -- and we

12  spent about four months on mediation and trying to resolve the

13  disputes amicably.

14      The basic proposal that my counsel made was that Priscilla

15  and [E.G.] would relocate to the United States at my expense.

16  That Priscilla -- that [E.G.] be recorded as my daughter.  And

17  that I would support both of them in the United States.

18  Basically, the same exact agreement that we have reached a year

19  and a half later in litigation.

20      But at the time, and throughout the litigation history, we

21  have never been able to actually agree to something.  So

22  unfortunately, the only way -- the only way forward was to

23  continue litigation.

24      And because only Zimbabwe had jurisdiction over both kids,

25  and Massachusetts did not, Zimbabwe was the only place in the

1    world at that point in time, in December, where I could record

2    [E.G.] as my daughter.

3         So, you're right.  I would not have traveled from

4    Massachusetts.  I mean, it was expensive, it was

5    time-consuming, it was unnecessary.  But the only way to secure

6    [E.G.]'s access to U.S. citizenship and access to her father

7    was for me to actually go there and add myself to her birth

8    certificate.  So that was essential to do that, yes.

9    **Q**    Did you go to Zimbabwe on that occasion?

10   **A**    I was arrested before I was able to reach Zimbabwe on that

11   occasion.

12   **Q**    Correct.

13   **A**    Yes.

14   **Q**    Yet you still established paternity with Priscilla, five

15   months later.

16   **A**    Yes.  Because at that point, in February of 2022, United

17   States -- State of Massachusetts acquired jurisdiction over

18   [E.G.].  I immediately filed for paternity.  That was after

19   being arrested.

20        And because there was no question that I'm the biological

21   father of [E.G.], it was impossible to resist that application.

22   It was -- it was obvious that I will be able to add myself to

23   [E.G.]'s -- I would be recognized as her father.  There was no

24   -- there could be no dispute.

25        So at that point, once that legal point was resolved,

 1  Priscilla was no longer arguing that point.  But as -- until

 2  the very moment, until I could do it, she was not willing to

 3  add me to the birth certificate.

 4  **Q**    So the four of you are in Boston, Massachusetts, at the

 5  end of 2021.  You, Priscilla, [O.G.], [E.G.].  Correct?

 6  **A**    Yes.

 7  **Q**    You take [O.G.] to Canada, to go to London, to go to

 8  Zimbabwe.  Correct?

 9  **A**    Yes.

10  **Q**    Without telling Priscilla.

11  **A**    Without asking for Priscilla's permission.

12  **Q**    Without asking for her permission.

13  **A**    Yes.

14  **Q**    So you can go establish paternity for [E.G.] in Zimbabwe.

15  **A**    Well, somewhere, yes.

16  **Q**    Okay.  Even though you have petitions pending in

17  Massachusetts, and you could resolve it, like you did five

18  months later.

19  **A**    Well, the only case pending Massachusetts concerned --

20  okay.  So at that point -- okay.  If I'm looking specifically

21  at December of 2021, towards the end of December, there are two

22  pending petitions for custody of [O.G.].  One filed by

23  Priscilla in Zimbabwe, and one filed by me in Massachusetts.

24  So, both of them are active petitions.

25       So I withdraw my petition in Massachusetts regarding

1   [O.G.], because it makes more sense to litigate custody over

2   both kids in one place, rather than litigating in two different

3   countries; we've already tried that.  So I withdraw my custody

4   petition in Massachusetts.

5        I notify Priscilla I'm willing to honor her request and

6   submit to the jurisdiction of Zimbabwean courts.  I travel to

7   Zimbabwe to establish paternity of [E.G.], and custody

8   regarding both kids.

9        Whether it was -- well, it's not like -- it wasn't really

10  a matter of choice.  It was a matter of that was the only place

11  where custody of both kids could be resolved at the same time.

12       And what you don't want to do is to have the court in

13  Massachusetts have one order about one kid, and the Zimbabwean

14  court another kid, and then you have complete chaos.

15  **Q**   And you couldn't try to resolve it with Priscilla in

16  Boston.

17  **A**   Priscilla had refused to add my name to the birth

18  certificate over the previous three years.  I'd asked

19  repeatedly.  I filed court cases.  And the only way I saw

20  forward was to appear in person in the court in Zimbabwe,

21  establish my paternity, and move on.

22  **Q**   Then how come she added it, even though according to you,

23  after you were kidnap -- after you were charged with the

24  parental kidnapping, it gave her more rights?

25  **A**    Well, it is not the right of the mother to deny paternity.

1   It is the right of the child to both parents.  So once -- as

2   soon as Massachusetts had jurisdiction over [E.G.], and as soon

3   as all of the parties were in Massachusetts, there was no point

4   resisting.  There was no question that I will be able to add

5   myself to the birth certificate.

6       So I assumed -- basically, I think sometimes people sort

7   of -- as long as they have a legal right, they will push it.

8   But the moment the legal right disappeared, like it did there,

9   there was just no point arguing about it because...

10      And I think that at the point in December, I thought that

11  one of the reasons why I was arrested was to prevent me from

12  reaching Zimbabwe, to prevent me from establishing paternity of

13  my daughter.  And in fact, it was quite a deliberate act.  But,

14  I mean, I don't know what was in her mind.

15  **Q**   Why did you not go to Zimbabwe in 2019 from Russia?  Why

16  did you come to the United States?  Why didn't you establish

17  paternity there?

18  **A**   So at the time when I left Russia in June of 2021, the

19  plan was to live in the United States, and some point for

20  [E.G.] and Priscilla to follow.

21      I did not expect Priscilla to not add me to the birth

22  certificate in Russia.  I did not expect Priscilla to not add

23  me to the birth certificate in Zimbabwe.  I did not expect

24  Priscilla to remain in Zimbabwe with [E.G.].

25      So at the time when -- around March of 2020, when I

1    realized that Priscilla's not coming to the United States, I

2    immediately filed my Hague Convention petition to bring [E.G.],

3    and I filed cases in, in Zimbabwe to establish paternity.  But

4    unfortunately, then everything got frozen by COVID.  So that

5    just got stuck.

6    **Q**    But you chose to go from Russia from the United States

7    with your son, without telling Priscilla.

8    **A**    Without getting Priscilla's permission.

9    **Q**    Okay.  You could have chosen to go to Zimbabwe at that

10   point, and establish paternity for your daughter.

11   **A**    I couldn't, because we did not have a Russian birth

12   certificate yet.  At that point in time, until November of '20

13   -- until November of 2019,  [E.G.] had no legal documents,

14   whatsoever.  Neither one of us could establish any parental

15   rights to [E.G.].

16   **Q**    And you had [E.G.]'s birth record?

17   **A**    Probably, yes.  I think Priscilla testified that I kept

18   records for the family and kind of handled the administrative

19   things, yes.

20   **Q**    Nonetheless, you chose to go to Russia from the United

21   States.

22   **A**    I'm not sure I understand "Nonetheless."  Nonetheless,

23   what?

24   **Q**    You could have chosen to establish paternity in some other

25   fashion instead of just leaving and take your son to go to the

1    United States, a country which Priscilla would need a visa for.

2    Correct?

3    **A**    I had a pending case in Russia to establish paternity.

4    That is the whole point.  We have -- Priscilla and I were

5    jointly trying to establish our parenting rights to our

6    daughter in Moscow at that time.  It was -- that case was

7    pending, and it was only resolved in October of 2019.  So I

8    couldn't -- okay.

9         [E.G.] was born in Russia.  She was physically in Russia.

10   We were all in Russia.  The only place where we could have

11   established any parenting rights was in Russia.  So I couldn't

12   have chosen to do anything else other than what I've chosen,

13   which is to try to first establish it in Russia, and then try

14   to establish it in Zimbabwe, and then try to establish it in

15   the United States.

16        So basically [E.G.] kept moving, and I kept trying to

17   establish paternity.  Um --

18   **Q**    How would leaving Russia help you establish paternity in

19   Russia?

20   **A**    No.  Leaving Russia would allow me to stabilize my son

21   [O.G.], and to make a first step in actually establishing us in

22   the United States.  That had nothing to do with establishing

23   paternity of [E.G.], which was in process in the courts in

24   Russia at the time.  And I came back to Russia to establish

25   paternity, and appear in front of the registrar to add my name

1    to her birth certificate.

2         Unfortunately, Priscilla at that point made a different

3    decision, and then we spent the next three years litigating it.

4    **Q**    She didn't put your name on the birth certificate because

5    you didn't bring [O.G.] to visit her in Russia when you came.

6    Right?

7              **MS. MITCHELL:**  Objection; calls for speculation.

8              **THE DEFENDANT:**  I do not --

9              **THE COURT:**  Sustained.

10             **THE DEFENDANT:**  I do not know.

11   **BY MS. HOSSEINI**

12   **Q**    You also talked about how initially the scheme with David

13   Rizzo was deportation, and then it changed to removal.

14   Correct?

15   **A**    Correct.

16   **Q**    Yet, when David said that the second option would be less

17   money, you said "And more definite."

18   **A**    Yes.

19   **Q**    How is removal more definite than deportation?

20   **A**    Well, I think I also clarified it to David that once the

21   person has notice that there is a deportation investigation and

22   then that there will be process steps taken, the person who is

23   subject to deportation can intervene in this process,

24   possibly -- or appear at immigration judge's hearing, possibly

25   ask for leniency of a special-circumstances exception, or

 1   somehow avoid being deported.

 2        So "more definite" meant that if a person does not know

 3   that this is going on, that the legal process is bypassed, then

 4   the person has no opportunity to hire a lawyer or get one's

 5   lawyers to get involved.

 6        So "more definite" means that you have -- he cannot

 7   involve himself in the legal process to try to slow it down or

 8   prevent it from happening.  And I think the words I used is

 9   that she ends up staying, that's the end of the conversation.

10   So, I was afraid that it was less definite.

11   **Q**   So removal was a forcible kidnapping of Priscilla from the

12   United States to Zimbabwe?

13   **A**   Um, I thought of it as removal.  I did not think of it as

14   kidnapping.  Maybe, under the color of the law.

15   **Q**   Removal was taking Priscilla from the United States

16   without the deportation or government officials, and dumping

17   her in Zimbabwe?

18   **A**   No.  By using the -- using the legal entities of the

19   United States.  That's why you bribe government official.

20   Because otherwise, you don't need a government official for a

21   kidnapping.

22   **Q**   Nonetheless, you thought it was reasonable for you to

23   plan -- whether it was through deportation or removal, a

24   distinction you make -- to remove the mother of your children

25   from the United States to Zimbabwe.

BOGNANNO - DIRECT / HOSSEINI

1    **A**    I don't think it's reasonable, no.

2    **Q**    You did it, though.  You planned that, did you not?

3    **A**    I tried to do it, yes.

4          **MS. HOSSEINI:**  Nothing further.

5          **THE COURT:**  Okay.  That concludes your testimony,

6    Mr. Gessen.

7          **THE DEFENDANT:**  Thank you.

8          **THE COURT:**  Does the defense have any further

9    evidence?

10          **MS. MITCHELL:**  No.

11          **THE COURT:**  All right, you can step down.

12    (Defendant excused from the witness stand)

13          **THE COURT:**  Does the government have any rebuttal?

14          **MS. HOSSEINI:**  Very briefly, Your Honor.  The United

15    States calls Christopher Bognanno.

16       **CHRISTOPHER BOGNANNO, GOVERNMENT'S WITNESS, SWORN**

17          **THE COURTROOM DEPUTY:**  Please state your name, and

18    spell it for the record.

19          **THE WITNESS:**  Christopher Bognanno, B-O-G-N-A-N-N-O.

20          **THE COURTROOM DEPUTY:**  Thank you.

21          **THE COURT:**  You may be seated.

22          **THE WITNESS:**  Thank you, Your Honor.

23                        **DIRECT EXAMINATION**

24    BY MS. HOSSEINI

25    **Q**    Good morning.

**BOGNANNO - DIRECT / HOSSEINI**

1   **A**   Good morning.

2   **Q**   Can you please tell us where you work.

3   **A**   The FBI.

4   **Q**   How long have you worked at the FBI?

5   **A**   Almost eight years.

6   **Q**   And, generally tell us very briefly what your duties and

7   responsibilities are at the FBI.

8   **A**   Sure.  I'm tasked with investigating violations of

9   Eurasian -- which is Eastern European, Russian and Asian --

10  organized crime.

11  **Q**   And what is your title at the FBI?

12  **A**   Special Agent.

13  **Q**   Directing your attention to June of 2022, were you

14  assigned as a Special Agent to an investigation involving Allen

15  Gessen?

16  **A**   Yes, ma'am.

17  **Q**   In that capacity, did you run any criminal history checks

18  for someone named Priscilla Chigariro?

19  **A**   Yes, ma'am.

20  **Q**   What was the result of that?

21  **A**   Ms. Chigariro, we ran a federal records check on

22  Ms. Chigariro and discovered that she had no federal criminal

23  record in the United States of America.  We also ran a

24  California state records check and discovered she had no

25  criminal history in the state of California.

 1         Further, we ran a Massachusetts state and local records

 2    check and discovered that she had no criminal history in the

 3    state of Massachusetts.

 4    Q    All right.  And these criminal history checks, do they

 5    pick up arrests and convictions?

 6    A    Yes.

 7    Q    And so the results of your criminal history checks was

 8    that she had no convictions, and no arrests?

 9    A    Yes, ma'am.  The FBI's found in the U.S. no record of

10    arrest or conviction for Ms. Priscilla Chigariro.

11              **MS. HOSSEINI:**  Nothing further.

12              **THE COURT:**  Any questions?

13              **MS. MITCHELL:**  Briefly.

14                        <u>**CROSS-EXAMINATION**</u>

15    **BY MS. MITCHELL**

16    Q    Agent Bognanno, you ran those checks in the United States?

17    A    Yes.

18    Q    You didn't run them in Zimbabwe?

19    A    No.

20    Q    You didn't run them in Russia?

21    A    That's correct.

22    Q    Not in Estonia?

23    A    Correct.

24    Q    No countries outside the United States.

25    A    That's right.

BOGNANNO - CROSS / MITCHELL

1  Q     You have no idea what Ms. Chigariro's criminal history is

2  in any place outside of the United States.

3  A     I do not.

4          MS. MITCHELL:  No questions, thank you.

5          THE COURT:  You may step down.

6          THE WITNESS:  Thank you, Your Honor.

7      (Witness excused)

8          THE COURT:  Does the government have any further

9  evidence?

10         MS. HOSSEINI:  No, Your Honor.  The government rests

11 its rebuttal case.

12         THE COURT:  Ladies and gentlemen of the jury, that

13 completes the presentation of the evidence.  We are going to

14 take about ten minutes right now to finalize jury instructions

15 and talk about scheduling.

16     And when you return I'll give you orally the final jury

17 instructions; you will get a written copy in the jury room.

18 And then we will begin with the closing arguments, right, but

19 not yet.

20     You still are under orders not to discuss is the case with

21 anyone, including each other, or do any research.

22     Thank you.

23     (Jury excused)

24     (The following proceedings were held outside of the

25 presence of the Jury)

1     **THE COURT:**  Okay.  So I think the only instruction

2   issue we have, at least that I'm aware of, is the defense's

3   requested modification and theory of defense venue instruction.

4       Ms. Hosseini, did you wish to respond?

5       **MS. HOSSEINI:**  Yes, Your Honor.

6       We believe that to the extent that the defendant claims

7   venue is an issue Your Honor should give the standard Ninth

8   Circuit instruction on venue.  The defendant's proposed

9   instruction on venue is contrary to law and misconstrues the

10   murder-for-hire cases.  It basically conflates venue with

11   specific requirements that are necessary to prove elements of

12   murder for hire.  None of the cases that they cited in their

13   memorandum are venue cases.

14       For example, the *Driggers* case, the one that they are

15   relying on mainly is about the need to have a temporal

16   connection between the use of an interstate facility and intent

17   to murder.

18       And the Court goes into how, under that instruction, in

19   *Driggers*, it could have been such that the one person told the

20   other person to go across state lines and pick up a birthday

21   present.  And then at a totally unrelated some time later, a

22   murder for hire would have happened in that state.  And under

23   that instruction, that would have been a violation of murder

24   for hire.

25       **THE COURT:**  Can I ask you, the venue statute we are

 1   looking at is 3237.  Right?

 2            MS. HOSSEINI:  I'm sorry, I don't have that with me.

 3            THE COURT:  It says "begun in one district and

 4   completed in another"?

 5            MS. HOSSEINI:  Yes.

 6            THE COURT:  All right.  And the second paragraph which

 7   revolves -- any offense involving the use of the mails,

 8   transportation in interstate commerce or importation of an

 9   object or person in the United States -- does "mails" include

10   wires?  Or is it just mail?

11            MS. HOSSEINI:  My understanding is it's just mail.

12            THE COURT:  All right.  So under that statute your

13   argument is that the offense was continued into San Francisco

14   via, at a minimum, the payment of the $23,000.

