1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

UNITED STATES OF AMERICA,

Case No.  22-cr-00276-JSC-1

Plaintiff,

8
9

v.

**ORDER RE: DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL, MOTION TO DISMISS, AND MOTION FOR NEW TRIAL**

10

ALLEN GESSEN,

11

Defendant.

Re: Dkt. No. 99

12
13

On May 8, 2023, a jury convicted Allen Gessen of murder-for-hire in violation of 18

14

U.S.C. § 1958.  (Dkt. No. 79.)[1]  Mr. Gessen now moves to set aside the jury verdict and enter a

15

judgment of acquittal, dismiss the indictment, or order a new trial.  (Dkt. No. 99.)  Having

16

carefully considered the briefing, and with the benefit of oral argument on December 13, 2023, the

17

Court DENIES Mr. Gessen's motions.

18

**DISCUSSION**

19

**A.  Motion for Judgment of Acquittal**

20

Mr. Gessen moves for acquittal on the grounds 1) insufficient evidence supports the

21

pecuniary consideration and intent elements of murder-for-hire under 18 U.S.C. § 1958 and 2)

22

venue in the Northern District of California was improper.

23

Federal Rule of Criminal Procedure 29 commands the Court "must enter a judgment of

24

acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R.

25

Crim. P. 29(a).  The Court's review of the evidence's constitutional sufficiency is governed by

26

*Jackson v. Virginia*, 443 U.S. 307 (1979).  *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th

27

United States District Court
Northern District of California

28

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Cir. 2010).  "*Jackson* thus establishes a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence."  *Id.* at 1164.  First, the court must consider the evidence presented at trial in the light most favorable to the prosecution, which restricts the court from usurping the role of the factfinder.  *Id.*  The court "may not ask whether a finder of fact could have construed the evidence produced at trial to support acquittal," and instead must presume "the trier of fact resolved any such conflicts in favor of the prosecution."  *Id.*  Second, the court must determine whether the evidence is adequate to allow "any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt."  *Id.* at 1165.

### 1.  Murder-for-Hire Conviction

The federal murder-for-hire statute provides:

> Whoever travels in or causes another . . . to travel in interstate or foreign commerce, or uses or causes another . . . to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, shall be . . . imprisoned not more than ten years.

18 U.S.C. § 1958(a).  The Court instructed the jury in accordance with Ninth Circuit Model Criminal Jury Instruction 16.7:

> The defendant is charged in the indictment with using interstate commerce facilities in the commission of a murder-for-hire in violation of Section 1958 of Title 18 of the United States Code.  For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, the defendant used or caused another to use a facility in interstate or foreign commerce;
>
> Second, the defendant did so with the intent that murder be committed; and
>
> Third, the defendant intended that the murder be committed in exchange for pecuniary value, namely $50,000.

(Dkt. No. 77 at 14.)  Mr. Gessen argues the trial evidence was insufficient to support a finding on the third element.  This argument is related to an argument made in his motion for a new trial; namely, the Court should have given his proposed theory-of-defense instruction.  So, the Court addresses Mr. Gessen's jury instruction argument first.

2

1

**a.  Proposed Theory-of-Defense Instruction**

2   Mr. Gessen does not dispute the accuracy of the above instruction.  Instead, he insists the

3   Court erred in not also giving his proposed theory-of-defense instruction:

> 4   In considering whether something of pecuniary value was promised
> or agreed to be paid as consideration for a murder, you are instructed
> 5   that the defendant must have reached an agreement with a person who
> clearly understood that they themself would commit a murder in
> 6   exchange for defendant's promise to pay or payment of something of
> pecuniary value—that is, a quid pro quo agreement.
> 7

8   (Dkt. No. 65 at 2.)  In other words, Mr. Gessen contends guilt under § 1958 requires proof the

9   undercover agent intended, or, more precisely, pretended to intend, he would commit the murder

10  himself.  Not so.

11  The plain language of the statute only requires the defendant intended the murder be

12  committed in exchange for something of pecuniary value.  *See* 18 U.S.C. § 1958(a) ("with intent

13  that a murder be committed . . . as consideration for the receipt of, or as consideration for a

14  promise or agreement to pay, anything of pecuniary value"); *see also* Ninth Circuit Model Jury

15  Instruction 16.7 (instructing "the defendant intended that the murder be committed in exchange for

16  pecuniary value").  Nothing in the statute suggests the person to whom the defendant promises to

17  pay money for the murder must be the person who the defendant believes will personally commit

18  the murder.

19  Mr. Gessen's citation to *United States v. Chong*, 419 F.3d 1076, 1082 (9th Cir. 2005), is

20  misplaced.  In *Chong*, the Ninth Circuit concluded § 1958's pecuniary value element was unmet

21  when there was insufficient evidence "the hitmen clearly understood they would receive

22  something of pecuniary value in exchange for performing the solicited murderous act."  419 F.3d

23  at 1082.  In other words, the evidence was insufficient to show the defendant (or his co-

24  conspirators) agreed to pay someone to commit a murder.  *Id*. at 1082 ("the evidence does not

25  support the government's claim that this money was promised to Casey in return for murdering

26  Bike Ming.").  *Chong* does not stand for the proposition money paid to an intermediary with the

27  understanding the intermediary will use it to get someone else to commit the murder is insufficient

28  to satisfy the pecuniary consideration element of § 1958(a).

United States District Court
Northern District of California

### b.  Pecuniary Consideration Element

Under this interpretation of § 1958, the trial evidence was sufficient to satisfy the pecuniary consideration element.  The pecuniary consideration element is satisfied if Mr. Gessen "gave or promised something of pecuniary value in exchange for seeking" Ms. Chigariro's murder.  *United States v. Chong*, 419 F.3d 1076, 1081 (9th Cir. 2005); *see also United States v. Phillips*, 929 F.3d 1120, 1124 (9th Cir. 2019) (affirming murder-for-hire conspiracy conviction when the hired "hitmen" were a government informant and undercover officer).

