JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
CANDIS MITCHELL, Bar No. 242797
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:     (415) 436-7706
Email:          Candis_Mitchell@fd.org

Counsel for Defendant Gessen

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **United States of America,**<br><br>Plaintiff,<br><br>v.<br><br>**Allen Gessen,**<br><br>Defendant. | **Case No.:** CR 22–276 JSC<br><br>**Defendant's Sentencing Memorandum**<br><br>**Court:**　　　　Courtroom 8, 19th  Floor<br>**Hearing Date:**　April 24, 2024<br>**Hearing Time:**　10:00 a.m. |

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................................... i

INTRODUCTION ....................................................................................................................... 1

SENTENCING GUIDELINES ................................................................................................... 1

    1.    Mr. Gessen's proposed Guideline calculations ...................................................... 2

        1.1.    The Court should give little weight to the Guidelines in determining the proper sentence ......................................................................................... 2

        1.2.    The Court should apply a downward adjustment for zero-point offender ........... 3

SECTION 3553(a) FACTORS ....................................................................................................... 6

    2.    The history and characteristics of the defendant and the nature and circumstances of the offense ............................................................................................................... 7

    3.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct ........................................................... 20

    4.    The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner ................................................................................................... 21

    5.    Any pertinent policy statement. ......................................................................... 21

    6.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct .................................... 22

    7.    The need to provide restitution to any victims of the offense. ........................... 23

CONCLUSION .......................................................................................................................... 23

TABLE OF AUTHORITIES

**Federal Cases**

*Gall v. United States,*
552 U.S. 38 (2007) ...................................................................................................................... 2

*Kimbrough v. United States,*
128 S. Ct. 558 (2007) .................................................................................................................. 1

*Spears v. United States,*
555 U.S. 261 (2009) ................................................................................................................. 2, 3

*Tanzin v. Tanvir,*
141 S. Ct. 486 (2020) .................................................................................................................. 5

*United States v. Atkinson,*
815 F. App'x 704 (4th Cir. 2020) ............................................................................................... 5

*United States v. Berkett,*
No. 2:21-CR-00292-MCS-1, 2024 WL 1516317 (C.D. Cal. Apr. 8, 2024) ............................... 6

*United States v. Booker,*
543 U.S. 220 (2005) .................................................................................................................... 1

*United States v. Carrillo,*
440 F. Supp. 3d 1148 (E.D. Cal. 2020) ...................................................................................... 3

*United States v. Carty,*
520 F.3d 984 (9th Cir. 2008) ...................................................................................................... 6

*United States v. Dorvee,*
616 F.3d 174 (2d Cir. 2010) ....................................................................................................... 3

*United States v. Goodman,*
556 F. Supp. 2d 1002 (D. Neb. 2008) ......................................................................................... 3

*United States v. Grober,*
624 F.3d 592 (3d Cir. 2010) ....................................................................................................... 3

*United States v. Harry,*
313 F. Supp. 3d 969 (N.D. Iowa 2018) ....................................................................................... 3

*United States v. Hart,*
324 F.3d 740 (D.C. Cir. 2003) .................................................................................................... 5

*United States v. Hayes,*
948 F. Supp. 2d 1009 (N.D. Iowa 2013) ..................................................................................... 3

*United States v. Hernandez-Barajas,*
71 F.4th 1104 (8th Cir. 2023) ..................................................................................................... 5

*United States v. Ibarra-Sandoval,*
265 F. Supp. 3d 1249 (D.N.M. 2017) ......................................................................................... 3

*United States v. Johnson,*
64 F.4th 1348 (D.C. Cir. 2023) .................................................................................................. 6

*United States v. Johnson,*
   379 F. Supp. 3d 1213 (M.D. Ala. 2019) ............................................................................................ 3

*United States v. McClelland,*
   72 F.3d 717 (9th Cir. 1995) ...................................................................................................... 15, 16

*United States v. Miller, Crim. A. No. 22-495,*
   No. ?DOCKET?, 2024 WL 363731 (N.D. Ohio Jan. 26, 2024) ...................................................... 6

*United States v. Moreno,*
   No. 5:19CR002, 2019 WL 3557889 (W.D. Va. Aug. 5, 2019) .......................................................... 3

*United States v. Overstreet,*
   693 F. App'x 374 (5th Cir. 2017) ................................................................................................ 5

*United States v. Pineda-Duarte,*
   933 F.3d 519 (6th Cir. 2019) .................................................................................................... 5

*United States v. R.V.,*
   157 F. Supp. 3d 207 (E.D.N.Y. 2016) .......................................................................................... 3

*United States v. Stone,*
   575 F.3d 83 (1st Cir. 2009) ........................................................................................................ 3

*United States v. Torres,*
   694 F. App'x 937 (5th Cir. 2017) ................................................................................................ 5

*United States v. White,*
   621 F. App'x 889 (9th Cir. 2015) ................................................................................................ 5


**Federal Statutes**

18 U.S.C. § 1958 .......................................................................................................................... 14

18 U.S.C. § 3553 ................................................................................................................... *passim*


**Other**

*Black's Law Dictionary*
   (11th ed. 2019) ...................................................................................................................... 5

U.S.S.G. § 1B1.1 ........................................................................................................................ 4

U.S.S.G. § 1B1.3 ........................................................................................................................ 4

U.S.S.G. § 2D1.1 ..................................................................................................................... 4, 5

U.S.S.G. § 2E1.4 ........................................................................................................................ 2

U.S.S.G. § 2G2.2 ........................................................................................................................ 3

U.S.S.G. § 4C1.1 ............................................................................................................... 2, 3-4, 4

INTRODUCTION

Under the strain of a dissolving relationship, defendant Allen Gessen, made the misguided choice to seek an unlawful permanent deportation of his former partner from the United States to gain sole custody of their two children. In doing so, Mr. Gessen attempted to hire people to do what he could not through the legal system—quickly place his children in his permanent custody with little chance of worrying they would be taken from him by their mother. The government interpreted his actions in seeking permanent deportation to instead be seeking to hire individuals to murder his former partner and prosecuted him for murder for hire. Though Mr. Gessen disputes the government's interpretation of his intentions, he accepts responsibility for his actions, admits that his choices were wrong, and through undersigned counsel, offers the following memorandum in support of his request for a below-Guidelines sentence of 60-months in custody. His request is supported by Mr. Gessen's age, low likelihood of reoffending, and the particularized emotional situation that caused him to become involved in the charged offense.

