ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ILHAM A. HOSSEINI (CABN 256274)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7196
    Fax: (415) 436-7234
    ilham.hosseini@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR-22-276-JSC |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Hearing Date: April 24, 2024 |
| ALLEN GESSEN, | Time: 10:00 A.M. |
| Defendant. | Judge: Hon. Jacqueline Scott Corley |

US Sentencing Memo
CASE NO. CR-22-276-JSC

TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................1
II.  FACTS .......................................................................................................................1
     A.   May 2021 Meeting re Bribing IRS Agents ...................................................1
     B.   March 2022 Recorded Call Requesting UCE-2 Help Gessen ............................2
     C.   June 2, 2022 Meeting Between Gessen and UCE-2 ........................................2
     D.   June 22, 2022 Meeting Between Gessen and UCE-2 ......................................4
     E.   Text Messages on Signal and Screenshots of Deleted Messages .....................5
     F.   Evidence of Motive: Child Custody Proceedings ..........................................6
     G.   Cover Up .....................................................................................................9
III. Sentencing Guidelines Calculation ..........................................................................10
IV.  Applicable Law .......................................................................................................10
V.   Recommended Sentence and Section 3553(a) Factors ............................................11
     A.   Nature and Circumstances of the Offense ..........................................................11
     B.   History and Characteristics of the Defendant ....................................................12
     C.   Need for the Punishment to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Avoid Unwarranted Sentencing Disparities………………………………………………………………..14
VI.  CONCLUSION........................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) .................................................................................................. 10

## Statutes

18 U.S.C. § 3553(a) ................................................................................................................ 10, 11

US Sentencing Memo
CASE NO. CR-22-276-JSC

## I. INTRODUCTION

Defendant Allen Gessen hired a criminal to arrange for a hitman to murder his ex-partner and the mother of his two young children, made payments to have her killed, and employed falsified documents and shell companies to cover it up. That criminal turned out to be an undercover FBI agent who recorded his conversations with Mr. Gessen. Mr. Gessen's words exhibit a cold and callous disregard for the life of his ex-partner, with whom he had a relationship for several years and two children. He said that his decision to have her killed was "not a spur of the moment, emotional reaction," and that he had previously hired a team of Israeli operatives—a "Mossad" team—to execute the hit but hesitated to pay the $220,000 price tag. He said he previously paid $10,000 to that team to do reconnaissance but did not proceed with paying the full amount for the murder. This time, Mr. Gessen agreed to pay $50,000 for her murder to the undercover agent. He personally handed the undercover agent a down payment toward the murder – a gold coin worth $2,000. He then sent the undercover agent a fake "consultancy agreement" to cover up the true reason for the payments and wired another $23,000 for the murder through a shell company. He sent the undercover agent a target package that contained his ex-partner's name, picture, address, social media accounts, current boyfriend, landlord, and information about her car and where her friends are located. He helped plan the murder: when it would happen, that it should appear "random," and that it should not happen in front of their kids. Notably, Mr. Gessen is a licensed and successful attorney. For the reasons set forth in this memorandum, the government respectfully recommends that the Court sentence Mr. Gessen to a term of imprisonment of 120 months, followed by three years of supervised release.

## II. FACTS

### A. May 2021 Meeting re Bribing IRS Agents

The FBI was conducting an international money laundering investigation pertaining to another target (Alex Kiselev). As part of that investigation, in May 2021, Kiselev introduced Gessen as an

US Sentencing Memo
CASE NO. CR-22-276-JSC

1

associate who would participate in one of the schemes being discussed with an FBI undercover agent (UCE-1). UCE-1 posed as a professional money launderer for South and Central American narcotics traffickers. After Kiselev identified Gessen as an associate, UCE-1 met with Gessen to discuss a bribery and extortion scheme. This in-person meeting between Gessen and UCE-1 occurred on May 27, 2021, in Boston Massachusetts.[1] Gessen and his associates were interested in bribing a representative of the Internal Revenue Service ("IRS") to obtain internal confidential tax records for four individuals. Over the year, the plans stalled. During the investigation, UCE-1 introduced another undercover employee ("UCE-2") in the investigation. Like UCE-1, UCE-2 posed as a launderer of illegal narcotics trafficking proceeds.

