**Pages 1 - 47**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
    vs.                         )       **Case No. 3:22-cr-00276-JSC**
                                )
ALLEN GESSEN,                   )
                                )
            Defendant.          )
_____)

                        San Francisco, California
                        Wednesday, April 24, 2024

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    ISMAIL RAMSEY
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            **BY:  ILHAM HOSSEINI**
                    **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:
                    JODI LINKER
                    Federal Public Defender
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            **BY:  CANDIS MITCHELL**
                    **ASSISTANT FEDERAL PUBLIC DEFENDER**

Also Present:  Brian Casai, Probation

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

**Wednesday - April 24, 2024**                         **10:15 a.m.**

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Calling criminal action CR 22-0276, USA vs. Allen Gessen.

Please state your appearance.

**MS. HOSSEINI:**  Good morning, Your Honor.  Ilham Hosseini for the United States.

**THE COURT:**  Good morning.

**MS. MITCHELL:**  Good morning, Your Honor.  Candis Mitchell on behalf of Mr. Gessen who's present before the Court and in custody.

**THE COURT:**  Good morning.

Good morning, Mr. Gessen.

**THE DEFENDANT:**  Good morning.

**THE PROBATION OFFICER:**  Good morning, Your Honor. Brian Casai for Probation.

**THE COURT:**  Good morning.

Okay, Mr. Gessen, as you know, a jury found you guilty of murder for hire in violation of 18 USC Section 1958. Specifically they found beyond a reasonable doubt that you hired someone to arrange the murder of the mother of your two children.

Fortunately the person who you paid the money to was an undercover agent, and so the mother of your children was not

murdered.

Now is the time set for sentencing.

I've reviewed the Presentence Report, the government sentencing memorandum, your sentencing memorandum, Ms. Chigariro letter, and I believe she's listening to the proceedings today, and the many letters that were submitted on your behalf, I think more than 25, including a letter from your mother who I believe is also listening today, from cousins, many friends, your son's violin teacher, even an inmate at Santa Rita. So I've reviewed all of those.

In terms of coming up with an appropriate sentence -- and actually before we get to the sentencing guideline and go through that, if we could talk about the proposed supervised release conditions. There are just three that were separate.

The second with respect to the financial, given that there actually isn't any evidence in front of me as to Mr. -- any financial crimes committed by Mr. Gessen, I was not going to give that number two, but I'll hear from the government on that.

**MS. HOSSEINI:** Your Honor, I believe that condition that is proposed by probation is appropriate in this case. Although it is not part of the offense conduct itself, there was and it is documented in the PSR that Mr. Gessen was involved in one aspect of a longer money laundering investigation.

**THE COURT:**  Well, that he was being investigated for it --

**MS. HOSSEINI:**  Correct.

**THE COURT:**  -- that's what led to the whole thing.

**MS. HOSSEINI:**  Correct.

**THE COURT:**  But I don't think I have really much more than that.

**MS. HOSSEINI:**  No.  Aside from the wire payments, there's nothing additional that's part of the offense conduct.

**THE COURT:**  So I'm not going to give that condition.

And then the first one that you must have no contact with this victim in the case unless otherwise directed by probation, I'm concerned that when he's released and on supervised release, there are, of course, family court matters going on in Massachusetts and there was the Hague Convention.  So I was going to propose unless permitted by order of a state or federal court.  Because I think they -- you know, there may be visitation with the children, and that's going to involve -- perhaps, I don't know -- but I think the courts there in Massachusetts should direct that.

**MS. HOSSEINI:**  Of course, Your Honor.

**MS. MITCHELL:**  I agree, Your Honor.

**THE COURT:**  All right.

**MS. MITCHELL:**  And I would have proposed that too, yes.

**THE COURT:** All right. And then the search condition, is there any objection to that?

**MS. MITCHELL:** It's the standard search conditions so we have no objection to that.

**THE COURT:** Okay. All right. Okay.

So now let's talk about determining an appropriate sentence.

So the first thing I have to do is look to the guideline range. It's just one factor of many. And here the guideline range -- well, the base offense level, everyone agrees, is 32 with no adjustments. And Mr. Gessen has no criminal history at all. So the guideline range is 121 to 151 months. Of course, the statutory maximum for the crime is 120 months. So that is the maximum sentence I can impose notwithstanding the guidelines.

Now Mr. Gessen argues that he should be entitled to a two-level deduction for being a zero point offender, that is, having no criminal history. However, to be eligible for that, the offense has to be one that did not use violence or credible threat of violence. I don't think I can say being convicted of murder for hire does not involve a credible threat of violence. So I would find he's not eligible for that.

**MS. MITCHELL:** And our argument to contradict that, Your Honor, is that there was no actual violence imposed in this case. So it rests on whether or not there was a credible

threat of violence.

Here Mr. Gessen's -- per the Government's theory, Mr. Gessen wanted to murder Ms. Chigariro.  He did not communicate that to Ms. Chigariro so she did not actually perceive a threat.  The communication of it was made after he was arrested by the FBI to her.  She had no idea at that time that there was actually a threat being communicated to her.

As a follow --

**THE COURT:**  Why does it -- to be eligible, does it have to be communicated to the victim?

**MS. MITCHELL:**  It's in some of the examples of cases where they have found that there has been a credible threat of violence, that was part of the determination that there was in fact a credible threat, that the threat had actually been communicated to the purported victim.

But --

**THE COURT:**  So if you attempt to strangle someone who's unconscious, you would be eligible for this because it wasn't communicated to the victim because the victim wasn't conscious and didn't perceive that threat.

**MS. MITCHELL:**  So in that case, there's -- that's actual violence being done to a victim.

**THE COURT:**  Didn't do it, actually didn't do it, just threatened like standing over them, have your -- I don't want to get graphic about it.  I'm just trying to pull out the logic

of your argument.

**MS. MITCHELL:**  In that hypothetical, you have someone who actually is -- and, again, this goes to a different part of the argument -- in a time and space, physical in proximity to the victim to actually be able to carry out the threat.