15            MS. HOSSEINI:  Yes, Your Honor.  The evidence in this

16   case is nothing like *Driggers*, where there is a disconnect

17   between the wires and the murder.

18            THE COURT:  Okay, all right, that's fine.  I

19   understand that.

20        Ms. Mitchell, I understand the argument.  It's a literal

21   argument, but I understand it.  It's essentially that

22   completed, the case is discussing when the offense is

23   completed, for purposes of abandoning or withdrawal from the

24   murder for hire, that "completed" means the same thing.

25        But the statute, right, it says -- "where it was begun,

PROCEEDINGS

1    continued or completed."  Certainly the jury could find that

2    the offense was continued by the payment of the money for the

3    alleged murder for hire.  Right?

4             MS. MITCHELL:  Yes, Your Honor, which actually could

5    have been in New York, which is where Mr. Gessen is alleged to

6    have given a gold coin to undercover Agent Rizzo as payment.

7    So at that point in time, based off of the case law, because

8    Mr. Gessen gave the gold coin to Agent Rizzo under the

9    government's theory with the intent that the murder for hire be

10   completed, that would have completed all of the evidence

11   required for the statute.

12            THE COURT:  I understand that.  So you are saying the

13   offense was not continued, the payment -- the wire transfer to

14   San Francisco was not part of the murder for hire.

15            MS. MITCHELL:  I'm saying that if the government

16   wanted to have separately charged that as another allegation

17   they could have --

18            THE COURT:  Wait a minute, what do you mean, "as

19   another allegation"?

20            MS. MITCHELL:  As another instance of where Mr. Gessen

21   demonstrated that he wanted to have a murder for hire be

22   completed.

23            THE COURT:  Two counts?

24            MS. MITCHELL:  They could have charged it.

25            THE COURT:  All right.

1          **MS. MITCHELL:**  Essentially as a wire fraud where an

2     individual is part of a continuing wire fraud, perhaps does one

3     instance, does another instance.

4          But here, there are multiple different actions that could

5     have been actions that completed the -- the murder for hire.

6     For instance it could have been allegation of using Signal at

7     some point in time with the intent to complete the murder for

8     hire.  That could have occurred at any point in time after, I

9     guess, June 2nd.  That would have been the use of something

10    after June 2nd.  That could have been the international -- or

11    interstate commerce facility, right?  Use of Signal.

12         And then any time after that with the intent that murder

13    for hire be committed, if there was the use of Signal at some

14    point in time.  And there was the communication that Mr. Gessen

15    intended that payment happen, and payment, in fact, happened.

16    These, all of these different uses of interstate commerce

17    coupled with the actions of Mr. Gessen making the payment,

18    under the government's theory, that would have completed the

19    murder for hire, based off of the current case law that says

20    the moment all of the instances are done, the murder for hire

21    is completed, the crime is completed --

22              **THE COURT:**  For purposes of abandonment or withdrawal.

23    You don't have a case that says venue.  And in the *Hernandez*

24    case in the Ninth Circuit that you cite, the 1326, that was a

25    case where it could not be continued, once the defendant was

1    found, that is, the United States became aware that they were

2    in there.  That's the case.

3         So as I said, I understand the argument.  It's a little

4    argument.  I would make the argument, if I were in your place,

5    but I'm not going to accept the argument.  I don't think it's

6    actually what the law would be.  But, the argument is

7    preserved.

8         But I will give, of course, the Ninth Circuit venue

9    instruction as well as the preponderance of the evidence

10   instruction, as well.

11        **MS. MITCHELL:**  Thank you, Your Honor.

12        **MS. HOSSEINI:**  Thank you, Your Honor.

13        **THE COURT:**  Okay.  So how -- so I can tell the jury

14   with respect to timing, do you have an estimate as to your

15   closing and rebuttal?

16        **MS. HOSSEINI:**  I think we'll request 45 minutes to an

17   hour.

18        **THE COURT:**  I'm not going to cut you off.  I just want

19   to know.  So, total, about an hour?

20        **MS. HOSSEINI:**  Yes.

21        **THE COURT:**  Okay.  And Ms. Mitchell?

22        **MS. MITCHELL:**  About the same, Your Honor.

23        **THE COURT:**  About the same.  Okay.  Good.  So I will

24   -- yeah, so we're taking a break now.  Ms. Ball, do you need a

25   break before we go for an hour?  Or I guess it would be a

1    little longer, an hour and 15 minutes?

2           **THE REPORTER:**  No, Your Honor I don't need a break

3    yet.

4         **THE COURT:**  Okay, so I'm going to go print out the

5    jury instructions, so I read the correct version.

6       Yes.

7         **MS. HOSSEINI:**  Your Honor, may we have a brief --

8    like, ten minutes just to set up our technology for the

9    closing?

10          **THE COURT:**  Yes, of course.

11          **MS. MITCHELL:**  Your Honor, for clarification, is it

12   the Court's intention to instruct the jurors, we come back and

13   do closings?  Because if both parties are going to do an hour

14   for closing and we are going to have the 12:00ish, no, we are

15   concluding today at 1:00.

16          **THE COURT:**  1:30.  So I think what we will do is

17   they'll come back, we'll end at let's say 11:15, I'll instruct,

18   we'll do the -- for an hour, or 45 minutes or less.  The

19   government -- take another brief break, and then we will do

20   yours and rebuttal, and then we will finish.

21          **MS. MITCHELL:**  Okay.

22          **THE COURT:**  I had told the jury 1:30 today.  If they

23   decide to stay, they can stay.  But they'll all have to agree.

24          **MS. MITCHELL:**  Okay.

25          **THE COURT:**  Does that make sense?

**PROCEEDINGS**

1          **MS. MITCHELL:**  Yes, Your Honor.

2          **MS. HOSSEINI:**  Yes, Your Honor.

3          **THE COURT:**  All right.  Great.

4          **THE COURTROOM DEPUTY:**  Will you tell them that?

5          **THE COURT:**  I'll tell them when they come in.

6      (Recess taken from 11:02 a.m. to 11:13 a.m.)

7      (The following proceedings were held outside of the

8  presence of the Jury)

9          **THE COURT:**  Since we just took this break, I think

10  maybe what I would like to do is go through with the arguments.

11  I want to make sure Ms. Ball had a break, but she just had a

12  break.  So we can go.  Your break --

13          **MS. MITCHELL:**  Into the arguments --

14          **THE COURT:**  Closing.

15          **MS. MITCHELL:**  Yes, Your Honor.  And then, just

16  because in light of the fact the Court is inclined to give the

17  model instruction as to venue, we do have some suggestions for

18  modification of the model, because the language there also

19  incorporates some aspect of conspiracy.

20      So we would request that the model instruction, so this is

21  6.32 -- be modified to read (As read):

22              "Venue is proper in the Northern District of

23              California if the charged offense was

24              committed in this district.  The indictment

25              alleges that the crime charged" -- I'm taking

1              the language from the statute here -- "was

2              begun, continued or completed in the Northern

3              District of California. There is no

4              requirement that all aspects of the crime

5              charged take place in the Northern District

6              of California.  Before you may return a

7              verdict of guilty, however, if that is your

8              decision, the government must convince you

9              that some act in furtherance of the crime

10             charged took place in the Northern District

11             of California."

12     And then into the second paragraph, no modifications of

13     that except for the removal of -- "It's more likely than not

14     that some act in furtherance of the crime charged," deleting

15     "that that part of the conspiracy took place here."

16          **THE COURT:**  Yeah, I don't have any reference to

17     conspiracy in mine.

18          **MS. MITCHELL:**  Uh-huh.

19          **MS. HOSSEINI:**  There is no reference to conspiracy, I

20     don't think.

21          **THE COURT:**  Let me tell you -- I should read to you

22     what I am going to do.  This is what I have (As read):

23              "The indictment alleges that some act in

24              furtherance of the crime charged occurred in

25              the Northern District of California.  There

1          is no requirement that all aspects of the

2          crime charged take place here in the Northern

3          District of California.  Before you may

4          return a verdict of guilty, however, if that

5          is your decision, the government must

6          convince you that some act in furtherance of

7          the crime charged took place in the Northern

8          District of California.  The Northern

9          District of California includes

10         San Francisco.  Unlike all the specific

11         elements of the crime charged that I've

12         described elsewhere in these instructions,

13         this fact regarding venue need only be proven

14         by a preponderance of the evidence.  This

15         means the government need only convince you

16         that it is more likely than not that some

17         acts in furtherance of the crime charged took

18         place here.  The government, however, must

19         prove all the offense -- specific elements of

20         any crime charged, as I have described

21         elsewhere in these instructions, beyond a

22         reasonable doubt.  The lesser standard of

23         preponderance of the evidence only applies to

24         your decision on the issue of venue."

25              **MS. MITCHELL:**  So with that, we would just request --

PROCEEDINGS

1  our request just modifies I think the first two sentences,

2  largely, with the inclusion of:  Venue is proper in the

3  Northern District of California if the charged offense was

4  committed in this district.

5      And then with the first part of that "the indictment

6  alleges," we would change that to instead of "some acts in

7  furtherance of the crime charged occurred," we would change

8  that to "the crime charged was begun, continued or completed."

9      MS. HOSSEINI:  I don't see a reason to modify the

10  venue language that has been approved by the Ninth Circuit.  It

11  says the indictment alleges that some acts in furtherance of

12  the crime charged occurred in the Northern District of

13  California.

14      THE COURT:  I don't have the indictment in front of

15  me.

16      MS. HOSSEINI:  The indictment is right here.  And the

17  indictment charges from June 2nd to July 26th.  And it said

18  that (As read):

19          "The defendant traveled in and used facility

20          of interstate and foreign commerce with the

21          intent to murder P.C."

22      And it goes on to say for a consideration --

23      THE COURT:  Okay, so -- I -- doesn't -- I don't need

24  -- so you want it to say that I need to find in some -- why do

25  I even have to refer to the indictment at all in the

1    instruction?  Don't I just need to refer to venue?  Right?

2            MS. MITCHELL:  I don't know that the Court does need

3    to refer to the indictment.

4            THE COURT:  Okay.  So, you would say -- yours is "for

5    there to be venue of the crime charged"?

6            MS. MITCHELL:  Ours starts with:

7                "Venue is proper in the Northern District of

8                California if the charged offense was

9                committed in this district."

10       And it would continue with -- right now we have:

11               "The indictment alleges that the crime

12               charged was begun, continued or completed in

13               the Northern District of California."

14           THE COURT:  So I would say -- I think it's confusing,

15   the first sentence, but I could say:  Venue is proper in the

16   Northern District of California if the crime charged was begun,

17   continued, or completed in the Northern District of California.

18           MS. HOSSEINI:  Or the flip side of that is that:  Some

19   act in furtherance of the crime charged occurred in the

20   Northern District of California, which --

21           THE COURT:  Well, that would mean continued, wouldn't

22   it?

23           MS. HOSSEINI:  Right.  I just don't want there to be a

24   misleading impression where the jury has to think it all began

25   here, and completed here.  So some act in furtherance is all

1    that the venue model instruction says must occur.  Not when it

2    began or completed.

3         **THE COURT:**  I see, because it would by confusing.  Why

4    should we even say began or completed?  That is not the theory.

5         **MS. MITCHELL:**  But it is exactly what the statute,

6    itself, reads.

7         **THE COURT:**  No, I understand.  But if to instruct the

8    jury on the statute, itself, would be confusing or misleading,

9    then we don't -- then we don't do it.

10        **MS. MITCHELL:**  And so we would just request that the

11   Court include that language, because it is the accurate

12   statement of what the law is.

13        **THE COURT:**  Okay.  What I'm going to say is I -- I'm

14   going to say venue is proper -- I'm not going to say the

15   indictment alleges -- venue is proper in the Northern District

16   of California if the crime -- no, I'll just take the model jury

17   instruction.  That some act -- I understand the argument, but I

18   do think it would -- in this case, it might be confusing.

19       Venue is proper in the Northern District of California in

20   some act in furtherance of the crime charged occurred in the

21   Northern District of California.

22       Okay.  All right.  Objection noted.

23       Okay.  Can we bring the jury in?

24       (The following proceedings were held in the presence of

25   the Jury)

1      **THE COURT:**  You may be seated.  Thank you for your

2  patience, members of the jury.

3      I'm now going to give you the instructions, and then the

4  lawyers will give you their closing arguments.  And then the

5  rest of the day will be up to you to decide how you are

6  schedule goes.

7                        **JURY INSTRUCTIONS**

8  **BY THE COURT**

9      Members of the jury, now that you have heard all of the

10  evidence, it is my duty to instruct you on the law that applies

11  to this case.  A copy of these instructions will be available

12  in the jury room for you to consult.

13      It is your duty to weigh and evaluate all the evidence

14  received in the case, and in that process, to decide the facts.

15  It is also your duty to apply the law as I give it to you to

16  the facts as you find them, whether you agree with the law or

17  not.  You must decide the case solely on the evidence and the

18  law.  You will recall that you took an oath promising to do so

19  at the beginning of the case.

20      You should also not be influenced by any person's race,

21  color, religious beliefs, national ancestry, sexual

22  orientation, gender identity, gender or economic circumstances.

23      Also do not allow yourself to be influenced by personal

24  likes or dislikes, sympathy, prejudice, fear, public opinion or

25  biases, including unconscious biases.  Unconscious biases are

1   stereotypes, attitudes or preferences that people may

2   consciously reject but may be expressed without conscious

3   awareness, control or intention.

4       You must follow all of these instructions and not single

5   out some and ignore others.  They are all important.  Please do

6   not read into these instructions or anything that I may have

7   said or done during the trial as any suggestion as to what your

8   verdict should be.  That is a matter that is entirely up to

9   you.

10      The indictment, the charge is not evidence.  The defendant

11  has pleaded not guilty to the charge.  The defendant is

12  presumed to be innocent, unless and until the government proves

13  the defendant guilty beyond a reasonable doubt.

14      In addition, the defendant does not have to testify or

15  present any evidence.  The defendant does not have to prove

16  innocence.  The government has the burden of proving every

17  element of the charge beyond a reasonable doubt.

18      Proof beyond a reasonable doubt is proof that leaves you

19  firmly convinced the defendant is guilty.  It is not required

20  that the government prove guilt beyond all possible doubt.  A

21  reasonable doubt is a doubt based upon reason and common sense

22  and is not based purely on speculation.  It may arise from a

23  careful and impartial consideration of all of the evidence or

24  from lack of evidence.

25      If after a careful and impartial consideration of all the

1  evidence you are not convinced beyond a reasonable doubt that

2  the defendant is guilty, it is your duty to find the defendant

3  not guilty.

4      On the other hand, if after a careful and impartial

5  consideration of all the evidence you are convinced beyond a

6  reasonable doubt that the defendant is guilty, it is your duty

7  to find the defendant guilty.

8      The evidence you are to consider in deciding what the

9  facts are consist of:

10      First, the sworn testimony of any witness;

11      Second, the exhibits that are received in evidence;

12      And third, any facts to which the parties agree.

13      In reaching your verdict, you may consider only the

14  testimony and exhibits received in evidence.  The following

15  things are not evidence, and you may not consider them in

16  deciding what the facts are.

17      Questions, statements, objections and arguments by the

18  lawyers are not evidence.  The lawyers are not witnesses.

19  Although you must consider a lawyer's questions to understand

20  the answers of a witness, the lawyer's questions are not

21  evidence.

22      Similarly, what the lawyers have said in their opening

23  statements, will say in their closing arguments and at other

24  times is intended to help you interpret the evidence but it is

25  not evidence.  If the facts as you remember them differ from

1    the way the lawyer states them, your memory of them controls.

2        Any testimony that I have excluded, stricken or instructed

3    you to disregard is not evidence.

4        In addition, some evidence -- well, I don't think we did

5    that, so I'll skip that.

6        Anything you may have seen or heard when the Court was not

7    in session is not evidence.  You are to decide the case solely

8    on the evidence received at the trial.

9        Evidence may be direct or circumstantial.  Direct evidence

10   is direct proof of a fact such as testimony by a witness about

11   what that witness personally saw or heard or did.

12   Circumstantial evidence is indirect evidence.  That is, it is

13   proof of one or more facts from which one can find another

14   fact.

15       By way of example, if you wake up in the morning and see

16   the sidewalk is wet, you may find from that fact that it rained

17   during the night.  However, other evidence such as a turned-on

18   garden hose may provide an explanation for the water on the

19   sidewalk.  Therefore, before you decide that a fact has been

20   proven by circumstantial evidence, you must consider all of the

21   evidence in the light of reason, experience and common sense.

22       You are to consider both direct and circumstantial

23   evidence.  Either can be used to prove any fact.  The law makes

24   no distinction between the weight to be given to either direct

25   or circumstantial evidence.  It is for you to decide how much

1   weight to give any evidence.

2      In deciding the facts of this case, you may have to decide

3   which testimony to believe, and which testimony not to believe.