A rational trier of fact could find Mr. Gessen hired the undercover agent to arrange Ms. Chigariro's murder in exchange for $50,000.  During Mr. Gessen's June 2, 2022 meeting with the undercover agent in Boca Raton, Florida, Mr. Gessen solicited the undercover agent to orchestrate the murder of Ms. Chigariro.  (Ex. 6 at 63 ("I mean, indecently, if there was a cheaper way to get rid of her that would be good too."); *id*. at 64 ("And more definite."); *id*. ("because with the [] issue with immigration so many lawyers and… [unintelligible], you get a bad guy and she ends up staying."); *id*. at 65 ("I want to make sure whoever orchestrates it makes sure the kids are not going to be present."); *id*. at 69 ("this is not a spur of the moment, emotional reaction."); *id*. at 72 ("She'll be taken out without them present.").)

On June 20, 2022, the undercover agent directed Mr. Gessen to pay him $50,000 for Ms. Chigariro's murder.  (Ex. 3 at 16 ("I expect you to bring half the amount for our other project.  My guys are ready to put in some work"); *id*. ("I need to know the full amount to know how much is 1/2."); *id*. at 17 ("Full amount is 50"); Dkt. No. 86 at 103:3-4 (undercover agent testifying "our other project" is the "murder-for-hire contract.").)  The murder was set to take place the last week of July.  (Ex. 8 at 6 ("Let's say the last week of July.  Ok?  Let's just say the last week of July.").)

At their June 22, 2022 Manhattan meeting, Mr. Gessen gave the undercover agent a gold coin, worth $2,000, as "part of the down payment" for arranging Ms. Chigariro's murder.  (Dkt. No. 86 at 123; *see* Exs. 1 (gold coin), 2 (photos of gold coin).)  Mr. Gessen then wired the undercover agent approximately $23,000 prior to the planned murder.  (Dkt. No. 59 ¶ 6; Exs. 22 (Bank of America wire transfer records), 15 (screenshot of wire transfers).)  The gold coin and $23,000 covered half the murder-for-hire contract.  (Exs. 3 at 16-17, 8 at 6.)  Mr. Gessen agreed to

1    pay the undercover agent the other half of the agreed-upon $50,000 after the murder's completion.

2    (Ex. 8 at 6 ("When it's done, and only when it's done.").)  Based on this evidence, any rational

3    factfinder could find Mr. Gessen gave or promised something of pecuniary value to the

4    undercover agent in exchange for Ms. Chigariro's murder.  *Chong*, 419 F.3d at 1081.

5        Mr. Gessen insists the pecuniary consideration element was unmet because the evidence

6    did not support a finding the undercover agent himself was going to keep any of the money Mr.

7    Gessen paid the agent.  In support, Mr. Gessen cites a portion of the undercover agent's testimony

8    where he says, "I was just doing this as a favor for Mr. Gessen." (Dkt. No. 86 at 21-22.)  As

9    discussed in the context of Mr. Gessen's theory-of-defense jury instruction, the statute does not

10   require the evidence show the defendant paid the money to a person who would personally

11   commit the murder, or that the defendant intended the intermediary to keep any of the promised

12   payment.  The statute merely requires the defendant pay money in return for a murder.  The trial

13   evidence satisfies this requirement.

14        **c.  Intent**

15        Next, Mr. Gessen contends the evidence was insufficient to support a finding of the

16   murder-for-hire statute's second element: he intended for a murder to be committed.  Mr. Gessen

17   admits he 1) sought to have Ms. Chigariro deported, removed, or otherwise gotten rid of; 2)

18   accepted the undercover agent's "proposal to pay for something illegal and morally questionable"

19   to achieve his goals; 3) intended harm to Ms. Chigariro; 4) knew their shared children would be

20   affected; and 5) wanted to conceal his involvement.  (Dkt. No. 99 at 9.)  But Mr. Gessen disputes

21   the government established he intended to kill Ms. Chigariro.  Again, the Court is unpersuaded.

22        Mr. Gessen and the undercover agent began their June 2, 2022 Boca Raton meeting by

23   discussing the deportation scheme.  (Ex. 6 at 9 ("Um, I would like you to..myself and the children

24   to remain in the United States... [] And go back to her home country.  And not be able to come

25   and harass us again.").)  Later in the same meeting, Mr. Gessen told the undercover agent, "I

26   mean, indecently, if there was a cheaper way to get rid of her that would be good too."  (*Id*. at 63.)

27   The undercover agent said, "there is a cheaper way and probably a more permanent way to do it,"

28   to which Mr. Gessen replied, "I am prepared to proceed."  (*Id*.)  Mr. Gessen continued, "If that's

an option, I didn't know that was an option.  I researched my sources, the lowest price was 220

dollars.  And there is one for the Israelis and Eastern Europe and Italy."  (*Id*. at 64; Dkt. No. 86 at

54 ("My understanding was that Mr. Gessen had already researched the option to kill his wife, and

had been in conversation or had done some research with another organized crime syndicates, in

this case Israelis or Eastern Europe, for the price of $220,000.").)  The undercover agent

responded, "it's a totally different conversation, but yes, that can happen, like, quickly."  (Ex. 6 at

64.)

Mr. Gessen inquired about the price of this "more definite" option, before musing "the

issue with immigration so many lawyers and…[unintelligible], you get a bad guy and she ends up

staying."  (*Id*.)  The undercover agent assured Mr. Gessen, "it will be very clean, and it'll be quick,

and it'll be final."  (*Id*.)  Mr. Gessen expressed, "My secret concern is I need to be sure that we

cannot possibly do this in front of the kids" and "whoever orchestrates it makes sure the kids are

not going to be present."  (*Id*. at 64-65.)  The undercover agent reiterated, "This would be a very

clean, professional job" but urged, "you have to be sure that this is what you want."  (*Id*. at 65-66.)