SENTENCING GUIDELINES

In sentencing Mr. Gessen, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court.[1] Mr. Gessen generally agrees with the Guidelines calculation in the Presentence Report (PSR) but argues that he should receive consideration for being a zero-point offender. As a result, his total offense level would be 30 with a Criminal History Category of I—resulting in an advisory guideline range of 97-121 months.

//
//
//
//
//

---

[1] *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

### 1.  Mr. Gessen's proposed Guideline calculations

Base Offense Level, U.S.S.G. § 2E1.4.........................................................................32
Zero Point Offender, U.S.S.G. § 4C1.1 ....................................................................−2

Total Offense Level........................................................................................................30
Criminal History Category ...........................................................................................I
Guideline Range ................................................................................................. 97-121

Mr. Gessen's Request ..................................................................................60 months
Probation's Recommendation ...................................................................120 months

### 1.1.  The Court should give little weight to the Guidelines in determining the proper sentence

While the Guidelines must serve as the "starting point and the initial benchmark" of the sentencing inquiry, the Court "may not presume that the Guidelines range is reasonable."[2] Accordingly, district courts may vary from the Guidelines on policy grounds.[3]  Here, because the 121-151 month Guidelines as calculated by Probation—from a total offense level of 32 and a Criminal History Category of I—would advocate for a sentence greater than the 10-year statutory maximum at play in this case, the Court should give less weight to them in determining the proper sentence. Because Congress decided that 10 years should be the maximum sentence imposed and the Guidelines fall at or near the top of the statutory maximum, the Guidelines ignore the substantial deference that is otherwise owed to the legislative branch—which has the responsibility for setting criminal penalties. By setting the Guidelines at essentially the statutory maximum, even for a first-time offender, they become arbitrary and unduly harsh. The Guidelines should provide guidance to the Court to otherwise produce a sentence proportionate to the crime for which Mr. Gessen or any other defendant has been convicted. By starting at the statutory maximum, no proportionality can be accorded. Courts have placed less weight on the Guidelines in similar circumstances when determining the proper Guidelines to apply in sentencing for crack/powder cocaine,[4] pure/impure

---

[2] *Gall v. United States*, 552 U. S. 38, 49-50 (2007).
[3] *Kimbrough*, 552 U. S. at 106-07 (holding that "district courts are free to deviate from the Guidelines based on disagreements with the crack/powder ratio. "); *see also Spears v. United States*, 555 U. S. 261, 264 (2009)  (holding that district courts had the authority to determine the "Guidelines' 100:1 ratio between powder cocaine and crack cocaine quantities [] yielded an excessive sentence in light of the sentencing factors outlined in 18 U. S. C. § 3553(a). ").
[4] *Spears v. United States*, 555 U. S. 261, 264 (2009).

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

methamphetamine,[5] and child pornography.[6] Because the Guidelines start at such a high range, a statutory maximum could be applied in almost every case there is little room for the sentencing court to distinguish between more and less culpable offenders. Similar reasons have caused courts in other cases to disagree with a blanket imposition of the Guidelines where they do not differentiate with well-reasoned and measured punishment. Judge Jack Weinstein of the Eastern District of New York eloquently explains why the Guideline in child pornography cases with similar issues are so offensive to our system of justice:

> Prosecution under the current sentencing framework has largely failed to distinguish among child pornography offenders with differing levels of culpability and danger to the community. The applicable structure does not adequately balance the need to protect the public, and juveniles in particular, against the need to avoid excessive punishment, with resulting unnecessary cost to defendants' families and the community, and the needless destruction of defendants' lives. One of the foundational rules of our criminal justice system is that punishment should be commensurate with the crime—its threat to society. The need to tailor sentences to the dangers and needs of the individual being sentenced (and his family and community) are also foundational. Proportionality in sentencing encourages a fair system. Increasingly, judges, prosecutors, advocates and concerned citizens have recognized that the current sentencing approach to child pornography offenders is often unfair, unreasonable, cruel, and conceptually deficient.

*United States v. R.V.,* 157 F. Supp. 3d 207, 209 (E.D.N.Y. 2016).

Because the Guidelines lacks any sound policy rationale in starting at or near the statutory maximum, the Court should give them minimal weight in determining the applicable sentence in this case.

### 1.2. The Court should apply a downward adjustment for zero-point offender

To be eligible for a two-level downward adjustment for zero-point offender under U.S.S.G. §

---

[5] *See e.g., id.; United States v. Carillo*, 440 F. Supp. 3d 1148 (E. D. Cal. 2020); *United States v. Moreno*, 19-CR-002, 2019 WL 3557889 (W. D. Va. 2019); *United States v. Hayes*, 948 F. Supp. 2d 1009 (N. D. Iowa 2013); *United States v. Harry*, 313 F. Supp. 3d 969 (N. D. Iowa 2018); *United States v. Johnson*, 379 F. Supp. 3d 1213 (M. D. Ala. 2019); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D. N. M. 2017); *United States v. Goodman*, 556 F. Supp. 2d 1002 (D. Neb. 2008).
[6] *See, e.g., United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (holding that § 2G2.2 leads to "unreasonable sentences that are inconsistent with what § 3553 requires"); *United States v. Grober*, 624 F.3d 592, 608-09 (3d Cir. 2010) (holding that because § 2G2.2 was not developed pursuant to the Commission's characteristic institutional role, district courts may vary from on policy grounds); *United States v. Stone*, 575 F.3d 83, 90 (1st Cir. 2009) (same).