**B.    March 2022 Recorded Call Requesting UCE-2 Help Gessen**

Subsequently, in March 2022, Kiselev reached out to UCE-2 and requested that UCE-2 help Gessen, which was captured on a recorded phone call. *See* March 24, 2022 recorded call, Exhibit 11 at 7:10 (audio corresponds to transcript, Exhibit. 23 at 5). On the recorded call Kiselev said to UCE-2, "I was kind of bugging you a little bit about that issue that, actually it's a guy who works with us very closely . . . and he has his ex pretty much making hell out of his life . . . Now, she took his kids . . . And, making my friend into a monster, even though he brought up the kids." Ex. 23 at 5-6. UCE-2 asked, "what would be the best case scenario that your friend is looking for?" *Id.* at 6. And Kiselev replied, "her visa gets revoked and she gets kicked out the country." *Id.*

**C.    June 2, 2022 Meeting Between Gessen and UCE-2**

On June 2, 2022, UCE-2 and Gessen met in person in Boca Raton, Florida. At the outset of their meeting, UCE-2 asked Gessen what he wanted, that there was a "blank slate" (Ex. 6 at 9). Gessen

---

[1] The audio recording of this meeting was Exhibit 9 and the transcript was Exhibit 10. Although they were submitted to the Court as part of the government's exhibits, they were not admitted at trial.

US Sentencing Memo
CASE NO. CR-22-276-JSC

2

responded that he wanted his ex-partner to be illegally removed from the country.  Gessen and UCE-2 discussed a deportation scheme that would cost $100,000 to deport his ex-partner from the United States.  Ex. 5 at 24:00 (audio corresponds to transcript, Ex. 6 at 9).  The initial plan was to bribe a corrupt immigration official who would start an immigration investigation into her status, send her a deportation letter, and have her deported in about 6 months.  Mr. Gessen believed that UCE-2 had contacts in government based on the prior May 2021 meeting to bribe IRS agents and so he wanted UCE-2 to bribe an immigration official to deport his ex-partner.

Almost two hours later at that meeting, Gessen said, "if there was a cheaper way to get rid of her that would be good too."  Exhibit 5 at 1:56:26 to 1:56:38 (Ex. 6 at 63).  Before UCE-2 could respond, Gessen said "It's simply more expensive."  *Id.*  After stumbling a bit, UCE-2 then said, "there is a cheaper way and probably a *more permanent* way to do it."  *Id.* (emphasis added).  In response, Gessen said, "Is there?"  UCE-2 responded, "that's up to you" and Gessen replied, "I'm prepared to proceed" in "that route."  *Id.*  Notably, immediately after he asked if there is a cheaper way to get rid of her, Gessen said that he had researched hiring a hitmen and the price was $220,000:  "I didn't know that was an option.  I researched my sources, the lowest price was 220 dollars. And there is one for the Israelis and Eastern Europe and Italy."  Ex. 6 at 64; *see also* Ex. 8 at 8-9; Trial Transcript (hereinafter "TT") at 218 (UC:  "My understanding was that Mr. Gessen had already researched the option to kill his wife, and had been in conversation or had done some research with another organized crime syndicates, in this case Israelis or Eastern Europe, for the price of $220,000.").  Mr. Gessen said he paid them $10,000 to do the recon but they came back with a price quote of another 210,000 to complete the job – to do the murder.  *Id.*  Later, Gessen said that he will bring the "schedules, addresses, descriptions, photographs," of his ex-partner.  He said, "I've been around the block."  Ex. 6 at 67.

During that recorded meeting, UCE-2 told Gessen "it's a totally different conversation" and that it would be less money.  Gessen said "[a]nd more definite," to which UCE-2 said "permanent."  Ex. 6 at

US Sentencing Memo
CASE NO. CR-22-276-JSC

3

64. Gessen further explained that the deportation scheme was less desirable to him because the immigration route was not definite – lawyers get involved and "you get a bad guy and she ends up staying;" that would be "unpredictable" and he may "fight the system for a couple of years and it becomes a pain." *Id.* UCE-2 responded that the other option "will be very clean, and it'll be quick, and it'll be final." *Id.* Gessen stated in response that his only concern is that "we cannot possibly do this in front of the kids." *Id.* Gessen affirmed his desire "to go that route." *Id.* at 65.