Mr. Gessen was never in a physical proximity with Ms. Chigariro to be able to carry out the threat.  He is no -- he was --

**THE COURT:**  That's because it's murder for hire.

**MS. MITCHELL:**  And we would argue that murder for hire under the situation that it occurred here did not convey a credible threat of violence to Ms. Chigariro.  It was communicated to an undercover FBI agent.  The FBI agent was never actually going to be able to intend to carry out this. It was not a credible threat of violence towards Ms. Chigariro based off of the circumstances here.

Mr. Gessen was not proximately next to her.  He didn't convey the threat directly to her.  This was something that was said to a person who never was going to be able to care it out. It did not have all of the what needed to happen for this threat to actually be credible.

**MS. HOSSEINI:**  Your Honor, there is no on point law in this because this amendment went into effect in November so about five month ago.  I only found one District Court opinion that actually addresses that specific guideline provision from

the Western District of Washington, which is not even really on point because it says that defendant had firearms and so he does not qualify.

Thus I think the Court must resort to a commonsense application of the adjustment which has ten enumerated provisions.  The fourth one is that the offense did not result in death or serious bodily injury.

We're not talking about that.  We're talking the broader one, number 3, which says the defendant did not use violence or credible threat of violence in connection with the offense. That is a broader provision as it's written.

And also to look at all the ten different disqualifiers that make a defendant not eligible for this two-level reduction, there's one about financial harm.

So I think that the intent of these disqualifiers are to be brought in to disqualify certain types of offenses or certain types of conduct.  Clearly murder for hire would fall within that provision because it is a credible threat of violence in connection with the offense.

It would lead to an absurd result that someone who, under (a)(7), someone who would either possess, receive, transport, or otherwise dispose of a firearm, which is a passive possession of a firearm, would not receive this two-level reduction, but someone else who would pay $25,000 towards the murder of someone else would receive it.  That on its -- that

comparison, the way the guidelines are written, would be an absurd result.

**MS. MITCHELL:** Your Honor, I understand the Government's point. But when it comes down to it, the specific wording of the statute and whether or not the point is applicable comes to is there an actual credible threat of violence.

We would argue that based off of the facts and circumstances of this case -- there may be murder for hire cases where there is a credible threat of violence when, for instance, some -- a hit person is stopped in the course of doing something or someone is actually -- where the threat has been communicated to them or someone has said, "I'm going to kill you, I'm going to hire someone." In those instance, that is a conveyal of a credible threat of violence, a credible threat actually exists.

In this instance, because the murder never could actually happen, that Mr. Gessen never communicated the threat to Ms. Chigariro. She was in no -- he was not proximately in a place where he could actually commit this himself. There was no actual real threat to Ms. Chigariro at any point in time during the entire course of this proceeding. We would argue that that means that there was not a credible threat of violence because actual violence didn't occur, that zero-point offender should be available to Mr. Gessen.

**THE COURT:**  The actual violence didn't occur, that argument is defeated by the fourth element, that it didn't result in death or serious bodily injury.

But I understand the argument.  I think categorically being convicted by a unanimous jury of murder for hire means the offense involved a credible threat of violence.  So he's not eligible for it.  But I note even so then, even if he did, it would still be a guideline range of 97 to 121 months there.

All right.  And then the other argument made is that -- I mean, the guideline range is just one factor to consider among many.  It gets no more weight than the others.  Mr. Gessen also argues in this case it's deserving of even less weight given the statutory maximum is 120 months.  If you were to apply the guideline range, you'd always have to vary, but it would essentially you say be arguing for or requiring the statutory maximum in every case.

That argument has -- go ahead.

**MS. HOSSEINI:**  Just to respond to that, Your Honor.  Mr. Gessen's sentencing memo relies on two analogies.  One, the crack to powder cocaine and the pure to impure meth.  That argument is based on a disparity between how the guidelines treat crack and powder cocaine, pure meth and impure meth.  That is not the case here.

Additionally, there's a reference to child pornography offenses.  That analogy is also not applicable here because the

way the child pornography guidelines work is they typically lump everyone together. So there's not a whole lot of differentiation potentially between a defendant who would passively download child pornography, watch it on his computer and immediately delete it and never do anything else with that aside from the downloading, and some other defendant who may have in his prior life had 10 victims of hands-on offenses in addition to possessing the child pornography.

That also is not applicable here. Because the way the statute is stratified here, murder for hire has three different statutory maximums. Here it's 10 years. But if personal injury results, it's 20 years. And if death results, then that's a death penalty, death-eligible offense.

So with regards to whether the guidelines should be completely thrown out or given less significance based on the drug argument or the child pornography argument, those arguments do not apply to this offense or this -- the way the guidelines are or the way the statute is written.

**THE COURT:** So there is, I think, another disparity, and that is the statutory maximum for attempted kidnapping is 20 years. And Mr. Gessen essentially testified to that on the stand when he talked about his -- what he really thought he was paying for was to illegally remove Ms. Chigariro with a raid to look random, which would be a kidnapping, is what he said. And there the statutory maximum would be 20 as opposed to the

10 here.

So I think if anything the 10 years sort of shows maybe the statute is a little bit out of step with the crime.  But be that as it may, again, the guidelines are just one factor.  And I think what it really comes down to in trying to determine the sentence here are the other factors that go into the calculation.

**MS. MITCHELL:**  And, Your Honor, just to address the Government's latter point about the statutory maximums changing if actual bodily injury occurred, in those cases the guidelines likely would change because in those instances the guidelines that would be applied would be the ones for murder, not necessarily murder for hire.

Our argument here is that because Congress, in looking at what the typical case would be, not one that actually resulted in murder, would set the statutory maximum at 10 years.

And having the guidelines reach that immediately without adding any sense of proportionality, we argue that these guidelines essentially lack the same empirical basis that appears when you set the guidelines for the disparity between powder and crack cocaine and the same set of guidelines for child pornography.

There is guidelines that are done without a sense of giving any sense of proportionality for what could have happened in the lead-up to the offense itself and the types of

things that could have happened in the offense, and because of that the guidelines should not be adhered to with a strict sense because it doesn't seem that the guidelines took into account the statutory maximums when they were first designed.