4   You may believe everything a witness says, or part of it, or

5   none of it.

6      In considering the testimony of any witness, you may take

7   into account:

8      First, the witness's opportunity and ability to see or

9   hear or know the things testified to;

10      Second, the witness's memory;

11      Third, the witness's manner while testifying;

12      Fourth, the witness's interest in the outcome of the case,

13   if any;

14      Fifth, the witness's bias or prejudice, if any;

15      Sixth, whether other evidence contradicted the witness's

16   testimony;

17      Seventh, the reasonableness of the witness's testimony in

18   light of all the evidence;

19      And eighth, any other factors that bear on believability.

20      Sometimes a witness may say something that is not

21   consistent with something else he or she said, sometimes

22   different witnesses will give different versions of what

23   happened.  People often forget things or make mistakes in what

24   they remember.  Also, two people may see the same event but

25   remember it differently.  You may consider these differences,

1   but do not decide that testimony is untrue just because it

2   differs from other testimony.

3        However, if you decide that a witness has deliberately

4   testified untruthfully about something important, you may

5   choose not to believe anything that witness said.  On the other

6   hand, if you think the witness testified untruthfully about

7   some things but told the truth about others, you may accept the

8   part you think is true and ignore the rest.

9        The weight of the evidence as to a fact does not

10  necessarily depend on the number of witnesses who testify.

11  What is important is how believable the witnesses were, and how

12  much weight you think their testimony deserves.

13       The defendant has testified.  You should treat this

14  testimony just as you would the testimony of any other witness.

15       You have heard testimony from an undercover agent who was

16  involved in the government's investigation in this case.  Law

17  enforcement officials may engage in stealth and deception such

18  as the use of informants and undercover agents, to investigate

19  criminal activities.  Undercover agents and informants may use

20  false names and appearances and assume the roles of members in

21  criminal organizations.

22       You are here to determine whether the defendant is guilty

23  or not guilty of the charge in the indictment.  The defendant

24  is not on trial for any conduct or offense not charged in the

25  indictment.

1    You have heard evidence that the defendant committed other

2  crimes, wrongs, and/or acts not charged here.  You may consider

3  this evidence only for its bearing, if any, on the question of

4  the defendant's intent, motive, opportunity, preparation, plan,

5  knowledge, identity, absence of mistake and/or absence of

6  accident, and for no other purpose.  You may not consider this

7  evidence as evidence of guilt of the crime for which the

8  defendant is now on trial.

9    The parties have agreed to certain facts that have been

10  stated to you.  Those facts are now conclusively established.

11    The defendant is charged in the indictment with using

12  interstate commerce facilities in the commission of a murder

13  for hire in violation of Section 1958 of Title 18 of the United

14  States Code.  For the defendant to be found guilty of that

15  charge, the government must prove each of the following

16  elements beyond a reasonable doubt.

17    First, the defendant used or caused another to use a

18  facility in interstate or foreign commerce.  And second, the

19  defendant did so with the intent that murder be committed.  And

20  third, the defendant intended that the murder be committed in

21  exchange for pecuniary value, namely, $50,000.

22    Venue is proper in the Northern District of California if

23  some act in furtherance of the crime charged occurred in the

24  Northern District of California.  There is no requirement that

25  all aspects of the crime charged take place here in the

 1    Northern District of California.

 2         Before you may return a verdict of guilty, however, if

 3    that is your decision, the government must convince you that

 4    some act in furtherance of the crime charged took place in the

 5    Northern District of California.  The Northern District of

 6    California includes San Francisco.

 7         Unlike all the specific elements of the crime charged that

 8    I've described elsewhere in these instructions, this fact

 9    regarding venue need only be proved by a preponderance of the

10    evidence.  This means the government need only convince you

11    that it is more likely than not that some act in furtherance of

12    the crime charged took place here.

13         The government, however, must prove all the

14    offense-specific elements of any crime charged, as I've

15    described elsewhere in these instructions, beyond a reasonable

16    doubt.  The lesser standard of preponderance of the evidence

17    only applies to your decision on the issue of venue.

18         And when we are done with closing argument I'll have a few

19    more instructions for you.

20         All right.  Is the government prepared to close?

21         **MS. JAMES:**  Yes, Your Honor.

22                         **<u>CLOSING ARGUMENT</u>**

23    BY MS. JAMES

24         "I researched my resources.  The lowest price was 220."

25    That's the defendant's words to plotting the murder of the

1    mother of his children.

2        Ladies and gentlemen, you have heard a lot of evidence

3    over the last few days.  You've heard about kidnappings; you've

4    heard about plots to bribe government officials.  You've heard

5    about multi-million-dollar business ventures.  But most

6    importantly, you heard about the defendant, Allen Gessen

7    (Indicating), plotting the murder of the mother of his children

8    and his ex-wife.

9        At the beginning of this trial, my colleague told you that

10   the government would prove its case beyond a reasonable doubt

11   that the defendant committed murder for hire.  What does the

12   government have to prove in order to show that the defendant

13   committed murder for hire?

14       First, the government must prove that the defendant used

15   or caused to be used a facility of interstate or foreign

16   commerce.  Two, that the defendant did so with the intent that

17   murder be committed.  And three, the defendant intended that

18   the murder be committed in exchange for $50,000.

19       Now I'm going talk about each of these elements and I'm

20   going to take them a little bit out of order.  I'm going to

21   start with the interstate commerce piece, move to the money

22   piece and then lastly, discuss intent that murder be committed.

23       Looking at the interstate commerce piece, there's no

24   dispute here.

25       (Document displayed)

1          **MS. JAMES:**  You have a stipulation in evidence that

2     the wire -- where -- where a facility of interstate or foreign

3     commerce.  So that money that went from the bank in Estonia

4     through the Citibank in the United States was received by the

5     bank here in San Francisco, California, by the FBI undercover

6     account.  The government has proven that element beyond a

7     reasonable doubt.

8          Next you heard about that gold coin.

9          (Image displayed)

10         **MS. JAMES:**  After solidifying the agreement, the

11    defendant provided Agent Rizzo with a gold coin as a $2,000

12    down payment for the murder of Priscilla.

13         You also heard about the wire transfers.

14         (Document displayed)

15         **MS. JAMES:**  Agent Peacock testified that the FBI bank

16    account received payments on multiple dates.  One, June 29,

17    2022.  That was for 17,975.  And then that second payment on

18    July 8, 2022, for $4,975.

19         Agent Peacock also told you that those amounts were minus

20    the $25 bank fee.

21         Now, this is also consistent with the other evidence in

22    the case.

23         (Document displayed)

24         **MS. JAMES:**  It is, one, consistent with the audio from

25    June 22nd, where the defendant agrees to make these payments

1    for Priscilla's murder.

2         Second, it's an agreement -- it's, excuse me, consistent

3    with that fake consulting agreement contract that indicates the

4    defendant would make two payments of these specified amounts

5    around these specified dates.

6         And three, it's consistent with those Signal messages

7    where Agent Rizzo and the defendant discussed that the murder

8    would cost $50,000, and that the defendant would pay half now,

9    half later.

10        The government has proven this element, beyond a

11   reasonable doubt.

12        Now, let's talk about intent that murder be committed.

13   How do you know that the defendant had the intent that murder

14   be committed?

15        Let's start with the defendant's ultimate goal.  Getting

16   rid of his ex-wife so that he can have sole custody of his

17   children.  And as you've seen from the evidence, the defendant

18   will go for that goal, by any means necessary.

19        (Document displayed)

20        **MS. JAMES:**  This is supported by Priscilla's

21   testimony.

22        From her testimony, you learned that when they lived in

23   Russia in 2019, the defendant abducted her son.  He went to the

24   United States, and he left Priscilla stranded, without a way to

25   follow him.  You heard she had no visa, she had a

seven-month-old baby, and she could not go to America.  That
was one way to achieve his goal.

     But he couldn't get rid of Priscilla so easily.  She told
you about all the legal battles she faced trying to get her son
back.  She told you about all the hardships she faced trying to
get to America.  And she eventually did get to America.

     And then two years later, in 2021, what does the defendant
do?  He kidnaps her son again.  He leaves Priscilla stranded in
America again.  And she has no way -- he flees the country.

     So in 2019 and in 2021, any means necessary meant
kidnapping and abandonment.

     Now let's turn to the June 2nd meeting.

     (Document displayed)

     **MS. JAMES:**  You heard from Agent Rizzo that he and the
defendant met to -- excuse me -- met to discuss bribing an
immigration official to deport Priscilla.

     You know from the evidence why he wants to deport
Priscilla.  He's angry that she had him arrested for parental
kidnapping and he wants his -- sole custody of his children.
So once again, Priscilla is in his way and the defendant needs
her gone.

     And at the beginning of that June 2nd, 2022, meeting, the
means, the any means necessary, that meant deportation.
There's no dispute that the plan originated as a deportation
scheme.

1     (Document displayed)

2     **MS. JAMES:**  However, at that June 2nd meeting, those

3  plans changed (As read):

4         "...incedently (sic) if there was a cheaper

5         way to get rid of her, that would be good

6         too.  It's simply more expensive."

7    That's the defendant's statement.  He wanted that cheaper

8  option.  And murder was the perfect option.  It was cheaper; it

9  was more definite.  And it was at that moment that the

10  defendant jumped at the possibility:  I didn't know that was an

11  option.  Give me the price.

12    You heard the audio.  You heard the testimony.  This is

13  not spur-of-the moment emotional reaction.  That's what the

14  defendant said, and the defendant is right.  This action is

15  deliberate, it's calculated, and it is without hesitation.

16     (Document displayed)

17     **MS. JAMES:**  Ladies and gentlemen, while you deliberate

18  on this case, do not leave your common sense at the door.

19     (Document displayed)

20     **MS. JAMES:**  The defendant researched this option.  He,

21  himself, said that he previously paid the $10,000 for

22  reconnaissance.  It's just that that additional 210,000 was too

23  much.

24    Listen to the conversation, and you think about what makes

25  sense.  If the defendant is talking about deportation, why is

1   there any conversation about Mossad, and reconnaissance?

2   Because the defendant isn't talking about deportation.  The

3   Mossad, an Israeli intelligence agency, is not coming to

4   America to deport someone in America.  That does not make

5   sense.

6        And let's look at that target packet.  If the defendant is

7   talking about deportation in the first instance for someone who

8   has applied for a visa, why does the defendant need to supply

9   Agent Rizzo with a target packet anyway?

10       The defendant told Agent Rizzo at both that June 2nd

11  meeting and that June 22nd meeting, that Priscilla had applied

12  for a temporary U.S. visa.

13       Priscilla testified here before you, and said she had

14  applied for a temporary U.S. visa.  That means she has supplied

15  the federal government with all the information they could

16  possibly need to deport her.

17       (Document displayed)

18       **MS. JAMES:**  And look at this target package.  This is

19  deportation?  Absolutely not.  Think about what's there.

20  Priscilla's Instagram, her boyfriend, her boyfriend's age, her

21  vehicle, her friends, lifestyle observations.  What does an

22  immigration officer need with that information?  Nothing.

23       But you know who does need that information?  Someone

24  trying to make a murder look random.  And that's exactly what

25  the defendant said he wanted.  Quick and random.

1       (Document displayed)

2       **MS. JAMES:**  Now, of course, he doesn't use words like

3   "murder" or "kill."  The defendant is a lawyer.  I would hope

4   he knows better.  And that's consistent with the defendant

5   trying to cover his tracks.  That's supported by the evidence.

6       The defendant himself says (As read):

7           "...we will stay on Signal.  None of the

8           words we mention here can end up there."

9       That's to cover up the arrangements for Priscilla's

10  murder.  It is the defendant who is drafting fake or sneaky

11  contracts to disguise the nature of the deal.  It is the

12  defendant setting messages to disappear on the Signal app.

13      Ladies and gentlemen, by the end of that June 2nd meeting,

14  the defendant is no longer talking about deportation.

15      (Document displayed)

16      **MS. JAMES:**  And if he were talking about deportation,

17  he would have said it.  And you know that, because in that

18  June 2nd meeting, he doesn't shy away from using the word

19  "deported."  He says those words.

20      And let's be clear.  This also is not a mistake or a

21  misunderstanding.  The defendant is a negotiator.  The

22  defendant knows exactly what Agent Rizzo is talking about.

23  It's the defendant who says "We shifted gears."  Shifted gears

24  from what to what?  Deportation to murder.

25      And again, this is further confirmed by the rest of that

1    conversation.  At the end of that June 2nd meeting, Agent Rizzo

2    says:

3              "I wish Alex would have been here on time."

4        And the defendant's response is:

5              "Well then we wouldn't have had this

6              conversation."

7        You heard the conversation with Alex on March 24th between

8    Agent Rizzo and him.  Alex knew about the deportation scheme.

9    In fact, Alex is the one who introduced Agent Rizzo to Allen

10   Gessen.

11       Ladies and gentlemen, why would they avoid a topic that

12   Alex already knows about, if that's what they're talking about?

13   They wouldn't.  They would avoid "murder," however.

14       Look at the messages.  The defendant acknowledges that

15   there are two projects that he and Agent Rizzo are planning.

16   And when talking about one project it's "vests" or "vests and

17   helmets."  There are no code words.  But when talking about the

18   murder, that's "the other project" (Indicating quotation marks)

19   or "the Boston project."

20       And when Agent Rizzo says "Boston project," the defendant

21   knows he is talking about murder.  Priscilla lives in Boston.

22   And he couldn't get rid of Priscilla by leaving Russia,

23   couldn't get rid of Priscilla by leaving America.  And he knows

24   he definitely won't get rid of Priscilla through deportation.

25   She's shown otherwise.  But murder, that's permanent.

1    And when you look at the messages between the defendant

2  and Agent Rizzo, where do you see the defendant ever asking for

3  clarity?  Where do you see the defendant expressing confusion

4  about their conversation?  You don't.  And that's because the

5  conversation is clear.  It continues because both parties know

6  that they are discussing murder.

7    (Document displayed)

8    **MS. JAMES:**  The defendant's statement in those audio

9  recordings and in those messages tell you everything you need

10  to know about his intent.

11    But let's turn to the defendant's statements in court.

12  You heard the defendant testify in this case.  And as the Court

13  has instructed you and will instruct you, you should treat his

14  testimony just as you would the testimony of any other

15  witnesses.

16    (Document displayed)

17    **MS. JAMES:**  And when assessing his testimony as you

18  would any other witness, the Court instructed you can consider

19  these factors that are listed here.

20    Now, this is listed directly from the jury instructions.

21  But I want to narrow in on a few factors.

22    Whether other evidence contradicts what the -- the witness

23  testimony.  Whether there's reasonableness of the witness

24  testimony, in light of all the evidence.  And, any other

25  factors that bear on believability.

1          You heard from the defendant.  He's a lawyer.  He's a

2    negotiator, and he is sophisticated.  He knew this day was

3    coming, and he wanted to have a story, a front for if he was

4    ever right here.

5          And you don't just know that from the evidence.  He told

6    you that in court, himself, in relationship to the deportation

7    plans.  He said these documents could end up with the

8    government.  So of course, he has a story to tell you, and he

9    has an answer for every question asked.

10         But ask yourself:  Do those answers make sense?  You have

11   heard the evidence.  Does the defendant's story that he was

12   looking for a definite deportation carried out by someone else,

13   another country's intelligence agency, make any sense?  No, it

14   doesn't.

15         And think back to how the defendant testified.  He was

16   precise in his language and thoughtful in his responses.

17         (Document displayed)

18         **MS. JAMES:**  But again, his story still didn't make

19   sense.  Listen to how it changed.

20         On direct, the defendant testified that he understood from

21   Alex that deportation scheme was on the way.  His whistleblower

22   complaint was taken care of.  He did not need to do anything

23   further.  And that David, Agent Rizzo, was coming in to speed

24   up that process.

25         But then later, the defendant testified that his intention

1  going into that June 2nd meeting with Agent Rizzo was to

2  discuss a ballistics factory.

3      Well, which one is it?  He went into that meeting, looking

4  to get rid of Priscilla by deportation.  And you know that also

5  from his testimony.  He said on the stand that he studied

6  immigration law while he was in jail for that June -- excuse

7  me -- for that December, 2021, kidnapping because he wanted

8  Priscilla deported.

9      Again, what makes the most sense?  You heard the defendant

10 tell the Court that he wanted by any costs to be reunited with

11 his children.  Then that changed to:  At any reasonable costs.

12     Was abducting their child in Russia reasonable?  Was

13 leaving Priscilla without a visa in Russia reasonable?  Was

14 abducting their child in America reasonable?  None of that was

15 reasonable.

16     (Document displayed)

17     **MS. JAMES:**  And to this defendant, though, getting rid

18 of Priscilla by any means is reasonable.

19     Each time, it just didn't work.

20     (Document displayed)

21     **MS. JAMES:**  He needed something permanent.  And for

22 him, murder was that only option.