Mr. Gessen replied, "I'm sure, I'm sure."  (*Id*. at 66.)  The undercover agent suggested they "meet

another time to discuss the final details," and Mr. Gessen said, "I will travel to where you are with

the paper versions of what you need.  Schedules, addresses, descriptions, photographs."  (*Id*. at

67.)

Over the course of their two in-person meetings, Mr. Gessen explained to the undercover

agent his frustration with Ms. Chigariro.  After Mr. Gessen and Ms. Chigariro had their first son,

Mr. Gessen brought Ms. Chigariro to Russia so they could find a surrogate to have a second child.

(*Id*. at 25-26.)  A month before a surrogate gave birth to their daughter, Ms. Chigariro told Mr.

Gessen she was leaving him for someone else.  (*Id*. at 26.)  Mr. Gessen recounts, "she starts a

serious war with me" by registering their daughter as being without a known father in Russia and

Zimbabwe.  (*Id*.)  In December 2021, when Mr. Gessen and his son were in Canada for a week of

skiing, Ms. Chigariro accused Mr. Gessen of kidnapping their son in a Massachusetts court.  (*Id*. at

27.)  As Mr. Gessen was boarding a flight from Montreal to Zimbabwe to establish the paternity of

his daughter, he was arrested for kidnapping.  (*Id*.)  Mr. Gessen spent 35 days in jail before he was

1    released.  (*Id.*)  "[F]or 35 days in prison, like let's just say that I'm a little pissed off, you know

2    what I mean?"  (*Id.*; *see id.* at 68 ("…she put me in fucking jail?").)  At the June 22, 2022

3    Manhattan meeting, Mr. Gessen told the undercover agent his criminal kidnapping charge was still

4    pending because the government needed to finalize the plea deal with Ms. Chigariro, the

5    "technical victim."  (Ex. 8 at 4.)  Mr. Gessen said Ms. Chigariro "has a bit of pull so she's very

6    happy about that," and "she is trying to leverage [the plea deal] to try and put pressure on me."

7    (*Id.*)

8         At trial, Ms. Chigariro testified Mr. Gessen took their son without her permission or

9    awareness across international borders twice: from Russia to the United States in 2019 and from

10   the United States to Canada in 2021.  (Dkt. No. 73 at 11-15, 31-38.)  On both occasions Ms.

11   Chigariro was unable to travel due to her immigration status.  (*Id.* at 15, 22, 34.)  Ms. Chigariro

12   filed a Hague petition for parental child abduction against Mr. Gessen when he took their son to

13   the United States.  (*Id.* at 18.)  She filed for custody of their son in Zimbabwe to support her

14   Hague petition.  (*Id.* at 24.)  In January 2020, Ms. Chigariro discovered Mr. Gessen had filed for

15   custody of their son in Massachusetts, where she was summoned to appear.  (*Id.* at 24-25.)  The

16   United States embassy in Zimbabwe issued Ms. Chigariro an expedited visa at the request of the

17   State Department so Ms. Chigariro could attend the custodial hearing in Massachusetts.  (*Id.* at

18   25.)  The Massachusetts court temporarily awarded Ms. Chigariro sole legal and physical custody

19   of their son, directed Mr. Gessen to surrender their son's passport, placed their son on the no-fly

20   list, and ordered "[n]either party shall remove the child" from Massachusetts without further court

21   order, (Ex. 30), the same day Mr. Gessen disappeared with their son in violation of the visitation

22   schedule.  (Dkt. No. 73 at 31-33.)  Mr. Gessen fled to Canada with their son, where he was

23   arrested for child kidnapping in Montreal while boarding a flight to London.  (Dkt. Nos. 73 at 38,

24   87 at 129-135; Ex. 6 at 27; Ex. 17.)

25         During their June 2, 2022 Boca Raton meeting, when the undercover agent asked Mr.

26   Gessen, "how do we protect the kids?  They're going to lose their mother right?  She's fucking

27   gone, how do we protect the kids?"  (Ex. 6 at 72.)  Mr. Gessen replied, their son "wants her gone.

28   He hates her with a passion," and "as long as they're not witnesses."  (*Id.*)  Mr. Gessen told the

7

1  undercover agent, "The trouble is and my mother keeps telling me, that my kids will end up

2  paying for…because [Ms. Chigariro] will be tormenting them."  (*Id*. at 68.)  Mr. Gessen affirmed,

3  "This is not a spur of the moment, emotional reaction."  (*Id*. at 69.)

4  Mr. Gessen and the undercover agent agreed to speak in code when exchanging messages

5  about the murder-for-hire scheme.  (Ex. 6 at 67 ("So, we will stay on Signal.  None of the words

6  we mention here can end up on there.").)  They referred to the murder-for-hire scheme as "our

7  special project in Boston."  (Ex. 3 at 6; Dkt. No. 86 at 86-87 (undercover agent testifying "our

8  special project in Boston" referred to "arranging the murder for hire for his wife"), 103

9  (undercover agent testifying "our other project" is the "murder-for-hire contract").)  Mr. Gessen

10  sent the undercover agent a Letter of Engagement as "a formality."  (Exs. 3 at 3-4; 12.)  The

11  undercover agent testified Mr. Gessen sent the letter "to basically officially cover our meeting."

12  (Dkt. No. 86 at 81.)

13  On June 14, 2022, the undercover agent messaged Mr. Gessen to ask, "Will you be

14  prepared to bring half of the documents we discussed.  My guys are lined up and are waiting."

15  (Ex. 3 at 15.)  Mr. Gessen responded affirmatively, adding, "Also sending documents by

16  electronic means might be easier."  (*Id*.)  The undercover agent replied, "For your protection and

17  ours paper is preferred.  Avoiding any scrutiny would be a [] good thing."  (*Id*.)  The undercover

18  agent testified "documents" meant money, "sending documents by electronic means" meant

19  wiring the money, "paper" meant cash, and "for your protection and ours" meant cash was

20  preferable to wiring money because wire transfers are traceable.  (Dkt. No. 86 at 100-101.)