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

4C1.1, Mr. Gessen must satisfy 10 requirements. The new § 4C1.1 ("Adjustment for Certain Zero-Point Offenders") provides for a two-level reduction in offense level for defendants who "meet[ ] all of the following criteria":

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
> (2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
> (4) the offense did not result in death or serious bodily injury;
> (5) the instant offense of conviction is not a sex offense;
> (6) the defendant did not personally cause substantial financial hardship;
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);
> (9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense); and
> (10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

U.S.S.G. § 4C1.1(a).1

The only criterion at issue in this case is the third: "the defendant did not use violence or credible threats of violence in connection with the offense."[7]

For purposes of § 4C1.1, "[o]ffense means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."[8] Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" as well as certain acts of others when done as part of "a jointly undertaken criminal activity."[9]

Neither § 4C1.1 nor other provisions in the Guidelines define the terms "use violence" or "use ... credible threats of violence."[10] Accordingly, the Court should look to the plain meaning of the

---

[7] *Id.* § 4C1.1(a)(3).
[8] *Id.* § 1B1.1 cmt. n.1(I); *see id.* § 4C1.1(b)(1).
[9] *Id.* § 1B1.3(a)(1).
[10] Similar language is used in § 2D1.1 of the Guidelines, which provides for an enhancement for certain drug offenses where the defendant "used violence, made a credible threat to use violence, or directed the use of violence." U.S.S.G. § 2D1.1(b)(2). But this provision does not include a definition either. And while § 4B1.2 defines "crime of violence," that definition is inapposite here because, inter

terms at the time of enactment. *See Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020); *United States v. Hart*, 324 F.3d 740, 745 (D.C. Cir. 2003).

Contemporary dictionaries define "violence" as "[t]he use of physical force, usu[ally] accompanied by fury, vehemence, or outrage; esp[ecially], physical force unlawfully exercised with the intent to harm,"[11] or as "the use of physical force so as to injure, abuse, damage, or destroy."[12] These definitions draw additional support from case law interpreting "violence" in similar contexts.[13]

A "credible" threat is one that "offer[s] reasonable grounds for being believed or trusted."[14] Section 2D1.1(b)(2) also does not define "threat." Nonetheless, Black's Law Dictionary defines "threat" as follows: "A communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent; a declaration, express or implied, of an intent to inflict loss or pain on another."[15] This communicated intent must come from the defendant even if the violence is to be perpetuated by another individual.[16]

There was no physical force applied in this case. Thus, the issue becomes whether Mr. Gessen made a credible threat of violence in connection with the offense. He did not. Mr. Gessen never made a direct threat to Ms. Chigariro. At the time the offense could have been completed, Mr. Chigariro had no idea of the conduct that Mr. Gessen was alleged to have completed. This sets Mr. Gessen apart from other cases whether courts have considered whether there was a credible threat to use violence where a threat was actually conveyed by the defendant to the victim.[17]

---

alia, the elements-of-the-crime-inquiry set forth therein is inconsistent with § 4C1.1's directive to consider whether a defendant used violence in connection with the offense of conviction or other relevant offense conduct. See id. § 1B1.3(a)(1).

[11] Violence, Black's Law Dictionary (11th ed. 2019)

[12] Violence, Merriam Webster, https://www.merriam-webster.com/dictionary/violence.

[13] *See, e.g., United States v. Pineda-Duarte*, 933 F.3d 519, 523 (6th Cir. 2019) (defining "violence," as used in § 2D1.1(b)(2), as "acts where one uses physical force with the intent to injure"); *United States v. Atkinson*, 815 F. App'x 704, 708 (4th Cir. 2020) (unpublished per curiam) (same).

[14] Credible, Merriam Webster, https://www.merriam-webster.com/dictionary/credible; see also *United States v. Bauer*, Crim. A. No. 21-3862-2 (TNM), 2024 WL 324234, at *3 (D.D.C. Jan. 29, 2024) ("[A] 'credible threat of violence' is a believable expression of an intention to use physical force to inflict harm.").

[15] Threat, Black's Law Dictionary (11th ed. 2019).

[16] *United States v. Hernandez-Barajas*, 71 F.4th 1104, 1106 (8th Cir. 2023) (explaining that under U.S.S.G. § 2D1.1(b)(2), "[t]he defendant is the one who must make the credible threat, even if it involves the potential use of violence by someone else").

[17] *United States v. Overstreet*, 693 F. App'x 374, 375 (5th Cir. 2017) (credible threat of violence when defendant brandished a gun during drug transaction, accused person of attempting to rob him);

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

Further, the suggested harm Ms. Chigariro could have never been followed through with and thus was not credible. In assessing whether a threat is "credible," courts routinely look to contextual evidence, including the defendant's ability to make good on the threat.[18]  After considering all the circumstances present here including the nature of Mr. Gessen's statements, how the suggestion originated from the agent, and the fact that these statements occurred while Mr. Gessen was speaking to an agent the statements were not "credible threats of violence [used] in connection with the offense."[19]

SECTION 3553(a) FACTORS

"The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a).[20] Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.[21] Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

---

*United States v. Torres*, 694 F. App'x 937, 942 (5th Cir. 2017) (credible threat of violence when defendant threatened drug debtor, held him at gunpoint); *United States v. White*, 621 F. App'x 889, 893 (9th Cir. 2015) (credible threat of violence when defendant urged gang members to use violence).
[18] *See United States v. Johnson*, 64 F.4th 1348, 1352  (D.C. Cir. 2023) (emphasizing that the defendant "was ... armed," "had been convicted of several violent crimes, including shooting someone," and had a powerful motive to carry out the threat); *see also United States v. Miller*, Crim. A. No. 22-495 (PAB), 2024 WL 363731, at *4 (N.D. Ohio Jan. 26, 2024) (collecting case law and concluding that a common element is "some temporal and spatial proximity between the defendant, his threat, and his intended victim").
[19] *c.f. United States v. Berkett*, No. 2:21-CR-00292-MCS-1, 2024 WL 1516317, at *2 (C.D. Cal. Apr. 8, 2024) (defendant used violence or credible threats of violence by directing the murder of the intended victim).
[20] *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted).
[21] *See* 18 U.S.C. § 3553(a)(2).