UCE-2 asked for her location and Gessen said he could provide the schedule and locations, "I will do the full RECON for you." *Id.* In response to UCE-2 telling Gessen "you have to be sure that this is what you want," Gessen said "I'm sure, I'm sure" and noted "We just shifted gears." *Id.* at 66. UCE-2 said, "sometimes they dig their own fucking grave," with which Gessen agreed. Ex. 6 at 68.

In talking to UCE-2, Gessen shed light on his motive for wanting to kill his ex-partner. He explained that she caused him to go to jail. Ex. 6 at 68 ("she put me in fucking jail?"). He said that he took their son from the US to Canada and she told the police that he had taken their son without telling her, so the police charged him with parental kidnapping.[2] Ex. 6 at 27. He was arrested – brought back to the US and as part of that process, he went to jail for 35 days, he ended up going to a few different jails as he was brought back from Canada to the US. *Id.* Gessen said that he was "pissed off" about that incident. *Id.* Furthermore, Gessen said that he is "ready" and that "this is not a spur of the moment, emotional reaction." Ex. 6 at 69.

### D. June 22, 2022 Meeting Between Gessen and UCE-2

Gessen and UCE-2 met a second time in New York on June 22, 2022 – about 3 weeks after the first meeting. Ex. 7, 8. They finalized their arrangement at that meeting. Ex. 8 at 6; TT at 277. They agreed the murder would cost $50,000. *Id.* They agreed that 50 percent of it must be paid in advance

---

[2] This occurred approximately six months before the meeting, on December 24, 2021. TT at 468.

US Sentencing Memo
CASE NO. CR-22-276-JSC

4

and the other 50 percent when the murder is completed. *Id.* Gessen did not bring cash to that meeting, but he brought a gold coin worth $2,000. *Id.* at 6, 11. Gessen provided a gold coin to UCE-2 as the initial down payment, worth $2,000. *See* Exhibit 1 (physical gold coin); Exhibit 2 (two photos of gold coin: depicting the front and back of the coin); TT at 287 (value of the coin was $2,000 and "it was part of the down payment").

Gessen agreed to wire the rest of the money into a San Francisco bank account; but he said he wanted to make sure that there would be "no trail." Ex. 8 at 37. He stated that if he is sending the money from any affiliated entities of his, he needs to make sure that there can be "no connection" to him. *Id.* At this second meeting, Gessen also updated UCE-2 that his parental kidnapping criminal charge was still pending because the prosecutor needed to finalize the plea deal with his ex-partner as the victim and that "she has a bit of pull so she's very happy about that." Ex. 8 at 4. During the meeting, Gessen said that the murder needed to appear "random" because he would be "the number one" suspect. Ex. 8 at 34-35.

Gessen subsequently paid roughly half of the $50,000 (about $23,000 via wire transfers) as the deposit before the murder would occur, and agreed to pay the other half after the murder would be completed. *See* Exhibit 22 (Bank of America records showing two wires in the amount of $18,000 and $5,000 minus the incoming wire fee); Exhibit 15 (screenshots of wires); Exhibit 32 (Stipulation #6 regarding two wires).

### E. Text Messages on Signal and Screenshots of Deleted Messages

Gessen and UCE-2 also communicated by using the Signal app, which is a messaging app with end-to-end encryption and believed to be secure. On the Signal text messages, Gessen and UCE-2 referred to the murder-for-hire scheme as the "special project in Boston." Ex. 3 at 5-6; Trial Transcript at 250-51. Via the Signal text messages, Gessen sent a Letter of Engagement (Ex. 12) to obfuscate the nature of the money he was paying for the murder. Ex. 3 at 4. They also discussed the murder-for-hire

scheme in code, such as bringing "half of the documents" (half of payment) and "paper is preferred" (cash is preferred). Ex. 3 at 15; TT at 263-65. Gessen said he needed "to know the full amount to know how much is 1/2" and UCE-2 responded that the "[f]ull amount is 50" and half is "25." Ex. 3 at 16-17; TT at 267.