**THE COURT:** Well, that does seem correct, right. It does seem odd that you would have a guideline range that exceeds the statutory maximum.

**MS. HOSSEINI:** It does happen.

**THE COURT:** I couldn't give a guideline sentence if I wanted to. I'm just not permitted as a matter of law.

All right. Well, so I think what really matters are, you know, the seriousness of the offense. Clearly it's a very serious offense and those matters.

So, yes, we'll turn to that. So, Ms. Mitchell?

**MS. MITCHELL:** Your Honor, I think the Court's very familiar with the facts of the case having sat through the trial so I won't spend as much time on that.

But in this case, it is very clear that Mr. Gessen's initial purpose in contacting and meeting with the undercover agent was that he was seeking to have Ms. Chigariro deported. It was not something that he suggested in any way, shape, or form that any other violence actually occur towards her aside from the deportation.

It was after that conversation began that the agent first suggested to Mr. Gessen a different alternative. And there is

the argument between us as to whether or not what Mr. Gessen perceived that alternative to be, but the government was the one who said we have this other option.  The government was the one who said this option will be less expensive than what we have previously talked about with permanent deportation.

This was at the direction of the government.  The agent, he was the one who initiated this as an option.  When Mr. Gessen said, "Is there anything less expensive?" the government agent said, "Yes, I've a more permanent option, less expensive.  I can get that for you."

We would argue that this is not the case where Mr. Gessen was the person who originated an idea of murder for hire.  He was not the person who originated a plan to perform permanent harm --

**THE COURT:**  How do you explain his testimony -- or his -- on the audio, then, that when Agent Rizzo said that, he then talks about the 220, the 10,000 that he had already spent on recon with the Israelis and Italy, and by the way, they're not going to be able to deport anyone.

So the only inference to be drawn is that he had looked into a murder for hire before meeting with Agent Rizzo.

**MS. MITCHELL:**  Actually I think Your Honor alluded to it earlier.  Attempted kidnapping is something that these agencies -- these groups could do.  They could forcibly pick someone up and remove them from the United States.  They're not

going to be able to use the legal system to deport someone. But they could put someone, against their will, and take them outside of the United States.

**THE COURT:**  Ms. Mitchell, okay.  That is also an incredibly serious, serious crime.  To invite essentially terrorists from outside the United States to come and kidnap someone and forcibly remove them to another country from the United States, that in itself certainly would be deserving of a long sentence.

**MS. MITCHELL:**  It would, but it's not the offense that Mr. Gessen has been charged with, and it wasn't what actually happened in this case.

Instead Mr. Gessen went with what he thought was going to be the preferred option which was trying to unlawfully deport Ms. Chigariro from the United States.  That was the method that they had agreed to, that they had settled on, that he was meeting the agent to discuss, that was the plan.  And it wasn't until they had met and started having the conversation that the agent purported to change that plan.

Mr. Gessen's intention was to have Ms. Chigariro to be deported.  Mr. Gessen's intention was to have her be removed from the United States.  Was not to have her be killed.

When the Court were to look at this sum total of who Mr. Gessen is as a person, and the letters that the Court can see, he is a person who has struggled in his youth to grow up

as a refugee in the United States, be subject to religious persecution in his home country, to have to have come here and once he got to the United States continued to be subject to struggles related to poverty, trying to learn a new language, adapt to a new culture.

He's settled here, has a strong family that supports him. His mother, of course, has been -- came here from the east coast to attend trial and stand by him in all ways.

He is a person who was in a very difficult situation in a child custody issue where there were certain things that were going on with the children that he believed they would be in a better situation if they were to be with him as the parent who's making decisions about their education, their medical, what they were doing with their lives.

And he thought that he could provide them with a more stable environment with a parent who was working, deeply invested in their education, deeply invested in making sure that they had experience with culture, the arts.

And he made a decision, an unfortunate decision, to try and step outside the legal system to effectuate that.

In some of the ways that he has grown up, you could see where some of these ideas might have taken hold.  When he was in the former USSR, it was not the legal system there that was helpful, that was supportive.  Instead it was the group that persecuted him and his family and when they spoke up against

what they saw to be injustice in the world that put his family in custody.

It was a legal system, in effect, that put his grandparents in concentration camps. He has been in a position where there have been times where people acting under the color of law have done more harm than good.

He attempted to reach -- use the legal system here to go through the process of getting custody of his children, reaching out through The Hague, through Boston, through the court system, and the result he got there was not one that he wanted to have. He wanted to have permanent full custody of his children. He did not have that through that.

**THE COURT:** At the time that he met with Agent Rizzo, they had signed a settlement agreement that allowed for joint custody; correct?

**MS. MITCHELL:** They had at that time, yes. But Mr. Gessen still -- it was his preference to have permanent full-time custody of the children where he could make all the decisions that he wanted to have for the children.

And so it was under the color of this very unique situation that he made the decision that he made.

We would ask the Court to take into consideration the fact that at his age, he is not likely to reoffend. The circumstances of this case are some that are some that are very, very unique. It's not likely to reoccur. He is in a

position now where he has had time to reflect on what's happened.  He is thinking with a cool head.

The danger that existed to Ms. Chigariro in any aspect no longer exists.  And Mr. Gessen is not someone who is likely to ever set foot in a courtroom again following new law enforcement contact.

I do not think for a deterrence purpose that the Court has to consider either specifically or generally a longer sentence for him because this experience in and of itself is going to be sufficient deterrence.

In a sense, even if the one that we recommend at five years would be a sufficient general deterrence to others who might consider engaging in this offense because five years in custody is a very significant amount of time, especially when considering that Mr. Gessen has not spent any significant time in custody prior to this case.

Based off of the very unique facts of this case, the sentence -- the recommended sentence of 60 months is sufficient and really not greater than necessary in order to convey to Mr. Gessen the seriousness of the offense, what he has done to, give him time to reflect, and also to significantly punish him for what's gone on.

**THE COURT:**  Thank you.

**MS. HOSSEINI:**  Your Honor, first I would like to respond to the fact that this was done at the suggestion from

the agent, which is on page 6 of the sentencing memo, and that he was pressured unduly by the government to go forward with the offense, which is on page 16 of the sentencing memo.  That is false and appalling.