23     (Document displayed)

24     **MS. JAMES:**  This is further supported by his

25 testimony.  He said by June, there was no useful purpose to

deport Priscilla.  And he's right.  Abandoning Priscilla in
Russia didn't work in 2019.  Stranding her in America didn't
work in 2021.  What do you think deporting her in 2022 would
have done?  Brought her right back.  So that scheme in June of
2022, the defendant was not talking about deportation by the
end of that meeting.

And you know that that -- and you know this as well
because when the defendant sent that target packet and when he
paid the money, that was on July 8th.  So he acknowledges that
June, there's no reason for this deportation.  But in July,
he's still continuing with it?  What makes sense?  He did that
because the scheme was not deportation.  The scheme was murder.

I'm going to wrap up here, and I want to leave you with
the defendant's words again (As read):

> "I am absolutely ambivalent to the modalities
> and circumstances as long as we achieve
> project objectives."

What does that mean?  I do not care how you kill
Priscilla, I do not care if you have to kill anyone who is with
Priscilla, as long as Priscilla is dead.

Ladies and gentlemen, the government has proven its case
beyond a reasonable doubt.  This started out as and continued
to be a plot to get rid of Priscilla, by any means necessary.
It's just that on June 2nd, and continuing through July 8 of
2022, for the defendant, "any means necessary" meant murder.

1          **THE COURT:**  Thank you.

2                        <u>**CLOSING ARGUMENT**</u>

3    **BY MS. MITCHELL**

4          Ladies and gentlemen, the government just got up here and

5    said that Mr. Gessen was willing to commit murder of

6    Ms. Chigariro by any means necessary.  They showed you a text,

7    that stream where he was talking about other people at a

8    location being deported at the same time that she was.

9          Because if you were to go along with the government's

10   story, if you were to believe their version of the case, that

11   text was just authorizing the mass murder of multiple people at

12   a location.  That's what they're saying that text was.

13         Mr. Gessen is not a mass murderer.  He is not someone who

14   would so cavalierly just agree that multiple people at a

15   location could be murdered in order to have his wife taken care

16   of.  That wasn't who Mr. Gessen is; it's not who he presents

17   himself to be.  He is, instead, a person who made a regretful

18   decision to have his wife be deported.

19         Now, in this case, we had multiple people provide you with

20   what they believed was going on.

21         (Image displayed)

22         **MS. MITCHELL:**  And I want you to take a look at this

23   image (Indicating).  Because when you take a look at this

24   image, some of you may see a rabbit.  And some of you may see a

25   duck.

1        Now, some of the most popular optical illusions are

2   illustrations that have multiple interpretations.  Essentially,

3   two viewers looking at the same object, and seeing two totally

4   different things.

5        And this is different from those hidden pictures, those

6   stereograms where you look at something, and you look at it

7   far, and you kind of relax your eyes and all of a sudden you

8   see a peace sign or something else.

9        No, this is something where you see a clear and obvious

10  image, where you don't have to tilt your head or close your

11  eyes, you don't have to think very hard about what it can

12  possibly be.  Just that when you see it, you can see the two

13  different things, at the exact same time.

14       Looking here, you may see a duck.  Looking here, you might

15  also see a rabbit.  And your perspective is controlling what it

16  is you see.

17       (Image displayed)

18       **MS. MITCHELL:**  So here, where Agent Rizzo might have

19  seen two faces, Mr. Gessen saw a vase.  Because Mr. Gessen,

20  during the entire time he was having his conversation with

21  Agent Rizzo, was talking about permanently removing

22  Ms. Chigariro from the United States.

23       Instead, Agent Gessen -- or Agent Rizzo, taking a look at

24  this, didn't see the vase, the permanent removal.  Instead,

25  Agent Rizzo, seeing two faces, said:  Murder for hire.  That

 1   was his perspective, that's what he saw, and that's what he

 2   continued to see.

 3       But this scheme only existed in the mind of Agent Rizzo,

 4   because absent proof of what Mr. Gessen was thinking, the

 5   government cannot prove their case to show that he is guilty.

 6       Now, you heard the testimony.  Mr. Gessen is a father.  He

 7   is a father who is concerned for his children.  And he is a

 8   father who thought he could do a better job raising his

 9   children than his former partner.  Not legally-married wife,

10   but his former partner, Ms. Chigariro.  He wanted to have the

11   opportunity to try to raise those children in an environment

12   where he could have more control.

13       You heard what he had to say about that.  You heard that

14   he thought that he could offer them better education, better

15   schooling, better therapy than they were getting with

16   Ms. Chigariro alone.  So he wanted to have the opportunity to

17   do so, and in doing that, his thought was he was going to have

18   increasingly more boosted attempts, more enhanced attempts, to

19   deport Ms. Chigariro.

20       How do we know that?  We know that because, in the first

21   instance, he filed an anonymous whistleblower complaint.  That

22   was the first thing he did.  He filed that to the immigration

23   officials, and he did that in a way that he didn't think would

24   jeopardize his opportunity to retain control and custody of his

25   children.  Because he had been informed by two different

1    attorneys that if he were to in any way have Ms. Chigariro

2    deported, he would lose custody of his children.  So he started

3    in the first instance with the anonymous complaint.  And he did

4    that shortly after he had been brought back to the United

5    States, after he had been detained, in Canada.

6        Then, he went to his friend, Alex Kiselev -- Alex, who had

7    held himself out as a person who was connected, a lobbyist who

8    had high-level connections with the U.S. government -- and

9    said: Alex, do you have someone who could help me speed up the

10   whistleblower complaint?

11       Alex promised that he could, that he could expedite the

12   whistleblower complaint.  But that went nowhere.

13       So then later on he went back to Alex.  And Alex said:

14   I've got a friend, a high-level immigration official.  He

15   could -- he could babysit the entire thing; he could get this

16   whistleblower complaint all the way through; I can make sure

17   that Ms. Chigariro gets deported.

18       Those conversations were the conversations that Alex

19   Kiselev was having with the person he didn't know was an

20   undercover agent, David Rizzo.  And in that course of those

21   conversations, the two of them were having conversations about

22   $100,000.  Six months.  I can get the deportation done.

23       So Alex then told Mr. Gessen:  I've got an opportunity for

24   you.

25       But that opportunity was one that brought Mr. Gessen

1    before you in this case.  Because that was an opportunity where

2    he agreed to ultimately pay $50,000 to have Ms. Chigariro

3    deported.  Removed from the United States.  Not murdered,

4    removed.

5        Now, Mr. Gessen didn't know the exact means by which

6    Ms. Chigariro would be removed.  But he knew from his time

7    studying immigration law that arrests for certain offenses

8    could lead to someone being permanently barred from the United

9    States.  He knew that someone could change someone's

10   immigration record to make it so that they were permanently not

11   allowed to come back into the United States.  And he knew that

12   corrupt immigration officials could just physically remove

13   Ms. Chigariro from the United States without following the

14   proper procedures.  Because that was the difference between the

15   two schemes.

16       The $100,000 bribe?  That one was going to be a standard

17   deportation procedure where someone in Immigration was going to

18   have to stay in the case all the way through to make sure that

19   Ms. Chigariro was actually deported.  Someone would have to be

20   there through what he talked about, the immigration

21   proceedings, through the Court proceedings, through the

22   appellate process.

23       That was why that procedure was going to cost so much more

24   and take so long, and wouldn't be definite.  Because it was a

25   fully-realized procedure.  Someone would have to be there with

their finger in the entire process to make sure that

Ms. Chigariro would even stand a chance of actually being

deported.

     But the $50,000 option?  That wasn't going to be an

officially-approved deportation procedure.  What was that?

Instead that was going to be Immigration agents, possibly.  It

was going to be someone who was going to come in, corrupt, not

follow the rules, not follow the procedures, and just remove

her from the United States.

     Who knew how they were going to do it?  Mr. Gessen didn't

know.  He didn't know the details of it.  David Rizzo didn't

know the details of it.  He said as much.  All he knew was they

have a couple of different ways that they can do it.  And

Mr. Gessen did not need to be concerned about the details of

how they did it.  He just wanted to make sure it wasn't going

to come back to him, because he didn't want to lose custody of

his children.

     So, was it going to be someone was going to falsely accuse

her of a crime and have her be removed that way?  Perhaps.  Was

it going to be that that someone was going to look into her

record and say:  Everybody at this address is not here legally

and they have overstayed their visa?  Perhaps.  Was it going to

be someone was just going to go into a computer system

somewhere and change "admissible alien" into "inadmissible

alien," and send someone out to pick her up?  Perhaps.  Mr.

1    Gessen didn't know the exact details of how it was going to be

2    done; David Rizzo didn't know the exact details of how it was

3    going to be done.

4         But to Mr. Gessen, what was going to be done was not going

5    to be a full-fledged $100,000 six-month procedure where lawyers

6    were going to be involved.  Instead, it was going to be an

7    unofficial act of corrupt agents who were just going to

8    physically remove Ms. Chigariro from the United States.

9         At no time did Mr. Gessen ever say to David Rizzo "I want

10   you to kill her.  I want you to murder her."  At no time.  Not

11   in the Signal messages, not in the recorded conversations.  At

12   no time did that conversation ever occur.

13        Now, as you sit here, you may not like what Mr. Gessen has

14   done.  You may not like the choices that he's made, the reasons

15   he's come to have the decision that he had to separate his

16   children from Ms. Chigariro.  You may not like the fact that he

17   has traveled the way he has.  But, not liking him is different

18   from finding him guilty of this offense.  Not liking the

19   decisions he made is different from finding him guilty of this

20   offense.  And not liking the methods by which he chose to do

21   his actions is still not finding him guilty of this offense.

22   Because the only way you can find him guilty of this offense is

23   if he actually committed this offense.  And he did not.

24        (Document displayed)

25        **MS. MITCHELL:**  Because despite how you feel about him,

1    it doesn't change the government's burden in this case.  The

2    Court has just given instructions on how you should evaluate

3    the evidence in this case.  And these instructions are

4    important.  Because what these instructions tell you is that

5    Mr. Gessen is presumed to be innocent of these charges.

6         Mr. Gessen is not guilty if the government cannot prove

7    every element of the charge beyond a reasonable doubt.  He is

8    not guilty if he did not have the intent to murder Priscilla

9    Chigariro.  Because the burden of proof is on the government.

10   And that burden, beyond a reasonable doubt, never changes.

11        So if the government cannot convince you that there is

12   only a duck, or there is only a rabbit, then -- and if you

13   could still see both images at the time this case is done, then

14   the verdict you have to return is not guilty.  Because

15   Mr. Gessen is presumed innocent unless and until the government

16   presumes (sic) him guilty beyond a reasonable doubt.

17        So despite not needing to testify -- because Mr. Gessen

18   did not have to testify -- despite not needing to testify,

19   Mr. Gessen got on the stand, and he told you the one thing that

20   Agent Rizzo could not do.  That is what was in his mind.  That

21   was what he was thinking.  Agent Rizzo presumed:  Oh, he's

22   talking about murder for hire, he absolutely is.

23        But that was Agent Rizzo's presumption.  He could only see

24   the duck.  He could only see the faces.  He couldn't see the

25   vase; he couldn't see the rabbit.

1          So the answer to what Mr. Gessen was thinking was yes, at

2     times he was upset, at times he was frustrated, at times he was

3     pissed off.  But homicidal?  Never.  He was never at the point

4     where he actually wanted to kill Ms. Chigariro.

5          So starting from that place of innocence and the burden of

6     proof that's on the government, we have to ask ourselves, what

7     happened here?

8          (Document displayed)

9          **MS. MITCHELL:**  Now, the Court just went through the

10    elements of what a murder for hire are.  And the elements are

11    what the government has to prove individually to each of you,

12    beyond a reasonable doubt.  You have to agree that you only see

13    the duck, or you only see the rabbit.  Because again, if you

14    see both that's the doubt.  That's the government not proving

15    their case.

16         And I want to focus on two of the elements in this case.

17    That's the intent that murder be committed, and the -- that's

18    the second element, that defendant did so with the intent that

19    murder be committed, and the third element, that the defendant

20    did so intending that the murder be committed in exchange for

21    pecuniary value.  Because in both of those elements there's one

22    factor that's the same.  And it's the factor that the

23    government cannot prove.  The intent that the murder be

24    committed.

25         (Document displayed)

1          **MS. MITCHELL:**  So, Allen, Mr. Gessen, and Priscilla

2     met at a fashion show in Zimbabwe.  Their son [O.G.] was born

3     in 2013, and Mr. Gessen committed an act of bribery on behalf

4     of his child.  Right?

5          You heard his testimony.  His son, [O.G.], was sick in the

6     NICU, he was a very tiny premature baby.  And he wanted to

7     protect his child.  He did what he needed to do to pay for

8     upgraded care, to get better treatment inside the hospital, to

9     have classical music piped in.  Not just for [O.G.] but for all

10    the children that were there at the NICU.

11         He took actions to take care of his child.  And for his

12    child he was willing to bend the rules.  But not to completely

13    break them.  He was willing to, as he said, facilitate things

14    to make sure it went better.  Right?  So he gave the people

15    there the money to get them to do their job even better than

16    they had been before.

17         And then Priscilla and Allen ended up moving to Russia,

18    where they lived together for a period of time.  But shortly

19    after they got to Russia, their relationship ended.  Their

20    daughter, [E.G.], had been born through gestational surrogate.

21    And because she was born by gestational surrogate, Mr. Gessen

22    had not been listed on her birth certificate, even though he

23    was biologically her father.

24         So the pair had some troubles with trying to resolve all

25    of the issues related to their family, to the legality of their

 1   children, to making sure that everything was taken care of for

 2   them.

 3        But despite the fact that the relationship was coming to

 4   an end, they -- they agreed, they committed to conscientious

 5   co-parenting while they were living in Moscow.  Right?  They

 6   lived together in that apartment, separate parts of the

 7   apartment, until the relationship became untenable.  And they

 8   agreed to separate.

 9        Now, when they agreed to separate, Mr. Gessen committed to

10   taking care of all the financials, resolving all of the issues,

11   and they began the process of resolving [E.G.]'s paternity.

12   You heard the testimony.  There was no way to get [E.G.] the

13   birth certificate in Russia and get everything finalized until

14   the court system there had run its course.

15        And at the time Mr. Gessen left Russia, it had been

16   anticipated that it was going to be mere weeks until everything

17   was resolved, and she could get fully registered.  That was the

18   thought.  It was going to be a few weeks; Priscilla was going

19   to go to Zimbabwe because she could not travel directly from

20   Russia to the United States, she had to go to Zimbabwe,

21   legally, to get a visa to come into the United States.  And it

22   was anticipated at the time he left that it would be four weeks

23   until the family was all together again.

24        Now, there were a lot of roadblocks that ended up

25   occurring there, that prevented that from happening.  None of

1  which were Mr. Gessen's fault.  Instead, what happened was the

2  Russian court system took their time in providing the

3  documentation needed for [E.G.] get her visa.

4       During that time, Mr. Gessen visited Russia two times.

5  No, he did not bring [O.G.] with him.  [O.G.] was six at the

6  time.  It was a two-day flight for him to get there.  How

7  disruptive would it have been to a six-year-old to travel

8  two days to be someplace for a couple of days and then fly

9  immediately back to the United States?  He was being a good

10 parent.

11      So he, instead, traveled to Moscow the day after [E.G.]'s

12 appeal was finalized, and her documentation was perfected.

13 Gave everything to Priscilla that she needed to get [E.G.]'s

14 travel documents ready, and [E.G.] and Priscilla departed

15 Russia shortly thereafter to go to Zimbabwe.  Again, they had

16 to go to Zimbabwe.  Priscilla could not just travel to the

17 United States without going to Zimbabwe first, because she had

18 to get her own travel documents.  She had to go through the

19 legal process to be able to come in to the United States from

20 Zimbabwe.

21      But once Priscilla got there, again, through no fault of

22 Mr. Gessen, COVID happened.  And everything shut down.  There

23 was no international travel.  She could not get back into the

24 United States.  There was no way for the entire family unit to

25 be reunited together.  This was not Mr. Gessen's grand plan.

 1  He did not create an international quarantine in order to

 2  prevent Ms. Chigariro and [E.G.] and he all to be together.  It

 3  was what happened.

 4       And so they struggled through.  And during that time,

 5  Ms. Chigariro did have contact with her son.  They communicated

 6  on video messages, they communicated via phone.  They chatted,

 7  they talked, they remained connected.

 8       And as soon as she had the ability to travel to the United

 9  States and the documentations were finalized, she arrived here,

10  and they all settled together in Massachusetts where Mr. Gessen

11  financially provided for them.  Where Mr. Gessen made sure that

12  Ms. Chigariro had access to her son, where they once again

13  started sharing custody, because they were all in the same

14  place together.

15       Now, the government may talk about how Mr. Gessen had

16  previously taken [O.G.] to Dubai, and this was him trying to

17  permanently deprive Ms. Chigariro from having her son.  But

18  that wasn't the case.  [O.G.], while residing in Russia, did

19  not have legal status to permanently remain in Russia.  He was

20  also on his own visa.  And to renew his visa, he also had to

21  leave the country, go to another country, and reapply to come

22  back into Russia.