21  On June 20, 2022, the undercover agent directed Mr. Gessen to pay him $50,000 for Ms.

22  Chigariro's murder.  (Ex. 3 at 16 ("I expect you to bring half the amount for our other project.  My

23  guys are ready to put in some work"); *id*. ("I need to know the full amount to know how much is

24  1/2."); *id*. at 17 ("Full amount is 50"); Dkt. No. 86 at 103 (undercover agent testifying "our other

25  project" is the "murder-for-hire contract.").)  The murder was set to take place the last week of

26  July.  (Ex. 8 at 6 ("Let's say the last week of July.  Ok?  Let's just say the last week of July.").)

27  At their June 22, 2022 Manhattan meeting, Mr. Gessen gave the undercover agent a gold

28  coin, worth $2,000, as "part of the down payment" for arranging Ms. Chigariro's murder.  (Dkt.

No. 86 at 123; *see* Exs. 1 (gold coin), 2 (photos of gold coin).)  After their second meeting, Mr. Gessen enabled the disappearing function in his Signal chat with the undercover agent so their messages would disappear after one day.  (Ex. 4 at 1.)  Mr. Gessen then sent the undercover agent a Consultancy Agreement.  (Exs. 4 at 1; 13.)  The undercover agent testified he was not surprised Mr. Gessen's name was not on the Consultancy Agreement "[b]ecause Gessen was using this instrument to cover his tracks for the payment for the murder for hire."  (Dkt. No. 86 at 140.)  Mr. Gessen also sent the undercover agent the "target package," which was available for two hours and could be accessed only once with a PIN number Mr. Gessen provided.  (Dkt. No. 86 at 144-47; Ex. 4 at 2.)  The target package included Ms. Chigariro's picture, date of birth, social media accounts, current address, and information on Ms. Chigariro's boyfriend, friends, landlord, vehicle, location, habitual movements, and lifestyle.  (Exs. 29, 31.)

Mr. Gessen sent the undercover agent two wires amounting to approximately $23,000 prior to the planned murder.  (Dkt. No. 59 ¶ 6; Exs. 22 (Bank of America wire transfer records), 15 (screenshot of wire transfers).)  In discussing the wires with the undercover agent, Mr. Gessen said, "I want to make sure there is no trial.  [unintelligible].  If I'm sending the money from any affiliated entities of mine, I need to make sure there can be no connection to me."  (Ex. 8 at 37.)  Mr. Gessen sent the first wire on June 29, 2022, and sent the second wire on July 8, 2022.  (Ex. 22.)  The gold coin and $23,000 covered half the murder-for-hire contract.  (Exs. 3 at 16-17; 8 at 6.)  Mr. Gessen agreed to pay the undercover agent the other half of the agreed-upon $50,000 after the murder's completion.  (Ex. 8 at 6 ("When it's done, and only when it's done.").)

The above evidence, along with other trial evidence, supports a finding beyond a reasonable doubt Mr. Gessen sought to hire the undercover agent to kill Ms. Chigariro as a cheaper, more permanent alternative to the deportation scheme.  Embroiled in a multi-front custody battle and facing a kidnapping charge, Mr. Gessen wanted "to get rid of" Ms. Chigariro so she would "not be able to come and harass [Mr. Gessen and his children] again."  (Ex. 6 at 9, 63.)  The use of code language, disappearing Signal messages, Letter of Engagement, Consultancy Agreement, and time-limited target package show Mr. Gessen's attempts to conceal the murder-for-hire plot.  Based on this evidence, any rational trier of fact could find Mr. Gessen paid the

1    undercover agent to have Ms. Chigariro murdered.

2           Mr. Gessen's arguments to the contrary invite the Court to usurp the role of the factfinder

3    by making inferences in his favor.  For instance, Mr. Gessen insists he would not have told the

4    undercover agent during their June 22, 2022 Manhattan meeting that Ms. Chigariro "just won the

5    green card lottery," (Ex. 8 at 9), if he had murderous intent because "murder renders immigration

6    status irrelevant." (Dkt. No. 99 at 16.)  But the opposite inference can be drawn from this

7    exchange.  The undercover agent, responding to Mr. Gessen's green card comment, said, "She

8    did?  Well I'm glad we didn't go that route then.  Right?" (Ex. 8 at 9.)  Mr. Gessen replied, "Well

9    we could still, I mean, the base that we were going to use was the visa fraud, so it doesn't matter."

10   (*Id*. at 9-10.)  The undercover agent said, "It would have made it a little bit more difficult…" (*Id*.

11   at 10.)  And then the two drop the subject and move on to discuss wiring instructions.  This

12   portion of the recorded meeting supports the inference Mr. Gessen and the undercover agent were

13   pursuing the murder-for-hire route, as opposed to the deportation route.  If Ms. Chigariro had

14   received a green card, "she would now be an American citizen, legal in the United States.  And it

15   would be impossible to deport her." (Dkt. No. 86 at 115.)  Or, at least, more difficult to deport her

16   under the visa fraud theory the undercover agent and Mr. Gessen had discussed. (Ex. 8 at 9-10.)

17   The two discuss the deportation route as their discarded option.

18          The Court "may not ask whether a finder of fact could have construed the evidence

19   produced at trial to support acquittal," and instead must presume "the trier of fact resolved any

20   such conflicts in favor of the prosecution."  *Nevils*, 598 F.3d at 1164.  The Court must construe

21   this green-card exchange as evidence Mr. Gessen and the undercover agent chose the murder-for-

22   hire route over the deportation route.