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

Mr. Gessen addresses these concerns below and argues that a 60-month sentence would be sufficient but not greater than necessary to achieve the sentencing goals of §3553(a).

**2. The history and characteristics of the defendant and the nature and circumstances of the offense**

Allen Gessen was an immigrant who came to the United States fleeing antisemitism and religious persecution in the former USSR who grew up to speak three languages, run several successful companies, and to help those less advantaged than him.

Growing up in Russia, he was raised by his mother as a single parent after his father had abandoned her while she was pregnant with him.[22] His childhood was marked by difficulties caused by the social stigma he faced at being one of the few children at his school without a father.[23] The financial difficulties his family experienced only increased how difficult it was for him as a child. At times his family had to forgo necessary clothing, and Mr. Gessen had to make do with wearing one pair of shoes for a long period of time.[24] His mother writes of Mr. Gessen during his youth that:

> Since kindergarten, he dreamed about buying me a warm winter coat that I didn't possess. A child born before perestroika, when stores were empty, and one had to hunt for sugar or soap and be lucky to run into a toilet paper seller on the street or find a counter with a laundry detergent, he began to feel responsible for our existence from the beginning.

> Exhibit A (Letter from Lenna Gessen).

And one early memory of his was when he was walking home another group of teenagers robbed him of the meager money he had managed to save after being targeted for being Jewish. Despite the poverty he experienced, he remembers his youth as a time with a loving and multi-generational home that was trying to be a source of stability in his life.

Growing up as part of a Jewish household the generational historic difficulties that those in his family went through became part of the fabric of his life. His great-grandparents were imprisoned by Germans and died in a concentration camp. His grandfather was imprisoned by the Soviets and his

---

[22] PSR ¶¶ 42, 43.
[23] PSR ¶ 44.
[24] PSR ¶ 43.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

grandmother was denied employment because she was Jewish and would not embrace communism. His family protested the Soviets, and his mother was ultimately arrested many times for political charges and ideological crimes against the communist party.[25] As a result, an early thought was placed into his head that the system and the government was not going to solve his problems and would instead interfere with the strong bonds of loyalty felt between family and children.

In her letter to the Court, his mother paints a picture of Mr. Gessen as a thoughtful child, even from a young age. She writes:

> It was during our visit to my father that I realised for the first time the uniqueness of his nature, the fact that his tolerance and wisdom are different from mine. That day, Allen met a new set of great-grandparents - my father's in-laws. The great-grandmother was very old and ailing, too weak to join the family at the dinner table, so after greetings and small talk we all moved to the dining room leaving her to rest in bed. It was a merry affair, my siblings and I chatting and laughing, and nobody paid much attention to the fact that Allen spent most of the time away from the table: everyone assumed that he was playing with his toys. The next day my father called to say that the whole time of our visit, Allen (who was not yet three years old then) had spent sitting next to the old lady's bed taking care that her blanket didn't slip down and she wouldn't get cold.

Exhibit A (Letter from Lenna Gessen).

Though Mr. Gessen yearned to have a closer relationship with the father who rejected him he was not able to reunite with him until he was 15. Prior to then, the only male role models in his life were the men that his mother had dated while he was growing up. The men were not beneficial role models to Mr. Gessen and frequently engaged in heavy drinking while he was around. As a result, he found himself trying to model himself off as the opposite of the men who were around him.

When he turned 15, his mother decided to leave Russia for the United States in search of a better life for both she and Mr. Gessen.[26] The move was made possible in part because he was cast in a film in 1989 in the role of "Jewish boy" for a film called "The Stalin's Funeral."[27] The money he made from the film provided he and his mother some of the funds they needed to travel to the United States with the remainder going to his grandmother.[28] The move to the United States was difficult for him,

---

[25] *See* Exhibit A (Letter from Lenna Gessen).
[26] PSR ¶ 45.
[27] *See* Exhibit A (Letter from Lenna Gessen).
[28] *See* Exhibit A (Letter from Lenna Gessen).

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

as he did not know English and he had to leave behind his beloved grandmother, Ester, who had helped raise him from childhood.[29]

In describing their relationship, his aunt Valeria Mikhalevskaya writes:

> Alyosha thought of every detail to make things more convenient for his relatives; for example, he organized everything for his grandmother. When walking became difficult for her, and she could no longer take care of things on her own, he came up with all the little things for her in her apartment, from a special hook to pick things up from the floor, to widening the aisles and getting the right equipment the bathroom. He taught her how to use a computer so that she could always stay in touch. Even when he had to live in different countries, he always called, and his absence was practically not felt. I observed the same approach and level of care towards all those people close to him (relatives and friends). Not a single person was ever forgotten, Alyosha had time and words of support for everyone.

Exhibit S (Letter from Valeria Mikhalevskaya).



Image. Mr. Gessen and his grandmother shortly before he left to come to the United States.

---

[29] PSR ¶¶ 43, 45.

With only two suitcases and $200 to their name, Mr. Gessen and his mother relocated to Massachusetts to join other family that had similarly relocated to the United States.[30]

After arriving in the United States, Mr. Gessen began the long slow process that refugee immigrants face when trying to acclimate to a new home and culture. His first few years in the States were difficult because he did not know English and he failed several classes when he first arrived. He started to pick up the language—adding to his native Russian and the Polish he learned to communicate with his grandmother—and began to excel in school. He eventually would go on to graduate from high school, then college, and eventually law school.[31] His path to academic excellence was a long one punctuated by low paying jobs for both himself and his mother who had been a journalist and professional translator while in Russia. From the menial labor they both engaged in, he and his mother were eventually able to cobble together a life that was richly supported by other relatives living in the area and through the synagogue they attended as a family. His mother writes of this time in her letter that:

> When we arrived in Boston in 1990, he used every opportunity to earn money - raked leaves and shoveled snow, perused the "job" section of the Newton Tab, catching every opportunity for us to get on our feet. He applied for a job at the supermarket the day he turned sixteen, soon became the fastest bagger and was promoted, soon winning the title of the best cashier. Allen has been working every day till the day of his arrest in 2022.
>
> After graduating first from Babson College and then from the UConn School of Law, Allen held different positions, worked in different countries, and always generously shared his earnings with friends and family in need. With the first salary at his first "grown-up" job, he bought me my first set of brushes and paints, gave me a camera with rolls of film, and said that now I could allow myself to be an artist. Since he turned sixteen and till her death, Allen fully supported my mother, paid her medical insurance and bills, renovated her apartment, and bought tickets and insurance so that she was able to spend winters with us in America, travel with us, and enjoy a big part of her later years in the Promised Land - in Israel.
>
> Exhibit A (Letter from Lenna Gessen).