After the second meeting, Gessen enabled a feature on the Signal app that made his messages disappear. UCE-2 documented the disappearing messages by taking a photograph of the messages prior to them disappearing. Photographs of the deleted messages show that Gessen sent a Consultancy Agreement (Ex. 14) to UCE-2, again, to further obfuscate the nature of their relationship and make it appear as though there was a legitimate business relationship. Ex. 4 at 1; TT at 301-05 ("Mr. Gessen is using this instrument to cover his tracks for the murder for hire."). He also sent a target package to UCE-2, giving him a specific PIN, noting that it would only be available for 120 minutes and that "[c]ontent can be accessed only once but can be copied and forwarded." Ex. 4 at 2; TT at 308-09. The target package that Gessen sent to UCE-2 contained the ex-partner's name, picture, address, social media accounts, current boyfriend, landlord, and information about her car and where her friends are located (Ex. 31).

### F. Evidence of Motive: Child Custody Proceedings

Gessen and his ex-partner met in Zimbabwe at an event. TT at 421. They began dating and had a traditional marriage in 2012. TT at 422. In 2013, they had their first child in Zimbabwe, their son. She was the primary parent until their son was five years old because although they lived in Zimbabwe, Gessen traveled to and from Russia for work. TT at 424-25. In 2016, they moved to Russia to use surrogacy services that were not available in Zimbabwe. TT at 424. In November 2018, they had their second child, their daughter, in Russia. TT at 425. Gessen was the primary breadwinner because the ex-partner had scaled down her ability to make more money so she could raise their children. TT at 426. Over time, their relationship soured, and they separated but were living together since they had two

US Sentencing Memo
CASE NO. CR-22-276-JSC

6

young children.  TT at 425.  In June 2019, while she was traveling to Zimbabwe on a trip that was supposed to last three days, Gessen took their son and left Russia and moved to the United States.  TT at 427-29.  She found out when she landed at the airport and received his text messages informing her of this news.  429.  At that time, their son was five years old and their daughter was seven months old.  TT at 428.  The daughter could not travel because she did not possess the necessary travel documents having been born through surrogacy, so Gessen left her with the nanny.  TT at 431.  When the ex-partner arrived at their apartment, she saw that he had also emptied the apartment and blocked her access to their accounts.  TT at 433-35.  Ultimately, she filed a report in Zimbabwe with Foreign Affairs and a Hague Petition for parental child abduction.  TT at 435-36.

     He moved from Russia to the US with their five-year old son, for whom she had been the primary care-taking parent, without informing her.  She was worried about her son's mental well-being because he had never been apart from her for more than a couple of days.  TT at 436.  Given her immigration status, she was trapped in Russia and could not travel to the US.  TT at 433.  He limited her ability to speak with their son on the phone.  TT at 437.  On two later occasions (August and October 2019), Gessen visited Russia but did not bring their son so she was not able to see him.  TT at 437.  Notably, when he left Russia, Gessen also took their daughter's birth records which made it impossible for the daughter to travel out of Russia, thereby trapping the ex-partner in Russia as well.  TT at 438.  Gessen told her that he would give the birth records to her "when the time was right."  TT at 438.  Subsequently, she ran out of money and food and had nowhere to stay so she went to the Zimbabwean embassy in Russia; she could not travel to Zimbabwe because Gessen was withholding the daughter's records.  TT at 439.  After she obtained a ruling granting her request for the birth records, Gessen released the records to her, and she went to Zimbabwe to "fight to get [her] son back."  TT at 438-40.  She stayed in Zimbabwe from November 2019 until July 2021, where she filed for custody and pursued her Hague petition.  TT at 441-42.  Separately, Gessen filed for custody in Massachusetts.  442.  She

obtained a US visa to attend the hearing related to her Hague petition and came to the US in 2021. TT at 444. Because there was no ruling from any court regarding custody at that time, they negotiated visitation that enabled her to see her son. TT at 444-45.