I'm looking at the trial exhibit, which was Exhibit 5 which corresponds with Exhibit 6 of the transcript.  It was very clear that Mr. Gessen was the person who said that "If there was a cheaper way to get rid of her, that would be good too."

The UC -- the undercover's response to that is he says, "Well" -- and then Mr. Gessen says, "It's simply more expensive."  And then he goes into an explanation right after about how he had done this for $220, as Your Honor commented.

I won't belabor the point because Your Honor presided over this trial not too long ago.  But this was fully vetted out and fleshed out before the jury.  We were in trial for about six days.  Mr. Gessen testified in his own defense for about two days, as I recall it, and this is something that the jury rejected.

So to say that this was at the suggestion of the government and he was unduly pressured is really problematic because it also flies in the face of and contradicts the evidence.

These are words that -- this is not just after-the-fact testimony.  These are recordings with Mr. Gessen's own words

where the undercover asked him -- this was at the trial transcript 220.

"You've got to tell me if that's the route you want to take?"

This started -- it all started at the very beginning when the undercover said, "There's a blank slate.  What do you want?"

Mr. Gessen was in control.  He did not stumble into a weird situation.  The entire meeting was at his request facilitated through his friend.

At another point, trial transcript 222, the undercover said, "But you have to be sure that this is what you want." And then it goes on.  Trial transcript 227, 233, 280, 281, 286, on each one of those situations -- there's no point in me rereading this -- but in each one of those situations, the undercover gave him an out.  That was part of the trial testimony, that on several occasions the undercover asked him if he was sure.  "I just want to make sure you're comfortable with it and you know that it is a permanent solution."

And he -- and another point it says, "I want to make sure you're comfortable and you don't have any regrets."

On each one of those outs, in each one of those occasions, Mr. Gessen could have walked away.  But on each one of those occasions, he chose to say, "I'm onboard 100 percent.  I am sure.  I am sure."  That is what the record -- his own recorded

voice tells the Court.

So for him to now blame the agents for it is appalling. But it is reflective of who he is. He is choosing once again to blame the undercover agents for his own actions. Just like in the past he chose, when he hatched this plan, he blamed Ms. Chigariro, the victim in this case, for the fact that she had reported the fact that he took their son instead of dropping him off at school. Instead of dropping him off, he took him to Canada.

She reported that fact to the police and then that started the parental kidnapping case. And when he came back, as he said on the recording, he said, "I'm pissed off. She put me in fucking jail."

Those were as a result his going to jail? The parental kidnapping case was a result of what he did. That was his action in violation of the whatever family court agreement or order that was in place that Mr. Gessen did not take his son to school but went to Canada.

And although the sentencing memo says it was for a vacation in Canada, he was arrested at the gate waiting to board from Montreal, Canada to London.

So once again he was doing this, going from the United States to Canada and London. This was the second time, Your Honor.

The first time this was in June -- this was at the end of

2021, December of 2021.  The first time he did this, this international kidnapping was in June of 2019 when his son was five years old.  And the mother, up until that point, had been the primary caretaker.

While she was on a trip to Zimbabwe, and they all had been living in Russia at that time.  That trip was to last three days.  When she landed, she came back to Russia, she learned -- she got the WhatsApp messages that he had moved from Russia to the United States and trapped her there with their child.  That daughter was seven months old and could not travel because she had been born through surrogacy and did not have the documents.

So this is reflective of who Mr. Gessen is.  Someone who wants what he wants in his life and will do whatever it is that will facilitate his objectives and then blame other people, whether it's the government agents or the mother of his two young children.  Those were his words that said "Our cause is just."

Even if he believed that this was an attempt -- which the jury clearly rejected after testimony from him for two days.  Even if he believed this was an attempted kidnapping where people were going to kidnap her and again for the third time remove her from her children, that is still separating a mother from her three-year-old daughter and her eight-year-old son without any regard for the agony that would cause to that mother who had spent much of her time relentlessly pursuing an

international Hague petition across multiple countries, multiple proceedings in two different family courts in Massachusetts to also have custody of their children.

No regard for the agony that it would cause that mother and no regard for the agony that would cause those two children who would be growing up without a mother in their lives.  That is a callous disregard for her life.

Of course the jury has returned a verdict that he tried to murder her for $50,000.  That is a cold and callous disregard for her life as a human being.

This is not a gang rivalry murder for hire.  This is not two people shooting at each other and one of them has to shoot in self-defense.  This is an innocent mother whose only fault is that she also loved her children.  She also wanted to be in the lives of her children and that she dared to fight him for some custody of her children to be present in their lives.

That is the nature and circumstances of the offense, Your Honor.  This is not a misunderstanding.  This is Mr. Gessen repeatedly exhibiting and showing to the Court, both in June of 2019 when he kidnapped their son and came from Russia to the United States, then again in December of 2021 when he went from the United States to Canada and about to be boarding to London, on each occasion choosing to trap the mother out of the lives of the children.

And then again this plan was to -- and because all the

fighting and the international Hague petition and all the disputes in District Court did not work, that meant at that point he had to live with her in his life and in the lives of his children.

And what did he result to?  He resulted to permanently and definitely have her removed.  That kind of conduct, Your Honor, is warranting of a guideline sentence regardless of whether it's 120 or regardless of whether the guideline range is 97 to 120.

That -- hardly any sentence -- hardly any case requires a sentence such as one where a highly educated, highly successful, highly intelligent attorney such as Mr. Gessen, who went through his upbringing as he did and excelled in every aspect of his life, whether it was his education, to be in law school, whether that he practiced law at various firms and in various capacities, that he was doing consulting in different parts of the world.  And the fact that he had accrued all these accolades in this impressive résumé.

Someone like that, someone who comes -- the filing was 105 pages of letters of support showing that he is a person who has the capacity to love and to care and has received the love and support of his family.  He is not some sociopath who has never loved anyone and who has never received family love.  He is someone who has the capacity to love and appreciate familial relationship.