23       Mr. Gessen took a two-week vacation essentially to Dubai

24  and had [O.G.] reapply for his permission to come back into the

25  country.  Now, he did not tell -- he did not get permission

from Priscilla before he left.  Mistake on his part, you may

think.  But it was something that had to happen in order for

the family to legally remain together while they were residing

in Russia.

So after Priscilla came to the United States, there were

multiple cases regarding the children pending.  There was one

with the Hague, and the Massachusetts Federal District Court,

and Zimbabwe, and the Federal Court.  But once the Hague case

completed, once it was established that the children could

remain in the United States, Mr. Gessen then said: Let's get

everything finalized.  I'm going to take [O.G.] for a Canadian

vacation, see the snow, hang out.  It was approaching Christmas

break.  It was December 18th.  Or December 20th, rather.  No

court orders prevented him from leaving the United States with

his son.  Because the plan was:  We're all going to meet again

in Zimbabwe.  Where Priscilla also had to go to renew her visa.

Right?  February, 2022, her visa had expired because her Hague

case had completed.

For her to be able to remain in the United States, she was

going to have to leave the country, just like her son [O.G.]

did when he left Russia, and reapply to come back into the

United States.

So it's natural to presume that Mr. Gessen was not

fleeing, never to have Ms. Chigariro be reunited with her son.

He was going to Zimbabwe to resolve everything at once.

1   [E.G.]'s case and his paternity, to make sure everything was

2   finalized with [O.G.] and to make sure that everything was

3   done.  So that by the time the family came back to the United

4   States, everyone would properly have visas, everyone would

5   properly have all their documents, he would be properly listed

6   as [E.G.]'s father.  All of that would be completed.

7        Instead, Ms. Chigariro ended up filing a -- filing --

8   charging Mr. Gessen with parental kidnapping, filing charging

9   -- requesting an *ex parte* designation of custody.

10       At the time she had done so, it was not illegal for

11  Mr. Gessen to leave the United States with [O.G.].  He did not

12  have a copy of that order.  The order had not been filed by the

13  time he left Massachusetts.  It wasn't until he had left the

14  state that he had any warning that the Court had ordered that

15  he remain in Massachusetts with his son.

16       So nothing about the relationship with Ms. Chigariro shows

17  that he had the intent to murder her.  Yes, it shows that

18  Mr. Gessen has been willing to engage in acts of bribery in

19  order to take care of his son.  Yes, it shows that he -- that

20  legal immigration can cause separation.  But it does not show

21  that Mr. Gessen is willing to or had any plans to commit

22  murder.

23       Now, Mr. Gessen and his friend Alex Kiselev came up with

24  two plans.  Their meeting wasn't just about Ms. Chigariro.

25  Because they were hoping to get funding for a factory that

1    Mr. Gessen was intending to build in Estonia.  And that factory

2    was going to supply vests and helmets to Ukrainians fighting

3    against the Russians.

4         So Mr. Kiselev, again, is a person that Mr. Gessen knew

5    was a Ukrainian-based lobbyist, someone who had previously been

6    able to introduce him to high-placed individuals in the U.S.

7    government.  Alex Kiselev said: I've got connections to what

8    you need.  I've got someone I think who works for one of those

9    three-letter agencies.  FBI, CIA.  Not:  I've got someone's

10   who's an Italian -- a New York -- or New Jersey-based Italian

11   mafioso who money launders for a Columbian cartel, but someone

12   I trust who I believe can help us out.

13        And it's not unreasonable that Mr. Gessen could have

14   believed that Agent Rizzo was a corrupt agent, who just was

15   assuming this persona of a money launderer.  Why is that?

16   Because when Agent Rizzo was talking, he said: Oh, you've met

17   my friend Ravi.  Right?  Ravi is the person we just heard

18   about.  The testimony that was just presented about a corrupt

19   person who was talking about being able to get IRS documents.

20   This was the person who Agent Rizzo said: Oh, that's part of my

21   friends -- that's my family.  One corrupt agent saying another

22   corrupt agent is his family.

23        So seeking $10 million to get his factory going, David

24   Rizzo, in the conversations that they had, talked about

25   investing nine, $10 million in this factory.  Mr. Gessen,

 1  skilled negotiator as he is, is not going to squabble about

 2  little things if he's got someone who is willing to help him

 3  out with the big prize that he's looking for.  The $10 million

 4  prize that could help save the lives of his friends, help save

 5  the lives of people he knew, help supply people in Ukraine with

 6  protection.

 7      So in the time that they were having their conversation he

 8  pumped himself up.  He wanted to project confidence, readiness.

 9  The ability to turn that cash into a ready opportunity.  But

10  Mr. Gessen didn't just take David Rizzo at his word.  He

11  thought there were inconsistencies in what he was saying.

12      So before he readily committed to everything, he said, I'm

13  going to talk to Alex Kiselev and I'm going to find out -- in

14  his head, he's like, I'm going to talk to Alex.  I'm going to

15  figure out if what this man is saying is actually true.

16      And he had these conversations, right?  He went back to

17  Alex Kiselev, and said:  This guy's saying he's a money

18  launderer; this guy's saying he's working for Columbian

19  cartels; this guy's saying he's an Italian mafioso.

20      Alex Kiselev reassured him:  No, he's my guy; he's got

21  connections inside the U.S. government; he's okay; he's like

22  Ravi.

23      All right.  In reviewing the evidence in this case, the

24  audio, the Signal messages, I want you to pay close attention

25  to how much of the conversation between Mr. Gessen and Agent

 1   Rizzo is actually dominated by the discussion of funding the

 2   factory.  What you heard in court is only a small portion of

 3   how much their conversation went on about that.  And you will

 4   see how large a role that actually played in their

 5   conversation.

 6        And the government may get up here after I'm done and make

 7   a lot of the argument about how David Rizzo was portraying

 8   himself, and how, because of the way he was portraying himself,

 9   Mr. Gessen must have known that when he was talking about

10   family he was dealing with the Mafia.  That Agent Rizzo was

11   holding himself out as a person that was connected to organized

12   crime, and obviously that was believable.

13        But by his own statements, by his own actions, Agent Rizzo

14   portrayed that he was, in fact, someone working for one of

15   those three-letter agencies.  He was, in fact, someone who was

16   not a money-launderer.  Because, what kind of self-respecting

17   money-launderer for a Columbian cartel would come out and tell

18   someone he just met that that's what he did for a living?

19        (Document displayed)

20        **MS. MITCHELL:**  So in the course of their conversation,

21   you'll see the financials that Mr. Gessen gave to David Rizzo.

22   And here, the words between the two were very clear.  There was

23   going to be a factory, it was going to be funded, that this was

24   important, that this was something they were working towards.

25   It was an actual real goal with Mr. Gessen that was important,

1    that was true, and that was a large part of their conversation.

2    But we also heard about the plan.  And this was the plan to

3    deport Priscilla.

4         (Document displayed)

5         **MS. MITCHELL:**  So after he was arrested in Canada, he

6    was jailed, he was prevented from seeing his children,

7    Mr. Gessen was in a state and he came up with a plan to make

8    sure the immigration service knew that Priscilla Chigariro --

9    by this point, after the February, 2022, expiration of her

10   visa, not knowing whether or not she had actually reapplied or

11   not, he came up with a plan to make sure she was deported.  And

12   his goal was to notify the INS that she had overstayed her

13   visa.

14        Now this was exactly what he already had done before.  He

15   had notified the IRS, via an anonymous whistleblower complaint,

16   about his clients from Russia.  His client from Russia had

17   reached out and said:  We've got someone who's stolen a

18   substantial amount of money; we're trying to use the services

19   of the IRS to figure out what went on.

20        What did he choose to do there?  He didn't bribe the IRS

21   official, he didn't bribe Ravi, who said you could bribe -- I

22   can get this to happen if you bribe, I can make this happen.

23   No, instead:  I'm going to file a whistleblower complaint.

24   Mr. Gessen does what he's done before.

25        So he did that here again.  Instead of filing the

1    whistleblower complaint to the IRS, this time he filed it to

2    the INS.  And he notified them, among other things, that

3    Priscilla had been here too long, and she shouldn't have been.

4         Now we heard Agent Bognanno say:  I searched all the

5    different records here in the United States, and Ms. Chigariro

6    has no criminal history here in the United States.  But he

7    didn't search in Russia, and he didn't search in Zimbabwe.

8         And we heard Ms. Chigariro talk about how she had been

9    arrested before in Zimbabwe.  Who knows if that information

10   made it on the visa application that she submitted?  Who knows

11   if she would have been able to come into the United States if

12   that information had made it on her visa?

13        But when the whistleblower complaint languished and

14   Mr. Gessen sought assistance, he escalated things and reached

15   out to his friend Alex for assistance.  And Alex put him in

16   touch with David Rizzo, because David Rizzo was going to do

17   something as a favor for a favor.

18        (Portion of audio recording played in open court)

19        **MS. MITCHELL:**  So they talked, right?  Alex -- that's

20   Alex, and that's Agent Rizzo.  They were having a conversation

21   there.  And what Alex knew, how Alex knows it, who knows?  He

22   is the one who is there reaching out to Agent Rizzo, and asking

23   various requests of him, making requests to get connected to

24   people he can set things up with.

25        Now, on June 2nd, 2022, Allen and Agent Rizzo meet for the

 1    first time in Boca Raton, Florida.  And at that time, Allen had

 2    two goals.  Get funding for the factory he was planning on

 3    building in Estonia, and supporting the war effort in Ukraine

 4    through that, and then also confirming that the plans to bribe

 5    an immigration official to deport Priscilla were going into

 6    effect.

 7         Agent Rizzo testified that he had only one plan.  And that

 8    one plan was coming -- for him, was to try and get Allen to

 9    talk about Priscilla, to talk about a crime.  He wanted to get

10    that, as his goal.  That wasn't communicated to Mr. Gessen.

11    When he was there, he was the one who was talking about the

12    factory.  Talking about what he wanted to get done there, too.

13         Now, when they were having the conversation, you'll

14    remember that it was Agent Rizzo, after Mr. Gessen asked about

15    a less-expensive option, said: I've got another option, and it

16    would be cheaper.

17         Think about that for a second.  Murder.  Cheaper than

18    bribery.  Half the price.  Allen had been quoted 100,000 for

19    the bribery scheme.  David was offering up a $50,000 option.

20         Mr. Gessen isn't someone who deals with murderers for

21    hire.  He's not someone who's been in the agency like Agent

22    Rizzo has been.  He's not someone who's interviewed people who

23    have committed murder for hire.

24         On what planet would it seem reasonable that murdering

25    someone would be less expensive than bribing an immigration

official?  There's nothing about the price that was offered

that would be anything that would convey to Mr. Gessen that he

should know that what Agent Rizzo was talking about was murder.

Nothing about that.

Instead, Mr. Gessen was there to talk to someone that he

thought could help him.  Because murder should cost more than

bribery.  It's murder.

We saw how Agent Peacock was reacting when he was talking

about how serious murder was.  Something as serious as murder,

something as serious as the taking of a life of someone is not

something that should be less expensive than bribing someone.

And it's not something that anyone can really realistically

expect Mr. Gessen to know.

(Document displayed)

**MS. MITCHELL:**  So we've got a bit of a timeline of the

audio recording that you can listen to, of what happened during

that meeting.  And I'm sorry that the print is so small.

There's so many events on it (Indicating).

But for the first 15 minutes they're there, they're just

talking about the background.  But in that first 15 minutes,

Mr. Gessen talks about what his priority is in that meeting.

And then at 15:10, he starts talking about vests and protective

gear.  He starts to talk about the factory deal.  They then go

on and have background conversation.  They're talking about

their kids, their hobbies.  They start ordering at the

 1  restaurant.

 2       And it's not until 18 minutes into that conversation that

 3  Agent Rizzo brings up Priscilla.  They then go into a

 4  conversation about the bribery scheme.  And when they start

 5  talking about the bribery scheme, --

 6       (Document displayed)

 7       MS. MITCHELL:  -- it's -- the first thing that Agent

 8  Rizzo says, tell me, there's like a blank slate, tell me what

 9  you want.

10       (Document displayed)

11       MS. MITCHELL:  And it's in response (As read):

12            "I understand, you know, through Alex that

13            you have some problems.  We have a solution

14            for you, I don't know what he's told you

15            about it, we have a solution for you."

16  In response to his question about Alex, saying: Alex told

17  me about your problems with Priscilla, we have a solution for

18  you, what is your solution?  It's the same thing that you heard

19  Alex Kiselev tell the agent before.  Myself and the children to

20  remain in the United States, and her to come back to her home

21  country, and not harass us again.  He wants her -- he wants her

22  to be permanently removed from the United States, to not be

23  able to come back in and harass them again.

24       So then the conversation continues.  After Agent Rizzo, at

25  about 30 minutes in, starts talking about money laundering and

1    the cartel, and they've already talked about the bribery

2    scheme, they've already talked about engaging in criminal

3    activity, that the phones get put away.

4         Now, one thing that I think is important for you to

5    understand is at 30 minutes in, Agent Rizzo is talking about

6    how he works for a Columbian cartel, how he works for the

7    Italian mafiosos.  It's only then that Mr. Gessen looks down at

8    the phone and says:  Are you -- what are you doing here?

9    Right?

10        The factory deal, the bribery, the mining, there are other

11   conversations that go on.  And it's not until an hour and 56

12   minutes into the conversation that that "cheaper way"

13   conversation happens.  Throughout this entire conversation,

14   Mr. Gessen is not using coded language when he's talking about

15   bribing an immigration official.  He was not using coded

16   language when he's talking about someone who is offering to

17   launder money for him.

18        It is an hour and 56 minutes into this conversation that

19   Mr. Gessen is openly and honestly talking with someone who's

20   talking about criminal activity -- he thinks he's talking to a

21   corrupt agent.  And's only at an hour and 56 minutes in does

22   Agent Rizzo get to what he believes is a conversation about

23   murder for hire.

24        Now, you heard from both Agent Peacock and Agent Rizzo --

25   who both were on the scene listening to the conversation,

1   providing surveillance -- that as they sat there and listened

2   to them, there was never any time that there was exact language

3   that you could really pinpoint to and say this was a

4   murder-for-hire scheme.  There was no talk of murder, there was

5   no talk of kill.  And Agent Rizzo said he assumed that was

6   because Mr. Gessen was using coded language.

7        But when you listen to the entirety of the conversation,

8   you'll realize that they -- Mr. Gessen never changes the way he

9   speaks; he never changes the words he uses throughout the

10  entirety of the conversation, he is consistent in not using

11  coded language.  He is obvious and up-front about what he

12  wants.

13       And in some ways, Agent Rizzo is too.  His use of his

14  terms don't change either.

15       Now, what are some of the words that could have been said

16  that could have made things much more clear?  Agent Rizzo had

17  the opportunity to use some of these words, but he didn't.

18  Right?

19       (Document displayed)

20       **MS. MITCHELL:**  It could have been -- any of the words

21  that you see here could have been words that you would have

22  expected someone to use, that would have been much more

23  definite that they are talking about murder.

24       But none of those words were used by Agent Rizzo.  And he

25  had the opportunity to do so.  Not just in this meeting but in

 1   the Signal exchanges and in the subsequent meetings between the

 2   two of them.

 3        Agent Rizzo never used clear language about what he

 4   thought was going to happen.  Instead, what he said --

 5        (Document displayed)

 6        **MS. MITCHELL:**  -- was, when they were talking about

 7   deportation (As read):

 8             "You can get her ass fucking bounced out of

 9             here.

10             "She's fucking gone yeah she's fucking gone."

11        She's:

12             "Bounced out.

13             "I'm going to go to her house, I'm going to

14             grab her ass and they'll fucking get it, you

15             know, they'll put her on a plane, they'll get

16             her the fuck out."

17             "That-that-that stuff that would have been

18             taken care of a long time ago."

19        Because, remember, the conversation where Agent Rizzo

20   proposes the murder for hire doesn't take place until one hour

21   and 56 minutes into their conversation.

22        After that conversation and what Agent Rizzo thinks is the

23   murder for hire conversation, it's (As read):

24             "There's a cheaper way and probably a more

25             permanent way to do that."

1       He thinks that's conveying murder for hire.  Agent Rizzo

2    does.  That it was permanent.  It was quick, and it would be

3    final.

4            "That shit would have been taken care of a

5            long time ago.

6            "It's fast and clean.

7            "Right, she's gone.

8            "Taken out.:

9       What do we see here though?  We see that Agent Rizzo uses

10   the same language consistently when he is talking about

11   deportation and when he's talking about murder for hire.  That

12   stuff would have been taken care of a long time ago.