23                                        * * *

24          Viewing the evidence in the light most favorable to the prosecution, the evidence was

25   sufficient to allow any rational trier of fact to find the pecuniary consideration and intent elements

26   of murder-for-hire were met beyond a reasonable doubt.  *Nevils*, 598 F.3d at 1164.  Accordingly,

27   Mr. Gessen's motion for acquittal on these grounds is DENIED.

28   //

United States District Court
Northern District of California

### 2. Venue

Mr. Gessen also insists the government did not prove San Francisco was a proper venue for this case. Venue lies in the state and district where a crime was committed. U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; Fed. R. Crim. P. 18 ("The government must prosecute an offense in a district where the offense was committed."); *see also United States v. Chi Tong Kuok*, 671 F.3d 931, 937 (9th Cir. 2012) ("The Constitution requires that venue lie in the state and district where a crime was committed"). Any offense "begun in one district and completed in another, or committed in more than one district," may be prosecuted "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *see also United States v. Pace*, 314 F.3d 344, 350 (9th Cir. 2002) ("Crimes that are not unitary but instead span space and time, . . . may be prosecuted 'in any district in which such offense was begun, continued, or completed.'"). The government bears the burden of establishing proper venue by a preponderance of the evidence. *Chi Tong Kuok*, 671 F.3d at 937.

Venue is a jury question. *United States v. Moran-Garcia*, 966 F.3d 966, 969 (9th Cir. 2020). The Court explicitly instructed Mr. Gessen's jury, "Venue is proper in the Northern District of California if some act in furtherance of the crime charged occurred in the Northern District of California." (Dkt. No. 77 at 15); Ninth Circuit Model Criminal Jury Instruction No. 6.32. If part of the conduct that formed the charged offense occurred in the Northern District, "even if that conduct was performed by an undercover government agent, venue there was proper." *Chi Tong Kuok*, 671 F.3d at 938.

Mr. Gessen complains venue was improper because "[n]o part of the crime" occurred in the Northern District. (Dkt. No. 101 at 17.) Incorrect. Sufficient evidence demonstrated some acts in furtherance of Mr. Gessen's murder-for-hire scheme occurred in the Northern District such that any rational trier of fact could find venue proper in the Northern District of California. Mr. Gessen sent two wire transmissions, amounting to $23,000, to a San Francisco bank account as payment for the murder of Ms. Chigariro. (Dkt. Nos. 59 ¶ 6, 86 at 103 (undercover agent testifying "our other project" is the "murder-for-hire contract."), 87 at 155-58; Ex. 3 at 16 ("I expect you to bring half the amount for our other project. My guys are ready to put in some

work"); *id*. ("I need to know the full amount to know how much is 1/2."); *id*. at 17 ("Full amount is 50"); Exs. 22 (Bank of America wire transfer records), 15 (screenshot of wire transfers).)  The undercover agent also exchanged messages with Mr. Gessen to organize the June 22, 2022 Manhattan meeting from the San Francisco Federal Bureau of Investigation office.  (Dkt. No. 87 at 153-55); *see United States v. Temkin*, 797 F.3d 682, 691 (9th Cir. 2015) (ruling use of a telephone qualifies as use of a facility of interstate commerce).  Based on these facts, a rational trier of fact could find some acts in furtherance of Mr. Gessen's murder-for-hire crime occurred in San Francisco.

The Ninth Circuit's recent decision in *United States v. Fortenberry*, 2023 WL 8885105 (9th Cir. Dec. 26, 2023), does not compel a different result.  There, the defendant was convicted of making false statements to federal investigators while they were investigating a campaign finance scheme.  Though the defendant made the statements to investigators in Nebraska and Washington, D.C., the government indicted and tried the defendant in the Central District of California.  *Id*. at *6.  The government reasoned venue was proper in the Central District of California because defendant's false statements "effected" the Los Angeles-based investigation, which was "run by the FBI's Los Angeles field office, located in the Central District of California."  *Id*. at *2.  The Ninth Circuit disagreed.  It held venue "turns on the action by the defendant that is essential to the offense, and where that specific action took place."  *Id*. at *4.  Because the "essential conduct" of the charged false-statement offense is the making of a false statement, and the defendant's false statements were made in and to persons in Nebraska and Washington, D.C., Los Angeles was not a proper venue.

As the discussion regarding the sufficiency of the evidence highlights, the essential conduct of the murder-for-hire statute is promising to provide something of pecuniary value— here, money—in exchange for a murder.  At a minimum, that conduct occurred in New York, where Mr. Gessen provided the undercover agent with the gold coin, and San Francisco, where Mr. Gessen wired $23,000.  The government did not argue venue was proper because Mr. Gessen's conduct "effected" an investigation based out of San Francisco; instead, it proved Mr. Gessen committed part of the murder-for-hire crime in San Francisco by wiring payment for the

1  murder to San Francisco.  This evidence satisfies the Constitution and the venue statute.

2        Accordingly, Mr. Gessen's motion for judgment of acquittal for improper venue is

3  DENIED.

4  **B. Motion to Dismiss the Indictment**

5        Mr. Gessen moves to dismiss the indictment on due process grounds, arguing 1) "the

6  government charged the case as a substantive offense but the evidence shows, at most, a

7  conspiracy entirely manufactured by the government," and 2) the government's role in

8  manufacturing the scheme amounts to outrageous government conduct.  (Dkt. No. 99 at 18-19.)

9  "Generally, an indictment is sufficient if it sets forth the elements of the charged offense so as to

10  ensure the right of the defendant not to be placed in double jeopardy and to be informed of the

11  offense charged."  *United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995), *as amended* (Apr.

12  19, 1995).

13        Federal Rule of Criminal Procedure 12(b)(3) requires motions alleging defects in

14  instituting the prosecution or the indictment be brought before trial "if the basis for the motion is

15  then reasonably available and the motion can be determined without a trial on the merits."  Mr.

16  Gessen argues he had no means of demonstrating the government manufactured the charged

17  offense "without the examination of the evidence."  (Dkt. No. 101 at 17.)