---

[30] PSR ¶ 45.
[31] PSR ¶ 56.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

10



Image. Mr. Gessen with his extended family in Massachusetts.

After graduating school, Mr. Gessen began travelling and living abroad and worked in a variety of fields. He ran his own consultancy firm in Russia where he helped companies recover funds.[32] He started the Brunsnita supermarket chain in Ukraine and in 2009 and he was awarded the title of Ukraine's Best Young Entrepreneur for his work.[33] He also started multiple companies in Zimbabwe.[34] The last company that he was involved with prior to his arrest was EE-Farm which sought to leverage technology to help independent farmers in Africa act as a group when negotiating prices for the purchase of supplies and sell of crops and other goods on the agricultural market.[35] One

---

[32] PSR ¶ 57.
[33] Exhibit B (Letter from Tatiana Akivis).
[34] PSR ¶ 57.
[35] PSR ¶ 57.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

of his former colleagues described their experience working with Mr. Gessen in their letter to the Court:

> At EE-Farm, he gave me real work that made me feel I had a purpose again. Over long days and late nights over home-cooked meals, Allen mentored me not just in business but in life. With Zen-like patience, he explained concepts until they clicked. When I made mistakes, which was often, he gently showed me where I went wrong and coached me through improvements. His humble spirit encouraged me to open up and ask questions. I blossomed under his wisdom.
>
> After 7 life-changing months alongside Allen, I found the courage to start my own company. Like any young ambitious founder, I didn't get it right the first time. It took 2.5 years to get anywhere. Today I run a startup that wants to fix the same problem. It was accepted into Notre Dame's prestigious accelerator program. I've raised funding for another start-up, hired teams, trained teams, and now coached other founders as a Coach for Alchemist Accelerator's cohort this year!
>
> Exhibit K (Letter from Mark Evgenev).

Another describes how Mr. Gessen and EE Farms gave her purpose in life following being domestically abused.

> On the 29th of January 2021, I sent a message of distress to Lenna. It was the night my husband had beaten me up quite severely. I had already by this stage explored various options to prevent the now escalating violent episodes. I had previously filed a complaint with th Victim Friendly Unit of our local police force. That night I resolved to leave my marriage of 17 years. Lenna came to mind because I had previously relied on her for sound counsel. On that call, in the middle of the night, she realized that I was determined to leave even though I had no place to go. It was then that Allen took on the responsibility of extracting my distraught children and I, to place us in a haven. Our friendship began then. Allen took on, remotely, my family. He housed us, ensured we were fed and that my children were able to get an education. He ensured that we received the emotional, financial, and mental health support we needed. Eventually he took on the role of mentor.
>
> In March 2021, Allen realized that I had the potential to do well in any field I dared to explore. Agriculture was my passion and after many conversations EE-Farm (Private) Limited was born. With Allen's passion to help impoverished farmers in Africa, he was instrumental in bringing to life the concept of an agri-digital solution which provides not only technical and extension support to farmers but also a project management system that encompasses the whole value chain around the sector. He is an inspirational leader, a patient teacher and has helped me to grow. This year I have launched a pilot project for the mobile phone application developed because of the collaboration we had. I mention this with the utmost humility. The stereo type is that Jews and Muslims cannot cooperate or respect each other. Allen being Jewish, worked selflessly to enhance my life without hesitation and simply because his mother trusted me.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

> My story does not end here. Allen has been instrumental in grooming me and instructing me on how to engage with potential investors for the project. The confidence I had lost during my marriage has returned.

Exhibit Q. (Letter of Mahmooda Lowe).

It was while he was in Zimbabwe that he met Ms. Chigariro. A late bloomer romantically, Mr. Gessen felt blessed that Ms. Chigariro was interested in him. They began a world spanning romantic relationship that took them from Africa to Russia and then eventually to the United States. Their relationship lasted from 2011 to 2018. During that time, they had two children—a son and a daughter. When their relationship dissolved in 2018, they were all living together in Russia. Mr. Gessen and his son moved from Russia to the United States in 2019 with the expectation that Ms. Chigariro would follow with his daughter after her travel documents had been issued by the Russian government. The documents were delayed because his daughter had been born via surrogacy and Mr. Gessen's paternity was legally complicated to establish. Instead, Ms. Chigariro and his daughter returned to Zimbabwe and an international child custody case was established with filings in the Hague and in federal court in Boston.



Image. Mr. Gessen with his children in happier times.

During the pendency of their custodial cases, Mr. Gessen was charged with parental kidnapping for taking his son on vacation to Canada. After the escalation in their cases, the two eventually were able to enter into a shared custodial agreement. However, Mr. Gessen was dissatisfied with their arrangement as he felt he was the more qualified and caring parent who had been responsible for ensuring the proper education and medical care were provided to their children. He sought and wanted to have sole custody over his children and had been frustrated in that purpose by the legal system. As a result, Mr. Gessen sought a solution to establishing sole custody of his children outside the strictures of the legal system and government that he felt had failed him. His wrongful actions in seeking an alternate resolution led to the charges in the instant offense.