At the end of 2021, the court issued a ruling on the Hague petition, finding that the son was wrongfully removed from Russia, but because Russia was the son's habitual home prior to the US, and because Russia and the US did not have a treaty, the court could not send the son back to Russia. TT at 445-46. Thereafter, the parties would be subject to Massachusetts law, which for unwed couples, would grant custody to the mother. TT at 447. Notably, that final week of school when the son was scheduled to spend Christmas with the ex-partner, she was alerted to the fact that Gessen had not dropped off their son at school. TT at 449. She testified that she rushed to court because she "was afraid that he had taken him again. He had kidnapped him again. I couldn't reach any of them. I was supposed to pick him up from school that day. He had not informed me of any change of plans. . . I was worried more about his [son's] emotional well-being, as well as what had previously happened. The two-year separation had been very hard for him. I didn't want this to happen again." TT at 450. That judge issued an order saying Gessen could not leave Massachusetts with their son and granted temporary custody of the son to the ex-partner. TT at 450. She then went to the police station in an effort to find her son. TT at 452. She could not leave the United States due to her immigration status because she only had a visa that permitted her to stay in the US. TT at 452.

Gessen had purchased tickets to fly to London with their son – once again, unbeknownst to her. TT at 456. He was stopped at the airport in Montreal, Canada about to board a flight to London. TT at 456. He was brought back to US – he was in immigration detention in Montreal and was then transported to a prison in upstate New York and then extradited to Massachusetts. TT at 457. This incident was "very traumatic" for the son and it led the ex-partner to secure therapy for the son. TT at 460.

US Sentencing Memo
CASE NO. CR-22-276-JSC

8

Indeed, Gessen told UCE-2 about this incident. He shed light on his motive for wanting to "get rid" of her: she sent him to "fucking jail" and he was "pissed off." Ex. 6 at 27, 63, 68. The US-Canada trip led to his criminal case involving international kidnapping, for which he went to jail. TT at 474; Ex. 6 at 27. During their meeting, Gessen showed a picture of his kids to the undercover agent. After seeing the picture of the kids, the agent asked "how do we protect the kids? They are too young. . . they're going to lose their mother. She's gone, how do we protect the kids?" Ex. 6 at 72. Gessen responded that their son does not like her and their daughter is too young to remember. *Id.* None of it mattered – he just wanted her gone.

### G. Cover Up

Gessen, an intelligent and sophisticated licensed attorney, employed a cover story. To cover his tracks, he told the UC that they needed to "communicate safely." Ex. 6 at 66. During that first meeting in Boca Raton, Gessen and the UC talked about communicating and how they would use the Signal app. Gessen said, "None of the words we mention here can end up on there." Ex. 6 at 67.

Furthermore, the day after their meeting, Gessen sent a text to the UC saying "I would like to reaffirm that I am prepared to proceed. Attached is the letter of engagement." Ex. 3 at 4. The Letter of Engagement made it seem as though Gessen was the UC's lawyer – for a project in the European Union. Ex. 12 at 1. But as the trial evidence bore out, that was not the case – it was just to cover up the murder-for-hire scheme. TT at 245 ("Mr. Gessen is a lawyer, by trade and by his own admission. Mr. Gessen is sending me a letter of engagement to – to basically officially cover our meeting.").

Moreover, Gessen sent a "consultancy agreement" to the UC, which made it seem as though the UC's company was providing consulting services to an Estonian company. TT at 301-04. But this was a fake contract – to hide the true nature of the money – that it was for the murder of his ex-partner. *Id.* This agreement was a phony cover to avoid having any direct evidence showing he was paying someone to murder his ex-partner. *Id.* He told the UC that he had a holding company in Estonia and he used that

as part of the cover story. *Id.* Furthermore, as noted above, after the second meeting Gessen enabled a feature on the Signal app that would make his messages disappear. He also sent the target package with operational security measures: he sent a specific PIN, it was only available for 120 minutes, and it could be accessed only once.