He was not some random guy who had never met his family members and therefore didn't fully understand how his conduct like this would have repercussions and consequences for the lives of the mother and his two children.  He is a family man. He did know better.  He should have known better.

And so in light of the history and characteristics of Mr. Gessen, plus the nature and circumstances of the offense, a sentence of 120 months is warranted in this case.

Just to briefly comment on the fact that his age should factor in for a downward variance.  It should not. Mr. Gessen's conduct was less than two years ago.  He was 47 at that time.  He was not a young, immature man in his early 20s doing something that was thoughtless.  In his own words, "I have been around the block."  That's what he said.  In his own words, this was not a spur of the moment emotional reaction. He knew better.

As that relates to the likelihood of him reoffending, we respectfully disagree.  He had mentioned that he had previously hired another team and paid them $10,000 for recon.  And as he submits in his sentencing memo that this was an emotional situation that caused the offense.  That emotional situation is not going to go away.  If anything, things are much worse now that he has been convicted of hiring someone to murder the victim in this case.

I don't see how the emotional situation, as we stand here,

leads to him not reoffending.  If anything, the fact that she put him in jail for 35 days necessitated this murder for hire plan and now that all of this has happened.  And it was an undercover operation without any of her involvement so she did not cause any of this.  That is clear on the record.

But nonetheless he stands here convicted for his own words and recordings from the FBI agent.  I don't see how this situational -- pardon me -- this emotional situation leads to him not reoffending, not in the Government's mind.  He still has kids.  They will still be minors for many years to come. There still needs to be a situation where things would need to be hammered out.

This is not a drug problem where the drug was the source of the offense conduct and all he needs to do is get some drug treatment and straighten out his life.  This is who he is. This is what he sought to do.

So we respectfully disagree about the likelihood of him not reoffending and his age and necessitating a downward variance.

In summary, Your Honor, I would just like to say that a 60-month sentence is not just punishment for the offense and does not reflect the seriousness of the offense, the taking of an innocent life, a mother whose fault it was to love her children and also want to be in their lives.

And it does not promote respect for the law.  It does not

go to deterrence.  Whether it's general for all future people who are going to be thinking about planning someone to murder someone else, or specifically, as I have said, in his words, he said, "I am absolutely ambivalent to the modalities and circumstances as long as we achieve project objectives."

That was about whether there would be extra guests at the show, the reference being what if her boyfriend is at that scene and would Mr. Gessen be okay with taking him out too.  In his words, he was absolute ambivalent to the modalities and circumstances.

He could have said, well, could you just try to be more judicious, or anything.  He was absolutely ambivalent in modalities.  Those are his words.

A lot of times we don't have a defendant's own words in cases, but in this case we do.  And that was in a message that he thought nobody would ever see because he caused those signal messages to be automatically deleted.  But the undercover was able to take a photo of them really quickly and so that's why his words were preserved in our part of that -- part of this record that Your Honor will rely on.

At the very end, Your Honor, I just want to reference the victim letter which Your Honor has read so I will not read it, but it goes through the lifelong trauma that the victim in this case will endure, the effect that it will have on her children, that she will never feel safe and that she has to live with the

fact that she's a solo parent and has to figure out who will watch her children when she has to do overtime.  All of this because one person decided I did not deserve to be alive.

That in itself, what effect the victim has, is another consideration.  This is not a victimless crime.

In summary, Your Honor, I would just say that it is a rare occurrence in my experience where the Probation Department and the government have the exact same recommendation which is a sentence of 120 months.

**THE COURT:**  Thank you.

**MS. MITCHELL:**  Your Honor, I just want to briefly respond to some of the allegations that the government brings up.

Mr. Gessen disputes and holds fast the idea that he did not ever attempt to kidnap either of his children at any point in time.  Anytime Mr. Gessen traveled abroad with his children, he was not attempting to permanently deprive Ms. Chigariro from contact with them.

His goal in traveling with his children was either to get to a location where they could have an actual court hearing regarding their -- the custodial status.

In their travels, in their communications, and what had happened leading up to the case, it became very clear that the ultimate place where they would have to make final decisions and perfect the case for their youngest daughter as to her

custodial arrangements would have to be in Zimbabwe.  They were all eventually going to have to go to Zimbabwe to get a birth certificate for her, to get her documents arranged, and to have everything be perfected.  That was always the plan for the family to ultimately meet together there.

So Mr. Gessen was not attempting to kidnap his children and permanently deprive Ms. Chigariro from contact with them. He was going to the location that they had spoke about going all together to perfect the criminal -- the cases that they had to work on.  That was never in any way an attempted parental kidnapping.

When the government makes this argument that this is who he is, the letters to the Court and the history of Mr. Gessen shows who he is.  This --

**THE COURT:**  Can I ask you about those letters?

**MS. MITCHELL:**  Yes, Your Honor.

**THE COURT:**  It doesn't appear -- I know they weren't at the court in the trial, and it doesn't appear they were aware of his testimony.  I mean someone even said he's innocent.  None of them acknowledged, for example, his testimony that his -- the second scheme, what he calls the removal, is to get them to do something illegal such as altering the immigration records or something else to provide a legal basis for removal and then removing.  So it was just that step.  Wanted to look like a random raid, whole bunch of people

caught up in it.

I didn't get the impression from those letters -- his mother, a different matter, I understand that -- that they had any idea as to what he actually even testified to, that they had any acknowledgment of it at all.  So I accept that to them, you know, he was -- as he was always in court, polite and kind and did all those things.

But I don't know that they can speak to what he did, whether he'll do it again or why he did it, because they seem to have no idea of the evidence in the case.

**MS. MITCHELL:**  But what they do have an idea of is Mr. Gessen's character.  What they have seen of him --

**THE COURT:**  The character that he showed to them.

**MS. MITCHELL:**  Over a period of, in some instances, 40 years' worth of character.  To say that these individuals are in some way limited in who they believe Mr. Gessen to be because they have, in some instances, 20 years, 40 years of being with him, observing with him, seeing him interact with others, and in this in one instance, in this one case with this one situation, that this is instead who he is as a person versus the person that they have seen over the large expanse of --

**THE COURT:**  Why can't you be both persons?

**MS. MITCHELL:**  And in taking that into consideration that both people, the person who is an excellent mentor, looks

out for others, stands in for people when they are involved in situations where they are vulnerable and needs someone to step in, is a person who can make a bad choice, is a person who could be in a situation where he could come to a situation where he just makes a bad decision because he is emotionally controlled by what he wants to have happen.