13           "That shit would have been taken care of a

14           long time ago"

15      When he's clearly talking about in his mind deportation,

16   and when in his mind he is clearly talking about murder for

17   hire, his language doesn't change:  She's fucking gone.  Yeah,

18   she's fucking gone.  Right, she's gone.  Again.  Clearly

19   talking about deportation.  Clearly talking about what, in his

20   mind is a murder for hire conversation.  His language doesn't

21   change:  When she's bounced out, when I get her the fuck out,

22   when she's taken out.

23      Again, this is him, in his mind clearly conveying that he

24   is talking about murder for hire.  But his language remains

25   consistent throughout the entire conversation, despite whether

1  or not he's talking about murder for hire or deportation.

2  There was nothing in the language that he used that conveyed to

3  Mr. Gessen at all that Agent Rizzo had two different

4  conversations going on.

5       Are the similar faces of the duck?  Are they the rabbit?

6  How is this supposed to be any kind of indication to Mr. Gessen

7  that Agent Rizzo has suddenly changed from talking about

8  deportation and removal to murder?  It's not.  Because in his

9  mind, in the conversation that Mr. Gessen was having with

10 Agent Rizzo, this was consistent the entire way, throughout.

11 He had just been talking about deportation.  And the change had

12 been in the speed.  The change of gears.  The change had been

13 in the method in which it was going to occur.  It was no longer

14 going to be a legal deportation.  And instead, it was going to

15 be an illegal removal done by corrupt agents.

16      So on June 22nd, Mr. Gessen and Agent Rizzo meet again.

17 And Mr. Gessen was already in New York for a vacation when he

18 met with Agent Rizzo.  And he was earnest in his plans, again.

19 The conversation was about deportation, removal and building

20 the factory.

21      And Agent Rizzo, again, was obtuse.  He used that same

22 language that he thought was so obviously clear, that was

23 apparently, when we look at it preserved, was not.

24      So during this meeting they finalized the plans for the

25 wire transfer.  Mr. Gessen gave Agent Rizzo a gold coin as a

1  down-payment.  And Mr. Gessen told Agent Rizzo he didn't want

2  his kids to be there.

3      Now, the government talked about this, and made much of

4  the fact that Agent Gessen -- Mr. Gessen didn't want his kids

5  to witness what was happening.  And Agent Rizzo presumed it was

6  because they were talking about murder.

7      But Mr. Gessen told you the reason why he didn't want his

8  kids to see Ms. Chigariro be arrested by immigration officials

9  is because he didn't want her -- his children to be

10 traumatized, like [O.G.] was traumatized when he was in

11 Montreal and [O.G.] saw him being arrested by immigration

12 officials there.  He didn't want to have the same situation

13 where [O.G.] went back in the holding cell, and he had to

14 reassure him that everything was going to be okay.

15     Mr. Gessen was trying to be a good father, because he

16 didn't want to re-traumatize his children in seeing their

17 mother be arrested.  That was why he didn't want the kids

18 there.

19     Instead, he wanted to build as many layers between himself

20 and the removal.  And the reason why was not because he

21 intended to have Ms. Chigariro be killed.  The reason why was

22 because he knew that he still wanted to have some sort of

23 co-parenting relationship with her after the removal.  He knew

24 that it was important for Ms. Chigariro and he to be on

25 speaking terms after the removal.  And he knew that if she

1   thought that he had actually had her removed, that that would

2   not occur.  He also knew that if anyone got wind of the fact

3   that he had done anything to remove the kids, he was going to

4   lose custody of them.

5        Now, Mr. Gessen did not have $100,000.  He didn't have --

6   you heard his testimony.  He said he did not have $100,000 in

7   disposable income to give.  And he didn't want to be directly

8   linked to bribing any government official to do a removal.

9        So -- and he didn't want to, also, because he was under

10  investigation for parental kidnapping, right?  He was in a

11  situation where bribing a government official in a case where

12  (inaudible) --

13       (Reporter clarification)

14       MS. MITCHELL:  In a case where he already had a

15  parental kidnapping case going on, would not be helpful.  He

16  did not want to be tied in any way to bribing a government

17  official.  Because if the judge caught wind of his trickery, he

18  was going to lose custody of his children.  So he built a layer

19  between himself and Agent Rizzo.

20       (Document displayed)

21       MS. MITCHELL:  And because he didn't have independent

22  cash on hand to give Agent Rizzo, he arranged for GEEWIZ, the

23  company that he worked for, to pay Agent Rizzo the salary he

24  was supposed to get for consultancy.  He reached out to GEEWIZ

25  and said: If I give you a consultancy agreement for this

1    individual, please don't pay me my salary for July.  Please

2    don't pay me my salary for the next few months.  Instead, pay

3    it to this man.

4         That was how he was arranging things.  And that is why

5    this document got submitted.

6         (Document displayed)

7              **MS. MITCHELL:**  So in looking at the timeline of the

8    meeting between the two in -- there in the conversation that

9    happened in New York, again, there's conversation about

10   Priscilla and the custody; they discuss the payment for

11   Priscilla being removed from the United States.  And Mr. Gessen

12   hands the agent a gold coin.

13        They get into Priscilla's background information.  And

14   Mr. Gessen talks about Priscilla winning the green card

15   lottery.  Now, this is important, and we're going to talk about

16   that a little bit later on, and how that really also does not

17   show that Mr. Gessen ever had the intent to have Ms. Chigariro

18   murdered.

19        They ordered food.  But the conversation once again turns

20   to the factory.  They talk again about the factory.  Mr. Gessen

21   is again in a position with someone who he thinks can

22   financially provide for a factory that's extremely important

23   for him.  And so he's going to handle the negotiation, he's

24   going to handle the conversation with him in a different way

25   than he would otherwise.  Because he wants to impress him, he

1   wants to make sure he knows he's confident.  He has someone who

2   can handle the money that he's hoping to get from him.

3       And then, with those logistics satisfied, with the

4   understanding between the two -- once again in Mr. Gessen's

5   mind that it's removal, and only in Agent Rizzo's mind that

6   it's murder for hire -- the conversation ends.

7       In this entire two-hour conversation, again, no one uses

8   the word "kill," no one uses the word "murder," no one uses any

9   language that says anything else to Mr. Gessen that makes him

10  think in any way that the two of them are talking about

11  anything else but an expedited removal of Ms. Chigariro from

12  the United States.

13      Now, Mr. Gessen has previously been in situations where he

14  has used money to facilitate things to make life better for his

15  children.  He has been in situations where he has tried to

16  facilitate things in the hospital for his children to make sure

17  that they are okay.  And he's lived in cultures where

18  facilitations like this, where bribes like this are very

19  common.

20      But as he said, he never, prior to the time that he was

21  agreeing to bribe an immigration official to have Ms. Chigariro

22  removed, bribed someone here in the United States.

23      But he has some repeating patterns.  And when you look at

24  those repeating patterns, what they show is that Mr. Gessen

25  uses the power of the courts and laws to try and gain custody

1   of his children, that he reaches out to the courts to try and

2   arrange custody of his children, that he uses the power of

3   bribery to try and gain custody of his children.

4        Then you heard from Ms. Chigariro.  Her accusation was

5   that Mr. Gessen, at some point in time, bribed officials in

6   Zimbabwe to have her arrested.  That he had her put in custody

7   so that he could try and gain custody of their daughter,

8   [E.G.].

9        This is -- nowhere in his history do we have a pattern or

10  a history of him trying to kill Ms. Chigariro.  Trying to

11  murder Ms. Chigariro.  Instead, it's by using the legal system,

12  it's by using other people's financial willingness to engage in

13  corrupt actions, that Mr. Gessen uses.  He uses the power of

14  separation of countries.  Right?  The separation of space.  But

15  never murder.  Never has he ever been accused of trying to

16  murder Ms. Chigariro.

17       And Ms. Chigariro, herself, when she was on the stand,

18  said she was surprised that this was even something that

19  Mr. Gessen was accused of.  This is not something that she

20  thought was within his wheelhouse.  This was not something that

21  she thought he would do.

22       She was surprised on the day that the agents knocked on

23  her door and said that Mr. Gessen was accused of trying to

24  murder her.  It's not something that even she, a person who

25  knows Mr. Gessen better than almost anyone in the courtroom,

1    thought was possible for him.  Mr. Gessen did not have the

2    intent to murder Ms. Chigariro that day.

3         Now, on direct -- on their -- during their closing, the

4    government mentioned the Mossad, and how this is prove that

5    Mr. Gessen was trying to murder Ms. Chigariro.  But that's not

6    the case.

7         Mr. Gessen, instead, was an individual who had friends,

8    highly-connected individuals, people he was talking to.  And he

9    reached out to them.  And he said:  You, Mossad agents, you,

10   you're individuals who have a history of kidnapping back in the

11   day, Nazis, and removing them from countries where they should

12   not have been, and bringing them back to Israel for

13   prosecution.  Let's -- in a joking manner.  In a way that he

14   was talking about:  How much would it cost to have Priscilla

15   kidnapped?  Not murdered, kidnapped.  $220,000.  $10,000 for

16   reconnaissance.  This is how much it would cost to have

17   Priscilla forcibly removed from the United States.

18        He didn't agree to do that; he didn't have the money to do

19   that.  That was not something he pursued.  But, again, not

20   murder.  Never murder

21        Now, when you're thinking about this, and you may say to

22   yourself:  You know, you've given me a lot, I'm thinking

23   through this; I don't know that I have the doubts that are

24   needed.  I don't know that I can actually say that the

25   government hasn't met their burden.  I can't not say that the

 1    government hasn't met their burden.

 2        You can.  Because even if you're looking at the

 3    restaurant, and you're like:  There, at that time he was in the

 4    restaurant I think that's when he traveled internationally, and

 5    I think that's where he gave the gold coin, and I think that's

 6    where everything happened, then you can't find that it happened

 7    here.  Because the government -- the Court instructed you that

 8    this crime has to occur in San Francisco.

 9        And if you think that Mr. Gessen committed this offense,

10    and if you think he committed this offense in New York, then

11    Mr. Gessen is not guilty of committing this offense here in

12    San Francisco.

13            MS. HOSSEINI:  Objection, misstates the law.

14            THE COURT:  Overruled.

15        You will follow my instructions as I gave them.

16            MS. MITCHELL:  But that's not the only thing you can

17    take into consideration.  You can also take into consideration

18    the other evidence that was presented to you.  All the other

19    things that show the doubt that happened in this case.

20        (Document displayed)

21            MS. MITCHELL:  Like these messages that were sent.

22    You remember when Agent Peacock explained about the differences

23    between these three exhibits, right?  The exhibit on the left

24    was supposed to be all the messages sent from David Rizzo from

25    those files of Mr. Gessen that were set to disappear.

1     But, what happened when we did a deeper dive on those

2  messages?  When we did the deeper dive on those messages, we

3  found that there were messages that Agent Bognanno had that

4  were never preserved by Agent Rizzo.  The messages were never

5  on Agent Rizzo's phone.  They were never in his note to self.

6  We have no idea where these messages came from.

7     Agent Rizzo says: I sent them.  Agent Rizzo, the person

8  who is trained to lie professionally for a living, says:  I was

9  the one who sent them.

10     But then, Mr. Gessen got on the stand and said: I didn't

11  -- I didn't send this all to him this way.  I sent him part of

12  this, true.  Yes, true.  I sent part of this.  But I didn't

13  send all of this.  Some of this is enhanced with information I

14  didn't provide.

15     And remember, he was providing information to Agent Rizzo

16  at Agent Rizzo's request.  He said:  Give us details, give us

17  stuff, we need to know where she is, all of this.  And they

18  made a lot of that in saying:  No law enforcement would really

19  need this information if they were doing a deportation; this

20  obviously meant that Mr. Gessen knew that it was a murder.

21     But we also heard all the agents who testified say:  When

22  we're performing arrests, it's helpful to know where someone

23  lives, where they hang out, who they interact with.

24     And we heard from Mr. Gessen about how Priscilla did not

25  have a standard address.  She moved around a lot.  She didn't

 1   have a Social Security number.  She didn't have any -- she

 2   didn't have a job in the United States.

 3       All of those databases that the agents could have looked

 4   at if they were trying -- the rogue agents who were performing

 5   the removal could have looked at to try and locate her and

 6   track her down?  She may not have been in those databases.  Not

 7   in any way that they could have actually found her.  She may

 8   have been someplace that they could not have found.

 9       So Mr. Gessen set out to make it as easy as possible for

10   those rogue -- those corrupt agents to try and figure out where

11   Ms. Chigariro was.  And so he provided her -- Agent Rizzo with

12   the information that he had.  But when he was looking at this,

13   he said:  I didn't know this.  I didn't add in this

14   information.  And the ages of my children I think are wrong on

15   this.

16       In the message, it says that they are nine and five.  And

17   at that time Mr. Gessen testified that [O.G.] had not yet

18   turned nine.  His birthday was that year, that month.  But at

19   the time the message had been sent, that [O.G.] had not yet

20   turned nine.

21       Mr. Gessen, a father, would know how old his own children

22   are.  And if he was the one who had finished all these

23   messages, he would have been the one to accurately provide the

24   information.

25       (Document displayed)

1      **MS. MITCHELL:**  We also saw in these messages that --

2    with Agent Bognanno's phone, that there was a message on

3    Saturday, July 16, and then another one on Monday, July 18.

4    But when we looked at the messages on Agent Rizzo's phone, that

5    Saturday, July 16th, message was never there.

6         Where did it come from?  Who wrote it?  Was it something

7    that Agent Rizzo completed, himself?  Who knows?  We don't

8    know.

9         Now, I told you I wanted to go back to one message that I

10   think really solidifies the fact Mr. Gessen did not ever intend

11   for Priscilla Chigariro to be murdered.

12        (Document displayed)

13        (Portion of audio recording played in open court)

14      **MS. MITCHELL:**  "Well, we still could."

15   On June 22, 2022, they are talking about Ms. Chigariro.

16   They're saying -- Mr. Gessen says:  Oh, she just won the green

17   card lottery.  And we heard from Mr. Gessen that that doesn't

18   mean that she was automatically given a green card.  She was

19   now put in the position where she could apply to receive a

20   green card.  She still had to go through the process of

21   actually obtaining the green card.

22        So as she's going through this process of obtaining the

23   green card, she still is subject to review by Immigration.  She

24   still is subject to Immigration scrutiny.

25        And Agent Rizzo says "She did?  Well, I'm glad we didn't

go that route then."

　　Mr. Gessen says:

　　　　"Well we still could." (sic)

　　If on June 22nd, 2022, Mr. Gessen had been thinking the
entire time that this was a murder-for-hire plot, why would he
still think that you could go through the process of bribing an
immigration official to get Ms. Chigariro deported?  If he was
so convinced that the entire time they had been talking about
murder for hire, why would he say: Well, we still could.

　　He wouldn't.  Because that was the base that they were
going to use.  It was the fraudulent application in the visa
fraud.  At this time, they are still talking about whether or
not it would be viable to have an immigration official still
use the fraudulent basis for the visa application in the first
place, to remove Ms. Chigariro from the United States.

　　If Mr. Gessen had been talking this entire time since June
2nd about murder, if all of those Signal messages that had been
sent were about murder, if this meeting was about murder, then
why would Mr. Gessen still be talking about visa fraud?

　　It was a visa fraud.  Mr. Gessen says:  Yeah, so it
doesn't matter, because right now they have a plan they were
going to do.  Because they could still -- meaning that they
could still have Ms. Chigariro removed from the United States.
It's just that the visa fraud would no longer be a good basis
if she got a green card.

1      When he says it doesn't matter, he's referring to the fact

2  of the fraud they were trying to say happened.  That

3  Ms. Chigariro had applied for documents falsely is not relevant

4  anymore, because they had the plan for the removal.

5      So, what does Rizzo say to that?  It's not:  Oh, she's

6  going to be taken out.  Oh, she's going to be killed.  Or even:

7  Where she's going there's no reason for her to use a visa

8  anymore.  He doesn't say any those things.  He just says:

9            "It would have made it a little more

10           difficult."

11     Not it would not have been necessary, or it's not even

12  necessary.  If he had said any of those things, that may have

13  conveyed to Mr. Gessen that they weren't talking about the same

14  thing anymore.  But that's not the case.

15     Mr. Gessen didn't believe that anyone was going to be

16  killed.  He thought that she was going to be removed.  But, he

17  just thought they couldn't do it on the basis of the visa fraud

18  any longer, because she had won the green card lottery.  That's

19  what that means.

20     (Document displayed)

21     **MS. MITCHELL:**  So, looking at this, do you see a

22  rabbit?  Do you see a duck?  Because the father who wanted

23  custody of his children, who was willing to bend but not break

24  the rules in the ultimate way, he saw a duck.

25     And the agent, who is a trained agent who engages in these

1   types of cases before, who is familiar with murder for hire,

2   who has interviewed individuals who commit murder for hire, who

3   thought he was speaking in clear veiled language but was not,

4   he saw the rabbit.