18        **1. Substantive Murder-for-Hire Offense**

19        Mr. Gessen argues he should have been charged with conspiracy to commit murder-for-

20  hire, not a substantive murder-for-hire offense, because "the elements proven by the government

21  do not support the government's legal theory under § 1958 that Gessen had hired [the undercover

22  agent]."  (Dkt. No. 99 at 18.)  For the reasons explained above, all three elements of substantive

23  murder-for-hire were met.  Accordingly, Mr. Gessen's motion to dismiss the indictment on this

24  basis is DENIED.

25        **2. Outrageous Government Conduct**

26        Whether government misconduct contravened constitutional due process principles is a

27  question of law.  *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir. 1983).  The involvement of

28  undercover agents bars conviction of a predisposed defendant as a matter of due process where

United States District Court
Northern District of California

13

"government agents engineer and direct the criminal enterprise from start to finish." *Id.* "Prosecution is barred only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *Id.* (cleaned up); *see also United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) ("Dismissing an indictment for outrageous government conduct, however, is limited to extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice." (cleaned up)). It is not outrageous for government agents to approach individuals already involved in or contemplating a criminal act. *Black*, 733 F.3d at 302.

The Ninth Circuit has identified six factors relevant to whether the government's conduct was outrageous:

> (1) known criminal characteristics of the defendants;
> (2) individualized suspicion of the defendants;
> (3) the government's role in creating the crime of conviction;
> (4) the government's encouragement of the defendants to commit the offense conduct;
> (5) the nature of the government's participation in the offense conduct; and
> (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*Id.* at 303. Mr. Gessen contends these factors warrant dismissal because the government manufactured this case:

> There is no other case where law enforcement had proposed to a private person who was not planning and was not involved in crime, with no criminal history, three distinct criminal schemes in the course of two hours. This "investigation" and prosecution did not begin with a crime or suspected crime. This persecution began with Gessen as a target, to whom the government proposed crimes, and then offered to commit crimes on his behalf. Manufacturing crimes for the sole purpose of bringing criminal charges is the very definition of outrageous conduct.

(Dkt. No. 99 at 20.) Mr. Gessen's argument fails because it is not premised on the evidence.

### i. Individualized Suspicion

Mr. Gessen's associate, Aleksei Kiselev, who was under investigation for money laundering, introduced Mr. Gessen to the undercover agent. (Dkt. No. 86 at 4-7; Exs. 11, 23 at 5-10.) Kiselev asked the undercover agent to help Mr. Gessen, who was having custody issues with

14

his ex-partner and, specifically, asked the undercover agent to bribe an immigration official to have Mr. Chigariro deported.  (Exs. 11, 23 at 5-10.)  And a year before Kiselev introduced Mr. Gessen to the undercover agent to help him with Ms. Chigariro, Kiselev introduced Mr. Gessen to a different undercover agent to facilitate money laundering schemes.  In Boston on May 27, 2021, Mr. Gessen met with this other undercover agent to discuss bribing a representative of the Internal Revenue Service to obtain confidential United States tax return records for four Russian nationals residing in the United States, among other things.  (Ex. 10.)  So, before the undercover agent met with Mr. Gessen in Boca Raton on June 2, 2022, the government had reason to suspect Mr. Gessen was involved in money laundering and bribery.  This factor weighs against a finding of outrageous government conduct.

### ii.     Known Criminal Characteristics

"Closely related to the question of individualized suspicion is whether a defendant had a criminal background or propensity the government knew about when it initiated its sting operation."  *Black*, 733 F.3d at 304.  Mr. Gessen's aforementioned connection to Kiselev, a known money launderer under investigation for organized crime, and May 27, 2021 Boston meeting with the other undercover agent to facilitate a bribery and extortion scheme, gave the government notice of Mr. Gessen's criminal background and propensity.  This factor also weighs against a finding of outrageous government conduct.

### iii.    Government's Role in Creating the Crime

"Also relevant is whether the government approached the defendant initially or the defendant approached a government agent, and whether the government proposed the criminal enterprise or merely attached itself to one that was already established and ongoing."  *Black*, 733 F.3d at 305.  Kiselev connected the undercover agent to Mr. Gessen, not the other way around. (Exs. 11, 23 at 5-10, 6 at 9; Dkt. No. 86 at 4-7.)  And Kiselev, not the government, suggested illegally removing Ms. Chigariro.  (Exs. 11, 23 at 5-10 ("her visa gets revoked and she gets kicked out the country.").)  Mr. Gessen and the undercover agent began their June 2, 2022 Boca Raton meeting by discussing the deportation scheme initially proposed by Kiselev.  (Ex. 6 at 9.)  But later in the meeting, Mr. Gessen told the undercover agent, "I mean, indecently, if there was a

15

cheaper way to get rid of her that would be good too." (*Id*. at 63.)  The undercover agent said, "there is a cheaper way and probably a more permanent way to do it," to which Mr. Gessen replied, "I am prepared to proceed." (*Id*.)  Mr. Gessen continued, "If that's an option, I didn't know that was an option.  I researched my sources, the lowest price was 220 dollars.  And there is one for the Israelis and Eastern Europe and Italy." (*Id*. at 64; Dkt. No. 86 at 54.)  The undercover agent responded, "it's a totally different conversation, but yes, that can happen, like, quickly." (Ex. 6 at 64.)  The undercover agent reiterated, "This would be a very clean, professional job" but urged, "you have to be sure that this is what you want." (*Id*. at 65-66.)  Mr. Gessen replied, "I'm sure, I'm sure." (*Id*. at 66.)

So, Mr. Gessen's lament the government created the crime is unsupported.  Kiselev and Mr. Gessen arranged for the undercover agent to meet Mr. Gessen.  Kiselev initiated the illegal deportation idea with the government.  Mr. Gessen—not the undercover agent—initiated the discussion from the illegal deportation scheme to "a cheaper way to get rid of her." (*Id*. at 63.)  And, without prompting, Mr. Gessen told the undercover agent he himself had previously researched the price for having Ms. Chigariro killed.  (*Id*. at 64; Dkt. No. 86 at 54.)  The undercover agent "merely attached [himself] to [a criminal enterprise] that was already established and ongoing." *Black*, 733 F.3d at 305.  This factor weighs against a finding of outrageous government conduct too.