On May 8, 2023, a jury returned a verdict convicting Mr. Gessen.[36] The jury convicted Mr. Gessen of murder-for-hire, in violation of 18 U.S.C. § 1958. As instructed by the district court, to be convicted of murder for hire, the government in this case had to prove that: (1) Mr. Gessen used or caused another to use a facility in interstate or foreign commerce; (2) the use of any interstate facility was done with the intent that a murder be committed; (3) Mr. Gessen intended that the murder be committed in exchange for pecuniary value, namely $50,000.[37]

The government's theory of prosecution was that Mr. Gessen sought murder because he wanted to "get[] rid of his ex-wife so that he can have sole custody of his children."[38] To accomplish that, Mr. Gessen connected with Agent Rizzo to effectuate his plan as he thought Rizzo would connect him to a hitman who would eliminate his former partner for money. The government argued that Mr. Gessen communicated using Signal—an encrypted messaging service for instant messaging, voice, and video calls—paid a gold coin worth $2000 as a down payment for murder, and that Mr. Gessen caused $22,950 to be transferred in interstate commerce from a bank in Estonia to a Citibank in San Francisco, California.[39] The government argued that Mr. Gessen's intent could be gleaned from coded conversations that he was having over multiple meetings with Agent Rizzo.[40]

---

[36] PSR ¶ 2.
[37] Dkt. 77, Jury Instruction No. 13; 18 U.S.C. § 1958.
[38] Dkt. 89 at 873, lines 15-16.
[39] PSR ¶ 13; Dkt. 89 at 872, lines 1-7, 10-12.
[40] Dkt. 89 at 878, lines 11-25.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

The government presented evidence in the form of (1) testimony from law enforcement witnesses; (2) audio recordings of Rizzo and Gessen's conversations; (3) photos and video of Gessen's messages with Rizzo; (4) testimony from Gessen's ex-partner Pricilla Chigariro; and, (5) stipulations and documentary evidence regarding money transfers.

With the exception of the testimony of undercover Agent Rizzo, which relied on speculation, much of the evidence in this case was undisputed. The government and the defense both agreed that Mr. Gessen and his ex-partner Priscilla Chigariro had reached the end of their relationship and were engaged in an ongoing litigious battle regarding the custody of their children. Likewise, both parties agreed that Mr. Gessen met with Agent Rizzo on multiple occasions and solicited him to do something to Ms. Chigariro. Thus, the only real disputed issues of fact in this case were what did Mr. Gessen solicit Agent Rizzo to do as captured by the audio recordings of Mr. Gessen and Agent Rizzo's conversation. Mr. Gessen has always maintained that his intention was simply to have Agent Rizzo unlawfully cause his wife to be deported. The government on the other hand argued that Mr. Gessen hired an unidentified hit person (through Rizzo) to kill Ms. Chigariro.

At trial, Mr. Gessen's testimony dislodged the government's theory that he was attempting to murder his ex-partner Ms. Chigariro.[41] Instead, Mr. Gessen testified that the money he gave undercover Agent Rizzo was for a deportation bribery scheme. Agent Rizzo's testimony corroborated that Mr. Gessen's friend Alex Kiselev, had reached out to Rizzo regarding a bribery scheme of an immigration agent.[42] Agent Rizzo then suggested a "more permanent" method of removal in response to Mr. Gessen's request for a less expensive option than the proffered cost of $100,000 for the deportation scheme.[43] Mr. Gessen agreed to this "more permanent" method only after suggestion by Agent Rizzo.

The Ninth Circuit has long recognized circumstances of this kind as "imperfect entrapment," warranting a reduced sentence.[44] The defense of "entrapment," where law enforcement induces a defendant to commit a crime that he was not otherwise predisposed to commit, is of course a perfect

---

[41] Dkt. 88, Transcripts – Transcript of Trial Proceedings, Vol. 4, at 638, lines 16-25.
[42] Dkt. 86, Transcripts – Transcript of Trial Proceedings, Vol. 2, at 172-174.
[43] Dkt. 86 at 215-216.
[44] *See, e.g., United States v. McClelland*, 72 F.3d 717, 724-26 (9th Cir. 1995).

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

defense properly resulting in a not guilty verdict.[45] By contrast, "imperfect entrapment," warranting a conviction but a reduced sentence, occurs when, for example, defendants may be predisposed to sell drugs (as, for example, established by prior instances of drug trafficking) "but who are then pressured unduly by the government to go forward with the offense."[46] As discussed above, that is exactly what occurred in this case. Here, it is undisputed that Mr. Gessen did not initiate the meeting with Agent Rizzo with an express desire to have Ms. Chigariro murdered. Their conversation instead started from a position of deportation. It was only after Agent Rizzo suggested an option that was less expensive that Mr. Gessen agreed to it. As the suggestion was not Mr. Gessen's initial plan and the government made it financially enticing for him to agree, he was entrapped by their actions to acquiesce to it. Accordingly, it is respectfully submitted that the Court should take into account under the factors of 18 U.S.C. § 3553(a) the "imperfect entrapment" of Mr. Gessen.

Agent Rizzo also testified that there was no overt discussion, agreement, or plan about a murder of Ms. Chigariro.[47] Rather, Agent Rizzo's testimony regarding Mr. Gessen's intent was primarily derived from what he interpreted Mr. Gessen to mean during their conversation, rather than any statements actually made by Mr. Gessen.[48] The evidence was ambiguous, at best, as to what it was that Mr. Gessen expected Agent Rizzo to do after he provided payment. Despite the ambiguity, Mr. Gessen fully accepts responsibility for attempting to bribe an official to deport Ms. Chigariro unlawfully.[49] In the Presentence Report he stated:

//

//

//

//

//

//

---

[45] *See, e.g., McClelland*, 72 F.3d at 725; see also 9th Cir. Manual of Model Criminal Jury Instructions (2022 ed.) § 5.2.
[46] *McClelland*, 72 F.3d at 725.
[47] Dkt. 87, Transcripts – Transcript of Trial Proceedings, Vol. 3, at 343-346.
[48] Dkt. 86 at 190, 228.
[49] PSR ¶ 21.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

> Although we have never expressly discussed with agent murdering or killing Ms. Chigariro, without any doubt I had agreed to pay for something illegal, ugly, wrongful and unacceptable, something that would be deeply hurtful and harmful to Ms. Chigariro.
>
> The trial was a true eye-opening for me; when I realized that the undercover had genuinely believed that I wanted Ms. Chigariro dead, and when twelve reasonable, attentive people came to the same conclusion after listening to our conversations. I was a party to those conversations, and I had every opportunity to say no, to ask for clarification, to walk away. I did not. Instead I paid for an illegal scheme. That's on me and me alone.
>
> PSR ¶ 21.