### III. Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation in the PSR: total offense level is 32 and his criminal history category is I, resulting in a range of 121-151 months. *See* PSR at ¶ 64. However, the statutory maximum for this offense is 10 years, so the Guidelines range would revert to 120 months. U.S.S.G. §5G1.1(a).

### IV. Applicable Law

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also* 18 U.S.C. § 3553(a). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Sentencing Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness considering the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991–93. Under Section 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

US Sentencing Memo
CASE NO. CR-22-276-JSC

(4) the need for the sentence imposed to protect the public from further crimes of the defendant;

(5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(6) the need to provide restitution to any victims of the offense.

## V. Recommended Sentence and Section 3553(a) Factors

In light of the Section 3553(a) factors, the Court should sentence Gessen to 120 months' imprisonment, followed by three years of supervised release.

### A. Nature and Circumstances of the Offense

The nature and circumstances of the offense are very serious. There are hardly circumstances more warranting of a significant sentence than a defendant who hired a hitman to murder the mother of his young children. This offense involves Gessen soliciting the assistance of a purported criminal who launders money for drug cartels to arrange the illegal deportation and subsequent murder of his ex-partner because they were involved in a custody battle. *Gessen* – not the UC – asked "if there was a cheaper way to get rid of her" and then explained how the more "definite" and "permanent" way was better because the deportation scheme would involve lawyers and she could end up staying. His words, captured on recordings, show his desire to get rid of her and his steadfast commitment to the murder-for-hire plan, despite the many times the UC offered him an out to walk away from the plan. The UC repeatedly asked if this was what Gessen really wanted and if he was sure. Again and again, Gessen confidently and without hesitation affirmed that he was "comfortable" with the "permanent solution." TT at 280-81. In fact, Gessen was "100 percent on board."

He helped plan the murder and provided a target package with personal information that would only be useful in executing her murder. He also employed measures to distance himself from the communications by having his messages disappear, using a fake consultancy agreement to make it seem

US Sentencing Memo
CASE NO. CR-22-276-JSC

11

as though the payment was for consulting fees, and structured the wire payments from an Estonian company to avoid any paper trail leading back to him. He valued her life at $50,000. In his own words, he was dismissive of the fact that his two young children, aged three and eight at that time, would be motherless as they grew up. He showed a cool, cruel, calculated approach to the taking of an innocent woman's life – the mother of his children. He wanted her out of his life because she also loved her children and fought him for custody.

This was not his first attempt to murder her. He previously hired a "Mossad" hit team, who performed initial reconnaissance on his ex-partner. He ultimately did not proceed with that plan to murder her because it was expensive ($220,000). In his words, he "been around the block." He was willing to try again because he believed in this endeavor wholeheartedly – in his own words, he said of the murder-for-hire plan: "our cause is just." Ex. 4 at 13. In fact, he did not care if another innocent life was lost as long as she would be killed. In the deleted Signal messages, the UC asked him "If there are any guests present do you have any problem with showing them the exit? My guys said we need to plan for extra guests at the show." Ex. 4 at 11. In response, Gessen said "I am absolutely ambivalent to the modalities and circumstances as long as we achieve objectives. Additional unexpected expenses are a part of doing business." *Id.* When the UC clarified that he does not "expect any additional costs. Same job," Gessen said "I meant the collateral. I mean it's fine." *Id.* The UC understood "collateral" to mean her boyfriend and that the UC understood Gessen "did not care either way on how it was carried out. He just wanted the objective to be achieved and he – he didn't care about if we killed the boyfriend, if he was there." TT at 334-35. These are messages that he thought nobody would ever see because he set them to be deleted. Gessen's own words show his absolute lack of regard for the life of other individuals, so long as he obtains what he wants.

B. **History and Characteristics of the Defendant**

The history and characteristics of the Defendant call for a proportionate sentence in this case.