However, his decision in trying to have Ms. Chigariro deported is not who Mr. Gessen is as a sum total of a person. Who he is, is the person that is reflective of what --

**THE COURT:**  But for sentencing, don't I have to accept the jury's finding that his decision was to have her murdered? I mean, I understand he doesn't have to admit it, but that's what the evidence showed, that's what the jury found, the evidence supported it.

So it wasn't just to have her deported, it was to have her murdered.  And even by his own testimony, it wasn't just to have her deported.  It was -- by his own testimony, it was, somehow -- I don't know how this would happen in the United States because that's not the United States I know -- that somehow someone could be bribed with less, by the way, than a legal deportation, to create some sort of raid and avoid due process and have her extrajudicially removed somehow.  That was his own testimony.

**MS. MITCHELL:**  Yes, Your Honor.  And he admits that --

**THE COURT:**  So it wasn't just deportation.  It was --

that, in itself, is an outrageous scheme.  Outrageous.  It offends everything of the values of this country that you think that, A, that you think there'd people in the government that would do that, A, in this government in this country that would do that.  I'm not aware of that.

Certainly people can be bribed.  There's no question we've seen it.  But for that, for $50,000 that they would somehow have someone kidnapped essentially.  That's what I'm having -- that's why I'm pushing back on just the deportation.  Because I understand he wants to argue "I didn't intend to murder," but his own words on the stand for seven hours, his own words described an absolutely horrendous scheme.

**MS. MITCHELL:**  Which Mr. Gessen has made very clear he is apologetic for and that it was a bad decision on his part. It was something he makes very clear is not who he typically would be.  It was an act that was aberrant.  And it was something that the history of his interactions with others, with himself, with his family is not who he is.

And the man standing before the Court is someone who is deeply regretful of the actions that led him here today.  He loves his children.

However, he will never again be in another situation that places his children in harm, that places Ms. Chigariro in harm. He is a person who is deeply regretful of what has occurred that has led him to be here today.  And he is requesting that

the Court take into consideration all of the factors that have gone on in his life in forming the sentence.

**THE COURT:**  And does Mr. Gessen wish to make a statement?

**MS. MITCHELL:**  Yes.

**THE COURT:**  I did read his statement in the PSR.

**MS. MITCHELL:**  Yes.  Mr. Gessen wants to make a separate statement.

**THE DEFENDANT:**  Yes, Your Honor.  My notes.

Your Honor, I would like first to take this opportunity -- I haven't had that opportunity before to address Priscilla directly and to say that I'm sorry.

I -- only two minutes before this hearing I saw her letter, the victim impact letter.  And I can't imagine the fear.  Priscilla, if you can see me and you can hear me, I can't imagine the fear and the agony and the disappointment that you went through when you were told by the FBI that I had hired somebody to kill you.

I'm sorry that I didn't have the presence of mind and the patience to work out our differences, to address it as an adult, and I instead opted to have you separated from our kids. I regret it every day.

I love our children.  I love Orrin, I love Elizabeth.  And I do realize that as a result of what I did, they were gravely injured and that's something I'll never be able to make up to

them or to you.

I'm also sorry that I'm not there to support you or them in the way that normal parenting requires, either financially or in terms of my time.

I hope that you have found the stability and the comfort. I know you have the strength. And I want to give you my absolute assurance that all I want right now for you and for the kids is to be in a stable, safe, peaceful environment. You're the only one who can provide it to them right now.

I will continue to work through the family court to try to maintain a meaningful relationship with the children who deserve the love of both their parents. And I will continue to cooperate with your lawyers in trying to secure U.S. citizenship for Lizzie and her birth documents to be finalized.

I cannot -- I cannot change what I've done. I cannot change the past. But I can learn from my mistakes. And I have and I will never put any of us in jeopardy again.

Thank you, Priscilla. Again I'm very sorry.

And, Your Honor, I'd like to say a few words to you.

When I was arrested two years ago, I felt outrage. I felt that I was set up by the FBI. I wanted my day in court. I wanted to explain to the jury that I never wanted anyone to die.

I had my day in court. I testified for 10 hours and had every opportunity to explain the logic of my words and my

actions.  The -- I'm glad I did.  The trial and the verdict that followed, they showed me mirror reflection that I didn't like.  It showed me very clearly that somewhere along the road I lost my way.

Before the trial, I had an opportunity to plead guilty in exchange for a -- for a reduced sentence.  It would have been the opposite of accepting responsibility.  It would have been using a legal fiction to try to get a better outcome.

It was the trial that -- and the evidence and the recordings that sort of hit it home for me.  And to understand where I've gone wrong and to sort of see it.  Because it's sort of -- when you sign the papers, you don't really necessarily see it.  I was listening to those recordings.  It was embarrassing to listen to my conversation with the FBI agent. I sounded cynical, arrogant.  I -- I tried to sound like somebody I'm not.

And the letters that Your Honor has, I hope they speak a little bit about who I am.  And I -- I have spent much of my life trying to help other people and trying to be -- being a decent human being, being -- and being able to help others is something that has given meaning to my life always.  And it's -- it's -- that has been the primary driver of all of my -- all of my life.

In her closing arguments and today again, Ms. Hosseini mentioned two things about me, that I'm very intelligent and

that I would do anything for my kids. These two things are -- have come into conflict in this situation. I was very stressed out and worried about the kids. And intelligence -- and intelligence doesn't supplant emotions. It's sort of the intelligence took a break. And -- and what I did was stupid, and that's why -- that's why I ended up where I am.

It is possibly ironic that in jail I have found almost unlimited opportunities to help others. It's in all areas of life from substance abuse and dealing with loss of family members and helping people with their cases.