5       If after reviewing all of the evidence in this case, if

6   after discussing the case with your fellow jurors, if you can

7   still see both, if you can still see Mr. Gessen seeing the

8   rabbit and Agent Rizzo seeing the duck, then that's reasonable

9   doubt.  And if you find reasonable doubt in this case, it means

10  the government has not proven their case and must find

11  Mr. Gessen not guilty.

12      **THE COURT:**  Thank you.

13                  **REBUTTAL ARGUMENT**

14  **BY MS. HOSSEINI**

15      There's a quote that says when someone shows you who they

16  are the first time, believe them.

17      So when Mr. Gessen said on the stand: "I wanted at any

18  cost to be reunited with my children," believe him.  When

19  Mr. Gessen said that he was looking for a cheaper way to get

20  rid of her, that would be good too, believe him.  When he said

21  he wanted a more definite way (Indicating quotation marks),

22  believe him (Indicating).

23      The government did not show you a duck and another optical

24  illusion.  It was not a duck; it was not a rabbit.  The

25  government showed you evidence of his words.  Words he said

1   when he did not think anybody was recording them.  Words he

2   wrote when he deleted his Signal messages, and thought they

3   would disappear forever, and would never end up in Federal

4   Court.  Not a duck, not a rabbit.  Evidence of his words.

5   Evidence of his actions.  That's what the evidence in this case

6   is.  Not an optical illusion as to where -- what kind of

7   picture this looks to you.

8        Mr. Gessen has told you what kind of picture that it was

9   in his mind by his words and by his actions.  And Mr. Gessen is

10  very intelligent, very sophisticated.  He's smart.  He knows

11  what a "fucking grave" means.  He was not a fumbling idiot to

12  not be able to follow a simple conversation that he had with

13  Agent Rizzo.  Two conversations.  Mr. Gessen is very smart.  He

14  is a lawyer; he went to law school.  He worked at a law firm in

15  New York City on Wall Street.  He said he worked at the best

16  consulting firm.  He worked on all sorts of sensitive matters.

17  He was recruited to work for the richest person in Europe.  He

18  had all sorts of accolades.  We went through all of them.

19       He's not a fumbling idiot to not know and be misled down

20  some confusing conversation.  He is smart; he knew what they

21  were talking about.  The cheaper way?  He fished for that.

22  He's the first person that said: Incidentally, if there's a

23  cheaper way to get rid of her, that would be good too.

24       Well, um, uh, as the agent was struggling for words, he

25  said:  It's simply more expensive.

1        (Documents displayed)

2        **MS. HOSSEINI:**  Those are his words, telling you what

3    he was thinking.  Intent to murder.  "Intent" means his words

4    and his actions.

5        And then he said, right after he said that, he said:  I

6    researched my sources, and the cheapest price was $220,000.

7    There's some Israelis, Eastern Europe, and Italy.  And when he

8    was asked about that, when he was testifying, he said it was a

9    joke about the Israelis.

10       Yesterday he said it was a joke.  Today he said no, it was

11   not a joke.  And then he had to be read back his transcript to

12   figure out:  Well, it was kind of a joke to this part, and not

13   a joke to that part.

14       And when he was asked "Why did you mention Eastern Europe

15   and Italy," he said "I don't know."  "It is what it is."  Even

16   he, with so many other explanations, even he did not come up

17   with an explanation for that.

18       Why would you mention having researched your sources for a

19   price, including Israelis, Eastern Europe and Italy?  Because

20   those prices were for murder.

21       He said he never paid $10,000 for someone from the Mossad

22   or Israeli team to come do recon.  But that's not what the

23   June 22nd Exhibit 7 says.  That -- that audio is in evidence.

24   When Agent Rizzo says "So you paid someone $10,000 to come do a

25   recon?  I'm scratching my head that's so much money, $220,000,

1  you paid someone 200 -- you paid someone $10,000?"  He.

2       Said yeah.

3       And then he says, but that's such a crazy price.

4       Mr. Gessen explains why it's such a crazy price.  He says:

5  Well, it's about risk management.  Naturally, someone who's

6  coming internationally is going to have more risk and more

7  costs.  It's more expensive and it's operationally more

8  difficult to conduct an international hit than it would be to

9  do a domestic one.

10       He's explaining that.  Those are his words.  Evidence of

11  his intent.

12       He's not some idiot who doesn't know what "grave" means,

13  or "taken out," or "definite" or "wanting her gone."

14  Preference in the means.  How many different ways are there to

15  deport someone or remove someone?

16       He also uses military terms.  "Recon."  He said to Agent

17  Rizzo: "I will do the full recon for you."  "Recon."  That's a

18  military term.

19       Later.  When Agent Rizzo asked him if there's extra guests

20  at the show does he have any problem showing them the exit, he

21  said:  No, no problem.  There may be extra cost.

22       Agent Rizzo said:  No, there's no extra cost.

23       He said:  I meant the collateral.

24       The boyfriend is the collateral.  Let's be very clear.

25  The defense just said that the government's theory is that he's

1   a mass murderer.  That has never been something that the

2   government has said or implied.  Or had any kind of innuendo.

3   Nobody on the government's side, none of the witnesses have

4   ever said, and the evidence does not show or imply that

5   Mr. Gessen was a mass murderer.

6       Agent Rizzo testified that that text showing someone the

7   exit for being an extra at the show was simply meant about

8   Priscilla's new boyfriend.  Because those messages were about

9   the fact that Priscilla's address was listed and that it was

10  not in a through street.  It was very clear that the only

11  person was Priscilla's boyfriend.  That was the only extra

12  person.  Not a mass murder situation.

13      And Mr. Gessen said: I meant the collateral.  "Collateral"

14  is a military term.  What does the military do?  They do a

15  recon, and then there is collateral.  The military goes to war,

16  and they kill.  Those are his words. " Collateral."  "Recon."

17  Evidence of his intent.  Those are the words he chose.

18      This is not a spur-of-the-moment emotional reaction.

19  Those are his words.

20      (Document displayed)

21      **MS. HOSSEINI:**  Now, let's see what he said on June 2nd

22  and June 22nd, compared to after the fact.

23      On that day, he never asked for a clarification about what

24  this removal -- cheaper, more permanent, more definite option

25  (Indicating quotation marks) would be.  A smart businessman who

1    runs all sorts of businesses is not going to ask the

2    arrangements of the deal?  Does that make sense?

3        Did he ever ask:  Well, wait a minute, is this someone

4    falsely accusing her of a crime?  Or:  Is this someone going

5    into a government database and changing inadmissible to

6    admissible?  Or is this some random immigration raid?

7        Isn't he going to want to know what the benefit of his

8    deal is?  He's going to pay $50,000 and have no idea how random

9    it would be?  Does that make sense?

10       He's is going to pay $50,000 to either a law enforcement

11   officer or a mobster or investor, and he's not sure which of

12   the three that might be.  He's going to pay $50,000 and hope to

13   God that it would be random, and it wouldn't blow back on him?

14       But he's going to go through the effort of sending a

15   letter of engagement and a consultancy agreement through

16   another company, an Estonian company, because nobody asks

17   questions about Estonian transactions.  He's going to go

18   through all that trouble to cover up the payments and

19   disassociate himself from the payment, but he's not going to

20   ask how the plan would be random or how it would be carried

21   out?  Which is it?

22       He testified for a day and a half and we still don't know

23   if it's someone going into a government database, if it's

24   someone falsely accusing her of a crime, or if it's some random

25   Immigration raid where Priscilla would somehow randomly, in

1   Boston, have to be placed with a bunch of other illegal

2   immigrants.  That does not make sense.

3       And the reason why I keep asking if it makes sense is

4   because the definition of "reasonable doubt" as the judge read

5   it, and as you will have it before you, is a doubt based on

6   reason and common sense.

7       So in order for you to assess reasonable doubt, you ask

8   yourself:  Is that doubt based on reason and common sense?

9   Does that make sense that Mr. Gessen, so smart, so intelligent,

10  so sophisticated, a savvy businessman, would never ask any

11  questions about this deal and just agree to pay $50,000 and

12  only cover up the payment part?  No.  The reason why is because

13  he knew that it was for murder.  That is the explanation that

14  makes sense.  That is the explanation that is reasonable.

15      We talked about his words.  Let's talk about his actions.

16  What led to that June 2nd meeting with Agent Rizzo and all

17  those words that were said?  A long -- repeating patterns, I

18  believe, that is one thing we can agree on.  That Mr. Gessen's

19  repeating patterns (Indicating quotation marks) were

20  continuously to separate Priscilla from the children so

21  Mr. Gessen could have sole custody of the children.

22      In 2019, he left Russia and came to the United States.

23  Without telling Priscilla.  Took a five-year-old child from his

24  mother, from his sister, from Russia, to the United States so

25  he could have sole custody, sole access to that child.  Those

**REBUTTAL ARGUMENT / HOSSEINI**

1  are his actions.

2      Two years went by before Priscilla saw her child again.

3  She had to go through a whole process of the Hague Convention

4  and all of that.  She was able to follow him and come here.  So

5  that didn't work.

6      Then they start fighting in Boston state courts and family

7  courts about custody.

8      Then he took that same child and went from the United

9  States to Canada.  And he claimed it was because he was going

10  to then go to London, and then go to Zimbabwe.

11      Instead of sit here and finalize his disputes in family

12  court in Boston where all four of them are, he's going to go to

13  Zimbabwe now, and try to figure it out there.  That makes no

14  sense.  His goal, his repeating pattern, always was to have

15  custody of the children and to separate Priscilla.  At any

16  cost.

17      And that cost included murder.  Because nothing else had

18  worked.  The legal disputes had not worked.  In fact, they had

19  gotten worse because he ended -- he ended up in jail.  He now

20  had a parental kidnapping charge.  Things are not working out

21  in the legal system; things are not working out by moving to

22  another country.

23      On three occasions he went to another country, took the

24  child, and did not tell Priscilla.  She keeps following,

25  because she also loves her children.

1          So there's no way to deal with Priscilla, because running

2     away to another country on multiple occasions is not working.

3     Filing all kinds of lawsuits in Zimbabwe or Russia or the

4     United States is not working.

5          The only option he saw on June 2nd was a cheaper option to

6     get rid of her.  A more definite, more permanent option.

7     Murder.  That's why he didn't ask any questions about the

8     details of the arrangement, because he knew that it was murder,

9     because he's smart, and he can follow a conversation when

10    someone says clear terms to him.

11         And if his theory that it was some random other thing,

12    some unspecified miraculous removal hearing were true, would

13    that make sense?  How would going into a database as a

14    government official, changing someone's status, how is that

15    cheaper?  Because of exposure?

16         So putting someone in a deportation proceeding would not

17    expose that government official, but accessing a government

18    website and falsely changing someone's status would?  How's

19    that cheaper?  How's that more permanent?  The person gets

20    removed from the United States, whether you called it

21    "deported" or "removed."  How is that more definite?  How is

22    that more permanent?  That does not make sense.  Because he

23    didn't think it was removal; he thought it was murder.

24         What's more definite than removal or deportation?  Death.

25    And why would it be cheaper?  Falsely accusing someone of an

1    arrest, why is that cheaper, why is that more permanent, why is

2    that more definite?  It's not.

3        Conducting a random immigration raid of a bunch of

4    different people; how is that cheaper or more permanent?  It

5    does not make sense.  Because it was not.

6        It was a plan to murder Priscilla, because none of the

7    other actions had worked, whether it was running away to

8    multiple different countries or filing all sorts of lawsuits.

9    Whether under the Hague Convention or family courts, that was

10   not working.  Those were his repeating patterns to separate

11   Priscilla from the children so that he could have sole custody,

12   at any cost.

13       That's what he said at first.  "I wanted at any cost to be

14   reunited with the children."  So believe him (Indicating).

15       And then, Ms. Mitchell had to ask followup questions to

16   get him to a place to say: I meant any reasonable cost.

17       Deportation was reasonable in his mind?  Bribing a

18   government official is reasonable in his mind?  Conducting a

19   random immigration raid of a bunch of different people who have

20   nothing to do with this case is reasonable in his mind?  No.

21   It was at any cost.  That's what he said at first.  That's who

22   -- that's who he showed himself to be, at any cost.  So believe

23   him.  Believe his words.

24       It also doesn't make sense that removal would be more

25   permanent or less cheaper because Mr. Gessen testified that

 1  Priscilla had a very effective and aggressive lawyer

 2  (Indicating quotation marks).  So whether Priscilla was removed

 3  or deported, wouldn't that effective and aggressive lawyer

 4  figure out a way to bring her back into the United States?  I

 5  mean, she came here once.

 6       So how is that more definite?  How is that more permanent?

 7  It's not.  Because he intended to murder her.  That is what is

 8  more definite.  That is what is more permanent.

 9       Still staying on his actions, what else does he do?  He

10  has those conversations with Agent Rizzo.  He sends a letter of

11  engagement to cover it up.  He has a consultancy agreement to

12  cover it up.  Then he starts deleting his text messages on

13  Signal.  Why?

14       He'd already talked about deportation.  It does not make

15  any sense that he would do all those things to cover up the

16  payment part, but never ask questions about how this plan was

17  going to get carried so that it would not blow back on him.

18  He's just going to trust this mobster, investor, law

19  enforcement agent, not sure who he is?  Does not make sense.

20       And it doesn't make sense in the context of when this

21  happened.  Because he testified that in June, when he met with

22  Agent Rizzo, his relationship with Priscilla was such that

23  things were civil (Indicating quotation marks), they were

24  resolved (Indicating quotation marks), and their disagreements

25  were truly minor (Indicating quotation marks).  It was about:

1    Hey, you're late, or where's the T-shirt?

2        Then why is he trying to deport her?  If they have reached

3    such a cooperative posture where their relationship is so good

4    that it's resolved, and civil, and they have truly minor

5    disagreements, why did he tell Agent Rizzo on June 2nd:  I want

6    -- when he said:  It was a blank slate, tell me what you want,

7    he said:  I want for Priscilla to go back to her home country.

8        Why?  Everything is so civil and resolved now.  Why do you

9    want her to go back to her home country?  Doesn't make sense.

10       And why would he pay $50,000, but then do the full recon,

11   himself?  Why would he need to provide that level of

12   information?  And he says he only gave some of it.  Even if he

13   gave some of it, why would he need to do that?  If you are

14   paying someone $50,000, they better do what they said they

15   would do.

16       And he's a savvy businessman.  He is a smart person.  He's

17   a lawyer.  He's worked on all sorts of sensitive matters.  That

18   target packet was to make it look random.  Whether her

19   boyfriend's house is on a through street is not relevant to

20   anything else, except for making her murder look random.

21       And why would he need to isolate himself?  If this is

22   someone going into a government database and changing her

23   status.  Why is Mr. Gessen isolating himself?  If this is

24   someone accusing her falsely of an arrest, why is Mr. Gessen

25   isolating himself?  Why is he being told not -- to put charges

1   on his credit card at that time?  How would that relate to the

2   false arrest, and how would that relate to the improper

3   accessing of the government database?  His credit card charges.

4        Doesn't make sense.  That's only to build an alibi to say:

5   I was somewhere else, I was at Cape Cod at this time, look at

6   all these credit card charges.  I was with other people.

7        It's to build an alibi.  You did not need an alibi for

8   another government official accessing a government database.

9   You need an alibi if someone's murdered.

10       Ms. Mitchell also said:  Who knows if that false arrest

11  made it into a visa application?  The false arrest of

12  Priscilla, somewhere internationally.

13       First of all, Priscilla testified that she was acquitted

14  of that.  Second of all, who knows?  Yeah, who knows?  He

15  (Indicating) doesn't know.  He said: I didn't review her visa

16  application, and I didn't fill it out for her.

17       So how would he even know that that would provide a basis

18  for deportation or removal?  He doesn't know.  Who knows?  He

19  doesn't know.  She was brought here through the official

20  system.  And he doesn't care if there is an actual basis to

21  deport her or not.  All he cares is she needs to be gone, she

22  needs to be taken out, she needs to be removed, she needs to

23  just be out.

24       Now let's talk about his testimony.  His testimony came

25  across like an extended effort to, one by one, explain away all

1  the incriminating facts.  Each explanation was strained.  He

2  had to twist himself into a little bit of a pretzel to explain

3  all of that.

4      One or two on their own might be believable, maybe three

5  or four might be believable.  But a dozen strained explanations

6  simply are not believable.  He just meandered through the

7  transcript and the audio recordings to try to explain away

8  every single incriminating fact.  That is not believable.

9      He testified in this case, so you treat his testimony like

10  the testimony of any other witness.  And those factors that

11  were on the credibility slide that we can look at again are the

12  manner of testifying -- I am not going to ad every single one,

13  but during the jury instructions we looked at them earlier.

14  I'll highlight three.  The manner of testifying, interest in

15  the outcome and reasonableness of testimony.

16      The interest in the outcome is pretty obvious.  Nobody in

17  this case has a stronger interest in the outcome of this case

18  than Mr. Gessen.