### iv.  Government Encouragement

"The extent to which the government encouraged a defendant to participate in the charged conduct is important, with mere encouragement being of lesser concern than pressure or coercion." *Id*. at 308.  Here, there is no evidence the government encouraged Mr. Gessen to hire the undercover agent to kill Ms. Chigariro.  On the contrary, the undercover agent tried on multiple occasions to give Mr. Gessen "an out." (Dkt. No. 86 at 56; Ex. 6 at 65-66, 69, 72; Ex. 8 at 11, 29.)  Mr. Gessen repeatedly affirmed he was sure about having Ms. Chigariro murdered. (Exs. 6 at 63 ("I am prepared to proceed."), 65-66 ("I'm sure, I'm sure."), 69 ("And, this is not a spur of the moment, emotional reaction."), 72 ("As long as they're not witnesses."); 8 at 11 ("Good.  Mazel."), 29 ("Hundred percent on board.").)  The absence of government

United States District Court
Northern District of California

encouragement weighs against a finding of outrageous government conduct.

### v.   Government Participation

"The duration of the government's participation in a criminal enterprise is significant, with participation of longer duration being of greater concern than intermittent or short-term government involvement." *Black*, 733 F.3d at 308.  The court also considers the nature of the government's participation in the defendant's conduct, which concerns "whether the government acted as a partner in the criminal activity, or more as an observer of the defendant's criminal conduct." *Id*.  "Finally, courts have examined the necessity of the government's participation in the criminal enterprise—whether the defendants would have had the technical expertise or resources necessary to commit such a crime without the government's intervention." *Id*. at 309.

Mr. Gessen initiated both the deportation and murder-for-hire scheme; the government participated in both at his prompting.  The undercover agent was involved in Mr. Gessen's murder-for-hire scheme for only two months.  But Mr. Gessen did not require the government's participation to hire someone to murder Ms. Chigariro, as Mr. Gessen already had contacts willing and able to complete the murder-for-hire contract.  (Ex. 6 at 64.)  This factor too weighs against a finding of outrageous government conduct.

### vi.   Nature of the Crime

Finally, courts consider "the need for the investigative technique that was used in light of the challenges of investigating and prosecuting the type of crime being investigated." *Black*, 733 F.3d at 309.  This factor weighs neutrally because the government did not seek to investigate Mr. Gessen for either the deportation or the murder-for-hire scheme when the undercover agent got involved.  Though the existence of "recordings to prove what was actually said and done has weighed heavily" in the Court's review of the record, *see id*. at 310, the undercover agent's initial tactics were aimed at investigating organized money laundering, not murder-for-hire.

\* \* \*

This is not a close issue.  The government's conduct was not "so grossly shocking and so outrageous as to violate the universal sense of justice." *Id*. at 310.  Accordingly, the Court DENIES Mr. Gessen's motion to dismiss the indictment for outrageous government conduct.

United States District Court
Northern District of California

1

### C. Motion for a New Trial

Mr. Gessen moves for a new trial under Federal Rule of Criminal Procedure 33 on the grounds 1) the jury's verdict was against the weight of the evidence, 2) much of the undercover agent's testimony was improper, 3) other evidence was improperly admitted, 4) the government referenced facts not in evidence at closing argument, and 5) the jury instruction on § 1958 failed to accurately state the law.

Rule 33 empowers the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (cleaned up). If the Court concludes, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence weighs so heavily against the verdict "that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000).

#### 1. Jury's Verdict Versus the Weight of the Evidence

For the reasons explained above, the trial evidence met all three elements of substantive murder-for-hire. The evidence does not "preponderate[] sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Kellington*, 217 F.3d at 1097. Accordingly, Mr. Gessen's motion for a new trial on this basis is DENIED.

#### 2. Undercover Agent's Testimony

Mr. Gessen next claims the undercover agent "repeatedly offered expert testimony on the ultimate issue of fact, namely, whether Gessen intended to kill Ms. Chigariro and entered into a murder-for-hire scheme." (Dkt. No. 99 at 25.) The undercover agent was not an expert witness; he did not offer expert testimony. The undercover agent was a lay witness testifying about his personal understanding of conversations he had with Mr. Gessen as a fellow participant in those conversations. (*See, e.g.*, Dkt. No. 86 at 107-08 (overruling objection because the undercover agent was testifying as to his understanding of his conversation with Mr. Gessen as "the other party to the conversation. So, he said what he said, based on his interpretation of what was being

1    said.").)

2         Lay opinion testimony is admissible under Federal Rule of Evidence 701 if the testimony

3    is "(1) rationally based on the perception of the witness and (2) [] helpful to the jury in acquiring a

4    clear understanding of the witness' testimony or the determination of a fact in issue." *United*

5    *States v. Simas*, 937 F.2d 459, 464 (9th Cir. 1991).  The undercover agent testified about Mr.

6    Gessen's statements to him, which is sufficient to satisfy the first requirement of Rule 701.  *Id*. at

7    464-65.  "As to the second requirement, a lay witness' opinion concerning the witness'

8    understanding of the declarant's statements or conduct may be helpful to the jury."  *Id*. at 465.

9         In this case, as in *Simas*, Mr. Gessen's statements to the undercover agent were often

10   vague or ambiguous and "[t]he listener's understanding of the words and innuendo was helpful to

11   the jury in determining what [Mr. Gessen] meant to convey."  *Id*.  For example, Mr. Gessen

12   complains about the undercover agent's testimony interpreting Mr. Gessen's question as to

13   whether there was a "cheaper" and "more permanent way" as asking if there was a way to have

14   Ms. Chigariro killed.  (Dkt. No. 99 at 25.)  Indeed, the gravamen of Mr. Gessen's post-trial

15   motions is that his words did not mean he wanted Ms. Chigariro killed, only unlawfully deported.