Mr. Gessen's actions in seeking to deport his wife and his agreement to the unlawful scheme to remove her from the county is described as aberrant behavior from the people that know him best. In preparation for sentencing, over 90 letters of support were sent in from individuals around the world on behalf of Mr. Gessen. Culling those letters to the 26 letters that were submitted to the Court as exhibits, Mr. Gessen's friends, family, and former coworkers think highly of him and consider his behavior in this case atypical of the person that they know best. Examples include the particularly well written and thoughtful letters of his former law school classmate Anne Gosset, friend Anastasia Kladova, former girlfriend Kateryna Ohuriaieva, and a current detainee at Santa Rita Jail.[50]

His friend Nikolay Alexeev describes Mr. Gessen as peaceable, charitable, thoughtful, and non-violent in nature:

> An incident at a McKinsey alumni gathering, where Allen was unwittingly assaulted, offers insight into his inherent non-violent stance. Despite the unprovoked attack and subsequent injury, he opted for peace and discretion over retaliation or legal action. Allen decided not to punish the attacker, despite being in great physical shape and having the advantage of being sober. He saved the party by not letting it slip into a messy brawling and dealt with the situation in a most delicate and intelligent manner. Furthermore, he decided not to prosecute the person criminally afterward, having all the means to do it, leaving the reprimanding to the attacker's friends and family. In my opinion, this incident underscores his ability to resolve conflicts amicably, demonstrating his non-violent nature and respect for social decorum.
>
> Exhibit C (Letter from Nikolay Alexeev).

---

[50] *See* Exhibit M (Letter of Anne Gosset); Exhibit O (Letter of Anastasia Kladova); Exhibit T (Letter of Kateryna Ohuriaieva); Exhibit Z (Letter from Vaughn Boatner).

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

Allen has been a great mentor to my mother, Roxy Danckwerts too, helping her to navigate difficulties in her work of orphan elephant rescue and rehabilitation. He has helped her to manage crises to do with personal injury and danger as well as severe trauma and loss.

He even has gone further in that when a purpose built swimming pool was urgently needed to be built for a badly injured elephant, Allen was the first person to come forward and support the building of this pool. The pool still exists and has been hugely beneficial to many other elephants who have serious injuries and are undergoing rehabilitation for preparation for the return to the wild.

Exhibit H (Letter from Jos Danckwerts).

Allen has an amazing quality of making people feel safe and reassured. In 2014 I've started having serious panic attacks due to my stressful work environment at the time and had to be taken into emergency rooms and hospitalized on a few occasions. Allen helped me enormously by arranging for me to see the best doctors both in Berlin and Moscow - without me ever asking him to do so.

Exhibit I (Letter from Olia Danckwerts).

And multiple letters from people that Mr. Gessen has worked with describe him as a valued mentor to them in their lives:

So I am grateful for the advice that gave me stability until today. If we talk about the family, then you will not meet a person who is so careful about family traditions and values. We were just friends, but I knew how Alex loves and honors his women (mother, grandmother, and wife).

Exhibit D (Letter from Anikeeve Tatyana Valdamirovna).

Allen has also been a loyal friend and a compassionate human being. In 2019, I faced a professional crisis due to a change of company's leadership. Allen was one of the few people who stood by me, offered his unconditional support, and helped me resolve the situation in my favor. I am forever grateful to him for that generous act of empathy and solidarity.

Exhibit F (Letter from Olga Bahlmann).

In 2008, when the global financial crisis struck the Ukrainian economy, my livelihood was heavily dependent on my job at Ukrainian Retail. Losing my job meant being unable to pay rent or even buy food. I was in a state of desperation as my position was eliminated from the company's budget, and I found myself unemployed.

It was during this challenging period that Alexey not only showcased his leadership qualities but also exemplified his values. Recognizing the dire circumstances I was facing, he made a remarkable decision. After

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

18

providing me with a short educational course, he believed in my potential and transferred me to another position within the company. This gesture meant that I had job security, a steady salary, and the ability to meet my financial obligations. I will never forget the kindness and faith he showed me during that time. His unwavering support and belief in my abilities left a lasting impression on me.

Throughout the crisis, Alexey motivated the company to work together as a team, going above and beyond what was expected. We felt his unwavering support and guidance during those challenging times. He provided us with a strong foundation and acted as a pillar of strength for everyone involved.

Exhibit X (Letter from Olesia Shybka).

Many mentioned how Mr. Gessen was a devoted and caring father and supported both his and their families:

Despite the passing of time and the various paths our lives have taken, we have made  conscious effort to stay connected: Allen has visited my family in Munich, Germany several times over the years. We even had the opportunity to get to know his wife Priscilla and his wonderful son O[ ]. On these occasions, Allen has shown to be a patient and caring father. I have never seen him loose his temper or even raise his voice against his son or wife. Quite to the contrary he always had his children's best interest in mind constantly wondering about which activities to offer them and what might help them grow, whether it be playing an instrument or what sport to engage in: in O[ ]'s case it turned out to be foil-fencing. Allen and I proudly exchanged videos of our children's sports activities, O[ ] fencing while my youngest daughter L[ ], slightly older, is competitive figure skater.

Exhibit E (Letter from Mirijam Aulfes).