US Sentencing Memo
CASE NO. CR-22-276-JSC

12

Gessen is an attorney licensed to practice law in New York.[3] He attended the University of Connecticut law school. He practiced law. He worked at the firm Thatcher, Proffitt & Wood. He practiced as a litigation attorney and then joined McKinsey & Company, which he deemed to be the world's number one strategy consulting group. He was recruited as a fund manager for assets by one of the richest persons in Europe. He was appointed as a CEO in a company, which was the fastest-growing supermarket retail chain in Ukraine. He managed multiple investment funds and family offices. He did consulting work on special and sensitive situations in different parts of the world. He was trained in negotiations and studied immigration law. He ran several companies as an executive manager. He was on the board of a public company in Europe and worked with several startup companies. He knows how to manage businesses and operate them. He had a holding company in Estonia. In sum, as he agreed, he is a "very intelligent and an accomplished attorney."

He was not a bumbling idiot who happened to stumble into some unexpected situation. Gessen was 47 years old at the time of the offense conduct. He was mature and the father of two children, having worked in different parts of the world in various capacities. He was not an immature young man in his early twenties. The PSR notes that he grew up under modest circumstances in Russia, but he was otherwise well cared for by his mother and grandparents. The defendant and his mother immigrated to the United States. He completed a high school education in the United States, followed by undergraduate and Juris Doctor degrees. He has a history of employment as a consultant. The murder-for-hire plan that he hatched was well thought-out and intentional.

Although he does not have any prior criminal convictions, he has a pending case for Kidnapping and Endangering a Minor, involving traveling with his child internationally without the child's mother's permission or knowledge. PSR ¶ 39. That pending case is illuminating as to his history and

---

[3] The facts in this paragraph are taken from Gessen's trial testimony. TT at 711-15.

US Sentencing Memo
CASE NO. CR-22-276-JSC

13

characteristics, as it shows his motive for wanting to kill her. Gessen previously kidnapped their son across international borders on two occasions: once from Russia to the United States in June 2019 and again from the United States to Canada in December 2021. TT at 428-29; 474. Notably, in 2019, Gessen took their five-year old son and moved to the United States without telling her. TT at 428-29. He separated a five-year old child from his mother, who had been the primary caretaker, and moved him to a new country where she could not follow. After his efforts were unsuccessful, he kidnapped their son on the second occasion in 2021, having departed from the US to Montreal, Canada about to board a flight to London. On both occasions, Gessen separated the young son from his mother and trapped her in a situation where she could not travel to follow them given her immigration status. When the second kidnapping resulted in him being jailed, he was angry at her. He blamed her for the consequences of his own reckless actions. And thus, resorted to arranging her murder, thereby depriving his three-year-old daughter and eight-year-old son from having their mother in their lives as they would grow up.

### C. Need for the Punishment to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Avoid Unwarranted Sentencing Disparities

A guidelines sentence is necessary in this case to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. Gessen hired the UC – believing he was a criminal – to arrange the murder of his ex-partner and the mother of his two young children over custody proceedings. Gessen promised to pay $50,000 for the murder and actually paid $25,000 (the gold coin worth $2,000 and $23,000 with two wire transactions) to the UC for the murder of his ex-partner. A 120-month sentence is thus warranted for an offense that exhibits such a callous disregard for human life. Such a sentence is also important for deterrence purposes – both general deterrence and specific deterrence for this defendant who has now tried twice to murder her in an effort to gain sole custody. As for unwarranted sentencing disparities, the PSR notes the JSIN data: the average length of imprisonment imposed was 108 months and the median length of imprisonment imposed was 120

US Sentencing Memo
CASE NO. CR-22-276-JSC

months. Thus, a 120-month sentence falls within the heartland of such sentences. Notably, what is not reflected in the JSIN data is that Gessen tried to murder his ex-partner and the mother of his two young children. Murder-for-hire cases typically involve violent gangs, business rivals, or enemies. The fact that the victim here was not some random person but his ex-partner and the mother of his young children, who dared to love and fight for her children, is compounded in this case.

## VI. CONCLUSION

Based upon a consideration of the Sentencing Guidelines, all of the circumstances of this case, and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends that the Court sentence the Defendant to a term of imprisonment of 120 months, followed by three years of supervised release.

DATED: April 17, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

/s/
ILHAM A. HOSSEINI
Assistant United States Attorney

US Sentencing Memo
CASE NO. CR-22-276-JSC