The last two years have been incredibly productive. I've, for the first time, really had a lot of time for myself and time to reflect and sort of mental clarity I haven't had before. I've been reading a lot and studying, finally studying Hebrew and physics and mathematics. I managed to write three books, a book for teenagers, a philosophy for my son. I wrote a children's book for my daughter. And I wrote a collection of short stories, just my observations of life in jail.

I'm currently collaborating on a screenplay with a former gang member. I originally conceived the project to help him deal with his depression, and it really worked. It's -- as a therapy, it turns out to be very effective.

I am prepared to serve any sentence Your Honor deems just. I will manage to put the time to good use. It will be hard again to start from scratch, particularly if I'm released

closer to 60.  But I have already incurred my greatest punishment, Your Honor, and I have lost all access to my children.  And poetic justice has done its job.  So wherever I am, I don't know when I'll see them again, if I will.

And the torture I suffer every day comes from my awareness of the impact that it did -- was had on them and had on my mom. They have lost a lot of love and a lot of opportunities.

And my one hope is to be able to contribute at some point again.

But I do want, in conclusion, to talk briefly about my mom.  The letters that Your Honor has, many of them are from women, from two women that I was -- that I had longer term relationships with, with four women who have run the companies I've started with, about a dozen other women.

There's a reason for that.  My attitude towards women has been developed thanks to my mom and my grandma, two very strong sort of fierce, independent women who raised me.  The three of us were the closest friends.  Now it's just the two of us, my mom and I.  And we were living together until my arrest.

And my mother's world has collapsed after my arrest.  I'm the only child.  And she doesn't see the children either now. Today, April 24th, is her birthday.  She has turned 71 today.

Last week she saw her retinal specialist who said that she -- her macular degeneration of the retina is progressing and is now severe and she has maybe one or two years left of

eyesight, first left eye, then both.

I live with the fact that I have abandoned her in this situation. And I can't really imagine, you know, what will happen in a couple of years.

I've accepted my punishment, Your Honor. And I understand that I'm not blaming anyone for where I am. Not Priscilla, certainly not Priscilla, not the FBI.

I am very grateful that it was the FBI agent that I spoke to. His interpretation of our conversation is entirely plausible, entirely reasonable. And if it was somebody else, then we would have had a very different conversation altogether.

So I own everything that I said, I own everything that I've done, and I -- I'm not proud.

So thank you, Your Honor.

**THE COURT:** Thank you, Mr. Gessen. And thank you for speaking to Priscilla.

And I can see -- I didn't see it when you were on the stand at trial, but I can see it now and I saw it actually in your answers to probation's questions. Finally you acknowledged the harm that your conduct -- that your conduct caused and to your children too.

Of course, it's obvious, it was obvious to everyone that you loved your children. That was never the issue. The issue was that you then decided that you alone got to decide who

would -- whether they'd have their mother in their life or not.

So in trying to think of an appropriate sentence, I just -- it's hard for me to think of a more less -- or of a less serious crime than this one was.

And I'll start with you talked about -- and I know you love your mom.  It's obvious from that letter, she was here, how close you were to her, right, how important she is to you and how sad you are about how you've said you've now abandoned her.

But that irony is with this particular crime, you were more than willing to prevent your children from having that relationship with their mom, and from Priscilla from having that love with her children.  And you personally know how strong and important that is.  There's almost nothing more powerful, right?  And yet you were willing to have that ripped away and taken away from your children and from her.  So there's that in itself.

The other thing is you, of course, had many chances for this not to happen.  When you -- not just in that one conversation with Agent Rizzo.  You didn't have to meet with him the second time.  You could have just not shown up.  You didn't have to give him the gold coin.  Then you didn't have to wire the $23,000.  And you didn't have to send the target package.  And you didn't have to tell him when you were going to be on vacations with the kids so they wouldn't be there;

right?  So you had opportunity after opportunity after opportunity, but you went forward because that was your intent.

**THE DEFENDANT:**  I did.

**THE COURT:**  You did.  Yeah, that was your intent.

And that was consistent with having taken your son to the United States, Priscilla not being able to see him for two years, and then only able to see him when she was able to do a Hague convention and get herself here.  That was -- you know, so it was consistent with this keeping her away, that for years you tried to keep her away.

And I accept -- and it's frankly -- it's so tragic that you have been such a generous and helpful person to all these other people, but we see that sometimes with domestic violence, which is essentially what this crime is; right?  A person, a man, or sometimes the wife, can be an upstanding citizen and no one has any idea, but yet for whatever reason they decide they alone get to decide what's right for their children even at the harm of the others.  It's a real problem.  And the sentence has to reflect that, that you just can't do it.

So having heard you today -- I was concerned before I came in here before today with Mr. Gessen, because Priscilla's letter is, and you acknowledge, right, she's going to be afraid for the rest of her life.  But having seen you here -- and I'll tell her because she can't see you -- you seem sincere to me in that you recognize the wrong and that you wouldn't do that

again.  But that's not the only deterrent I have to think about.

The message has to be out to every parent out there that you cannot take the law into your own hands and decide what's best, whether it be to have your spouse murdered or removed or even if it's just to, like, try to have your kids not like, you know, your former spouse or whatever.  All those things, right?  It's completely wrong.

And it's wrong to the children as well; right?  We need parents to recognize that when they split for whatever reason, and we have these processes, the family law, the social workers, the help, because these neutral people help do what is in the best interest of these kids because -- and I know you feel sad about this -- we don't know what the long-term impact on your children is going to be.

We hope they're going to be all right, we hope they're going to be all right, but to know this is going to have some impact on them.  And that's why the message has to be out that you cannot take it into your own hands.

And that you did so when notwithstanding or having to come here and file that Hague convention, that you going to Canada, she still agreed to joint custody.  She wasn't fighting for full custody.  She had signed an agreement for joint custody, and yet you did this then, that that wasn't good enough.

And then finally, Mr. Gessen, you're a lawyer.  You're a

barred lawyer.  You took an oath to uphold the law.  But by your own testimony, your own testimony on the stand in the trial, you thought that you were going to bribe some official to have her kidnapped and removed from the United States.  I mean, that's horrible for anyone, but for a lawyer to do, that in itself, I'm sorry, the sentence just has to reflect that.