19      The manner of testifying, you saw him testifying before

20  you.  That is for you to see and assess.  You saw him when I

21  asked him:  Was it a joke?  You saw his demeanor.  At first he

22  said it was not a joke, then he said maybe it was.

23      He also said: I wasn't 100 percent transparent, at some

24  point when he was talking about something that had happened.

25  When I asked him about the fact that he had said the price was

1  eminently reasonable (Indicating quotation marks) and that the

2  price was a good price, he said he was portraying himself

3  (Indicating quotation marks).

4       And I said:  So did you lie?  He said yes.  You saw his

5  demeanor, how he answered those questions.  When I said: So you

6  said that there was -- a letter of engagement was a sneaky way

7  to get David's last name, but you already had it, which was

8  documented in those messages that he had the name before, you

9  saw his demeanor.

10      And the reasonableness of his testimony.  We've covered

11  that.  That's the common sense.  That's the explanations that

12  are strained, that do not make sense.  That story about

13  possibly a random raid of random illegal immigrants having to

14  be at the same time and place as Priscilla but then isolated

15  from him does not make sense.

16      And at the end, when I asked him what he would do for his

17  kids, we went through a long line of things that he would do

18  for his kids.  Bribery, deportation scheme, commit crimes, file

19  all sorts of lawsuits.

20      And I asked him if he would perjure himself for his kids.

21  And he said:  Yes, I would.  Without hesitation.

22      So he admitted that his oath means nothing to him.  The

23  oath he took to tell the truth, he admitted, means nothing.

24      Some her points I would like to respond to, whether the

25  crime was committed in San Francisco and to what extent the

1    government has to prove that, as opposed to the fact that the

2    coin was given in New York.

3        The law is clear that some acts in furtherance of the

4    crime charged must have occurred in the Northern District of

5    California, or in San Francisco.  Some acts.  Not that every

6    single thing has to have happened in San Francisco, as opposed

7    to New York or Florida.  Some acts.

8        And that's something the government has to prove beyond a

9    preponderance, which is a lesser standard than the other

10   elements of the crime that the government must prove beyond a

11   reasonable doubt.  Which I've talked about.  The reason and

12   common sense.

13       But back to whether some of those acts occurred in

14   San Francisco.  The wires that came in, came in to a

15   San Francisco bank account.  MLI Ventures.  Two wires, on

16   June 29 and July 8th, for $18,000 and $5,000, $23,000 total,

17   came into a San Francisco bank account.  The money that is

18   charged for being in exchange for the murder came into a

19   San Francisco bank account.  Those are some acts.

20       That is in the stipulations which is the last stipulation

21   between the parties, meaning both parties agree.  That's

22   Exhibit 32.  It also was the testimony of Agent Peacock that

23   the money came into a San Francisco account.

24       Agent Peacock also testified about how, at some point, the

25   undercover phone was in San Francisco.  And that messages were

1  sent to set up the June 22nd meeting in New York with

2  Mr. Gessen.

3      Those are some acts, setting up the second meeting, was

4  done from San Francisco.

5      And those Signal messages went from June 2nd to June 22nd,

6  Government's Exhibit 3.  And then the deleted ones went from

7  June 22nd to July 26th.  And the charged conduct here is from

8  June 2nd to July 26th.  So some acts certainly happened in

9  San Francisco.

10      It is not necessary that all the facts happen in

11  San Francisco.  Some happened in Boca, some happened in

12  New York, but some did occur in San Francisco.

13      The defense also said that:  We don't know where these

14  Signal messages came from.  The Signal messages came from the

15  undercover phone.  They came from Agent Rizzo's phone.  The

16  chain of custody was pretty clear.

17      Both Agent Peacock and Agent Rizzo testified about how the

18  FBI conducts its investigations.  In undercover situations, the

19  undercover has the phone at the beginning.  But then it becomes

20  evidence, it goes to the custody of the FBI, and it goes to the

21  custody of the case agents.  And at some point, one of the case

22  agents takes those contents, and it becomes an exhibit at

23  trial.

24      One of the ways Agent Rizzo preserved those deleted texts

25  was through screenshots of his phone.  That's Exhibit 4.  The

1  other way he preserved it was to put the target package into a

2  note to himself.  That was downloaded from his phone.  Another

3  way was to text Agent Bognanno on the alias of Agent Bognanno,

4  Christopher Belefiore, so that those messages would be

5  preserved.

6       Much was made of the fact that they were not documented or

7  preserved in the exact same way.  Some deleted messages were

8  deleted from -- were taken by the screenshot of the phone by

9  Agent Rizzo.  Some were preserved in a note to self on the

10  phone.  And some were texted to Agent Bognanno.  Who cares?

11  They were all preserved.

12       This is an undercover operation where agents are in the

13  field.  Their goal is to preserve evidence.  It doesn't matter

14  which method was used, if a laptop or a phone or a piece of

15  paper was used.  The point is that it was preserved.

16       And why were they being deleted in the first place?

17  Because Mr. Gessen had enabled the Signal messages to

18  disappear.  Because those are evidence of his words, evidence

19  of his actions, that he did not think would ever make it to

20  court.  But they did.  And they are evidence, and they're

21  before you.

22       The defense also said that the reason why Priscilla got

23  stuck and couldn't come to the United States after Mr. Gessen

24  left -- from Russia to the United States on the second occasion

25  was because of the COVID pandemic.  But let's place this

 1    timeline in history.

 2         Mr. Gessen took their son from Russia to the United States

 3    on June 23rd, 2019.  The COVID pandemic hit everybody and

 4    everything shut down in March of 2020.  That is nine months

 5    later.

 6         The COVID pandemic did not cause Priscilla not be able to

 7    return -- to come to the United States.  It was the fact that

 8    Mr. Gessen purposefully trapped her in a situation where her

 9    daughter's immigration status prevented her from leaving

10    Russia, and the fact she was a Zimbabwean national living in

11    Russia and could not come to the United States without a visa.

12    Can't blame that on COVID pandemic.  Those were Mr. Gessen's

13    actions.  Those were his choices.

14         The defense also said that:  What self-respecting money

15    launderer is going to admit to the fact that he is a money

16    launderer?

17         Agent Rizzo was talking about the drug cartels that he was

18    doing business with, and he was talking about the fact he had

19    clients that were Columbian cartel members.  On its own, that

20    might have some superficial appeal.  But again, let's place it

21    into context.

22         Agent Rizzo testified, and so did Agent Peacock, to a

23    certain extent, about that.  That there was an FBI

24    investigation, a years-long investigation before they were even

25    introduced to Mr. Gessen, on Kiselev and another target.  That

1   was about money laundering.

2        So at the point that Mr. Kiselev introduced Mr. Gessen to

3   Agent Rizzo, that legend or that persona or that undercover

4   persona had already been established with Mr. Kiselev for a

5   long time.  So it made sense for Agent Rizzo to come out in the

6   open in meeting him, and tell him what he did, because he would

7   have already known it from Mr. Kiselev.

8        And in that first June 2nd meeting, Agent Rizzo says "I

9   asked Alex, hey, can I trust this guy?"  Meaning Mr. Gessen.

10  "And Alex told me I could trust you."  So he clearly is

11  explaining that the reason why he's telling him that he's a

12  money launderer is because he probably already knows it from

13  Kiselev.

14       At the end of the day, this case boils down to the fact

15  that Mr. Gessen is smart, he knows how to communicate, he knows

16  how to conduct business deals, he knows how to do deals.  And

17  he would have never done some weird deal where he didn't know

18  the details of it, some -- accessing a database or creating,

19  wholesale, a random immigration raid, or maybe doing some false

20  accusation of an arrest.  No.  He knew the deal that he entered

21  into was murder for hire.

22       This guy is smart, sophisticated, and a savvy businessman.

23  Instead of saying something like "I don't care," he said "I'm

24  absolutely ambivalent to the modalities and circumstances as

25  long as we achieve project objectives."

1        Instead of saying That's a good price, he said "The price

2    is eminently reasonable."  This guy knows how to talk.   This

3    guy knows how to communicate.  And when he was talking to Agent

4    Rizzo, the words that were used were very clear.  "Taken out,"

5    "grave."  "Permanent."  "Definite."  "Preference in the means."

6        All of those words, that conversation, in context, made it

7    very clear to Mr. Gessen that he was entering into a deal that

8    would be for murder.  More definite, more permanent.  And

9    that's what he wanted.

10        Because everything else he had done at that point, whether

11    it's through going to other countries and trapping her in

12    countries that she couldn't travel to, or going through a legal

13    system, had not worked.  That's the only thing left; that is

14    the only thing he can do to get rid of Priscilla.  And that's

15    what he did.

16        When you look at the evidence, when you look at his words,

17    when you look at his actions, that evidence will lead you to

18    the only verdict that is consistent with that evidence.  And

19    that is a verdict of guilty.

20        **THE COURT:**  Thank you.

21            **FINAL JURY INSTRUCTIONS**

22    **BY THE COURT**

23        Members of the jury, when you begin your deliberations,

24    elect one member of a jury as your presiding juror, who will

25    preside over the deliberations and speak for you here in court.

1    You will then discuss the case with your fellow jurors to

2    reach agreement, if you can do so.  Your verdict, whether

3    guilty or not guilty, must be unanimous.

4    Each of you must decide the case for yourself, but you

5    should do so only after you have considered all of the

6    evidence, discussed it fully with the other jurors, and

7    listened to the views of your fellow jurors.  Do not be afraid

8    to change your opinion if the discussion persuades you that you

9    should, but do not come to a decision simply because other

10   jurors think it is right.

11   It is important that you attempt to reach a unanimous

12   verdict, but of course only if each of you can do so after

13   having made your own conscientious decision.

14   Do not change an honest belief about the weight and effect

15   of the evidence simply to reach a verdict.  Perform these

16   duties fairly and impartially.

17   You should also not be influenced by any person's race,

18   color, religious beliefs, national ancestry, sexual

19   orientation, gender identity, gender or economic circumstances.

20   Also, do not allow yourself to be influenced by personal

21   likes or dislikes, sympathy, prejudice, fear, public opinion,

22   or biases, including unconscious biases.  Unconscious biases

23   are stereotypes, attitudes or preferences that people may

24   consciously reject but may be expressed without conscious

25   awareness, control or intention.

1    It is your duty as jurors to consult with one another and

2  to deliberate with one another with a view towards reaching an

3  agreement, if you can do so.

4    During your deliberations, you should not hesitate to

5  reexamine your own views and change your opinion if you become

6  persuaded that it is wrong.

7    Because you must base your verdict only on the evidence

8  received in the case, and on these instructions, I remind you

9  that you must not be exposed to any other information about the

10  case, or the issues involved, except for -- and this goes

11  specially for Mr. Hamilton and Mr. Smith, our alternates,

12  right?  You will not be deliberating, but we may need you.  So

13  it is especially important while you are not excused yet, that

14  you continue to follow these instructions.

15    (Alternate jurors indicate in the affirmative)

16    **THE COURT:**  So do not communicate with anyone in any

17  way, and do not let anyone else communicate with you in any way

18  about the merits of the case or anything to do with it.

19    This restriction includes discussing the case in person,

20  in writing, by phone, tablet, computer, or any other means,

21  including email, text messaging, or any internet chatroom,

22  blog, website or other forms of social media.

23    These restrictions applies to communicating with your

24  family members, your employer, the media or press and the

25  people involved in the trial.  If you are asked or approached

1  in any way about your jury service or anything about this case

2  until you have been excused, you must respond that you have

3  been ordered not to discuss the matter and to report the

4  contact to the Court.

5      Do not read, watch or listen to any news or media accounts

6  or commentary about the case or anything to do with it.  Do not

7  do any research such as consulting dictionaries, searching the

8  internet or using other reference materials and do not make any

9  investigation or in any way try to learn about the case on your

10  own.

11      The law requires these restrictions to ensure the parties

12  have a fair trial, based on the same evidence that each party

13  has had an opportunity to address.  A juror who violates these

14  restrictions jeopardizes the fairness of these proceedings, and

15  a mistrial could result, that would require the entire trial

16  process to start over.

17      If any juror is exposed to any outside information, please

18  notify the Court immediately.

19      Now, some of you have taken notes during trial.  Whether

20  or not you took notes, you should rely on your own memory of

21  what was said.  Notes are only to assist your memory.  You

22  should not be overly influenced by your notes or those of your

23  fellow jurors.  The punishment provided by law for this crime

24  is for the court to decide.  You may not consider punishment in

25  deciding whether the government has proved its case against the

1    defendant beyond a reasonable doubt.

2        A verdict form has been prepared for you.  After you have

3    reached unanimous agreement on a verdict your presiding juror

4    should complete the verdict form according to your

5    deliberations, sign and date it and advise the courtroom deputy

6    that you are ready to return to the courtroom.  If it becomes

7    necessary during your deliberations to communicate with me, you

8    may send a note through the courtroom deputy, signed by any one

9    or more of you.  No member of the jury should ever attempt to

10   communicate with me except by a signed writing, and I will

11   respond to the jury concerning the case only in writing, or

12   here in open court.  If you send out a question I will consult

13   with the lawyers before answering it, which may take some time.

14   You may continue your deliberations while waiting for the

15   answer to any question.  And remember you are not to tell

16   anyone, including me how the jury strands, numerically or

17   otherwise on any question submitted to you, including the

18   question of guilt of the defendant, until after you have

19   reached a unanimous verdict or have been discharged.

20       So now the case is in your hands.  I believe Ms. Means has

21   arranged and we do have for you in the jury room, lunch.  Does

22   that include the alternates?

23       **THE COURTROOM DEPUTY:**  I think they can be excused,

24   but I did bring them --

25       **THE COURT:**  Yeah, so Mr. Hamilton and Mr. Smith, you

1    can grab your lunches and leave.   And the remaining 12, I would

2    suggest you elect your presiding juror and then decide what you

3    want to do.   You could leave now, return Monday, we normally

4    start at 8:30 but again, it's up to you.   Or you can stay

5    longer.   We are happy to do whatever you want to do.

6        So you just decide and then just let Ms. Means know

7    schedule-wise what you want to do.   But, there is lunch waiting

8    for you.   And Mr. Hamilton and Mr. Smith, make sure Ms. Means

9    -- she probably already did that -- knows how to get in contact

10   with you.

11       All right.   I've ordered you not to discuss this case.

12   Now I'm ordering you it is, in fact, your duty to discuss the

13   case but only with each other.   Thank you.

14       (Jury excused)

15       (The following proceedings were held outside of the

16   presence of the Jury)

17       **THE COURT:**   Okay.   If you hang out a bit, I imagine we

18   will know very shortly whether they are staying or not and then

19   whether you can go.   If they do stay just remember to turn your

20   phones back on so that you can hear if Ms. Means contacts you

21   to let you know if the jury has a question or something that we

22   need to do.

23       Before we go, I want to commend the parties and the

24   attorneys.   It was an excellently presented case by all of you.

25   Extremely professional.   There is obviously a lot at issue but

1   I think you were all extremely professional, well-prepared and

2   well-presented and I feel -- I hope Mr. Gessen feels, but I do

3   feel like it was a very fair presentation.  So I very much

4   appreciate that.

5       All right.  So hang tight.  Ms. Means will let you know.

6   And then she'll let you know what time they are coming back

7   Monday.  Just make sure you are back in the courthouse with

8   your phones on so she can alert you if we have a question or a

9   verdict.

10      **MS. MITCHELL:**  And Your Honor, for the jurors, would

11  they begin deliberations at 8:30?  8:00 Monday?  Or is it going

12  to be a schedule set by them?

13      **THE COURT:**  I suggested 8:30, but I said I think it is

14  up to them at this point.  So Ms. Means will let us know that

15  as well.

16      **MS. MITCHELL:**  Thank you, Your Honor.

17      (Record concluded at 1:43 p.m.)

# I N D E X

Friday, May 5, 2023 - Volume 5

|                                          | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| The Government rests on rebuttal         | 850      | 5        |
| Jury Instructions                        | 863      | 5        |
| Closing Argument by Ms. James            | 870      | 5        |
| Closing Argument by Ms. Mitchell         | 883      | 5        |
| Rebuttal Argument by Ms. Hosseini        | 923      | 5        |
| Final Jury Instructions                  | 943      | 5        |

| **DEFENDANT'S WITNESSES**                | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| **GESSEN, ALLEN**                        |          |          |
| (RECALLED)                               | 762      | 5        |
| Cross-Examination Resumed by Ms. Hosseini | 762     | 5        |
| Redirect Examination by Ms. Mitchell     | 826      | 5        |
| Recross-Examination by Ms. Hosseini      | 836      | 5        |

| **GOVERNMENT'S REBUTTAL WITNESSES**      | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| **BOGNANNO, CHRISTOPHER**                |          |          |
| (SWORN)                                  | 847      | 5        |
| Direct Examination by Ms. Hosseini       | 847      | 5        |
| Cross-Examination by Ms. Mitchell        | 849      | 5        |

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Saturday, June 17, 2023