16   The undercover agent's testimony explained the agent's understanding of Mr. Gessen's vague and

17   ambiguous words.  *See United States v. Freeman*, 498 F.3d 893, 902 (9th Cir. 2007) ("A lay

18   witness may provide opinion testimony regarding the meaning of vague or ambiguous

19   statements").  And, "the probative value of the undercover agent's opinion testimony was strong

20   and outweighed any unfair prejudicial effect."  *Simas*, 937 F.2d at 465.  The undercover agent's

21   testimony thus satisfied Rule 701's second requirement.

22        Mr. Gessen's reliance on *Freeman* to support the inadmissibility of the undercover agent's

23   testimony is misplaced.  There, the government agent testified to the agent's interpretations of

24   ambiguous conversations based upon his knowledge of the case, not as an actual participant in

25   those conversations.  *Freeman*, 498 F.3d at 904-05.  Here, the undercover agent's testimony

26   interpreted vague and ambiguous portions of conversations he himself had with Mr. Gessen.

27        Accordingly, Mr. Gessen's motion for a new trial on the grounds the undercover agent's

28   testimony was improper is DENIED.

United States District Court
Northern District of California

19

United States District Court
Northern District of California

### 3. Sixth Amendment Violation

Mr. Gessen accuses the government of violating his Sixth Amendment right to counsel by having the undercover agent contact him a day after his indictment. (Dkt. No. 99 at 27.) The grand jury indicted Mr. Gessen on July 26, 2022. (Dkt. No. 1.) He claims the undercover agent sent the last few disappearing Signal messages on July 27, 2022, and therefore Mr. Gessen's responding messages should not have been admitted. Setting aside Mr. Gessen's failure to object to the messages' admissibility at trial, (Dkt. No. 86 at 135), Mr. Gessen's timeline is wrong. Mr. Gessen sent the undercover agent a message on July 26, 2022, saying, "I am leaving for Cape Cod tomorrow (Wednesday, July 27) at 4 PM and will only be back at home on Sunday, the 31st." (Ex. 4 at 10.) The last text exchange between the undercover agent and Mr. Gessen ended when Mr. Gessen sent his final message ("Thank you my brother. Our cause is just.") less than 30 minutes after Mr. Gessen referenced July 27 as "tomorrow." (Ex. 4 at 10-13.) Mr. Gessen speculates the time stamps on the undercover agent's messages may be incorrect because he might have had his phone off. Besides there being no evidence to support this speculation, it is contradicted by the content of the correspondence. The undercover agent's message responding to Mr. Gessen's July 26 message says: "The project is in it's final stages and I suspect. [*sic*] It will be completed on the 28th." (Ex. 4 at 10.) If this message was sent on the 27th, as Mr. Gessen posits, the undercover agent would have said it will be completed tomorrow, not the 28th. The undercover agent did not contact Mr. Gessen the day after his indictment, so Mr. Gessen's Sixth Amendment rights were not violated. *See Massiah v. United States*, 377 U.S. 201, 206 (1964).

### 4. Government's Closing Argument

Mr. Gessen next asserts the government improperly argued Mr. Gessen directed the undercover agent to kill Ms. Chigariro's boyfriend. A prosecutor's remarks rise to a level of misconduct constituting infringement of a defendant's constitutional rights only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). While prosecutors may ask the jury to draw inferences from the evidence the prosecutor in good faith believes might be true, it is improper for the government to propound inferences it knows to be false or has a very strong reason to doubt.

United States District Court
Northern District of California

1   *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002).  "[A] court should not lightly infer

2   that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury,

3   sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging

4   interpretations."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  Attorneys are given

5   "wide latitude" in closing arguments to make "reasonable inferences from the evidence presented

6   at trial."  *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997).

7       At closing, the government argued "[t]he boyfriend is the collateral" to rebut the defense's

8   characterization of the government's theory as painting Gessen as "a mass murderer."  (Dkt. No.

9   89 at 167-68.)  Facts about Ms. Chigariro's boyfriend were in the trial record, including the target

10  package stating the boyfriend's name, age, location, and length of relationship with Ms. Chigariro.

11  (Ex. 31 at 3.)  The target package said, "When children are with ex-husband, subject stays at her

12  boyfriend's house in Cambridge."  (*Id.* at 4.)  The undercover agent asked Mr. Gessen, "If there

13  are any guests present do you have any problem with showing them the exit?" (Ex. 4 at 11), by

14  which he meant "if there was anybody with his ex-wife at the time we were going to conduct the

15  killing, would he have any problem with us killing that person as well." (Dkt. No. 86 at 170.)  Mr.

16  Gessen responded that it was fine.  (Ex. 4 at 11 ("I meant the collateral.  I meant it's fine.").)

17      The government's comment about the boyfriend being collateral was supported by the

18  factual record and plainly within the scope of permissible argument.  Accordingly, Mr. Gessen's

19  motion for a new trial on this basis is DENIED.

20          **5.   Jury Instructions**

21      As discussed at the beginning of this Order, Mr. Gessen insists the Court's jury instruction

22  on § 1958 was defective because the Court did not include his proposed theory-of-defense

23  instruction.  The Court rejects this argument for the reasons previously explained.

24                              * * *

25      Mr. Gessen fails to persuade the Court the interests of justice require a new trial.

26  Accordingly, Mr. Gessen's Rule 33 motion for a new trial is DENIED.

27                      **CONCLUSION**

28      Mr. Gessen's motions to set aside the jury verdict and enter a judgment of acquittal,

1   dismiss the indictment, or order a new trial are DENIED.  A status conference is scheduled for

2   Wednesday, February 7, 2024 at 10:00 a.m. to set a sentencing date.

3        This Order disposes of Docket No. 99.

4        **IT IS SO ORDERED.**

5   Dated: January 16, 2024

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

22