Allen is also a devoted father and son, who cares deeply for his family. I had the opportunity to meet his two children and his mother in July 2022, when they visited my vacation home on Cape Cod, MA. I was struck by how close and loving they were, how involved he was in his children's upbringing, and how supportive he was of his mother. He showed genuine interest and kindness to my family as well, and shared his insightful advice on my own business venture.

Exhibit F (Letter from Olga Bahlmann).

//

//

//

//

But Allen is not only a great father, he cares deeply about all his loved ones, always supportive and ready to help in times of need. About fifteen years ago, during a difficult time when my father battled cancer, Allen offered our family unwavering support and assistance. Not only was he always there for me, my aunt and my step-mother, he also helped to pay for the treatment and used all his sources to help us find the best available doctors. Moreover, when my father finally passed away, he financially helped his widow, my step-mom, who was left alone with a small child.

Exhibit L (Letter from Alexandra Gessen).

I was deeply impressed by O[ ]'s father's concern for his child, his upbringing and education, his physical development - swimming and fencing. The physical absence of the mother was made up for by the care of the father and grandmother. In conversations, O[ ]'s younger sister, E[ ], was often mentioned with great sympathy and warmth.

I want to add a few more facts from my communication with Alexei Gessen. When, after a stroke, I lost the right to use the car as well as the car itself, Alexei did everything possible to alleviate my domestic inconvenience: he delivered food to my house and provided his car and himself as a driver, and very tactfully offered his help without waiting for my request. After learning about my problems with the IRS, he spent a lot of time writing to various official authorities, which was successful and alleviated my social discomfort.

Exhibit P (Letter from Samuil Kreynes).

3.  **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct**

Mr. Gessen is almost 50 years old and has no prior convictions. In a 2017 study done by the United States Sentencing Commission, the Commission found a direct link between age and the risk of reoffending: younger offenders were more likely to be rearrested than older offenders, they were rearrested faster than older offenders, and they committed more serious offenses after they were released than older offenders.[51] Specifically, the reincarceration rate was highest among those between the ages of 21 to 24 years old (38.6%) and declined in each subsequent age group. The Commission found that time to reincarceration expands with age and severity of reincarceration offense declined with age. Nearly 50, Mr. Gessen's likelihood of recidivism is approaching the lowest level identified by

---

[51] United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, Dec 2017. Accessed at: https://www. ussc. gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age. pdf.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

the Sentencing Commission.



Image. Reincarceration rates for recidivism study of defendants by age of release.

**4. The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

Mr. Gessen is making a special request for placement at FCI Otisville in New York. The facility has a high percentage of Jewish inmates and Mr. Gessen feels that he could openly practice his faith and remain complaint with his desire to eat Kosher while residing there.

As an attorney, Mr. Gessen had no necessary educational or vocational training to take into consideration while in custody. Though he has already attained an advanced degree, he nevertheless intends to take advantage of his time in custody and study mathematics, history, and physics.[52] If possible, he would also like to write a philosophy book while in custody.[53] Mr. Gessen has no medical or substance abuse needs requiring special placement while in custody.

**5. Any pertinent policy statement.**

Research by the Washington State Institute for Public Policy and others has also shown that use of research-based rehabilitation and prevention programs to reduce recidivism among targeted

---

[52] PSR ¶ 56.
[53] PSR ¶ 59.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

21

criminal offenders is more effective than incarceration.[54] The research evidence is unequivocal that incarceration does not reduce offender recidivism. To the contrary, incarceration actually results in slightly increased rates of offender recidivism.[55] In The Diminishing Returns of Increased Incarceration: A Blueprint to Improve Public Safety and Reduce Costs, nationally-renowned researchers James Austin and Tony Fabelo concluded that what governments now need to do, after ensuring that dangerous and violent prisoners are incarcerated, is to improve utilization of limited criminal-justice resources and enhance public safety—by diverting non-violent offenders from prison to alternative rehabilitation and sanctioning programs.[56] While conceding that some time in custody is appropriate, Mr. Gessen argues that any additional months in custody has diminishing returns in terms of preventing recidivism, particularly in light of his age and the situational nature of the offense.

## 6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

Mr. Gessen's proposed sentence of 60-months is a variance from the typical sentence. However, there is a limited amount of data available to the court to determine what a typical sentence in this type of case would be. From 2018-2022, only five other individuals were charged with Murder for Hire who had criminal history category I. There, the average length of sentence imposed was 108 months.[57] While a sentence of 60-months represents a substantial departure from the average sentence, the recommended sentence would incorporate consideration of the situational nature of the offense and Mr. Gessen's background.

---

[54] Washington State Institute for Public Policy, The Criminal Justice System in Washington State: Incarceration Rates, Taxpayer Costs, Crime Rates, and Prison Economics 292-294 (2003), 293. Available at: https://www. wsipp. wa. gov/ReportFile/824/Wsipp_The-Criminal-Justice-System-in-Washington-State-Incarceration-Rates-Taxpayer-Costs-Crime-Rates-and-Prison-Economics_Full-Report. pdf

[55] Raymond Liedka, Anne Morrison Piehl & Bert Useem, The Crime-Control Effect of Incarceration: Does Scale Matter?, 5 Crime and Public Policy 245, 245-276 (2006).

[56] See James Austin & Tony Fabelo, The JFA Institute, The Diminishing Returns of Increased Incarceration: A Blueprint to Improve Public Safety and Reduce Costs 5 (2004).

[57] PSR ¶ 80.

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

**7.  The need to provide restitution to any victims of the offense.**

To date Ms. Chigariro has submitted no documentation regarding restitution.

CONCLUSION

The facts before the Court establish compelling reasons to sentence Mr. Gessen to a term of 60 months and three-years supervised release. Such a sentence would adequately balance the necessity of meting out sufficient punishment for the instant offense, while also simultaneously accounting for the myriad countervailing sentencing objections and considerations provided for in 18 U.S.C. § 3553(a).

//

//

Dated:     April 17, 2024

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

_____/S_____
CANDIS MITCHELL
Assistant Federal Public Defender

DEF.'S SENT. MEMO.
*GESSEN*, CR 22–276 JSC

23