So I accept your apology, I do.  And I'm so glad you said that, Mr. Gessen, today.  And I do believe and hope that you can continue to help others in prison.

And I was going to say, but you beat me to the punch, that it is so lucky that it was actually an undercover agent that you were talking to and not someone else.  Because if it were someone else and Priscilla had been harmed, you wouldn't have a hope of chance of getting out.  So you are lucky.  And that you recognize that too gives me hope for you as well.

But for all those reasons, I have to tell you this sentence has to reflect the maximum sentence.  It just does.

So pursuant to the Sentencing Reform Act of 1984, it is the judgment of the court that Allen Gessen is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 120 months.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.  Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in

the district to which Mr. Gessen is released.

While on supervised release, Mr. Gessen shall not commit another federal, state, or local crime, must not unlawfully possess a controlled substance, must refrain from my unlawful use of a controlled substance, submit to a drug test within 15 days of release and two periodic drug tests thereafter.

There's no restitution in this case.

And must cooperate in the collection of DNA and must comply with the following conditions.

As part of the supervised release, the standard conditions which have been adopted by this court and listed in the attachment to the Presentence Report recommendation identified as the standard conditions of supervision are hereby imposed and incorporated into the sentence.

You must not have any contact with the victim in this case unless a state -- unless permitted by order of a state or federal court. You must submit your person, residence, office, vehicle or any property under your control, including any computers, cell phones, and other electronic devices, to a search.

Such a search must be conducted by a United States probation officer at a reasonable time in a reasonable manner based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation. You must warn any

residents that the premises may be subject to searches.

It is further ordered that Mr. Gessen shall pay to the United States a special assessment of $100.  Payment shall be made to the Clerk of the U.S. District Court, 450 Golden Gate Avenue, Box 36060, San Francisco, California 94102, or via the pay.gov online payment system.

During imprisonment, payment of criminal monetary penalties is due at the rate of not less than $25 per quarter, and payment shall be the Bureau of Prisons Inmate Financial Responsibility Program, and shall be made to the Clerk of the U.S. District Court, Attention Financial Unit, 450 Golden Gate Avenue, Box 36060, San Francisco 94102, or via the pay.gov online payment system.

The Court finds the defendant does not have the ability to pay a fine and the fine is waived.

I find that this sentence is needed and is no more than necessary to reflect the seriousness of the offense, to promote respect for the law, afford adequate deterrence to criminal conduct and given the nature of the circumstances of the offense.

Mr. Gessen, I have hope for you.  I do.  And I didn't take this sentence lightly.  But this was such a serious, terrible thing to do.  But, again, thank you so much for your words today.  That goes a lot in giving me some confidence that you can make something of your life and make up for what you did.

And I hope -- it's not up to me, it's up to the courts and Priscilla, but I know you loved your kids and that they loved you, and I just wish them all the best.

And that you continue to help people that are imprisoned with you.  As those letters show, you're smart, or as you say not in all things, but you're smart.

I know you love your mother and that.  And I'm sorry it turned out that way.  But I do, I have hope for you.

**THE DEFENDANT:**  Thank you, Your Honor.

**THE COURT:**  Anything further?

**MS. HOSSEINI:**  Your Honor, may I request a finding that even if Mr. Gessen was eligible for the two-point adjustment, the guidelines range would have been the 97 to 120. Your Honor would have still imposed the same sentence?

**THE COURT:**  I would have imposed the same sentence.  I do see the maximum.  But I find he's not eligible so that that law can start to be created.  But even if he were, I would still impose the same sentence.

The guidelines, as Ms. Mitchell argued and I kind of believe, given that they exceeded the statutory maximum, I don't find them that useful.  And it was the other factors that more persuaded me here.

**MS. HOSSEINI:**  Just two more housekeeping matters, Your Honor.  If Your Honor could advise Mr. Gessen that he has a right to appeal within 14 days.

THE COURT:  Thank you.

You do, Mr. Gessen, have the right to appeal.  You have 14 days --

MS. HOSSEINI:  In calendar days.

THE COURT:  If you cannot afford counsel, counsel will be appointed for you to represent on appeal.  I know you have some appellate issues that you may want to raise that you preserved also with respect to your post-trial briefs.  And if you wish to do so, you absolutely should do so.

THE DEFENDANT:  Thank you, Your Honor.

MS. HOSSEINI:  And lastly, Your Honor, if Your Honor could ask if Mr. Gessen has seen the standard conditions and reviewed them, they're the last page in the PSR.

MS. MITCHELL:  Your Honor, I could say that I've reviewed them all with Mr. Gessen and he is aware of what the standard conditions are.

THE COURT:  Okay.

MS. MITCHELL:  We would, of course, for the purposes of the appeal, object to the procedural and substantive sentence that imposed -- make an objection on procedural and substantive grounds for the sentence imposed.

And Mr. Gessen would request placement at FCI Otisville, if the Court could make that request.

THE COURT:  Do you think it helps or hurts if I make that request?

**MS. MITCHELL:**  I think it would actually help.  We have a specific -- because Mr. Gessen, his -- because he was sentenced here, there is -- we want to make sure that the BOP is decidedly aware of the fact that Mr. Gessen's residence is actually in Boston, that Otisville would be within 500 miles of that residence, and that would be the preferred facility for a number of reasons.

**THE COURT:**  Yes.  Okay.  So I will recommend that he be housed at FCI Otisville.

**MS. MITCHELL:**  And if the Court could include in the judgment part of that reason is for religious consideration, that might mean that Mr. Gessen does actually get placed there.

**THE COURT:**  Yes.  And I believe there are religious considerations that would warrant such placement.

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  All right.  Thank you, everyone, for your presentations today.

And thanks to probation as well for your thorough order.

And good luck.

**MS. MITCHELL:**  Thank you, Your Honor.

**THE DEFENDANT:**  Thank you, Your Honor.

**THE PROBATION OFFICER:**  Thank you, Your Honor.

**MS. HOSSEINI:**  Thank you, Your Honor.

(Proceedings adjourned at 11:25 a.m.)

---oOo---

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Thursday, May 30, 2024




_____

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter